# EXHIBIT 17

[redacted]

[redacted]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

BECKMAN COULTER, INC.,

Plaintiff,

v.

CYTEK BIOSCIENCES, INC.,

Defendant.

C.A. No. 22-945-CFC-EGT

**REBUTTAL EXPERT REPORT OF JAMES F. LEARY, PH.D.
REGARDING NON-INFRINGEMENT OF
U.S. PATENT NOS. 10,330,582; 11,703,443; and 12,174,107**

Dated: 1/20/2026

James F. Leary, Ph.D.

[redacted]



## VII. LEGAL FRAMEWORK

22. I am neither an attorney nor a legal expert. The legal standards I applied in reaching the opinions I present throughout this Report were provided to me by counsel for Cytek. In preparing my Report, I have tried to faithfully apply these legal standards to the matters that I address. I do not intend to offer opinions on the law. Below, I will describe the law I applied in considering whether the Asserted Claims have been shown to be infringed by Drs. Houston and Schaafsma.

### A. Infringement Principles

23. I have been informed that Plaintiff bears the burden of proving infringement by a preponderance of the evidence. I understand that proving infringement requires showing that each and every element of an asserted claim is present in the accused product or method. I understand that, if an accused product does not implement even a single element of a claim, there is no infringement of that claim.

24. I understand that the determination of infringement is a two-step process. I understand the first step of the process is to construe the meaning of claim terms in dispute as would have been understood by a person of ordinary skill in the art ("POSA") (*see* Section IX), which is a legal matter for the Court. My approach to claim construction is described below in Section VIII.

25. I understand that the second step in the infringement analysis is to

[redacted]



compare the properly construed claims to the Accused Products (or methods, if applicable, which is not the case here since no asserted claims recite methods). It is my understanding that infringement of a patent claim occurs when every element of a properly construed patent claim is present in the accused products or methods, either literally or by application of the doctrine of equivalents.

26. *Literal Infringement.* I understand that a claim element is literally present if an accused product has each and every limitation of the claim exactly as recited in the claim. For a means-plus-function limitation (see Section VIII), I understand an accused product must (1) perform the identical function(s) recited in the claim limitation and (2) perform that function(s) using the structure disclosed in the specification or a structural equivalent.

27. *Infringement Under the Doctrine of Equivalents.* I understand that a claim element is present under the doctrine of equivalents if any differences between the claimed element and the identified "equivalent" are insubstantial. I understand one way to determine if the differences are insubstantial is to analyze whether the element of the accused product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed element. A factor that may be considered to determine whether the equivalent of a claim element is present in the accused product is to consider whether or not persons of ordinary skill in the art would consider the two to be interchangeable.

[redacted]



28. I also understand that infringement under the doctrine of equivalents can be barred under certain circumstances. First, prosecution history estoppel bars the patent owner from setting forth a theory of infringement under the doctrine of equivalents if that theory would amount to recapturing subject matter that was clearly and unmistakably surrendered during prosecution to secure claim allowance. Second, ensnarement bars the patent owner from asserting a theory of infringement under the doctrine of equivalents if that theory would encompass, or "ensnare," the prior art. Lastly, a patent owner may not set forth an infringement theory under the doctrine of equivalents that broadens the meaning of the claim element so much that it would vitiate the claim limitation, or essentially render the element meaningless.

### B. Direct and Indirect Infringement

29. I understand from counsel that a person or entity directly infringes a patent claim under 35 U.S.C. § 271(a) by making, using, offering to sell or selling in the United States, or importing into the United States, a product meeting all the limitations of the claims.

30. It is my understanding that when a defendant participates in or encourages infringement, but does not itself directly infringe a patent, the defendant may be found liable for indirect patent infringement. The two types of indirect patent infringement are referred to as induced and contributory infringement. It is further my understanding that both types of indirect patent infringement require, as a

[redacted]



predicate, a finding that someone has committed or will commit an act of direct infringement in the United States.

31. I understand that a defendant is liable for induced infringement under 35 U.S.C. § 271(b) when it knows of the patent; knowingly aids, instructs, encourages, promotes, or recommends infringement, with the intent to cause another party to commit acts that would constitute direct infringement of the patent, and when that other party directly infringes the patent.

32. I understand that a defendant is liable for contributory infringement under 35 U.S.C. § 271(c) when (i) it knows of the patent, (ii) it will sell or offer to sell a product that is a material part of the patented invention, knowing that it will be used in practicing a patent, and (iii) the product has no substantial non-infringing uses.

33. I understand that under 35 U.S.C. § 271(f)(1) and (2), a company can be liable for patent infringement if it ships components of a patented invention overseas to be assembled there, according to the following statutory language:

> (1) Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.
>
> (2) Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is

[redacted]


> especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

I understand that under § 271(f)(1) liability attaches if all components of a patented invention or a substantial portion of the components of a patented invention are supplied from the United States for combination outside the United States into the patented invention. I understand that the phrase "substantial portion" of the components of a patented invention refers to a quantitative measure, not a qualitative measure, and that a single component of a patented invention can never constitute a "substantial portion" so as to trigger liability. I understand that under § 271(f)(2), liability attaches if any component of a patented invention is supplied from the United States and the statutory requirements are met.

### C. Willful Infringement

34. I have been informed by counsel that "willful" infringement requires that the plaintiff prove by a preponderance of the evidence that the infringer both knew of the patent and specifically intended to infringe the patent. I understand that infringement is not willful if the party found to be infringing had a reasonable basis to believe that the patent claims are invalid or not infringed.

### D. Indefiniteness

35. I have been informed by counsel that a patent claim is invalid as indefinite if the claim, as read in light of the specification delineating the patent, and the prosecution history, fails to inform a POSA, with reasonable certainty, about the scope of the invention. I also have been informed by counsel that a claim term does not become reasonably certain simply because a POSA, when pressed, might manage to articulate a definition for it. I understand that showing that a POSA cannot recognize the scope of a claim term with reasonable certainty requires showing considerably less uncertainty than showing that a POSA could not understand the claim term at all.

36. I also have been informed by counsel that a claim limitation that is subject to a means-plus-function construction may also be found indefinite if the patent's specification does not disclose sufficient structure for performing the claimed function(s) (as further noted in Section VIII).

## VIII. CLAIM CONSTRUCTION

37. I understand that the Court has issued claim construction rulings. Counsel has reproduced the Court's claim construction rulings related to the Asserted Claims below for ease of reference. I have applied these constructions in reaching my opinions. Where a claim construction has not been provided, with the exception of the terms "collimating optical element" and "focusing optical element"

| Claim Term | Construction |
|---|---|
| "portion" ('582 patent, cls. 1, 3; '443 patent, cl. 1; '107 patent, cls. 1, 5, 16, 21) | "subset of the spectrum of wavelengths of light" (Sep. 17, 2025 Hr'g Tr. at 92:23-24.) |

### B. Additional Means-Plus-Function Terms

38. I understand from counsel that a "means-plus-function" claim in patent law describes a claim element by function rather than by structure. I also understand that a claim term that does not include the word "means" is presumed to not be a means-plus-function term, but that this presumption is not strong and such term can still be a means-plus-function term if the claim term does not provide sufficient structure for performing the claimed function. I understand from counsel that nonce terms like "element" do not connote sufficient structure for performing the claimed function.

39. I understand that a claim limitation that is subject to means-plus-function construction will be construed to encompass the structures in the specification that are sufficient and clearly linked to performing the claimed function(s) (and structural equivalents).

40. I also understand that a claim limitation that is subject to a means-plus-function construction may also be found indefinite if the patent's specification does not disclose sufficient structure for performing the claimed function.

[redacted]



### 1. "Collimating Optical Element"

| Claim Term | Cytek's Proposed Construction | Beckman's Proposed Construction |
|---|---|---|
| "collimating optical element" ('582 patent, cls. 1, 6) | **Function**: (1) receive light from a light source; and, (2) project a "collimated beam<br><br>**Structure:** Indefinite<br><br>Alternatively, achromatic doublet lens 902 (and structural equivalents) at a focal distance from a light source | *Alternatively, if means-plus function:*<br><br>**Function**: (1) receive light from a light source; (2) project a collimated beam<br><br>**Structure**: a lens, such as an achromatic doublet lens, and structural equivalents thereof |
| "collimating optical element" ('582 patent, cl. 20) | **Function**: (1) receive light from a light source; and, (2) project a first image<br><br>**Structure:** Indefinite<br><br>Alternatively, achromatic doublet lens 902 (and structural equivalents) at a focal distance from a light source | *Alternatively, if means-plus function:*<br><br>**Function**: (1) receive light from a light source; (2) project a first image<br><br>**Structure**: a lens, such as an achromatic doublet lens, and structural equivalents thereof |
| "collimating optical element" ('582 patent, cls. 1, 6, 20) | Alternatively, if not construed as means-plus-function: "an optical component at a focal distance from a light source that projects a 'collimated beam' centered on the optical axis such that a 'portion of the collimated beam' is projected onto a first focusing optical element, and another 'portion of the collimated beam' is projected onto a first optical | No construction necessary; plain and ordinary meaning.<br><br>*That is*: an optical element, such as a lens, mirror, or grating, to render rays of light more nearly parallel; a collimator |

[redacted]



| Claim Term | Cytek's Proposed Construction | Beckman's Proposed Construction |
|---|---|---|
| | relay element," otherwise indefinite | |

41. For the claim term "**collimating optical element**," I understand the Court deferred construing the term and noted that Cytek was prejudiced by Beckman not following the Court's Scheduling Order requiring pinpoint citations on briefing. (Sep. 17, 2025 Hr'g Tr. at 3:15-4:9; 195:14-206:15.) I understand that, at the first claim construction hearing on August 21, 2025, the Court construed "optical element" as a means-plus-function term and stated that the other "optical element" terms – including "collimating optical element" – would also involve an assessment of means-plus-function construction:

**MR. KHAN:** And then for the other optical element terms.
**THE COURT:** Yep.
**MR. KHAN:** And each claim, optical element, collimating optical element, collecting optical element, focusing optical element.
**THE COURT:** You need to identify corresponding structure.
**MR. KHAN:** Corresponding structure.
**THE COURT:** Right. I think that's right.
I mean, is there anything...
And the reason why, to the extent you've already done that in the briefing, I think you need to... I'm giving you the opportunity to rethink. You know now which way I've ruled. I mean, I've said it's means-plus-function. So, you know...

42. (Aug. 21, 20205 Hr'g Tr. at 192:12-24.) I understand that, at the second claim construction hearing on September 17, 2025, the Court was not able to reach

the parties' dispute on "collimating optical element." (Sep. 17, 2025 Hr'g Tr. at 3:16-4:9; 195:14-206:15.) I understand that the Court ordered Beckman to narrow the number of asserted claims and noted: "Well, then, ideally neither of those two terms ["collimating optical element" and "collecting optical element"] would be in the 16 asserted claims. Because then they are not prejudiced." (*Id.* at 205:5-7.) I understand that Beckman nonetheless has maintained Asserted Claims that claim a "collimating optical element."

43. I understand that Cytek has taken the position that the term "collimating optical element" is subject to means-plus-function claiming, and that the term is indefinite because the specification does not disclose sufficient structure for performing that function. I have also reviewed Dr. Ilkov's Opening Invalidity Report, and his opinion that "collimating optical element" is indefinite because no focal length is specified in the specification and there is insufficient structure disclosed in the specification for performing the functions corresponding to the "collimating optical element" within claims 1 and 20 of the '582 patent. (*See* Ilkov Op. Rep., Section XV.I.2.) In fact, the lack of sufficient structure for the claimed "collimating optical element" as it relates to where the light source needs to be placed relative to the focal length of the lens to perform the claimed functions was effectively admitted by Dr. Schaafsma in his Reply Declaration during claim construction. There, Dr. Schaafsma expressly noted that "a POSA would understand

[redacted]



Figure 25 does not provide any specific dimensions or suggest any given scale. This is because Figure 25 does not include a scale bar, dimensions, or any other indication that it is intended to be of scale." (D.I. 117-11 ("Schaafsma Reply Decl."), ¶68.) Hence, the specification of the Asserted Patents provides insufficient structure that corresponds to performing the ambiguous functions of "projecting a collimated beam" or "projecting a first image" (particularly considering the Court has construed "image" to include a real image and an "afocal image").[4] I have also reviewed Dr. Ilkov's declarations in connection with claim construction of the term "collimating optical element" and "collimated beam." (*See* D.I. 115-27, Ex. 28 ("Ilkov Answering Decl."), Sections VI.B, VI.E; D.I. 117-36, Ex. 90 ("Ilkov Sur-Reply Decl."), Sections VI.C, VI.F.) As discussed below, I agree.

44. The term "collimating optical element" is not a widely used and understood category of optical components such that a POSA would understand what this term is referring to. (*See* Ilkov Answering Decl., ¶¶106-11; Ilkov Sur-Reply Decl., ¶45.) Therefore, I disagree with Dr. Shcaafsma's opinion that a POSA "would know from basic optics which lenses, mirrors, and gratings are collimating optical elements and would also call this category of optical components 'collimators.'" (Schaafsma Rep., ¶105.)

45. Additionally, Claim 1 of the '582 patent requires "the collimating

[4] I understand the Court deferred the issue of whether "image" is indefinite.

[redacted]



optical element is configured to project a collimated beam" (emphasis added), but the disclosure in the specification states: "As depicted in FIG. 25, a collimating optical element, in this case an achromatic doublet lens 902, may capture the light source 901, and project a *magnified image* of the object near a final focusing lens 905. The size of the image near 905 may be kept approximately the same as the effective size of the collimating optical element 902." ('582 patent at 44:58-63 (emphasis added).) In my opinion, a POSA would not understand this passage on projecting a *magnified image* and the size of the image near 905 being kept approximately the same size as the collimating optical element 902 to teach sufficient structure to perform the claimed function "to project a collimated beam." In the next sentence, the specification goes on to state, in conclusory fashion: "Consequently, beam of light propagating between the collimating optical element 902 and the focusing lens 905 may be *effectively* collimated." ('582 patent at 44:63-66 (emphasis added).) Notably, claim 1 does not recite projecting an "effectively collimated beam," but instead projecting a "collimated beam." In any event, nothing in the disclosure of the specification teaches to a POSA sufficient structure for projecting a collimated beam, as Dr. Ilkov's Opening Invalidity Report further explains. (*See* Ilkov Invalidity Rep., Section XV.I.2.ii.)

46. Claim 20 of the '582 patent requires "the collimating optical element configured to project a first image." I understand that Beckman takes the position

[redacted]



that a "collimating optical element" can project a "collimated afocal image." Notably, claim 20 recites projecting an "image" not a "collimated afocal image." In any event, there is no disclosure within the specification of any structure for the "collimating optical element" that projects either a real "image" or a "collimated afocal image," as Dr. Ilkov's Opening Invalidity Report further explains. (*See id.*, Section XV.I.2.iii.)

47. However, even if not indefinite, a "collimating optical element" should be limited to the achromatic doublet lens 902 (and structural equivalents) at a focal distance from a light source. As explained above, the achromatic doublet lens is the only structure disclosed in the specification associated with the term "collimating optical element." This is supported by the file history of related U.S. Patent No. 12,174,106 (the "'106 patent") where Beckman pointed out to the Patent Office what it considered to be the "collimating optical element":



FIG. 25

(BEC-CYTEK-00004404 at -4819 ('106 patent file history (July 18, 2024 Response to Final Office Action Sent May 2, 2024), 14) (annotations in original).) Notably, applicant's response echoes a June 12, 2024 examiner interview summary in which the examiner expressly noted that the applicant's disclosure describes "a collimating optical element" as an "achromatic doublet lens 902." (*Id.* at -4797 (June 12, 2024 Examiner Interview Summary Record Sent June 17, 2024, 1).) Dr. Houston's report, in fact, also points to this portion of the '106 file history. (Houston Rep., ¶382.)

48. I also understand that Beckman previously proposed during the claim construction proceedings in this case that the corresponding structure for

[redacted]



"collimating optical element" is "a lens, such as an achromatic doublet lens, or structural equivalents thereof." However, Drs. Houston and Schaafsma have departed from Beckman's prior position and now also state that "mirrors" are also corresponding structure. (*See, e.g.*, Houston Rep., ¶¶421-424; Schaafsma Rep., ¶¶201-203.) Their opinions ignore that for both claim 1 and claim 20 of the '582 patent, the recited functions include "to receive light from a light source."

49. The claimed "collimating optical element" in claim 1 needs to perform two recited functions: "a collimating optical element arranged [1] to receive light from a light source, the collimating optical element configured [2] to project a collimated beam."

50. The claimed "collimating optical element" in claim 20 needs to perform two recited functions: "a collimating optical element arranged [1] to receive light from a light source, the collimating optical element configured [2] to project a first image."

51. The "mirrors" disclosed in the specification, at minimum, do not perform the first function "to receive light from a light source." Therefore, in my opinion, the "mirrors" are not sufficient structure and not corresponding structure for the claimed "collimating optical element"; they do not receive light from the light source, but rather from a filter.

52. Claim 20 of the '582 patent further requires "the collimating optical

[redacted]



element configured to project a first image" (emphasis added). I understand that Beckman takes the position that a "collimating optical element" can project a "collimated afocal image". Notably, claim 20 recites projecting an "image" not a "collimated afocal image." In any event, there is no disclosure within the specification of any structure for the "collimating optical element" that projects either a real "image" or a "collimated afocal image," as Dr. Ilkov's Opening Invalidity Report further explains. (*See* Ilkov Op. Rep., Section XV.I.2.iii.)

53. Finally, even if not construed as means-plus-function, I agree with Cytek's alternate construction, which includes the requirement of a focal distance: "an optical component at a focal distance from a light source that projects a 'collimated beam' centered on the optical axis such that a 'portion of the collimated beam' is projected onto a first focusing optical element, and another 'portion of the collimated beam' is projected onto a first optical relay element."

54. For the reasons discussed below concerning claim 1 of the '582 patent, I disagree with Dr. Schaafsma that the Accused Products comprise a "collimating optical element" or a "collimated beam" under either party's construction.

### 2. "Focusing Optical Element"

| Claim Term | Cytek's Proposed Construction | Beckman's Proposed Construction |
|---|---|---|
| "focusing optical element" | **Function**: (1) receive at least a portion of the collimated beam reflected by the optical relay | *Alternatively, if means-plus-function:* |

[redacted]



| Claim Term | Cytek's Proposed Construction | Beckman's Proposed Construction |
|---|---|---|
| ('582 patent, cl. 1) | element; and, (2) focus the portion of the collimated beam from the optical relay element onto a semiconductor detector<br><br>**Structure:** focusing lens (and structural equivalents) that is of a size that captures all light rays of the at least a portion of a collimated beam | **Function**: (1) receive at least a portion of the collimated beam reflected by the optical relay element; and, (2) focus the portion of the collimated beam from the optical relay element onto a semiconductor detector<br><br>**Structure:** a lens and structural equivalents thereof |
| "focusing optical element" ('582 patent, cl. 3) | **Function**: (1) receive at least a portion of the collimated beam reflected by the optical relay element; (2) focus the portion of the collimated beam from the optical relay element onto a semiconductor detector; and (3) focus the portion of the collimated beam received from the optical relay element to a size smaller than 1 millimeter in diameter<br><br>**Structure:** focusing lens (and structural equivalents) that is of a size that captures all light rays of the at least a portion of a collimated beam | *Alternatively, if means-plus-function:*<br><br>**Function**: (1) receive at least a portion of the collimated beam reflected by the optical relay element; and, (2) focus the portion of the collimated beam from the optical relay element onto a semiconductor detector<br><br>**Structure:** a lens and structural equivalents thereof |
| "focusing optical element" ('582 patent, cl. 26) | **Function**: focus the light from the optical relay element to a size smaller than the object of the light source to a first semiconductor detector<br><br>**Structure:** focusing lens (and structural equivalents) that is of | *Alternatively, if means-plus-function:*<br><br>**Function**: focus the light from the optical relay element to a size smaller than the object of the light source to a first semiconductor detector |

| Claim Term | Cytek's Proposed Construction | Beckman's Proposed Construction |
|---|---|---|
| | a size that captures all light rays of the at least a portion of a collimated beam | **Structure:** a lens and structural equivalents thereof |
| "focusing optical element" | Alternatively, if not construed as means-plus-function: "lens that is of a size that captures all light rays of the at least a portion of a 'collimated beam' and projects a focused beam," otherwise indefinite | No construction necessary; plain and ordinary meaning.<br><br>*That is*: an optical element, such as a lens, mirror, or grating to converge light |

55. I understand that Cytek has taken the position that the term "focusing optical element" is subject to means-plus-function claiming, and that the term should be construed as a "focusing lens that is of a size that captures all light rays of the at least a portion of a collimated beam." As discussed below, I agree.

56. The specification identifies a "focusing lens" as performing the recited functions of the claimed "focusing optical element." (*See* '582 patent, 44:58-45:7, 45:38-54, 46:17-27, 47:15-21, FIG. 25, FIG. 25A, FIG. 27, FIG. 28.) A POSA would understand that a "focusing lens" focuses light, fulfilling one of the functions.

57. Regarding size, in FIG. 25, the focusing lens 905 (shown as a plano-convex lens) and the collimating optical element 902 are shown to be about the same size. Those two structures are also depicted to be about the same size in Figures 27 and 28. (*Id.*, FIGs. 25, 27, 28.)

[redacted]






FIG. 25

(*Id.*, FIG. 25 (annotated).)

58. In addition, the specification explains that the collimating optical element "project[s] a magnified image of the object near a final focusing lens **905**" and that "[t]he size of the image near **905** may be kept approximately the same as the effective size of the collimating optical element **902**." (*Id.*, 44:60-63.)

59. As discussed in this Report, and as previously explained by Dr. Ilkov (*See, e.g.*, Ilkov Opening Rep., ¶¶91-93, 890-899, 911-926, 1040-1053), the '582 patent only supports separating a collimated beam into distinct color bands (as explained this is wavelength division demultiplexing) while maintaining substantially the same beam size throughout the relay architecture. In this way, a

[redacted]



POSA would understand that the "focusing optical element" of claim 1 must be "of a size that captures all light rays of the at least a portion of a collimated beam," given that claim 1 recites "collimating optical element configured to project a collimated beam" and an "optical relay element arranged to receive at least a portion of the collimated beam from the collimating optical element" and then "reflect the portion of the collimated beam." Claim 1 further recites "a first focusing optical element" then "receive[s] at least a portion of the collimated beam reflected by the optical relay element[,]" "wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element onto the first semiconductor detector." In other words, because a collimated beam maintains its beam size over a given distance, the focusing optical element must have a diameter at or greater than the diameter of a collimating optical element to accomplish receiving a portion of the collimated beam from the optical relay element and focusing the portion of the collimated beam onto the first semiconductor detector.

60. In addition, as discussed in this Report, and as previously explained by Dr. Ilkov (*See, e.g.*, *id.*, ¶¶91-93, 890-99, 911-26), the '582 patent only supports a "WDM" (despite the misnomer as discussed further in my discussion of claim 1(c) of the '107 patent below) where the light received from the optical relay element is of substantially the same beam size as the light projected by the collimating optical

[redacted]



element. In this way, a POSA would understand that when the "focusing optical element" of claim 26 is required to focus *the* light, that in turn requires that the "focusing optical element" have a diameter at or greater than the collimating optical element in order to capture all light rays of the at least a portion of a collimated beam.

61. Even if not construed as means-plus-function, I agree with Cytek's alternate construction: "lens that is of a size that captures all light rays of the at least a portion of a 'collimated beam' and projects a focused beam" as this is consistent with the scope of "focusing optical element" in the specification.

62. Finally, although I provide my opinion above on the claim construction for "focusing optical element," my non-infringement opinions on claim elements containing the term "focusing optical element" apply whether Cytek's proposed construction or Beckman's proposed construction is adopted. This is because the claim elements containing the term "focusing optical element" include additional requirements that are not infringed (e.g., claim 1(d) of the '582 patent recites "a first focusing optical element arranged to receive at least a portion of the collimated beam reflected by the optical relay element"), as further described in Section XIV.C.1.

63. If the Court issues any revised or additional orders regarding claim construction of any terms in the '582 patent, '443 patent, and '107 patent, I reserve the right to supplement or otherwise modify my opinions in response to said orders.

[redacted]



### B. The Accused Products Employ Spectral Technology

135. All of the Accused Products use Cytek's "Full Spectrum Profiling™ (FSP®)" technology, which measures the entire emission spectra of the fluorescent dyes excited by the instrument's lasers. This technology enables distinguishing between fluorophores' overlapping peak emissions, and thus enabling use of panels of up to 40 colors demonstrated.

136. I have reviewed Dr. Weigl's description of conventional vs. spectral flow cytometry, including the spectral operation of the Accused Products, and incorporate that description here by reference. (*See* Weigl Op. Rep., Section VII.B; *see also* CYTEK_0000008312.)

### C. The Accused Products Propagate Light Through the Relay Architecture By Initially Focusing the Light and then Alternatively Diverging and Converging the Light As it Travels Through the Relay Architecture

137. The Accused Products include a detector array paired to each laser. (CYTEK_0000034668 at -670.) As discussed in more detail below, and as demonstrated by the Zemax modeling that Dr. Ilkov has conducted, it is clear that [redacted].

### D. The Accused Products Use Bandpass Filters, Not Dichroic Filters

138. The Accused Products do not use dichroic filters but instead rely on a series of bandpass filters to separate, transmit, and reflect light across an optical relay

[redacted]



system. As I explain below, dichroic filters and bandpass filters are distinct optical elements, with distinguishable optical properties and functions. I also understand that Dr. Weigl offered opinions concerning the lack of written description support and full scope enablement for "filter," as claimed by the '443 and '107 patents, where he addresses the differences between bandpass and dichroic filters. (*See* Weigl Op. Rep., Section VIII.E.) I have reviewed Dr. Weigl's analysis, and I agree and incorporate his opinions regarding the differences between bandpass and dichroic filters, including within the context of conventional flow cytometry.

139. Dichroic filters (also called "beamsplitters") are optical elements configured to spatially separate a light beam into two spectral bands based on a wavelength cutoff, wherein one band is reflected and another is transmitted through the filter.[7] Indeed, the term "dichroic" is rooted in the Greek words "di-," meaning "two" or "double," and "-chroic," meaning color.[8] There are two categories of dichroic filters: long pass and short pass. Long pass filters are those that transmit light above a specific wavelength, while reflecting light below that wavelength. Short pass filters are those that transmit light below a specific wavelength, while

---

[7] KUPO Optics, *Optical Filters Explained: A Practical Guide to Bandpass, Dichroic, and Long-Pass* (June 30, 2025), https://www.kupooptics.com/en/blogs/optics-playbook/optical-filters-bandpass-dichroic-longpass.

[8] Oxford English Dictionary, *dichroic* (last visited Jan. 19, 2026), https://doi.org/10.1093/OED/4964162278.

[redacted]



reflecting light above that wavelength.[9] For example, a 650 long pass (LP) dichroic filter transmits light above 650 nm and reflects light below 650 nm while a 650 short pass (SP) dichroic filter transmits light below 650 nm and reflects light above 650 nm. Dichroic filters are typically configured for use at an angle of incidence of forty-five degrees to reflect non-transmitted light at ninety degrees as compared with the light that is transmitted through the filter.[10] In flow cytometry, dichroic filters are typically used to route light, using a wavelength cutoff to reflect and transmit light at certain wavelengths based on that cutoff.

140. Bandpass filters (also called "emission filters") are angle-sensitive optical elements configured to transmit a band of light around a center wavelength, while blocking light outside of that range.[11] The light that is not transmitted by a bandpass filter may be absorbed or reflected depending on specific configurations. For example, a 650/50 bandpass filter will transmit light between 625 and 675 nm

---

[9] KUPO Optics, *Optical Filters Explained: A Practical Guide to Bandpass, Dichroic, and Long-Pass* (June 30, 2025), https://www.kupooptics.com/en/blogs/optics-playbook/optical-filters-bandpass-dichroic-longpass; Katherine M. McKinnon, *Flow Cytometry: An Overview*, Current Protocols in Immunology, 120:5.1.1-5.1.11 (2018) ("McKinnon"), 5.1.2.

[10] *KUPO Optics, Optical Filters Explained: A Practical Guide to Bandpass, Dichroic, and Long-Pass (June 30, 2025), https://www.kupooptics.com/en/blogs/optics-playbook/optical-filters-bandpass-dichroic-longpass*.

[11] KUPO Optics, *Optical Filters Explained: A Practical Guide to Bandpass, Dichroic, and Long-Pass* (June 30, 2025), https://www.kupooptics.com/en/blogs/optics-playbook/optical-filters-bandpass-dichroic-longpass; McKinnon, 5.1.2.

[redacted]



(i.e., a 50 nm passband comprising 25 nm above and below 650 nm). These boundaries are actually specified by the 50 percent transmittance point on a spectral curve describing the performance of the filter. Bandpass filters rely on constructive and destructive interference to transmit light around a center wavelength (constructive interference) and blocking light outside of that passband (destructive interference).[12] Given the angle sensitivity of bandpass filters, variations in the angle of incidence may materially affect the passband range, thereby yielding undesirable changes in the passband range.[13] Because bandpass filters are typically used to ensure detectors receive a target band of light, changes in the passband range would result in undesirable spillover between detector channels.

141. Spillover between detector channels is especially problematic in the context of conventional flow cytometers given the more limited compensation analysis that is enabled. This is why conventional flow cytometers typically rely on additional optical elements, such as dichroic filters, to provide additional layers of filtering prior to directing light to bandpass filters, which in turn transmit a specific wavelength to a detector so that individual fluorochrome can be detected and measured.[14] (Weigl Op. Rep. ¶120 (citing U.S. Patent No. 5,317,162 to Bertram G.

---

[12] Thorlabs, *Bandpass Filter Tutorial* (last visited Jan. 19, 2026), https://www.thorlabs.com/bandpass-filter-tutorial?tabName=Bandpass%2520Filter.
[13] *Id.*
[14] McKinnon, 5.1.2.

[redacted]



Pinsky et al. ("Pinsky"), FIG. 1; World Patent No. WO 2010/101623 A1 to Michael Thomas ("Thomas"), FIG. 2; Canadian Patent No. 2 771 324 to Paul Patt ("Patt"), FIG. 7; '582, FIG. 25).)

142. Thus, dichroic filters and bandpass filters are not equivalent. Dichroic filters mainly operate as routing light beam splitters, separating light into two bands based on a wavelength cutoff wherein one band is transmitted, and the other is reflected. Indeed, dichroic filters are characterized by their wavelength cutoff, with high reflection and transmission efficiency. In contrast, bandpass filters transmit light of a specific wavelength range and are characterized by high transmission across the central passband coupled with strong blocking elsewhere. These properties are shown in the figure below, which illustrates dichroic filters used to transmit and reflect light at different wavelengths (shown as different colors), with bandpass filters used to filter a target wavelength range for detectors (here, PMTs):

[redacted]



Lynnea Waters, *Demystifying the Flow Cytometry Optics System: A Peek Under the Hood*, BiteSize Bio (last updated Jan. 14, 2025), https://bitesizebio.com/31638/flow-cytometry-optics-system/




143. Thus, while both dichroic filters and bandpass filters can be used for light separation, the type of light separation achieved by each is materially distinct, with bandpass filters being uniquely effective for selecting a particular wavelength range that reaches a sensor.

## E. The Accused Products Use Microlenses, Not Mirrors

144. The Accused Products do not use mirrors to manipulate light from and to the array of filters located on the opposite side of the glass optical block within the relay architecture. Rather, the Accused Products use microlenses, to which a

[redacted]



in conjunction with other components of the optical block assembly of the relay module would be understood not to simply reflect light (as a mirror does) but also to refract light (as a lens does), causing chromatic effects.

