IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BECKMAN COULTER, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 24-945 (CFC) (EGT) |
| CYTEK BIOSCIENCES, INC., | ) | [redacted] |
| Defendant. | ) | REDACTED - PUBLIC VERSION |

**DEFENDANT CYTEK BIOSCIENCES, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTIONS FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT AND INVALIDITY (MSJ NO. 1-3)**

OF COUNSEL:
Reuben H. Chen
HanByul Chang
Juan Pablo Gonzalez
Alexandra Leeper
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304

Elizabeth M. Flanagan
COOLEY LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402

Adam Pivovar
Dustin M. Knight
Rosalynd D. Upton
David Yun
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Karen Jacobs (#2881)
Jeremy A. Tigan (#5239)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
kjacobs@morrisnichols.com
jtigan@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Defendant Cytek Biosciences, Inc.*

March 13, 2026

**TABLE OF CONTENTS**

**Page**


I. INTRODUCTION ....... 6

II. NATURE AND STAGE OF THE PROCEEDINGS ....... 10

III. SUMMARY OF THE ARGUMENT ....... 10

IV. STATEMENT OF FACTS ....... 13

V. MOTION NO. 1: The Accused Products Do Not Infringe Claims 23 and 26 of the '582 Patent Under the Court's Claim Construction ....... 18

- A. BEC's infringement theories for the "the size of the first image is substantially the same as the size of the second image" limitation do not properly apply the Court's construction of "second image," so summary judgment of non-infringement must follow ....... 18
- B. BEC's reply opinions comparing sequential spot sizes, to the extent considered, fail to create a genuine issue of material fact regarding infringement of the "size of the first image is substantially the same as the size of the second image" limitation ....... 22
- C. Alternatively (or additionally), the term "image" is indefinite ....... 29

VI. MOTION NO. 2: The Accused Products Do Not Infringe Claims 1, 3, and 6 of the '582 Patent Because They Do Not Use a "Collimated Beam" ....... 33

- A. The Claims and Written Description Demand Propagation of a Collimated Beam Within the Claimed Optical Subsystem ....... 34
- B. The Accused Products do not propagate a "collimated beam" within their detector module and therefore do not infringe claims 1, 3, and 6 ....... 38
  1. The Accused Products' input optics do not project and propagate a "collimated beam" within the detector module; Schaafsma's reliance on allegedly collimated beam segments does not satisfy claim 1 ....... 40
  2. The Accused Products do not have "an optical relay element" that is arranged both "to receive at least a portion of the collimated beam from the collimating optical element … [and] to reflect the portion of the collimated beam received from the collimating optical element[.]" ....... 46
  3. The Accused Products do not satisfy "collimated beam" under the doctrine of equivalents because BEC's theory would vitiate

**TABLE OF CONTENTS**
(continued)

**Page**

the claim term and because a focused and defocused beam is substantially different from a "collimated beam" ..................... 48

C. Alternatively, the Term "Collimated Beam" Is Indefinite as a POSA Would Be Unable to Determine the Scope of the Term with Reasonable Certainty ..................... 52

VII. MOTION NO. 3: The '443/'107 Asserted Claims Are Invalid for Lack of Written Description for the Full-Scope of "WDM" ..................... 55

A. The Only "WDM" Supported by the Written Description Is One that Includes a Collimating Optical Element/"First Optical Element" that Projects a Collimated Beam Used by the WDM ..................... 55

B. The '443/'107 Asserted Claims Recite a WDM But Not the Essential Element, a "Collimating Optical Element"/"First Optical Element" That Projects a Collimated Beam Used by the WDM ..................... 58

VIII. CONCLUSION ..................... 61

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*,
811 F.3d 1334 (Fed. Cir. 2016) ....................44

*Athletic Alts., Inc. v. Prince Mfg., Inc.*,
73 F.3d 1573 (Fed. Cir. 1996) ....................45

*Augme Techs., Inc. v. Yahoo! Inc.*,
755 F.3d 1326 (Fed. Cir. 2014) ....................46

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
349 F.3d 1373 (Fed. Cir. 2003) ....................47

*Gentry Gallery, Inc. v. Berkline Corp.*,
134 F.3d 1473 (Fed. Cir. 1998) ....................54

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
558 F.3d 1368 (Fed. Cir. 2009) ....................56

*Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*,
589 F.3d 1179 (Fed. Cir. 2009) ....................18

*Lipocine Inc. v. Clarus Therapeutics, Inc.*,
541 F. Supp. 3d 435 (D. Del. 2021)....................54

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
424 F.3d 1336 (Fed. Cir. 2005) ....................56

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)....................49

*Novozymes A/S v. DuPont Nutrition Biosciences APS*,
723 F.3d 1336 (Fed. Cir. 2013) ....................54

*NuVasive, Inc. v. Alphatec Holdings, Inc.*,
557 F. Supp. 3d 1069 (S.D. Cal. 2021)....................49

*Regents of Univ. of Minn. v. AGA Med. Corp.*,
717 F.3d 929 (Fed. Cir. 2013) ....................18

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Sage Prods. Inc. v. Devon Indus. Inc.*,
126 F.3d 1420 (Fed. Cir. 1997) ....................................................................45

*In re Shafovaloff*,
No. 2024-1035, 2025 WL 1779173 (Fed. Cir. June 27, 2025)...........................55

*Stragent, LLC v. Volvo Car USA, LLC*,
No. 22-cv-00293, 2024 WL 1366813 (D. Del. Apr. 1, 2024)................18, 19, 20

*Tronzo v. Biomet, Inc.*,
156 F.3d 1154 (Fed. Cir. 1998) ....................................................................43

*Univ. of Rochester v. G.D. Searle & Co.*,
358 F.3d 916 (Fed. Cir. 2004) ......................................................................54

**Other Authorities**

Fed. R. Civ. P. 30(b)(6)....................................................................................52

# TABLE OF ABBREVIATIONS

| Abbreviation | Term/Meaning |
|---|---|
| ’582 patent | U.S. Patent No. 10,330,582 |
| ’443 patent | U.S. Patent No. 11,703,443 |
| ’107 patent | U.S. Patent No. 12,174,107 |
| Asserted Patents | ’582 patent; ’443 patent; ’107 patent |
| Asserted Claims | Claims 1, 3, 6, 23, and 26 of the ’582 patent; claims 4, 6, 10, 11, and 15 of the ’443 patent; claims 5, 16, 18, 26, 27, and 29 of the ’107 patent |
| BEC | Plaintiff Beckman Coulter, Inc. |
| Cytek | Defendant Cytek Biosciences, Inc. |
| Houston | Jessica Houston, Ph.D., BEC’s expert |
| Ilkov | Fedor Ilkov, Ph.D., Cytek’s expert |
| Leary | James Leary, Ph.D., Cytek’s expert |
| Schaafsma | David Schaafsma, Ph.D., BEC’s expert |

# I. INTRODUCTION

This case involves a patent family that originally claimed inventions using a specific configuration for what is known today as conventional flow cytometry, but which BEC, after its purchase of the portfolio, has tried to expand to read onto Cytek's revolutionary spectral flow cytometers. Though claiming priority to an unasserted parent patent filed in 2014, the later Asserted Patents all issued years after Cytek launched its first spectral flow cytometer, Aurora, on June 7, 2017, made available its innovative technology to the public, and filed its own patent. BEC recognized the revolutionary nature of Cytek's technology and, prior to filing this lawsuit, [redacted] (SUF3, ¶15.)

The problem for BEC is that its infringement reads for the '582 patent stretch far beyond the claim language, as construed by the Court, as well as the written description. For all three motions, the operation of the Accused Products is not disputed – only claim scope. Summary judgment is warranted on claims 23 and 26 of the '582 patent because BEC's infringement evidence disregards the Court's claim construction for "second image." Summary judgment is warranted on claims 1, 3, and 6 of the '582 patent because the Accused Products lack a "collimated beam" that propagates throughout the detector module. Finally, summary judgment is

warranted on all asserted claims of the ’443 and ’107 patents because the claims cover material not supported by the written description by omitting the essential requirement of a “collimating optical element.”

The earliest of the Asserted Patents, the ’582 patent, which was filed on June 30, 2017 (shortly after Cytek launched Aurora), issued in 2019 with claims reciting the essential aspects of the original disclosure, including a “collimating optical element” that projects a “collimated beam” that is maintained throughout the disclosed detector module. (SUF2, ¶¶1, 3; Ex. 2A, cls. 1, 20.) Consistent with the disclosed invention’s requirement to use collimated light, the written description expressly declares that “efficient color separation can only be accomplished economically with collimated light beam.” (SUF2, ¶8; Ex. 2A, 44:24-26.) The written description’s sole focus on collimated light into and throughout the optical path is depicted in Figure 25, with color annotations by BEC’s expert.




