# EXHIBIT E



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BECKMAN COULTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 24-945 (CFC) |
| | ) | (EGT) |
| CYTEK BIOSCIENCES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPENING INVALIDITY EXPERT REPORT OF FEDOR A. ILKOV, PH.D.**

Dated: _12/19/2025_

Respectfully submitted,

Fedor A. Ilkov, Ph.D.

███████████████████████████████

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................1

     B.    Qualifications and Experience ...............................................1

     C.    Assignment ............................................................................4

     D.    Materials Considered..............................................................5

II.    SUMMARY OF OPINIONS.............................................................5

III.   LEGAL STANDARDS ......................................................................6

     A.    Invalidity ...............................................................................7

     B.    Claim Construction................................................................7

     C.    Anticipation ...........................................................................7

     D.    Obviousness...........................................................................9

     E.    Conception and Reduction to Practice .................................15

     F.    Written Description .............................................................16

     G.    Enablement ..........................................................................17

     H.    Indefiniteness......................................................................18

IV.   CLAIM CONSTRUCTION .............................................................19

V.    PERSON OF ORDINARY SKILL IN THE ART ("POSA").....................20

VI.   PRIORITY DATE .............................................................................23

VII.  TECHNOLOGY BACKGROUND....................................................31

     A.    Flow Cytometers .................................................................31

     B.    Wavelength Division Demultiplexers .................................33

     C.    Use of Avalanche Photodiodes (APDs) in Flow Cytometry..............41

VIII. ASSERTED PATENTS .....................................................................49

     A.    Overview of the Shared Specification.................................49

     B.    Listing of the Asserted Claims ...........................................51

IX.   OVERVIEW OF THE PRIOR ART ................................................51

     A.    BD FACSArray System .......................................................51

     B.    BD LSR-II System ...............................................................56

█████████████████████████████

C.    Lemoff ................................................................................59

D.    Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors ("DxP System") ......................................61

E.    Luminex FlexMap 3D System ........................................................75

F.    Oostman ................................................................................80

G.    Frazier ................................................................................83

X.    USE OF DISPUTED TERMS & TERMS LACKING § 112 SUPPORT FOR PRIOR ART ANALYSIS IN SECTIONS XI-XIII .........83

XI.    PRIOR ART APPLIED TO THE '582 PATENT ......................................84

A.    Ground 1: Claims 1, 3, 6 of the '582 Patent are Obvious Over the BD FACSArray System and Lemoff ...........................................84

B.    Ground 2: Claims 1, 3, 6 of the '582 Patent Are Obvious Over the Luminex FlexMap 3D System and Lemoff ..............................127

C.    Ground 3: Claims 1, 3, 6 of the '582 Patent Are Obvious Over Oostman, Lemoff, and Frazier ......................................................135

D.    Ground 4: Claims 1, 3, 6, 23, 26 of the '582 Patent are Obvious Over Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors and BD FACSArray System .................155

E.    Ground 5: Claims 1, 3, 6, 23, 26 of the '582 Patent Are Obvious Over Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors and Luminex  FlexMap 3d System .......227

XII.    PRIOR ART APPLIED TO THE '443 PATENT ....................................239

A.    Ground 1: Claims 6, 10, 11, 15 of the '443 Patent Are Anticipated by Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors ("DxP System") ......................239

B.    Ground 2: Claims 4 and 10 of the '443 Patent are Obvious Over Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors .............................................................271

C.    Ground 2a: Claim 4 of the '443 Patent is Obvious Over Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors ("DxP System") and Lemoff ...........................................288

D.    Ground 3: Claims 4, 6, 10, 11, 15 of the '443 Patent Are Obvious Over the BD LSR-II System and Lemoff ........................297

███████████████████████████

E.      Ground 4: Claims 4, 6, 10, 11, 15 of the '443 Patent are
        Obvious Over the Luminex FlexMap 3D System and Lemoff........331

F.      Ground 5: Claims 4, 6, 10, 11, 15 of the '443 Patent based on
        Oostman and Lemoff................................................................342

XIII.  PRIOR ART APPLIED TO THE '107 PATENT ...............................352

A.      Ground 1: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent are
        Obvious Over the BD FACSArray System and Lemoff .................352

B.      Ground 2: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent are
        Obvious Over the Luminex FlexMap 3D System and Lemoff........399

C.      Ground 3: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent are
        Obvious Over Oostman, Lemoff, and Frazier...............................422

D.      Ground 3a: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent are
        Obvious over the BD FACSArray System, Oostman, and
        Lemoff ...................................................................................441

E.      Ground 4: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent are
        Obvious over Cytek's Curved-Mirror DxP Wavelength
        Division (de)Multiplexer Detectors and the BD FACSArray
        System ...................................................................................451

F.      Ground 5: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent are
        Obvious Over Cytek's Curved-Mirror DxP Wavelength
        Division (de)Multiplexer Detectors and the Luminex FlexMap
        3D System ..............................................................................506

XIV.   THERE ARE NO SECONDARY INDICIA OF NON-
       OBVIOUSNESS.................................................................................525

XV.    THE ASSERTED CLAIMS ARE INVALID UNDER 35 U.S.C. §
       112 ...................................................................................................530

A.      Introduction ............................................................................530

B.      "Wavelength Division Multiplexer (WDM)"-Related Terms .........557

C.      "WDM is capable of detecting a substantially full spectrum of
        visible light" ...........................................................................588

D.      Optical Fiber- / Light Source-Related Terms...............................608

E.      Detector-Related Terms ...........................................................625

F.      Mirror Terms ..........................................................................642

iii

███████████████████████

G.     Flow Cell Terms ..................................................................................653

H.     The Claimed "light" in the Asserted Claims of the '443 and '107 Patents Lacks Full Scope Enablement and Associated Written Description ........................................................................661

I.      Collimation-Related Terms ...............................................................668

J.      Image-Related Terms .........................................................................694

K.     "Substantially"-Related Terms ..........................................................712

L.      Other Terms ......................................................................................714

XVI.   CONCLUSION .........................................................................................718

883.   As noted, a conventional flow cytometer has a one-detector-one-dye configuration, wherein each detector channel is designed for each dye's fluorescent emission peak, with sufficient gaps between the detector channels to minimize spillover from non-target dyes.  Accordingly, the detector design in spectral flow cytometers is significantly different since they are designed with detector channels that cover the entire emission spectra to enable the use of the spectral signatures of each dye together with computer algorithms to analyze the collected full-spectral data.

### 2.   The Asserted Patents are directed to and only disclose a conventional flow cytometer

884.   The disclosures of the Asserted Patents are directed toward a conventional flow cytometer, despite the fact that a "spectral detection system" in flow cytometry that collected and detected the full emission spectrum of tagged cells and utilized the different "spectral signatures" for different dyes had been disclosed and was known in the art prior to the filing of the Asserted Patents.  (*See, e.g.,* J. Paul Robinson et al., *Multispectral cytometry: the next generation*, Biophoton. Int. (Oct. 2004), at 36); J. Robinson et al., *Collection Hardware For High Speed Multispectral Single Particle Analysis* (Abstract), ISAC Montpellier 2004, *Cytometry Part A*, Vol. 59, No. 1, pp. 52-52 (May 2004); J. Paul Robinson, et al., *Multispectral flow cytometry: Next generation tools for automated classification*, Microscopy and Microanalysis, 11(Suppl 2) (2005), at 2-3 ; J. Paul

537

██████████████████████████

Robinson, et al., *Multispectral cytometry of single bio-particles using a 32-channel detector*, Advanced Biomedical and Clinical Diagnostic Systems III, Vol. 5692, pp. 359-365, SPIE (April 2005); Gérald Grégori, et al., *Hyperspectral cytometry at the single-cell level using a 32-channel photodetector*, Cytometry Part A, 81(1), 35-44 (2012); U.S. Pat. No. 7,280,204 ("Robinson"), 1:57-62 ("spectral detection system"), 2:66-67 ("forming a spectral signature in a multi-channel collection system"), 3:7-8 ("comparing the spectral signature to a set of known spectral signatures in a processor configured to receive the spectral signatures"); Sony News Releases, *Sony announces the development of the 'Spectral' cell analyzer, the industry's first cell analysis instrument capable of detecting full spectrum fluorescence to facilitate highly accurate analysis*, https://www.sony.com/en/SonyInfo/News/Press/201206/12-082E/ (June 19, 2012).)

Yet, there is no mention of the use of spectral signatures or any other disclosures within the Asserted Patents that would even remotely indicate or suggest that the inventor contemplated, possessed, or had enabled a spectral flow cytometer. In my opinion, any assertion by Beckman Coulter that the inventor of the asserted patents invented and disclosed Cytek's full-spectral flow cytometers within the Asserted Patents would be false. Nor, in my opinion, did the Asserted Patents contemplate an optical design for detecting light within a full-spectral flow cytometer that would capture the full spectral emission for purposes of analysis using the dyes full spectral

538

signatures across multiple lasers and different detector modules using unmixing algorithms. None of that is mentioned or discussed within the Asserted Patents and, as such and in my further opinion, the inventor never had possession of any "WDM" configured to measure the full fluorescence emission spectrum within a spectral flow cytometer.

