# EXHIBIT 2S



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NICE SYSTEMS, INC., and       :
NICE SYSTEMS, LTD.            :
                             :
            Plaintiffs        :
                             :
    v.                        :   Civil Action No. 06-311-JJF
                             :
WITNESS SYSTEMS, INC.         :
                             :
            Defendant         :

Scott G. Lindvall, Esquire and Joseph M. Drayton, Esquire of KAYE SCHOLER LLP, New York, New York.
Melanie K. Sharp, Esquire, Karen E. Keller, Esquire, and Mary F. Dugan, Esquire of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware.

Counsel for Plaintiffs NICE SYSTEMS, INC., and NICE SYSTEMS, LTD.

Nagendra Setty, Esquire, Daniel A. Kent, Esquire, and Noah C. Graubart, Esquire of FISH & RICHARDSON P.C., Atlanta, Georgia.
William J. Marsden, Jr., Esquire and Kyle Wagner Compton, Esquire of FISH & RICHARDSON P.C., Wilmington, Delaware.

Counsel for Defendant WITNESS SYSTEMS, INC.

**MEMORANDUM ON TENTATIVE CLAIM CONSTRUCTION**

December 14, 2007

**Farnan, District Judge.**

This action was brought by Plaintiffs, NICE Systems, Inc. and NICE Systems, Ltd. (collectively, "NICE"), against Defendant Witness Systems, Inc. ("Witness") alleging infringement of United States Patent Nos. 5,274,738 (the "'738 patent"); 5,396,371 (the "'371 patent"); 5,819,005 (the "'005 patent"); 6,249,570 (the "'570 patent"); 6,728,345 (the "'345 patent"); 6,775,372 (the "'372 patent"); 6,785,370 (the "'370 patent"); 6,870,920 (the "'920 patent"); 6,959,079 (the "'079 patent"); and 7,010,109 (the "'109 patent"), collectively referred to as the "patents-in-suit." The parties briefed their respective positions on claim construction, and the Court conducted a <u>Markman</u> hearing on the disputed terms. Since the <u>Markman</u> hearing, NICE has withdrawn certain claims, resulting in the removal of the '738, '079, '005, and '370 patents from this lawsuit. This Memorandum provides the Court's tentative construction of the remaining disputed terms.

BACKGROUND

The patents-in-suit relate to the monitoring, recording, and analysis of telephone calls. Broadly, the patents-in-suit divide into four distinct technological advances. First, the '371 patent claims a method that can simultaneously record audio data and retrieve stored audio data. Second, the '109 patent claims a method of recording a telephone call by conferencing a recording device as an additional participant into the call. Third, the

2

'005, '372, and '920 patents claim modularized and networked voice processing and recording systems.  Fourth, the '570, '345, and '370 patents claim systems that can record, store, and reconstruct every aspect of a telephone call.

## DISCUSSION

### I.    The Legal Principles of Claim Construction

Claim construction is a question of law.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 977-78 (Fed. Cir. 1995), aff'd, 517 U.S. 370, 388-90 (1996).  When construing the claims of a patent, a court considers the literal language of the claim, the patent specification and the prosecution history.  Markman, 52 F.3d at 979.  Of these sources, the specification is usually "dispositive; it is the single best guide to the meaning of a disputed term."  Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed. Cir. 2005)(internal citations and quotation marks omitted).  When using the specification to discern the meaning of a disputed term, though, a court must take care not to import limitations from the specification into the claim.  Id., at 1323.

A court may consider extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises, in order to assist it in construing the true meaning of the language used in the patent.  Markman, 52 F.3d at 979-80 (citations omitted).  A court should interpret the language in a claim by applying the ordinary and accustomed meaning of the words in the

3

claim. Envirotech Corp. v. Al George, Inc., 730 F.2d 753, 759 (Fed. Cir. 1984). However, if the inventor clearly supplies a different meaning, the claim should be interpreted accordingly. Markman, 52 F.3d at 980 (noting that patentee is free to be his own lexicographer, but emphasizing that any special definitions given to words must be clearly set forth in patent). Accordingly, though extrinsic evidence can "shed useful light" on the relevant art, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." Phillips, 415 F.3d at 1317-18 (internal citations and quotation marks omitted).

## II.   The Meaning Of The Disputed Claim Terms

### A.   The Disputed Terms in the '371 Patent

The '371 claims a method of storing and retrieving audio data from a digital logger, a device that can retrieve audio while recording. In contrast to prior art loggers, the '371 patent teaches a digital logger that simultaneously retrieves audio and records without using a secondary tape.

The parties disagree on the proper construction of the following terms, which are highlighted in bold in claims 1 and 8 of the '371 patent.

> 1. In a method of storing and retrieving audio from a digital audio logger, the steps comprising:
>
> monitoring an audio source,
>
> storing audio data from the audio source in a **buffer**,

4

**writing the audio data from the buffer onto a <u>digital audio tape</u> and a random access storage device**, and

retrieving audio from the random access storage device while audio data is written into the digital audio tape and the random access storage device.

\*\*\*

8. An audio data storage device, comprising:

a random access storage device having a primary partition for storing audio data and a secondary partition for storing means for locating data on said primary partition and a **pair of pointers** in communication with said random access memory, a first of said pointers being operated to transmit data to said random access storage device and the second of said pointers being operative to retrieve audio data from said random access storage device.

1.    "buffer"

| NICE's Construction | Witness's Construction |
|---|---|
| Memory used for temporary storage of data. | Device in communication with the digital audio tape and the random access storage device that temporarily stores data. |

The parties dispute the meaning of the term "buffer," as used in claim 1 of the '371 patent.  Their respective proposed constructions are listed above.  NICE contends that Witness's construction unnecessarily reads a limitation into the claim as to how the buffer relates to other components of the claimed method and that this relationship can be determined from the plain meaning of the claim language.  Witness contends that the specification confirms that the buffer is in communication with

the random access storage ("RAS") and digital audio tape ("DAT"), citing:

> Apparatus and method have been devised wherein information can be retrieved from a digital audio logger as the logger continues to receive audio. The audio logger is provided with a buffer that receives audio in real time and temporarily stores the same in the buffer. <u>A digital audio tape (DAT) and a random access storage (RAS) device are in communication with the buffer</u> to simultaneously receive data when the buffer down loads data.

