# EXHIBIT 12

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

---oOo---

BECKMAN COULTER, INC.,              :
                                    :
            Plaintiff,              :
                                    :
        vs.                         : No. 1:24-cv-00945-CFC-EGT
                                    :
CYTEK BIOSCIENCES, INC.,            :
                                    :
                                    :
            Defendant .             :
_____     :


██████████████████████████████

DEPOSITION OF JESSICA P. HOUSTON, Ph.D.

February 23, 2026


Job No. 1482896

Stenographically reported by:
LAURA AXELSEN, CSR NO. 6173
    RMR, CCRR, CRR, CRC, RDR



Page 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
---oOo---

BECKMAN COULTER, INC.,          :
                                :
          Plaintiff,     :
                                :
     vs.          : No. 1:24-cv-00945-CFC-EGT
                                :
CYTEK BIOSCIENCES, INC.,        :
                                :
                                :
          Defendant .      :
_____ :

     BE IT REMEMBERED THAT, pursuant to Notice and on Monday, February 23, 2026, at 9:18 a.m. thereof at 2600 El Camino Real, Suite 400, Palo Alto, California, before me, LAURA AXELSEN, a Certified Shorthand Reporter, personally appeared
          JESSICA P. HOUSTON, Ph.D.,
called as a witness by the defendant.
          ---oOo---

Page 3

APPEARANCES

FOR THE PLAINTIFF:

     WILMERHALE
     BY:  LAURA MACRO, PH.D., ESQ.
          PATRICK NYMAN, ESQ.
     7 World Trade Center
     250 Greenwich Street
     New York, New York 10007
     laura.macro@wilmerhale.com

FOR THE DEFENDANT:

     COOLEY LLP
     BY:  REUBEN CHEN, ESQ.
          HANBYUL CHANG, ESQ.
     3175 Hanover Street
     Palo Alto, California  94304
     rchen@cooley.com

     There also being present Marcus Majors, videographer.

Page 4

INDEX

                    PAGE
EXAMINATION BY MR. CHEN          7

          ---oOo---

     INDEX OF EXHIBITS

EXHIBIT     DESCRIPTION          PAGE

Exhibit 1    Dr. Houston's Opening Report     48
Exhibit 2    Dr. Houston's Rebuttal Report     48
Exhibit 3    Dr. Houston's Reply Report     48
Exhibit 4    Flow Cytometry:  Advances,     59
             Challenges, and Trends
Exhibit 5    Flow Cytometry:  Past and Future     63
Exhibit 6    Spectral Flow Cytometry:     65
             Fundamentals and Future Impact
Exhibit 7    Spectral Flow Cytometry To     66
             Distinguish Tamoxifen-Resistant
             Breast Cancer Cells
Exhibit 9    Dr. Robinson's Rebuttal Report     78
Exhibit 10   U.S. Patent No. 10,330,582     137
Exhibit 11   U.S. Patent No. 11,703,443     137

Page 5

Exhibit 12   U.S. Patent No. 12,174,107     137
Exhibit 13   Dr. Leary's Rebuttal Report     157
Exhibit 14   Beckman Coulter Second Amended     162
             Infringement Contentions
Exhibit 15   U.S. Patent No. 11,169,076     163
Exhibit 16   Appendix A to Dr. Ilkov's     173
             Rebuttal Report
Exhibit 17   U.S. Patent No. 8,284,402     191
Exhibit 18   BMS-Zymogenetics DxP11 Optical     200
             Diagram
Exhibit 19   Optics, Fourth Edition, Eugene     203
             Hecht
Exhibit 20   BEC-CYTEK-00157265.XLS     204
Exhibit 21   BEC-CYTEK-00273221.XLS     204

          ---oOo---



Page 6

VIDEOGRAPHER: Good morning. We are now on the record. The time is 9:16 a.m. Today's date is February 23rd, 2026. This marks the beginning of media file No. 1 in the deposition of Dr. Jessica Houston in the matter of Beckman Coulter, Inc., versus Cytek Biosciences, Inc., in the United States District Court for the District of Delaware, Case No. 1:24-CV-00945-CFC-EGT.