## XIV. BECKMAN COULTER FAILS TO SHOW INFRINGEMENT BY A PREPONDERANCE OF THE EVIDENCE

### A. Beckman Has Failed to Demonstrate the Accused Products Meet All Limitations of the '107 Asserted Claims

149. In my opinion, the Accused Products do not infringe the '107 Asserted Claims (claims 5, 16, 18, 26, 27 and 29).

150. I understand that claim 5 depends from each of claims 1, 2 and 3, and thus includes all elements of claims 1, 2, and 3, in addition to the elements of claim 5. I reproduce below claims 1, 2, 3, and 5 of the '107 patent with individual elements broken down (a, b, c, d, etc.,) as identified in Dr. Houston's report:

> **(1a)** 1. A flow cytometer comprising:
> **(1b)** an optical fiber; and
> **(1c)** a wavelength division multiplexer (WDM) configured to receive light from the optical fiber, wherein the WDM comprises:
> **(1d)** an array of mirrors;
> **(1e)** an array of filters; and
> **(1f)** an array of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters in the array of filters;
> **(1g)** wherein each of the filters in the array of filters is configured to receive light such that: a portion of the light passes through the filter; and another portion of the light is reflected; and
> **(1h)** wherein each of the mirrors in the array of mirrors is configured to: receive light reflected by a filter in the array of filters; and reflect light to another filter in the array of filters.
>
> **(2a)** 2. The flow cytometer of claim 1, wherein:

[redacted]



**(2b)** the array of mirrors is substantially linear;
**(2c)** the array of filters is substantially linear; and
**(2d)** the array of APDs is substantially linear.

**(3a)** 3. The flow cytometer of claim 2, wherein
**(3b)** at least one of the mirrors in the array of mirrors is a concave mirror.

**(5a)** 5. The flow cytometer of claim 3, wherein
**(5b)** the WDM is configured such that a portion of an optical path between the array of mirrors and the array of filters forms a zig-zag pattern.

151. The elements of claims 1, 2, 3, and 5 of the '107 patent that in my opinion Drs. Houston and Schaafsma have not demonstrated are present in the Accused Products, either literally or under the doctrine of equivalents are as follows, and explained in more detail below: 1(c), 1(d), 1(e), 1(f),1(h), 2(b), 2(c), 2(d), and 3(b).

152. I understand Dr. Ilkov opined that the '107 patent's specification discloses a conventional flow cytometer and fails to provide written description support for, and fails to enable the use of, a "flow cytometer," that performs spectral flow cytometry. (Ilkov Op. Rep., Section XV.A) The Accused Products are spectral flow cytometers, and thus are not within the scope of asserted claim 5. (*Id.*) The Accused Products are spectral flow cytometers, and thus are not within the scope of asserted claim 5. I also understand Dr. Ilkov has opined that the '107 patent's specification fails to provide written description support for, and fails to enable the use of, a "Wavelength Division Multiplexer (WDM)" (despite the misnomer) other

[redacted]



than with a collimating optical element that produces a collimated beam (or effectively collimated beam), propagating through the optical path. (Ilkov Op. Rep., ¶¶91-93, 890-899, 911-926.) I also understand that Dr. Ilkov has opined that the ’107 patent’s specification fails to provide written description support for, and fails to enable the use of, “light” other than a collimated beam (or effectively collimated beam), propagating through the optical path between the claimed “filters” and “mirrors.” (*Id.* at ¶¶91-93, 890-99, 1033.) The Accused Products make use of a converging and diverging beam, not a collimated beam, and thus are not within the scope of asserted claim 5. In addition, I understand that Dr. Weigl and Dr. Ilkov have opined that the ’107 patent’s specification fails to provide written description support for, and fails to enable the use of, “filters” other than “dichroic filters” for propagating a beam between the filters and the claimed mirrors. (Ilkov Op. Rep., ¶¶1034-1036; Weigl Op. Rep., ¶¶112-136.) The Accused Products use bandpass filters, not dichroic filters, and thus are not within the scope of asserted claim 5 for this additional reason.

153. I understand that asserted claim 16 is an independent claim, and that asserted claims 18, 26, 27 and 29 all ultimately depend from claim 16 and thus include all elements of claim 16. I understand that claim 18 depends from claim 17, and thus includes all elements of claims 17 and 16 in addition to the elements in claim 18 itself. I understand that claim 26 depends from claim 22, and thus includes

[redacted]



all limitations of claims 22, 21, 20, and 16, in addition to the elements in claim 26 itself. I understand that claim 27 depends from claim 26, and thus includes all elements of claims 26, 22, 21, 20 and 16, in addition to the elements of claim 27 itself. I understand that claim 29 depends from claim 28, and thus includes all elements of claims 28, 26, 22, 21, 20, and 16, in addition to the elements of claim 29 itself. I reproduce below claims 16, 17, 18, 20, 21, 22, 26, 27, 28, and 29 of the '107 patent with individual elements broken down (a, b, c, d, etc.) as identified in Dr. Houston's report:

> **(16a)** 16. A flow cytometer comprising:
> **(16b)** a flow cell configured to permit liquid to flow through the flow cell;
> **(16c)** a laser configured to project light into the flow cell;
> **(16d)** a multimode optical fiber configured to receive light from the flow cell; and
> **(16e)** a wavelength division multiplexer (WDM) configured to receive light from the multimode optical fiber, wherein the WDM comprises:
> **(16f)** a plurality of mirrors, wherein at least one of the mirrors is a concave mirror;
> **(16g)** a plurality of filters; and
> **(16h)** a plurality of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters of the plurality of filters;
> **(16i)** wherein each of the plurality of filters is configured to receive light such that: a portion of light passes through the filter; and another portion of light is reflected; and
> **(16j)** wherein each of the plurality of mirrors is configured to: receive light reflected by a filter of the plurality of filters; and reflect light to another filter of the plurality of filters.
>
> **(17a)** 17. The flow cytometer of claim 16,
> **(17b)** wherein the WDM further comprises: a plurality of focusing lenses,

[redacted]



**(17c)** wherein each of the plurality of focusing lenses is configured to focus light that passed through a filter of the plurality of filters to a spot on an APD of the plurality of APDs,
**(17d)** wherein the spot has a diameter that is smaller than a diameter of a core of the multimode optical fiber.

**(18a)** 18. The flow cytometer of claim 17,
**(18b)** wherein for each of the plurality of focusing lenses, the diameter of the spot is less than 1 mm.

**(20a)** 20. The flow cytometer of claim 16,
**(20b)** wherein the plurality of mirrors includes more than one concave mirror.

**(21a)** 21. The flow cytometer of claim 20,
**(21b)** wherein the WDM is configured such that a portion of an optical path between the plurality of mirrors and the plurality of filters forms a zig-zag pattern.

**(22a)** 22. The flow cytometer of claim 21,
**(22b)** wherein the laser is configured to emit blue light, yellow-green light, violet light, or ultraviolet light.

**(26a)** 26. The flow cytometer of claim 22, wherein:
**(26b)** the WDM further comprises a block comprising a first surface; and
**(26c)** each of the plurality of filters is coupled to the first surface of the block.

**(27a)** 27. The flow cytometer of claim 26,
**(27b)** wherein the flow cytometer is a benchtop flow cytometer.

**(28a)** 28. The flow cytometer of claim 26,
**(28b)** wherein the flow cytometer is compact.

**(29a)** 29. The flow cytometer of claim 28, wherein:
**(29b)** wherein the WDM is capable of detecting a substantially full spectrum of visible light.

154. The elements of claims 16, 20, 21, 22, 26, 27, 28 and 29 that in my opinion Drs. Houston and Schaafsma have not demonstrated are present in the

[redacted]



Accused Products, either literally or under the doctrine of equivalents are as follows, and explained in more detail below: 16(b), 16(d), 16(e), 16(f), 16(j) 17(b), 20(b), and 26(c).

155. I understand Dr. Ilkov opined that the '107 patent's specification discloses a conventional flow cytometer and fails to provide written description support for, and fails to enable the use of, a "flow cytometer," that performs spectral flow cytometry. (Ilkov Op. Rep., Section XV.A) The Accused Products are spectral flow cytometers, and thus are not within the scope of asserted claims 16, 20, 21, 22, 26, 27, 28 and 29. I understand Dr. Ilkov has opined that the '107 patent's specification fails to provide written description support for, and fails to enable the use of, a "Wavelength Division Multiplexer (WDM)" (despite the misnomer) other than with a collimating optical element that produces a collimated beam (or effectively collimated beam), propagating through the optical path. (Ilkov Op. Rep., ¶¶91-93, 890-899, 911-926.) I also understand that Dr. Ilkov has opined that the '107 patent's specification fails to provide written description support for, and fails to enable the use of, "light" other than a collimated beam (or effectively collimated beam), propagating through the optical path between the claimed "filters" and "mirrors." (*Id.* at ¶¶91-93, 890-99, 1033.) The Accused Products make use of a converging and diverging beam, not a collimated beam, and thus are not within the scope of asserted claims 16, 20, 21, 22, 26, 27, 28 and 29. In addition, I understand

[redacted]



that Dr. Weigl and Dr. Ilkov have opined that the ’107 patent’s specification fails to provide written description support for, and fails to enable the use of, “filters” other than “dichroic filters” for propagating a beam between the filters and the claimed mirrors. (*Id.* at ¶¶1034-1036; Weigl Op. Rep., ¶¶112-136.) The Accused Products use bandpass filters, not dichroic filters, and thus are not within the scope of asserted claims 16, 18, 26, 27 and 29 for this additional reason.

#### 1. Elements of Asserted Claim 5 Not Present in the Accused Products

156. I understand that claim 5 depends from each of claims 1, 2 and 3, and thus includes all elements of claims 1, 2, and 3, in addition to the elements of claim 5.

##### a. 1(c): “a wavelength division multiplexer (WDM) configured to receive light from the optical fiber, wherein the WDM comprises:”

157. In my opinion, claim limitation 1(c) is not present in the Accused Products because the Accused Products lack “a wavelength division multiplexer (WDM).”

158. Dr. Houston asserts that “the ’107 Patent describes ‘a Wavelength Division Multiplexing (WDM) system to separate a light beam into multiple colored bands’,” and that “[a] POSA would thus understand that reference to wavelength division multiplexing refers to ‘optically separating [e.g., demultiplexing] light received via the optical fiber into color bands.’” (Houston Rep., ¶137 (citing ’107

[redacted]



patent at 2:40-42, 2:62-65); *see also id.* at ¶130.) I note that the claim term at issue is "Wavelength Division Multiplexer (WDM)" and not "Wavelength Division Multiplexing." In my opinion, a POSA would understand that a "wavelength division multiplexer (WDM)," as recited in the claim, refers to an optical component that brings together rather than separates different wavelengths of light. In my opinion a POSA would interpret a "wavelength division multiplexer (WDM)" according to its plain meaning, which requires multiplexing, and would not interpret the term as encompassing a wavelength division demultiplexer – which performs an opposite function. To the extent, Beckman intended to claim a de-multiplexer, it should have claimed such a component. A POSA would undoubtedly understand a multiplexer to multiplex.

159. The Accused Products do not include a multiplexer and do not multiplex light, but rather include a demultiplexer and demultiplex light, and so do not meet limitation 1(c) of the '107 patent. There is no multiplexer optical component in the Accused Products. This is further reinforced when considering the natural laws of light. For example, fluorescence light, which includes one or more colors emitted from target cells, is gathered by the initial objective lens and contains a reproducible fraction of the total fluorescence light from the cells. This is just a free space capture of the fluorescence light and there is no need to perform a multiplex operation and accordingly, there is no multiplexer optical component

[redacted]



present to do that. The Accused Products, by standard fluorescence optics, performs the multiplexing operation without using a WDM optical component. There are many different ways this operation can be accomplished without using a WDM optical component. Any multiplexing that occurs in the Accused Products is simply the natural production and intermixing of different fluorescence colors during the laser excitation of the fluorophores. Hence, any multiplexing is due to the fundamental physics of light without the need of any optical component to "multiplex" and this natural multiplexing is done before any part of the entire optical train, including fiber optics, is involved. Without any optical multiplexer component present, there can be, by definition, no "wavelength division multiplexer (WDM)" in the Accused Products. By Beckman's own admission, a WDM must contain both multiplexing and de-multiplexing optical components. There is no multiplexing optical component of any kind in the Accused Products, and hence there is no WDM.

160. A POSA would understand the differences between "wavelength division multiplexing," "wavelength division de-multiplexing," a "wavelength division multiplexer," and a "wavelength division de-multiplexer." Wavelength division multiplexing is a method in which individual wavelengths are merged into a combined, single signal. *See e.g.,* Harry Newton, *Newton's Telecom Dictionary: the official dictionary of telecommunications* (1998) ("Newton") at 838 ("Wavelength Division Multiplexing (WDM): A way of increasing the capacity of

[redacted]



an optical fiber by simultaneously operating at more than one wavelength, and at as many as four wavelengths . . . In optical fiber communications, WDM is any technique by which two or more optical signals having different wavelengths may be simultaneously transmitted in the same direction over one strand of fiber, and then be separated by wavelength at the distant end.”). Wavelength division demultiplexing is a technique in which combined set of wavelengths are separated or split into individual wavelengths. *See e.g.*, Telecommunications: glossary of telecommunication terms (1997) at D-12 (“demultiplexing: The separation of two or more channels previously multiplexed; i.e., the reverse of multiplexing.”) A wavelength division multiplexer is the componentry that achieves multiplexing and a wavelength division demultiplexer is the componentry that achieves demultiplexing. *See e.g.*, Newton at 497 (“Multiplexer: Electronic equipment which allows two or more signals to pass over one communications circuit”); *Id.* at 222 (“Demultiplexer: A device that pulls several streams of data out of a bigger, fatter or faster stream of data.”).

161. During their depositions, Cytek’s CEO and CTO repeatedly emphasized [redacted]. (W. Jiang Dep. Tr. at 63:14-20 [redacted]

[redacted] *id.* at 362:10-18 [redacted]; M. Yan Dep. Tr. at 343:9-13 [redacted]

162. The optical engineer who played a role in designing the Accused Products, Jay Hsieh, also testified to the differences. (J. Hsieh Dep. Tr. at 56:20-57:8 [redacted] *id.* at 57:19-24 [redacted]

163. The Accused Products contain a de-multiplexer. Numerous internal

[redacted]



and external Cytek documents articulate the use of a demultiplexer array to detect signals. For example, in a published white paper titled "Spectral Analysis Meets Flow Cytometry," Cytek clearly identifies that the optical systems in the Accused Products utilize a "demultiplexer assembly." CYTEK_0000567088 at -090; *id.* at CYTEK_0000567089.




Figure 2: Light emitted from the sample is collected and passes through the optical filter-based coarse wavelength division multiplexing (CWDM) demultiplexer arrays on the Cytek Aurora and Northern Lights cytometers.

*See also* CYTEK_0000330753 at -824 (describing Cytek's patent-pending detector modules as a CWDM *demultiplexer* assembly); CYTEK_0000029762 at -806 and CYTEK_0000766804 at -838 (describing how the [redacted] CYTEK_0000810957 at -957 ([redacted]

164. Cytek has also expressed that its optical system utilizes de-multiplexing technology. (*See* CYTEK_0000892992 at -998 (Cytek presentation describing a "New Cytek Cytometer" enabling spectral unmixing through "Course Wavelength *De-Multiplexing* Technology" (emphasis added)); CYTEK_0000893677 at -677

[redacted]

165. This is further evidenced by Cytek's own patents. For example, nowhere does the Cytek '076 patent claim or describe a WDM device. Indeed, the specification of the patent repeatedly describes a "wavelength de-multiplexing system" and light that is "de-multiplexed" or "wavelength demultiplexed" into detector channels. (*See* '076 patent at 4:9-10 ("The detection module 100 is a wavelength *de-multiplexing* system." (emphasis added)); *see also id.* at 12:31-33 ("Accordingly, different wavelengths are *de-multiplexed* by the plurality of detectors in each of the first detection module 714 and second detection module 715." (emphasis added)).)

166. Cytek's CEO and CTO also repeatedly testified that [redacted]. W. Jiang Dep. Tr. at 68:17-21 [redacted]; *id.*at 63:5-13 [redacted]

[redacted] *id.* at 67:21-68:2 [redacted] M. Yan Dep. Tr. at 80:8-17 [redacted]

167. Dr. Hsieh testified similarly. (J. Hsieh Dep. Tr. at 234:24-235:8 [redacted] *id.* at 58:4-8 [redacted]

168. Dr. Houston appears to allege the Accused Products contain a WDM as claimed because each "contains a set of filters that separate the light into different

colored bands that are each directed toward semiconductor detectors." (Houston Rep., ¶131.) But as explained above, this action is demultiplexing, and the Accused Products' optical system is thus a de-multiplexer not a multiplexer. There is no WDM claimed in the patents of the Accused Products because there can be, by definition, no WDM without both multiplexer and de-multiplexer optical components. There is no multiplexer optical component present in the Accused Products.

169. I also understand Dr. Houston alleges that "Cytek documents frequently refer to the Accused Products as including wavelength division multiplexers" to support her opinion that this claim limitation is met. (Houston Rep., ¶137.) I have reviewed the evidence Dr. Houston cites and cannot locate such descriptions. My understanding is that Cytek has never referred to its products as containing a "wavelength division multiplexer." Cytek materials have contained the term "coarse wavelength division multiplexing" (CWDM). But as Cytek's CEO testified, [redacted] W. Jiang Dep. Tr. at 63:5-13 [redacted]

[redacted]

170. I understand that following Dr. Jiang's deposition, Cytek has updated its marketing materials in order to more precisely describe its products. [redacted] *see e.g.*, Cytek's Aurora EVO Flow Cytometer Technical Specifications (available at https://cytekbio.com/tech-specs/aurora-evo describing Cytek's "high sensitivity Spectrum Profile Detection Module") (last visited Jan. 15, 2026); Cytek's Aurora Brochure (available at https://cytekbio.com/brochures/aurora); Cytek's Aurora CS Brochure (available at https://cytekbio.com/brochures/aurora-cs) (last visited Jan. 15, 2026); Cytek's Northern Lights Brochure (available at https://cytekbio.com/brochures/northern-lights) (last visited Jan. 15, 2026); Cytek's Northern Lights-CLC Brochure (located at https://cytekbio.com/brochures/nl-clc); Cytek's Aurora Product Page (located at https://cytekbio.com/pages/aurora) (last visited Jan. 15, 2026).

171. In any event, regardless of Cytek's usage of the term, the '107 patent's claim language recites a wave division multiplexer, which a POSA would understand is componentry that combines individual wavelengths, and the Accused

[redacted]



Products simply do not perform that function and thus cannot and do not meet claim limitation 1(c).

172. For all the foregoing reasons, in my opinion the Accused Products do not contain a "wavelength division multiplexer" as recited in the claims of the '107 because the optical system in the Accused Products is a de-multiplexer.

**b. 1(d): "an array of mirrors"**

173. In my opinion, claim limitation 1(d) is not present in the Accused Products because the Accused Products lack "an array of mirrors."

174. I first note that this claim element recites "mirrors"; that is, it identifies and requires a specific, concrete type of optical component. The claim does not recite more broadly, for example, anything that has a mirrored surface, any element with a reflective coating, or any component (or assembly of components) that reflect(s) light.

175. In her report, however, Dr. Houston states: "[i]n my opinion, a POSA would understand that a 'mirror' is an optical component that reflects light." (Houston Rep., ¶140.) Because this definition is overbroad, I disagree. There are many types of optical components that reflect light that a POSA would not consider to be a "mirror." For example, many bandpass filters reflect light but a POSA would consider/classify these components as optical "filters," not as "mirrors."

176. I therefore disagree with Dr. Houston's application of this overbroad

[redacted]



definition and her mapping of the microlenses of the Accused Products to the "mirrors" recited in this claim element. As I previously discussed in Section XIII.E and incorporate here, in addition to being shaped, sold as, and called something else (that is, "microlenses"), these components operate differently from mirrors when assembled and installed in the Accused Products. The microlenses, when assembled and used in the Accused Products in conjunction with other components of the optical block assembly, would be understood not to simply reflect light (as a mirror does) but also to refract light (as a lens does), causing chromatic effects.

177. In his report, Dr. Schaafsma states: "the cognomen 'microlens' is used to denote instruments that work based on refraction, not reflection. Mirrors work on the principle of reflection." (Schaafsma Rep., ¶142.) To the extent that Dr. Schaafsma is opining that anything that reflects light or "work[s] on the principles of reflection" should and would be considered a "mirror," as this term would be understood by a POSA, I disagree. Such a definition is overbroad and incorrect for the reasons just discussed. In other words, a POSA would understand a "mirror" to work *exclusively* on the principle of reflection, and where—as here—an optical component or assembly of components redirects light rays using principles of *both* reflection *and* refraction, such a component is not properly classified as and would not be understood to be a "mirror."

178. In my opinion, a POSA would understand that the microlenses in the

[redacted]



Accused Products redirect light rays using *both* reflection and refraction because of how the optical block in the Accused Products is assembled. [redacted] *See* CYTEK_0000000252 at -264-267. In other words, the optical block assembly is not a single, unitary piece of glass, and there are interfaces or boundaries between the top surface of the glass block and the bottom of the glue layer and between the top of the glue layer and the bottom surface of the microlens. [redacted] *See id.* at CYTEK_0000000254; CYTEK_0000000794; CYTEK_0000009840; CYTEK_0000009843; Optocast 3553 Technical Datasheet, available at https://www.gluespec.com/Materials/SpecSheet/daf446b7-60a8-45ab-b40e-4119f40519ce (last visited Jan. 15, 2026) (indicating Optocast 3553 has a refractive index of 1.512 at 589 nm); Schott N-BK7 Datasheet, available at https://media.schott.com/api/public/content/41e799d0bf874807a0bb8e702fbb75b5?v=54856406 (last visited Jan. 15, 2026) (indicating N-BK7 has a refractive index of 1.5167 at 589.3 nm). Accordingly, because the light passes through these different materials at a non-perpendicular angle, a POSA would understand the

[redacted]



microlenses to produce some refraction and chromatic effect.




179. Further, [redacted]. (*See* CYTEK_0000000252 at -252-70.) That Cytek decided not to include these boundary effects in its computer model of the Accused Product does not alter the physics of how the Accused Products actually operate.

180. In addition to the refraction and chromatic effects that occur at the boundaries between the microlenses and the glass block, a person of ordinary skill in the art would also recognize that there are refractive or chromatic effects caused by the air gaps between the optical block assembly and the filters arrayed below. (*See, e.g.*, Houston Rep., ¶¶316-317 (acknowledging and reproducing illustrations showing air gap between the filters and optical block assembly in Accused

[redacted]



Products); CYTEK_0000666665 (Filter 16 Bracket drawing showing air gap between filters and the optical block in the accused products); *see also* claim element 26(c) of the '107 patent below (which I incorporate here), discussing the air gap between the filters and optical block.) The refractive effects resulting from this air gap (due to the different refractive index for air compared with that of the glass block) will change how different wavelengths of light spread after reflection off the filters as they travel back through the glass medium of the glass block and the additional glass medium in the plano-convex microlenses. This is another example showing how light is propagated through the relay module and the optical block assembly (including the microlenses) in the Accused Products via a combination of *both* reflection *and* refraction.

181. I thus disagree with Dr. Schaafsma's opinion that "the principle by which light rays are redirected by" the microlenses in the Accused Products "is reflection, *not* refraction." (Schaafsma Rep., ¶142 (emphasis in original).) The error in Dr. Schaafsma's opinion appears to stem from his (unsupported and incorrect) assertion that the microlenses are "attached to the glass block by an index-matching adhesive which stifles reflections or refraction at the flat surface." (*Id.*) As discussed, the refractive index of the UV-cure adhesive does not match that of the glass block or the glass of the microlenses.

182. I also disagree with Dr. Schaafsma's opinion that the microlenses in the

[redacted]



Accused Products are equivalent to "mirrors" under the Doctrine of Equivalents, as this opinion is premised on the same mistaken assumptions regarding how the microlenses operate to direct light in the Accused Products. Schaafsma Rep., ¶145 ("A POSA would also recognize that the 'microlens' elements in the Accused Products achieve their function through reflection rather than refraction."). To the contrary, for the reasons discussed above, a POSA would recognize that the microlenses (and the optical block assembly as a whole, including the microlenses) achieve their function *both* through reflection *and* refraction, and thus would not be classified as "mirrors" or the equivalent of "mirrors."

183. In addition, I disagree with Dr. Houston's opinion that a subset of the alleged "mirrors" in the APD module may satisfy this claim limitation, including "the first three mirrors . . . the first four mirrors, five mirrors, six mirrors etc. within the APD module. Any of these and various other combinations of mirrors constitute the claimed array of mirrors." (Houston Rep., ¶150.) In my opinion, a POSA would understand an "array of mirrors" to constitute the full set of mirrors in the APD module, not a subset or simply an "ordered arrangement of mirrors" as Dr. Houston asserts. (*Id*. at ¶140.)

184. This is reinforced by the way the Cytek User Guides use the term "array," which Dr. Houston repeatedly quotes in her report. For example, Dr. Houston quotes the Aurora EVO User Guide as stating that the Aurora EVO uses

[redacted]



"high-sensitivity, semiconductor APD arrays [that] are equipped with up to 16 channels per laser to capture the emission spectra of dyes that emit in the 365 to 829 nm wavelength range." (Houston Rep., ¶102.) In my opinion, a POSA would understand this quote and use of "array" to refer to all semiconductors present in the APD module, not some subset of them. (*See also* CYTEK_0000008383 at -408 ("the Cytek Aurora CA system uses a solid-state, multi-channel, narrow-beam detector APD array for each laser").) The same concept applies to the claim term "array of mirrors." And, in fact, Dr. Houston uses the term that way, for example, in describing the "array of mirrors" present in the APD module, where *all* mirrors are encompassed within the three boxes labeled "array of mirrors," and where the cited engineering drawings show described as "illustrat[ing] the array" show all mirrors. (Houston Rep., ¶146 (citing CYTEK_0000011236 (entitled "lens array")).)

185. Dictionaries are consistent in defining "array" to refer to an entire grouping. (*See, e.g.*, Random House Compact Unabridged Dictionary, Special Second Edition (1996) at 116 ("array": "order or arrangement"; "a large and impressive grouping or organization of things: He couldn't dismiss the array of facts"; "regular order or arrangement; series: an array of figures"; "a large group, number, or quantity of people or things: an impressive array of scholars; an imposing array of books"; "an arrangement of interrelated objects or items of equipment for accomplishing a particular task: thousands of solar cells in one vast array").)

[redacted]



186. I also note that Dr. Schaafsma does not take the view that a subset of mirrors satisfies this claim limitation. He refers to all 15 alleged "mirrors" in the APD module in analyzing this claim limitation. (Schaafsma Rep., ¶275.)

187. Thus, should Drs. Houston and Schaafsma contend limitation 1(d) is met based on fewer than all alleged "mirrors" present in the APD module, I disagree.

**c. 1(e): "an array of filters"**

188. I disagree with Dr. Houston's opinion that "multiple subsets of the [filters] may satisfy the limitation. For example and without limitation, the first three filters in the APD module may satisfy the limitation, as well as the first four filters, five filters, six filters etc. within the APD module. Any of these, and various other combinations of filters constitute the claimed array of filters." (Houston Rep., ¶162.) In my opinion, a POSA would understand an "array of filters" to constitute the full set of filters in the APD module, not a subset or simply an "ordered arrangement of filters" as Dr. Houston asserts. (*Id*. at ¶155.)

189. In her report, Dr. Houston refers to the "array of filters" in the accused APD modules with reference to *all* filters in the APD module, not a subset of filters, including with reference to Cytek documents referring to *all* filters as the "filter array." (Houston Rep., ¶157.)

190. I also note that Dr. Schaafsma refers to all 16 filters in the APD module in analyzing this claim limitation. (Schaafsma Rep., ¶276.) He then asserts that any

[redacted]



subset of filters can constitute the claimed "array of filters" but offers no analysis in support. As already discussed, I disagree a POSA would agree with that interpretation of "array of filters." (*Id*. ¶277.)

191. Thus, should Drs. Houston and Schaafsma contend limitation 1(e) is met based on fewer than all filters present in the APD module, I disagree.

**d. 1(f): "an array of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters in the array of filters;"**

192. As explained above for limitation 1(e) of the '107 patent, and incorporated here, it is my opinion that a "subset" of filters does not constitute an "array of filters," and so to the extent Drs. Houston and Schaafsma rely on less than all filters to demonstrate the presence of this claim limitation in the Accused Products, in my opinion, they have not demonstrated that this claim limitation is met.

193. In addition, I note that, while for the "array of mirrors" and "array of filters" claim terms Dr. Houston asserts that a subset mirrors/filters, rather than all alleged mirrors/filters present can satisfy the claim term, Dr. Houston does not make a similar argument for this "array of APDs" claim term. In my opinion, a POSA would understand an "array of APDs" to constitute the full set of APDs , not a subset of, or simply an "ordered arrangement of APDs" as Dr. Houston asserts. (Houston Rep., ¶¶164, 166.)

194. I also note that Dr. Schaafsma refers to all 16 APDs in the APD module

[redacted]



in analyzing this claim limitation. (Schaafsma Rep. ¶278.) He then asserts that any subset of APDs can constitute the claimed "array of APDs" (a contention Dr. Houston does not make) but offers no analysis in support. (*Id*. at ¶279.) As already discussed, I disagree a POSA would agree with that interpretation of "array of filters."

195. Thus, should Drs. Houston and Schaafsma contend limitation 1(f) is met based on fewer than all filters and/or APDs present in the APD module, I disagree.

**e. 1(h): "wherein each of the mirrors in the array of mirrors is configured to: receive light reflected by a filter in the array of filters; and reflect light to another filter in the array of filters."**

196. As explained above for limitation 1(d) of the '107 patent, and incorporated here, it is my opinion that the Accused Products do not contain "mirrors" and that the microlenses present in the Accused Products are not the equivalent of the claimed "mirrors."

197. As explained above for limitation 1(d) of the '107 patent, and incorporated here, it is my opinion that a "subset" of mirrors in the Accused Products does not constitute an "array of mirrors," and so to the extent Drs. Houston and Schaafsma rely on less than all alleged mirrors to demonstrate the presence of this claim limitation in the Accused Products, in my opinion, they have not demonstrated that this claim limitation is met. (*See* Houston Rep., ¶184; Schaafsma Rep., ¶¶275,

[redacted]



281-282.)

**f. 2(b): "the array of mirrors is substantially linear;"**

198. As explained above for limitation 1(d) of the '107 patent, and incorporated here, it is my opinion that the Accused Products do not contain "mirrors" and that the microlenses present in the Accused Products are not the equivalent of the claimed "mirrors."

199. As explained above for limitation 1(d) of the '107 patent, and incorporated here, it is my opinion that a "subset" of mirrors in the Accused Products does not constitute an "array of mirrors," and so to the extent Drs. Houston and Schaafsma rely on less than all alleged mirrors to demonstrate the presence of this claim limitation in the Accused Products, in my opinion, they have not demonstrated that this claim limitation is met. (*See* Houston Rep., ¶190; Schaafsma Rep., ¶¶284-285.)

**g. 2(c): "the array of filters is substantially linear; and"**

200. As explained above for limitation 1(e) of the '107 patent, and incorporated here, it is my opinion that a "subset" of filters does not constitute an "array of filters," and so to the extent Drs. Houston and Schaafsma rely on less than all filters to demonstrate the presence of this claim limitation in the Accused Products, in my opinion, they have not demonstrated that this claim limitation is met. (*See* Houston Rep., ¶197; Schaafsma Rep., ¶¶286-287.)

[redacted]



**h. 2(d): "the array of APDs is substantially linear."**

201. As explained above for limitation 1(f) of the '107 patent, and incorporated here, it is my opinion that a "subset" of APDs does not constitute an "array of APDs," and so to the extent Drs. Houston and Schaafsma rely on less than all APDs the presence of this claim limitation in the Accused Products, in my opinion, they have not demonstrated that this claim limitation is met. (*See* Houston Rep., ¶203; Schaafsma Rep., ¶¶288-289.)