*FIG. 25*

(SUF2, ¶8; D.I.115-1, ¶¶27-29, 97-98; Ex. 2B, ¶¶82-83.) This "collimated beam" purportedly includes so-called "collimated afocal images" that are intended to be the "substantially same size" along the beam's path. (SUF1, ¶¶4, 11-12, 22-23.)

The Accused Products lack these essential features of the disclosed invention. The Accused Products do not use a "collimated beam" in their detector modules and the "images" on sequential filters are not "substantially the same size." Rather, the Accused Products use a non-collimated, alternatingly focused and defocused beam that results in smaller, focused images onto odd-numbered filters and larger, alleged

"afocal images" in beam sections that include the even-numbered filters, and, therefore, do not infringe the '582 Asserted Claims. This is shown, below, in a simulation of the light beam.

[redacted]

(SUF2, ¶11; Ex. 2B, ¶130; Ex. 2H, ¶99.) The USPTO expressly recognized this important distinction in issuing Cytek's patent over the teachings in the Asserted Patents' disclosure. (SUF2, ¶31; Ex. 2M, CYTEK_0000990377-990378 (the Examiner stating that Cytek's invention "reimag[es] light onto odd filters").)

Unlike the '582 patent, the asserted '443 and '107 patents—which did not issue until 2023 and 2024, respectively—depart from their original disclosure and broadly claim a so-called "Wavelength Division Multiplexer (WDM)" without reciting a "collimating optical element" and therefore claim use of any light, whether

collimated or not. Because the ’443/’107 Asserted Claims do not recite a “collimating optical element” (or any optical element) to control the light beam, they lack written description support because the alleged invention was specific to collimated light. Therefore, summary judgment should be granted that the ’443/’107 Asserted Claims are invalid for lack of written description support.

Cytek respectfully requests that the Court grant its three summary judgment motions, which would fully resolve this case.

## II. NATURE AND STAGE OF THE PROCEEDINGS

Fact and expert discovery are closed. (D.I. 178, 1; D.I. 210, 2.) The pretrial conference is set for August 7, 2026. A jury trial is set to begin August 17, 2026. (D.I. 178, 2.)

## III. SUMMARY OF THE ARGUMENT

### Motion 1

Summary judgment of noninfringement is warranted for asserted claims 23 and 26 of the ’582 patent because BEC fails to apply the Court’s construction of “second image” and cannot show the Accused Products include a “first image” and a “second image” “*wherein the size of the first image is substantially the same size as the size of the second image*” (element 20(d)).

The Court construed “second image” to mean the “second image is created

after the first image ***and there is no intervening image***." (SUF1, ¶6.)[1] BEC advanced two alternative infringement theories for the "substantially the same … size" limitation, and both disregard the Court's construction. The first theory identified pairs of "afocal images" as first and second images and asserted that such "afocal images" are substantially the same size. (SUF1, ¶13.) The second theory identified pairs of focused, real images as first and second images and asserted that such focused images are substantially the same size. (*Id*.) Both infringement theories fail because there is always an ***intervening***, different-sized image between each identified respective "first image" and "second image."

Alternatively (or additionally), the term "image" (which appears in all '582 claims) is indefinite. The Court construed "*image*" to mean a "representation of an object created by light or emanating from a light source," but deferred ruling on indefiniteness. (SUF1, ¶5; *see also* Ex. 1B, 205:19-206:6 ("[A]s I've alluded to earlier is, there's some issues that [] my antenna says aren't right with some of this patent, issue[s] like a collimated afocal image. … It just doesn't make a lot of sense.").) The term is indefinite as used in the Asserted Patents because the included concept of a "collimated afocal image"—a term that appears only in the Asserted Patents and is not a term of art—describes an impossibility with respect to flow cytometers. Moreover, to the extent BEC argues there is a factual dispute regarding

[1] All emphases have been added unless otherwise indicated.

infringement of the "substantially the same … size" limitation, such a (demonstrably incorrect) dispute would only further illustrate how a POSA would not be able to determine the scope of "*image*" in the '582 patent to know whether there is infringement with reasonable certainty.

**Motion 2**

Summary judgment of noninfringement is warranted for remaining asserted claims 1, 3, and 6 of the '582 patent because the Accused Products do not include the "collimated beam" recited in claim 1. The claim language requires that a collimated beam propagate within the WDM. But it is undisputed that the beam in the Accused Products is alternatingly focused and defocused. Therefore, it is not a "collimated beam." To the extent a *segment* of the beam could qualify as a "collimated beam" (and it should not because it would only be a segment and not the entire beam), there is still no "portion of the collimated beam" that is both *received* and *reflected* by an "optical relay element" as required by element 1(c).

Alternatively, the term "collimated beam" is indefinite because a POSA could not determine its scope with reasonable certainty, i.e., when is a beam "collimated" vs. non-collimated? (SUF2, ¶5; Ex. 2C, 133:11-15 (the Court noting "serious concerns about indefiniteness").) The written description provides no guidance as to what amount of divergence or convergence of a beam delineates a "collimated beam" from a non-collimated beam.

**Motion 3**

Summary judgment of invalidity is warranted for all '443/'107 Asserted Claims for failure to satisfy the written description requirement. The written description only discloses a so-called "Wavelength Division Multiplexer (WDM)" [2] having a "collimating optical element"/"first optical element" configured to project a collimated beam used within the WDM, but the claims broadly recite a WDM that uses any light without any requirement for that light to be "collimated" by a "collimating optical element"/"first optical element."

## IV. STATEMENT OF FACTS

The written description states that "efficient color separation ***can only be*** accomplished economically with collimated light beam." (SUF2, ¶8; Ex. 2A, 44:24-26.) In infringement contentions, BEC pointed to the beam throughout the Accused Products' detector module as the alleged "collimated beam."

[2] BEC treats a "wavelength division multiplexer (WDM)" as a "wavelength division *de*multiplexer." Cytek disagrees because a multiplexer adds different light bands together while a *de*multiplexer separates light into different bands. Cytek does not move for summary judgment on this non-infringement position, but reserves the right to advance it at trial.




(SUF2, ¶30; Ex. 2K, 32 (BEC's annotations); *see also id.* at 42-44.) Tellingly, BEC annotated the entire beam traveling through the detector modules as "portions of **collimated beam**." BEC maintained this position even after conceding at *Markman* that "portion" means "subset of the spectrum of wavelengths of light" instead of BEC's proposed construction that sought to ambiguously construe "portion" as meaning a single light ray (or some subset of the rays) within the accused "beam." (Ex. 2D, 92:21-24.)

In infringement contentions, BEC also identified all beam spots on the Accused Products' bandpass filters as "images" and distinguished the alleged "images" (in green below) from other segments of the alleged "collimated beam" (in blue). (SUF1, ¶7.)




(*Id*., (citing Ex. 1C, 66, 220.)

[redacted]

(*Id*., (citing Ex. 1C, 55, 202).)

The undisputed evidence, however, is that the accused "beam" in the Accused Products is not a "collimated beam" because, as BEC's expert, Schaafsma, admitted, segments of the beam are not "collimated." (SUF2, ¶16; Ex. 1H, 214:9-15.) So, in

expert discovery, BEC advanced a new theory. BEC's expert, Schaafsma,[3] pointed to mere segments of the beam as allegedly "collimated," abandoning BEC's theory that the entire beam is the accused "collimated beam." (SUF2, ¶¶ 14-16 (citing Ex. 2B, ¶¶130-131, 171-172; Ex. 2H, ¶¶201-207).)

Additionally, Schaafsma's new infringement theory relied on two different "types" of alleged "images" within the Accused Products: (1) "afocal images" that purportedly exist along segments of the beam, such as the beam segments between elements M1 & M2, and (2) focused or real images on the odd-numbered filters (F1, F3, etc.) (rather than on sequential filters). (SUF1, ¶¶8-9, 13)

[redacted]

[3] Schaafsma was BEC's only expert to independently provide substantive infringement opinions regarding the "collimated beam"-related and "image"-related limitations. Another BEC expert, Houston, provided opinions only regarding the "collimating optical element"-related limitations and simply opined that she reviewed and agreed with Schaafsma's analysis of these limitations. (SUF2, ¶10; SUF1, ¶10.)