885. To the contrary, the disclosures within the Asserted Patents are entirely consistent with a conventional flow cytometer. For instance, the patent expressly describes the one-detector-one-dye to capture the dye's fluorescent emission peak: "Detecting and analyzing brightness changes in a combination of scattered and fluorescent light at each detector (one for each fluorescent emission peak) permits deriving various types of information about the physical and chemical structure of each individual particle." ('582, 27:33-37.) This is describing conventional flow cytometry.

886. Additionally, as I describe in further detail below, the Asserted Patents have extensive and repeating disclosures relating to a "replaceable dichroic filter assembly" within the claimed and disclosed "WDM." (*E.g.*, '107, 47:54-57 ("To accommodate different types of fluorescence probe, various techniques have been developed to enable user *selection of dichroic filters suitable for their particular needs*."); 48:1-3 ("fabricating a *replaceable dichroic filter assembly* 934 illustrated in FIG. 29C"); 48:39-42 ("FIGS. 30A and 30B depict an embodiment of the present

539

disclosure where the fore-mentioned *replaceable dichroic filter assembly 934 is used in the WDM 90* for optically processing a beam of light from an extended light source."); 48:47-50 ("As shown in FIG. 30B, when *installing a dichroic filter* 927 the reference surface 931 of *the replaceable dichroic filter assembly* 934 may slide against the flat surface of the glass reference block 935 and be kept in contact therewith by a spring loaded screw 936.").) Such disclosures in the Asserted Patents only have relevance in the context of conventional flow cytometry, where different filters would need to be changed when using different dyes with different emission peaks. Because spectral flow cytometers are designed to collect the full fluorescent emission across the multiple-detector channels, changing filters is not necessary. This is yet another reason why the Asserted Patents are directed to and only disclose a conventional one-detector-one-dye flow cytometer.

887. Indeed, in my opinion, the lack of any written description support or enablement of a spectral flow cytometer within the Asserted Patents is confirmed by the fact that Beckman Coulter took more than a decade since it acquired the Asserted Patents to develop and launch its own spectral flow cytometer detector module. If the Asserted Patents disclosed and enabled a POSA to create a spectral flow cytometer, then why did it take Beckman Coulter so many years to do so? I understand that it wasn't until March of 2025 that Beckman Coulter first launched the "CytoFLEX mosaic Spectral Detection Module." (Beckman Coulter, *Beckman*

540

███████████████████████

*Coulter Life Sciences Launches Industry-First Modular Spectral Flow Cytometry Solution*, https://www.beckman.com/news/beckman-coulter-life-sciences-launches-industry-first-modular-spectral-flow-cytometry-solution (Mar. 18, 2025).) In Beckman Coulter's press release for the mosaic module, it claimed the module "revolutionizes spectral flow cytometry." (*Id.*, at 1.) Beckman Coulter further acknowledged the material difference between a spectral flow cytometer and a conventional flow cytometer and claimed the newly launched spectral module was an "innovation":

> The richer data resulting from spectral analysis can help untangle the complexities of biological systems and diseases faster, with a nuanced understanding of immune cell subsets, their functions and interactions, thanks to *simultaneously detecting multiple markers*.
>
> In contrast to conventional flow cytometry, *spectral flow cytometry acquires the full emission spectrum of each antibody-associated fluorophore across all lasers, rather than measuring only the peak of emission*. This powerful evolution delivers a more detailed and precise characterization of cellular properties to advance understanding of complex biological systems and diseases within each sample *versus legacy approaches*.
>
> 'As a central feature of the CytoFLEX platform, *this innovation* is focused on pairing ease-of-use with powerful, sensitive acquisition technology to remove the intimidation encountered in many flow cytometry instruments,' said Product Manager Matthew Goff. . . .
>
> The CytoFLEX mosaic spectral detection module is *powered by a unique algorithm* capable of improving resolution compared to other available methods, along with *unmixing* accuracy checks to ensure efficiency.

(*Id.* (emphasis added).)

541

888.   In my opinion, the lack of any written description or enablement for a spectral flow cytometer within the Asserted Patents is fully consistent with Beckman Coulter's apparent inability to readily develop a spectral flow cytometer without many years of effort, coupled with the fact that the Asserted Patents do not mention or disclose any of the hallmark features of spectral flow cytometry that Beckman Coulter has now begun touting in the marketplace.  Beckman Coulter's statements earlier this year (in March 2025) state that their new spectral module: (1) "revolutionizes spectral flow cytometry," (2) is capable of "simultaneously detecting multiple markers," (3) "acquires the full emission spectrum [i.e., spectral signature] of each antibody-associated fluorophore across all lasers, rather than measuring only the peak of emission," (4) is an "innovation," and (5) "is powered by a unique algorithm" with "unmixing."

889.   These statements from Beckman Coulter, only after it commercially-launched this new module, are inconsistent with and directly contrary to the positions that Beckman Coulter has adopted concerning the inventions disclosed and claimed in the Asserted Patents.  Consequently, in my view, the lack of any written description or enablement for a spectral flow cytometer or any "WDM" in the Asserted Patents configured for use within a spectral flow cytometer is evident by Beckman Coulter's own recent statements.

542

███████████████████████████████████████

### 3. The Asserted Patents disclose a "WDM" for use in a conventional flow cytometer using a "collimated beam"

890. A POSA would have immediately recognized that optics for the "WDM" disclosed for use within the conventional flow cytometer in the Asserted Patents uses a "collimated beam" throughout. This is, in my opinion, abundantly clear from the description within the specification regarding the basis for the allegedly inventive WDM and the consistent and repeated statements within the specification:

> ***Since efficient color separation can <u>only</u> be accomplished economically with <u>collimated light beam</u>***, small area APD has not been considered viable for multicolor fluorescence light detection applications. ***Clearly, <u>a technology capable of collimating a large etendue light beam</u>*** over an extended distance without significantly expanding the beam diameter would be highly desirable. ***<u>Such a technology would enable a WDM like device for fluorescence light detection</u>*** with characteristics comparable to low noise semiconductor detectors.

('582, 44:24-34 (emphasis added).)

> ***[T]he present disclosure provides <u>a device capable of collimating a light beam</u> from an extended light source*** over an extended distance without significantly expanding the beam diameter.

('582, 2:26-29 (emphasis added).)

> [A] wavelength division multiplexer ("WDM") may include at least two optical elements. ***The first optical element collimates a beam of light*** received from an extended light source, such as the light from a pinhole or from a multimode optical fiber. The first optical element magnifies the extended light source, for example, as defined by the pinhole, or the core of the multimode optical fiber, to an image having a size similar to the effective cross section of the first optical element ***thereby creating a collimated light beam*** between the first optical

543

element and its image. A second optical element is positioned near the image, and *relays the first optical element with unit magnification down the optical path*. In this way, the second optical element effectively doubles *the collimated path length*. Additional optical elements in the same *1:1 image relay configuration* may also be included *to further extend the collimated optical path*. The *cascaded unit-magnification image relay architecture <u>of the present disclosure</u> extends the collimated optical path length without large beam expansion*. As a result, WDM techniques well-established in the optical communication industry can be readily adapted for fluorescence light detection.

('582, 4:34-55 (emphasis added).)

It is apparent to those skilled in the art that dichroic filters may be inserted anywhere along *the long, narrow and <u>collimated beam path afforded by the present disclosure's relay imaging</u>* . . . .

('582, 5:11-20 (emphasis added).)

As depicted in FIG. 25, *a collimating optical element*, in this case an achromatic doublet lens 902, may capture the light from source 901, and project a magnified image of the object near a final focusing lens 905. The size of the image near 905 may be kept approximately the same as the effective size of the collimating optical element 902. Consequently, *beam of light propagating between the collimating optical element 902 and the focusing lens 905 may be <u>effectively collimated</u>*. As shown in FIG. 25, so long as the magnification factor is kept small, for example, less than around 10, using a simple singlet lens as the focusing lens 905, *<u>the collimated beam of light</u>* can readily focused down to a spot smaller than that of the beam of light received by the WDM 90 at location 901.

('582, 44:58-45:4 (emphasis added).)

The light beam between the concave mirror 907 and the second image at the lens 908 may have *substantially the same diameter* as the beam of light between the collimating lens 902 and the first image near the focusing lens 905. *The relay imaging concave mirror 907 therefore <u>effectively doubles the collimated beam path</u> without expanding the beam's diameter*. Again, *the extended yet collimated beam* can be

544

easily focused down to a spot smaller than that of the light source at 901.

('582, 45:22-31 (emphasis added).)

As shown in FIG. 25, additional **relay collimating optical elements** 910, 911, 912, 913 and dichroic filters 914, 915, 916, 917 can be cascaded in the same way to produce multiple images near focusing lenses 918, 919, 920 and 921, each of these images corresponding to a specific color band of light received by the WDM 90 at location 901. As shown in FIG. 25, **due to the present disclosure's _1:1 imaging relay architecture_** . . . .

('582, 45:43-54 (emphasis added).)