('371 Pat., col. 1:45-53 (emphasis added).)

After reviewing the claim language and the specification, the Court concludes that, in this context, a buffer is, as Witness's contends, a "device in communication with the digital audio tape and the random access storage device that temporarily stores data."  The language of both the claim and the specification support a construction of buffer as a device in communication with the RAS and DAT.

### 2.    "digital audio tape"

| NICE's Construction | Witness's Construction |
|---|---|
| Tape used to store digital data. | Magnetic tape designed for storage of audio in digital form. |

The parties dispute the meaning of "digital audio tape," as used in claim 1 of the '371 patent.  NICE contends that Witness seeks to read in limitations not supported by the claim language or specification, and that the specification does not support the contention that the tape must be "magnetic" or "designed" for storage.  Witness contends that NICE's construction improperly

reads out the term "audio," and that one skilled in the art in 1993 (when the '371 patent was filed) would have understood DAT to mean a magnetic medium designed for audio (citing Dictionary of Multimedia, 52 (1997)(DAT "records and plays back digital audio on magnetic tape cassettes that are smaller than common audio cassettes.")). NICE responds that a person of ordinary skill would have understood DAT as being capable of non-audio storage, as evinced by the contemporaneously-filed '005 patent-in-suit (col. 3:65), which stores computer "time-data" on a DAT.

Considering the only intrinsic evidence cited, the language of the disputed term, and the extrinsic evidence cited by both parties, the Court concludes that digital audio tape means "magnetic tape designed for storage of audio in digital form." NICE has not persuaded the Court that the claim or specification support a reading of "digital audio tape" that gives no meaning to "audio," a term included in the disputed phrase. Further, the Court accords more probative value to a technical dictionary definition than to a contemporaneously-filed patent, finding that the former is more representative of the understandings of a person of ordinary skill in the art than the latter.

7

Case 1:06-cv-00311-JJF    Document 279    Filed 12/17/07    Page 8 of 43 PageID #: 4072

3.    "writing the audio data from the buffer onto a digital audio tape and a random access storage device"

| NICE's Construction | Witness's Construction |
|---|---|
| Plain meaning. | Transferring audio data from the buffer directly to both a digital audio tape and a random access storage device simultaneously. |

The parties dispute the meaning of "writing the audio data from the buffer onto a digital audio tape and a random access storage device," as used in claim 1 of the '371 patent.  NICE contends that, contrary to its plain meaning, Witness seeks to read into this language two improper limitations – that the transfer of audio from a buffer to the DAT and RAS device occurs "directly" and "simultaneously."  Witness contends that the claim language, specifically the step after this disputed term, and the specification confirm the simultaneity requirement.  NICE responds that the reference to "simultaneous" in the specification does not relate to information being transferred to the DAT and RAS, but to the transfer of data to one of those devices while the buffer is downloading data.  With respect to proposed language "directly," Witness contends that the term "writing" inherently includes a subject or agent that performs the act of transferring data to the DAT and RAS, which in this case is the buffer.  As the subject doing the transfer, Witness contends that the transfer has to be direct, rather than through

an intermediary.  Witness cites Figure 1 of the patent to support this interpretation.

The Court construes the disputed language to mean "transferring audio data from the buffer directly to both a digital audio tape and a random access storage device."  After reviewing the claim language, specification, and Figure 1, the Court concludes that the disputed language includes directness component but not a simultaneity element.  The specification, under the "summary of the invention" heading, states "a digital audio tape (DAT) and a random access storage (RAS) device are in communication with the buffer to simultaneously receive data when the buffer down loads data." (col 1:50-53.)  The Court agrees with NICE that "simultaneously" in this context goes to reception and download, not to reception by DAT and reception by RAS. Figure 1 of the claim supports Witness's contention that the transfer of audio data to the DAT and RAS is direct.

4.    "pair of pointers"

| NICE's Construction | Witness's Construction |
|---|---|
| Digital information used to read data from and write data to a storage component. | Two pointers facilitating the simultaneous retrieval of data from the random access storage device and the writing of data thereto. |

The parties dispute the meaning of pair of pointers," as used in claim 8 of the '371 patent.  A "pointer" is digital information that refers, or "points," to an address, memory

9

location, function, etc.  Witness contends that NICE's proposed
construction ignores the word "pair" and the clear meaning of the
specification.  Nice contends that, while the reading and writing
pointers could operate simultaneously, there is no requirement
that they do so.  Nice contends that the specification makes
clear that data is continuously being written to the RAS device,
(col. 1:65-67), but is only retrieved when desired and "[u]pon
input of the time and date of the data to be retrieved," (col.
4:3-4).

The Court construes the disputed language to mean "digital
information used to read data from and write data to a storage
component."  The specification clearly discloses that the reading
and writing of data to the RAS does not have to be simultaneous,
even if, in some circumstances, it will be.

Case 1:06-cv-00311-JJF    Document 279    Filed 12/17/07    Page 11 of 43 PageID #:
4075

B.    The Disputed Terms in the '570 and '345 Patents

The '570 and '345 patents are generally related to computer-aided monitoring and recording of telephone calls.  The '570, and '345 patents are specifically related to a method for collecting and storing data related to a telephone call from multiple sources so as to facilitate monitoring, recording, and playing back of complete telephone calls.  The patents teach gathering metadata into a single database, which allows retrieval and replay without reconstruction - the process of retrieving many recorded segments, from different database locations, to reconstruct segmented calls.  Because the patents are closely related, sharing specifications and inventors, the Court will discuss common claim terms across the related patents.