We are located at WilmerHale, 2600 El Camino Real, Suite 400, Palo Alto, California. My name is Marcus Majors, the videographer with Magna Legal Services.

Will all counsel present please introduce themselves, starting with the noticing attorney.

MR. CHEN: Thank you. Good morning everyone. My name is Reuben Chen from Cooley, LLP, on behalf of Cytek Biosciences. I'm joined with by my colleague, HanByul Chang, also from Cooley.

MS. MACRO: Laura Macro on behalf of plaintiff Beckman Coulter from WilmerHale, joined by my colleague Patrick Nyman, also from WilmerHale.

VIDEOGRAPHER: Thank you. Will the court reporter please introduce herself and swear in the doctor.

THE REPORTER: All right. I am Laura Axelsen,

Page 7

CSR No. 6173.

JESSICA P. HOUSTON, Ph.D. having been duly sworn/affirmed under penalty of percentage testified as follows:

EXAMINATION BY MR. CHEN

MR. CHEN: Q. Good morning, Dr. Houston.

A. Good morning.

Q. Could you please state your name for the record?

A. Jessica Perea Houston.

Q. And could you please also provide your home address for the record?

A. Home address is 2002 Avenida de Antigua, Las Cruces, New Mexico 88005.

Q. Dr. Houston, have you been deposed before?

A. No.

Q. Okay. Have you ever testified in court before?

A. No.

Q. Okay. Have you ever served as an expert in a patent litigation case before?

A. I have not.

Q. Okay. Let me explain some ground rules to help us with today's deposition and make sure that it

Page 8

proceeds efficiently and so there are no misunderstandings. I'll be asking some questions and you'll be giving some answers. Do you understand that?

A. Yes.

Q. Okay. And since Ms. Reporter is taking down our testimony, we need to be careful not to talk over each other so that she can capture the testimony. So I'll try to do that and if you can do the same I would appreciate it.

A. Okay.

Q. Okay. If I ask you a question and you don't understand it, please ask me for clarification. I'll try to rephrase or clarify the question if that's appropriate. Otherwise, I'll assume that you understood the question. Is that fair?

A. Yes.

Q. Okay. And if you need to take a break, please just let me know. From time to time -- if I ask you a question and you want to take a break, unless your counsel instructs you that you need to discuss a point of privilege or point of protected communication, not privilege, then let me know that. Otherwise, I'd ask that you provide an answer before you go on a break. Do you understand that?

A. I understand.

Page 9

Q. Okay. And from time to time, your attorney may also interrupt with an objection, but unless your attorney instructs you not to answer the question, you must still answer the question. Do you understand that?

A. I understand it.

Q. Okay. Do you have any questions about the process as I've explained it to you?

A. No.

Q. Okay. Are there any conditions or factors that would prevent you from giving accurate and complete testimony today, such as being under the influence of any medications or substances?

A. There are no factors.

Q. Okay. And you brought some documents with you today. Those are your opening, rebuttal, and reply reports, correct?

A. That is correct.

Q. Okay. Did you bring any other documents with you today to the deposition?

A. No other documents --

Q. Okay.

A. -- besides the noted corrections.

Q. Okay. Do you understand that you've just given an oath to tell the truth and that the testimony here today is as if given in court and may be played for

**MAGNA**
LEGAL SERVICES

3 (Pages 6 to 9)

Page 94

of a team effort basically.

Q. Okay. When was that done?

A. 2008.

Q. Okay.

A. 2008 or '09. 2008, I think.

Q. Okay. You're saying you had a flow cytometer in 2008, 2009 that had spectral capabilities?

A. Yeah. There was at Los Alamos National Laboratory.

Q. Okay. And did that flow cytometer -- was that focused on detecting spectral signatures of fluorophores?

MS. MACRO: Objection; vague?

THE WITNESS: Yeah, it was a cytometer that took a spectral output and whether or not you were taking it with cells or microspheres it could do both.

MR. CHEN: Q. Okay. What's the difference between a cell and microsphere, just for the record?

A. A microsphere is a small sphere primarily made up of like a -- some type of polymer like polystyrene and imbibed with fluorescent compound like fluorophores. And microspheres are mainly used for, like, calibration, standardization, and analysis, whereas cells can, you know, are typically labeled with multiple colors so therefore you get more of the -- what we call a

Page 95

polychromatic assay out of those -- the cell.