**i. 3(b): "at least one of the mirrors in the array of mirrors is a concave mirror."**

202. As explained above for limitation 1(d) of the '107 patent, and incorporated here, in my opinion the Accused Products do not contain "mirrors" and that the microlenses present in the Accused Products are not the equivalent of the claimed "mirrors." So claim limitation 3(b) which requires that "at least one of the mirrors in the array of mirrors is a concave mirror" is not met because the Accused Products do not contain "mirrors."

203. As explained above for limitation 1(d) of the '107 patent, and incorporated here, it is my opinion that a "subset" of mirrors in the Accused Products does not constitute an "array of mirrors," and so to the extent Drs. Houston and Schaafsma rely on less than all alleged mirrors to demonstrate the presence of this claim limitation in the Accused Products, in my opinion, they have not demonstrated that this claim limitation is met. (*See* Houston Rep., ¶209; Schaafsma Rep., ¶¶291-

[redacted]



292.)

**j. 5b: "the WDM is configured such that a portion of an optical path between the array of mirrors and the array of filters forms a zig-zag pattern."**

204. As explained above for limitation 1(d) of the '107 patent, and incorporated here, in my opinion the Accused Products do not contain "mirrors" and that the microlenses present in the Accused Products are not the equivalent of the claimed "mirrors." So claim limitation 5(b) which requires that "the WDM is configured such that a portion of an optical path between the array of mirrors and the array of filters forms a zig-zag pattern" is not met because the Accused Products do not contain "mirrors."

205. As explained above for limitation 1(d) of the '107 patent, and incorporated here, it is my opinion that a "subset" of mirrors in the Accused Products does not constitute an "array of mirrors," and so to the extent Drs. Houston and Schaafsma rely on less than all alleged mirrors to demonstrate the presence of this claim limitation in the Accused Products, in my opinion, they have not demonstrated that this claim limitation is met. (*See* Houston Rep., ¶209; Schaafsma Rep., ¶¶291-292.))

**k. Conclusion: Asserted Claim 5**

206. As discussed above, and incorporated here, Drs. Houston and Schaafsma have not demonstrated that each of the Accused Products meets all the

[redacted]



limitations of claims 1, 2, and 5, and thus it is my opinion that asserted claim 5 of the '107 patent is not infringed.

#### 2. Asserted Claim 16

##### a. 16(b): **a flow cell configured to permit liquid to flow through the flow cell; 16(c): a laser configured to project light into the flow cell**

207. In my opinion, claim limitations 16(b) and 16(c) are not present in the Accused Products because the Accused Products lack the claimed "flow cell."

208. I understand that Dr. Ilkov has opined that the term "flow cell" is indefinite for lack of written description and enablement. (Ilkov Op. Rep., Section XV.G.) I have reviewed his opinion and agree that the only flow cell supported by the specification is one that includes a composite microscope objective, comprising a concave mirror and an aberration corrector plate.

209. None of the documents Dr. Houston cites (Houston Rep., ¶230) show that the flow cell used in the Accused Products contains a concave mirror or an aberration corrector plate. ([redacted] Instead, the flow cell in the Accused Products has an objective lens, which is structurally distinct from a composite microscope

objective made up of a concave mirror and an aberration corrector plate as described in the '107 patent's specification. (CYTEK_0000892238 at -248, -252 (showing a "collection lens" or "objective lens" after the flow cell along the optical beam path before light being received by the fiber); CYTEK_0000003882 at -4004 [redacted] CYTEK_0000002507 at -630 (same); CYTEK_0000001226 at -227 [redacted] CYTEK_0000002061 at -2154-2158 [redacted] CYTEK_0000002264 at -297-300 (same).) The following documents also show Cytek's objective lens [redacted]. (CYTEK_0000000271 at -272, -283; CYTEK_0000000285 at -286, -297.)

210. The difference between the claimed "flow cell" and the "flow cell" in the Accused Products is further supported by Beckman's own documents comparing its CytoFLEX (which Beckman contends practices the Asserted Patents) and the accused Aurora product. (*See* BEC-CYTEK-00270394 at -00270410-11.) Beckman notes that the Aurora is "[m]issing an important [p]iece!" (*Id.* at BEC-CYTEK-00270410.) Then Beckman states the "[k]ey [p]oint" is that CytoFLEX's "flow cell

[redacted]



… has amplification optics integrated into the design – proprietary fluorescence collection optics of effective NA>1.3[.]") (*Id*. at BEC-CYTEK-00270411.)

211. Although Dr. Schaafsma opines that this claim limitation is met (Schaafsma Rep., ¶¶298-99), his discussion of the flow cell in the Accused Products is lacking, and I see the word "flow cell" only once in Section XI of his report, which he references to suggest this claim limitation is met. Regardless, neither Dr. Houston's nor Dr. Schaafsma's reports establish that the flow cell in the Accused Products includes a composite microscope objective, comprising a concave mirror and an aberration corrector plate, which is the only flow cell adequately described in the '107 patent, as Dr. Ilkov has explained.

**b. 16(d): "a multimode optical fiber configured to receive light from the flow cell; and"**

212. In my opinion, limitation 16(d), "a multimode optical fiber configured to receive light from the flow cell," is not present in the Accused Products.

213. In my opinion, the optical fiber in the Accused Products is not "configured to receive light from the flow cell." In the Accused Products, the optical fiber is configured to receive light from the objective lens, not the flow cell. Dr. Houston recognizes this, stating in the Accused Products that "fluorescence emissions *passes through* the objective lens and into the fiber pickup." (Houston Rep., ¶245 (emphasis added).) I reproduce the figure used by Dr. Houston from Cytek's document, showing that [redacted]

[redacted]

[redacted]

(Houston Rep., ¶245 (citing CYTEK_0000003882 at -4004; CYTEK_0000002507 at -630).)

214. Dr. Houston opines that "Element 16(d) does not require that the multimode fiber receive light directly from the flow cell without any intervening optical elements." (Houston Rep., ¶247.) I disagree. In my opinion, based on the plain language of the claim, a POSA would understand that the fiber must receive light directly from the flow cell, and that light that has passed through (and is

[redacted]



manipulated by) any intervening optical element, such as an objective lens in the case of the Accused Products, is not considered "light from the flow cell," but rather "light from the objective lens."

215. Dr. Houston's citation of Dr. Shao's testimony is not to the contrary. (Houston Rep., ¶247.) In full context, Dr. Shao testified that [redacted] (Q. Shao Depo. Tr. at 129:18-25 (emphasis added).)

216. In addition, claim limitation 16(d) is not present in the Accused Products for the additional reason that they lack the claimed "flow cell" for the same reasons described above for limitations 16(b) and 16(c), which analysis I incorporate here by reference.

**c. 16(e): "a wavelength division multiplexer (WDM) configured to receive light from the multimode optical fiber, wherein the WDM comprises:"**

217. In my opinion, claim limitation 16(e) is not met for the same reasons discussed above for limitation 1(d) of the '107 patent (i.e., the Accused Products lack a "wavelength division multiplexer (WDM)"), which analysis I incorporate here by reference.

**d. 16(f): "a plurality of mirrors, wherein at least one of the mirrors is a concave mirror"**

218. As explained above for limitation 1(d) of the '107 patent, and

[redacted]



incorporated here, in my opinion the Accused Products do not contain "mirrors" and that the microlenses present in the Accused Products are not the equivalent of the claimed "mirrors." So claim limitation 16(f) which requires that "a plurality of mirrors, wherein at least one of the mirrors is a concave mirror" is not met because the Accused Products do not contain "mirrors."

219. In addition, Dr. Houston asserts that a "'plurality' of mirrors includes two or more mirrors" and contends that because the Accused Products contain at least two mirrors this element is satisfied, including for the same reasons that limitation 1(d) is satisfied. (Houston Rep., ¶253.) To the extent Dr. Houston is asserting that this limitation is satisfied with reference to fewer than all "mirrors" in the array, I disagree. Claim 16 expressly recites a "flow cytometer" comprising a "WDM" and its scope encompasses a spectral flow cytometer because dependent claim 29 recites "wherein the WDM is capable of detecting a substantially full spectrum of visible light." In my opinion, a POSA would not understand a flow cytometer—let alone a spectral flow cytometer—to be operational with only two "mirrors," as Dr. Houston seemingly contends would satisfy this claim limitation. Instead, a POSA would recognize that all "mirrors" necessary to achieve the full spectral analysis must be present for the flow cytometer to work correctly.

[redacted]



**e. 16(g): "a plurality of filters; and"; 16(h): "a plurality of avalanche photodiodes (APDs)…"; 16(i) "wherein each of the plurality of filters…"**

220. In my opinion, claim limitation 16(g) is not met for the same reasons discussed above for limitations 1(d) (no "mirrors") of the '107 patent, which analysis I incorporate here by reference.

221. In addition, in my opinion claim limitations 16(g), 16(h), and 16(i) are not met for the same reason discussed above for limitation 16(f) regarding the term "plurality." Thus, to the extent Dr. Houston and/or Schaafsma contend that these limitations are satisfied with reference to fewer than all "filters" or "APDs" in the array, I disagree. A full set of these components are needed for a fully functional flow cytometer, including one that employs spectral technology.

**f. 16(j): "wherein each of the plurality of mirrors is configured to: receive light reflected by a filter of the plurality of filters; and reflect light to another filter of the plurality of filters."**

222. As explained above for limitation 1(d) of the '107 patent, and incorporated here, in my opinion the Accused Products do not contain "mirrors" and that the microlenses present in the Accused Products are not the equivalent of the claimed "mirrors." So claim limitation 16(j) which requires that "wherein each of the plurality of mirrors is configured to: receive light reflected by a filter of the plurality of filters; and reflect light to another filter of the plurality of filters" is not met because the Accused Products do not contain "mirrors."

[redacted]



223. In addition, in my opinion claim limitation 16(j) is not met for the same reason discussed above for limitation 16(f) regarding the term "plurality." Thus, to the extent Dr. Houston and/or Schaafsma contend that this limitations is satisfied with reference to fewer than all "filters" or "mirrors" in the array, I disagree. A full set of these components are needed for a fully functional flow cytometer, including one that employs spectral technology.

**g. Conclusion: Asserted Claim 16**

224. As discussed above and incorporated herein, Drs. Houston and Schaafsma have not demonstrated that each of the Accused Products meets all limitations of claim 16, and thus is it my opinion that asserted claim 16 of the '107 patent is not infringed.

**3. Asserted Claim 18**

225. I understand that claim 18 depends from claim 17, which in turn depends from claim 16.

**a. 17(b): "wherein the WDM further comprises: a plurality of focusing lenses,"**

226. In my opinion, claim limitation 17(b) is not met for the same reasons discussed above for limitation 1(c) (i.e., the Accused Products lack a "wavelength division multiplexer (WDM)"), which analysis I incorporate here by reference.

227. In addition, in my opinion claim limitation 17(b) are not met for the same reason discussed above for limitation 16(f) regarding the term "plurality."

[redacted]



Thus, to the extent Dr. Houston and/or Schaafsma contend that this limitation is satisfied with reference to fewer than all "focusing lenses" in the array, I disagree. A full set of these components are needed for a fully functional flow cytometer, including one that employs spectral technology.

**b. Conclusion: Asserted Claim 18**

228. As discussed above, and incorporated here, Drs. Houston and Schaafsma have not demonstrated that each of the Accused Products meets all the limitations of claims 16, 17 and 18, and thus it is my opinion that asserted claim 18 of the '107 patent is not infringed.

**4. Asserted Claims 26, 27, and 29**

229. I understand that claims 26, 27, and 29 each ultimately depend from claims 20-22.

**a. 20(b): "wherein the plurality of mirrors includes more than one concave mirror."**

230. As explained above for limitations 1(d) and 16(f) of the '107 patent, and incorporated here, in my opinion the Accused Products do not contain "mirrors" or a "plurality of mirrors" and that the microlenses present in the Accused Products are not the equivalent of the claimed "mirrors." So claim limitation 20(b) which requires that "wherein the plurality of mirrors includes more than one concave mirror" is not met because the Accused Products do not contain "mirrors" or a "plurality of mirrors."

[redacted]



**b. 21(b): wherein the WDM is configured such that a portion of an optical path between the plurality of mirrors and the plurality of filters forms a zig-zag pattern.**

231. As explained above for limitation 1(d) of the '107 patent, and incorporated here, in my opinion the Accused Products do not contain "mirrors" and that the microlenses present in the Accused Products are not the equivalent of the claimed "mirrors." So claim limitation 21(b) which requires that "wherein the WDM is configured such that a portion of an optical path between the plurality of mirrors and the plurality of filters forms a zig-zag pattern" is not met because the Accused Products do not contain "mirrors."

**c. 26(c): "each of the plurality of filters is coupled to the first surface of the block."**

232. In my opinion, limitation 26(c), wherein "each of the plurality of filters is coupled to the first surface of the block" is not present in the Accused Products.

233. Dr. Houston asserts that the filters in the Accused Product are "coupled to" the first surface of the fused silica (glass) block. (Houston Rep., ¶¶315-319; *see also id.* at ¶¶309-312 (describing the block).) I disagree.

234. In my opinion, a POSA would understand the plain and ordinary meaning of "coupled to" in asserted claim 26 of the '107 patent to require a physical link, joining, pairing, or connection between the two coupled items. Dr. Houston's report contends that a physical connection is not required, and that a filter that is

[redacted]



"near" or "close to" but not touching the block satisfies this claim limitation. (*See, e.g.*, Houston Rep., ¶317 ("Coupling does not require direct physical touching of the two components.").) I disagree.

235. In my opinion, a POSA would understand "coupled to" to denote a physical link between two items and "coupled with" to denote an association between two items without requiring a physical linkage. This is supported by the terms' usage in the specification. For example, the specification discusses a mirror "optically coupled to a flat surface of said cuvette" and describes the following to "accomplishes the optical coupling": "an optical adhesive material"; "an index matching fluid"; and "optical contact bonding." ('582 patent at 10:46-54; *see also id.* at 10:62-11:4; *id.* at 11:19-29; *id.* at 15:9-21; *id.* at 15:27-36; *id.* at 15:51-61; *id.* at 16:24-36; *id.* at 16:42-51; *id.* at 17:1-16; *id.* at 33:38-44; *id.* at 33:50-57.) A POSA would understand each of these materials to directly, physically couple two items together.

236. The specification also discusses in Figure 11 a configuration in which the corrector plate (602) is not optically coupled to the cuvette (603), the Figure showing a physical separation between the two components, which are described as being "optically *decoupled*":

[redacted]






FIG. 11

(*See* '582 patent at FIG. 11; *id.* at 35:44-57 (emphasis added).) In contrast, Figure 36 is described as having an "aberration corrector plate **602** *coupled to* the two sides of the cuvette **603**," and the picture shows a direct connection between the cuvette and plate (annotation is mine). (*Id.* at FIG. 36; *id.* at 51:51-67 (emphasis added).)




FIG. 36

237. In addition, the specification contrasts the usage of the terms "positioned near" and "coupled to," further supporting that "coupled to" requires a physical connection. ('582 patent at 50:28-29 ("The first detector **401** may be

[redacted]



positioned near or coupled to the first dichroic filter **519**.”); *see also, e.g.*, *id.* at 51:1-5, 51:30-45.)

238. As Dr. Houston’s Report acknowledges, there is an air gap between the filters and the block in the Accused Products. (Houston Rep., ¶317.) Because of this, limitation 26(c) is not met as it requires a physical connection between the block and filters, which is not present in the Accused Products.

239. I note that at least one document graphic Dr. Houston included in her report are annotated to cover the air gap. When her annotations are removed, [redacted]

[redacted]

(CYTEK_0000003882 at -4001; *see also* CYTEK_0000082637 at -481 (showing gap, as depicted in Houston Rep., ¶316; CYTEK_0000103871-879.) Notably, this document is [redacted]

240. [redacted]

[redacted]

241. CYTEK_0000666665 (red annotations added).

242. Dr. Schaafsma's report, generally referring back to Section XI of his report, contends that "the filters used in the WDM are mechanically coupled to a surface of the glass block and therefore meet" limitation 26(c). (Schaafsma Rep., ¶337 (referring back to Section XI of his report).) In Section XI of his report, Dr. Schaafsma does not use the phrase "coupled to" or "mechanically coupled," so it is

[redacted]



unclear what exactly he is referring to in support of his opinion on this claim limitation, and I reserve all rights to respond to whatever content he is actually relying on. In Section XI.G of his report, entitled "Filters," Dr. Schaafsma does not discuss how the filters are situated vis-à-vis the block. (*See id.* at ¶¶150-53.) He does note the air gap present between the block and filters, though. (*Id.* at ¶¶159-61.) Because of this air gap, I disagree with Dr. Schaafsma that the filters and block are "mechanically coupled," or that claim limitation 26(c) is satisfied.

243. In addition, in my opinion claim limitations 26(c) is not met for the same reason discussed above for limitation 16(f) regarding the term "plurality." Thus, to the extent Dr. Houston and/or Schaafsma contend that this limitation is satisfied with reference to fewer than all "filters" in the array, I disagree. A full set of these components are needed for a fully functional flow cytometer, including one that employs spectral technology.

**d. Conclusion: Asserted Claims 26, 27 and 29.**

244. As discussed above, and incorporated here, Drs. Houston and Schaafsma have not demonstrated that each of the Accused Products meets all the limitations of claims 16, 20 and 26, and thus it is my opinion that claims 26, 27 and 29 of the '107 patent are not infringed.

**B. Beckman Has Failed to Demonstrate the Accused Products Meet All Limitations of the '443 Asserted Claims**

245. In my opinion, the Accused Products do not infringe the '443 Asserted

[redacted]

James F. Leary, Ph.D. Rebuttal Report Regarding Non-Infringement

Claims (claims 4, 6, 10, 11, and 15).

246. I understand that claims 4, 6 and 11 all depend from claim 1 and thus each includes all elements of claim 1 in addition to the elements of claims 4, 6, and 11, respectively. I understand claim 10 depends from claim 9, which in turn depends from claim 1, and thus includes all limitations of claims 9 and 1 in addition to the limitations of claim 10. I understand claim 15 depends from claim 13, which in turn depends from claim 11, and thus claim 15 includes all limitations of claims 13, 11 and 1 in addition to the limitation in claim 15. Below I reproduce claims 1, 4, 6, 9, 10, 11, 13, and 15 of the ’443 patent with individual elements broken down (a, b, c, d, etc.,) as identified in Dr. Houston’s report:

> **(1a)** 1. A wavelength division multiplexer (WDM) for a flow cytometer comprising:
> **(1b)** a set of filters, each filter of the set of filters configured to pass a corresponding portion of multiple portions of light;
> **(1c)** at least one mirror including at least one curved mirror,
> **(1d)** the at least one mirror configured to: receive one or more portions of the light from the set of filters; and
> **(1e)** reflect the one or more portions of the light to the set of filters; and
> **(1f)** a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector.
>
> **(4a)** 4. The WDM of claim 1, further comprising:
> **(4b)** a block positioned between the at least one mirror and the set of filters, the block configured to enable transmission of the light; and
> **(4c)** a set of elements, each element of the set of elements positioned in an optical path between a different pair of a filter of the set of filters and a detector of the set of detectors,

[redacted]



wherein each element of the set of elements includes a bandpass filter, a lens, or a combination thereof.

**(6a)** 6. The WDM of claim 1, wherein:
**(6b)** the set of filters include at least one dichroic filter, and
**(6c)** the at least one curved mirror is a concave mirror.

**(9a)** 9. The WDM of claim 1, wherein
**(9b)** an optical path of the light includes a first filter of the set of filters, followed by a first mirror of the at least one mirror, followed by a second filter of the set of filters, followed by a second mirror of the at least one mirror, followed by a third filter of the set of filters, followed by a third mirror of the at least one mirror, and followed by a fourth filter of the set of filters.

**(10a)** 10. The WDM of claim 9, wherein:
**(10b)** the first filter is an initial filter of the set of filters configured to receive the light, the second filter is configured to receive a first collimated beam of the light from the first mirror, and the fourth filter is configured to receive a second collimated beam of the light from the third mirror.

**(11a)** 11. A flow cytometer comprising the WDM of claim 1.

**(13a)** 13. The flow cytometer of claim 11, further comprising:
**(13b)** a flow cell including a flow channel configured to enable passage of a particle; and
**(13c)** an optical element configured to detect scattered light emitted by the particle in the flow channel and illuminated by a light source.

**(15a)** 15. The flow cytometer of claim 13, further comprising:
**(15b)** a plurality of lasers including a first laser configured to illuminate the particle in the flow channel at a first location; and
a second laser configured to illuminate the particle at a second location in the flow channel.

247. The elements of asserted claims 4, 6, 10, 11, and 15 of the ’443 patent that in my opinion Drs. Houston and Schaafsma have not demonstrated are present

[redacted]



in the Accused Products, either literally or under the doctrine of equivalents are as follows, and explained in more detail below: 1(a), 1(c), 1(d), 1(e), 4(a), 6(a), 6(b), 6(c), 9(a), 9(b) and 11(a).

248. I understand Dr. Ilkov has opined that the '443 patent's specification fails to provide written description support for, and fails to enable the use of, a "Wavelength Division Multiplexer (WDM)" (despite the misnomer) other than with a collimating optical element that produces a collimated beam (or effectively collimated beam), propagating through the optical path. (Ilkov Opening Rep., ¶¶91-93, 890-899, 911-926.) I also understand that Dr. Ilkov has opined that the '107 patent's specification fails to provide written description support for, and fails to enable the use of, "light" other than a collimated beam (or effectively collimated beam), propagating through the optical path between the claimed "filter" and "mirrors." (Ilkov Op. Rep., ¶¶91-93, 890-899, 1033.) The Accused Products make use of a converging and diverging beam, not a collimated beam, and thus are not within the scope of asserted claims 16, 20, 21, 22, 26, 27, 28 and 29. In addition, I understand that Dr. Ilkov and Dr. Weigl have opined that the '443 patent's specification fails to provide written description support for, and fails to enable the use of, "filters" other than "dichroic filters" for propagating a beam between the filters and the claimed mirrors. The Accused Products use bandpass filters, not dichroic filters, and thus are not within the scope of asserted claims 4, 6, 10, 11, and

[redacted]



15 of the ’443 patent for this additional reason.

**1. Asserted Claim 4**

249. I understand claim 4 of the ’443 patent depends from claim 1 and thus includes all elements of claim 1 in addition to the elements of claim 4.

**a. 1(a): “A wavelength division multiplexer (WDM) for a flow cytometer comprising:”**

250. In my opinion, claim limitation 1(a) is not met for the same reasons discussed above for limitation 1(c) of the ’107 patent (i.e., no “wave division multiplexer (WDM”)”), which analysis I incorporate here by reference.

**b. 1(c): “at least one mirror including at least one curved mirror,**

251. As explained above for limitations 1(d) of the ’107 patent (in Section XIV.A), and incorporated here, in my opinion the Accused Products do not contain “mirrors” and that the microlenses present in the Accused Products are not the equivalent of the claimed “mirrors.” So claim limitation 1(c) which requires “at least one mirror including at least one curved mirror” is not met because the Accused Products do not contain a “mirror.” They are hemispheric microlenses that both refract and reflect light in ways that are not done by a mirror.

**c. 1(d): “the at least one mirror configured to: receive one or more portions of the light from the set of filters; and”**

252. As explained above for limitation 1(d) of the ’107 patent (in Section

[redacted]



XIV.A), and incorporated here, in my opinion the Accused Products do not contain "mirrors" and that the microlenses present in the Accused Products are not the equivalent of the claimed "mirrors." So claim limitation 1(d) which requires "the at least one mirror configured to: receive one or more portions of the light from the set of filters; and" is not met because the Accused Products do not contain a "mirror."

**d. 1(e): "reflect the one or more portions of the light to the set of filters; and"**

253. As explained above for limitation 1(d) of the '107 patent (in Section XIV.A), and incorporated here, in my opinion the Accused Products do not contain "mirrors" and that the microlenses present in the Accused Products are not the equivalent of the claimed "mirrors." So claim limitation 1(e) which requires "the at least one mirror configured to" "reflect the one or more portions of the light to the set of filters" is not met because the Accused Products do not contain a "mirror."

**e. 4(b): "a block positioned between the at least one mirror and the set of filters, the block configured to enable transmission of the light; and"**

254. As explained above for limitations 1(d) of the '107 patent (in Section XIV.A), and incorporated here, in my opinion the Accused Products do not contain "mirrors" and that the microlenses present in the Accused Products are not the equivalent of the claimed "mirrors." So claim limitation 4(b) which requires "a block positioned between the at least one mirror and the set of filters, the block configured to enable transmission of the light" is not met because the Accused

[redacted]



Products do not contain a "mirror."

#### f. Conclusion: Asserted Claim 4

255. As discussed above, and incorporated here, Drs. Houston and Schaafsma have not demonstrated that each of the Accused Products meets all the limitations of claims 1 and 4, and thus it is my opinion that asserted claim 4 of the '443 patent is not infringed.

### 2. Asserted Claim 6

256. I understand claim 6 of the '443 patent depends from claim 1 and thus includes all elements of claim 1 in addition to the elements of claim 6.

#### a. 6(b): "the set of filters include at least one dichroic filter, and"

257. In my opinion, limitation 6(b), "the set of filters include at least one dichroic filter, and" is not present in the Accused Products. As discussed above in Section XIII.D, the Accused Products use bandpass filters, not dichroic filters.

258. Indeed, neither Dr. Houston nor Dr. Schaafsma identify any materials, such as Cytek schematics, BOMs, presentations, or the like, pertaining to the Accused Products that indicate the use of dichroic filters as recited by limitation 6(b). To the contrary, as Dr. Houston explains in Appendix B of her report (beginning at page 11), the Accused Products' filter assembly comprises bandpass filters. (*See, e.g.*, CYTEK_0000011098 at -11110; CYTEK_0000009850; CYTEK_0000011172.) As a result, claim element 6(b) is not literally present in the

[redacted]



Accused Products.

259. Instead, Dr. Houston attempts to expand the meaning of "dichroic filter" as claimed by the Asserted Patents to encompass bandpass filters. Specifically, Dr. Houston describes a dichroic filter as "an optical component that passes a subset of wavelengths of light and reflects another subset of wavelengths of light." (Houston Rep., ¶373.) She then refers back to claim element 1(g) of the '107 patent and her opinion that the filters in the claimed array of filters in the Accused Products "are configured to receive light such that: a portion of the light passes through the filter; and another portion of the light is reflected," to conclude that the Accused Products contain at least one dichroic filter. (Houston Rep., ¶373.) Dr. Schaafsma provides the same description of dichroic filters as Dr. Houston (Schaafsma Rep., ¶150) and opines that "[t]he filters in the Cytek products are dichroic filters, as I have explained above because they pass a color band of interest and reflects [sic] the remaining colors in the beam of light," (Schaafsma Rep., ¶252).

260. I disagree with this rationale. A dichroic filter is an optical element that reflects light at some wavelengths and transmits light at other wavelengths through the filter. The wavelength splitting achieved by the dichroic filter is not abrupt but instead follows a spectral curve for that dichroic filter. A dichroic filter is typically specified by a 50 percent transmittance wavelength, which is generally measured at a 45 degree angle of incidence. Essentially a dichroic filter is a simple wavelength

[redacted]



splitter.

261. In contrast, bandpass filters employ a more complex multilayer design than dichroic filter, which allow them to perform far more complicated functions than simple beam splitting. A bandpass filter is therefore a more sophisticated optical device with more complex spectral transmittance properties than the long- or short wavelength pass transmittance properties of a dichroic filter, which allow bandpass filters to have far more precise spectral properties using its multiple layers to perform destructive interference. For example, a bandpass filter can create a "band region" and reject wavelengths outside (both higher and lower) than this region. This differs from dichroic filters, which as used in the field of flow cytometry, cannot do that and are configured as beamsplitters as previously explained. Unlike dichroic filters, bandpass filters are normally specified by their spectral properties when the light is entering it perpendicularly and may yield a more complicated spectral response if oriented at an angle. Thus, equating bandpass filters to dichroic filters ignores these added complexities and behaviors associated with bandpass filters.

262. As I explain in Section XIII.D above, dichroic filters and bandpass filters are distinct optical elements, with distinguishable optical properties and functions. In fact, I understand that Dr. Weigl offered opinions concerning the lack of written description support and full scope enablement for "filter," as claimed by the '443 patents, where he addresses the differences between bandpass and dichroic

[redacted]



filters. (*See* Weigl Op. Rep., Section VIII.E.) I have reviewed Dr. Weigl's analysis, and I agree and incorporate his opinions regarding the differences between bandpass and dichroic filters, including within the context of conventional flow cytometry.

263. A POSA would not understand a dichroic filter, as claimed by the '443 patent, to include any "optical component that passes a subset of wavelengths of light and reflects another subset of wavelengths of light," (Houston Rep., ¶373), or any optical element that "pass[es] a color band of interest and reflects the remaining colors in the beam of light," (Schaafsma Rep., ¶252). Nor would a POSA necessarily understand a bandpass filter to meet these descriptions—for example, as I explain in Section XIII.D, a bandpass filter may be configured to transmit a subset of wavelengths of light while absorbing (i.e., not reflecting) another subset of wavelengths of light. Indeed, a POSA would understand that many types of optical components exist that, depending on their specific configuration, could pass "pass[] a subset of wavelengths of light and reflect[] another subset of wavelengths of light," as Dr. Houston describes a dichroic filter, (Houston Rep., ¶373). Among such filters are dichroic filters, notch filters, bandpass filters, shortpass filters, and longpass filters.[15] However, each of these filters have distinct optical properties—and, a

[15] Evaporated Coatings Inc, *An Introduction to the Different Types of Optical Filters* (last visited Jan. 19, 2026), https://evaporatedcoatings.com/an-introduction-to-the-different-types-of-optical-filters/.

[redacted]



POSA would not equate a bandpass filter to a dichroic filter.

264. Dr. Houston also relies on Cytek's patent, U.S. Patent No. 11,913,868 ("'868 Patent), claiming it "confirms that band pass filters and dichroic filters are not mutually exclusive (i.e., bandpass filters can be dichroic filters)." This reliance is misplaced. As an initial matter, I note that none of the '868 Patent claims recite using a dichroic filter, so whether the Accused Products practice one or more of the '868 Patent claims has no bearing on whether the Accused Products comprise a dichroic filter. Furthermore, the '868 Patent does not equate dichroic filters to bandpass filters or otherwise indicate that "bandpass filters can be dichroic filters" as Dr. Houston claims. Indeed, the '868 Patent consistently refers to bandpass filters and dichroic filters as distinct types of optical element, which is consistent with my opinion. (*E.g.*, '868 Pat., 5:25-29 ("Generally, the image array consists of an array of micro-mirrors and an opposing array of bandpass *and/or* dichroic filters for each detection channel." (emphasis added)); 6:11-15 ("The plurality of long-pass dichroic filters D(1) through D(N) *can alternatively be* passband or bandpass optical filters *or include both* a dichroic optical filter and a bandpass optical filter in combination together to assure a limited range of wavelengths of light pass through." (emphasis added)); 9:49-53 ("Moreover, the last filter D(16) 314 *may not be a dichroic filter; instead a bandpass filter* can be used [where i]n the case of the bandpass filter, the incident light need not be further reflected to another mirror or filter." (emphasis

[redacted]



added).)

265. To support her opinion that the ’868 Patent confirms that “bandpass filters can be dichroic filters,” Dr. Houston relies on the ’868 Patent’s explanation that “[t]he alignment of the mounting block 1200 with the transparent block 806,1006 of the imaging array 708 and the angle of the angled curved openings 1201 is such that light reflected off a micro-mirror 712E can be *bandpass filtered* by a dichroic filter 709E and coupled into a lens/detector 711E.” (*Id.*, 15:4-9 (emphasis added).) A POSA would not understand this passage to equate bandpass and dichroic filters, but rather to describe a configuration wherein dichroic filters are used to transmit a narrow passband of light. Such a configuration is similarly described in the following passage:

> The center wavelength and passband width of each optical dichroic filter are designed for optimized sampling of the fluorescence spectrum of dye to yield better accurate unmixing of a large quantity of different dyes. For example, assuming a fluorescence spectrum of light wavelengths from 400 nm to 800 nm and a sixteen (16) channel detection module, a bandwidth of 25 nm in light wavelength can be analyzed by each. For example, the first detector channel and the first dichroic filter D(1) can bandpass and analyze light wavelengths from 400 nm to 425 nm with a center wavelength of 412.5 nm. Wavelengths outside 400 nm to 425 nm are substantially filtered out and not passed onto the first detector in the first detector channel. A second detector channel and the second dichroic filter D(2) can bandpass and analyze light wavelengths from 425 nm to 450 nm with a center wavelength of 437.5 nm and increasing so on and so forth for each detector channel. The last or sixteenth detector channel and sixteenth dichroic filter D(16) can bandpass and analyze light wavelengths from 775 nm to 800 nm with a center wavelength of 787.5 nm.