(*Id.*) According to Schaafsma, "afocal images" exist along the entire length of the allegedly "collimated" segments of the beam, not just at the filters. (SUF1, ¶¶11-12.) Thus, using Schaafsma's taxonomy, the Accused Products have an alternating sequence of focused images on the odd filters (F1, F3, etc.) with intervening "afocal images" (e.g., in annotated segment(s) B4-B5 between M1-F2-M2), and vice versa. (SUF1, ¶¶8-9, 11-12.)

Schaafsma's initial infringement analysis for the "substantially the same … size" element 20(d) rested on two alternative infringement theories: (1) that the so-called "afocal images" were all essentially the same size (ignoring the intervening focused images), and (2) separately, that the focused images on the odd-numbered filters are the same size (ignoring the intervening "afocal images"). (SUF1, ¶¶13-14.) The "images" identified by Schaafsma in each theory are nonsequential, and there are intervening images between each respective pair of first and second "images." (*Id.*)

Schaafsma also introduced a third new infringement opinion in his Reply report, asserting that the focused beam spots on the odd-numbered filters and the unfocused beam spots on the even-numbered filters purportedly differ by [redacted] in size, so "are substantially the same size." (SUF1, ¶15.)

## V. MOTION 1: THE ACCUSED PRODUCTS DO NOT INFRINGE CLAIMS 23 AND 26 OF THE '582 PATENT UNDER THE COURT'S CLAIM CONSTRUCTION

### A. BEC's infringement theories for the "the size of the first image is substantially the same as the size of the second image" limitation do not properly apply the Court's construction of "second image," so summary judgment of non-infringement must follow

Under the Court's construction, a "*second image* is created after the first image ***and there is no intervening image***." (SUF1, ¶6.)

BEC's infringement theories for limitation 20(d) fail to properly apply the Court's construction of "second image." BEC ignores the construction's prohibition against "no intervening image" between the "first image" and "second image" by instead recasting its infringement theory to merely prohibit "no intervening image ***of the same type***" between the first and second images. (SUF1, ¶¶13-14.) Under the Court's construction of "second image," BEC has failed to provide any evidence that the Accused Products infringe the "substantially the same … size" limitation.

Schaafsma offered two alternative and incorrect infringement theories regarding claim element 20(d). (SUF1, ¶¶13-14.) In his first theory (depicted below), Schaafsma identified the so-called "afocal image in the path between M1 and M2" as the "first image" and the "afocal image [in the] the path between M3 and M4" as the "second image." (SUF1, ¶14.)

[redacted]

(*Id*.; Ex. 1F, ¶262 (orange text/annotations added).)

In his second theory (depicted below), Schaafsma identified the "focused image at F1" as the "first image" and the "focused image at F3" as the "second image."

[redacted]

(SUF1, ¶14; Ex. 1F, ¶263 (green text/annotations added).)

Neither theory establishes infringement of element 20(d) because the "*second image*" that BEC identifies for each theory does not satisfy the Court's construction.

As illustrated below, in BEC's first infringement theory, there is an ***intervening*** (focused) image at F3 (green) between the identified "first" and "second" "afocal images."

[redacted]

(SUF1, ¶14; Ex. 1F, ¶262 (orange and green text/annotations added).)

In BEC's second theory, there is an ***intervening*** so-called "afocal image" (orange) between the identified "first" and "second" images.

[redacted]

(SUF1, ¶14; Ex. 1F, ¶263 (orange and green text/annotations added).)

There is no material dispute concerning the operation of the Accused Products—only claim scope, which the Court has already resolved. There can be no dispute that there is an intervening "image" between the first and second images identified in both of BEC's theories. Since no alleged "second image" meets the Court's construction of "second image" with respect to the "first image" to which Schaafsma compares it, BEC has failed to put forward evidence to show that the Accused Products infringe claim element 20(d) when the Court's construction of "second image" is correctly applied. Summary judgment of non-infringement of claims 23 and 26 of the '582 patent should be granted.

### B. BEC's reply opinions comparing sequential spot sizes, to the extent considered, fail to create a genuine issue of material fact regarding infringement of the "size of the first image is substantially the same as the size of the second image" limitation

After Cytek and its experts identified the foregoing dispositive defects in Schaafsma's infringement analysis, Schaafsma improperly added in reply a new theory based on sequential "images."[4] But even if the Court considered this tardy theory, it does not raise a genuine issue of material fact.

In his Reply Report, Schaafsma newly opined that the beam spot sizes between the even- and odd-numbered filters are "substantially the same size." (SUF1, ¶15; Ex. 1F, ¶271 ("Although I dispute Ilkov's 'corrected' model is 'more

[4] Cytek is seeking to strike this new opinion.

accurate', according to Ilkov's own theories and 'corrected' model, Cytek still infringe because according to his 'corrected' Zemax model the spot sizes between even and odd filters ranges from [redacted] based on Ilkov's charts so the images are substantially the same size.").) This untimely assertion does not create a genuine issue of material fact regarding infringement of the "substantially the same . . . size" limitation because it is conclusory and irreconcilable with Schaafsma's other opinions and positions.

First, Schaafsma fails to identify any evidence, whether intrinsic or extrinsic, to support his bare conclusion that "the spot sizes between even and odd filters ranges from [redacted]," so that "the images are substantially the same size." (SUF1, ¶15.) Schaafsma admits that the spots are *not* the same size, and he identifies no evidence from the written description of the '582 patent, for example, to support the proposition that "images" could differ in size by [redacted] and still be considered "substantially the same" size. (*Id.*) BEC "cannot overcome summary judgment" on these claims because Schaafsma's "conclusory infringement opinion does not create a genuine dispute of material fact." *Stragent, LLC v. Volvo Car USA, LLC*, No. 22-cv-00293, 2024 WL 1366813, at *4 (D. Del. Apr. 1, 2024) (citing *Intell. Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1183 (Fed. Cir. 2009) & *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 941 (Fed. Cir. 2013) ("Conclusory expert assertions cannot raise triable issues of material fact on summary judgment.")).

Second, Schaafsma's new [redacted] variance is insubstantial"-theory is contradicted by his other opinions. According to Schaafsma, a POSA would understand two images to be "substantially the same size" where the images are intended to be the same size but deviate slightly from the intended goal of perfect identity/equality due to real-world tolerances, constraints, and limitations in optical systems. (SUF1, ¶16.) Schaafsma asserted in his Rebuttal Report on validity that "a POSA would have understood that 'substantially the same size' conveys that the images are approximately equal in size within the tolerances inherent in optical design, while recognizing that perfect identity is not technically achievable. … the intended relationship is near equality, not arbitrary similarity." (*Id.*)

This validity position is incompatible with his new infringement assertion that the *unfocused* beam spots on the even-numbered filters are "substantially the same size" as the *focused* beam spots on the odd-numbered filters. It is undisputed that the *focused* beam spots (formed by converging rays) both are and are ***intended to*** be smaller than the *unfocused* beam spots. (SUF1, ¶¶8, 17-19.)

[redacted]

(*Id.*) The different sizes of the *focused* and *unfocused* beam spots (whether it is [redacted]) is a result of the intended design of the Accused Products, which is undeniably apparent in the models and images of the Accused Products, including those relied upon by Schaafsma, and is not due to unintended, unavoidable "minor variations due to manufacturing tolerances, alignment constraints, and wavelength-dependent effects." (SUF1, ¶16 (quoting Ex. 1E, ¶982); *see also* SUF1, ¶¶8, 17-21, 28.) Indeed, BEC's counsel stated at *Markman*: "An afocal image, of course, is the ***opposite*** of a focused image." (Ex. 1B, 55:2-3.)[5]

[5] To the extent Schaafsma's conclusory assertion that beam spots on consecutive filters are substantially the same size were found sufficient to overcome summary judgment of noninfringement, his subjective opinion concerning this "arbitrary similarity" illustrates the indefiniteness of the "substantially the same … size" limitation.

[redacted]

(SUF1, ¶20.)

[redacted]

(SUF1, ¶21.)