891.    There is no disclosure within the Asserted Patents of any use of a non-"collimated beam" for input into and to be relayed through the "WDM."  To the contrary, as the exemplary excerpts I have highlighted above demonstrate: (1) light from an extended light source is "collimated" by a "first optical element"/"collimating optical element"; (2) a "second optical element" "relays the first optical element with **unit magnification** down the optical path"; (3) "[a]dditional optical elements **in the same 1:1 image relay configuration** may also be included to further extend the collimated optical path," which the specification refers to as "additional relay collimating optical elements"; (4) such that the "collimated beam" has "substantially the same diameter" along "**[t]he cascaded unit-magnification image relay architecture _of the present disclosure_**." Accordingly, in my opinion, there is no written description and no enablement within the Asserted Patents for the full scope of any claims that may be interpreted to have

545

934. Claims 9 and 29 each recite the additional claim element that the "WDM is capable of detecting a substantially full spectrum of visible light." A POSA reviewing this claim language would have interpreted Claims 9 and 29 to cover a WDM with non-conventional spectral flow cytometry capabilities. In my opinion, the '107 written description lacks any disclosure directed to a non-conventional spectral flow cytometer, and instead includes contrary teachings on replaceable dichroic filter assemblies and detecting fluorochrome emission peaks that would have indicated to a POSA that the claimed WDM was used in conventional flow cytometers that process voltage pulse data by binning per known wavelength emission peak and compensating to account for spectra overlap (spillover) between adjacent fluorochromes.

935. Conventional flow cytometers process fluorescent light to capture fluorescence signals using a combination of dichroic mirrors and bandpass filters, where bandpass filters pass a color band (pass band) centered about a known emission peak of a fluorochrome. Photons with wavelengths in that color band pass through the bandpass filter and are then focused into a photodetector. Beckman Coulter's website provides an exemplary configuration of four color bands (indicated in blue, green, orange, and red rectangles on right) for four different bandpass filters and four fluorochromes directed into four different photodetectors of a conventional flow cytometer (e.g., one-detector-one-dye), which is similar in

589

principle to the claimed WDM:



(Beckman Coulter, *Spectral Flow Cytometry: A Detailed Scientific Overview* ("Spectral Flow Cytometry"), https://www.beckman.com/resources/reading-material/application-notes/spectral-flow-cytometry-detailed-scientific-overview (last visited Dec. 18, 2025), Fig. 1A.) The full fluorescent light emission of each fluorochrome is plotted in the chart over the spectrum. An ideal bandpass filter characteristic is represented by the colored rectangles indicating what fraction of the spectrum that a photodetector can capture for the fluorochrome fluorescent light spectral emission. There are one or more significant spectral gaps between the color bands of the four ideal bandpass filter characteristics where light is not detected. However, the fluorescent light spectral emission can still spillover into adjacent color bands. For example, the blue DAPI, green FITC, and orange ALEXA Fluor 555 plots spillover into the red rectangle (ideal bandpass filter) that is used to capture the peak intensity of the red APC plot. (*See, e.g., id.*, at Fig. 7A.) One obvious

590

option to reduce the effects of spillover into other detectors is to separate the adjacent color bands to be further apart, forming larger gaps if practical. Bandpass filters can be selected with pass bands having more separation between them with the fluorochromes having peak emission wavelengths to match. Another obvious option to avoid spillover would be to mark particles or biological cells with fluorochromes that have narrower bandwidth emission characteristics and use bandpass filters with narrower pass bands to match if practical. Accordingly, having replaceable bandpass filters to match the selection of fluorochromes is desirable in a conventional flow cytometer to achieve better results in the analysis of a sample of unknown counts of a plurality of different biological cells or particles. Additionally, with a limited number of photodetectors, replaceable bandpass filters are useful to support usage of a wider variety of fluorochromes for a wider variety of analysis of biological cells and particles in a single test tube. Indeed, with reference to FIGS. 29A-29C, the '107 patent describes "fabricating a replaceable dichroic filter assembly **934** illustrated in FIG. **29**C suitable for small area detectors" for its WDM. ('582, 47:49-51, 48:13-16 (underlining added).)

936. When photons of fluorescent light pass through a bandpass filter within its color band and enter the photodetector (e.g., APDs), the photons are converted into electrons that are multiplied by the photodetector to form an analog current signal (photocurrent). Generally, the analog current signal is then amplified and

591

converted from the analog current signal into an analog voltage signal by a transimpedance amplifier or preamplifier. Over the total period of time of an event, when a laser interacts with each fluorochrome attached to a cell or particle so that it emits fluorescent light, the analog voltage signal varies over periods of time of the event forming a voltage pulse (also called a signal pulse). Over periods of time during the event, the analog voltage signal is further sampled and converted by an analog-to-digital converter into digital numbers for each time period. (*See* Fisher Scientific, *Electronics of a Flow Cytometer* ("Electronics of a Flow Cytometer"), https://web.archive.org/web/20200919201221/https:/www.thermofisher.com/us/en/home/life-science/cell-analysis/cell-analysis-learning-center/molecular-probes-school-of-fluorescence/flow-cytometry-basics/flow-cytometry-fundamentals/electronics-flow-cytometer.html (last visited Dec. 18, 2025), Fig. 7.) The digital numbers over the time periods representing the voltage pulse are transferred to a computer for analysis and storage. (*Id.*) Generally, each voltage pulse for each event has three attributes of interest—height (amplitude), full pulse width (overall sum of time periods over the event), and area (integration or summation of amplitude multiplied by time periods over the event)—that can provide different information to identify and count the target material (particle or cell to which the fluorochromes were attached) of interest in a sample with a plurality of particles or cells. (*Id.*) For each event, the voltage pulse data from each detector

592

███████████████████████████████████

then goes through a process called "binning," where the voltage pulse data (height, full pulse width, area) for each event (e.g., cell) of each target material is assigned a bin or bucket of a plurality based on its digital value. (*See id.*, Fig. 6.) To adjust for spillover in a conventional digital flow cytometer, compensation for each detector channel can be applied to the voltage pulse data to separate out spectra overlap between adjacent fluorochromes that bleed or spill over from adjacent color bands. (*See* Spectral Flow Cytometry, Fig. 7A.) When the sample of a plurality of particles or cells in a test tube are all examined by events with each laser, all of the data from all events aggregated into the plurality of bins form a sample distribution for each detector channel, including each fluorescent detector channel associated with emission peaks within each color band. The sample distribution for each detector channel can be used to form dot plots or histograms on a computer display. (*See* Electronics of a Flow Cytometer, computer display in Fig. 8.) The sample distribution of the sample for each fluorescent detector channel is formed by using fluorochrome emission peak wavelength detection methods using mirrors and bandpass filters, where each fluorescent photodetector corresponds to a known emission peak wavelength for a given fluorochrome.

937. In contrast, for each event, spectral flow cytometry relies on detector configurations that can detect the ***entire emission spectrum*** of the fluorescent light from all fluorochromes present without any substantial gaps between detector

593

████████████████████████

channels, which is accomplished by using a greater number of detectors than the number of fluorochromes used to mark cells or particles in a sample. (Claudio Ortolani, Chapter 22 *Non-Conventional Flow Cytometry*, Flow Cytometry Today (2019) ("Ortolani"), at p.019; *see also Spectral Flow Cytometry*, right side of Fig. 1B.) Beckman Coulter's website provides an illustrative spectral flow cytometry configuration for dispersing fluorescent light into different wavelength bands and detection by a detector array during each event. In this illustration, fifteen (15) different wavelength bands (shown by grey rectangles), representing fifteen detector channels for a single laser and single detector array, that are used to detect essentially all of the fluorescent light emitted by four fluorochromes (plotted in blue, green, orange, and red curves) across the visible light spectrum during each event:



(Spectral Flow Cytometry, Fig. 1B.) Notably, the configuration shown on Patent Owner's website employs a light dispersing element (e.g., grating or prism instead

594

of WDM) that is unclaimed and not discussed with respect to the '107 written description's WDM disclosures. (*See id.*, left side of Fig. 1B.)

938.   A "major difference" between conventional flow cytometry and spectral flow cytometry "lies in the way the contribution of each fluorochrome is separated from similar signals[.]"   (*Id.*, at p.009.)   Whereas conventional flow cytometers use compensation to correct for overlapping spectra (spillover) from adjacent fluorochromes to isolate individual contribution, spectral flow cytometers use deconvolution to "unmix" the mixed fluorescent signals of a plurality of fluorochromes that are detected across the entire spectrum by each of the detectors. (Ortolani, at p.019 (underlining); *see also* Spectral Flow Cytometry, Fig. 7.) Generally, the predetermined spectral signature of each individual fluorochrome for every detector channel is used by sophisticated computer algorithms (unmixing algorithms) to analyze the different fluorochromes based on differences in their overall emission profiles (i.e., spectral signatures) that extend across the visible light spectrum.   (*See* Electronics of a Flow Cytometer, Fig. 6; Ortolani, at p.019.) Conceptually,   the   differences   between   conventional   flow   cytometry   using compensation algorithms and spectral flow cytometry using unmixing algorithms of two partially overlapping fluorochromes is shown below in a simplified manner, again from Beckman Coulter's website:

595



**Figure 7.** Graphical representation of differences between compensation used in traditional flow cytometry and unmixing used in spectral flow cytometry. **(A)**Graph on the left side shows overlapping spectra of 2 fluorescent signals (for example, from different fluorophores). After compensation, the overlapping signal, as seen for the blue detector, is adjusted by reducing the interference from spillover.**(B)**Graph on the left side shows data being captured by a spectral flow cytometer where unmixing process uses more detectors than fluorophores to deconvolute signals, showing individual isolated spectra for each fluorophore.