The parties disagree on the proper construction of the terms that are highlighted in bold.

Patent 6,249,570

6. A method for recording information regarding telephone calls comprising one or more segments, comprising:

(a) receiving audio data regarding one or more telephone call segments relating to one or more **telephone calls**, and data regarding **telephony events** associated with said telephone call segments;

(b) storing the received audio data regarding telephone call segments;

(c) storing the received data regarding telephony events associated with said telephone call segments;

(d) identifying telephone call segments that relate to one telephone call; and

11

Case 1:06-cv-00311-JJF    Document 279    Filed 12/17/07    Page 12 of 43 PageID #:
4076

> (e) **constructing a _data representation of a lifetime of_
> _the telephone call_ using data regarding telephony
> events associated with the telephone call segments of
> the telephone call**, wherein said data representation
> comprises, for each segment of the call, the location
> of the stored audio data of that segment and the start
> time, end time, and duration of that segment.

Patent 6,728,345

> 14. A method for recording information regarding telephone
> calls with three or more participants and comprising one or
> more participants and comprising one or more telephone call
> segments, comprising:
>
> (a) receiving audio data regarding one or more
> telephone call segments;
>
> (b) receiving data regarding **telephony events**
> associated with said telephone call segments; . . .
>
> (e) identifying **telephone call** segments that relate to
> the same telephone call; and
>
> (f) constructing **_data representations_ of lifetimes of
> telephone calls**, wherein said data representations are
> constructed using data regarding telephony events
> associated with telephone call segments.

     1.   "telephone call"

| NICE's Construction | Witness's Construction |
|---|---|
| plain meaning | Entire conversation with an entity from a caller's perspective, including transfers and conferences. |

The parties dispute the meaning of "telephone call," as used
in the '570 patent (claim 6) and '345 patent (claim 14).  NICE
contends that the disputed term has a plain and ordinary meaning
that requires no construction by the court.  Further, NICE

12

contends that Witness improperly relies on an excerpt from the description of the preferred embodiment to read a limitation into the claim. Witness's proposed construction is drawn from the following specification passage:

> In other words, within the system of the preferred embodiment, recording is managed in a call-centric (rather than event-centric) fashion. This corresponds with the typical caller's point of view, in which a call is the entire conversation with a business entity, even if the conversation involves transfers to other agents or conferencing of multiple parties.

(Pat. '570, col. 8:5-11.)

After considering the claim language and the specification, the Court construes "telephone call" to mean "the entire conversation between a business entity and a caller to that entity, including transfers and conferences." The specification cited above defines "telephone call" within a broader discussion of a preferred embodiment; the definition of the phrase itself is not the preferred embodiment. Further, the language of the claims suggests the need to differentiate between a "telephone call" and a "telephone call segment." See, e.g., ('570 pat., claim 6(a)("receiving audio data regarding one or more telephone call segments relating to one or more telephone calls").)

13

Case 1:06-cv-00311-JJF   Document 273   Filed 12/17/07   Page 14 of 43 PageID #:
4078

2.    "telephony events"

| NICE's Construction | Witness's Construction |
| --- | --- |
| Actions or occurrences detected by a computer program and that are related to what happens to a phone call (such as the initiation of the call, the addition or removal of callers, the transfer of the phone call, or the termination of the calls).[1] | Actions or occurrences detected by a computer program and that are related to what happens to a phone call (such as the initiation of the call, the addition or removal of callers, the transfer of the phone call, or the termination of the calls), and are not identifying numbers.  Agent-entered information is not data regarding telephone events. |

The parties dispute the meaning of "telephony events," as used in the '570 patent (claim 6) and '345 patent (claim 14). The parties' constructions are identical except for the addition, in Witness's proposal, of "and are not identifying numbers. Agent-entered information is not data regarding telephone events." NICE contends that this addition is not supported by intrinsic evidence and unnecessarily complicates the construction of the term, making it difficult to understand. Witness bases its proposed language on NICE's argument to the examiner during the prosecution of the patent, citing '345 Pat. Pros. Hist., 2nd Prelim. Amend., 4 ("None of the agent entered information is telephony event data, since a telephony event is an action or

---

[1]This proposed construction is the one presented by NICE in its claim construction brief.  Additionally, NICE proffers a different construction in the "November 8, 2007 Revised Joint Claim Construction Chart."

occurrence, captured by a computer, relating to a telephone call."). In response, NICE contends that this single statement quoted from the prosecution history specifically discusses the Peavey prior art reference, which did not disclose a system that uses a computer to capture an action or occurrence relating to a telephone call.

The Court construes telephony events to mean "Actions or occurrences detected by a computer program and that related to what happens to a phone call (such as the initiation of the call, the addition or removal of callers, the transfer of the phone call, or the termination of the calls)." After considering the claim and the prosecution history cited, the Court concludes the referenced prosecution history goes to a prior art discussion and does not constitute a clear and unmistakable disavowal of claim scope.

15

Case 1:06-cv-00311-JJF    Document 279    Filed 12/17/07    Page 16 of 43 PageID #:
4080

3.    "data representation(s)"

| NICE's Construction | Witness's Construction |
| --- | --- |
| Digital representation of data. | Data structure that represents an object as a single identifiable entity. |

4.    "data representation(s) of a lifetime(s) of the telephone call"

| NICE's Construction | Witness's Construction |
| --- | --- |
| Data (e.g., voice information and/or metadata) representing an entire telephone call. | Call-centric data record of the telephone call that includes a detailed cumulative start-to-finish history of a telephone call, including all telephony events and participants.  The data representation represents only the telephone call, is not event-centric, and is not construed on a 1-to-1 basis for the events during the total lifetime of a call. |

The parties dispute the meaning of "data representation(s)" and "data representation(s) of a lifetime(s) of the telephone call," as used in the '570 patent (claim 6) and '345 patent (claim 14).  NICE contends that Witness impermissibly seeks to import the preferred embodiment's management of recording in a "call-centric" fashion into the claim.  Witness contends that the specification shows that the invention's *sine qua non* is its creation of a "single call record . . . [where] the call's entire history is contained in the call record," citing '570 Pat., col. 7:12-16.  Further, Witness contends that NICE emphasized the

16

event-centric versus call-centric distinction as the distinguishing feature between NICE's invention and the prior art, citing '570 Pat., col. 20:34-64 ("Previous recording systems . . . mimicked the event-oriented interfaces . . . constructed on a 1-to-1 basis for the events occuring during the total lifetime of a phone call.").