Q. Flow cytometers can be used with cells, correct?

A. Correct.

Q. Flow cytometers can be used with microspheres, correct?

MS. MACRO: Objection; vague.

THE WITNESS: It's common to use microspheres and use those as a alignment approach or, like I said, standardization.

MR. CHEN: Q. Okay. Flow cytometers can be used with particles, correct?

MS. MACRO: Objection; vague.

THE WITNESS: Yeah, define particle.

MR. CHEN: Q. Well, do you have -- do you have -- have you used that word before, particle?

MS. MACRO: Objection; vague.

THE WITNESS: Yeah. Particle is, yeah, some kind of a vernacular that I've seen for sure. And that is something in the field that sometimes can be referred to as anything ranging from large particles to small particles and that's how we use the term.

MR. CHEN: Q. Uh-huh.

A. Because in cytometry we care about size ranges. So nano particle would be an example.

Page 96

Q. Sure.

A. And a large particle would be something like a spheroid or organoid. That range of particle sizes is kind of a way to characterize the different sample.

Q. The asserted patents talk about the measuring of particles in flow cytometry, right?

MS. MACRO: Objection; vague.

MR. CHEN: Q. You can search for the word particle if you want.

A. Right. I'd have to look for that.

Q. So there's particle based flow cytometry, correct?

MS. MACRO: Objection; vague.

THE WITNESS: So some instruments are measured as -- we might call a particle analyzer and that might mean they're, you know, specific to a -- they're de-emphasizing the measurement of the cell and they're saying it's mostly -- if you use the word particle, then you're, you know, perhaps in a marketing sense I think you would be probably trying to say this is distinct from, you know, any range of mammalian cell types that you might want to measure or even mammalian cell types.

MR. CHEN: Q. I mean, you told me earlier that the term flow cytometry is broad.

A. Uh-huh.

Page 97

Q. It can capture a lot of different types of flow cytometers, right?

MS. MACRO: Objection; mischaracterizes testimony. Vague.

THE WITNESS: There's broadness to a number of things in -- in cytometry in general.

MR. CHEN: Q. Okay. And so flow cytometers can be used with beads, right?

MS. MACRO: Objection; vague.

THE WITNESS: Do you mean microspheres? Is that what you mean by beads.

MR. CHEN: Q. Have you used the term bead before?

MS. MACRO: Objection; vague.

THE WITNESS: There is a common term that people use called a bead-based assay.

MR. CHEN: Q. Uh-huh.

A. So that is a term, yeah.

Q. Right. So are there -- strike that. Are there flow cytometers that can be used with bead-based assays?

MS. MACRO: Objection; vague.

THE WITNESS: I'd be kind of making a blanket assumption if I tried to put myself in the shoes of a investigator that is needing to utilize an assay that

Page 98

involves microspheres. And that is because investigators have a lot of different reasons for making measurements with beads.

MR. CHEN: Q. I'm just asking you whether the term flow cytometer can encompass flow cytometers that are used with bead-based assays?

MS. MACRO: Objection; vague. Asked and answered.

THE WITNESS: And then to answer that I need a little more explanation on the bead-based assay. Is what I was trying to say.

MR. CHEN: Q. Well, have you ever heard of scientists in your field using a flow cytometer for bead-based assays?

MS. MACRO: Objection; vague. Asked and answered.

THE WITNESS: Yes. Lots of cytometry systems and they are very useful for measuring a range of things including microspheres. Including cells. Including plant nuclei, as an example. So --

MR. CHEN: Q. How about beads?

MS. MACRO: Objection; vague. Asked and answered.

THE WITNESS: Cytometers are used for many things. Again.

Page 99

MR. CHEN: Q. How about beads?

MS. MACRO: Objection; vague. Asked and answered.

THE WITNESS: It is very useful to standardize an experiment with microspheres and/or beads if you want to say that.

MR. CHEN: Q. The flow cytometer that you said you partially designed, that wasn't a commercial flow cytometer, right?

A. That was not commercial.

Q. Okay. Have you ever built a spectral flow cytometer?

MS. MACRO: Objection; asked and answered. Vague.