[redacted]



(*Id.*, 7:51-8:5.) This passage describes a configuration wherein the fluorescence spectrum of light comprises wavelengths from 400 nm to 800 nm, and dichroic filters are arranged so that a bandwidth of 25 nm of light reach each of sixteen detectors. For example, the first dichroic could comprise a 425 short pass dichroic filter, which would transmit light below 425 nm (resulting in a passband of 400 nm to 425 nm based on the 400 nm to 800 nm spectrum), and relaying light above 425 nm to a next-in-sequence 450 short pass dichroic filter which would transmit light below 450 nm (resulting in a passband of 425 nm to 450 nm based on the 425 nm to 800 nm spectrum relayed by the previous dichroic). Thus, a POSA would not understand the '868 Patent to suggest that bandpass filters can be dichroic filters, but rather that dichroic filters can be arranged to transmit a narrow wavelength passband.

266. In short, Dr. Houston's opinion that "bandpass filters can be dichroic filters" is problematic and inconsistent with how a POSA would understand these filters; they are not literally the same.

267. Dr. Houston also offers the alternative opinion that "[t]o the extent that bandpass filters in the Accused Products are not literally dichroic filters, they are equivalent to dichroic filters," and then relies on Dr. Schaafsma's explanation of this alleged equivalence. (Houston Rep., ¶376). Dr. Houston, however, adds no separate analysis or opinions on this issue of alleged equivalence. Dr. Schaafsma, in turn, opines that the Accused Products' bandpass filters are equivalent to the claimed

[redacted]



dichroic filters "since their function is as the same as the standard understanding of a dichroic filter as understood by a POSA and described in the specification (*see* Section XI.G). A POSA would recognize that the bandpass filters in the Accused Products achieve their function through transmission of some subsets of the wavelengths of light and reflection of other wavelengths, making them functionally equivalent to dichroic filters." (Schaafsma Rep., ¶252.)

268. But as I explain in Section XIII.D above, dichroic filters and bandpass filters are not equivalent. Dichroic filters mainly operate as routing light beam splitters, separating light into two bands based on a wavelength cutoff wherein one band is transmitted, and the other is reflected. Indeed, dichroic filters are characterized by their wavelength cutoff, with high reflection and transmission efficiency. In contrast, bandpass filters transmit light of a specific wavelength range and are characterized by high transmission across the central passband coupled with strong blocking elsewhere.

269. These properties are shown in the figure below, which illustrates dichroic filters used to transmit and reflect light at different wavelengths (shown as different colors), with bandpass filters being used to filter a target wavelength range for detectors (here, PMTs):

[redacted]



https://bitesizebio.com/31638/flow-cytometry-optics-system/
(last updated Jan. 14, 2025)




270. Thus, while both dichroic filters and bandpass filters can be used for light separation, the type of light separation achieved by each is materially distinct, with bandpass filters being uniquely effective for selecting a particular wavelength range that reaches a sensor. In fact, the specification of the '443 patent clearly confines bandpass filters to the role of further filtering a subset of light prior to it reaching a sensor, while relying on dichroic filters as routing light beam splitters. ('443 patent, 45:20-25 ("The dichroic filter **903** may pass the color band of interest and reflects the remaining colors in the beam of light for further processing within the WDM **90**. An optional band pass filter **904** may be inserted following

[redacted]



the dichroic filter **903** to further improve the color isolation capability of the WDM **90**.”).)

271. For these reasons, Drs. Houston and Schaafsma have not demonstrated that the Accused Products include “at least one dichroic filter” as required by limitation 6(b) of the ’443 patent, either literally or under the doctrine of equivalents.

**b. 6(c): “the at least one curved mirror is a concave mirror.”**

272. As explained above for limitation 1(d) of the ’107 patent (in Section XIV.A), and incorporated here, in my opinion the Accused Products do not contain “mirrors” and that the microlenses present in the Accused Products are not the equivalent of the claimed “mirrors.” So claim limitation 6(c) which requires “the at least one curved mirror is a concave mirror” is not met because the Accused Products do not contain a “mirror.”

**c. Conclusion: Asserted Claim 6**

273. As discussed above, and incorporated here, Drs. Houston and Schaafsma have not demonstrated that each of the Accused Products meets all the limitations of claims 1 and 6, and thus it is my opinion that asserted claim 6 of the ’443 patent is not infringed.

**3. Asserted Claim 10**

274. I understand claim 10 of the ’443 patent depends from claim 9, which in turn depends from claim 1, and thus includes all elements of claims 1 and 9 in

[redacted]



addition to the elements of claim 10.

**a.** 9(b): **"an optical path of the light includes a first filter of the set of filters, followed by a first mirror of the at least one mirror, followed by a second filter of the set of filters, followed by a second mirror of the at least one mirror, followed by a third filter of the set of filters, followed by a third mirror of the at least one mirror, and followed by a fourth filter of the set of filters**

275. I understand that the Court construed the terms "**first**" and "**second**" filters to "require that the first filter occur sequentially before or temporally before the second filter" (Aug. 21, 2025 Hr'g Tr. at 73:18-23.) In my opinion, limitation 9(b), "wherein the optical path of the light includes a first filter of the set of filters, followed by a first mirror of the at least one mirror, followed by a second filter of the set of filters, followed by a second mirror of the at least one mirror, followed by a third filter of the set of filters, followed by a third mirror of the at least one mirror, and followed by a fourth filter of the set of filters" is not present in the Accused Products.

276. In my opinion, a POSA would have understood the plain and ordinary meaning of "followed by" in this claim limitation to require a direct path between the corresponding mirrors and filters, without any intervening item in between. (*See, e.g.*, Random House Compact Unabridged Dictionary, Special Second Edition (1996) at 744 (defining "follow" as "to come next after something else in sequence, order of time, etc." and "to happen or occur after something else; come next as an

[redacted]



event").)

277. This is in stark contrast from what is claimed in Claim 4, which claims "a block positioned between the at least one mirror and the set of filters." ('443 patent, cl. 4.) In describing a set of filters and a set of mirrors, claim 4 explicitly claimed a "block" positioned between the filters and a set of mirrors. This "block" is further "configured to enable transmission of the light." (*Id.*) Reading this claim, a POSA would have understood that the light travels from one filter *through the optical block* to the mirrors.

278. Not so in claim 9, which recites "a first filter of a set of filters" "followed by" "a first mirror of the at least one mirror." Here, a POSA would have understood, especially in light of claim 4, that claim 9 does not include a block between the filters and mirrors. It is also worth noting that the specification discloses embodiments of the invention that do *not* include an optical block. (*See, e.g.*, FIGs. 27, 28.) And while FIG. 25A describes a WDM with a reference block 935, the patent clarifies that it is an illustration of "some embodiments" of the present disclosure. ('582 patent, 46:6-9.) I am informed by counsel that the claims are not limited to a single embodiment disclosed in the specification and that Plaintiff did not present one embodiment that all clams are limited to. (Aug. 21, 2021 Hr'g Tr. at 15:2-23.)

279. The light in the Accused Products travel through a "block" between the

set of filters and microlenses:

[redacted]

(CYTEK_0000003882 at -4001.)

280. The documents that Dr. Houston relies on (Houston Rep., ¶¶381-383) further show that, in the Accused Products, the light travels *through the optical block* between the filters and microlenses. (CYTEK_0000082467 at -82483 [redacted] CYTEK_0000103871 at -0000103877 [redacted] CYTEK_0000009787 at -0000009807 ("To provide a compact detector module, the image array 106B is formed out of a solid ***transparent material*** such as further explained with reference to FIGs. 8 and 10. The solid transparent material of the ***transparent imaging block*** used for the if image array can be clear glass or clear

[redacted]



plastic, for example, with mirrors and dichroic filters formed into or on the transparent material." (emphasis added)); *see also* Houston Rep., Section XI.B.1.h (Dr. Houston's analysis on Element 4(b) and "block").)

281. Dr. Houston further states that she has spoken with Dr. Schaafsma and reviewed his Expert Report, which "confirm[ed]" her opinion that Cytek's Accused Products infringe this limitation. However, Dr. Schaafsma generally refers to his analysis in Section XI, where he ignores that there is an optical block between filters and mirrors in the Accused Products.

282. In addition, claim limitation 6(b) is not met for the same reasons discussed above for limitation 1(d) of the '107 patent, which analysis I incorporate here by reference (i.e., no "mirror").

**b. 10(a): "The WDM of claim 9, wherein:"**

283. In my opinion, claim limitation 10(a) is not met for the same reasons discussed above for limitation 1(c) of the '107 patent (i.e., no "wave division multiplexer (WDM)"), which analysis I incorporate here by reference.

**c. 10(b): "the first filter is an initial filter of the set of filters configured to receive the light, the second filter is configured to receive a first collimated beam of the light from the first mirror, and the fourth filter is configured to receive a second collimated beam of the light from the third mirror."**

284. In my opinion, claim limitation 10(b), "the first filter is an initial filter of the set of filters configured to receive the light, the second filter is configured to

[redacted]



receive a first collimated beam of the light from the first mirror, and the fourth filter is configured to receive a second collimated beam of the light from the third mirror" is not present in the Accused Products. Specifically, there is no "first collimated beam" and "second collimated beam" of light in the Accused Products. I understand that Dr. Ilkov has provided his opinion on the invalidity of the terms "first collimated beam" and "second collimated beam" for lack of written description support and of enablement in his invalidity report, which I have reviewed and incorporate here. (Ilkov Op. Rep., Section XV.I.3.)

285. This claim limitation does not exist in the Accused Products because there is only *one* beam of light traveling between the bandpass filters and microlenses. Therefore, there cannot be "first collimated beam" or "second collimated beam." The one beam that exists in the Accused Products is not a "collimated beam" in the Accused Products because the beam converges or diverges as it travels from the input optics through the APD module in the Accused Products. I also further provide my opinions on why the Accused Products do not use "collimated beam" below in Section XIV.C.1.

286. Dr. Houston asserts that this claim limitation is met because "Cytek marketing materials demonstrate that initial filter receives the light, the second filter receives a collimated beam from the first mirror, and the fourth filter also receives a collimated beam from the third mirror," and includes a screenshot of a figure from

[redacted]



an unknown source.[16] (Houston Rep., ¶388.) Dr. Houston also cites to the '868 patent's general disclosures that the "plurality of micro-mirrors images the fiber aperture onto the odd filters and collimates the light beam on the even filters," without further explaining how this disclosure maps on to the claim limitation. (*Id.*) Therefore, in my opinion, Dr. Houston has failed to show that this claim limitation is present in the Accused Products.

287. Dr. Houston further states that she has "spoken with Dr. David Schaafsma and reviewed his Expert Report" and concludes that his explanation "confirm[ed]" her opinion that the Accused Products practice this claim limitation. (Houston Rep., ¶389.) However, Dr. Schaafsma does not cite the only document that Dr. Houston cites for this claim limitation, BEC-CYTEK-000039733. Rather, Dr. Schaafsma provided his own (incomplete, as discussed below) modeling of a Zemax file, without explaining how that Zemax file relates to the only document cited by Dr. Houston for this claim limitation, BEC-CYTEK-000039733, whose source is unclear.

---

[16] The document cited, BEC-CYTEK-00039733, is a single-page document including the figure included in Dr. Houston's report, and I am told from counsel that the metadata of this produced document showed a filename of "Exhibit 8." Therefore, I am unable to opine on whether this is an accurate depiction of the implementation of multiplexing in the Accused Products. However, just for purposes of this Report, I assume that this is a figure from Cytek's marketing materials, depicting an idealized model of the Accused Products. I reserve the right to respond if further information is provided on the source of this document.

288. Dr. Schaafsma, referring back to Section XI of his report, contends that [redacted] respectively. (Schaafsma Rep., ¶¶257-258.) In Section XI.D, Dr. Schaafsma provides a "layout" of a Zemax file, "where rays from only 1 field point are shown." (*Id.*, ¶129.) I disagree that this is an accurate representation of the shape of beam of light because the light source in the Accused Products is an extended light source, not a point source. As I describe below in discussing "collimated beam" for the '582 patent, I provide Dr. Ilkov's Zemax modeling that actually shows that [redacted] I also report the spot sizes at each filter and microlenses in the table below, as determined by Dr. Ilkov. Even following Beckman's construction of a "collimated beam," which is "nearly parallel" (which is an indefinite definition), the spot size does not remain "nearly" the same as it travels through the optical block.

#### d. Conclusion: Asserted Claim 10

289. As discussed above, and incorporated here, Drs. Houston and Schaafsma have not demonstrated that each of the Accused Products meets all the limitations of claims 1, 9 and 10, and thus it is my opinion that asserted claim 10 of the '443 patent is not infringed.

[redacted]



#### 4. Asserted Claim 11

290. I understand claim 11 of the '443 patent depends from claim 1 and thus includes all elements of claim 1 in addition to the elements of claim 11.

##### a. 11(a): "A flow cytometer comprising the WDM of claim 1."

291. I understand Dr. Ilkov opined that the '443 patent's specification discloses a conventional flow cytometer and fails to provide written description support for, and fails to enable the use of, a "**flow cytometer**," that performs spectral flow cytometry. (Ilkov Op. Rep., Section XV.A) The Accused Products are spectral flow cytometers, and thus are not within the scope of asserted claim 11.

##### b. Conclusion: Asserted Claim 11

292. As discussed above, and incorporated here, Drs. Houston and Schaafsma have not demonstrated that each of the Accused Products meets all the limitations of claims 111, and thus it is my opinion that asserted claim 11 of the '443 patent is not infringed.

#### 5. Asserted Claim 15

293. I understand claim 15 of the '443 patent depends from claim 13, which in turn depends from claim 11, which in turn depends from claim 1, and thus includes all elements of claims 1, 11 and 13 in addition to the elements of claim 15.

##### a. 13(b): "a flow cell including a flow channel configured to enable passage of a particle; and"

294. For the same reasons I provided for claim 16(b) of the '107 patent,

[redacted]



which I incorporate here, the Accused Products do not infringe claim limitation 13(b) because the Accused Products do not use the claimed "flow cell" (i.e., a flow cell comprising a composite microscope objective, comprising a concave mirror and an aberration corrector plate). Rather, the Accused Products use a flow cell that comprises a separate objective lens. Therefore, in my opinion, the Accused Products do not infringe this claim limitation 13(b).

#### b. Conclusion: Asserted Claim 15

295. As discussed above, and incorporated here, Drs. Houston and Schaafsma have not demonstrated that each of the Accused Products meets all the limitations of claims 1, 11 and 13, and thus it is my opinion that asserted claim 15 of the '443 patent is not infringed.

### C. Beckman Has Failed to Demonstrate the Accused Products Meet All Limitations of the '582 Asserted Claims

296. In my opinion, the Accused Products do not infringe the '582 Asserted Claims (cls. 1, 3, 6, 23 and 26).

297. I understand that asserted claim 3 depends from claim 2, which in turn depends from claim 1 and thus includes all elements of claims 2 and 1 in addition to the elements of claim 3. I understand claim 6 depends from claim 1, and thus includes all limitations of claim 1 in addition to the limitations of claim 6. I understand claim 23 depends on claim 22, which in turn depends from claim 20, and thus claim 23 includes all limitations of claims 22 and 20 in addition to the

[redacted]



limitations in claim 23. I understand claim 26 depends from claim 22, which in turn depends from claim 20, and thus claim 26 includes all limitations of claims 22 and 20 in addition to the limitations in claim 26. Below I reproduce claims 1, 2, 3, 6, 20, 22, and 26 of the '582 patent with individual elements broken down (a, b, c, d, etc.,) as identified in Dr. Houston's report:

> **(1a)** 1. An optical subsystem for a flow cytometer, the optical subsystem comprising:
> **(1b)** a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam;
> **(1c)** an optical relay element arranged to receive at least a portion of the collimated beam from the collimating optical element, the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a first image;
> **(1d)** a first focusing optical element arranged to receive at least a portion of the collimated beam reflected by the optical relay element; and
> **(1e)** a first semiconductor detector,
> **(1f)** wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element onto the first semiconductor detector.
>
> **(2a)** 2. The optical subsystem of claim 1,
> **(2b)** further comprising the light source, wherein the light source comprises light passing through a pinhole or light emitted from a facet of a multimode optical fiber.
>
> **(3a)** 3. The optical subsystem of claim 2, wherein
> **(3b)** the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element to a size smaller than 1 millimeter in diameter.
>
> **(6a)** 6. The optical subsystem of claim 1,

[redacted]



**(6b)** further comprising a first optical filter disposed along an optical path between the collimating optical element and the optical relay element, the first optical filter configured to separate the collimated beam into a first branch and a second branch.

**(20a)** 20. An optical subsystem for a flow cytometer, the optical subsystem comprising:
**(20b)** a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a first image; and
**(20c)** an optical relay element arranged near the first image, the optical relay element configured to receive light from the collimating optical element and to project a second image;
**(20d)** wherein the size of the first image is substantially the same as the size of the second image, and
**(20e)** wherein the optical relay element comprises a curved mirror or a concave-shaped dichroic filter.

**(22a)** 22. The optical subsystem of claim 20,
**(22b)** further comprising the light source, wherein the light source comprises an extended light source that forms an object,
**(22c)** wherein the first image is a magnified image of the object.

**(23a)** 23. The optical subsystem of claim 22, wherein
**(23b)** the light source comprises light passing through a pinhole or light emitted from a facet of a multimode optical fiber.

**(26a)** 26. The optical subsystem of claim 22 further comprising
**(26b)** a first focusing optical element arranged near the second image,
**(26c)** the first focusing optical element configured to focus the light from the optical relay element to a size smaller than the object of the light source to a first semiconductor detector.

298. The elements of asserted claims 1, 3, 6, 23, and 26 of the ’582 patent that in my opinion Drs. Houston and Schaafsma have not demonstrated are present in the Accused Products, either literally or under the doctrine of equivalents are as

[redacted]



follows, and explained in more detail below: 1(b), 1(c), 1(d), 1(f), 3(b), 6(b), 20(b), 20(c), 20(d), 20(e), 22(c), and 26(c).

**1. Asserted Claim 1**

**a. "collimated beam"**

299. In my opinion, the Accused Products do not infringe any of the "collimated beam" limitations of claim 1 (1(b), 1(c), 1(d), 1(f)) because the Accused Products do not use a "collimated beam," but instead use a beam with alternating converging and diverging light rays.

300. Claim 1 of the '582 patent uses the term "collimated beam," not "effectively collimated beam" or "nearly collimated beam." I understand the Court construed "collimated beam" as plain and ordinary meaning and deferred ruling on the issue of whether "collimated beam" as used in the asserted claims is indefinite.

301. I have reviewed Dr. Ilkov's Opening Invalidity Report, and his opinion that "collimated beam" as used in the asserted claims is indefinite. (*See* Ilkov Op. Rep., Section XV.I.) I agree with Dr. Ilkov's opinion.

302. If not indefinite as used in the context of claim 1 of the '582 patent, I agree with the alternative position that a POSA would understand the plain and ordinary meaning of "collimated beam" to be "a beam wherein all rays of light originating from a point on the source are projected parallel with each other and those rays within the beam are neither converging (i.e., a focused beam) or

[redacted]



diverging." (Ilkov Op. Rep., ¶231.) The Accused Products do not use a collimated beam but instead has a series of diverging and converging optics. As the well-known Shapiro textbook on Practical Flow Cytometry states: "light consisting of parallel rays is said to be collimated."




Rays from a point source get farther apart as they go along; they are divergent, or have negative vergence. Parallel rays have zero vergence; light consisting of parallel rays is said to be collimated. Rays that converge, or have positive vergence, get closer together as they go along. Convergent

(Howard M. Shapiro, *Practical Flow Cytometry* 119 (4th ed. 2003) ("Shapiro").)

303. Beckman's own user manual also defines "Collimate – To make parallel (for example, collimate rays of light."




GLOSSARY

Collimate - To make parallel (for example, collimate rays of light).

GLOSSARY-1

(BEC-CYTEK-00158922 at -159416.)

304. Further, during prosecution, Beckman also specifically distinguished a

[redacted]



collimated beam from a beam that is focusing or converging. (*See, e.g.*, BEC-CYTEK-00004404 at -4753-754 ('106 patent file history (June 4, 2024 Applicant Remarks, 9-10)) (Beckman's statement that in "FIG. 25 (light 'effectively collimated' … is not converging.")).)

305. Dr. Schaafsma opines that "[a] POSA would further understand the concept of a 'collimated beam' as one with nearly parallel rays." (Schaafsma Rep., ¶202.) Dr. Schaafsma opines: "People of skill in the art commonly use the term 'collimated' in real-world systems, such as systems with fluorescent light like a flow cytometer, to describe to [sic] a real beam with rays that are slightly converging and/or diverging but remain 'nearly parallel.'" (Schaafsma Rep., ¶108.) Dr. Schaafsma also ambiguously contends that a "collimating optical element" "mak[es] light from an extended light source more nearly parallel" without any explanation as to how much "more nearly parallel" is purportedly required to achieve any such alleged "collimated beam." (Schaafsma Rep., ¶105.) Dr. Houston also opines that "People of skill in the art commonly use the term 'collimated' in real-world systems, such as systems with fluorescent light like a flow cytometer, to describe to [sic] a real beam which maintains substantially the same diameter and with rays that are slightly converging and/or diverging but remain 'nearly parallel.'" (Houston Rep., ¶416.) I disagree and I note that the '582 specification does not provide any explanation of what "nearly parallel" means (e.g., providing a permitted angle of

[redacted]



divergence). In contrast, I note that one of the optical communication patents mentioned in the '582 specification – U.S. Patent No. 5,786,915 to Michael A. Scobey ("Scobey") – specifies "[t]he collimated light preferably has a divergence of not more than about 0.15º …." (Scobey, 7:51-52.) No such parameter is provided in the '582 patent for a POSA to understand what "nearly parallel" means.

306. Dr. Schaafsma also points to column 46:51-59 and FIG. 26 in opining that a collimated beam "may be 'diverg[ing] rapidly' when it is received by the optical relay element." (Schaafsma Rep., ¶132 (alteration in original).) I have reviewed column 46:51-59 and FIG. 26, and the '582 patent actually states: "FIG. 26 illustrates an optical ray trace for a *prior art* collimating device." ('582, 46:51-52 (emphasis added).) This passage on a prior art device does not support Dr. Schaafsma's opinion that the "collimated beam" in the claimed invention may be diverging rapidly. Indeed, the passage does not use the word "collimated beam." Instead, the passage states: "the *beam* of light diverges rapidly *beyond* the image 924 created by the collimating optical element 923." (*Id.* at 55-57 (emphases added).)




*FIG. 26*

(*Id.* at Fig. 26.) In any event, a POSA simply would not understand the plain and ordinary meaning of "collimated beam" to include a beam diverging rapidly, as

[redacted]



supported by both the intrinsic and extrinsic evidence I have pointed to above. Nor would a POSA understand the plain and ordinary meaning of "collimated beam" to include a beam that converges, as supported by both the intrinsic and extrinsic evidence I have pointed to above. In my opinion, if not **indefinite**, a "**collimated beam**" is "**a beam wherein all rays of light originating from a point on the source are projected parallel with each other and those rays within the beam are neither converging (i.e., a focused beam) or diverging**."

**(1) Cytek's Accused Products do not use a "collimated beam" through the detector module**

307. Dr. Schaafsma bases his infringement opinion on pointing only to segments of the beam path as purportedly "collimated beams." (*See*, *e.g.*, Schaafsma Rep., ¶¶131-132, 170-173, 196-197.) But, as I understand it, this is inconsistent with Beckman's infringement contentions, which repeatedly mapped the collimated beam to the entire beam path, and alleged that there are portions of the collimated beam at



[redacted]



each segment.

(Nov. 19, 2025 Second Am. Infringement Contentions, Exhibit 1 at 32 (Beckman's own annotations).)



Figure 2: Light emitted from the sample is collected and passes through the optical filter-based coarse wavelength division multiplexing (CWDM) demultiplexer arrays on the Cytek Aurora and Northern Lights cytometers.

(*Id.* at 33 (Beckman's own annotations).)




(*Id.* at 42 (Beckman's own annotations).)

[redacted]






(*Id.* at 42 (Beckman's own annotations).)



[redacted]



(*Id.* at 43 (Beckman's own annotations).)




(*Id.* at 43 (Beckman's own annotations).) As shown by Beckman's annotations, Beckman points to the focusing beam from the input optics (which include the purported collimated optical element labeled "COE") as projecting a "collimated beam" in blue which travels throughout the entire detector module. Beckman then points to "portions of collimated beam" of the entire collimated beam. Dr. Schaafsma's Report is not consistent with this mapping and instead advances a different theory, merely pointing to segments of the beam as satisfying the term "collimated beam."

308. In my opinion, a POSA would understand a collimated beam as used in

[redacted]



asserted claims 1 and 6 of the '582 patent to mean the single collimated beam projected by the "collimating optical element", by receiving light from the fiber "light source" and collimating the light to project a "collimated beam" that then passes back and forth between the "filters" and "optical relay elements," and through the "filters" to the "focusing optical elements." This is supported by the claim language. For example, claim 1 recites that a "**collimating optical element** [is] configured to project a **collimated beam**; an **optical relay element** [is] arranged to receive at least a portion of the **collimated beam** from the collimating optical element, the **optical relay element** comprising a curved mirror configured to reflect the portion of the **collimated beam** received from the collimating optical element …"; and "a **first focusing optical element** [is] arranged to receive at least a portion of the **collimated beam** reflected by the optical relay element." ('582 patent, cl. 1 (emphases added).) Claim 6 adds "a **first optical filter** disposed along an optical path between the collimating optical element and the optical relay element, the first optical filter configured to separate the **collimated beam** into a first branch and a second branch." ('582 patent, cl. 6 (emphases added).) This is also supported by FIG. 25 which shows a collimated beam throughout as Dr. Schaafsma's own annotations show.

[redacted]






FIG. 25

(Schaafsma Rep., ¶82.)

309. In my opinion, it is clear that the Accused Products do not use a "collimated beam" through their detector modules. I have reviewed the printouts of the Zemax files that were generated by Dr. Jay Hsieh as part of the development of the Accused Products, and are cited in Dr. Schaafsma' report. (HSIEH_0000000005; HSIEH_ 0000000006; HSIEH_ 0000000007.) Those Zemax files confirm that [redacted]. I have further discussed with Dr. Ilkov his analysis of those

Zemax files. Dr. Ilkov's printouts of the Zemax files, which I include below, show that [redacted]

[redacted]

[redacted]

[redacted]

(Ilkov Rebuttal Rep., App. B.)

310. I understand that Dr. Ilkov also generated data (reproduced below) on the diameter of the beam at the various optical components [redacted] which confirms that [redacted]. Dr. Ilkov ran an analysis using the exact Zemax model provided by Dr. Hsieh with the following results:

[redacted]

[redacted]

[redacted]

[redacted]



(Ilkov Rebuttal Rep., App. B.)

311. Dr. Ilkov also ran an analysis that [redacted] (*See, e.g.*, CYTEK_0000832643 (showing a 498nm longpass filter with a diameter of 12.5 mm +/- 0.05 mm); CYTEK_0000832645 (showing a 652nm longpass filter with a diameter of 12.5 mm +/- 0.05 mm); CYTEK_0000391088 at -391091 (purchase order from Photop showing different LP filters with a diameter of 12.7 mm).) As the following diagram shows, [redacted]

[17] [redacted].

[redacted]



[redacted]

The results of the analysis are below and show that the [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

(Ilkov Rebuttal Rep., App. C.) I understand that Dr. Ilkov also ran the Zemax simulation [redacted]. The beam spots are shown below:

[redacted]

[redacted]



(Ilkov Rebuttal Rep., App. C.)

312. I have reviewed Dr. Ilkov's Appendix A and observed a demonstration of how light would appear on the bandpass filters of the Accused Products in a fully assembled and aligned detector assembly according to the evaluation performed by Dr. Ilkov. The results clearly show that there is no collimated beam.

[redacted]

313. In contrast, Dr. Schaafsma generated a Zemax file using only one central field point. By using one central field point (which Dr. Schaafsma admits does not represent the actual extended light source made of many field points),[18] [redacted]

[18] Dr. Schaafsma states: "Since the fiber is an extended source (both laterally and axially), the beam is not as perfectly collimated as shown above but it is effectively collimated for such a source." (Schaafsma Rep., ¶130.)

[redacted]



[redacted].

[redacted]

(Schaafsma Rep., ¶130.) This is also depicted in FIG. 2B of Cytek's '076 patent using only a single field point:




FIG. 2B

[redacted]



(CYTEK_0000990444 at -447 ('076 patent, Fig. 2B).) These figures clearly show that, unlike in the claimed invention, no "collimated beam" is used throughout Cytek's detector modules. So, even using a single field point (which again does not accurately depict light from the extended light source of the Accused Products), the Accused Products do not use a "collimated beam."

314. That the U.S. Patent Office issued Cytek's '076 patent over the disclosures of the asserted patents, and specifically allowed the claims of the '076 patent because the asserted patents and other prior art did not disclose "reimaging light onto odd filters of a plurality of filters arranged in a row" (CYTEK_0000989932 at -990377-378 ('076 patent file history (July 9, 2021 Notice of Allowability)), 2-3), further supports my opinion that the Accused Products also do not use a "collimated beam."

315. Dr. Schaafsma's opinions are deficient. Most significantly, Dr. Schaafsma does not provide details of the spot sizes at each filter or mirror. It is impossible to assert whether the light beam is "focused and re-collimated," as Dr. Schaafsma incorrectly states (Schaafsma Rep., ¶172), or remains "collimated" throughout the APD module without providing the beam spot diameter at each filter or mirror. In fact, Dr. Schaafsma himself states that "the propagation of light is determined by beam diameter, waist locations, image formation, and other observable parameters." (*Id.* at ¶56.) He has not provided any of such parameters.

[redacted]



316. Dr. Schaafsma does provide some rough beam spot diameters. (*Id.* at ¶¶174-176.) However, [redacted] but he also uses broad language that does not support his position that any portion of the beam is "collimated." (*See id.* at ¶174 ("roughly 1mm"), ¶175 ("comparable size"), ¶176 ("a smaller spot").) For the same reason, Dr. Schaafsma's opinion that "every other detector channel (even channels …) receives a collimated beam," discussing "curved mirrors," has no evidentiary support. (*Id.* at ¶139; *see also id.* at ¶149.)

317. Further, as noted above, the Zemax files that were generated by Dr. Jay Hsieh as part of the development of the Accused Products [redacted].

**(2) Cytek's Accused Products do not use a "collimated beam" even if "collimated beam" could (incorrectly) refer to segments of the beam**

318. Even if "collimated beam" could (incorrectly) refer to segments of the beam rather than the entire beam, Dr. Schaafsma has not shown any segments that are actually "collimated" as further explained below with respect to each limitation that includes the term "collimated beam."

319. For example, as further explained in Section XIV.C.b below, the components that Dr. Schaafsma points to as the "collimating optical element" are (a)

[redacted]

(Schaafsma Rep., ¶¶196-197.) However, as the Zemax files from Dr. Hsieh show,

[redacted]

[redacted]

(Ilkov Rebuttal Rep., App. B.)