Third, Schaafsma's belated infringement theory for claim element 20(d) is inconsistent with his other infringement analyses. For example, Schaafsma relied on different models of the light beam within the Accused Products—which he maintained were just as, if not more, accurate than the model from Cytek's expert, Ilkov (*see* SUF1, ¶15)—that showed a much larger difference between the size of the focused images on the odd-numbered filters and the size of the unfocused beam

spots on the even-numbered filters. (SUF1, ¶¶17-19.) In the model used in his Opening Report, Schaafsma admitted the unfocused spot at an even-numbered filter was around [redacted] than the focused spot on the preceding odd-numbered filter. (SUF1, ¶17 (citing Ex. 1H, 237:5-15).)

[redacted]

(*Id*. (citing Ex. 1D, ¶¶175-176 (orange and green text/annotations added)).) And, in a model that Schaafsma modified for his Reply Report, the unfocused spots at the even-numbered filters were about [redacted] as the focused images on the odd-numbered filters with substantially larger diameter than the "[redacted] variance" Schaafsma arbitrarily asserted was insubstantial. (SUF1, ¶¶18-19.)

[redacted]

(SUF1, ¶19; Ex. 1F, ¶120 (colored highlighting/annotations added).)

Regardless of whether the unfocused spots on the even-numbered filters are [redacted] bigger than the focused images on the odd-numbered filters, BEC and Schaafsma acknowledged that they are different under every model/analysis, and they thus fail to show that the beam spots on consecutive filters are "substantially the same … size." (SUF1, ¶¶8, 15, 17-21.)

Likewise, Schaafsma's new, conclusory opinion is inconsistent with his infringement opinions regarding the "images" allegedly present in the Accused Products. Critically, Schaafsma's new theory does ***not*** compare the size of so-called "afocal *images*" to those of other (focused) *images* as the claim requires—instead, it compares the size of certain ***beam spots*** to the size of focused images. Schaafsma identifies two purported "types" of images in the Accused Products: (1) focused or

real images that are formed on the odd-numbered filters, and (2) "afocal images" that purportedly comprise segments of the light beam (*e.g.*, between M1-M2, M3-M4, etc.) that encode information "that can later be re-imaged to form a real image." (SUF1, ¶¶9, 12.) According to Schaafsma, an "afocal image" exists along the "entire length" of an (effectively) collimated beam segment. (SUF1, ¶11.) What Schaafsma calls an "afocal image" is three-dimensional, whereas the focused images on the odd-numbered filters are only two-dimensional. (SUF1, ¶¶11-12, 26.) Schaafsma's previous description of an "afocal image" is thus inconsistent with his new opinion regarding the difference between the unfocused ***spot size*** at the even-numbered filters and the size of the focused/real ***images*** formed on the odd-numbered filters.

Thus, even Schaafsma's belated, conclusory assertion that the focused spots on the odd-numbered filters are "substantially the same size" as the unfocused spots on the even-numbered filters—which is irreconcilable with his other opinions—is insufficient to create a genuine issue of fact regarding noninfringement of element 20(d).

**C. Alternatively (or additionally), the term "image" is indefinite**

The term "image" as used in the '582 patent is indefinite because BEC contends it includes a "collimated afocal image," but the term "collimated afocal image" describes an impossibility in a flow cytometer. Though "afocal" is a known term, it is undisputed that the phrase "collimated afocal image" does not appear

anywhere in the field other than in the Asserted Patents. (SUF1, ¶22.) And the two instances where this phrase is used in the written description fail to provide guidance on what a "collimated afocal image" is, where it is formed within the light path of an optical subsystem for a flow cytometer, or the size of such an "image." (SUF1, ¶23; Ex. 1J, ¶¶1080-1085.) Rather, the two uses of the phrase "collimated afocal image" in the written description discuss a different component—a composite microscope objective—than what is claimed in the '582 patent, a different component that produces a real image through further focusing the beam (using, *e.g.*, a lens) "at a finite distance." (SUF1, ¶23 (citing Ex. 1A, 35:25-25, 36:25-32).)




*FIG. 10*

(Ex. 1J, ¶1082; Ex. 1A, FIG. 10 (annotated).)

In contrast, a POSA would understand that a collimated beam forms an afocal "image" at infinity. (SUF1, ¶24.)

Using this relationship, you can see why light going through a converging lens can produce three different results (this is similar to what we saw earlier for light passing through a spherical boundary). Whether the light converges, diverges, or is collimated depends on where the object is relative to the focal length of the lens:




(*Id.*, (citing Ex. 1J, ¶1079).) Because a collimated beam forms an afocal image at infinity, a POSA would not understand any "collimated afocal image" to be formed within the claimed "optical subsystem for a flow cytometer," as the light path in such a subsystem is indisputably not infinite. (SUF1, ¶¶24-25.)

Schaafsma equates an "afocal image" with a "collimated" *segment* of a light beam and contends that "image information" is included or encoded in the collimated beams propagating between two optical elements. (SUF1, ¶¶11-12.) The claims of the '582 patent recite an "image," however, not "image information" that can later be used to form an image. (SUF1, ¶27.) "Information" that can be used to form an "image" is not the "image" itself. (Ex. 1L, ¶413.) Schaafsma further confuses an "afocal image" (which resolves at infinity) with an "afocal system" that can create a real image if there is a second lens. (*Id.*, ¶¶410, 414.) There is no "afocal image" that exists along a path of light; rather, "images" are two-dimensional shapes formed on an image plane—located at a finite distance for real images to be formed

by converging rays and located at an infinite distance for a collimated beam—not a three-dimensional object comprising an entire length of a beam segment. (*Id.*)

Schaafsma's conclusory comparison of the "size" of an "afocal image" to that of a focused/real image further underscores the indefiniteness of the "image" term. Real images are formed by converging rays on or at a two-dimensional image plane, while "afocal images," according to Schaafsma, allegedly "exist" along the entire length of a segment of a light beam with no identifiable image plane. (SUF1, ¶¶9, 11-12, 26.) Thus, whether a real image at an image plane is "substantially the same … size" as a projection of a "collimated afocal image" with no image plane (or an image plane at infinity) has no objective answer since nothing identifies where to measure the relative size of the "collimated afocal image" for comparison against a real image (even assuming comparing the "size" of Schaafsma's two different types of "images" makes any sense). Indeed, Schaafsma's own model shows that the allegedly "collimated afocal image" segment of the beam between M1-F2-M2 has varying cross-sectional diameter of [redacted] (SUF1, ¶¶18-19; Ex. 1G.) Since the allegedly "collimated afocal image" has a different cross-sectional size at different locations in BEC's identified beam segment in which the "collimated afocal image" allegedly "exists" and there is no image plane to indicate which of the varying sizes of the "collimated afocal image" are to be used to determine whether "the first image is substantially the same as the size of the second image," a POSA

would not be able to determine with reasonable certainty whether a real "first image" is substantially the same size as a "collimated afocal" "second image." (SUF1, ¶¶11-12, 18-19; Ex. 1L, ¶¶413-415.)

Thus, to the extent that: (i) "collimated afocal images" or "afocal images" are included within the scope of the "image" term; (ii) "collimated afocal images" or "afocal images" need not be (perfectly) collimated; and (iii) an arbitrary cross-section of a three-dimensional projection of a "collimated afocal image" can serve as a proxy for the "image" "size," all as BEC contends, a POSA would not understand the scope of the term "image" with reasonable certainty because they would not understand ***where*** along the length of a "collimated" beam path a two-dimensional cross-section that represents the "size" of the three-dimensional projected "afocal image" is located. (*Id.*)

## VI. MOTION 2: THE ACCUSED PRODUCTS DO NOT INFRINGE CLAIMS 1, 3, AND 6 OF THE '582 PATENT BECAUSE THEY DO NOT USE A "COLLIMATED BEAM"

The Accused Products do not infringe the remaining asserted claims of the '582 patent because they use an alternatingly focused and defocused beam within the detector module, not a "collimated beam" as required by claim 1 of the '582 patent. BEC does not dispute that the beam within the Accused Products is alternatingly focused and defocused. Instead, BEC attempts to prove infringement by pointing to mere "segments" of the beam and arguing that only initial collimation

by the collimating optical element is necessary to prove infringement regardless of the admittedly non-collimated segments of the beam that occur thereafter. But this disregards the remainder of the claim's language that requires the beam remain collimated. Additionally, this ignores the Court's construction that "portion" is a subset of the wavelengths of light (not individual rays within the subset of the wavelengths of light) and the specific language in claim 1(c) that the "optical relay element" is arranged both "to *receive* at least a portion of *the collimated beam* from the collimating optical element … [and] to *reflect* the portion of *the collimated beam* received from the collimating optical element." As shown below, there is no factual dispute and summary judgment is warranted.