(Spectral Flow Cytometry, p.009, Fig. 7.)  Figure 7A depicts how compensation in conventional flow cytometry removes the spillover from one fluorochrome (in green) from the other fluorochrome (in blue) by subtracting the spillover of the green fluorochrome from the blue fluorochrome within the detector that is configured to detect the peak emission of the blue fluorochrome (i.e., one-detector-one-dye). Figure 7B shows how the use of four detectors to capture the fluorescence emission from two dyes can be unmixed in spectral flow cytometry to obtain the resulting spectral signature contributions of both individual fluorochromes across each of the

596

four detectors such that the contributions and shapes of the spectral signatures of the blue fluorochrome and the green fluorochrome can be distinguished and quantified from detectors measuring their overlapping fluorescent emissions (i.e., all-detectors-all-dyes). That is, the unmixing algorithms of spectral flow cytometry rely on the spectral signature of all fluorochromes across of the detectors for data analysis; whereas the compensation algorithms of conventional flow cytometry determine the signal associated with a single fluorophore within a single detector by subtracting the spillover contributions of other dyes.

939. The '107 written description nowhere describes how the claimed WDM (and its detectors) has spectral flow cytometry capabilities. The words "substantially full spectrum" appear nowhere in the written description and appear only in the later added claim language in 2024. Instead, the written description is clear that the disclosed WDM is configured only for emission peak wavelength analysis as is performed in conventional flow cytometers:

> Detecting and analyzing brightness changes in a combination of scattered and fluorescent light at *each detector (one for each fluorescent emission peak)* permits deriving various types of information about the physical and chemical structure of each individual particle.

('107, 27:45-49.) Spectral flow cytometers, as discussed, have more detectors than fluorochromes to capture the full emission spectrum.

983. With reference to several of the traditional *Wands* Factors, the recited "light source" is not fully enabled. First, the "light source" in Claims 1 and 20 is very broad, comprising any number of configurations of optical components (or none) that interact with light emitted from the flow cell before the light is received by the collimating optical element (*Wands* Factor No. 1 – Breadth of the Claims). Second, these other configurations can have a multiplicity of (unknown) impacts on the optical properties of the light, including providing, e.g, non-diverging light where the light source is *not* at the focal length of the collimating optical element (and thus, the collimating optical element will not project a collimated beam). There is no written description for any other "light source" other than the specific examples recited in Claims 2 and 23, and thus no guidance or working examples from the specification for any other "light source" beyond what is recited in Claims 2 and 23 such that a POSA would not have understood, without excessive experimentation, how these other configurations for a "light source" may deliver sufficient signal with the correct optical properties to (1) permit the collimating optical element to project a collimated beam; and (2) to render the claimed semiconductor detectors operable for their intended purpose within the flow cytometer (*Wands* Factor Nos. 5-8 – Predictability, Guidance from the Specification, Working Examples, and Amount of Experimentation).

## E.   Detector-Related Terms

984. All Asserted Claims that recite a detector limitation are, in my opinion,

invalid for lack of written description and lack of enablement for the full scope of the claimed detector.    In the '582 patent, claims 1, 3, 6, and 26 recite a "semiconductor detector."  In the '443 patent, claims 4, 6, 10, 11, and 15 generically recite (through independent claim 1) a "detector"—i.e., "a set of detectors, each detector of the set of detectors . . . to the detector." (*See also* '443 claim 4 "a detector of the set of detectors".)  In the '107 patent, claims 5, 16, 18, 26, 27, and 29 each recite (at least in independent claim 1 and independent claim 16) "avalanche photodiodes (APDs)."

985.    The specification expressly asserts that a "semiconductor detector" can be a "carbon nanotube detector":

> "According to other exemplary embodiments *a wavelength division multiplexer (WDM)* for separating light emitted from a light source into multiple colored bands comprises . . . . wherein the semiconductor photo detector is located in the first branch, and wherein the focusing optical arrangement is located between the dichroic filter arrangement and the semiconductor photo detector so as to focus the beam of light onto the semiconductor photo detector. Thus, an effective detection arrangement may be provided, which may be operated with a semiconductor detector. The semiconductor detector may be a semiconductor photodetector. *The semiconductor detector may be an avalanche photodiode or a carbon nanotube detector*."

('582, 8:12-33 (emphasis added).)

> FIG. 25A illustrates a top view of a light detection assembly **937** with the WDM **90** illustrated in FIG. 25 in accordance with some embodiments of the present disclosure. The light detection assembly 937 may include the WDM 90 and a photodetector system 938. . . . After being processed by *the WDM* 90, the beam of light emitting from the facet of the optical fiber 852 may split into multiple colored bands

626

with    different    wavelengths    to    be    detected by photodetectors 940, 941, 942, 943, 944, and 945, respectively. *The photodetector can be, but is not limited to, a semiconductor detector, an avalanche photodetector (APD), and <u>a carbon nanotube detector</u>.*"

('582, 46:6-29 (emphasis added).)

The scattered and fluoresced light may be processed by a wavelength division multiplexer (WDM) (not shown in FIG. 36) before being detected by the photodetector. The WDM may be configured as a WDM illustrated in FIGS. 25, 25A, and 25B. *The photodetector can be, but not limited to, a semiconductor photodetector, a multi-pixel photon counter, and <u>a carbon nanotube detector</u>.*"

('582, 52:23-29 (emphasis added).)

At least one of the semiconductor photo detectors is an avalanche photo diode detector. *As an alternative or in addition, at least one of the semiconductor photo detectors <u>is a carbon nanotube detector</u>.*

('582, 58:44-47 (emphasis added).)

986.   Based on the express language of the specification, the inventions disclosed therein purport to include carbon nanotube semiconductor detectors and carbon nanotube semiconductor avalanche photodetectors/photodiodes. Hence, the full scope of the claimed inventions based on the express statements within the specification includes claim scope wherein a flow cytometer with a "WDM"/"optical subsystem" includes a carbon nanotube "semiconductor detector" ('582 patent claims), a carbon nanotube "detector" ('443 patent claims), and a carbon nanotube avalanche photodiode(s) ('107 patent claims).

987.   I have spoken with and read the expert report of Dr. Junichiro Kono. I understand that Dr. Kono is a research professor at Rice University, where he is the

627

Karl F. Hasselmann Chair in Engineering and a Professor in the Departments of Electrical and Computer Engineering, Physics and Astronomy, and Materials Science and Nanoengineering. I understand that "Professor Kono is a leader in optical studies of condensed matter systems and photonic applications of nanosystems, including semiconductor nanostructures and carbon-based nanomaterials. He has made a number of pioneering contributions to the diverse fields of semiconductor optics, terahertz spectroscopy and devices, ultrafast and quantum optics, and condensed matter physics." (*See* Dr. Junichiro Kono Opening Expert Report., Ex. 2 (Kono Biography).)

988. I also understand that the Dr. Kono has been awarded the American Physical Society's 2026 Frank Isakson Prize for Optical Effects in Solids. (*See* Rice Univ., *Kono awarded American Physical Society's Isakson Prize,* https://news.rice.edu/news/2025/kono-awarded-american-physical-societys-isakson-prize (Nov. 5, 2025).) Dr. Kono's "research explores how light interacts with materials at the nanoscale and could lay the groundwork for new kinds of light-based technologies, from faster and more efficient electronics to quantum communication and sensing systems that operate at the limits of physical precision. His group has revealed new optical phenomena in semiconductors and carbon nanostructures, advancing understanding in photonics and quantum optics using state-of-the-art spectroscopic techniques." (*Id.*) By any measure, Dr. Kono is a

leading, world-class research scientist with detailed knowledge relating to the material properties of carbon nanotubes, their use in photodetectors, and the state of the art at the cutting edge of research on carbon nanotube photodetectors.

989.    In my discussions with Dr. Kono, I informed him of features of flow cytometry, including the characteristics, capabilities, and functional requirements necessary for a detector to be adequate for use in a flow cytometer in order to measure the relatively low intensity fluorescent light emissions from cells tagged with fluorescent dyes.  In this regard, I informed him that a conservatively low event rate in a flow cytometer would have been about 1,000 cells per second, such that each event would occur on the order of ~1 μs.  I further informed him that the response time for a suitable photodetector would therefore need to be substantially faster than 1 μs.  I also informed him that, due to the nature of the optics in flow cytometer detector systems, the active area of a detector suitable for a flow cytometer would need to be at least about ~0.5 mm (by diameter or side) and should have high sufficient detection quantum efficiency (i.e., the number of photos that are converted into charge carriers to generate an electrical signal).  We also discussed the wavelengths of light that would need to be detected, which I informed him are primarily in the visible or close to the visible range (i.e., near-IR, near-UV).

990.    During our discussion and as set forth in his report, Dr. Kono informed me that even experts research scientists investigating carbon nanotube

629

photodetectors could not build or make available a carbon nanotube photodetector that would be able to adequately function within a flow cytometer as of today, let alone back in 2012 or anytime thereafter. As I understand it, prior to December 4, 2013, researchers in scientific labs, like Dr. Kono's, had discovered that highly purified semiconducting single wall carbon nanotubes (SWCNTs) can possess photodetection as well as avalanche properties. These material properties of single wall carbon nanotubes were studied and discovered in prototype devices, mostly on single nanotubes (that have diameters that are on the order of 1/1,000,000—i.e., nm). But even as of today, there are no readily or commercially available semiconducting carbon nanotube photodetectors or semiconductions carbon nanotube avalanche photodetectors outside of bespoke prototypes within research laboratories.