After considering the claim language and the specifications, the Court construes (1) "data representation(s)" to mean "digital representation of data," and (2) "data representation(s) of a lifetime(s) of the telephone call" to mean "Call-centric data record of the telephone call that includes a detailed cumulative start-to-finish history of a telephone call, including all telephony events and participants."  Though not explicit in the the abstract or summary of the '570 patent, the Court concludes that the specification reveals a call-centric compilation of data to be an indispensable element of the invention, and not merely an element of the preferred embodiment.  See, e.g., ('570 Pat., col. 7:12-16; col. 26:10-20 ("The Call Record Generator (CRG) *in accordance with the present invention* . . . is responsible for collecting data from different sources with respect to portions of a call on various recording input channels, and merging them together into a *unified call record*. . . .")(emphasis added); col. 20:34-64.)  In the Court's view, the additional language proposed by Witness beyond that adopted in the Court's

17

construction is unnecessary.

> 5.    "constructing a data representation of a lifetime of the telephone call using data regarding telephony events associated with the telephone call segments of the telephone call"

| NICE's Construction | Witness's Construction |
|---|---|
| Plain meaning. | Using data regarding telephony events to associate telephone call segments of a telephone call to form a data representation of the lifetime of the telephone call, and not using an identifier or key to form the data representation. |

The parties dispute the meaning of "constructing a data representation of a lifetime of the telephone call using data regarding telephony events associated with the telephone call segments of the telephone call," as used in the '570 patent (claim 6) and '345 patent (claim 14). NICE contends that disputed terms beyond "data representation of a lifetime of the telephone call," "telephony events," "telephone call segments," and "telephone call," should be accorded their plain meaning. NICE further contends that Witness has simply rearranged words used in the claim phrase and improperly inserted a limitation to preclude the use of "an identifier or key" to form the data representation. Witness contends that its proposed construction tracks the precise definition NICE used to disclaim prior art in its prosecution history, citing '345 Pros. Hist., 2nd Prelim. Amend., 9-10. In response, NICE contends that the cited

18

prosecution history is taken out of context and does not constitute a clear and unmistakable disavowal.

After considering the specification, relevant prosecution history, and the Court's earlier constructions, the Court concludes that "constructing a data representation of a lifetime of the telephone call using data regarding telephony events associated with the telephone call segments of the telephone call" does not require construction. The Court's construction of "data representation of a lifetime of the telephone call," in particular, obviates the need to further construe the disputed language.

19

C.   The Disputed Terms in the '372 Patent

The '372 patent discloses a multi-stage data logging system comprising a telecommunications stage for receiving, processing, and compressing data from one or more input channels, a recorder stage for storing data to a memory device, a distribution stage for retrieving data and distributing data to one or more output channels, and a plurality of interface paths linking these three stages to one another.  The logging system is designed so that the different stages can be located wide distances apart.

The parties disagree on the proper construction of the following terms, which are highlighted in bold in claims 1 and 33 of the '372 patent.

1. A multi-stage data logging system comprising:

> a) a **telecommunications ("telecom") stage** receiving input from a plurality of communication channels;
>
> b) a recorder stage having one or more recorders, at least one recorder logging data associated with information transmitted on at least one of said plurality of communication channels;
>
> c) a **distribution stage** providing access to data logged in the recorder stage; . . .

***

> 33. The data logging system of claim 32, wherein the network server is a **Web server.**

1.    "telecommunications ('telecom') stage"

| NICE's Construction | Witness's Construction |
|---|---|
| The stage that serves to capture and pre-process signals from two or more communication channels and interfaces with the recorder stage. | Device that receives input from communication channels passively, and is not part of the communications system. |

The parties dispute the meaning of "telecommunications ('telecom') stage," as used in claim 1 of the '372 patent. NICE contends that the specification clearly supports its construction, citing col. 7:51-54 and col. 9:67-10:1, and that Witness's construction improperly adds the limitations "device" and "passively." Witness contends that NICE disclaimed all but "passive" methods of recording during prosecution, citing '372 Pros. Hist., Office Action at 3, Amend. At 9-10 (wherein NICE distinguished its telecom stage from Knitl prior art by arguing that the telecom stage "monitor[s] information transmitted on communication channels, but are not part of the communications system." Further, Witness argues that the specification support its construction, citing col. 7:60-8:5 ("[T]elecom stage 102 incorporates a first interface . . . that allows for passive tapping of the phone lines.").

After reviewing the claim language, specification, and relevant prosecution history, the Court concludes that NICE's construction of "telecommunications ('telecom') stage" is the correct one.  Under the heading "The Telecom Stage," the

21

Case 1:24-cv-00945-CFC    Document 352-3    Filed 05/06/26    Page 23 of 44 PageID #:
30945
Case 1:06-cv-00311-JJF    Document 279    Filed 12/17/07    Page 22 of 43 PageID #:
4086

specification states:

> In accordance with the present invention telecom stage 102
> generally functions to capture and pre-process signals from
> a plurality of communications lines into a format that is
> recognized by the recorder stage.

(col. 7:51-54.)  The specification also states that the telecom

and recorder stage interface.  (col. 9:67-10:1 (recorder stage

has "an interface 120 receiving input from the telecom stage").)