THE WITNESS: I was involved in a lot of conception of the idea behind a -- what we would call a lifetime spectral flow cytometer. And a lot of those -- the development of that was written in a grant application that was submitted around 2007.

MR. CHEN: Q. Okay.

A. It's an example of just my experience with design.

Q. Design. How about building?

MS. MACRO: Objection.

MR. CHEN: Q. Have you built a spectral flow

Page 100

cytometer?

MS. MACRO: Objection; asked and answered. Vague.

THE WITNESS: I was around when other scientists were interested in demonstrating spectral flow cytometer at the Los Alamos National Laboratory. And in my time being there, I was able to observe the spectral nuances of the spectral system, meaning oh, how do you display spectral on a detector, what kind of lasers could you do. Can you interchange them. I was involved in the readout of the data sets and processing of data. In the terms of building, I don't think any one person builds from the ground up a spectral cytometer. They source components. They do design. The consult with many people and --

MR. CHEN: Q. Okay.

A. Do tests and optimization.

Q. Okay. Would it be fair to say that your research is focused on lifetime fluorescence?

A. That is the primary interest area that my lab has, is measurement of fluorescence lifetimes.

Q. Okay. And does that use a spectral flow cytometer?

MS. MACRO: Objection; vague.

THE WITNESS: We have developed a number of

Page 101

ideas on combining fluorescence lifetime with spectral, but we have never demonstrated an instrument like that in our laboratory.

MR. CHEN: Q. Okay.

A. Or constructed.

Q. Okay. Have you ever designed a commercial flow cytometer?

A. Can you be more specific with what you mean? Designed commercial, do you mean --

Q. Commercial product, right? I think we're on the same page there. Product that's available commercially. Is that a fair definition to you?

A. Okay. Uhm, I've never worked for a cytometry company.

Q. Okay. So you've never designed a commercial flow cytometer?

MS. MACRO: Objection; mischaracterizes testimony.

THE WITNESS: Yeah. I've never worked for a cytometry company.

MR. CHEN: Q. I guess I'm not quite sure why you're answering it that way. It's not like a trick question or anything like that. I'm just wanting to get to the truth. Have you designed a commercial flow cytometer?

MAGNA
LEGAL SERVICES

Page 102

MS. MACRO: Objection; asked and answered. Answer the question how you wish.

THE WITNESS: In my experience, someone that has designed a commercial cytometer is someone that works on a large engineering team for a cytometry company that engages in everything from design to assembly to testing to optimization. So there are many examples of companies that operate in different ways that are involved in design. So -- and building of cytometry systems. Manufacturing. Because of the many layers and that my answer to that is I've never worked with cytometry company that's my understanding of your question.

MR. CHEN: Q. Right. So you've never designed a commercial flow cytometer right?

MS. MACRO: Objection; asked and answered.

THE WITNESS: We -- cytometers being as complex as they are have -- and seeing as there's many different components to a cytometer, the word design is too vague. I can't answer that. Is this -- are you -- is this a designing a part of the beam that routes somewhere. Is this designing the -- writing digital signal processing for the data acquisition system? Like, the design aspect of your question is -- I'm not able to answer because there's -- there's not just one

Page 103

single element of that goes into the product. The product itself as a flow cytometer.

MR. CHEN: Q. Let me ask a slightly different question. I don't think there's anything wrong with the question I asked but let me ask a different question. Have you ever designed any aspect of a commercial flow cytometer?

MS. MACRO: Objection; vague.

THE WITNESS: None of the work from our lab has ever been translated from commercially. And we certainly have spoken to companies about the possibility of doing tech transfer, but none -- not so much of that it's gone to the extent where a patent's been licensed and there's been a concerted effort to -- to commercialize some of the outputs from our lab anyway.

MR. CHEN: Q. Okay. Separate question. Did Dr. Yong Chen invent Cytek's spectral flow cytometers?

MS. MACRO: Objection; vague. Calls for a legal conclusion.

THE WITNESS: Dr. Yong Chen was really developing and demonstrating some really interesting WDM platforms and in his efforts to demonstrate compactness, sensitivity, and low cost, it's clear that he has, you know, been part of a cytometry system that's -- works with -- and is widely used.