A converging beam cannot be a "collimated beam" as Beckman itself argued during prosecution of its patent. (BEC-CYTEK-00004404 at -4753-754 ('106 patent file history (June 4, 2024 Applicant Remarks), 9-10).) Similarly, the [redacted]

[redacted]

(Ilkov Rebuttal Rep., App. B.) In my opinion, a POSA would not consider these segments collimated segments.

320. Dr. Ilkov's [redacted] of the Zemax model that [redacted],

[redacted].

[redacted]

(Ilkov Rebuttal Rep., App. C.)

321. As another example, and as further explained in Section XIV.C.1.c below, the claim language requires that the "optical relay element," which Dr. Schaafsma maps onto the [redacted], … (Schaafsma Rep., ¶¶196-197), both (1) "receive at least a portion of the collimated beam from the collimating optical element" and (2) "reflect the portion of the collimated beam received from the collimating optical element." ('582 patent, cl. 1.) The claim language also requires that "a first focusing optical element [is] arranged to receive at least a portion of the collimated beam from the optical relay element." (*Id.*) [redacted]. In my opinion, this is evident from the single field point

Zemax printout that Dr. Schaafsma generated and included in his report.

[redacted]

(Schaafsma Rep., ¶130.)

322. Additionally, to the extent, Dr. Schaafsma is attempting to rely on any segment of the beam which is diverging (and again using multiple field points results in no collimated segments), Dr. Schaafsma's mapping does not satisfy the claim language [redacted], and there is nothing in the '582 specification to indicate when a beam diverges enough

[redacted]



such that it is no longer “nearly collimated” under Beckman’s interpretation of “collimated.” This is shown in the Zemax files, including the Zemax printouts shown in FIGs. 3 and 5 of Cytek ’076 patent.




(’076 patent, FIG. 3)

[redacted]






FIG. 5

('076 patent, FIG. 3)

323. Further, as noted above, the Zemax files that were generated by Dr. Jay Hsieh as part of the development of the Accused Products used [redacted]

**324.** Cytek witnesses have also testified that [redacted] (*See supra* deposition testimony of Q. Shao, B. Shan, J. Hsieh; *see also* W. Jiang Depo. Tr. at 184:23-185:11 [redacted]

[redacted]

#### (3) The "Collimated beam" limitations are not met under the Doctrine of Equivalents

325. Dr. Schaafsma opines that the limitations in the claims requiring a "collimated beam" are also met under the Doctrine of Equivalents. (Schaafsma Rep., ¶¶112-117.) I disagree as I explain here and also in Section XIV.C.1.b below.

326. Specifically, Dr. Schaafsma opines: "To the extent the beam and/or any portion(s) of the beam are not literally a 'collimated beam' and/or a 'portion of the collimated beam,' then the beam is equivalent to the claimed 'collimated beam' and/or any portion(s) thereof under the Doctrine of Equivalents. because [sic] the differences, if any, are *insubstantial* and because the collimated beam and/or any portion(s) of the beam perform *substantially the same function in substantially the same way to obtain the same result*. In particular, the beam and all portions thereof maintain substantially the same maximum diameter as it travels along the optical path by having controlled divergence and/or convergence with the result that the projected beam can be efficiently color separated by filters and focused onto one or

[redacted]



more APDs. The difference, if any between the beam and/or any portion(s) of the beam and the claimed 'collimated beam' and any portion(s) thereof is insubstantial because in each instance the beam maintains substantially the same maximum diameter such that the beam can be efficiently color separated by filters and focused onto an APD." (Schaafsma Rep., ¶117 (emphases added).)

327. I disagree with Dr. Schaafsma that the difference between the beam used in the Accused Products and a "collimated beam" is insubstantial. The repeatedly converging and diverging beam path in the Accused Products is essentially the opposite of a collimated beam. The two beams are clearly visually distinct.

[redacted]

[redacted]






FIG. 25

(Schaafsma Rep., ¶82.) A POSA would consider these beams to be ***substantially different***.

328. Additionally, the Patent Office allowed the claims of Cytek '076 patent over the disclosures in the Asserted Patents and other prior art because they did not disclose "reimaging light onto odd filters of a plurality of filters arranged in a row." (CYTEK_0000989932 at -990378 ('076 patent file history (July 9, 2021 Notice of Allowability), 3).) This further supports that the beam used in the Accused Products is substantially different from a "collimated beam."

[redacted]



329. Furthermore, the specification of the Asserted Patents emphasize the necessary use of a "collimated beam" within the claimed inventions. In this regard, the specification states that "efficient color separation *can only be accomplished economically with collimated light beam*." ('582 patent, 44:25-26 (emphasis added).) The specification further emphasizes the need to maintain "unit magnification down the optical path," the "1:1 image relay configuration," and the "cascaded unit-magnification" are all essential so that "WDM techniques well-established in the optical communications industry can be readily adopted for light detection" within the disclosed and claimed inventions. (*Id.* at 4:44-55.) Indeed, the specification further touts the purported disclosed invention as "a technology capable of collimating a large etendue light beam over an extended distance" (*id.* at 44:28-30) and again reiterates "the present disclosure's 1:1 imaging relay architecture" (*id.* at 44:28-30). From these disclosures, a POSA would not have considered a non-collimated focused/defocused beam to be insubstantially different than a "collimated beam."

330. A POSA would have known that the disclosure in the specification that "efficient color separation *can only be accomplished economically with collimated light beam*" ('582 patent, 44:25-26 (emphasis added)) is directed towards ensuring that the light rays need to impinge upon the filters with consistent angle of incidence, else the efficiency of the transmission and reflection of the light for color separation

[redacted]



by the dichroic filters can and will cause substantial losses and errors in signal intensity. Hence, the '582 patent requires having a "collimated beam," which the specification notes for a single mode optical fiber "can be easily collimated" and then contends that the disclosed invention accomplishes the same "collimated beam" with an "extended light source." (*Id.* at 44:4-7, 44:25-34.) With a "collimated beam," the specification also notes that "dichroic filters may be inserted anywhere along the long, narrow and collimated beam path." (*Id.* at 5:12-13.)

331. In contrast, Cytek's transformative full-spectral flow cytometers are able to do what the specification expressly teaches against—using a non-collimated focused/defocused beam. Because Cytek's Accused Products are full-spectral flow cytometers that utilize higher powered lasers and completely different data analysis algorithms based on the spectral signature of each dye to perform unmixing, the strict requirement for the disclosed conventional flow cytometer detector configurations that require "efficient color separation [that] can only be accomplished economically with collimated light beam," simply does not apply as Cytek's successful design and granted patents over the Asserted Patents clearly establish.

332. Moreover, the file history of the Asserted Patents also demonstrates that a focused beam is substantially different from a "collimated beam":

[redacted]



> Applicant respectfully disagrees that Oostman's objective lens 19 is configured to "focus fluorescent light" because the objective lens "collimate[s]" rather than focuses "the fluorescent signal from the target substance." Oostman at ¶ [0003] (emphasis added). Because Oostman's objective lens 19 collimates fluorescent light, a POSITA would have understood that the objective lens "brings all of the rays [] parallel to each other," albeit with some "beam divergence" in view of practical limitations. *See, e.g.*, Excerpts from Newport Catalog at 480, 500, *available at* http://rpdata.caltech.edu/courses/aph162/2007 (defining "Collimated Beam" and explaining how collimated beams have some "beam divergence" because "nothing is ever a true point source") (attached as APPENDIX A). This is not "focus[ing]" the fluorescent light, which instead involves converging the light. *See, e.g.*, *id.* at 480 ("the focusing of a laser beam to a small spot" involves converging the light to "the focused spot"); Excerpt from Merriam Webster's Collegiate Dictionary Tenth Edition at 451 (1993) ("focus" means "to bring (as light rays) to a focus: CONCENTRATE" or "to come to a focus : CONVERGE") (attached as APPENDIX B); *compare, e.g.*, Specification at 54:27-31 and FIG. 10 (light that doublet lens 609 "focus[es]" converges "onto the image plane 605") *with* Specification at 68:21-26 and FIG. 25 (light "effectively collimated" by collimating optical element 902 is not converging).

(BEC-CYTEK-00004404 at 4753-754 ('106 patent file history (June 4, 2024 Applicant Remarks), 9-10) (annotated).)

333. As the foregoing statements by Beckman during prosecution plainly noted, the key feature of a "collimated beam" is that "all of the rays [are] parallel to each other" and "[t]his is not focusing … which instead involves converging the light." (*Id.*, 9.) Thus, Beckman itself recognized during prosecution that a focusing

[redacted]



beam of converging light (and, necessarily, a defocusing beam of diverging light) is not insubstantially different from a "collimated beam."

334. I have also considered Dr. Schaafsma's opinion above that the beam used in the Accused Products and a "collimated beam" perform "substantially the same function in substantially the same way to obtain the same result." (Schaafsma Rep., ¶117.) I disagree with Dr. Schaafsma's opinion, which is that the function, way, result test is satisfied because "the beam and all portions thereof maintain substantially the same maximum diameter as it travels along the optical path by having controlled divergence and/or convergence with the result that the projected beam can be efficiently color separated by filters and focused onto one or more APDs." (*Id.*)

335. First, the beam in the Accused Products and the claimed "collimated beam" do not perform substantially the same function. In this regard, Dr. Schaafsma contends that the function of the claimed "collimated beam" is the same as the non-collimated focused/defocused beam within the Accused Products because "the beam and all portions thereof maintain substantially the same maximum diameter as it travels along the optical path by having controlled divergence and/or convergence with the result that the projected beam can be efficiently color separated by filters and focused onto one or more APDs." (*Id.*) But this assertion is wrong for multiple reasons. First, the non-collimated focused/defocused beam in the Accused Products

[redacted]



do not maintain the same beam diameter as it progresses down the optical path. The plain distinction between a focused/defocused beam is that its beam diameter is changing as it propagates, which is in stark contrast to the function performed by the claimed "collimated beam." Second, as I have noted above, the patent teaches that "efficient color separation *can only be* accomplished economically with collimated light beam," ('582 patent, 44:25-26 (emphasis added)) which requires parallel rays incident onto the filters at their designed angle of incidence. The function of having parallel rays for "efficient color separation" is distinct from (and opposite to) the function of a beam that is focused/defocused with converging/diverging rays that are not closely tied to the angle of incidence of the filters. Third, as I have also noted above, during prosecution Beckman expressly noted that the function of a collimated beam that "brings all of the rays [] parallel to each other …. is not focus[ing] the fluorescent light, which instead involves converging the light" and even "light 'effectively collimated' by collimating optical element 902 is not converging." (BEC-CYTEK-00004404 at 4753-754 ('106 patent file history (June 4, 2024 Applicant Remarks), 9-10) (alteration in original) (citation omitted).) Simply put, the function of an optical element that projects a focused/defocused beam of converging/diverging light is not the same function as projecting a "collimated beam" that "brings all of the rays parallel to each other."

336. In any detector module there is a desire to keep a beam within a certain

[redacted]



maximum diameter. It is easy for anyone to draw a theoretical box large enough to encompass any beam. But the function of the converging and diverging beams in the Accused Products is not to keep within a certain "maximum diameter." Rather, the focused/defocused beam within the Accused Products has a changing diameter as the beam travels along the optical path. After the beam of light projects through or reflects from the optical elements, the constraint on how much the beam actually contracts (to the minimum on the odd filters) or expands (on the microlenses) is governed by the geometrical constraints of the system—i.e., how far the focused/defocused beam propagates before encountering another optical element. However, such a geometrical constraint is not due to any lens or microlens within the Accused Products that result in focusing/defocusing of the beam as being a similar function to a "collimated beam." Rather, the nature of the focusing/defocusing beam is unchanged and merely constrained by how far along the optical path that the focused/defocused beam travels when it is shaped as a focused or defocused beam. That is, the nature of the beam of light, whether it is converging or diverging does not change simply because one can arbitrarily draw a cylinder around those beams of light, as I have depicted below. Thus, Dr. Schaafsma's and Dr. Houston's opinions equating a "collimated beam" with merely keeping light confined within an arbitrary cylinder (i.e., less than some arbitrary "maximum diameter") is simply incorrect. Converging light and diverging light is

[redacted]



not a "collimated beam" despite their enclosure within an arbitrary "maximum diameter" of the cylinder I have depicted in the image below.




(D.I. 116-20 at 11 (Ex. 51 (Steven Wasserman, Measure Biology, *Geometrical optics and ray tracing* (Aug. 27, 2019))) (colored annotations added).)

337. Additionally, while it is desirable from an optical design point-of-view to keep the beam from becoming so large that significant portions of the light will be larger than the detectors, the Accused Products employ enhanced components that, in conjunction with the focused/defocused optical design for the beam, provides higher fluorescent signal and reduces aberrations that are prevalent with the disclosed "collimated beam" design. For instance, as BEC's itself has recognized, the Accused Products use optical components that are all higher quality than those used in the CytoFLEX products, including high power lasers[19] with a special focusing lens to make flat-top beam profile and provide outstanding performance at

[19] I understand that Cytek's Accused Products use a 100 mW violet laser (405 nm), a 50 mW yellow-green laser (561 nm), and a 80 mW red laser (640 nm); whereas BEC's Cytoflex use less powerful a 80 mW violet laser (405 nm), a 30 mW yellow-green laser (561 nm), and a 50 mW red laser (640 nm).

[redacted]



high sample rates (i.e., events):

> Another observation that could be interesting for the marketing team. I looked under the Aurora's laser box and the first the impression that all optical components are more expensive than in CytoFLEX:
> - 3 lasers from Coherent (561, 488, 355) and 2 OEM unknown vendor
> - Optics are at least 1 inch in diameter (lenses, dichroic mirrors) in order to accommodate big laser beams.
> - Opto-mechnical parts are good quality that allow to align and lock the mounts at the best position. (pain point in CytoFLEX)
> - Focusing lens is a special lens that makes beam profile flat top, obviously more expensive than regular spherical lens.

(Ex. 25 to L. Shi Dep. Tr (BEC-CYTEK-00137956) (annotated); *see also Why Use a Flat Top Laser Beam?*, Edmund Optics Worldwide, https://www.edmundoptics.com/knowledge-center/application-notes/optics/why-use-a-flat-top-laser-beam (last visited Jan. 18, 2026) ("flat top beams often result in more accurate and predictable results, such as cleaner cuts and sharper edges, but they come with additional system complexity and cost"); BEC-CYTEK-00270394 at -413 (noting flat-top laser beam provides "[h]igher flow rate possible without loosing [sic] resolution (CV)".)

338. The reduction in aberrations causes the focused/defocused beam within the Accused Products to be effectively propagated along the more detector channels required in Cytek's spectral flow cytometers in comparison to the "collimated beam" conventional one-detector-one-dye flow cytometer disclosed in the Asserted Patents. (*See, e.g.*, '582 patent, 44:13-14 (citing U.S. Patent No. 4,482,994); U.S. Patent No. 4,482,994, 3:24-28 ("The improvement on insertion loss caused by the aberration of a collimating lens system is particularly important when more than eight wavelengths are demultiplexed ….").)

[redacted]



339. The greater loss of light using a "collimated beam" is also why the '582 patent discloses a different flow cell with amplification optics, e.g., concave mirror 601 and aberration corrector plate 602 shown in FIG. 8 ('582 patent, 33:34-34:2), that are not necessary and not used in the Accused Products. This is further supported by Beckman's own documents comparing its CytoFLEX product and the accused Aurora product. (*See* BEC-CYTEK-00270394 at -411 ("The [CytoFLEX flow] cell has amplification optics integrated into the design– proprietary fluorescence collection optics of effective NA> 1.3" and noting that Cytek's "Many Filters (up to 16)= Loss of light !").) The greater loss of light also explains why Beckman's CytoFLEX uses a 0.22 NA optical fiber as compared to the [redacted]. (*Compare* BEC-CYTEK-0038420 *with* CYTEK_0000009817 *and* CYTEK_0000011265-11269.)

340. By minimizing the aberrations with the focused/defocused beam, the Accused Products have more efficient beam control and are able to perform sufficient color separation across more detector channels in a way that is directly contrary to the '582 specification's assertion that "efficient color separation *can only* be accomplished economically with collimated light beam." ('582 patent, 44:25-26 (emphasis added).) That is, in the Accused Products, minimizing aberrations with a non-collimated focused/defocused beam permits the higher intensity excitation signals achieved using the flat-top laser and provides efficient propagation along the

[redacted]



larger number of detector channels such that the spectral resolution necessary for the subsequent unmixing algorithms to resolve overlapping spectra from two or more fluorophores can be accurately performed.

341. Second, the beam in the Accused Products and the claimed "collimated beam" do not perform in substantially the same way. As I stated above, the repeatedly converging and diverging beam path in the Accused Products is essentially the opposite of a collimated beam. Cytek purposefully causes its beam to converge and diverge. The claimed invention, however, is designed to maintain a "collimated beam," not to purposefully cause a beam to converge and diverge. Additionally, Dr. Schaafsma's inclusion of "controlled … convergence" (Schaafsma Rep., ¶117) is contradicted by the prosecution history where Beckman argued that its use of a "collimated beam" is distinguishable from prior art that converges light. (BEC-CYTEK-00004404 at -4753-754 ('106 patent file history (June 4, 2024 Applicant Remarks), 9-10).) I understand the doctrine of prosecution history estoppel prevents Beckman to assert as equivalent, claim scope that it surrendered during prosecution. Otherwise, I understand such an equivalent would ensnare the prior art that Beckman overcame during prosecution. Further, if "substantially the same way" were to include converging light that would render the term "collimated" in "collimated beam" meaningless. I understand that the doctrine of claim vitiation prevents Beckman from rendering the term "collimated" meaningless.

[redacted]



342. Third, the beam in the Accused Products and the claimed "collimated beam" do not achieve substantially the same result. To the contrary, the converging and diverging beam allows the Accused Products to more efficiently perform full spectral flow cytometry. The converging and diverging optics of the Accused Products is not collimated optics, and is fundamental to the design of Cytek's spectral cytometers because it efficiently minimizes aberrations such that the full fluorescence spectrum can be captured by the higher number of detector channels so that subsequent unmixing algorithm software can resolve overlapping spectra from two or more fluorophores based on each dye's unique spectral signature. Hence, any trade-off incident to color separation between the use of a "collimated beam"—which the specification of the Asserted Patents says "*can only be accomplished* economically with collimated light beam" ('582 patent, 44:25-26 (emphasis added)) versus the aberration-limiting, non-collimated focused/defocused beam within the Accused Products clearly lands in favor of Cytek's design, which is specific to the needs of Cytek's spectral flow cytometers.

343. Therefore, in my opinion, the beam in Cytek's Accused Products and the claimed "collimated beam" do not perform substantially the same function, in substantially the same way, to achieve substantially the same result.

344. Again, the Patent Office allowing the claims of Cytek '076 patent over the disclosures in the Asserted Patents and other prior art because they did not

[redacted]



disclose "reimaging light onto odd filters of a plurality of filters arranged in a row" (CYTEK_0000989932 at -990378 ('076 patent file history (July 9, 2021 Notice of Allowability), 3)), further supports my opinion.

**b. 1(b): "a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam;"**

345. In my opinion, limitation 1(b), "a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam" is not present in the Accused Products.

346. Drs. Houston and Schaafsma opine that the Accused Products meet this claim limitation by identifying two separate components in the Accused Products as the claimed "collimating optical element": the "collimating lens" and, in the alternative, odd-numbered "concave mirrors." (Houston Rep., ¶¶417-427; *see also* Schaafsma Rep., ¶¶196-197.) I disagree with either of Drs. Houston's and Schaafsma's mappings, and reference my opinions above on the claim construction of the term "collimating optical element" and my opinions above concerning "collimated beam." I further explain below why this limitation is not present in the Accused Products.

347. For the term "collimating optical element," as I noted in Section VIII.B.1 above, I understand that Beckman has proposed a purported "plain and ordinary meaning" construction of "an optical element, such as a lens, mirror, or

[redacted]



grating, to render rays of light more nearly parallel; a collimator." (D.I. 114 (Joint Claim Construction Br.) ("Joint CC Br.") at 74.) In the alternative, Beckman provides a construction for the term as a means-plus-function term.

348. The term "collimating optical element" is not a widely used and understood category of optical components such that a POSA would understand what this term is referring to. (*See* Ilkov Answering Decl., ¶¶106-111; Ilkov Sur-Reply Decl., ¶45.) Therefore, I disagree with Dr. Shcaafsma's opinion that a POSA "would know from basic optics which lenses, mirrors, and gratings are collimating optical elements and would also call this category of optical components 'collimators.'" (Schaafsma Rep., ¶105.)

349. I understand that Cytek has proposed that "collimating optical element" is a means-plus-function term. (Joint CC Br., 74.) In the alternative, Cytek proposed the following construction of the term: "'an optical component at a focal distance from a light source that projects a 'collimated beam' centered on the optical axis such that a 'portion of the collimated beam' is projected onto a first focusing optical element,' and another 'portion of the collimated beam' is projected onto a first optical relay element,[] otherwise indefinite." (*Id.*, 75.)

350. As a means-plus-function term, both parties agree that the function of the "collimating optical element" in claim 1(b) is to "(1) receive light from a light source" and (2) "project a collimated beam." (*Id.*, 74.) However, while Plaintiff

[redacted]



argues that a "lens, such as an achromatic doublet lens and structural equivalents thereof" may qualify as the structure of "collimating optical element," Cytek argues that the term is indefinite for failure to provide sufficient corresponding structure. (*Id.*, 74.)

351. I agree with Cytek that the term "collimating optical element" is a means-plus-function term whose structure is indefinite. I understand that the Court has construed "optical element," (a term appearing in the '443 patent) as a means-plus-function term. "Collimating" is simply a functional term modifying a means-plus-function term, "optical element," which I understand does not impart structure.

352. I have also reviewed Dr. Ilkov's Opening Invalidity Report, and his opinion further confirms my opinion that this term is indefinite because no focal length is specified in the specification. (*See* Ilkov Op. Rep., Section XV.I.) However, even if not indefinite, a "collimating optical element" should be limited to the achromatic doublet lens 902 (at its focal distance), which is the only structure disclosed in the specification associated with the term "collimating optical element" (and equivalents). (*See id.*, Section XV.I.2.ii.) This is supported by the file history of the related '106 patent where Beckman pointed out to the Patent Office what Beckman considered to be the "collimating optical element":

[redacted]






FIG. 25

(BEC-CYTEK-00004404 at -4819 ('106 patent file history (July 18, 2024 Response to Final Office Action Sent May 2, 2024), 14) (annotations in original).) Dr. Houston's report, in fact, also points to this portion of the '106 file history. (Houston Rep., ¶82.) While Dr. Schaafsma points to the specification to support his opinion that the "collimating optical element" can be a lens or similar optical instrument such as a concave mirror, (Schaafsma Rep., ¶85), I disagree for reasons I discussed above in my recitation of the claim construction arguments as well as further below.

353. ***The "Collimating Lens" in the Accused Products Is Not a Collimating Optical Element Configured to Project a Collimated Beam***. Dr. Houston identifies

[redacted]



the "collimating lens"—also identified as "lens 1" in the Accused Products—as the "collimating optical element." (Houston Rep., ¶¶417-420.) I disagree and, in my opinion, there is no infringement under either party's construction.

354. While Cytek may label lens 1 a "collimating lens" in some instances, it does not serve the claimed function of being configured to project a collimated beam for the detector module, and Dr. Schaafsma and Dr. Houston have essentially ignored that the focusing lens—also identified as "lens 2"—is part of the input optics of the Accused Products. Yet I see that, during claim construction, Dr. Schaafsma relied on a reference showing that "[t]he most common way of focusing a laser diode beam is to use two collimating lenses, the first lens is to collimate the beam, the second lens is to focus the collimated beam, as shown in Fig. 3.1." (D.I. 115-26 (Joint CC Br., Ex. 27 (Haiyin Sun, *Laser Diode Beam Basics, Manipulations and Characterizations* 40 (2012)), at 40.)

40 3 Single Transverse Laser Diode Beam Manipulation Optics




**Fig. 3.1** **a** Using the first aspheric lens to collimate and second aspheric lenses to focus a laser diode beam. **b** Directly focusing a laser diode beam using one aspheric lens

(*Id.*) Given Dr. Schaafsma's reliance on this reference, I do not understand why he

[redacted]



essentially ignored the focusing lens in the Accused Products.

355. Even considering lens 1 alone, in my opinion, Dr. Houston (Houston Rep., ¶417) and Dr. Schaafsma (Schaafsma Rep., Section XI.J) cite documents and deposition transcripts that do not establish that the "collimating lens" is a collimating optical element configured to project a collimated beam.

356. For example, CYTEK_0000000089 and CYTEK_0000001392 are Cytek's [redacted]

357. In addition, to the extent that Drs. Houston and Schaafsma rely on the following graphic from the field service manual to suggest Lens 1 is projecting a collimated beam, I disagree.

[redacted]

358. (Houston Rep., ¶417 (annotated by Houston).) That cartoon-like graphic is not an adequate substitute for the actual characteristics of the light exiting Lens 1. Dr. Shao unambiguously explained that [redacted] (Q. Shao Dep. Tr. at 72:6-7 (discussing Q. Shao Dep. Ex. 7, CYTEK_0000003882 at -4001).)

359. As noted above, I have reviewed the Zemax printouts from Dr. Ilkov. The Zemax printouts of Dr. Jay Hsieh's model shows that the [redacted]

[redacted]

(Ilkov Rebuttal Rep., App. B.)

360. I understand that [redacted] From my conversation with Dr. Ilkov, who I understand spoke to Dr. Hsieh, [redacted] In the actual Accused Products, that longpass filter has a diameter larger than 12 mm (*See, e.g.*, CYTEK_0000832643 (showing a 498nm longpass filter with a diameter of 12.5 mm +/- 0.05 mm); CYTEK_0000832645 (showing a 652nm longpass filter with a diameter of 12.5 mm +/- 0.05 mm); CYTEK_0000391088 at -391091 (purchase order from Photop showing different LP filters with a diameter of 12.7 mm) [redacted] As

my annotations below show, [redacted]

[redacted]

361. I further understand that Dr. Ilkov [redacted]

[redacted]

(Ilkov Rebuttal Rep., App. C.)

Regardless, as the light travels through the detector module, the light continues to alternately converge and diverge, just [redacted]

[redacted]



362. In addition, Cytek's witnesses are clear that the "collimation lens" is not "configured to project a collimated beam" While Dr. Houston cites to Dr. Shao's and Dr. Shan's depositions to contend the opposite, Dr. Shao in fact testified that the "collimation lens" [redacted] (Q. Shao Dep. Tr. at 122:16-23, 123:18-24.) Dr. Shan testified that the purpose of the "collimation lens" is [redacted] (B. Shan Dep. Tr. at 68:11-17, 68:23-69:6; *see also id.* at 67:24-68:4 [redacted] In contrast, the inventor of the Asserted Patents admitted during deposition that the claimed "WDM" cannot work with a diverging beam. This is why he placed the lens a little further away from the focal length. (Y. Chen Dep. Tr. at 170:21-171:13 ("If you want to collimate the point source, you put the point source at the focal point of your lens. In this case they call it collimating lens. But for the extended light source, if you do that, you get a mess. You actually have to make sure … your source is outside of your focal point. If it's on the focal point, you are not collimating."), *see also id.*, 174:8-177:10 ("For the extended light source, when you collimate, you make sure your source is not at the focal point.… [I]f you put the light source at the

[redacted]



focal point, right, that confined distance is almost zero.").)

363. Dr. Hsieh, in discussing the email that Dr. Houston cites (HSIEH_000000008) at paragraph 419 of her report, clarified that [redacted] (J. Hsieh Dep. Tr. at 164:24-165:6.) He also clarified throughout his deposition that [redacted] (*Id.* at 170:23-171:13, 203:9-204:16 [redacted] This is consistent with my opinion above, that collimation cannot happen with an extended light source, but collimation can happen with a point source.

364. Dr. Schaafsma states that "the Accused Products include a collimation lens whose focal length is at or around the distance from the multimode optical fiber and which projects a collimated beam, a portion of which is directed towards a focusing optical element" and further that "these optical elements are approximately at *f* because they are propagating light from an extended light source." (Schaafsma

[redacted]



Rep., ¶106.) This is a faulty argument. First, Dr. Schaafsma's opinion essentially admits that Lens 1 and the mirrors are not necessarily placed at the focal length but only at "approximately the focal length." Second, Dr. Schaafsma cites numerous documents to support his opinion that the collimation lens has a focal length at or around the distance from the multimode optical fiber. But these documents do not show what the focal length of the collimation lenses are, or any accurate method to place Lens 1 and the mirrors at their focal lengths, for the same reasons I discuss below.

365. Dr. also Schaafsma appears to opine that a POSA would approximately collimate a beam by "project[ing] a beam onto a surface at some relevant distance away, and then adjust the collimating optical element until a minimum spot size is seen." (Schaafsma Rep., ¶¶57-58.) I disagree this produces a "collimated beam," for the reasons discussed below.

366. A POSA would understand that the function of the lens in front of the optical fiber (the "collimation lens") would be to collect as much light coming out of the fiber as possible. [redacted]

[redacted]

367. More importantly, Drs. Houston and Schaafsma ignore that [redacted]

[redacted] 0000000089 at -103.)

368. Cytek's input optics project a focused beam, not a collimated beam.

[redacted]

(*Id.* at CYTEK_0000000104.)

[redacted]

369. This is in stark contrast to the claimed invention where only an achromatic doublet lens is used (not focusing lens) to project a collimated beam that is used through the entire detector module.

[redacted]






*FIG. 25*

(BEC-CYTEK-00004404 at -4819 (’106 patent file history (July 18, 2024 Response to Final Office Action Sent May 2, 2024), 14) (annotations in original).)

370. Drs. Houston and Schaafsma do not take into account that the claim language requires that the “collimating optical element” “project[s] a collimated beam” where the “optical relay element” “receive[s] at least a portion of the collimated beam *from* the collimating optical element.” (’582 patent, cl. 1 (emphasis added).) Drs. Houston and Schaafsma selectively map “collimating optical element” only onto Lens 1 in an attempt to ignore that in the Accused Products, Lens 2 is part of the input optics and focuses the beam. In my opinion, there is no “collimating

[redacted]



optical element" in the Accused Products that "project[s] a collimated beam" where the "optical relay element" "receives at least a portion of the collimated beam *from* the collimating optical element."

371. ***Dr. Schaafsma's Doctrine of Equivalents opinion ignores the recited function "to project a collimated beam."*** Dr. Schaafsma opines: "[T]here is no difference between the described function and the way the collimation lens is used, and the same result is achieved. The size of the beam is maintained so that a substantial portion of light can be received by each channel in the WDM, thereby 'extending the collimated distance.'" (Schaafsma Rep., ¶112; *see also id.* ¶¶173-177.) Dr. Schaafsma bases his opinion on the purported "function of the collimating optical element(s) [being] to create a beam 'over an extended distance without significantly expanding the beam diameter.' ('582 patent, 44:28-34, 46:51-59.)" (Schaafsma Rep., ¶113.) Dr. Schaafsma then goes on to opine that "this function includes creating a beam that can be imaged and successively reimaged to create multiple images of the same size using a '1:1 relay,' thus controlling the maximum width of the beam as it propagates through the system. ('582 patent, 44:58-45:2, 45:22-29; 45:44-54.)" (*Id.*)

372. Dr. Schaafsma further opines: "The collimation lens in each Accused Product performs substantially the same function, in substantially the same way, to achieve substantially the same result as the collimating optical element(s) disclosed

[redacted]



in the Asserted Patents. In particular, as discussed above, the collimation lens is a doublet lens, which a POSA would understand reduces the convergence or divergence of light from the multimode fiber, when positioned by the standard collimation procedure for an extended light source (described above) which results in the multimode optical fiber being around one focal distance from the collimation lens. As discussed below, a POSA would know that the collimation of any real source results in a beam that can converge slightly and then diverge, while remaining nearly parallel and maintaining substantially the same size between the collimation lens and the next element. In the relay section of the WDM, this description applies to portions of the collimated beam under the court's construction of 'portion.' As I discuss in detail below (Section XI), the collimation lens in the Accused Products acts to achieve the same result as the collimating optical element described in the Asserted Patents, including the limitations of spot size and focusing on detectors." (Schaafsma Rep., ¶114.)