### A. The Claims and Written Description Demand Propagation of a Collimated Beam Within the Claimed Optical Subsystem

The plain language of claim 1 of the '582 patent requires a beam that remains collimated as it propagates within the recited optical subsystem, which is consistent with the specification's declaration that "efficient color separation can only be accomplished economically with collimated light beam." (SUF2, ¶8; Ex. 2A, 44:24-26.) As shown below, claim 1 recites in limitation 1(b) a "collimating optical element configured to project **a collimated beam**." It then recites in limitation 1(c) that there must be "an optical relay element arranged to receive at least a portion of **the collimated beam** from the collimating optical element" and "configured to reflect the portion of **the collimated beam** received from the collimating optical

element." Further, a portion of **the collimated beam** reflected by the optical relay element is received by "a first focusing optical element" according to limitation 1(d). This first focusing optical element focuses "the portion of **the collimated beam** received from the optical relay element onto the first semiconductor detector" (limitations 1(e)-(f)).

> 1. An optical subsystem for a flow cytometer, the optical subsystem comprising:
> (b) a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam;
> (c) an optical relay element arranged to receive at least a portion of the collimated beam from the collimating optical element, the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a first image;
> (d) a first focusing optical element arranged to receive at least a portion of the collimated beam reflected by the optical relay element; and
> (e) a first semiconductor detector,
> (f) wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element onto the first semiconductor detector.

(SUF2, ¶3 (annotated).) Claim 1 thus specifies how the "collimated beam" is passed, component-by-component, through the optical subsystem.

Claim 1's language that projects and propagates "the collimated beam" matches the specification's disclosure, as BEC and Schaafsma previously recognized. In his *Markman* declaration and opening report, Schaafsma pointed to the "collimated beam" that travels through the claimed detector module wherein

portions ("subsets of the spectrum of wavelengths of light") of the collimated beam are separated by filters. (SUF2, ¶8; D.I. 115-1, ¶¶27-29, 97-98; Ex. 2B, ¶¶82-83.)




*FIG. 25*

(SUF2, ¶8; Ex. 2B, ¶82 (Schaafsma's annotations showing collimated beam throughout the entire detector module); *see also* D.I. 115-1, ¶27 (same).)

Schaafsma recognized that "[t]his wavelength separation is accomplished by using an optical relay structure, where each channel is successfully dropped from ***the main beam*** into its own detection path." (SUF2, ¶9; Ex. 2B, ¶83.) Schaafsma further pointed to a first optical element that projects a collimated beam and a second

optical element that allows for relaying "with ***unit magnification down the optical path*** [and] effectively doubles the ***collimated path*** length." (*Id.*) Schaafsma concluded that "the WDM described in the Asserted Patents ***maintains the size of the beam*** containing fluorescence ***through the length of the WDM*** so that each channel can have the same architecture and passive losses to the beam are minimized." (*Id.*) Therefore, Schaafsma's own description of the specification belies his opinion that claim 1 does not require propagation of "the collimated beam" within the claimed optical subsystem.

BEC likewise recognized the claims require propagation of "the collimated beam" from the "collimating optical element" ("COE") throughout the detector module, as illustrated in its infringement contentions:




(SUF2, ¶30; Ex. 2K (BEC's annotations); *see also id.* at 42-44.) Tellingly, BEC annotated the entire beam traveling through the detector module as "portions of

**collimated beam**."

### B. The Accused Products do not propagate a "collimated beam" within their detector module and therefore do not infringe claims 1, 3, and 6

There is no dispute that the Accused Products do not use a collimated beam throughout the detector module. Rather, the Accused Products' beam alternatingly focuses and defocuses as it travels through the detector module. Schaafsma concedes this. To illustrate, Schaafsma analyzed a Zemax simulation of the optical path within the Accused Products, originally done by Jay Hsieh, the optical engineer who helped design the Accused Products' detector module.[6]

[redacted]

[6] The Zemax file uses so-called ideal or paraxial components (not the actual lenses, filters, and microlenses with reflective surfaces in the Accused Products).

(SUF2, ¶¶11, 13; Ex. 2B, ¶130-131 (annotated in green and red to show focused defocused beam spots at filters (F1-F15)); *see also* Ex. 2H, ¶99 (showing "smaller" and "larger" beam spots at alternating filters).) The alternating focused and defocused nature of the beam is obvious when looking at the propagating blue beam. (Notably, Schaafsma used only the center field point of Hshieh's Zemax file. When viewing the multiple field points in Hshieh's Zemax file, no segments have parallel rays. For example, B1 would not have parallel rays and M1-M2 would not have parallel rays. However, this motion references Schaafsma's own analysis to demonstrate there is no infringement.)

Cytek's expert, Ilkov, also performed a Zemax analysis that shows a non-collimated focused and defocused beam. (SUF2, ¶12; Ex. 2E, ¶¶115, 129.) Ilkov additionally evaluated actual light as it travels through the optical path and demonstrated the alternating and substantially different beam diameter of the non-collimated focused and defocused beam.

[redacted]

(Ex. 2E, ¶99.)[7]

Recognizing this problem—that the Accused Products' beam is not collimated into and throughout the detector module—BEC and Schaafsma point to mere *segments* of the beam (*e.g.*, B1 and B4) to cobble together a theory that the Accused Products nonetheless use a "collimated beam." (SUF2, ¶¶ 14-16 (citing Ex. 2B, ¶¶130-131, 171-172; Ex. 2H, ¶¶201-207).) But reliance on only segments of the beam ignores the claim language as explained below.

#### 1. The Accused Products' input optics do not project and propagate a "collimated beam" within the detector module; Schaafsma's reliance on allegedly collimated beam *segments* does not satisfy claim 1

Under Schaafsma's First Infringement Theory, Accused Beam Segment B1 Is Not Propagated Within the Detector Module, So At Least Limitation 1(C) Is Not Met. To contend the Accused Products satisfy the "collimated beam" claim requirement, Schaafsma ignores a dispositive feature of the Accused Products' input optics. With reference to the diagram below, Schaafsma points to the first lens L1 as the "collimating optical element" and the segment B1 between the first lens and the second lens L2 to contend there is a "collimated beam." (SUF2, ¶¶15-19, 21;

[7] This is further supported by the USPTO issuing Cytek's '076 patent over the parent patent of the Asserted Patents. *Specifically, in allowing the claims the Examiner noted the disclosure of the Asserted Patents does not teach Cytek's use of a beam "**reimaging light onto odd filters** of a plurality of filters arranged in a row." See supra*, page 3 (citing SUF2, ¶31; Ex. 2M, CYTEK_0000990377-990378.)

Ex. 2B, ¶¶201-202, 130-131; Ex. 2H, ¶¶201-202.) But Schaafsma disregards that, unlike the claimed invention, the input optics of the Accused Products also have a second lens L2, which is a *focusing* lens. The result is that L2 focuses (not collimates) the beam segment B2 (in green below) onto the first filter F1. This is undisputed as Schaafsma himself recognizes "L1 and L2 [] form a telecentric pair" wherein L2 "then focuses the beam(s)." (SUF2, ¶¶16, 20; Ex. 2B, ¶¶130-31; Ex. 2I, 131:6-15.)

[redacted]

(SUF2, ¶16; Ex. 2B, ¶130 (annotated to show focused beam in green).)

Indeed, Schaafsma asserted that "the segment B2 is a focused segment, and over B1 it's a collimated segment. So that over B2, the rays are not collimated, not nearly parallel…." (SUF2, ¶16; Ex. 2I, 214:9-15.) Thus, even if beam segment B1

were "collimated" over some short distance (and it is not when multiple field points are used), lens L2, projects the beam as a (non-collimated) focused beam, which then propagates through the rest of the detector module in an alternatingly focused/defocused manner. Indeed, Schaafsma "agree[s] that Cytek focuses its beam at portions along the optical path." (SUF2, ¶22; Ex. 2H, ¶101.)

Schaafsma does not dispute the beam is not collimated throughout. (*Id.*) Instead, he opines there is no requirement "that the beam remain collimated throughout, but rather only requires initial collimation by the collimating optical element." (SUF2, ¶14; Ex. 2H, ¶245.) But this disregards that the recited claim language requires a beam that is initially projected as a 'collimated beam" by the "collimating optical element" and remains "collimated" for the remaining claim elements. (SUF2, ¶3.)