991. These researchers are materials scientists, physicists, chemists, electrical engineers, and the like, who are experts in the field of carbon nanotube research. They possess knowledge and experience well beyond what would be know to a POSA in flow cytometry at the time the patents were filed. Accordingly, in my opinion, a POSA of the Asserted Patents would not have found that the inventor was in possession or had enabled a "flow cytometer" or "WDM"/"optical subsystem" that included a semiconducting carbon nanotube photodetector/avalanche photodetector.

992. Based on my experience, a POSA in the technology of the Asserted

630

Patents would have no idea how to practice the claimed inventions with a carbon nanotube-based detector. Personally, I have never heard of anyone ever refer to or propose the use of a carbon nanotube detector, considering that ultrafast traditional semiconductor-based avalanche photodetectors (such as those based on silicon) are commercially available from a number of suppliers, such as Hamamatsu. In contrast, I am not aware of any place a person designing and developing a flow cytometer could turn to for a commercially-available carbon nanotube-based detector. Thus, in my opinion, a POSA would not have found the inventor to have had possession of any carbon nanotube-based detectors for use in a flow cytometer since they simply do not exist outside of prototypes in a select few research labs. Moreover, a POSA would not know how to make any such carbon nanotube detector devices, especially considering the specification appears to simply (and wrongly) presume that they exist and provides no guidance whatsoever.

993. For these reasons and as explained below, it is my opinion that all asserted claims (other than claim 23) of the '582 patent, all asserted claims of the '443 patent, and all asserted claims of the '107 patent are invalid for lack of written description and enablement because the specification contends that the claimed detectors within these claims "can be" a carbon nanotube photodetector. by claiming an "optical subsystem for a flow cytometer" comprising a "semiconductor detector" in view of the specification's assertion that such a "semiconductor detector" can be

631

a "carbon nanotube detector":

> "According to other exemplary embodiments *a wavelength division multiplexer (WDM)* for separating light emitted from a light source into multiple colored bands comprises . . . . wherein the semiconductor photo detector is located in the first branch, and wherein the focusing optical arrangement is located between the dichroic filter arrangement and the semiconductor photo detector so as to focus the beam of light onto the semiconductor photo detector. Thus, an effective detection arrangement may be provided, which may be operated with a semiconductor detector. The semiconductor detector may be a semiconductor photodetector. The *semiconductor detector may be* an avalanche photodiode or *a carbon nanotube detector*."

('582, 8:12-33 (emphasis added).)

> FIG. 25A illustrates a top view of a light detection assembly 937 with the WDM 90 illustrated in FIG. 25 in accordance with some embodiments of the present disclosure. The light detection assembly 937 may include the WDM 90 and a photodetector system 938. . . . After being processed by *the WDM* 90, the beam of light emitting from the facet of the optical fiber 852 may split into multiple colored bands with different wavelengths to be detected by photodetectors 940, 941, 942, 943, 944, and 945, respectively. *The photodetector can be*, but is not limited to, a semiconductor detector, an avalanche photodetector (APD), and *a carbon nanotube detector*."

('582, 46:6-29 (emphasis added).)

> The scattered and fluoresced light may be processed by a wavelength division multiplexer (WDM) (not shown in FIG. 36) before being detected by the photodetector. The WDM may be configured as a WDM illustrated in FIGS. 25, 25A, and 25B. *The photodetector can be*, but not limited to, a semiconductor photodetector, a multi-pixel photon counter, and *a carbon nanotube detector*."

('582, 52:23-29 (emphasis added).)

632

████████████████████████████

**2.    The Claimed "semiconductor detector" Lacks Full Scope Enablement ('582, cls. 1, 2, 3, 6, 26)**

994.    In my opinion, Claims 1, 2, 3, 6, and 26 of the '582 patent are not fully enabled as to the term "semiconductor detector." The '582 specification refers to the term "semiconductor detector" as encompassing "carbon nanotube[s]," a kind of semiconductor detector that (1) was not available as of the effective filing date for the '582 patent, June 30, 2017 (nor is it available today); and (2) the '582 specification fails to enable a POSA to make or use carbon nanotube detectors without undue experimentation.

995.    I have considered the so-called *Wands* Factors, listed in the Legal Principles section above, and which consist of: (1) the breadth of the claims; (2) field or nature of the invention; (3) the state of the prior art; (4) the level of skill of a POSA; (5) the predictability of the art; (6) the amount of direction or guidance provided by the patent's specification; (7) working examples included in the patent's specification; and (8) the amount of experimentation necessary. Below, I apply the *Wands* Factors in my analysis in determining that the claimed term "semiconductor detector" is not enabled with respect to carbon nanotube detectors identified in the '582 specification.

996.    ***Wands Factor No. 1 – Breadth of the Claims.*** Independent Claim 1 and Dependent Claim 26 each recite an "optical subsystem" comprising "semiconductor detector" A POSA would have understood reading the claims in

633

███████████████████████

light of the specification that "semiconductor detector" broadly claims a class of photodetectors. The '582 specification in FIG. 25A provides a top view of a six-port WDM **90** with photodetectors **940**, **941**, **942**, **943**, **944**, **945** (in yellow):



FIG. 25A

(*Id.*, FIG. 25A (annotated).) The '582 explains that each of photodetectors **940**, **941**, **942**, **943**, **944**, **945** "can be, but is not limited to, a semiconductor detector, an avalanche photodetector (APD), and a carbon nanotube detector." (*Id.*, 46:27-29.) The '582 also indicates that the "semiconductor detector may be an avalanche photo diode or a carbon nanotube detector," (*id.*, 8:32-34), confirming to a POSA

634

that the claimed "semiconductor detector" is meant to capture APDs *and* carbon nanotube detectors in its scope.

997. ***Wands Factor No. 2 – Field or Nature of the Invention.*** The field of the invention, as I have previously noted, is flow cytometry, fiber optics, and wavelength demultiplexing and detection. (*See also* '582, 1:32-35.) The '582 patent discusses various subassemblies to a flow cytometer, with a photodetection assembly including semiconductor detectors among them. (*Id.*, 8:32-34, 46:27-29.)

998. ***Wands Factors Nos. 3 and 4 – State of the Prior Art at the Time of the Invention and Level of a POSA.*** As discussed above, a POSA would have been aware of various types of photodetectors used in flow cytometry, including, e.g., PMTs, APDs, and silicon photodiodes. (Shapiro, at 151-156.) The '582 specification provides several commercially available examples of PMTs and APDs but ultimately claims that PMTs are the "de-facto low-level light detector in many commercial fluorescence detection flow cytometers." ('582, 43:43-67.)

999. While the '582 identifies carbon nanotube detectors as part of the claimed "semiconductor detector" class, carbon nanotube detectors are unavailable for commercial use even as of today. In an April 2019 article, *Time response in carbon nanotube/Si based photodetectors* by M. Salvato et al., the authors explain that most of the commercially available photodetectors are based on silicon-based semiconductor technology but carbon nanotubes "are good candidates for

photodetector applications." (*Id.*, at 71.) Over four years later, a review article identified remaining technical challenges and obstacles still preventing "CNT photodetectors [from] find[ing] their way toward real applications." ( Xiaolu Xia et al., *Emerging optoelectronic architectures in carbon nanotube photodetector technologies*, Fundamental Research 5, at Abst., 1153, and 1165 (2025); *see also* X. Cai et al., *Recent progress of photodetector based on carbon nanotube film and application in optoelectronic integration*, at Abst., 1, and 13. (February 2023), concluding that "in terms of photodetector performance, there is still a gap between current [prototypes] and traditional photodetectors"); Y. Wang et al., *Advancement in Carbon Nanotubes Optoelectronic Devices for Terahertz and Infrared Applications*, at Abst., 1-2 (July 2024), *Advancement in Carbon Nanotubes Optoelectronic Devices for Terahertz and Infrared Applications*, by Y. Wang et al., suggesting that "carbon nanotubes (CNTs) hold significant *potential* in the fields of materials, physics, chemistry, biology, as well as emerging disciplines such as electronic and optoelectronic" (emphasis added)).) I am not aware of any commercially available carbon nanotube detectors even as of today, let alone any time earlier, for use in flow cytometer applications or otherwise. At best, a POSA at that time may have recognized that carbon nanotube semiconductor detectors were being considered for particularized experimental uses outside flow cytometry and there was a potential possibility that such devices could come to fruition, but

636

according to Dr. Kono they have not and still remain a technology of the future.

1000. I identified the level of ordinary skill above, incorporated here, and I note that Dr. Schaafsma during claim construction proceedings has identified the level of ordinary skill as having "a master's degree or a Ph.D. in electrical engineering, optics, physics, or physical chemistry and three-to-five years of experience in the field of optics, particularly as those systems relate to optical sensing for biological or diagnostic applications." (D.I. 115-11 (June 5, 2025 Decl. of Dr. David Schaafsma Ph.D.), at 22.) Under either definition for the level of ordinary skill, it is my opinion that a POSA—notably *not* having experience in materials science or materials engineering, or carbon nanotube detector design—would not have known how to design a carbon nanotube detector for use in the claimed flow cytometer based on the state of the art without undue experimentation. Indeed, Dr. Kono, who is just such an expert and likely of extraordinary skill in the field of carbon nanotube detector development, stated that no such suitable devices currently exist. In sum, carbon nanotube detectors were experimental at the time among experts *in carbon nanotube detector* technology, and they still are.