Witness's citation to the term "passive" in the specification

(col. 7:60-8:5) is unpersuasive because the term is used only in

a description of an example of the invention.  Likewise,

Witness's reference to the prosecution history is also

unpersuasive.  NICE distinguished a telecom stage from a Private

Branch Exchange ("PBX") in a 1993 Knitl patent by explaining:

> [T]he PBX cannot be a telecom stage of a data logging system
> at least because the PBX switch forms part of the
> communication system, while the telecom stage of [the '372
> patent] monitors signals on established communication
> channels.  In fact, the written description at page 3, lines
> 17-33, specifically mentions problems associated with
> connecting a logging system to a PBX switch, the clear
> inference being that a PBX switch is not part of the logging
> system.

(JCC Ex. 11 at 10.)  This is consistent with claim 1 of the

patent, and does not support Witness's contention regarding

passivity.

2. "distribution stage"

| NICE's Construction | Witness's Construction |
|---|---|
| The stage that serves for retrieval of recorded information and providing it in a human recognizable form and/or serves for archiving the recorded information to removable storage. | Plain meaning. |

The parties dispute the meaning of "distribution stage," as used in claim 1 of the '372 patent. NICE contends that the specification supports its construction, citing col. 11:40-48:

> Generally, the distribution stage serves for retrieval of recorded information and providing it in a humanly recognizable form, i.e., as an image, a printout, a sound clip or others. In a preferred embodiment, the distribution stage also serves for archiving the recorded information to a removable storage, such as magnetic tape, magnito-optical storage device, DVD, or others.

(col. 11:42-48.) Witness contends that NICE's proposed "and/or" language makes the retrieval element of the term optional, which is not supported by the specification.

In light of the claim language and specification, the Court construes "distribution stage" to mean "The stage that serves for retrieval of recorded information, providing it in a human recognizable form, and, in some instances, archiving the recorded information to removable storage." NICE's proposed "and/or" language is not supported by the patent's specification.

Case 1:24-cv-00945-CFC    Document 352-3    Filed 05/06/26    Page 25 of 44 PageID #:
30945
Case 1:06-cv-00311-JJF    Document 279    Filed 12/17/07    Page 24 of 43 PageID #:
4088

3.    "web server"

| NICE's Construction | Witness's Construction |
|---|---|
| A component that provides access to information accessible from a computer connected to the Internet or an intranet. | A computer that receives a request for stored data, retrieves the stored data, and transfers the data over the World Wide Web. |

The parties dispute the meaning of "web server," as used in claim 33 of the '372 patent. NICE contends that the plain meaning of the contested term and the specification support its construction, citing col. 12:18-21 and 12:44-46. Witness contends that NICE's construction reads the word "Web" out of the term, that the ordinary meaning of "Web" indicates "World Wide Web," and that the prosecution history confirms Witness's construction.

The Court construes "web server" to mean "A component that provides access to information accessible from a computer connected to the Internet or an intranet." The specification provides:

> [T]he Web server 280 acts as an intermediary between one or more recorders 252 in the recorder stage of the logger, and the users accessing the stored information via, for example, the Internet. . . . It will be appreciated that similar distribution scheme can be provided as part of a corporate intranet.

(col. 12:18-21, 12:44-46.) Further, the prosecution history Witness references supports construing "web server" to include either Internet or intranet. "The prior art of record simply does not disclose, teach or even suggest a method for accessing

24

information in a logger, where users communicate requests for stored data over a 'Web' in the sense of a communications network *like* the Internet." ('372 Pros. Hist. Amend., 13, dated Sept. 24, 2001 (emphasis added).) The term "like" in the prosecution history accords with the usage of both Internet and intranet in the specification and supports the Court's construction.

Case 1:06-cv-00311-JJF    Document 279    Filed 12/17/07    Page 26 of 43 PageID #:
4090

D.    The Disputed Terms in the '920 Patent

Like the '372 patent, the '920 patent discloses a multi-stage data logging system.  The '920 patent is divisional of and shares the same specification as the application which led to the '372 patent.  Generally, the '920 patent discloses a method of using a computer network server to respond to a request for retrieval of stored information.

The parties disagree on the proper construction of the following terms, which are highlighted in bold in claims 1, 3, 16, 18, and 21 of the '920 patent.

> 1. A method for accessing information in at least one digital logger storing data associated with input from a plurality of input channels, comprising:
>
>> at a **Web server** having access to said at least one **digital logger, receiving a request for retrieval of stored data** from a client; **retrieving stored data** in accordance with the received request; and **transferring the retrieved data** to the client.
>
> 2. The method of claim 1 wherein the step of retrieving stored data comprises accessing a record of an input channel made by said at least one digital logger.
>
> ***
>
> 16. A method for accessing information stored by at least one digital logger storing data associated with input from a plurality of communication channels, comprising:
>
>> at a **Web server** having access to said information stored by at least one **digital logger** over a communications network, **receiving a request for retrieval of stored data** from a user; **retrieving said stored data** from said information in accordance with the received request; and **transferring the retrieved data** to the client.

26

17. The method of claim 16 wherein the step of retrieving stored data comprises accessing a record of a communication channel made by said at least one digital logger.

*** 

21. The method of claim 16 wherein the step of **retrieving stored data** comprises accessing archived data at the **Web server** corresponding to a **record of a communication channel** made by said at least one **digital logger**.

1.    "web server"

| NICE's Construction | Witness's Construction |
|---|---|
| A component that provides access to information accessible from a computer connected to the Internet or an intranet. | A computer that receives a request for stored data, retrieves the stored data, and transfers the data over the World Wide Web. |

The parties dispute the meaning of "web server," as used in claims 1, 16, and 21 of the '920 patent.  NICE reiterates the contentions it made for this term as used in the '372 patent.  Witness also reiterates its earlier contentions, and also contends that the specification discussion of prior art supports its construction, citing col. 6:56-65.