Page 104

MR. CHEN: Q. Is that your complete answer?

A. Yes.

Q. Okay. I'll object that it's non-responsive. Did Yong Chen invent Cytek's spectral flow cytometers?

MS. MACRO: Objection; vague. Asked and answered.

THE WITNESS: My answer is Dr. Chen possessed a WDM for the purpose of sensitively and in a very compact way and for a very inexpensive sales to separate light of different colors and make cytometry measurements of -- of -- at different spectral wavelengths.

MR. CHEN: Q. Dr. Houston, it sounds like you cannot answer whether or not Yong Chen invented Cytek spectral flow cytometers; is that right?

MS. MACRO: Objection; mischaracterizes testimony. Argumentative. Asked and answered twice already. Go ahead.

THE WITNESS: Just saying Dr. Chen conceived of the WDM, worked to demonstrate that in a flow cytometer, showed separation of light of a different -- of different colors, and focusing of that light onto small detector arrays.

MR. CHEN: Q. You signed your three reports, correct?

Page 105

A. Yes.

Q. Do these reports contain a complete statement of the opinions you plan to offer in this case? With your corrections, of course.

A. So I do reserve the right to supplement my opinions in the future to respond to any arguments or additional evidence that's raised and take into account new information as it becomes available to me.

Q. Sitting here today, are there any such new opinions?

A. Are you asking if I have new opinions to add to the report?

Q. Yeah. Yeah. Sitting here today, do you have any new opinions to add that are not in your expert reports?

A. I mean, I've provided opinions on things, on the papers you've presented to me and other materials that weren't cited in the report, so.

Q. That's fair. I understand that. Yeah. I mean obviously you don't know what additional questions are coming up. So sitting here today, besides the opinions in your report and the opinions that we will discuss during your deposition, are there any additional opinions that you plan to offer that you have not already offered?

MAGNA
LEGAL SERVICES

Page 106

A. I -- my opinions are to the extent at which we're having this discussion and when we're referring to these reports. So I -- I'm not offering any additional opinion at this time.

Q. Okay. Thank you. You signed your opening infringement report on December 19th, right?

A. Yes.

Q. Before your -- strike that.

Before you submitted your opening report, you had not yet inspected Cytek's accused products, correct? Strike that.

MS. MACRO: Objection.

MR. CHEN: Q. Before you submitted your opening report, had you inspected Cytek's accused products?

A. Oh, before signing this, there -- I did a lot of work studying, which included a lot of looking at images, diagrams, you know, CAD files, and so all of the inspection really was with the help of a lot of materials and photographs and also with reading other comments and feedback. So, I mean, as you can see in here, there's quite a bit of images and reference to the cytometers that Cytek has.

Q. I have a very specific question, Dr. Houston. The question is before submitting your opening report,

Page 107

had you physically inspected the Cytek accused products?

A. So I have a Northern Lights in my lab. So what do you mean physically inspected?

Q. Have you ever -- prior to submitting your opening report, have you ever seen the insides of a Cytek accused product?

MS. MACRO: Objection; asked and answered.

THE WITNESS: I have -- again, can you -- can you be specific because the insides means I can open up the Northern Lights and see inside of it, and that's how you do things like observe it for maintenance or repair --

MR. CHEN: Q. Okay. Let me --

A. -- things.

Q. Yeah, sure. Sure. Let me ask another question, then. Prior to submitting your opening report, had you physically inspected the detector assembly of an accused product or what you call the WDM?

MS. MACRO: Objection; vague.

THE WITNESS: In a WDM and the way I think -- I believe that those are, you know, mounted and inserted into the box -- the outer box of the cytometer would -- would be -- would be difficult because, you know, there's a lot of other mounting components, and there's pieces of the optics that are kind of sealed, and so

Page 108

typically when we observe a -- or when we have a commercial system in anybody's laboratory, it's not common to want to take it apart and -- you know, because you risk trying to --

MR. CHEN: Q. Sure.

A. -- making it not work again.

Q. I understand that.

A. If you're messing with it.

Q. Yeah. Everything you said makes perfect sense to me. So my question is prior to submitting your opening report, had you physically inspected a detector assembly or what you call a WDM of the accused products?