373. However, Dr. Schaafsma's doctrine of equivalents opinions would render meaningless the claimed function "to project a collimated beam" where the "optical relay element" "receives at least a portion of the collimated beam from the collimating optical element," whether under means-plus-function construction or plain and ordinary meaning. I disagree with Dr. Schaafsma that this claimed function is substantially the same because "the collimation lens is a doublet lens,

[redacted]



which a POSA would understand reduces the convergence or divergence of light from the multimode fiber." (Schaafsma Rep., ¶114.) I understand that the doctrine of claim vitiation prevents Beckman from rendering the claimed function meaningless. But that is precisely what Dr. Schaafsma's opinion does by (1) changing the function to reducing the convergence or divergence of light and (2) ignoring that the focusing Lens 2 in the input optics of the Accused Products focuses the light and therefore there is no portion of the collimated beam received by the optical relay element. I further reference my opinion in Section XIV.C.1.a above regarding "collimated beam." Changing the function to include reducing the convergence of light would contradict Beckman's position during prosecution where Beckman argued that its use of a "collimated beam" is distinguishable from prior art that converges light. (BEC-CYTEK-00004404 at -4753-754 ('106 patent file history (June 4, 2024 Applicant Remarks, 9-10)).) I understand that this would violate the doctrines of prosecution history estoppel, ensnarement, and claim vitiation.

374. ***"Concave Mirror" Is Not a Collimating Optical Element Configured to Project a Collimated Beam Either Literally or Equivalently.*** Dr. Houston and Dr. Schaafsma also identify the odd-numbered "concave mirrors" in the Accused Products as the "collimating optical element." (Houston Rep., ¶¶421-427; Schaafsma Rep., ¶201.) I disagree.

375. As an initial matter, the APD Module in the Accused Products do not

[redacted]



comprise "multiple curved, concave mirrors." (Houston Rep., ¶421.) Instead, it contains plano-convex microlenses as discussed above in connection with limitations of the '107 patent reciting "mirrors." (*See supra* Section XIV.A.1.)

376. Even if plano-convex microlenses were concave mirrors, concave mirrors would not satisfy the claim limitation under either party's construction. Under means-plus-function, if not indefinite, the only structure disclosed in the specification that performs the two functions to "(1) receive light from a light source" and (2) "project a collimated beam" is the achromatic doublet lens 902. This is consistent with Beckman's position during prosecution.




FIG. 25

(BEC-CYTEK-00004404 at -4819 ('106 patent file history (July 18, 2024 Response to Final Office Action Sent May 2, 2024), 14) (annotations in original).)

377. Therefore, as I understand from counsel, if not indefinite, the structure under means-plus-function construction is the "achromatic doublet lens **902**" (and structural equivalents) at a focal distance.

378. I understand that Beckman previously proposed during the claim construction proceedings in this case that the corresponding structure for "collimating optical element" is "a lens, such as an achromatic doublet lens, or structural equivalents thereof." (D.I. 114, Joint CC Br. at 74.) However, Drs. Houston and Schaafsma have departed from Beckman's prior position and now also state that "mirrors" are also included in the claimed "collimating optical element." (*See, e.g.*, Houston Rep., ¶¶421-424; Schaafsma Rep., ¶¶201-203.)

379. Dr. Schaafsma further opines that the collimating mirrors are "at least equivalent" to collimating optical element. Dr. Schaafsma states: "Each of the collimating mirrors in the Accused Products perform[] substantially the same function, in substantially the same way, to achieve substantially the same result as the collimating optical element(s) disclosed in the Asserted Patents. As I discuss below, the collimating mirrors are curved (concave) mirrors, which can be used to reduce the convergence or divergence of light by reflection, as a lens does by refraction. The collimating mirrors are each positioned at a distance equal to their

[redacted]



focal length from the preceding filter they receive light from, and the rays produced by the collimating mirrors are nearly parallel, and the beam maintains the same maximum diameter throughout the optical path, as I describe below. As I discuss in detail below (section XI), the collimation mirrors in the Accused Products acts to achieve the same result as the collimating optical element described in the Asserted Patents, including the limitations of spot size and focusing on detectors. Additionally, to the extent the mirrors are not 'an optical relay element arranged to receive at least a portion of the collimated beam from the collimating optical element,' then the mirrors are equivalent for the same reasons." (Schaafsma Rep., ¶116.) Dr. Houston relies on Dr. Schaafsma's opinion on equivalents. (Houston Rep., ¶428.)

380. I disagree with Dr. Schaafsma's and Dr. Houston's opinions that a "curved mirror" can satisfy the claimed "collimating optical elements." Dr. Schaafsma's and Houston's opinion ignore the claim language requires the "collimating optical element" (1) receive light from a light source and (2) project a "collimated beam." This applies whether or not the "collimating optical element" is subject to means-plus-function construction. The claim language requires that the collimating optical element "*receive light from a light source*." ('582 patent, cl. 1.) As I discussed in Element 1(c) of the '582 patent below, the "curved mirrors" in the Accused Products are not configured to receive light from a light source.

[redacted]



Additionally, the claim language requires the collimating optical element "*project* a collimated beam." ('582 patent, cl. 1.) But a "curved mirror" does not project any light, it simply reflects light.

381. Additionally, a concave mirror is not equivalent to an achromatic doublet lens because, as Dr. Schaafsma also agrees, a mirror reflects, while a lens refracts. These are two distinct optical processes that are not equivalent. I also reference my opinions above regarding the doctrine of equivalents on "collimated beam."

382. Additionally, the deposition transcripts that Dr. Houston points to do not support her position. Dr. Hsieh, the engineer who was involved in creating simulation models of the optical path, clarified multiple times that [redacted]. (J. Hsieh Depo. Tr. at 131:16-132:20, 170:24-171:13 [redacted]

383. Dr. Schaafsma points to the Zemax model (Schaafsma Rep., ¶¶131, 139, 149), but the Zemax model shows that [redacted]

[redacted]



[redacted]

(Ilkov Rebuttal Rep., App. B.)

384. And while Dr. Houston and Dr. Schaafsma point to the description from the ’868 patent (Houston Rep., ¶¶422-423; Schaafsma Rep., ¶¶140, 180-187), FIG. 2B of the patent uses a single field point and does not actually represent the actual shape of the beam in the Accused Products. (*See* J. Hsieh Depo. Tr. at 187:19-188:11 [redacted] Therefore, it is my opinion that the “concave mirror” is not “a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam.”

[redacted]



**c. 1(c): "an optical relay element arranged to receive at least a portion of the collimated beam from the collimating optical element, the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a first image;"**

385. For the same reasons I provided in my analysis in Section XIV.C.1.b (limitation 1(b)), fully incorporated by reference here, each of the Accused Products does not comprise a "**collimating optical element**," and does not utilize a "**collimated beam**."

386. As explained above for limitation 1(d) of the '107 patent (in Section XIV.A), and incorporated here, in my opinion the Accused Products do not contain "mirrors" and that the microlenses present in the Accused Products are not the equivalent of the claimed "mirrors." So claim limitation 1(c) which requires "the optical relay element comprising a curved mirror" is not met because the Accused Products do not contain a "mirror."

387. In my opinion, each of the Accused Products further do not comprise "an optical relay element arranged to receive at least a portion of the collimated beam from the collimating optical element, the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam." ('582 patent, cl. 1.) The Court construed "portion" to mean "subset of the spectrum of wavelengths of light." (Sep. 17, 2025 Hr'g Tr. at 92:21-24.)

388. Dr. Schaafsma's own annotations to FIG. 25 of the '582 patent show

that each "optical relay element" (907, 910, 911, 912, 913) receives a subset of the wavelengths of the collimated beam and reflects that subset of wavelengths.




FIG. 25

(Schaafsma Rep., ¶82.)

389. For the Accused Products, Dr. Schaafsma opines that [redacted] Dr. Schaafsma made a layout of a Zemax file that uses a single, central field point and annotated the figure.

[redacted]

(*Id.* at ¶¶129-132.) Dr. Schaafsma admits that over [redacted] (*Id.* at ¶130.) For the same reasons I provided in my analysis in Section XIV.C.1.b (limitation 1(b)), fully incorporated by reference here, each of the Accused Products does not satisfy this claim element because the "beam" in the accused products is not a "collimated beam." [redacted]

[redacted] the beam itself is not a "collimated beam" – only segments of the beam would be collimated.

390. Moreover, in my opinion, and as Dr. Schaafsma's own annotations show, [redacted] The claim language requires: "**an optical relay element arranged to receive at least *a* portion of the collimated beam from the collimating optical element**, **the optical relay element comprising a curved mirror configured to reflect *the* portion of the collimated beam**." ('582 patent, cl. 1 (emphasis added).) Unlike the claimed invention where mirrors both receive and reflect a portion of the collimated beam, as shown in FIG. 25, the even-numbered microlenses in the Accused Products clearly do not reflect "the portion of the collimated beam." To the contrary, [redacted]. I have annotated this below.

[redacted]



[redacted]

(Annotations added to Dr. Schaafsma's layout of HSIEH_0000000006.)

391. Notably, as explained more in the following section (Section XIV.C.1.d), the further claim language requires that the claimed "collimated beam" continues to propagate whereby "a first focusing optical element [is] arranged to receive at least a portion of the *collimated beam* reflected by the optical relay element." ('582 patent, cl. 1 (emphasis added).)

392. I have also reviewed Dr. Houston's opinion where she only opines that "curved mirrors" "receive at least a portion of the collimated beam from the collimating optical element," but relies on Dr. Schaafsma for his opinion that "the optical relay element comprising a curved mirror" is also "configured to reflect the portion of the collimated beam received from the collimating optical element." (Houston Rep., ¶¶429-432.) Therefore, for the same reasons discussed above, I disagree with Dr. Houston. In my opinion, none of the Accused Products infringe limitation 1(c) of the '582 patent.

[redacted]



**d. 1(c): "an optical relay element arranged to receive at least a portion of the collimated beam from the collimating optical element, the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a *first image*;" 1(d) "a *first focusing optical element* arranged to receive at least a portion of the collimated beam reflected by the optical relay element"; and 1(e) "a *first semiconductor detector*," 1(f) wherein the *first focusing optical element* is configured to focus the portion of the collimated beam received from the optical relay element onto the *first semiconductor detector*."**

**(1) "image" and "first image"**

393. I have reviewed Dr. Ilkov Opening Invalidity Report, and his opinion that the claim term "image" as used in the Asserted Claims of the '582 patent is indefinite because Beckman has taken the position that "image" can include a "collimated afocal image." (*See* Ilkov Op. Rep., Section XV.I.) I agree with Dr. Ilkov's opinion. A collimated afocal beam forms an image at infinity, and it does not make sense within the context of flow cytometers that there would be an image at infinity since a beam in a flow cytometer does not travel to infinity.

394. I have reproduced a portion of Dr. Ilkov's opinion below describing the disclosures in the '582 patent:

[redacted]



[redacted]

Testing 06.22.2018.pdf (2018) ("Afocal systems, by definition, produce a virtual image projected from infinity.").)

1080. The inclusion of "collimated afocal image" within the term "image" renders the term "image" indefinite. A POSA would not understand with reasonable certainty the metes and bounds of an "image" that includes a "collimated afocal image," in particular within the context of the clam elements, which recite "the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a first image"; "the collimating optical element configured to project a first image" and "the optical relay element configured to receive light from the collimating optical element and to project a second image." This is because a collimated beam forms an image at infinity, and a POSA would not understand any image to be formed within the claimed "optical subsystem for a flow cytometer" as the light path in a flow cytometer is plainly not infinite. A POSA would not understand where such a "collimated afocal image" would form within the light path of the "optical subsystem for a flow cytometer."

1081. I have reviewed the two disclosures in the '582 patent that discuss "collimated afocal image." Both disclosures reference FIG. 10 of the '582 patent, which I have reproduced below.

[redacted]



[redacted]




*FIG. 10*

1082. The disclosures relate to a composite microscope objective 60' that is used to collect fluoresced and scattered light from a flow cell. The '582 patent states: "The shapes of the back-surface mirror 601' and the aberration corrector plate 602' depicted in FIG. 10 are modified slightly to produce **collimated afocal images of the emission locations near the viewing zone** within the flow channel '604." ('582, 35:25-29 (emphasis added).) The '582 then further states: "It is understood by those having skill in the art that the composite microscope objective 60'' [of FIG. 12] may be configured to provide either a finite focused image similar to that depicted in FIG. 9A, or a **collimated afocal image** **<u>which is focused at a finite distance</u>** from the composite microscope objective 60'' **by a chromatic aberration correction doublet similar to the doublet lens 609 depicted in FIG. 10**." ('582, 36:25-32 (emphasis added).) In my opinion, a POSA reviewing these disclosures would understand that the design discussed in these disclosures is intended to produce an image (not a collimated afocal image) at 605 by focusing the

698

[redacted]



[redacted]

so-called "collimated afocal image . . . near the viewing zone within the flow channel 604" and further focusing it through a doublet lens 609 such that it becomes "focused at a finite distance." I have annotated FIG. 10 to show this:




FIG. 10

1083. I have also reproduced FIG. 9A for comparison below.




FIG. 9A

1084. That is, the disclosure in the '582 patent of the so-called "collimated afocal image" refers to some imprecise location along the light path ("near the viewing zone" of flow channel 604) which is then further "focused at a finite distance" by a "doublet lens" to form an "image." Therefore, the disclosures of a "collimated afocal image" in the '582 patent would not provide a POSA with any

699

[redacted]



[redacted]

reasonable certainty on the meaning of "image" and, to the contrary, would contribute to a POSA's confusion over the meaning of an "image" that includes a "collimated afocal image" within the context of the claimed "optical subsystem for a flow cytometer."

1085. I further note that the disclosures of a "collimated afocal image" relate to the composite microscope objective used to collect fluoresced and scatter light from the flow cell, which is a separate component than the disclosed "wavelength division multiplexer (WDM)" or claimed "optical subsystem" of independent claims 1 and 20 of the '582 patent. Therefore, the disclosures of a "collimated afocal image" do not support Plaintiff's position that a collimated beam can form a "collimated afocal image" within the claimed "optical subsystem for a flow cytometer." Again, a POSA would understand that a collimated beam forms an image at infinity.

1086. I have worked in the field of optics for many years, and I have only seen the phrase "collimated afocal image" in Yong Chen's patents. Afocal systems, by definition, produce a virtual image projected from infinity (i.e., the output beam is collimated). The collimated image must be focused to form a real image. Hence, the combination of the words "collimating afocal image" does not bear a meaning one can grasp. Therefore, I am not aware of any extrinsic evidence using the phrase "collimating afocal image" that would help a POSA understand the meaning of

[redacted]



[redacted]

"collimating afocal image."

1087. The use of "image" within the written description of the '582 patent also causes confusion and would further contribute to a POSA not understanding the meaning of "image" as recited and used in claims 1 and 20 of the '582 patent.

1088. At the claim construction hearing, counsel for Beckman Coulter also pointed to the disclosure describing FIGs. 25, 27, and 28 in columns 56 to 58 of the '582 patent as supporting its proposed construction. (Sep. 17, 2025 Hearing Tr. at 78:1-79:25.) But this disclosure would only cause further confusion to a POSA. I have reproduced FIGs. 25, 27, and 28 below.




*FIG. 25*

701

[redacted]



[redacted]




*FIG. 27*




*FIG. 28*

1089. First, I note that this disclosure uses the word "image" not "collimated afocal image." Moreover, "image" is used in an imprecise manner in this disclosure. It is not entirely clear, but it appears that the named inventor Yong Chen or his patent attorney equated the term "image" to "collimated beam." For example, the

[redacted]



[redacted]

disclosure includes the following passage: "The imaging optical arrangement **902** forms a beam of light from the light emitted from a light source **901** and produces an image of substantially the same size as the effective size of said imaging optical arrangement. … The dichroic filter arrangement **903**, **904** may be located **between** said imaging optical arrangement **902** and said **image**, and separates the beam of light into a first branch and second branch of distinctive colors." ('582, 56:65-57:7 (emphasis added).) It is unclear from this passage what is being referenced as the "image" and where such an "image" is located. A further passage states: "The image focusing optical element arrangement **905** is located in or in proximity to an **image plane** of **said image**." (*Id.* at 57:21-23 (emphasis added).) Although not clear, this passage implies that the "image" is the "collimated beam" and the image plane is near 905. The following passage causes further confusion: "As can be seen in FIG. 25, the wavelength division multiplexer as described above may further comprise an image relay optical arrangement **907**. This image relay optical arrangement may be located in or in proximity to an **image plane** produced by said imaging optical arrangement in the second branch, wherein said image relay optical arrangement is adapted to produce an **image** of said imaging optical arrangement in a third branch having substantially the same size as the **image** in the second branch." (*Id.* at 57:36-45 (emphasis added).) Again, although not clear, this passage implies that the "image" is the "collimated beam." I have annotated FIGs. 25 and 27 to

703

[redacted]



[redacted]

highlight this confusion:




*FIG. 25*




*FIG. 27*

704

[redacted]

1090. As shown in yellow above, it is unclear whether the named inventor Yong Chen or his patent attorney is referring to the "collimated beam" as the image. I have also noted where the "image planes" would appear to be. I further note that claims 1 and 20 recite "image," not "image plane." In my opinion, a POSA reading the '582 patent would not be able to determine the meaning of "image" with any reasonable certainty. As I have stated above, a collimated beam forms an "image" at infinity. Therefore, in my opinion, independent claims 1 and 20 and their dependent claims are invalid because a POSA would not understand the meaning of "image" as set forth in the claimed "optical subsystem for a flow cytometer."

(Ilkov Op. Rep., ¶¶1080-1090.) I agree with Dr. Ilkov's opinion regarding these disclosures, which support that the claim term "image" as used in the asserted claims of the '582 patent is indefinite.

395. Dr. Schaafsma opines: "[I]n the Cytek ray trace I analyzed above, the relay elements are the [redacted] (Schaafsma Rep., ¶204.) Dr. Schaafsma also opines: [I]n the Cytek ray trace I analyzed above, [redacted] (*Id.* at ¶205.) Dr. Schaafsma further opines: "[I]n the Cytek ray trace I analyzed above, [redacted]." (*Id.* at ¶206.) Finally, Dr.

Schaafsma opines: "[T]he [Cytek] ray trace models show that the [redacted] (*Id.* at ¶207.)

396. Although it is not clear what Cytek ray trace Dr. Schaafsma is referring to that includes all the labels, I have included a diagram annotated by Dr. Schaafsma that appears to reflect Dr. Schaafsma's attempt to map the claim language onto the Accused Products.

[redacted]

(Schaafsma Rep., ¶130.)

397. As an initial matter, I note that Dr. Schaafsma attempts to map the claim

language using a real image rather than the purported "collimated afocal image." Dr. Schaafsma takes the position that [redacted] (Schaafsma Rep. ¶204.) However, Dr. Schaafsma does not include any mapping for how the limitation of a "**first image**" is satisfied. The claim language requires "an optical relay element arranged to receive at least a portion of the collimated beam from the collimating optical element, the optical relay element comprising a curved mirror configured to reflect the portion of *the collimated beam received from the collimating optical element to produce a first image*." ('582 patent, cl. 1 (emphasis added).) In the Accused Products, [redacted]

[redacted]

(Schaafsma Rep., ¶130 (annotated).)

398. In my opinion, Dr. Schaafsma has not shown how the claimed optical relay element produces a "first image."

**(2) "first focusing optical element" and "first semiconductor detector"**

399. Additionally, the claim also requires "**a first focusing optical element arranged to receive at least a portion of the collimated beam reflected by the optical relay element**" and "**a first semiconductor detector, wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element onto the first semiconductor**

**detector**." ('582 patent, cl. 1 (emphases added).) Although Dr. Schaafsma has not identified and labeled the purported "**focusing optical elements**," I have annotated the figure to further show [redacted]. (As I explain below, [redacted]) Similarly, [redacted]. While the figure provided by Dr. Schaafsma [redacted]

[redacted]

As the annotated figure shows, [redacted]

400. Under Dr. Schaafsma's mapping, [redacted] There are multiple flaws with this mapping. [redacted] A POSA reading the claim language would not understand the third focusing lens to be the "first focusing optical element" and the third semiconductor detector to be the "first semiconductor detector." Moreover, the claim language recites that the "first focusing optical element" is "arranged to receive at least a portion of the ***collimated beam*** reflected by the optical relay element." [redacted]

Therefore, [redacted]

[redacted]

401. Additionally, if Cytek's proposed construction of "focusing optical element" is adopted, Dr. Schaafsma has not provided any opinion that [redacted] Dr. Schaafsma only points to a Zemax printout, [redacted] [redacted] (Schaafsma Rep., ¶155 (citing CYTEK_0000011058 at -11061-62).) The claim language requires "a *first* focusing optical element arranged to receive at least a portion of the collimated beam reflected by the relay element." At most, [redacted]

**(3) Dr. Schaafsma's mapping of "collimating optical element" onto the first "curved mirror"**

402. Dr. Schaafsma maps the "collimating optical element" onto the purported first "curved mirror" (which is not a mirror, but a microlens as explained in Section XIII.E). Dr. Schaafsma provides the following annotated figure, which inaccurately does not show [redacted].

[redacted]

(Schaafsma Rep., ¶153.)

403. For the same reasons I provided in my analysis in Section XIV.C.1.b (Element 1(b)), fully incorporated by reference here, the "collimating optical element" cannot be mapped onto [redacted] because the claim language requires "a collimating optical element arranged *to receive light from a light source*, the collimating optical element configured to project a collimated beam." ('582 patent, cl. 1.) [redacted]

404. Nevertheless, even if the "collimating optical element" could be mapped onto [redacted] Dr. Schaafsma's mapping is still flawed in my opinion. Again, Dr. Schaafsma's mapping is not to the first set of focusing lens and semiconductor detector, but instead to the *third* set of focusing lens and semiconductor detector. A

POSA reading the claim language would not understand the third focusing lens to be the "first focusing optical element" and the third semiconductor detector to be the "first semiconductor detector." Moreover, the claim language recites that the "first focusing optical element" is "arranged to receive at least a portion of the *collimated beam* reflected by the optical relay element." ('582 patent, cl. 1 (emphasis added).) [redacted] In my opinion, Dr. Schaafsma has not shown how the accused Cytek products infringe Claim 1.

405. I have also reviewed Dr. Houston's opinion where she ultimately relies on Dr. Schaafsma for his opinion on the limitations I discuss above. Therefore, for the same reasons discussed above, I disagree with Dr. Houston. In my opinion, none of the Accused Products infringe Claim 1.

**e. Conclusion: Asserted Claim 1**

406. As discussed above, and incorporated here, Drs. Houston and Schaafsma have not demonstrated that each of the Accused Products meets all the limitations of claim 1, and thus it is my opinion that asserted claim 1 of the '582 patent is not infringed.

[redacted]



**2. Asserted Claim 3**

407. I understand that claim 3 of the ’582 patent depends from claim 2, which in turn depends from claim 1, and thus includes all elements of claims 1 and 2 in addition to the elements of claim 3.

**a. 3(b): “wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element to a size smaller than 1 millimeter in diameter.”**

408. In my opinion, claim limitation 3(b) is not met for the same reasons discussed above in Section XIV.C.1.b for limitations 1(b), 1(c), 1(d), 1(e), and 1(f) of claim 1 of the ’582 patent, which analysis I incorporate here by reference.

**b. Conclusion: Asserted Claim 3**

409. As discussed above, and incorporated here, Drs. Houston and Schaafsma have not demonstrated that each of the Accused Products meets all the limitations of claims 1, 2 and 3, and thus it is my opinion that asserted claim 3 of the ’582 patent is not infringed.

**3. Asserted Claim 6**

410. I understand that claim 6 of the ’582 patent depends from claim 1, and thus includes all elements of claim 1 in addition to the elements of claim 6.

**a. 6(b): "further comprising a first optical filter disposed along an optical path between the collimating optical element and the optical relay element, the first optical filter configured to separate the collimated beam into a first branch and a second branch."**

411. In my opinion, claim limitation 6(b) is not met for the same reasons discussed above in Section XIV.C.1.b for limitations 1(b), 1(c), 1(d), 1(e), and 1(f) of claim 1 of the '582 patent, which analysis I incorporate here by reference.

412. I also understand that Dr. Weigl has opined that the '582 patent's specification fails to provide written description support for, and fails to enable the use of, "optical filters" other than "dichroic filters." (Weigl Op. Rep., ¶137.) The Accused Products use bandpass filters, not dichroic filters, and thus are not within the scope of "filter" in claim limitation 6(b).

413. Additionally, each of the Accused Products does not satisfy the limitation of "the first optical filter configured to separate the collimated beam into a first branch and second branch." [redacted] (Schaafsma Rep., ¶¶215, 153.) However, [redacted]. He, therefore, has not shown the claim element is infringed.

[redacted]

(Schaafsma Rep., ¶130.)

414. Additionally, to the extent Dr. Schaafsma intended to rely on his following annotated figure ([redacted] that figure demonstrates non-infringement in my opinion.

[redacted]

(Schaafsma Rep., ¶153.)

415. The claim language requires that "the first optical filter configured to separate the collimated beam into a first branch and second branch." A POSA would understand that the plain and ordinary meaning of "the first optical filter" in the context of the claim language is the initial optical filter. The claim languages requires that the "first optical filter [be] disposed along an optical path between the collimating optical element and the optical relay element." As I have discussed in Section XIV.C.1.b (collimating optical element), the "collimating optical element" in the '582 patent is achromatic doublet lens 902 and not any of the curved mirrors. Therefore, [redacted]

[redacted]

As I have repeatedly explained, there is no collimated beam at all in the Accused Products. But even if a POSA were to consider segments of the beam, [redacted] To the contrary, the [redacted]

[redacted]

416. Even under Dr. Schaafsma's mapping [redacted] I have added my annotations on top of Dr. Schaafsma's mapping with arrows and texts ("converging" in red with black outline and "diverging" in green with black outline). The Zemax files show that [redacted]

[redacted]



[redacted]

(Ilkov Rebuttal Rep., App. B (annotated).)

417. I have also reviewed Dr. Houston's opinion where she ultimately relies

[redacted]



on Dr. Schaafsma for his opinion on the limitations I discuss above. Therefore, for the same reasons discussed above, I disagree with Dr. Houston. In my opinion, none of the Accused Products infringe Claim 6.

**b. Conclusion: Asserted Claim 6**

418. As discussed above, and incorporated here, Drs. Houston and Schaafsma have not demonstrated that each of the Accused Products meets all the limitations of claims 1 and 6, and thus it is my opinion that asserted claim 6 of the '582 patent is not infringed.

**4. Asserted Claim 20**

**a. 20(b): "a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a first image; and"**

419. In my opinion, claim limitation 20(b) is not met for the same reasons discussed above in Section XIV.C.1.b for limitation 1(b) of claim 1 of the '582 patent, which analysis I incorporate here by reference.

420. For the term "collimating optical element," I understand that Beckman has proposed a purported plain and ordinary meaning construction of "an optical element, such as a lens, mirror, or grating, to render rays of light more nearly parallel; a collimator." (D.I. 114, Joint CC Br., 74-75.) In the alternative, Beckman provides a construction for the term as a means-plus-function term.

421. I understand that Cytek has proposed that "collimating optical element"

[redacted]



is a means-plus-function term. (*Id.*, 74.) In the alternative, Cytek proposed the following construction of the term: "an optical component at a focal distance from a light source that projects a 'collimated beam' centered on the optical axis such that a 'portion of the collimated beam' is projected onto a first focusing optical element," and another 'portion of the collimated beam' is projected onto a first optical relay element,' otherwise indefinite." (*Id.*, 75.)

422. As a means-plus-function term, both parties agree that the function of the "collimating optical element" in claim 20(b) is to "(1) receive light from a light source" and "(2) project a first image." (*Id.*, 74-75.) However, while Beckman argues that a "lens, such as an achromatic doublet lens, and structural equivalents thereof" may qualify as the structure of "collimating optical element," Cytek argues that the term is indefinite for failure to provide sufficient corresponding structure. (*Id.*)

423. I agree with Cytek that the term "collimating optical element" is a means-plus-function term whose structure is indefinite. I understand that the Court has construed "optical element," (a term appearing in the '443 patent) as a means-plus-function term. "Collimating" is simply a functional term modifying a means-plus-function term, "optical element," which I understand does not impart structure.

424. I have also reviewed Dr. Ilkov's Opening Invalidity Report, and his opinion further confirms my opinion that this term is indefinite because no focal

length is specified in the specification. (*See* Ilkov Op. Rep., Section XV.I.)

425. Claim 20 of the '582 patent also requires "the collimating optical element configured to project a first image." I understand that Beckman takes the position that a "collimating optical element" can project a "collimated afocal image." Notably, claim 20 recites projecting an "image" not a "collimated afocal image." In any event, there is no disclosure within the specification of any structure for the "collimating optical element" that projects either a real "image" or a "collimated afocal image," as Dr. Ilkov's Opening Invalidity Report further explains. (*See* Ilkov Op. Rep., Section XV.I.2.iii.) However, even if not indefinite, a "collimating optical element" should be limited to the achromatic doublet lens 902, which is the only structure disclosed in the specification associated with the term "collimating optical element" (and equivalents). (*See* Ilkov Op. Rep., Section XV.I.2.ii.) This is supported by the file history of related '106 patent where Beckman pointed out to the Patent Office what Beckman considered to be the "collimating optical element":




*FIG. 25*

(BEC-CYTEK-00004404 at -4819 ('106 patent file history (July 18, 2024 Response to Final Office Action Sent May 2, 2024), 14) (annotations in original).) Dr. Houston's report, in fact, also points to this portion of the '106 file history. (Houston Rep., ¶82.) While Dr. Schaafsma points to the specification to support his opinion that the "collimating optical element" can be a lens or similar optical instrument such as a concave mirror, (Schaafsma Rep., ¶85), I disagree for reasons I discussed above in my recitation of the claim construction arguments as well as further below.

426. Although Dr. Schaafsma treats claim elements 20(b), 20(c), and 20(d) separately in his report (Schaafsma Rep., ¶¶219-223), these claim elements are

[redacted]



closely interrelated, and I therefore incorporate my discussion of the respective other two claim elements in this set into my discussion of elements 20(b), 20(c), and 20(d), respectively. Indeed, as discussed further below, Dr. Schaafsma's treatment of these claim elements is confusing, flawed, and incomplete because (among other reasons) he does not clearly identify what element(s) of the Accused Products purportedly map to what claim element(s) nor consistently describe or apply alternative theories of infringement that span these interrelated claim elements. I also note Dr. Houston does not provide a separate or independent analysis of these claim elements and instead simply cites to Dr. Schaafsma's (flawed) analysis. (*See* Houston Rep., ¶¶464-469.)

427. For element 20(b) ("a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a first image"), Beckman in its infringement contentions previously mapped the purported "images" to beam spots on the bandpass filter.

[redacted]






Figure 2: Light emitted from the sample is collected and passes through the optical filter-based coarse wavelength division multiplexing (CWDM) demultiplexer arrays on the Cytek Aurora and Northern Lights cytometers.

Optical Subsystem



[redacted]





Optical Subsystem
300
102
COE
302
303
Collimated Beam projected by COE
304
301
Portions of Collimated Beam
5
Optical Relay Elements Comprising Curved Mirrors and Further Collimating Beam
106B
M(1) M(2) M(3) M(4) M(5) M(6) M(7) M(8) M(9) M(10) M(11 M(12) M(13 M(14) M(15)
Images
D(1) D(2) D(3) D(4) D(5) D(6) D(7) D(8) D(9) D(10) D(11) D(12) D(13) D(14) D(15)
314 D(16)
316
313A 313B 313C 313D 313E 313F 313G 313H 313I 313J 313K 313L 313M 313N 313O 313P
318
320
4B
FIG. 3

[redacted]





FIG. 6

(*See, e.g.*, Nov. 19, 2025 Second Am. Infringement Contentions, Ex. 1 at 55, 60, 61, 66, 67, 200.)