As one example, limitation 1(c) requires "an optical relay element arranged to receive at least a portion of the collimated beam from the collimating optical element." (SUF2, ¶3.) The Accused Products do not satisfy this limitation. Schaafsma's Zemax analysis, shown above, demonstrates that M1 receives a (non-collimated) diverging beam from F1. In fact, Schaafsma concedes that he has "never described the beam from the odd-numbered filters to the odd-numbered mirrors as collimated." (SUF2, ¶¶19-20; Ex. 2B, ¶¶130-131; Ex. 2H, ¶¶201, 215.)

Schaafsma's asserted mapping of the "optical relay element" to M2 also fails

for multiple reasons. First, the claim language requires that the "optical relay element is arranged to receive at least a portion of the collimated beam *from* the collimating optical element." This is not satisfied for M2. Second, M2 does not satisfy the further requirement that the "optical relay element" both "receive" and "reflect" "the portion of the collimated beam" as discussed in Section VI.B.2 below.

<u>Schaafsma's Alternative Infringement Theory Fails At Limitation 1(B) Because Mirrors Do Not Satisfy the Court's Construction of "Collimating Optical Element."</u> Perhaps recognizing the flaw in his mapping, Schaafsma presents an alternative infringement theory asserting that odd-numbered mirrors are the "collimating optical element" that projects a collimated beam and even-numbered mirrors are the "optical relay element" that receive a portion of the collimated beam. (SUF2, ¶23; Ex. 2B, ¶201; Ex. 2H, ¶203.) But BEC's attempt to expand the scope of "collimating optical element" beyond the positions it took during prosecution as well as claim construction should be rejected. During prosecution, BEC pointed to the achromatic doublet lens as the "collimating optical element."



*FIG. 25*

(SUF2, ¶29; Ex. 2J, BEC-CYTEK00004819 (annotations in original).) And during claim construction, BEC took the position that the structure was "a lens, such as an achromatic doublet lens," but never proposed including a mirror as structure that performs the claimed functions. (SUF2, ¶28; D.I. 114, 74-75.)

Moreover, BEC and Schaafsma's new mapping of a mirror to be the claimed "collimating optical element" is inconsistent with the claim language and does not follow the Court's ruling that the "collimating optical element" functions are "(1) receive light from a light source; (2) project a collimated beam" and its structure is "a lens, such as an achromatic doublet lens, and structural equivalents thereof."

(SUF2, ¶6; D.I. 226, 5.) The alleged mirrors[8] in the Accused Products do not satisfy this claim term as construed by the Court for multiple reasons. First, the alleged odd-numbered mirrors (M1, M3, etc.) do not perform the claimed functions. Unlike the achromatic doublet lens, no alleged mirror is arranged to "receive light from a light source." (SUF2, ¶24; Ex. 2B. ¶¶130-131.) The claim language makes clear that the "collimating optical element" receives light from the light source (limitation 1(b)) and the "optical relay element" receives light from the "collimating optical element" (limitation 1(c)). In addition, ***mirrors do not "project" a collimated beam***. Mirrors do not "project" light; mirrors "reflect" light. (SUF2, ¶25; Ex. 2E, ¶150; Ex. 2F, ¶380; Ex. 2B, ¶142 ("Mirrors work on the principle of reflection.").) Moreover, a lens and a mirror are substantially different and, at minimum, do not perform in substantially the same way given a lens refracts and a mirror reflects. (SUF2, ¶26; Ex. 2E, ¶151; Ex. 2F, ¶381.) Therefore, BEC's alternative mapping based on the alleged mirrors being the recited "collimating optical element" also fails to satisfy the Court's construction of "collimating optical element" as a matter of both the claimed function and corresponding structure.

Simply put, BEC has not established that the Accused Products project and propagate a "collimated beam," whether based on the Accused Products' input optics

---

[8] Cytek's Accused Products use microlenses with reflective surfaces. However, for simplification, Cytek refers to the "microlenses" as what BEC identifies as the alleged "mirrors."

or alleged mirrors.

### 2. The Accused Products do not have "an optical relay element" that is arranged both "to receive at least a portion of the collimated beam from the collimating optical element … [and] to reflect the portion of the collimated beam received from the collimating optical element[.]"

Further, to the extent an individual segment of a beam could satisfy the claim term "collimated beam" (and it does not) under any of Schaafsma's infringement mappings (whether accusing L1 or M1 as the claimed "collimating optical element" and M1 or M2 as the accused "optical relay element"), the Accused Products would not satisfy the entirety of limitation 1(c), which requires "an optical relay element" arranged both "to receive at least a portion of the collimated beam from the collimating optical element … [and] to reflect the portion of the collimated beam received from the collimating optical element[.]" (SUF2, ¶3.) In other words, the optical relay element must both *receive* and *reflect* the same portion (subset of wavelengths) of "the collimated beam." This is absent from the Accused Products as Schaafsma's Zemax analysis demonstrates.

[redacted]

(SUF2, ¶27; Ex. 2B, ¶130 (annotated to show non-collimated beam and optical relay elements).)

None of M1-M15 satisfy the limitation of an "optical relay element" receiving "a portion of the collimated beam" and reflecting "the portion of the collimated beam." Schaafsma admits that he has "never described the beam from the odd-numbered filters to the odd-numbered mirrors as collimated." (SUF2, ¶20; Ex. 2H, ¶215.) Hence, it is undisputed that none of the accused odd-numbered mirrors receive "a portion of the collimated beam." Schaafsma also "agree[s] that Cytek focuses its beam at portions along the optical path" (SUF2, ¶22; Ex. 2H, ¶101), and admits that a "POSA would not consider something that is brought to a point of focus" to be a collimated beam. (SUF2, ¶22; Ex. 2I, 131:6-15.) Thus, it is also

undisputed that the accused even-numbered mirrors (M2, M4, etc.) do not reflect "the portion of the collimated beam."

Because there is simply no alleged mirror that both receives and reflects the same portion (subset of wavelengths) of the collimated beam (limitation 1(c)), Cytek does not infringe asserted claims 1, 3, and 6 of the '582 patent.

#### 3. The Accused Products do not satisfy "collimated beam" under the doctrine of equivalents because BEC's theory would vitiate the claim term and because a focused and defocused beam is substantially different from a "collimated beam"

The Accused Products also cannot infringe "collimated beam" under the doctrine of equivalents. Schaafsma alleges that if "any portion(s) of the beam are not literally a 'collimated beam' and/or a 'portion of the collimated beam,' then the beam is equivalent to the claimed 'collimated beam' and/or any portion(s) thereof under the Doctrine of Equivalents" because "the beam and all portions thereof maintain substantially the same *maximum* diameter as it travels along the optical path by having controlled divergence and/or convergence." (SUF2, ¶32; Ex. 2B, ¶117.) But Schaafsma's position vitiates the term "collimated" beam from the claims.

A theory of equivalence may not vitiate a claim term. *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998) ("If a theory of equivalence would vitiate a claim limitation, … then there can be no infringement under the doctrine of

equivalents as a matter of law."); *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1342 (Fed. Cir. 2016) (recognizing a DOE argument "fails if it renders a claim limitation inconsequential or ineffective"). Under Schaafsma's theory, a non-collimated beam (such as a focused beam) would be equivalent to a collimated beam, so long as a substantially same "maximum" diameter is not exceeded. (SUF2, ¶32; Ex. 2H, ¶162 ("the WDM can use a collimated beam over an extended distance without it diverging rapidly, and/or can use an image relay that converges and diverges the beam predictability throughout the relay without the beam going beyond a specified maximum diameter"), ¶¶220, 224.) By Schaafsma's own admission, this position would vitiate the word "collimated" from the claim limitations, as he admitted that a "POSA would not consider something that is brought to a point of focus" to be a collimated beam. (SUF2, ¶22; Ex. 2I, 131:6-15.) Similarly, Dr. Schaafsma admitted that he has "never described the beam from the odd-numbered filters to the odd-numbered mirrors as collimated." (SUF2, ¶20; Ex. 2H, ¶215.)

Had BEC wanted to claim a non-collimated beam or a beam with a maximum diameter, it should have done so. It did not. Instead, BEC now attempts to rewrite the limitation with a different criterion for infringement – maintaining substantially the same *maximum* diameter. Because BEC's equivalency argument would read out the requirement of a "collimated" beam, summary judgment of non-infringement

should be granted as a matter of law. *See, e.g.*, *Athletic Alts., Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1582-83 (Fed. Cir. 1996) ("the doctrine of equivalents is not a license to ignore or erase structural and functional limitations of the claim, limitations on which the public is entitled to rely in avoiding infringement" (cleaned up)); *Sage Prods. Inc. v. Devon Indus. Inc.*, 126 F.3d 1420, 1425 (Fed. Cir. 1997) (affirming summary judgment of no infringement and noting that, if the plaintiff desired broad patent protection, "it could have sought claims with fewer structural encumbrances").