1001. *Wands Factors Nos. 6 and 7 – Guidance from the Specification and Working Examples.* Nor would a POSA have understood how to design or implement a commercially available carbon nanotube detector (for which I am aware of none) prior to the filing date of the '582 patent. The '582 specification fails to

637

teach how to make a carbon nanotube detector, and the only commercially available examples for a "semiconductor detector" that the specification identifies are APDs. As far as I am aware, carbon nanotube detectors were not commercially available by, nor was it generally known how to implement (experimental or commercial) carbon nanotube detectors within the claimed flow cytometer.

1002. The '582 specification provides no guidance for how to integrate any carbon nanotube detector into its claimed flow cytometer, nor does it provide any working examples to guide a POSA. The '582 specification merely identifies carbon nanotube detectors as a type of semiconductor detector three times ('582, 8:32-33, 52:27-29, 58:45-47), and in each instance fails to offer any guidance or examples of suitable carbon nanotube detectors that a POSA could use to practice the invention. While the '582 details multiple examples and configurations concerning other photodetectors like PMTs and APDs, it does not teach how to build, obtain, or otherwise incorporate a carbon nanotube detector into the claimed invention.

1003. *Wands Factors Nos. 5 and 8 – Predictability & Amount of Experimentation.* The development of new types of photodetectors for use with flow cytometry is a highly unpredictable field that demands significant experimentation based on multiple design parameters. This is apparent from the industry's increased adoption of APDs compared to the traditionally favored PMTs for flow cytometry applications, factoring in, e.g., detector size, active area size,

638

temperature dependence, signal-to-noise ratio, quantum efficiency, and spectral response range. The same factors would have had to have been accounted for in the design and implementation of carbon nanotube detectors within the claimed flow cytometer, for which the specification provides no teaching.

### 3. The Claimed "detector" Lacks Full Scope Enablement ('443, cls. 1, 4, 9, 10, 11, 13, 15)

1004. Claim 1 of the '443 patent recites a "set of detectors" that a POSA would have understood to broadly comprise *any* type of detector, including the following types of detectors expressly recited in the specification: PMTs (e.g., '582, 43:40-56, 46:65-47:3), PIN photodiodes (*id.*, 43:40-42), multi-pixel photon counters (*id.*, 52:27-29), carbon nanotube detectors (*id.*, 8:31-33, 52:27-29, 58:45-47), and APDs (e.g., *id.*, 8:31-33, 43:41-42, 46:27-29, 58:45-47). But while the specifications contemplate that "detector" includes within its scope a carbon nanotube detector, the specifications do not enable a carbon nanotube detector for the reasons I set forth in above with respect to the '582 patent, incorporated here.

### 1. The Claimed "semiconductor detector" Lacks Full Scope Written Description Support ('582, cls. 1, 2, 3, 6, 26)

1005. For the same reasons I discussed above, incorporated here, Claims 1, 2, 3, 6, and 26 of the '582 patent lack written description support for the claimed "semiconductor detector" because a POSA reviewing the disclosures in the specification would not conclude that the inventor had possession of any carbon

639

nanotube detector.  The written description refers to a carbon nanotube detector four times, and only in identifying it as (1) a photodetector; and (2) a semiconductor detector (including as an APD).  ('582, 8:31-33, 46:27-29, 52:27-29, 58:45-47.)  As discussed above, prior to the filing date of the '582 patent and event today, carbon nanotube detectors were not and are not commercially available, a POSA would not have had the requisite experience to design or implement one without undue experimentation, and the written description provides no teachings to guide a POSA toward the design of a carbon nanotube detector or its implementation within the claimed "optical subsystem."

> **2.  The Claimed "[array/plurality] of avalanche photodiodes (APDs)" Lacks Full Scope Enablement  ('107, cls. 1, 2, 3, 5, 16, 17, 18, 20, 21, 22, 26, 27, 28, 29)**

1006. Claims 1 and 16 of the '107 patent recite an "[array/plurality] of avalanche photodiodes (APDs)." The specifications indicate that a "photodetector can be, but is not limited to, a semiconductor detector, an avalanche photodetector (APD), and a carbon nanotube detector."  ('582, 46:27-29.)  A POSA reading this passage from the specification would have understood the specification to claim that the claimed APD is (and can be) both a semiconductor detector and a carbon nanotube detector.  Moreover, both the semiconducting and avalanche properties of single wall carbon nanotubes were known by 2008, making them suited for applications as carbon nanotube APDs.  (*See* Kono Report, ¶26 ("In 2008, the avalanche/impact-ionization behavior in

640

collimated light (i.e., converging, diverging light), is received at the focusing lenses.

## I.    Collimation-Related Terms

### 1.    The Claimed "collimated beam" is Indefinite ('582, cl. 1; '443, cl. 10)

1040. I previously provided opinions on "collimated beam" in connection with two declarations I provided on claim construction, which I incorporate here. I have reproduced my analysis in part below regarding the indefinite nature of the claimed "collimated beam."

1041. The claims do not recite a "nearly collimated beam," "approximately collimated beam," or even "effectively collimated beam"—they recite a "collimated beam." Beckman Coulter properly recognized the meaning of these disputed terms during patent prosecution but, remarkably, its proposed claim constructions do not.

1042. During prosecution, as described above, Beckman Coulter made numerous statements to the Patent Office expressly recognizing that a "collimated beam" brings all of the rays parallel to each other, albeit with some beam divergence, such as:

- "Applicant respectfully *disagrees* that [the prior art's] objective lens 19 is configured to 'focus fluorescent light' *because the objective lens 'collimates[s]' rather than focuses" the fluorescent light*. (D.I. 115-7, at 9 (underlining in original; additional emphases added).)

- Because "objective lens 19 *collimates* fluorescent light, *a POSITA would have understood that the objective lens 'brings all of the rays [] parallel to each other,'* albeit with some 'beam divergence' in view of practical

668

limitations. . . . *This is **not** 'focus[ing]' the fluorescent light, which instead involves converging the light*." (*Id.* (emphasis added))

- "Because [the prior art's] objective lens 19 *collimates* the fluorescent light (e.g., *makes its rays parallel*, albeit with some divergence), *it is **not** configured to 'focus [the] fluorescent light . . . such that the fluorescent light leaving [the objective lens] converges*.'" (*Id.*, at 10 (emphasis added).)

- "[L]ight [that is] 'effectively collimated' by collimating optical element 902 *is **not** converging*." (*Id.* (emphasis added).)

1043. These foregoing statements (among others made by Beckman Coulter in the file history) are precisely what a POSA would have understood for a "collimated beam"—i.e., making light rays parallel to each other (i.e., "collimate"), albeit with *some* overall beam divergence, and does not include focusing/converging light (i.e. a "collimated beam"). A POSA would understand, consistent with the file history, that a "collimated beam" of light would have "*some* 'beam divergence.'"

1044. In my opinion, however, the intrinsic record fails to supply any reasonably objective measure regarding *how much* "divergence" is allowed in a "collimated beam" before it is no longer suitable for use within the claims. The specification discloses "nearly collimated" and "effectively collimated", but what is the basis for distinguishing between a "collimated beam" *per se* and a "nearly collimated" beam? (*See* '582, 28:28-32; 44:63-66.) At what point does a "collimated beam" sufficiently diverge such that it is no longer a "collimated beam" as recited in the claims? The intrinsic record fails to provide objective boundaries for a POSA to understand when a beam is a "collimated beam" and when it ceases

669

to be "collimated."

1045. The indefinite and subjectively variable meaning of "collimated beam" is also indicated by Beckman Coulter's various different interpretations of the terms meaning. Before the Patent Office on June 4, 2024, Plaintiff asserted that a because an "objective lens 19 *collimates* fluorescent light, *a POSITA would have understood that the objective lens 'brings all of the rays [] parallel to each other,'* albeit with some 'beam divergence' in view of practical limitations. . . . *This is <u>not</u> 'focus[ing]' the fluorescent light, which instead involves converging the light*." (Claim Construction, Exhibit 7, 9.) That is, Beckman Coulter supplied an accurate description of how a POSA would understand a "collimated beam"—i.e., brings all rays parallel to each other with some beam divergence. Furthermore, Beckman Coulter further noted that even "light [that is only] 'effectively collimated' by collimating optical element 902 *is <u>not</u> converging*"—i.e., not focused.

1046. Then, barely a month later on July 18, 2024, Beckman Coulter asserted a different interpretation for a "collimated beam," this time stating: "A POSITA would have understood that collimation means generally maintaining the width of a beam for some distance, including by, for example, limiting its convergence or divergence." (Claim Construction, Exhibit 6, 15.) This ambiguous statement does little to resolve the indefiniteness as it uses the indeterminate terms "for some distance" including by "limiting its convergence or divergence." So, what is the

670

the following image and it is a non-collimated beam.  As depicted, there is nothing showing that the beam is split into multiple beams.



(Ex. 34, FIG. 2B.)