As in the '372 patent context, and for the same reasons, the Court construes "web server" to mean "A component that provides access to information accessible from a computer connected to the Internet or an intranet."  The specification passage Witness relies on supports the proposition that "web server" could include an internet component, it does not mandate that "web server" must.

27

Case 1:24-cv-00945-CFC    Document 352-3    Filed 05/06/26    Page 29 of 44 PageID #:
30951
Case 1:06-cv-00311-JJF    Document 273    Filed 12/17/07    Page 28 of 43 PageID #:
4092

2.    "digital logger"

| NICE's Construction | Witness's Construction |
|---|---|
| A device, system or software for recording, in digital form, audio data representing multiple concurrent telephone calls. | A device, system or software for recording audio in digital form. |

The parties dispute the meaning of "digital logger," as used in claims 1, 16, and 21 of the '920 patent. NICE contends that the claim language itself supports its proposal that a logger can record from multiple input sources, citing claims 1 and 16 ("A method for accessing information in at least one digital logger storing data associated with input from a plurality of input channels,..."). Witness contends that the claim language demonstrates that multiple input sources can be recorded by the logger, but does support the proposal that "at least one digital logger" must record more than one call concurrently.

The Court construes "digital logger" to mean "a device, system or software for recording audio in digital form." The claim language states that a digital logger can record from a variety of input types, but makes no mention of whether those recordings are done concurrently. Further, NICE cites no other intrinsic or extrinsic evidence to support its proposed construction.

28

Case 1:24-cv-00945-CFC     Document 352-3     Filed 05/06/26     Page 30 of 44 PageID #:
30952
Case 1:06-cv-00311-JJF     Document 279     Filed 12/17/07     Page 29 of 43 PageID #:
4093

3.    "receiving a request for retrieval of stored data," "retrieving stored data," & "transferring the retrieved data"

| NICE's Construction | Witness's Construction |
|---|---|
| Plain meaning. | The Web server receives a request for retrieval of data stored in the digital logger.<br><br>The Web server retrieves data stored in the digital logger.<br><br>The Web server sends the data retrieved from the digital logger. |

The parties dispute the meaning of "receiving a request for retrieval of stored data," "retrieving stored data," and "transferring the retrieved data," as used in claims 1, 16, and 21 of the '920 patent.  NICE contends that Witness' proposals improperly add the limitation that the data retrieved is stored in the digital logger.  The claims themselves, NICE contends, show this construction to be wrong.  Claims 6 and 21 recite "wherein the step of retrieving stored data comprises accessing archived data at the Web server."  NICE contends this language (1) directly contradicts Witness's proposed construction, and (2) mandates, according to principles of claim differentiation, that claims 1 and 16 must be broad enough to cover, at the least, data stored at the logger or at a Web server.  With respect to language "Web server," NICE contends that only the "receiving a request" step of the method of claim 1 occurs "at a Web server."

Witness contends that the intrinsic evidence and the claim

29

Case 1:24-cv-00945-CFC    Document 352-3    Filed 05/06/26    Page 31 of 44 PageID #:
30953
Case 1:06-cv-00311-JJF    Document 279    Filed 12/17/07    Page 30 of 43 PageID #:
4094

structure support its proposal that all three steps, "receiving," "retrieving," and "transferring," are performed by the Web server. The specification, Witness contends, reveals only the Web server as the device or component that retrieves or transfers data after a request is made, citing col. 13:21-25 ("In response to [client requests], Web server accesses the loggers records directly . . . and sends the requested files to the requesting client."). With respect to the "digital logger" language it proposes, Witness contends that claim requires the "digital logger" limitation, and that NICE's claim differentiation argument only shows that claim 6 is invalid.

The Court construes the disputed terms to include the language "Web server" but not "digital logger." With respect to "Web server," NICE did not attempt to rebut Witness contention regarding the specification. With respect to "digital logger," the claim language and the principle of claim differentiation establish that data received need not be stored in the digital logger.

30

Case 1:06-cv-00311-JJF   Document 273   Filed 12/17/07   Page 31 of 43 PageID #: 4095

4.   "record of an input channel" & "record of a communication channel"

| NICE's Construction | Witness's Construction |
|---|---|
| Stored voice and/or call information received from an input channel. | A record identified by an input channel. |
| Stored voice and/or call information received from a communication channel. | A record identified by a communication channel.[2] |

The parties dispute the meaning of "record of an input channel" and "record of a communication channel," as used in claims 3 and 21 of the '920 patent.  NICE contends that its proposal is based on the specification, which echoes the plain meaning of the words, citing col. 10:30-34.

> In a particular embodiment directed to storing voice records, the function of recorder stage 104 can be described broadly as creating voice files and providing an associated database with stored call information.

(col. 10:30-34.)  NICE further contends that Witness's construction improperly adds the limitation that the record is "identified by the input [or communication] channel."  Witness contends that the word "of" in the disputed term equates "identified by," and cites col. 11:14-19 to support its construction.

After reviewing the claims and the specification, the Court

---

[2]The Court lists the constructions used by Witness in its claim construction briefings.  For reasons the Court cannot discern, Witness proffers different constructions in the "November 8, 2007 Revised Joint Claim Construction Chart."

31

concludes that NICE's construction is the correct one.  The

specification makes clear that a record can be identified by more

than just an input channel:

> [R]ecords that correspond to different input channels appear
> to the user as separate files having unique record
> addresses. In a preferred embodiment, these files are
> identified by the call record information and contain, for
> example, information about the caller ID, the date and time
> of the communication, its duration, and others.

(col. 11:14-23.)  Accordingly, the disputed terms are construed

without Witness's proposed limitation.

32

E.    The Disputed Terms in the '109 Patent

The '109 patent discloses a system and method for recording and/or otherwise monitoring Internet Protocol ("IP") multimedia sessions. The recording device is a participant in the IP multimedia session, although preferably the recording device only receives data for recording or monitoring the session. Therefore, the IP multimedia session is preferably a multi-user session, such as a "conference call" for example.