MS. MACRO: Objection; vague.

THE WITNESS: I had only looked at the images, and physical inspection, I never held one in my hand, but in a lot of the images and a lot of the materials we had it was clear to see, you know, the different angles of parts of the WDM, and so if you're asking if I held one in my hand, I did not. I didn't have that prior to this date.

MR. CHEN: Q. Okay. You never opened up a detector assembly, looked inside it prior to submitting your expert report, correct?

MS. MACRO: Objection; vague. Asked and answered. Mischaracterizes testimony.

Page 109

THE WITNESS: Again, I just visualized it through a lot of the images and lots of materials and engineering drawings.

MR. CHEN: Q. Right. So you never physically inspected a detector assembly or what you call WDM prior to formulating the opinions in your report, correct?

MS. MACRO: Objection; mischaracterizes testimony. Asked and answered.

THE WITNESS: A lot of material that clearly shows the --

MR. CHEN: Q. I'm asking a very specific question, Dr. Houston. Asked you a very, very specific question. I'll just repeat it. I'm entitled to an answer.

You never physically inspected a detector assembly or what you call a WDM prior to formulating the opinions in your report, correct?

MS. MACRO: Objection; vague. Badgering the witness. Mischaracterizes testimony. Asked and answered.

THE WITNESS: Inspection and --

MR. CHEN: Q. What did you say, Dr. Houston?

A. I'm trying to remember something, a timeline from when I was able to look at the CytoFLEX.



28 (Pages 106 to 109)

Page 210

him?

MS. MACRO: I'll let you ask that question. You can answer.

THE WITNESS: Yeah, in general, I think Jim's been a -- you know, always very avid in the field in terms of wanting to participate in the meetings. I see that as a positive attribute, especially for cytometry, because we always need people to be -- you know, to opine on things and to speak up and to -- and so he certainly wanted to be involved in things, and so I think that's -- that's a good thing. Good quality.

MR. CHEN: Q. Do you respect him?

MS. MACRO: All right. No more questions. I mean, you can answer that. It's fine.

THE WITNESS: Yeah, and, again, I respect all of my cytometry counterparts and all of the people that I work with and that I encounter in our field, and that's -- you know, that's -- that's who I am and that's a -- you know, something that I see is important to model as the president of ISAC.

MS. MACRO: All right. No more questions. We probably need to break for maybe 20 minutes.

MR. CHEN: Okay. We can go on break.

VIDEOGRAPHER: This marks the end of Media File labeled No. 8. Off the record at 5:40 p.m., and

Page 211

everyone don't forget your mics. Thank you.

(The deposition was in recess from 5:41 to 6:09.)

VIDEOGRAPHER: This marks the beginning of Media File labeled No. 9. Back on the record at 6:09 p.m.

MR. CHEN: And let's go ahead and mark the transcript as highly confidential outside attorneys' eyes only.

MS. MACRO: We have no questions at this time. Thank you.

MR. CHEN: Thank you.

THE REPORTER: Could I get your orders on the record?

MR. CHEN: We have a standing order. So rough transcript today.

THE REPORTER: And the final.

MS. MACRO: Three day.

MR. CHEN: We'll do a three day.

MS. MACRO: I'll change it.

MR. CHEN: Okay. I'll do the same.

THE REPORTER: Thank you.

VIDEOGRAPHER: I'll go ahead and take us of.

MR. CHEN: Thank you, Dr. Houston.

VIDEOGRAPHER: This concludes today's video

Page 212

deposition of Dr. Jessica Houston on February 23rd, 2026. Original media will remain in the custody of Magna Legal Services. Off the record at 6:10 p.m.

(The deposition was concluded at 6:10 p.m.)

_____
JESSICA P. HOUSTON, Ph.D.

Page 213

CERTIFICATE

I, the undersigned, a Certified Shorthand Reporter, State of California, hereby certify that the witness in the foregoing deposition was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete, and true record of said testimony; and that the witness was given an opportunity to read it and, if necessary, correct said deposition and to subscribe the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed this 26th day of February, 2026.

_____
LAURA AXELSEN, C.S.R. 6173

MAGNA
LEGAL SERVICES