428. However, Dr. Schaafsma appears to present two new theories of infringement for this claim element. (Schaafsma Rep., ¶¶219-220.) I address each in turn.

429. First, Dr. Schaafsma opines: [redacted] (Schaafsma Rep., ¶219.) He continues: [redacted]

[redacted] (*Id.*) I understand Dr. Schaafsma to thus contend that [redacted] hat satisfies this part of claim element 20(b). For the reasons previously discussed, and incorporated here, I disagree. [redacted] as this means-plus-function term has been construed.

430. Dr. Schaafsma fails to expressly or clearly identify what he contends is the "first image" under this first infringement theory for this claim element, but as best I can discern from the context of paragraphs 219 and 221 of his report, I believe Dr. Schaafsma is alleging that [redacted] (Schaafsma Rep., ¶219.) I disagree. For the reasons previously discussed, including for example for claim element 1(c) and incorporated here, [redacted] (The segment is also not collimated as light is converging and diverging as I previously explained for claim 1 of the '582 patent on "collimated beam" (and incorporate here).)

431. [redacted] Dr. Schaafsma fails to provide

any rationale for why a person of ordinary skill in the art would understand this particular segment of the light beam to constitute the "*first* image," when any earlier segments and/or points in the light pathway would more readily or logically be considered "first" under the apparent (and incorrect) conception of an "image" employed by Dr. Schaafsma. This includes, for example, [redacted]. (To be clear, it is not my opinion that [redacted] Similarly, as discussed further below, the [redacted]

[redacted]

432. Dr. Schaafsma next offers an alternative theory for this claim element, stating: [redacted] (Schaafsma Rep., ¶220.) I disagree with Dr. Schaafsma's assertion that the Accused Products satisfy this claim element under this alternative theory. First, for the reasons I have previously discussed (e.g., for claim element 1(b)) and incorporate here, [redacted]

433. Second, Dr. Schaafsma does not expressly state but appears to imply that [redacted]. (Schaafsma Rep., ¶19.) This claim element requires, however, that the *collimating*

[redacted]



optical element be "configured to project the first image"—that is, project a first *collimated* image. [redacted].

**b. 20(c): "an optical relay element arranged near the first image, the optical relay element configured to receive light from the collimating optical element and to project a second image;"**

434. In my opinion, claim limitation 20(c) is not met for the same reasons discussed above in Section XIV.C.1.b for limitation 1(b) of claim 1 of the '582 patent, which analysis I incorporate here by reference. Each Accused Product does not comprise a "collimating optical element."

435. For this claim limitation, Dr. Schaafsma has again departed from Beckman's infringement contentions, which pointed to purported images at the bandpass filter. (*See, e.g.*, Nov. 19, 2025 Second Am. Infringement Contentions, Ex. 1 at 55, 60, 61, 66, 67, 200-201.) Beckman's infringement contentions stated: "As illustrated, the first image is the closest image of the object to the collimating optical element, along the optical path, and the second image is the next sequential

[redacted]



image of the object after the first image, along the optical path, without any intervening image of the object. Therefore, the Accused Products include 'a first image' and a 'second image [after the first image with no intervening image],' as required by the Court's construction." (*Id.*, 201.) (As I discuss below for claim element 20(d), Dr. Schaafsma does not show, or even allege, that the alternating sequential pairs of focused and unfocused light at the bandpass filters (that were the purported "images" alleged in the infringement contentions) are "substantially the same size.")

436. I disagree with Dr. Schaafsma's opinions for claim limitation 20(c), which are deficient and incorrect in multiple ways. Dr. Schaafsma: (1) fails to identify with specificity what he alleges is a/the "second image" in the Accused Products (2) fails to identify with specificity which purported "optical relay element" projects a/the "second image" and/or (3) fails to show that any particular "optical relay element[s]" that he generally identifies are arranged "near" the "first image" identified in claim element 20(b). (Schaafsma Rep., ¶¶221-222.) These deficiencies and inadequacies are somewhat understandable, as the Accused Products do not comprise "an optical relay element arranged near the first image, the optical relay element configured to receive light from the collimating optical element and to project a second image."

437. I first note that Dr. Schaafsma makes no showing (and does not even

attempt to show) that [redacted]

[redacted]

438. In his discussion of claim limitation 20(c), however, Dr. Schaafsma appears to offer a new *third* mapping to an alleged "first image." (Schaafsma Rep., ¶222.) He states: [redacted] For the reasons previously discussed (including for claim element 1(c)), I disagree with such contentions that either of these identified

[redacted]



sections of the light beam would be considered to be or include any "image." I also disagree with such an identification of a "first" and a "second" image because it is inconsistent with the Court's claim construction for these terms. [redacted]

439. Additionally, even if one were to accept (for the sake of argument only) Dr. Schaafsma's identification here of a "first image" [redacted]

[redacted]

441. Dr. Schaafsma also fails to clearly and specifically identify what he alleges is the "second image" here. As best I can understand, under the theory in this paragraph, [redacted] As this claim element requires the "optical relay

[redacted]



element" to be configured to "project a second image," I infer from Dr. Schaafsma's seeming [redacted]

442. Dr. Schaafsma states: [redacted] Indeed, I disagree with Dr. Schaafsma's theory for at least three related reasons.

443. First, this claim limitation requires that the optical relay element be "arranged near the first image," not "near enough" to the first image. Further, Dr. Schaafsma identifies no support from the '582 patent (or elsewhere), and I am not aware of any, for his assertions that the focal length of an alleged "focusing relay element" that allegedly "projects a second image" has any bearing on the question of whether that focusing relay element is "arranged near" (or "near enough") a "first

image." Indeed, there are no "focusing relay elements" discussed in the '582 patent, as its disclosure is aimed at projecting and maintaining a collimated light beam throughout a relay device. This is another illustration of how the Accused Products are fundamentally different from the devices disclosed in and claimed by the '582 patent.

444. Second, there is no principled reason (and certainly none are offered by Dr. Schaafsma) why one would limit the concept of an image being "near" (or near enough) to an optical relay element to the focal lengths of any focusing optical relay elements (which, again, are not disclosed in the '582 patent). [redacted] A person of ordinary skill in the art would not consider something that is infinitely far away from an optical relay element to be "arranged near" that optical relay element.

445. Third, Dr. Schaafsma appears to avoid or ignore this issue by just asserting [redacted]

[redacted]

446. For the reasons previously discussed and incorporated here, a person of ordinary skill in the art would not consider a collimated light beam segment to constitute or comprise an "image" and would not consider any and all of the infinitely many cross sections of this beam segment to constitute an "image" or "first image."

447. In addition, even if one accepted the proposition that a [redacted]

[redacted]

(Schaafsma Rep., ¶130 (additional annotations added in green and red).)

448. For all of these reasons, the Accused Products do not comprise "an optical relay element arranged near the first image, the optical relay element configured to receive light from the collimating optical element and to project a second image."

**c. 20(d): "wherein the size of the first image is substantially the same as the size of the second image;"**

449. For this claim element, Dr. Schaafsma has again departed from Beckman's infringement contentions, which pointed to purported images at the

[redacted]



bandpass filter. (*See, e.g.*, Nov. 19, 2025 Second Am. Infringement Contentions, Ex. 1 at 202-210.)

450. For the same reasons I provided in my analysis in Sections XIV.C.1.d (limitation 1(c)) and for limitations 20(b) and 20(c) above, incorporated by reference here, each of the Accused Products does not comprise an "image" or "first image" or "second image," to the extent that Dr. Schaafsma is contending that any of the these "image" elements are satisfied by an allegedly collimated beam and/or "afocal image." This includes both the first and second "afocal image[s]" that Dr. Schaafsma identifies in paragraph 222 of his report as well as the so-called [redacted] in paragraphs 219 and 221 of his report.

451. In addition, as discussed for the previous claim element and incorporated here, in paragraph 221 of his report, Dr. Schaafsma appears to argue that "afocal image" and the following focused image on the odd-numbered filters form pairs of "first" and "second" images. For claim element 20(d), however, Dr. Schaafsma does not argue that these pairs of alleged first (afocal) and second (focused) images have "substantially the same size." Instead, he merely asserts that [redacted] He does not assert (nor show), for example, that

[redacted] Nor could he, because the sizes of the light beam at these points or sections of the relay module are clearly different sizes and are not substantially the same. This is illustrated, for example, in the images reproduced below.

[redacted]

[redacted]

[redacted]
James F. Leary, Ph.D. Rebuttal Report Regarding Non-Infringement (CYTEK_0000000089 at -106 ([redacted]).)

452. Finally, also as discussed above for claim limitations 20(b) and 20(c) and incorporated here, Dr. Schaafsma also appears to allege in paragraph 220 of his report that [redacted]. As such, Dr. Schaafsma does not and cannot show that [redacted] And even if Dr. Schaafsma were to later, further newly assert [redacted] I also incorporate here my discussion above of the deficiencies in Dr. Schaafsma's spot size analysis, where he fails to show that even the *non*-sequentially occurring spots on the odd-numbered filters are "substantially the same size."

453. [redacted]

[redacted]



**d. 20(e): "wherein the optical relay element comprises a curved mirror or a concave-shaped dichroic filter."**

454. In my opinion, limitation 20(e) is not met for the same reasons as limitation 1(d) of the '107 patent (in Section XIV.A), which analysis I incorporate here, because the Accused Products do not contain "mirrors" and the microlenses present in the Accused Products are not the equivalent of the claimed "mirrors." Further, neither Drs. Houston or Schaafsma have alleged (nor offered any evidence supporting an allegation) that the Accused Products include a concave-shaped dichroic filter. (Houston Rep., ¶470; Schaafsma Rep., ¶224.) So claim limitation 20(e) which requires "**wherein the optical relay element comprises a curved mirror or a concave-shaped dichroic filter**" is not met because the Accused Products do not contain a "mirror" nor a concave-shaped dichroic filter.

**e. Conclusion: Asserted Claim 20**

455. As discussed above, and incorporated here, Drs. Houston and Schaafsma have not demonstrated that each of the Accused Products meets all the limitations of claim 20, and thus it is my opinion that asserted claim 20 of the '582 patent is not infringed.

**5. Asserted Claims 23 and 26**

456. I understand that claim 23 of the '582 patent depends from claim 22, which in turn depends from claim 20, and thus includes all elements of claims 20 and 22 in addition to the elements of claim 23.

457. I understand claim 26 of the '582 patent depends from claim 22, which in turn depends from claim 20, and thus includes all elements of claims 20 and 22 in addition to the elements of claim 26.

**a. 22(c): "wherein the first image is a magnified image of the object."**

458. For claim 22(c), Dr. Schaafsma provides two mappings (Schaafsma Rep., ¶227), and Dr. Houston's opinion relies on Dr. Schaafsma. (Houston Rep., ¶475.) Dr. Schaafsma contends that the "first image" is [redacted]

[redacted]

459. Dr. Schaafsma's mappings for claim 22(c) and 26(b) are inconsistent with the Court's claim construction requiring that "the second image is created after

[redacted]



the first image and there is no intervening image" (Sep. 17, 2025 Hr'g Tr. at 117:1-3), as I further explain below in addressing claim 26(b).

460. In addition, Dr. Schaafsma's assertion that [redacted] (Schaafsma Rep., ¶227), is inconsistent with his earlier assertions in his report where he distinguished "afocal images" from "magnified" images. (*Id.* ¶85 ("The image produced, as made clear in the specification, can be *either* a (unit) magnified image *or* an afocal image (as in a telescope)." (emphasis added)).)

461. Further, Dr. Schaafsma fails to explain or point to any evidence to support his alternative assertion that [redacted] (Schaafsma Rep., ¶227.) Indeed, he appears to treat the "magnified image" claim term as a nullity, that would be satisfied by any hypothetical system, stating: "The magnification can be either greater than or less than one, depending on the choice of lenses in the system." (*Id.*) [redacted] It is all hypothetical. Dr. Schaafsma

[redacted]



thus fails to show that the Accused Products satisfy this claim limitation.

**b. Conclusion: Asserted Claim 23**

462. As discussed above, and incorporated here, Drs. Houston and Schaafsma have not demonstrated that each of the Accused Products meets all the limitations of claims 20 and 22, and thus it is my opinion that asserted claim 23 of the '582 patent is not infringed.

**c. 26(b): "further comprising a first focusing optical element arranged near the second image,"**

463. [redacted]

(Schaafsma Rep., ¶233.) Dr. Schaafsma's mapping ignores the Court's construction requiring that "the second image is created after the first image and there is no

intervening image." (Sep. 17, 2025 Hr'g Tr. at 117:1-3.) Therefore, Dr. Schaafsma has not shown any "second image" near a "first focusing optical element."

464. Additionally, [redacted]

[redacted]



[redacted]

If Dr. Schaafsma later asserts that any different point(s) or segment(s) of the light beam within the relay module would or could constitute a "second image" for this claim element, I disagree for the reasons provided above for claim elements 20(b), 20(c) and 20(d), which I incorporate here, and note that Dr. Schaafsma has not offered any argument or evidence that any such hypothetical other "second images" are "arranged near" "a first focusing optical element."

465. I disagree that the Accused Products further comprise "a first focusing optical element arranged near the second image." [redacted]

[redacted]



[redacted]

466. Second, Dr. Schaafsma's assertion that "[a]s I have discussed above, in this type of relay system an optical element is considered near the image if the focusing or recollimating optic captures as much of the light as possible" is unsupported and mistaken. (Schaafsma Rep., ¶232.) He identifies no support from the '582 patent—and I am aware of none—for this statement that associates the concept of *nearness* to an image with the concept of capturing as much light as possible. I also was not able to identify any "discussion above" in Dr. Schaafsma's report that supported this statement. Indeed, if anything, the "discussion above" suggested that it was beam size and optical element size that mattered for "captur[ing] as much of the light as possible[,]" *not* the nearness (or lack thereof) of the optical element to the alleged "image." (*See, e.g.*, Schaafsma Rep., ¶88 ("For an image relay, this would mean unit magnification and for a collimated relay, this

[redacted]



would mean that the beam size does not change diameter substantially (*i.e.*, such that the next optic [*which could be located arbitrarily far away for a collimated beam*] can capture as much of the light relayed by the previous one as possible.”).)

467. Further, [redacted]

**d. 26(b): “further comprising a first focusing optical element ..., the first focusing optical element configured to focus the light from the optical relay element to a size smaller than the object of the light source to a first semiconductor detector.”**

468. Additionally, if Cytek’s proposed construction of “focusing optical element” is adopted, Dr. Schaafsma has not provided any opinion that the first half-ball lens FL1 “captures all light rays of the at least a portion of a collimated beam” as required under Cytek’s proposed construction. Dr. Schaafsma only points to a Zemax printout, [redacted] (Schaafsma Rep., ¶155 (citing CYTEK_0000011058 at -11061-62).) The claim language requires “the *first* focusing optical element configured to focus the light from the optical relay element . . . to a *first* semiconductor detector.” At most, Dr. Schaafsma has only addressed

the last focusing optical element, FL16.

#### e. Conclusion: Asserted Claim 26

469. As discussed above, and incorporated here, Drs. Houston and Schaafsma have not demonstrated that each of the Accused Products meets all the limitations of claims 20, 22 and 26, and it is my opinion that asserted claim 26 of the '582 patent is not infringed.

### D. Cytek Does Not Infringe Under 35 U.S.C. § 271(a)

470. As the foregoing analysis demonstrates, Beckman's experts have failed to demonstrate that the Accused Products meet each and every limitation of the Asserted Claims, and as such, in my opinion, Beckman has failed to prove direct infringement under § 271(a).

### E. Cytek Does Not Infringe Under 35 U.S.C. § 271(b) or (c)

471. I have reviewed Dr. Houston's Report with respect to infringement under 35 U.S.C. § 271(b) and (c) and disagree that Cytek infringes under 35 U.S.C. § 271(b) and (c). As an initial matter, I am told that there cannot be infringement under 35 U.S.C. § 271(b) or (c) if there is no direct infringement of any of the Asserted Claims. As set forth above, Beckman's experts have not demonstrated that the Accused Products meet each and every limitation of the Asserted Claims, there is no direct infringement. Because there is no direct infringement, I understand there can be no infringement under 35 U.S.C. § 271(b) and (c). I have reviewed Dr.

[redacted]



Houston's Report with respect to infringement under 35 U.S.C. § 271(b) and (c) and disagree that Cytek infringes under 35 U.S.C. § 271(b) and (c). As an initial matter, I am told that there cannot be infringement under 35 U.S.C. § 271(b) or (c) if there is no direct infringement of any of the Asserted Claims. As set forth above, Beckman's experts have not demonstrated that the Accused Products meet each and every limitation of the Asserted Claims, there is no direct infringement. Because there is no direct infringement, I understand there can be no infringement under 35 U.S.C. § 271(b) and (c).

472. Additionally, counsel has informed me that to actively induce infringement pursuant to Section 271(b) or engage in contributory infringement pursuant to Section 271(c) requires showing, among other things, that a party (1) knew of, or was willfully blind to, a patent's existence, and (2) knew or was willfully blind to the fact that the party's actions caused infringement of the patent.

473. Dr. Houston opines that Cytek had (1) the requisite knowledge of the Asserted Patents for inducing infringement based on the opinions she includes in her report's Section XII.A – Cytek's Knowledge of the Patents, and (2) the requisite knowledge that use of the Accused Products according to Cytek's instructions would infringe the Asserted Patents based on the opinions she includes in her report's Section VIII – Overview of the Asserted Patents. For the reasons discussed below regarding Beckman's allegations of willful infringement (where I address Dr.

[redacted]



Houston's opinion from Section XII.A of her report), I disagree that Cytek had the requisite knowledge of the Asserted Patents to induce infringement. Moreover, even if Cytek had the requisite knowledge of the Asserted Patents, Cytek lacked the requisite knowledge that use of the Accused Products according to Cytek's instructions would infringe the Asserted Patents, given (1) the reasonable belief it had that its products did not infringe any of Beckman Coulter's patent, which I discuss regarding Beckman's allegations of willful infringement and incorporate here, and (2) the numerous reasons for which Cytek's Accused Products do not infringe the Asserted Patents, which I describe in Sections XIV.A-D and incorporate here.

474. Dr. – Cytek's Knowledge of the Patents. For the reasons discussed below regarding Beckman's allegations of willful infringement (where I address Dr. Houston's opinion from Section XII.A of her report), I disagree that Cytek had the requisite knowledge of the Asserted Patents to engage in contributory infringement of the Asserted Patents. Moreover, even if Cytek had the requisite knowledge of the Asserted Patents, Cytek lacked the requisite knowledge that given (1) the reasonable belief it had that its products did not infringe any of Beckman Coulter's patent, which I discuss regarding Beckman's allegations of willful infringement and incorporate here, and (2) the numerous reasons for which Cytek's products do not infringe the Asserted Patents, which I describe in Sections XIV.A-D and incorporate here.

[redacted]



475. For these additional reasons, in my opinion, Beckman has not demonstrated infringement under 35 U.S.C. § 271(b) and (c).

**F. Cytek Does Not Infringe the Asserted Patents Under 35 U.S.C. § 271(f)(1)**

476. I have reviewed Dr. Houston's Report with respect to her opinions that Cytek infringes claims 11 and 15 of the '443 patent and claims 5, 16, 18, 26, 27, and 29 of the'107 patent under 35 U.S.C. § 271(f)(1), each of which claim a flow cytometer. (Houston Rep., ¶¶784-787.) I disagree that Cytek infringes these claims under 35 U.S.C. § 271(f)(1).

477. First, as my claim-by-claim analysis above demonstrates, Beckman's experts have failed to demonstrate that the Accused Products meet each and every limitation of the Asserted Claims, and as such, in my opinion, Beckman has failed to prove infringement under § 271(f)(1).

478. Second, I am told that a company can infringe a patent if it supplies components of a patented invention from the United States to be assembled outside the United States. To face liability, I understand that the company must supply all or a substantial portion of the patented invention's components from the United States for combination abroad into the patented invention. I understand that the phrase "substantial portion" refers to a quantitative—not qualitative—measure, and that a single component of a patented invention—even one that is important or necessary—can never constitute a "substantial portion" so as to trigger liability.

[redacted]



479. At a high level, the Accused Products (aside from the Laser Upgrades) are flow cytometers or cells sorters that include the following components: mechanical structures, fluidics, flow cells, lasers and light sources, optical detection systems, thermal management, electronics, computer hardware and software, and system-level control and processing hardware. All of the Accused Products' components are set forth in instrument-level BOMs. (*See, e.g.*, CYTEK_0000020918 (Aurora 56 Channel BOM); CYTEK_0000021020 (Aurora Evo 67 BOM); CYTEK_0000020944 (Northern Lights 3000 BOM).) The relevant unit of analysis under § 271(f)(1) for these asserted claims is therefore the entire instrument.

480. Dr. Houston asserts that Cytek infringes under 35 U.S.C. § 271(f)(1), by supplying APD modules manufactured in Fremont, California to Cytek's ex-U.S. facilities, where those modules are combined with other components into completed flow cytometers or cell sorters. (*See* Houston Rep., ¶785.) Dr. Houston opines that APD modules constitute a "substantial portion" of the Accused Products because multiple APD Modules are incorporated into each Accused Product, and they are "necessary components" for the Accused Products' fluorescence detection and spectral flow cytometer, "and they are a substantial portion of the subsystems that form Aurora, Aurora EVO, and North Lights cytometers. (*See* Houston Rep., ¶786.) In my opinion, Dr. Houston's analysis is conclusory and deficient, and does not

[redacted]



establish the APD modules are a "substantial portion" of a flow cytometer.

481. Dr. Houston never performs a quantitative analysis of the componentry of the Accused Products (e.g., by reference to a BOM) to conclude that the APD modules constitute a "substantial portion" of the claimed flow cytometers. Instead, she relies on other documents, such as user manuals, to opine that "APD Modules . . . are a substantial portion of the subsystems that form Aurora, Aurora EVO, and Northern Lights cytometers[,]" based on descriptions of functionality rather than an analysis of these products' component structure and without ever correlating those functional descriptions to the underlying components reflected in the BOMs. (*See, e.g.*, Houston Rep., ¶786 (citing various user guides that describe the Accused Products' functional capabilities but that do not quantify these products' components and subcomponents).) But these general user manuals are not designed to, and do not, quantify the components in the Accused Products. They instead describe what the instruments do, not the details of the instruments' components. Dr. Houston's opinion therefore depends on qualitative assertions rather than an assessment of the actual component structure of the Accused Products, which I understand is not how the "substantial portion" inquiry is supposed to be evaluated. But even so, the APD modules are but one sub-component of a the multiple sub-components required for a functioning flow cytometer, and even considered this way, are not a "substantial portion" of the Accused flow cytometers.

[redacted]



482. Based on my analysis of the Accused Products' instrument-level BOMs, the APD Modules do not constitute a "substantial portion" of the claimed flow cytometer under § 271(f)(1) and so there is no infringement under § 271(f)1 for this additional reason.

483. As an example, I analyzed the BOM for the Aurora 56 cytometer (CYTEK_0000020918), to quantify the number of individual components within the APD modules against the overall number of components in the instrument.

484. First, I identified the line items corresponding to the APD assembly modules present in the Aurora 56 channel, 4 laser instrument (R-B-V-UV). [redacted] (*See* CYTEK_0000020918.) [redacted] Considering that, [redacted] Thus, the

[20] In summing the Quantity column for the APD assembly module rows, I relied on the quantities as listed in the BOM. [redacted]

[redacted]



components used for all 4 APD assembly modules in this instrument is [redacted][21] This is not a "substantial portion" of the complete flow cytometer instrument. This is not a surprising outcome given that flow cytometers are composed of many distinct multi-component subsystems beyond the APD assembly modules. Again, Dr. Houston does not appear to have addressed the question of how the number of components in the instruments' APD assembly modules compare to the total components in the instrument. My analysis for the Aurora 56 4-laser instrument shows that the APD assembly modules are not a "substantial portion" of the instrument.

485. As a further example, I also analyzed the BOM for the Northern Lights 1000 System (CYTEK_0000020909) and [redacted][22] In my opinion, this quantitative

---

[redacted].

[21] I recognize that some line items in the BOM [redacted]

[redacted]



calculation demonstrates that the APD assembly module does not constitute a "substantial portion" of the claimed flow cytometer under 35 U.S.C. § 271(f)(1).

486. These examples show that across Cytek's instrument offerings, the total components in the APD assembly modules are not a substantial portion of the full instruments..

**G. Cytek Does Not Infringe the Asserted Patents Under 35 U.S.C. § 271(f)(2)**

487. I have reviewed Dr. Houston's opinions regarding infringement under 35 U.S.C. § 271(f)(2) and I disagree that Cytek infringes under 35 U.S.C. § 271(f)(2). As my claim-by-claim analysis above demonstrates, Beckman's experts have failed to demonstrate that the Accused Products meet each and every limitation of the Asserted Claims, and as such, in my opinion, Beckman has failed to prove infringement under § 271(f)(2). (*See* Houston Rep., ¶¶789-790.)

488. Separately, I note that Dr. Houston's § 271(f)(2) opinion is conclusory as to the statutory "especially made/adapted" and "no substantial non-infringing use" elements and does not tie those elements to a limitation-by-limitation analysis of any specific APD module configuration. I reserve the right to respond to any additional analysis she may present in an additional report or at deposition.

---

[redacted]

[redacted]



### H. Dr. Houston Does Not Establish Willful Infringement of the Asserted Claims

489. I have reviewed Dr. Houston's Report with respect to willful infringement. I disagree that Cytek willfully infringed. As an initial matter, I am told by counsel that there cannot be willful infringement if there is no direct infringement of any of the Asserted Claims. As I have explained above, there is no direct infringement of any Asserted Claim; therefore, there cannot be any willful infringement.

490. Dr. Houston seems to opine that Cytek's knowledge of the Asserted Patents and the patent family is sufficient to prove willful infringement. (Houston Rep., Sections XII and XIII.) I am told by counsel that to prove willful infringement, knowledge of the patents alone is not sufficient. Rather, there must be 1) knowledge of the patents, and 2) specific intent to infringe. Dr. Houston, however, does not provide any evidence that Cytek knew that it was infringing and that it specifically intended to infringe.

491. Dr. Houston also points to evidence of Cytek's knowledge and analysis of Xitogen and the CytoFLEX Products. However, none of this evidence is specifically tied to knowledge of *the Asserted Patents*, or to a specific intent to infringe *the Asserted Patents*. Dr. Houston seems to suggest that the alleged similarities between the Accused Products and the CytoFLEX Products show that Cytek was willfully blind to infringement of the Asserted Patents. (*E.g.* Houston

[redacted]



Rep., ¶501.) However, I understand from counsel that it is improper for expert witnesses to opine regarding a party's mental state with respect to willful infringement or willful blindness.[23] I understand that neither Dr. Houston nor I am qualified to opine regarding whether Cytek had the requisite specific intent to infringe, or be willfully blind to, the Asserted Patents. Nonetheless, to the extent Dr. Houston is permitted to testify regarding Cytek's mental state, I disagree with any insinuation that Cytek was willfully blind to its alleged infringement of the Asserted Patents, as discussed below. Further, I disagree with Dr. Houston's assertions regarding the technical similarities between the Accused Products and the CytoFLEX Products. (*Id.*)

492. Dr. Houston relies on the same evidence to speculate that Cytek "deliberately and wantonly copied" the claimed inventions in designing and developing the Accused Products. (*E.g.*, Houston Rep., ¶500.) First, the Accused Products launched *before* the first Asserted Patent (and the parent '412 patent) issued, so Cytek could not have "copied" the claimed inventions. Second, as noted, I understand that experts cannot opine regarding whether a party intentionally copied

[23] I am informed by counsel that willful infringement can be established if the accused infringer was willfully blind as to its infringement of a patent, *i.e.*, if the accused infringer 1) was aware that there was a high likelihood that the accused products infringed a valid patent, and 2) took deliberate action to avoid learning whether the accused products infringed such a patent.

[redacted]



another technology or patent. To the extent Dr. Houston is permitted to testify regarding Cytek's mental state, I disagree that her cited evidence shows that Cytek "copied" (let alone *intentionally* copied) the Asserted Patents and/or the CytoFLEX Products, as discussed below.

493. Dr. Houston concludes by asserting that Cytek willfully infringed the Asserted Patents because it "kn[e]w[] the Accused Products infringed the Asserted Patents, and its purported non-infringement positions were not reasonable." (Houston Rep., ¶500.) Again, I understand that neither Dr. Houston nor I can speculate regarding what Cytek "knew" at the time of infringement—this would be pure conjecture. And as explained below, I disagree that Cytek's non-infringement positions were "not reasonable." In fact, from a technical standpoint, I agree with non-infringement positions set forth in Dr. Jiang's claim charts regarding the '412 and '582 patents, as I further explain below. It is thus my opinion that Cytek's belief in non-infringement and/or invalidity was objectively reasonable, and I am informed by counsel that infringement is not willful if the accused infringer had a reasonable basis to believe that the patent claims are not infringed or invalid. Accordingly, I disagree with Dr. Houston's opinion that Cytek willfully infringed the Asserted Patents.

[redacted]



### 1. Mere Knowledge of the Patents Cannot Establish Willful Infringement, and Cytek Had an Objectively Reasonable Belief in Non-Infringement

494. Dr. Houston first points to various evidence to assert that "Cytek had knowledge of the patent family for the Asserted Patents as early as 2015[.]" (Houston Rep., ¶489.) However, as noted above, I understand that knowledge of the patents (or their earlier family members) is not enough to establish willful infringement. Specific intent to infringe must also be established, and I am informed by counsel that neither Dr. Houston nor I am qualified to opine on these issues. Nonetheless, I will address the evidence cited by Dr. Houston regarding Cytek's knowledge of the Asserted Patents.

495. Dr. Houston correctly recites the dates of Cytek's first awareness of the Asserted Patents and the parent '412 patent. (Houston Rep., ¶483.) Specifically, and as stated in Cytek's interrogatory responses, [redacted]

[redacted]



[redacted].[24] But as noted above, I understand that mere awareness of the patents is not sufficient to establish willful infringement, and as further explained below, Cytek developed objectively reasonable beliefs in non-infringement and/or invalidity of the Asserted Patents. As Dr. Houston acknowledges, Beckman did not provide any formal notice of its patents and never even alleged infringement until its *June 14, 2024* Letter to Cytek regarding the '582 and '443 patents, and [redacted] (*See* Houston Rep., ¶483 (citing CYTEK_0000909015 (Beckman's June 14, 2024 Letter to Cytek); Cytek's Resp. to Interrog. No. 6 (Dec. 16, 2024).) I am informed that after receiving that letter, Cytek's in-house and outside counsel met with Beckman and Danaher's in-house and outside counsel and, as Dr. Houston acknowledges, Cytek responded in a September 11, 2024 Letter pointing out deficiencies in Beckman's infringement charts and identifying Cytek's own prior art that predated the Asserted Patents. (Houston Rep., ¶483 (citing CYTEK_0000989599 (Cytek's September 11, 2024 Letter responding to Beckman's

---

24 [redacted])

[redacted]



June 14, 2024 Letter)).) As Dr. Houston acknowledges, [redacted]. (Houston Rep., ¶483; Cytek's Second Suppl. Resp. to Interrog.Oct. 222025).)

496. Further, I understand from counsel that Beckman did not own rights to the Asserted Patents until July 19, 2024—i.e., *after* Beckman sent Cytek the June 14, 2024 Letter noted above. (BEC-CYTEK-00038722-729.) The '582 and '443 patents were originally assigned to Iris International, Inc., who then assigned the rights to the Asserted Patents' parent applications to Beckman. (*Id.* at -722 (assigning Application Number 15638461, the application that issued as the '582 patent; Application Number 17980669, the application that issued as the '443 patent, and Application Number 14555102, a parent application of all three Asserted Patents, including the '107 patent; *see id.* at -725 (showing effective date of July 19, 2024 and execution date of July 20, 2024).) Subsequently, the '107 patent issued on December 24, 2024. Accordingly, I understand that Beckman did not own rights to the Asserted Patents at the time of the June 14, 2024 Letter. Additionally, I understand from counsel that the assignment discussed above was not publicly recorded until August 30, 2024—i.e., *after* Beckman filed the instant lawsuit against Cytek on August 14, 2024. (BEC-CYTEK-00038722 at -722 (showing a recorded date of 08/30/2024 in the header).)