Nevertheless, even considering the insubstantial differences and function, way, result tests, Cytek's use of a focused and defocused beam is substantially different from a "collimated beam." The Accused Products are designed to use a focused and defocused beam. (SUF2, ¶11; Ex. 2B, ¶¶130-131; Ex. 2E, ¶¶72, 89, 133; Ex. 2F, ¶¶331, 338; Ex. 2G, 93:3-16 ("In our APD design, the beam is not always parallel. It's converging, diverging through the propagation [path].").) This is the opposite of and, at minimum, substantially different from the Asserted Patents' teaching that "efficient color separation *can only be accomplished economically with collimated light beam*." (SUF2, ¶8; Ex. 2A, 44:24-26.) BEC also made the distinction between a collimated beam and a focused beam clear during prosecution, arguing that "light 'effectively collimated' by the collimating optical element 902 is not converging." (SUF2, ¶33; Ex. 2J, BEC-CYTEK-00004404 at -4753-754.)

Indeed, during the claim construction hearing, BEC's counsel effectively admitted that a "collimated beam" is the opposite of a focused beam in the context of the different types of images associated with such beams: "But the specification expressly discloses a collimated afocal image. An afocal image, of course, is ***the opposite of*** a focused image." (SUF2, ¶34; Ex. 2D, 55:1-3); *see Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1335 (Fed. Cir. 2014) ("we have found 'specific exclusion' where the patentee seeks to encompass a structural feature [by equivalents] that is the opposite of, or inconsistent with, the recited limitation").

BEC also clearly distinguished a collimated beam and a focused beam during prosecution, arguing that "light 'effectively collimated' by the collimating optical element 902 is not converging." (SUF2, ¶33; Ex. 2J, -4753-754.)

Schaafsma impermissibly attempts to equate the function of a "collimated beam" to the function of maintaining substantially the same *maximum* diameter as the beam travels along the optical path. (Ex. 2B, ¶117.) But the functions recited in claim 1 are projecting a collimated beam, receiving a collimated beam, and reflecting a collimated beam. (Ex. 2A, cl. 1.) Those functions are not substantially the same as maintaining a *maximum* diameter. (Ex. 2E, ¶¶132-133; Ex. 2F, ¶¶334-336.)

Further, the functions are not performed in substantially the same way. *See Augme*, 755 F.3d at 1336 (holding "that conclusory expert testimony on the 'way' prong of the function-way-result test was insufficient, by itself, to create a

genuine issue of material fact on the issue of infringement by equivalents"). The claimed invention is designed to maintain a "collimated beam," not purposefully cause a beam to converge and diverge like the Accused Products. (SUF2, ¶11; Ex. 2E, ¶¶86-89; 133; Ex. 2F, ¶¶327-331.) Moreover, Schaafsma made no attempt to assert that the undisputed non-collimated converging and non-collimated diverging segments within the Accused Products are approximately "collimated," nearly "collimated," or closely "collimated" to support any contention that they are merely insubstantially different and/or operate in substantially the same way as the recited "collimated beam."

Finally, the result is not substantially the same. Cytek's converging and diverging optics helps minimize aberrations so that the beam can propagate further to reach more detectors. (Ex. 2E, ¶133; Ex. 2F, ¶340.) Moreover, BEC has submitted no evidence demonstrating substantially the same result between use of a "collimated beam" and use of a focused and defocused beam. Therefore, there can be no infringement under the doctrine of equivalents.

### C. Alternatively, the Term "Collimated Beam" Is Indefinite as a POSA Would Be Unable to Determine the Scope of the Term with Reasonable Certainty

Alternatively, the term "collimated beam" is indefinite because "its legal scope is not clear enough that a person of ordinary skill in the art could determine whether a particular composition infringes or not." *Geneva Pharms., Inc. v.*

*GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) (inability for a POSA to know whether a particular product is within the claim scope is "the epitome of indefiniteness.").

The Court construed the term "collimated beam" under its plain meaning but reserved the issue of indefiniteness. (SUF2, ¶5; Ex. 2C, 133:11-15 ("I'm not going to construe this term. I'm going to give it its plain and ordinary meaning. I do think it raises, though serious concerns about indefiniteness.").)

BEC contends the plain meaning is "a beam with nearly parallel rays." (*See* D.I. 89-1, 12; Ex. 2I, 146:2-6, 147:22-148:3.) But the specification does not provide any guidance, such as disclosing the allowed degree of divergence (or convergence) of the beam, if any, to distinguish a "collimated beam" from a non-collimated beam. (SUF2, ¶35; Ex. 2O, ¶1053.) BEC's experts, Schaafsma and Houston, admit as much. (SUF2, ¶35; Ex. 2H, ¶206; Ex. 2P, 135:25-136:11.)

During deposition, Schaafsma admitted that defining a "collimated beam" as having "minimal convergence or divergence" is merely "a descriptive term that doesn't particularly have an implied metric." (SUF2, ¶36; Ex. 2I, 181:11-19.) Similarly, Schaafsma admitted that the plain meaning of "collimated beam" with respect to "weak divergence" does not "imply any kind of a metric." (*Id.*, 182:16-22)

This begs the question, what degree of divergence or convergence could be

accepted and still have a "collimated beam?" (*See* Ex. 2C, 135:9-13.) Schaafsma testified that he would interpret a "nearly collimated beam" "as it is collimated," thereby demonstrating there is no reasonable certainty regarding the scope of the term. (SUF2, ¶37; Ex. 2I, 166:12-170:21 ("Q. If someone wanted to have a system that did not use a collimated beam, but they wanted to use a nearly collimated beam, how would they do that? A. Again, it's a descriptive term, so unless there is something that said -- you know, that spelled out that difference, I would interpret it as it is collimated."), 175:7-179:22 ("Q. So 'approximately collimated' would be having approximately nearly parallel rays, right? A. If you read that in conjunction with the construction, you would come up with that term.").) This is precisely the indefinite "zone of uncertainty" the Supreme Court has warned against. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909-10 (2014).

BEC's DOE infringement position only further highlights the indefiniteness of "collimated beam" since the literal scope of the term lacks reasonable certainty to a POSA. Therefore, in the alternative, summary judgment of indefiniteness of the term "collimated beam" is proper. *See NuVasive, Inc. v. Alphatec Holdings, Inc.*, 557 F. Supp. 3d 1069, 1077 (S.D. Cal. 2021) ("Claims cannot rely on the 'unpredictable vagaries of any one person's opinion.'" (citation omitted)).

## VII. MOTION 3: THE '443/'107 ASSERTED CLAIMS ARE INVALID FOR LACK OF WRITTEN DESCRIPTION FOR THE FULL-SCOPE OF "WDM"

The Asserted Claims of the '443 and '107 patents lack written description support for the full scope of "WDM" because the claims fail to recite an essential element, namely, a "collimating optical element"/"first optical element" that projects a collimated beam for use by the WDM. Without this essential feature, the written description lacks support for the WDM's function and, instead, teaches that it would not function as required. A POSA would therefore not have understood the inventors to have possessed the full scope of the claimed invention.

### A. The Only "WDM" Supported by the Written Description Is One that Includes a Collimating Optical Element/"First Optical Element" that Projects a Collimated Beam Used by the WDM

The written description makes clear that a "collimating optical element"/"first optical element" that projects a collimated beam is an essential feature in operating the claimed "WDM." Specifically, this critical component appears throughout the written description and is featured in every WDM embodiment. Only in later filed continuation patents, years after the parent application was filed, did BEC remove this requirement from the claims to accuse Cytek of infringement. This resulted in claims, however, that are unsupported by the written description.

The written description declares that "efficient color separation can only be

accomplished economically with collimated light beam." (SUF3, ¶6; Ex. 3C,[9] 44:24-26.) To this end, the written description makes repeated reference to a "WDM" having a "collimating optical element" that captures light from the light source and projects a collimated beam with the effective size of the collimating optical element. (SUF3, ¶7; *see* Ex. 3C, 20:18-33 ("the wavelength division multiplexer (WDM) includes a collimating optical element"), 20:62-21:10 ("a method for separating beam of light into colored bands using a WDM includes a collimating optical element"), 21:40-44 ("a flow cytometer having a wavelength division multiplexer (WDM), which includes [] a collimating optical element that captures light from the extended light source"), 44:58-61 ("a collimating optical element, in this case an achromatic doublet lens **902**, may capture the light from source **901**"), 44:63-66 ("Consequently, beam of light propagating between the collimating optical element **902** and the focusing lens **905** may be effectively collimated."), 8:12-29 ("a wavelength division multiplexer (WDM) for separating light emitted from a light source into multiple colored bands comprises an imaging optical arrangement [**902**]"), FIGs. 25, 27 (a WDM including a collimating optical element **902**, projecting a collimated beam).)

The written description also teaches a "WDM" that includes "at least two

[9] For convenience, all citations to the common written description are to the '582 Patent.

optical elements," among them "a first optical element" that "collimates a beam of light received from an extended light source[.]" (SUF3, ¶8; Ex. 3C, 4:34-44.) The "second optical element" relays the projected collimated beam to "further extend the collimated optical path" such that "[t]he cascaded unit-magnification image relay architecture of the present disclosure extends the collimated optical path length without large beam expansion." (Ex. 3C, 4:44-53, *see also id.*, 5:7-11 (describing a collimated beam passing through different dichroic filters and concave mirrors).)

The essential nature of the "collimating optical element"/"first optical element" in the operation of the claimed WDM is further highlighted by earlier patent and patent applications, all of which recite a WDM comprising a "collimating optical element." (SUF3, ¶9; Ex. 3E, 52, 76 (reciting a "collimating optical element" in all independent claims directed to a WDM); *see also* Ex. 3F, cl. 1 (reciting a WDM comprising a "collimating optical element"); Ex. 3C, cl. 1 (same); Ex. 3G, cl. 1 (same).)

Further, BEC's Rule 30(b)(6) witness knowledgeable about conception and reduction to practice, Mr. Shi, who helped engineer the early version of BEC's detection module, admitted [redacted] (SUF3, ¶10; Ex. 3H, 339:2-8; *see also id.*, at 270:18-271:7, 280:7-17.) Schaafsma also takes the

position the claimed invention requires controlling a beam's diameter, yet the claimed input optical elements in the '443 and '107 patents do not recite a collimating optical element or a "first optical element" that projects a collimated beam. (SUF3, ¶11; Ex. 3I, 265:5-267:3.)

A POSA would thus have understood that the proposed solution in the '443 and '107 patents to "collimat[e] a large etendue light beam over an extended distance," would require a "collimating optical element"/"first optical element" to collimate fluorescent light and extend that collimated light throughout the WDM. (Ex. 3J, ¶914; *see also* Ex. 3C, 4:34-44, 44:29-30.)

### B. The '443/'107 Asserted Claims Recite a WDM But Not the Essential Element, a "Collimating Optical Element"/"First Optical Element" That Projects a Collimated Beam Used by the WDM

Although the written description discloses only a WDM having a "collimating optical element"/"first optical element" configured to project a collimated beam, the '443/'107 claims fail to recite the essential element of a "collimating optical element"/"first optical element" configured to project a collimated beam. (SUF3, ¶¶2-5, 12; *See* Ex. 3A, cl. 1 (claiming a WDM but no collimating optical element/first optical element); Ex. 3B, cls. 1, 16 (same).) Furthermore, the claims recite generic "light." (*See* Ex. 3A, cl. 1 ("portions of light"); Ex. 3B, cl. 1 ("portion of the light," "reflect light"), cl. 16 ("portion of light," "reflect light").) Based on this claim language, a POSA would have understood the '443/'107 Asserted Claims

are directed to a WDM that uses any type of light, and not just a collimated beam of light projected by a "collimating optical element"/"first optical element." (Ex. 3J, ¶923.) But there is no such description in the written description other than use of a collimated beam of light.

Because the '443/'107 Asserted Claims encompass more than what the specification describes and supports, they are invalid for lack of written description. Indeed, "[t]he purpose of the written description requirement is to 'ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification.'" *Lipocine Inc. v. Clarus Therapeutics, Inc.*, 541 F. Supp. 3d 435, 445 (D. Del. 2021) (quoting *Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 920 (Fed. Cir. 2004)); *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1348, 1351 (Fed. Cir. 2013) (affirming no written description when parent application lacked disclosure suggesting possession of claims in continuation patent at time of filing). Furthermore, these claims are invalid under *Gentry Gallery*, because they do not recite an "essential element" of the invention: "collimating optical element"/"first optical element." *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998).

None of Schaafsma's arguments creates a factual dispute. First, Schaafsma concedes that the '443/'107 Asserted Claims do not recite a "collimating optical

element"/"first optical element." (SUF3, ¶13; Ex. 3K, ¶802; *id.*, ¶803 ("The specification also describes a way of coupling output light from the extended light source to the WDM using a collimating optical element, but this aspect is not recited in the claims of the '107 and '443 Patents[.]"); Ex. 3I, 265:5-267:3.) Instead, he argues a POSA would have understood the claims to require such an optical element and points to a POSA's knowledge of a "collimating optical element" or other ways to control beam expansion. (SUF3, ¶13; Ex. 3K, ¶802 ("I understand it is not necessary to claim every component of the flow cytometer itself, e.g. where components are well-known to a POSA, as is the case for collimating optical elements positioned to direct a beam into the detection subsystem."); *id.*, ¶803.) Schaafsma's position, however, amounts to "rewrit[ing] the claim language to include what is foreclosed by the plain meaning." *In re Shafovaloff*, No. 2024-1035, 2025 WL 1779173, at *2 (Fed. Cir. June 27, 2025) (finding term indefinite, and declining to import limitation from specification where plain claim language foreclosed such reading). Here, the claim language simply does not recite or require a "collimating optical element"/"first optical element," but the written description describes only a WDM having a "collimating optical element"/"first optical element." Second, Schaafsma's assertion that "a collimating optical element between the extended light source and filter is not the only way for the WDM to work so long as the beam is controlled in some manner" is beside the point. (SUF3,

¶14; Ex. 3K, ¶803.) The claims lack *any* element that would control the input beam in any manner. The undisputed fact is that the claims do not recite a "collimating optical element"/"first optical element" (or any other way to control the input beam).

The claims' omission of this essential element is an improper attempt to claim more broadly than disclosed, such that summary judgment of invalidity for lack of written description should be granted. *See LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1346 (Fed. Cir. 2005) (affirming summary judgment of no written description where patent attempted to claim "any and all means for achieving that objective" but the specification disclosed only one way); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1378 (Fed. Cir. 2009) (similar).

## VIII. CONCLUSION

For the foregoing reasons, Cytek's motions for summary judgment should be granted.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

Karen Jacobs (#2881)
Jeremy A. Tigan (#5239)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
kjacobs@morrisnichols.com
jtigan@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Defendant*
*Cytek Biosciences, Inc.*

OF COUNSEL:

Reuben H. Chen
HanByul Chang
Juan Pablo González
Alexandra Leeper
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304

Elizabeth M. Flanagan
COOLEY LLP
30 South 9th Street, 7th Floor
Minneapolis, MN 55402

Adam Pivovar
Dustin M. Knight
Rosalynd D. Upton
David Yun
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004

March 13, 2026

# WORD COUNT CERTIFICATION

The undersigned counsel hereby certifies that the foregoing document contains 10,013 words, which were counted by using the word count feature in Microsoft Word, in 14-point Times New Roman font. The word count includes only the body of the statement. The word count does not include the cover page, tables or the counsel blocks.

*/s/ Jeremy A. Tigan*

Jeremy A. Tigan (#5239)

# CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 13, 2026, upon the following in the manner indicated:

Frederick L. Cottrell III *VIA ELECTRONIC MAIL*
Kelly E. Farnan
Christine D. Haynes
RICHARDS, LAYTON & FINGER P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
*Attorneys for Plaintiff*

Omar A. Khan *VIA ELECTRONIC MAIL*
Jeffrey A. Dennhardt
Lauren E. Matlock-Colangelo
Kelly A. Todd
Laura Macro
Maggie Sawin
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
*Attorneys for Plaintiff*

Akkad Y. Moussa
WILMER CUTLER PICKERING HALE
AND DORR LLP
2100 Pennsylvania Avenue NW
Washington DC 20037
*Attorneys for Plaintiff*

*VIA ELECTRONIC MAIL*

*/s/ Jeremy A. Tigan*

Jeremy A. Tigan (#5239)