1053. Finally, in my opinion, the specification's description of a beam based on diameter also does not clarify the indefiniteness of a "collimated beam." The specification merely uses subjective terms of degree, such as noting "without significantly expanding the beam diameter" ('582, 2:28-29) and "may have substantially the same diameter" ('582, 45:24-25).  A focused (converging) beam and a defocused (diverging) beam will not have substantially the same diameter. Indeed, the plain meaning of "collimated beam" is a beam that has "some divergence."  But, again, the question remains how much of a departure in beam diameter constitutes not "significantly expanding" or remaining "substantially the same" is unclear and arbitrary since the specification provides no clear guidance. Accordingly, in my opinion, a POSA would not have any reasonable certainty regarding the scope of the claimed "collimated beam" in claim 1 of the '582 patent and claim 10 of the '443 patent.

678

### 2.    The Claimed "collimating optical element" is Indefinite ('582, cls. 1, 20)

1054. I understand that the Court concluded that "collimating optical element" is drafted as a means-plus-function term. I further understand that the Court deferred construction of "collimating optical element" and whether the term is indefinite based on the failure of the specification to provide sufficient corresponding structure to perform the claimed functions. In my opinion, the specification of the Asserted Patents do not disclose sufficient structure for performing the claimed functions and the terms are therefore indefinite. As I describe in more detail below, one fundamental failure of the specification is that it does not specify any information relating to where the light source is placed relative to the focal length of the lens disclosed for potential use as the "collimating optical element." Since a mere lens without any specification of where the light source is placed relative to the focal length of that lens is insufficient structure for performing the claimed functions, the term "collimating optical element" as recited in claims 1 and 20 of the '582 patent , in my opinion is indefinite.

1055. I previously provided opinions on how "collimating optical element" is indefinite in my declarations on claim construction, which I incorporate here. I understand that the Court has indicated that the term "collimating optical element" in claims 1 and 20 of the '582 patent is subject to means-plus-function construction. I understand that for a means-plus-function claim term, there must be sufficient

679

structure disclosed in the specification for performing the claimed function, and if there is insufficient disclosure of structure to perform the claimed function, the claim term is invalid for indefiniteness.

1056. I understand that Beckman Coulter and its expert Dr. Schaafsma initially asserted that a mere "lens" is sufficient structure to perform the claimed functions for the "collimating optical element" recited in the claims. However, it is unclear what actually constitutes the purported "lens" that was identified.

1057. Dr. Schaafsma contended on behalf of Beckman Coulter that a "collimating optical element" need not be limited to a single "optical element," but can include any number of distinct "optical elements" so long as the light emitted therefrom is "collimated." (D.I.117-11 (Decl. of Dr. David Schaafsma, Ph.D. in Support of Beckman Coulter's Reply Claim Construction Brief) ("Schaafsma Reply Decl."), ¶¶ 68-69.) In my opinion, this demonstrates that "collimating optical element" does not connote a sufficiently definite class of structures and that Dr. Schaafsma was relying on function—not any definite structure known to a POSA. Moreover, Dr. Schaafsma's also asserted during claim construction that a "collimating optical element" can be any "device" or "assembly," so long as the undefined device or assembly projects a collimated beam. (*See* D.I. 117-30 (Joint Claim Construction Br., Ex. 84) ("**collimator.** *Optical device* that renders diverging or converging light rays *parallel*.") (emphasis added); D.I. 117-13 (Joint Claim

680

Construction Br., Ex. 67 (Newton's Telecom Dictionary (26th Ed. 2011)), 314

(**collimator.** A collimator is *an assembly* that is used to straighten and *make parallel*

diverging light") (emphasis added).)  This assertion by BEC's expert only further

demonstrates the lack of any associated definite structure in that, according to Dr.

Schaafsma, a "collimating optical element" also can arbitrarily be considered to

include entire multi-component "devices" and "assemblies" even though he has

provided no identified structure for any such devices or assemblies.  That is, a multi-

lens configuration wherein the resulting beam projected by the combination of the

lenses is a focused beam would not be considered a "collimating optical element"

since the projected beam is focused and not collimated.

1058. As I explained in my claim construction declarations, whether a given

lens projects a collimated/parallel beam (with some divergence)—as opposed to, for

example, a focused/converging beam—requires structure that places the light source

at the focal length ($f$) of the lens such that the rays of light from each point on the

source are parallel to each other (and not converging as in a focused beam with a

light source farther from the lens than the focal length ($f$) or diverging as in a

defocused beam with a light source closer to the lens than the focal length ($f$)):

███████████████████████████████████████

Testing_06.22.2018.pdf (2018) ("Afocal systems, by definition, produce a virtual image projected from infinity.").)

1080. The inclusion of "collimated afocal image" within the term "image" renders the term "image" indefinite. A POSA would not understand with reasonable certainty the metes and bounds of an "image" that includes a "collimated afocal image," in particular within the context of the clam elements, which recite "the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a first image"; "the collimating optical element configured to project a first image" and "the optical relay element configured to receive light from the collimating optical element and to project a second image." This is because a collimated beam forms an image at infinity, and a POSA would not understand any image to be formed within the claimed "optical subsystem for a flow cytometer" as the light path in a flow cytometer is plainly not infinite. A POSA would not understand where such a "collimated afocal image" would form within the light path of the "optical subsystem for a flow cytometer."

1081. I have reviewed the two disclosures in the '582 patent that discuss "collimated afocal image." Both disclosures reference FIG. 10 of the '582 patent, which I have reproduced below.

697



FIG. 10

1082. The disclosures relate to a composite microscope objective 60' that is used to collect fluoresced and scattered light from a flow cell. The '582 patent states: "The shapes of the back-surface mirror 601' and the aberration corrector plate 602' depicted in FIG. 10 are modified slightly to produce **collimated afocal images** of **the emission locations near the viewing zone** within the flow channel '604." ('582, 35:25-29 (emphasis added).) The '582 then further states: "It is understood by those having skill in the art that the composite microscope objective 60'' [of FIG. 12] may be configured to provide either a finite focused image similar to that depicted in FIG. 9A, or a **collimated afocal image <u>which is focused at a finite distance</u>** from the composite microscope objective 60'' **by a chromatic aberration correction doublet similar to the doublet lens 609 depicted in FIG. 10**." ('582, 36:25-32 (emphasis added).) In my opinion, a POSA reviewing these disclosures would understand that the design discussed in these disclosures is intended to produce an image (not a collimated afocal image) at 605 by focusing the

698

so-called "collimated afocal image . . . near the viewing zone within the flow channel 604" and further focusing it through a doublet lens 609 such that it becomes "focused at a finite distance." I have annotated FIG. 10 to show this:



FIG. 10

1083. I have also reproduced FIG. 9A for comparison below.



FIG. 9A

1084. That is, the disclosure in the '582 patent of the so-called "collimated afocal image" refers to some imprecise location along the light path ("near the viewing zone" of flow channel 604) which is then further "focused at a finite distance" by a "doublet lens" to form an "image." Therefore, the disclosures of a "collimated afocal image" in the '582 patent would not provide a POSA with any

699

reasonable certainty on the meaning of "image" and, to the contrary, would contribute to a POSA's confusion over the meaning of an "image" that includes a "collimated afocal image" within the context of the claimed "optical subsystem for a flow cytometer."

1085. I further note that the disclosures of a "collimated afocal image" relate to the composite microscope objective used to collect fluoresced and scatter light from the flow cell, which is a separate component than the disclosed "wavelength division multiplexer (WDM)" or claimed "optical subsystem" of independent claims 1 and 20 of the '582 patent. Therefore, the disclosures of a "collimated afocal image" do not support Plaintiff's position that a collimated beam can form a "collimated afocal image" within the claimed "optical subsystem for a flow cytometer." Again, a POSA would understand that a collimated beam forms an image at infinity.

1086. I have worked in the field of optics for many years, and I have only seen the phrase "collimated afocal image" in Yong Chen's patents. Afocal systems, by definition, produce a virtual image projected from infinity (i.e., the output beam is collimated). The collimated image must be focused to form a real image. Hence, the combination of the words "collimating afocal image" does not bear a meaning one can grasp. Therefore, I am not aware of any extrinsic evidence using the phrase "collimating afocal image" that would help a POSA understand the meaning of

700

"collimating afocal image."

1087. The use of "image" within the written description of the '582 patent also causes confusion and would further contribute to a POSA not understanding the meaning of "image" as recited and used in claims 1 and 20 of the '582 patent.

1088. At the claim construction hearing, counsel for Beckman Coulter also pointed to the disclosure describing FIGs. 25, 27, and 28 in columns 56 to 58 of the '582 patent as supporting its proposed construction. (Sep. 17, 2025 Hearing Tr. at 78:1-79:25.) But this disclosure would only cause further confusion to a POSA. I have reproduced FIGs. 25, 27, and 28 below.



*FIG. 25*

701



FIG. 27



FIG. 28

1089. First, I note that this disclosure uses the word "image" not "collimated afocal image." Moreover, "image" is used in an imprecise manner in this disclosure. It is not entirely clear, but it appears that the named inventor Yong Chen or his patent attorney equated the term "image" to "collimated beam." For example, the

702

disclosure includes the following passage: "The imaging optical arrangement **902** forms a beam of light from the light emitted from a light source **901** and produces an image of substantially the same size as the effective size of said imaging optical arrangement. … The dichroic filter arrangement **903**, **904** may be located **between** said imaging optical arrangement **902** and said **image**, and separates the beam of light into a first branch and second branch of distinctive colors." ('582, 56:65-57:7 (emphasis added).) It is unclear from this passage what is being referenced as the "image" and where such an "image" is located. A further passage states: "The image focusing optical element arrangement **905** is located in or in proximity to an **image plane** of **said image**." (*Id.* at 57:21-23 (emphasis added).) Although not clear, this passage implies that the "image" is the "collimated beam" and the image plane is near 905. The following passage causes further confusion: "As can be seen in FIG. 25, the wavelength division multiplexer as described above may further comprise an image relay optical arrangement **907**. This image relay optical arrangement may be located in or in proximity to an **image plane** produced by said imaging optical arrangement in the second branch, wherein said image relay optical arrangement is adapted to produce an **image** of said imaging optical arrangement in a third branch having substantially the same size as the **image** in the second branch." (*Id.* at 57:36-45 (emphasis added).) Again, although not clear, this passage implies that the "image" is the "collimated beam." I have annotated FIGs. 25 and 27 to

703

highlight this confusion:



FIG. 25



FIG. 27

704

1090. As shown in yellow above, it is unclear whether the named inventor Yong Chen or his patent attorney is referring to the "collimated beam" as the image. I have also noted where the "image planes" would appear to be. I further note that claims 1 and 20 recite "image," not "image plane." In my opinion, a POSA reading the '582 patent would not be able to determine the meaning of "image" with any reasonable certainty. As I have stated above, a collimated beam forms an "image" at infinity. Therefore, in my opinion, independent claims 1 and 20 and their dependent claims are invalid because a POSA would not understand the meaning of "image" as set forth in the claimed "optical subsystem for a flow cytometer."

2. **The claimed "optical relay element configured to reflect a portion of the collimated beam to produce a first image" ('582, cl. 1), and the claimed "collimating optical element configured to project a first image" and "optical relay element configured to receive light from the collimating optical element and to project a second image" ('582, cl. 20) lack written description support**

1091. I incorporate my opinions from the immediate section above, Section XV.J.1, here. In my opinion, the claimed "optical relay element configured to reflect a portion of the collimated beam to produce a first image" in claim 1 of the '582 patent, and the claimed "collimating optical element configured to project a first image" and "optical relay element configured to receive light from the collimating optical element and to project a second image" in claim 20 of the '582 patent lack written description support, as I further explain below.

705

in the Legal Principles section (Section III.G) above, and which consist of: (1) the breadth of the claims; (2) field or nature of the invention; (3) the state of the prior art; (4) the level of skill of a POSA; (5) the predictability of the art; (6) the amount of direction or guidance provided by the patent's specification; (7) working examples included in the patent's specification; and (8) the amount of experimentation necessary. Below, I apply the *Wands* Factors to determine that the recited "optical relay element configured to reflect a portion of the collimated beam to produce a first image" in claim 1 of the '582 patent, and the recited "collimating optical element configured to project a first image" and "optical relay element configured to receive light from the collimating optical element and to project a second image" in claim 20 of the '582 patent are not enabled.

1098. ***Wands Factor No. 1 – Breadth of the Claims***. Based on the disclosure of "collimated afocal image" in the '582 patent, the Court construed "image" as "representation of an object created by light or emanating from a light source" and deferred the issue of indefiniteness. The breadth of the claims would extend to, and thus require enablement for both real images and "collimated afocal images" in "an optical subsystem for a flow cytometer."

1099. ***Wands Factor Nos. 2 and 4 – Field or Nature of the Invention and Level of Ordinary Skill***. The relevant technical fields of the invention, as I noted in Section V, are flow cytometry, fiber optics, and wavelength demultiplexing and

708

detection. (*See also* '582, 1:32-35, 1:64-67, 2:30-35.) The '582 patent discusses various subassemblies in a flow cytometer, among them a WDM that includes a collimating optical element and a cascaded unit-magnification relay architecture that uses optical relay elements to propagate a collimated beam throughout. (*See, e.g.,* '582, 4:34-53.) I also identify the level of ordinary skill in Section V incorporated here, though I note that my overall *Wands* analysis would not change if another level of ordinary skill were adopted, given the lack of guidance from the specification and excessive experimentation required to enable these overbroad claims.

1100. ***Wands Factor Nos. 6 and 7 – Guidance from the Specification and Working Examples***. As discussed in Section XV.J.1, above, if the recited image is a real image, there is no guidance or working examples in the '582 specification of a "collimating optical element" projecting a real image and there is no disclosure in the patent of an "optical relay element" projecting or producing a real image. If the recited image is the so-called "collimated afocal image," there is no guidance or working examples in the '582 specification of an "optical relay element" that projects or produces a "collimated afocal image" within the claimed "optical subsystem for a flow cytometer." As I stated in Section XV.J.1, above, a collimated beam projects an image at infinity, whereas the light path in a flow cytometer is plainly not infinite.

1101. ***Wands Factor Nos. 3, 5, and 8 – State of the Art, Predictability, and***

709

███████████████████████████████████

*Amount of Experimentation*.  In my opinion, because of the absence of any teaching or working example in the specification for a "collimating optical element" to project a real image and no teaching or working example in the specification for a collimating optical element to project a "collimated afocal image" at infinity, a POSA would have had to engage in excessive experimentation to design a "collimating optical element" to project either a real image or a "collimated afocal image" in the claimed "optical subsystem for a flow cytometer."  Similarly, because of the absence of any teaching or working example in the specification for a "optical relay element" to project or produce a real image and no teaching or working example in the specification for a collimating optical element to project a "collimated afocal image" at infinity, a POSA would have had to engage in excessive experimentation to design a "collimating optical element" to project either a real image or a "collimated afocal image" in the claimed "optical subsystem for a flow cytometer."

> 4. **The Claimed "arranged near" in "an optical relay element arranged near the first image" is indefinite and lacks full scope written description and enablement  ('582, cl. 20)**

1102. Claim 20 of the '582 patent recites "an optical relay element arranged near the first image."  The term "arranged near" is indefinite because a POSA would not have understood with reasonable certainty the metes and bounds for the location of the "image" such that a POSA could determine whether the "optical relay

710

further demonstrated by Plaintiff's infringement contentions, identifying beam spots of clearly different sizes as being images that are "substantially the same."



(Nov. 19, 2025 Beckman Coulter's Second Am. Infringement Contentions, Ex. 1, at 210.)

1109. Though "substantially the same . . . size" has no clear boundary, in my opinion, Plaintiff Beckman Coulter's reading of the term "substantially the same … size" on both focused and unfocused segments of a beam is entirely inconsistent with the term "substantially the same … size."

## L.   Other Terms

1.   **The claimed "a first semiconductor detector, wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element onto the first semiconductor detector" lacks written description support  ('582, cl. 1)**

1110. Claim 1 of the '582 patent recites a specific configuration for the claimed "optical subsystem for a flow cytometer" that is unsupported by the written description.  Claim 1 requires "a first semiconductor detector, wherein the first focusing optical element is configured to focus the portion of the collimated beam

714

██████████████████████

received from the optical relay element [i.e., the recited 'curved mirror'] onto the first semiconductor detector." The written description of the patent fails to support this claim limitation. None of the configurations disclosed in the patent, including FIGs. 25, 27, 28 and their related descriptions disclose such a configuration. For the claimed configuration, the portion of the "collimated beam" received by the "curved mirror" must be directed to a "first focusing optical element" that receives the portion of the collimated beam and then focuses the portion of the collimated beam onto "a first semiconductor detector." I have included a diagram below to show the required sequence:



1111. In my opinion, none of the configurations shown in FIGs. 25, 27, or 28 describe such a sequence. I have provided annotations below to demonstrate:

715



FIG. 25



FIG. 27



*FIG. 28*

1112. As shown above, for each of FIGs. 25, 27, and 28, light from the curved mirror **907** is directed to the second <u>not</u> "first focusing optical element" and focused onto a second <u>not</u> "first semiconductor detector." Therefore, a POSA reading the '582 patent would not understand the named inventor Yong Chen to be in possession of the specific claimed configuration recited in claim 1 of the '582 patent.

### 2.    The Claimed "compact" is Indefinite ('107, cls. 28, 29)

1113. Claim 28 of the '107 patent recites a "compact" flow cytometer. In my opinion, the term "compact" is indefinite as there would be no way for a POSA to discern with reasonable certainty when the flow cytometer is no longer "compact" such that a POSA would have been able to distinguish a "compact" flow cytometer from a flow cytometer that is not "compact." While the term "compact" appears in the specification of the '107 patent, the specification merely uses the term to describe the claimed invention. (*See, e.g.*, '582, 2:13-18, 46:2-5.) It does not provide any

717

further clarification as to the objective boundary of this term of degree, such as providing a dimension of a "compact" flow cytometer.

## XVI. CONCLUSION

1114. For the foregoing reasons, it is my opinion that the Asserted Claims are invalid, including because they (1) are anticipated and/or rendered obvious by the prior art, (2) fail to satisfy the written description requirement, (3) fail to satisfy the enablement requirement, and (4) are indefinite. I reserve all rights to amend and/or supplement my opinions as disclosed in this report, including if additional information becomes available or upon any relevant rulings from the Court.

1115. I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that all statements made of my own knowledge are true and that all statements made on information and belief are believed to be true.