The parties disagree on the proper construction of the following terms, which are highlighted in bold in claim 1.

1. A method for recording at least a portion of one or more of a plurality of IP data sessions, each being between at least a first communication device and a second communication device through a network by a recording device, comprising for each IP data session:

initiating the data session by said first communication device with said second communication device;

implementing the data session as a conference call **through a conference controller** such that said first and second communication devices are connected, respectively, as first and second participants;

using the conference controller, selectively **entering the recording device to said conference call as an additional participant**, wherein the recording device is distinct from the first and second communication devices yet **receives as the additional participant at least the portion of the *IP data session* from each of the first and second participants**; and

recording at least the portion of the IP data session received as the additional participant of said conference call using said recording device.

33

1.    "conference controller," "through a conference controller"

| NICE's Construction | Witness's Construction |
|---|---|
| A component that initiates, enables and/or establishes a conference call. | Device that initiates, establishes and enables a conference call. |
| By use of a conference controller. | The data packet transmissions of the IP data session pass through the conference controller. |

The parties dispute the meaning of "conference controller" and "through a conference controller," as used in claim 1. NICE contends that the specification shows that a "conference controller" initiates, enables, and/or establishes a conference call, but all three functions only in "exemplary" situations, citing col. 5:6-col. 6:32. NICE also contends that nothing in the specification requires a "conference controller" to be limited to a device or hardware and to exclude software. Witness contends that the disputed term must initiate, enable, *and* establish a conference call, citing Figure 3 as demonstrating a conference controller performing all three functions.

With respect to "through a conference controller," NICE contends that Witness's proposal that data packets physically flow into and through conference controllers makes no sense based on how one skilled in the art would understand the specification. Witness contends that the use of both "through" and "using" in the claim language means each should have distinct meanings, and

34

that "through" should not then be construed to mean "by use of." Further, Witness contends that NICE consistently used the term "through" to mean "flow through" during the prosecution, and in particular in distinguishing Rust prior art, citing '106 Pros. Hist., Resp., 21 n.5, dated Sept. 11, 2005.  NICE responds that Witness's use of prosecution history is tortured and inaccurate, and that Figure 1 and the specification support its construction, citing col. 7:13-16 ("implementing the data session as a conference call through a conference controller such that said first and second communcation devices are connected.").  NICE further contends that the claim language and specification make clear that the conference controller serves to implement the connection of the two communication devices *before* there is any information flowing between them.

The Court construes "conference controller" to mean "a component that initiates, enables and/or establishes a conference call." Figure 3, which Witness bases its construction on, clearly "shows an optional flow of operations." (col. 6:17-23.) Moreover, even in Figure 3, the enabling function is only preferable.  (Id., "[c]onference controller 30 enables recording device 24 to participate in the conference call, as well as preferably enabling the conference call itself.")

The Court construes "through a conference controller" to mean "the data packet transmissions of the IP data session pass

through the conference controller." While NICE demonstrated that Witness's reliance on the prosecution history was misplaced, it failed to respond to Witness's contention regarding the use of both "through" and "using" in the claim language. In light of the claim language itself and the specification, the Court concludes that Witness's construction is the correct one.

    2.    "recording device"

| NICE's Construction | Witness's Construction |
| --- | --- |
| A device which records IP audio and/or video data. | Participant to a session that receives data for recording and monitoring and does not require an additional connection or port in the network. |

The parties dispute the meaning of "recording device," as used in claim 1.    NICE contends that Witness's construction imposes a negative requirement - "does not require an additional connection or port in the network" - that is ambiguous and is not used anywhere in the specification. Witness contends that NICE distinguished, in a foreign counterpart to the '109 patent's parent (the '106 application), the prior art by disclaiming all recording devices except those that could be connected to a conference call as a participant, "without any need to change the number of connected extentions, etc." (EPO Proceedings., File Hist. for WO2001IL0100805, Amend. 3.)  In response, NICE contends that the out-of-context quote was made *after* the '109 patent issued, was made in passing and prefaced by "it should be

36

Case 1:24-cv-00945-CFC   Document 352-3   Filed 05/06/26   Page 38 of 44 PageID #:
30960
Case 1:06-cv-00311-JJF   Document 273   Filed 12/17/07   Page 37 of 43 PageID #:
4101

mentioned," and clearly did not constitute a "clear and unmistakable" disavowal of claim scope.

In light of the claim language and pertinent prosecution history, the Court construes "recording device" to mean "a device which records IP audio and/or video data." Witness has not demonstrated that the prosecution history it cites constitutes a "clear and unmistakable" disavowal of claim scope.

### 3. "entering the recording device to said conference call as an additional participant"

| NICE's Construction | Witness's Construction |
| --- | --- |
| Plain meaning. | Joining the recording device to the conference call as an additional participant after the conference call has been established between the first and second participants. |

The parties dispute the meaning of "entering the recording device to said conference call as an additional participant," as used in claim 1. NICE contends that, following the Court's construction of "recording device" and "conference call," the disputed term has plain meaning that does not require construction. Witness's timing limitation, NICE contends, has no basis in the claim language or specification. Witness contends that the text and structure of the claims require the recording device to be entered after the conference call has already been established between the original participants, citing claim 1 ("entering the recording device to said conference call as an

37

*additional* participant." (emphasis added)). NICE responds that claim 2, which is dependent on claim 1, makes clear that the recording device is entered at the same time as the data session is initiated:

> [T]he method of claim 1, wherein the step of selectively entering the recording device to said conference call includes the step of directing the recording device to enter said conference call as the additional participant *when* a data session has been initiated.

(col. 7:27-31 (emphasis added).)

The Court concludes that "entering the recording device to said conference call as an additional participant" does not require construction. Though claim 1 might be read to reveal a sequential ordering of activities by the method, with the recording device entered last, claim 2 clearly shows that this sequential ordering is not required.

### 4. "IP data session"

| NICE's Construction | Witness's Construction |
|---|---|
| Communication which includes transmission of IP audio and/or video data. | The plurality of data packet transmission between any two or more communication devices. |

The parties dispute the meaning of "IP data session," as used in claim 1. NICE contends that the communication devices involved can be either IP (Internet Protocol) or non-IP telephony devices, and that in the preferred embodiment of the invention, "the IP multi-media session may also include one or more non-IP telephony devices," citing col. 3:52-56. Witness's construction

38

would exclude the preferred embodiment, NICE contends, because non-IP telephones do not transmit or receive "data packets." Witness contends that the patent's specification and prosecution history support its construction, citing Figure 3 and '106 Pros. Hist., Resp. 6, Dec. 19, 2004. Further, Witness contends that NICE is attempting to redefine the claim term and to read "IP" out of "IP data session." The specification makes clear that all non-IP communications within the system are first "translated" into IP communications (or data packets), demonstrating, Witness contends, that its construction is correct.

The Court construes "IP data session" to mean "the plurality of data packet transmission between any two or more communication devices." Though the claimed invention clearly contemplates involving non-IP telephone devices, it also makes clear that the invention must convert those non-IP communications into IP communications.

> [I]f a telephony device 20 communicating through a PSTN 22 is contacted by IP telephone 12 to initiate the multimedia call and/or if telephony device 20 initiates the call . . ., communication to and from telephony device 20 passes through a gateway 42, for example in order to translate regular PSTN 22 communication to IP-based communication.

(col.6:4-11.) Accordingly, the construction of "IP data session" should indicate that specifically IP-based communications are being transmitted.

5.    "the portion of the IP data session"

| NICE's Construction | Witness's Construction |
|---|---|
| At least a part of one or more of a plurality of IP data sessions. | All the data packets transmitted between the first and second participants during the part of the IP data session being recorded. |

The parties dispute the meaning of "the portion of the IP data session," as used in claim 1.  NICE reiterates its contention regarding "data packets" and non-IP communications made above, and also contends that the specification does not support the requirement that "all" IP data be recorded.  Witness contends that NICE's "one or more" language is contradicted by the preamble to claim one, which explains that the claimed steps apply "for each IP data session."  Further, Witness contends its construction preserves the limitations inherent in the structure of the claim by including, not an amorphous "part," but "the part of the IP data session being recording."

In light of the claim language and specification, the Court construes the disputed term to mean "all the data packets transmitted between the first and second participants during the part of the IP data session being recorded."  The term "all," in this context, refers to all of the data packets transmitted during recorded parts of the sessions, not all of the data packets transmitted, whether recorded or not.

## CONCLUSION

For the reasons discussed herein, the Court tentatively construes the disputed terms of the patents-in-suit as follows.

| PATENT | CLAIM TERM | COURT'S CONSTRUCTION |
|---|---|---|
| '371 | buffer | Device in communication with the digital audio tape and the random access storage device that temporarily stores data. |
|  | digital audio tape | Magnetic tape designed for storage of audio in digital form. |
|  | writing the audio data from the buffer onto a digital audio tape and a random access storage device | Transferring audio data from the buffer directly to both a digital audio tape and a random access storage device. |
|  | pair of pointers | Digital information used to read data from and write data to a storage component. |
| '570, '345 | telephone call | The entire conversation between a business entity and a caller to that entity, including transfers and conferences. |
|  | telephony event | Actions or occurrences detected by a computer program and that related to what happens to a phone call (such as the initiation of the call, the addition or removal of callers, the transfer of the phone call, or the termination of the calls). |
|  | data representation | Digital representation of data. |

41

Case 1:24-cv-00945-CFC    Document 352-3    Filed 05/06/26    Page 43 of 44 PageID #:
Case 1:06-cv-00311-JJF    Document 279    Filed 12/17/07    Page 42 of 43 PageID #:
30965
4106

| | | data representation of a lifetime of the telephone call | Call-centric data record of the telephone call that includes a detailed cumulative start-to-finish history of a telephone call, including all telephony events and participants. |
|---|---|---|---|
| | | constructing a data representation of a lifetime of the telephone call using data regarding telephony events associated with the telephone call segments of the telephone call | Plain meaning. |
| '372 | | telecommunications ("telecom") stage | The stage that serves to capture and pre-process signals from two or more communication channels and interfaces with the recorder stage. |
| | | distribution stage | The stage that serves for retrieval of recorded information, providing it in a human recognizable form, and, in some instances, archiving the recorded information to removable storage. |
| | | web server | A component that provides access to information accessible from a computer connected to the Internet or an intranet. |
| '920 | | web server | A component that provides access to information accessible from a computer connected to the Internet or an intranet. |
| | | digital logger | A device, system or software for recording audio in digital form. |
| | | receiving a request for retrieval of stored data | The Web server receives a request for retrieval of stored data. |

42

Case 1:24-cv-00945-CFC    Document 352-3    Filed 05/06/26    Page 44 of 44 PageID #:
30966
Case 1:06-cv-00311-JJF    Document 279    Filed 12/17/07    Page 43 of 43 PageID #:
4107

| | | |
|---|---|---|
| | retrieving stored data | The Web server retrieves stored data. |
| | transferring the retrieved data | The Web server sends the retrieved data. |
| | record of an input channel | Stored voice and/or call information received from an input channel. |
| | record of a communication channel | Stored voice and/or call information received from a communication channel. |
| '109 | conference controller | A component that initiates, enables and/or establishes a conference call. |
| | through a conference controller | The data packet transmissions of the IP data session pass through the conference controller. |
| | recording device | A device which records IP audio and/or video data. |
| | entering the recording device to said conference call as an additional participant | Plain meaning. |
| | IP data session | The plurality of data packet transmission between any two or more communication devices. |
| | The portion of the IP data session | All the data packets transmitted between the first and second participants during the part of the IP data session being recorded. |

43