497. [redacted]

[redacted]



[redacted] (Houston Rep., ¶484.) [redacted] does not establish Cytek's specific intent to infringe or knowledge of the Asserted Patents, which did not begin to issue until 2019. [redacted] have any bearing on Cytek's specific intent to infringe the Asserted Patents, as is required to establish willful infringement. As I explained at length above (*supra, e.g.,* Sections XIV.A.1.a, XIV.A.2.c), the Accused Products do not use a "wavelength division multiplexer" as claimed; thus, Cytek could not have intended to infringe the Asserted Claims.

498. [redacted] I understand that infringement is not willful if the accused infringer had a reasonable, good faith basis to believe that the patent claims are invalid or not infringed. [redacted]

[redacted]



[redacted]

[redacted]

[redacted] U.S. Patent No. 6,201,908 ("the '908 patent"), which issued on March 13, 2001, and discloses an optical wavelength division multiplexer and de-multiplexer. ('908 patent, Abstract.)




FIG. 1

500. [redacted]

[redacted]t. As Dr. Houston has not provided any opinion on the '908 patent, I reserve the right to respond to any opinion should Dr. Houston be permitted to later provide a new opinion.

501. [redacted]

[redacted]

[redacted]

[redacted]

- [redacted]

- [redacted]

- [redacted]

- [redacted]

- [redacted]

- [redacted]

[redacted]

[redacted]

[redacted]



[redacted] Dr. Houston does not address the specific non-infringement positions articulated in the chart, and instead concludes summarily that they are "not correct" based on her review of Dr. Schaafsma's report. (Houston Rep., ¶485 (citing Schaafsma Rep., ¶¶94-97, 188-192).) But Dr. Schaafsma also did not analyze [redacted] (*See* Schaafsma Rep., ¶¶94-97 (merely providing an overview of the '412 patent); *id.* at ¶¶188-192 ([redacted], and concluding without explanation that "[m]any of the same inaccuracies appear to exist for Cytek's analysis of the '412 patent").)[25] In my opinion, this is insufficient to show that [redacted]e—much less that Cytek had a specific intent to infringe the Asserted Patents. I further understand that, contrary to Dr. Houston's suggestion, "consult[ing] an[] attorney" is not required to develop a reasonable belief in non-infringement. (*See* Houston Rep., ¶485.) [redacted]

[25] I address Dr. Schaafsma's opinions regarding [redacted]

[redacted]



[redacted] As explained in this report, I agree that conventional flow cytometry is fundamentally different from full spectral flow cytometry.

504. Dr. Houston asserts that "Cytek's spectral cytometer is predicated on the use of a WDM" and "[t]herefore, the use of spectral technology alone does not render Cytek's products non-infringing with respect to the [']412 Patent or the Asserted Patents." (Houston Rep., ¶485.) I disagree, because as I explain above, the Accused Products do *not* use a WDM as claimed in the Asserted Patents.

Therefore, in my opinion, Cytek's non-infringement positions with respect to the '412 patent were objectively reasonable, thus precluding a finding of willful infringement, as I understand the law.

505. I also am informed by counsel that it was reasonable for Cytek "to wait" to [redacted] as I am told that a party cannot infringe claims that have not yet issued. (*See* Houston Rep., ¶485; [redacted] which in my opinion provided a reasonable basis for Cytek to believe it would not infringe any claims that may eventually issue from that application. (*See* W. Jiang Dep. Tr., 186:14-16.)

506. Dr. Houston then points to the [redacted] Cytek had an objectively reasonable belief that its products did not infringe these patents. [redacted]

[redacted] Each of these non-infringement positions is consistent with my opinions set forth above with respect to claim 1 of the '582 patent. Accordingly, I agree with [redacted] I am informed that the fact that Dr. Jiang "is not a lawyer" does not prevent him from forming a reasonable belief that Cytek does not infringe the Asserted Patents. (*See* Houston Rep., ¶486.)

507. Dr. Houston again summarily states that [redacted] are "not correct" based on her review of Dr. Schaafsma's report. (*See* Houston Rep., ¶486 (citing Schaafsma Rep., ¶¶94-97, 188-192, 371-400).) I disagree—Dr. Schaafsma does not establish that [redacted] are incorrect. In fact, Dr. Schaafsma agrees that [redacted] (Schaafsma Rep., ¶188.) Dr. Schaafsma then points to [redacted], and asserts without explanation that "Cytek's interpretation of claim 1 is not the meaning that a

[redacted]



POSA would understand from the Asserted Claims nor is it required by the claims." (*Id.* at ¶¶189-190.) I disagree—as I explain above, a POSA would understand that Cytek does not have a "curved mirror" or "collimating optical element" required by both claim 1 and 20 of the '582 patent. Dr. Schaafsma's criticism of claim 20 is misplaced and does not show that [redacted] was unreasonable. (*See id.* at ¶191.) First, Dr. Schaafsma agrees that "the spot sizes at 908 may be different than at 909[.]" (*Id.*) Second, it is unclear why Dr. Schaafsma is pointing to the spot sizes at the focusing lens 908 and dichroic filter 909 in FIG. 25 of the '582 patent. This mapping is neither consistent with Dr. Schaafsma's infringement opinion, nor Beckman's mapping in its infringement contentions, which is to the spot sizes on the bandpass filters in the Accused Products, in attempting to satisfy claim 20's requirement that "the size of the first image is substantially the same as the size of the second image".




Figure 2: Light emitted from the sample is collected and passes through the optical filter-based coarse wavelength division multiplexing (CWDM) demultiplexer arrays on the Cytek Aurora and Northern Lights cytometers.

Optical Subsystem

[redacted]




Optical Relay Elements Comprising Curved Mirrors and Further Collimating Beam
Collimated Beam from COE
101A
A(O)
Portions of Collimated Beam
A(1)
A(2)
A(3)
A(4)
A(N+1)
M(1)'
M(2)'
M(3)'
M(4)'
M(N)'
106B
L
Images
D(1)
D(2)
D(3)
D(4)
D(N+1)
FIG. 2B
Optical Subsystem


Optical Subsystem
102
300
COE
302
303
Collimated Beam projected by COE
304
5
Optical Relay Elements Comprising Curved Mirrors and Further Collimating Beam
301
106B
M(1) M(2) M(3) M(4) M(5) M(6) M(7) M(8) M(9) M(10) M(11 M(12) M(13 M(14) M(15)
Portions of Collimated Beam
Images
D(1) D(2) D(3) D(4) D(5) D(6) D(7) D(8) D(9) D(10) D(11) D(12) D(13) D(14) D(15)
314 D(16)
316
313A 313B 313C 313D 313E 313F 313G 313H 313I 313J 313K 313L 313M 313N 313O 313P
318
320
4B
FIG. 3

[redacted]





FIG. 6

(*See, e.g.*, Nov. 19, 2025 Second Am. Infringement Contentions at 55, 60, 61, 66, 67, 200.) Third, claim 20 is not infringed for additional reasons because—[redacted] In my opinion, this is sufficient to form an objectively reasonable basis of non-infringement, because I understand that if one element of a claim is not infringed, the entire claim is not infringed. Additionally, Dr. Schaafsma's report does not even cite, much less analyze, [redacted] (*See* Schaafsma Rep., ¶¶94-97 (merely providing an overview of the '412 patent); *id.* at ¶¶188-192 (not addressing the [redacted]

[redacted] *id.* at ¶¶371-400 (opining re alleged infringement of the ’582 patent and not addressing any of [redacted]).) Therefore, I disagree with Dr. Schaafsma’s opinions regarding [redacted], and Dr. Houston’s reliance thereon.

508. Dr. Houston also cites to [redacted] does not suggest an intent to infringe the ’582 patent, as is required to show willful infringement. As detailed above, [redacted] I note that this [redacted] occurred prior to any allegation that Cytek infringes the ’582 patent, which Beckman did not make until June 2024. [redacted]

509. Dr. Houston suggests that Dr. Jiang’s “analysis is not reliable” because he [redacted] (Houston Rep., ¶487 ([redacted]

[redacted]



[redacted] (*Id.*) However, I understand that Dr. Jiang did not need to analyze every limitation of every patent claim to develop a reasonable belief in non-infringement. ([redacted] Specifically, I understand that if a single claim limitation is not infringed, then the entire claim is not infringed. Therefore, [redacted] were sufficient to form a reasonable belief in non-infringement.

510. Dr. Houston further states that Dr. Jiang [redacted] However, as [redacted] (emphasis

[redacted]



in original).) This is consistent with [redacted], as well as my opinions above. In any event, claim 14 of the '582 patent is not one of the Asserted Claims in this litigation, and Cytek had formed a reasonable belief of non-infringement as to independent claims 1 and 20, from which the remaining Asserted Claims depend.

511. I am informed by counsel that inclusion of the '412 patent in the references cited for Cytek's own patents, including U.S. Patent No. 11,169,076 ("the '076 patent"), is not evidence that Cytek willfully infringed the Asserted Patents, because mere awareness of the patent does not show specific intent to infringe. (*See* Houston Rep., ¶488.) Moreover, as I note earlier in this Report, the U.S. Patent Office issued Cytek's '076 patent over the disclosures of the Asserted Patents, and specifically allowed the claims of the '076 patent because the Asserted Patents and other prior art did not disclose "reimaging light onto odd filters of a plurality of filters arranged in a row[.]" (CYTEK_0000989932 at -990377-378 ('076 patent file history (July 9, 2021 Notice of Allowance), 3).) In my opinion, this reaffirms that Cytek had an objectively reasonable belief that its products did not infringe the "collimated beam" and "collimated optical element" limitations of the '582 patent, [redacted] and is consistent with my opinions. [redacted] emphasis

[redacted]


altered).)

512. For the foregoing reasons, Dr. Houston's cited evidence regarding Cytek's awareness of the patent family for the Asserted Patents is not sufficient to establish willful infringement, which requires showing 1) knowledge of the patents and 2) specific intent to infringe. Further, although neither Dr. Houston nor I can opine regarding Cytek's subjective belief in non-infringement or invalidity, I believe that Cytek's beliefs therein were objectively reasonable, and they are consistent with my opinions in this Report.

#### 2. Cytek's Knowledge and Analysis of Xitogen and the CytoFLEX Products Cannot Show Willful Infringement, and Cytek's Activities Are Nonetheless Common Industry Practice

513. Dr. Houston spends about six pages recounting Cytek's knowledge and analysis of Xitogen and the CytoFLEX products. (Houston Rep., ¶¶490-501.) As an initial matter, I understand that the willful infringement inquiry assesses the accused infringer's knowledge of the ***patent***—not knowledge of the products allegedly embodying the patent. None of the examples provided by Dr. Houston specifically tie the CytoFLEX (or its Xitogen precursor) to the Asserted Patents Critically, all of the documents cited by Dr. Houston in ¶¶492-493 are dated ***before*** the first Asserted Patent (the '582 patent) issued on June 25, 2019. These documents therefore cannot support a finding of willful infringement—one cannot infringe a patent that does not yet exist. Additionally, Cytek released its Aurora on June 7,

[redacted]



2017, before even the parent '412 patent issued on August 29, 2017, and well before the '582 patent issued. And as explained above, even if Cytek knew that Beckman owned patents allegedly cover the CytoFLEX or the XTG product, knowledge of patents alone is insufficient to establish willful infringement.

514. Further, in my experience, all of Cytek's activities described in this section are common practice in the flow cytometry industry—it is normal and expected for competitors to monitor and analyze each others' products.

515. In fact, the evidence shows that [redacted]

[redacted]

[redacted].

517. In my opinion, these facts regarding [redacted] confirm that Cytek had no reason to believe it was infringing any patents owned by Beckman. These facts are also consistent with [redacted]

518. Turning back to Dr. Houston's opinions, Dr. Houston describes Dr. Ming Yan's former employment at Becton Dickinson and the ensuing trade secret litigation. (Houston Rep., ¶¶490-491.) I understand that case is separate from and has nothing to do with the instant litigation, and is certainly not relevant to willful infringement. Dr. Houston relies on this trade secret litigation as evidence that "Dr. Yan and Cytek had knowledge and awareness of Xitogen, the company that originally developed the claimed inventions, Dr. Chen, and Dr. Chen's work on the claimed inventions." (Houston Rep., ¶491.)

519. Dr. Houston then provides a bulleted list of documents allegedly showing that [redacted] (Houston

Rep., ¶492.) However, this evidence pertaining to the CytoFLEX *product* cannot establish that Cytek willfully infringed the Asserted *Patents*—especially when the Asserted Patents *did not yet exist* as of the date of these cited documents. Also, Cytek's activities—[redacted] are common practice in the field. Dr. Houston attempts to paint a picture that Cytek's knowledge of Beckman's technology was a one-way street, but in reality—as illustrated above—[redacted]

520. I have reviewed each document cited in ¶492 of the Houston Report, and found no evidence that Cytek believed the Accused Products infringed the yet-to-issue Asserted Patents. [redacted]

[redacted] As I explained above, the Accused Products also do not use a WDM as claimed by the Asserted Patents, and thus do not infringe.

521. [redacted] As I explain above, the Accused Products, employing APDs, also have full spectral functionality.

522. The majority of the remaining bullets in ¶492 also describe [redacted]. (Houston Rep., ¶492 at p. 238 (first through fifth and seventh bullets on page); *id.* at p. 239 (second through fourth and eighth bullets on page).) However, I understand that Dr. Yong Chen, the inventor of the Asserted Patents, does not purport to have invented APDs. (*See supra* Section XI.C.) Likewise, as discussed above, Beckman was not the first to use APDs in flow cytometry. (*Id.*; *see also* [redacted]

[redacted]



[redacted] hus, in my opinion, these documents discussing APDs have no bearing on the issue of whether Cytek infringed, much less willfully infringed, the Asserted Patents.[26]

523. The remainder of ¶492 cites Cytek documents that, at a high level, describe [redacted]. (Houston Rep., ¶492 at p. 237 (fourth bullet on page); *id.* at fn. 13; *id.* at p. 238 (sixth bullet on page); *id.* at p. 239 (first and fifth through seventh bullets on page).) Dr. Houston does not explain how these documents show that Cytek willfully infringed the Asserted Patents; they do not relate to the Asserted Patents and so do not show any intent to infringe. [redacted]

[26] In one of the bullets discussing APDs, Dr. Houston states that Cytek's commercial product "uses the WDM approach." (Houston Rep., ¶492, at p. 238 (fourth bullet).) For the reasons explained above, I disagree that Cytek's commercial products use a "WDM" as claimed by the Asserted Patents.

[redacted]



[redacted] Cytek had an objectively reasonable belief that it was *not* infringing the Asserted Patents. Nor does Dr. Houston explain how [redacted] supports willful infringement. In my experience, it is common for [redacted]. Cytek was therefore simply engaging in common industry practice, all while maintaining a reasonable belief of non-infringement for the reasons I explained above.

524. Dr. Houston concludes ¶492 by noting that Cytek released its Aurora on June 7, 2017. (Houston Rep., ¶492 (last bullet).) Importantly, this was *before* even the parent '412 patent issued on August 29, 2017, and well before the first Asserted Patent (the '582 patent) issued on June 25, 2019. This further supports that Cytek did not know it was allegedly infringing any Beckman patents—it cannot infringe patents that do not yet exist.

525. Dr. Houston next cites to three documents post-dating the Aurora's launch (and pre-dating the Asserted Patents) to claim that [redacted]

[redacted] (Houston Rep., ¶493.) Again, in my opinion, this is routine competitor behavior and suggests no wrongdoing by Cytek. None of the cited documents [redacted]

526. The activities described in ¶494 are likewise commonplace among competitors, and do not indicate that Cytek intended to infringe Beckman's patents. (Houston Rep., ¶494.) [redacted]

527. Lastly, Dr. Houston points to [redacted]. (Houston Rep., ¶495 (citing CYTEK_0000824631).) [redacted].

[redacted]



[redacted] Cytek had already developed an objectively reasonable belief that it did not infringe the Asserted Patents. (*See supra* Section XIV.H.1.)

528. For all the reasons set forth above, it is my opinion that Cytek's knowledge and analysis of Xitogen and the CytoFLEX products cannot and do not show willful infringement.

### 3. Dr. Houston's Speculations Regarding "Copying" Are Unsupported

529. Dr. Houston asserts that "Cytek copied Dr. Chen's inventions in designing and developing the Accused Products[.]" (Houston Rep., ¶¶497-499.) As a preliminary matter, I understand that neither Dr. Houston nor I am qualified to opine on Cytek's subjective intent with respect to "copying." Nonetheless, to the extent Dr. Houston is permitted to testify regarding Cytek's mental state, I disagree that her cited evidence shows that Cytek "copied" the Asserted Patents and/or the CytoFLEX Products. To the contrary, Cytek had a reasonable belief that it did ***not*** infringe or copy the Asserted Patents, since Cytek's design is fundamentally different from that of Beckman's.

530. Notably, Cytek released the Aurora on June 7, 2017, more than two years before the first Asserted Patent (the '582 patent) issued on June 25, 2019. I understand that one cannot "copy" from a patent that does not yet exist.

[redacted]



531. In this Section, Dr. Houston relies nearly exclusively on evidence already discussed in Sections XII.A-B of her Report. (Houston Rep., ¶¶497-498.) I therefore disagree with her opinions for the same reasons articulated above.

532. The only new document Dr. Houston cites in ¶¶497-498 is a [redacted]

[redacted]

(*Id.* at CYTEK0000124124.)

533. [redacted], in my opinion, it is clear that Cytek did not "copy" the CytoFLEX—much less the Asserted Patents. (*See id.*) Indeed, as I explained previously, Beckman's technology is conventional and fundamentally different from Cytek's spectral technology.

534. I disagree with Dr. Houston's assertions that Cytek "sought to use the same innovative compact APDs" as XTG-1600, and "us[ed] the patented WDM-APD architecture developed by Dr. Chen and implemented in the CytoFLEX." (*See* Houston Rep., ¶498.) As I explained above, Dr. Chen does not purport to have invented APDs, and Beckman was not the first to use APDs in flow cytometry. Indeed, I was routinely using APDs for flow cytometry in my academic laboratories

[redacted]



starting in 2008. Also, as I explained earlier, Cytek does not use WDMs as claimed in the Asserted Patents. Moreover, Cytek's design does not propagate a collimated beam in its detector module. Cytek's design uses a non-collimated focused/defocused beam, as I explained previously. Cytek had no obligation to "design around Beckman Coulter's patents" (*see* Houston Rep., ¶498) because it had formed an objectively reasonable belief that the Accused Products did not infringe the Asserted Patents, since their Accused Products did not use any of the components cited in Beckman's patents.

535. I further disagree with Dr. Houston's opinion that the evidence she cites "is inconsistent with Cytek undertaking independent design as it relates to the WDMs claimed in the Asserted Patents." (Houston Rep., ¶499.) First, as repeatedly noted, Cytek does not use the WDMs as claimed by the Asserted Patents. Second, in my opinion, Cytek independently developed the Accused Products without any "copying" of the Asserted Patents. Cytek's interrogatory response explaining the development of the Accused Products supports this. (Cytek's First Suppl. Resp. to Interrog. No. 4 (July 25, 2025).)

536. Accordingly, in my opinion, Dr. Houston has not shown that Cytek copied the Asserted Patents or Beckman's technology.

#### 4. Dr. Houston's Speculations Regarding Willful Infringement Are Improper and Unsupported

537. Dr. Houston devotes only two conclusory paragraphs to assert that

[redacted]



Cytek willfully infringed the Asserted Patents. (Houston Rep., ¶¶500-501.) As noted, I understand it is improper for an expert to opine regarding a party's subjective intent, including the specific intent to infringe—a necessary component of willful infringement. Thus, neither Dr. Houston nor I am qualified to provide ultimate expert opinions regarding willful infringement.

538. In the event Dr. Houston's opinions are found to be proper, I disagree with her opinion that Cytek "deliberately and wantonly copied the claimed inventions recited in the Asserted Patents in a manner that infringed those patents." (*See* Houston Rep., ¶500.) Dr. Houston cites no evidence showing that Cytek's actions rose to the level of "deliberate[] and wanton[]." I further disagree that Cytek "did so knowing the Accused Products infringed the Asserted Patents" and "its purported non-infringement positions were not reasonable." (*Id.*) To the contrary, Cytek's non-infringement positions were objectively reasonable and are consistent with my non-infringement opinions presented herein.

539. I likewise disagree with Dr. Houston's assertions that Cytek was "willfully blind to the patents and its infringement of the patents[.]" (*See* Houston Rep., ¶501.) Indeed, [redacted]—undercut a finding of willful infringement. [redacted] Danaher and Beckman never once suggested that Cytek infringed Beckman's patents

[redacted]. Also, Cytek did not "actively avoid[] identifying, reviewing, and analyzing the Asserted Patents" (Houston Rep., ¶501)—rather, [redacted]. (*See supra* Section XIV.F.1.)

540. Accordingly, in my professional opinion, Dr. Houston has not established that Cytek willfully infringed the Asserted Patents.

## XV. CYTOFLEX PRODUCTS DO NOT EMBODY THE ASSERTED PATENTS

### A. CytoFLEX Products Do Not Include a Wavelength Division Multiplexer

541. As discussed above, the '443 and '107 patents recite a "wavelength division multiplexer," which by definition "multiplexes" light. The CytoFLEX products do not include a wavelength division multiplexer, but rather include a wavelength division ***de***multiplexer, configured to ***de***multiplex light. Specifically,

[redacted]



a WDM. While I understand that Beckman Coulter refers to this system as a wavelength division multiplexer, Beckman Coulter's inaccurate naming convention does not alter the reality that what Beckman Coulter coins a wavelength division multiplexer is actually a wavelength division demultiplexer.

549. Thus, in my opinion, the CytoFLEX Products do not practice literally or under the doctrine of equivalents at least any Asserted Claim of the '443 and '107 patent, each of which recites a "wavelength division multiplexer (WDM)." I understand from counsel that Dr. Houston and Dr. Schaafsma are precluded from introducing any new opinions in their reply reports which they could have raised in their opening reports. To the extent that Dr. Houston or Dr. Schaafsma provide any additional opinions on the foregoing issues in a reply report, I reserve all rights to further reply.

**B. CytoFLEX Products Do Not Practice Filter Related Elements of the Asserted Claims**

550. [redacted] As I explain in Sections XIII.D and XIV.B.2.a above, dichroic filters and bandpass filters are distinct optical elements, with distinguishable optical properties and functions, such that a POSA would not equate bandpass and dichroic filters.

551. I have reviewed Dr. Houston and Dr. Schaafsma's Opening

Infringement Reports and confirmed that they do not offer any opinion or identify any evidence that [redacted] While Dr. Houston claims that the [redacted] (Houston Rep., ¶516), [redacted]

552. [redacted]

(*See also* BEC-CYTEK_00033904 at -907 (similar).)

553. [redacted]

554. [redacted]

[redacted]

555. The following materials, upon which Dr. Houston also relies, further [redacted]

[redacted]

[redacted]

(*See also, e.g.*, BEC-CYTEK_00074359 ([redacted] BEC-CYTEK_00074360 (similar); BEC-CYTEK_00074361 (similar); BEC-CYTEK_00074362 (similar); BEC-CYTEK_00074390 (similar); BEC-CYTEK_00074459 (similar).)

556. [redacted]

557. Thus, for the foregoing reasons, in my opinion, the CytoFLEX Products do not practice literally or under the doctrine of equivalents at least claim 6 of the '443 patent, which specifically recites the use of dichroic filters. In addition, I understand that Dr. Ilkov and Dr. Weigl have opined that the '443 patent's and '107 patent's specification fails to provide written description support for, and fails to enable the use of, filters other than "dichroic filters" for propagating a beam between the filters and the claimed mirrors. (Ilkov Op. Rep., ¶¶1034-1036; Weigl Op. Rep., ¶¶112-136.) I also understand that Dr. Weigl has opined that the '582 patent's specification fails to provide written description support for, and fails to enable the use of, "optical filters" other than "dichroic filters." (Weigl Op. Rep., ¶137.) The

[redacted]



Accused Products use bandpass filters, not dichroic filters, and thus are not within the scope literally or under the doctrine of equivalents of asserted claims 4, 6, 10, 11, and 15 of the '443 patent, claims 5, 16, 18, 26, 27 and 29 of the '107 patent, and claim 6 of the '582 patent for this additional reason. I understand from counsel that Dr. Houston and Dr. Schaafsma are precluded from introducing any new opinions in their reply reports which they could have raised in their opening reports. To the extent that Dr. Houston or Dr. Schaafsma provide any additional opinions on the foregoing issues in a reply report, I reserve all rights to further reply.

### C. CytoFLEX Products Do Not Detect Substantially Full Spectrum of Visible Light

558. Dr. Houston and Dr. Schaafsma failed to demonstrate that the CytoFLEX Products detect a substantially full spectrum of visible light. (*See* Houston Opening Rep. ¶¶638-641; Schaafsma Opening Rep. ¶479.)

559. I have reviewed Dr. Houston and Dr. Schaafsma's Opening Infringement Reports and confirmed that they do not offer any opinion or identify any evidence that any of the CytoFLEX Products "detect[] a substantially full spectrum of visible light." (*See* Houston Op. Rep. ¶¶638-641; Schaafsma Op. Rep. ¶479.) Claim 29 of the '107 patent requires a WDM capable of "detecting a substantially full spectrum of visible light," which the '107 patent defines as between 380 nm and 780 nm, ('107 patent, 57:37-40), using a single detector module (i.e., using a single set of filters and detectors without needing to rely on multiple detector

[redacted]



or Dr. Schaafsma provide any additional mapping as to this limitation in a reply report, I reserve all rights to further reply.

**2. 1(d): "a first focusing optical element arranged to receive at least a portion of the collimated beam reflected by the optical relay element; and"**

592. Dr. Houston and Dr. Schaafsma failed to address how the CytoFLEX Products practice each element of limitation 1(d) of the '582 patent.

593. Dr. Houston's opinion regarding this claim limitation consists of the following:

[redacted]



| Houston Op. Rep., ¶¶707-710. |
|---|
| 707. As discussed above with regard to Element 1(b), which I incorporate by reference here, I understand that the Court has construed that the term "collimated" beam should have its plain and ordinary meaning and that the Court declined to construe "collimating optical element." 8/21/2025 H'rg Tr. at 135:14-16, 193:5-7, 199:6-204:3. As discussed above for Element 1(g) of the '107 Patent, I also understand that the Court construed the term "portion of the" in this Element to mean "subset of the spectrum of the wavelengths of the." 9/17/2025 Hr'g Tr. at 92:21-24. I also understand that the Court has construed that the term "image" as "representation of an object created by light or emanating from a light source." 9/17/2025 H'rg Tr. at 90:9-13. [redacted] 709. Thus, the optical subsystem of the CytoFLEX Platform Products includes a first focusing optical element arranged to receive at least a portion of the collimated beam reflected by the optical relay element. [redacted] |

594. Dr. Schaafsma's opinion regarding this claim limitation consists of the following:

[redacted]



| Schaafsma Op. Rep., ¶374.[31] |
| --- |
| [redacted] |

595. Dr. Houston and Dr. Schaafsma fail to address every element of limitation 1(d) of the '582 patent. For example, while Dr. Houston and Dr. Schaafsma opine that [redacted], they fail to identify what focusing lens, if any, comprises a "*first* focusing optical element" that receives "a portion of the collimated beam reflected by the optical relay element" ('582 patent, cl. 1[d] (emphasis added).)

596. Indeed, it is my opinion that the CytoFLEX Products do not practice limitation 1(d) of the '582 patent. As I explain in Sections XV.D and XV.E.1, incorporated here, [redacted]

[31] I have reviewed section XIII of Dr. Schaafsma's Opening Report, which Dr. Schaafsma references in his opinion regarding this limitation, and confirmed that it does not offer additional analysis to address how the CytoFLEX Products practice every element of this claim limitation, including the missing elements I identify herein.

[redacted]

597. In the figure below, [redacted], (Houston Op. Rep., ¶512), [redacted] (Schaafsma's Op. Rep., ¶366). [redacted]

[redacted]

598. Alternatively, [redacted]

[redacted]:[32]

[32] As I discuss in Sections XV.D and XV.E.1, Dr. Houston and Dr. Schaafsma [redacted]

[redacted]

under the doctrine of equivalents. I understand from counsel that Dr. Houston and Dr. Schaafsma are precluded from introducing any new opinions in their reply reports which they could have raised in their opening reports. To the extent that Dr. Houston or Dr. Schaafsma provides any additional mapping as to this limitation in a reply report, I reserve all rights to further reply.

**3. 1(e): "a first semiconductor detector"**

600. Dr. Houston and Dr. Schaafsma failed to address how the CytoFLEX Products practice limitation 1(e).

[redacted]



patent, cl. 1[e] (emphasis added).)

604. Thus, Dr. Houston and Dr. Schaafsma fail to address how the CytoFLEX Products practice each limitation of Claim 1(e) literally or under the doctrine of equivalents. I understand from counsel that Dr. Houston and Dr. Schaafsma are precluded from introducing any new opinions in their reply reports which they could have raised in their opening reports. To the extent that Dr. Houston or Dr. Schaafsma provide any additional mapping as to this limitation in a reply report, I reserve all rights to further reply.

**4. 1(f): "wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element onto the first semiconductor detector"**

605. Dr. Houston and Dr. Schaafsma failed to address how the CytoFLEX Products practice each element of limitation 1(f).

606. Dr. Houston's opinion regarding this claim limitation consists of the following:

[redacted]



| Houston Op. Rep., ¶¶713-715. |
| --- |
| [redacted]<br><br>714. Thus, the optical subsystem of the CytoFLEX Platform Products includes a first focusing lens configured to focus the portion of the collimated beam received from the optical relay element onto the first semiconductor detector.<br><br>[redacted] |

607. Dr. Schaafsma's opinion regarding this claim limitation consists of the following:

[redacted]



| Schaafsma Op. Rep., ¶374.[34] |
| --- |
| [redacted] |

608. While Dr. Houston and Dr. Schaafsma opine that the CytoFLEX Products [redacted] if any, comprise a "*first* focusing optical element [that] is configured to focus the portion of the collimated beam received from the [*first*] optical relay element onto the *first* semiconductor detector." ('582 patent, cl. 1[d] (emphasis added).) Dr. Houston incorporates her analysis as to Elements 17[b] and 17[c] of the '107 patent, but there she does not identify a *first* focusing lens, *first* optical relay element, or *first* semiconductor detector.

609. Thus, Dr. Houston and Dr. Schaafsma fail to address how the CytoFLEX Products practice each limitation of Claim 1(f) literally or under the doctrine of equivalents. I understand from counsel that Dr. Houston and Dr. Schaafsma are precluded from introducing any new opinions in their reply reports which they could have raised in their opening reports. To the extent that Dr. Houston

---

[34] I have reviewed section XIII of Dr. Schaafsma's Opening Report, which Dr. Schaafsma references in his opinion regarding this limitation, and confirmed that it does not offer additional analysis to address how the CytoFLEX Products practice every element of this claim limitation, including the missing elements I identify herein.

[redacted]



or Dr. Schaafsma provide any additional mapping as to this limitation in a reply report, I reserve all rights to further reply.

**F. CytoFLEX Products Do Not Practice Claim 20 of the '582 Patent & Thus Also Do Not Practice Any Claims that Depend from Claim 20**

610. For the reasons I explain below, the CytoFLEX Products do not practice Claim 20 of the '582 Patent, and thus also do not practice any claims that depend from Claim 20, including asserted claim 26.

**1. 20(b): "a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a first image; and"**

611. Dr. Houston and Dr. Schaafsma failed to address how the CytoFLEX Products practice each element of limitation 20(b).

612. Dr. Houston's opinion regarding this claim limitation consists of the following: