# EXHIBIT 14

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| BECKMAN COULTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 24-0945-CFC-EGT |
| | ) | |
| CYTEK BIOSCIENCES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REBUTTAL EXPERT REPORT OF DR. DAVID SCHAAFSMA, PHD
## REGARDING VALIDITY OF U.S. PATENT NOS. 10,330,582, 11,703,443, AND 12,174,107

January 20, 2026

Dr. David Schaafsma

i

Dr. David Schaafsma Rebuttal Validity Report

Introduction

## I.    Introduction

1.      I have been retained as an expert in this case by WilmerHale on behalf of Plaintiff Beckman Coulter, Inc. ("BEC"). I expect to testify at trial regarding the matters set forth in this report, if asked about these matters by the Court or by the parties' attorneys.

2.      I understand that BEC has asserted U.S. Patent Nos. 10,330,582; 11,703,443; and 12,174,107 to Yong Qin Chen ("the '582 patent," the '443 patent," and "the '107 patent," or collectively the "Asserted Patents"), entitled "Flow Cytometer" against certain  products offered by Defendants Cytek Biosciences, Inc. ("Cytek"). Specifically, I understand that BEC is asserting claims 1, 3, 6, 23, and 26 of the '582 Patent at cls. 4, 6, 10, 11, and 15 of the '443 patent, and claims 5, 16, 18, 26, 27, and 29 of the '107 patent against certain Cytek products (collectively referred to as the "Asserted Claims").

3.      I previously submitted an expert report dated December 19, 2025, titled "Opening Expert Report of David Schaafsma, Ph.D." ("Schaafsma Opening Report") in this case, which I incorporate by reference.

4.      I have been asked for my expert opinion regarding, among other things, the validity of the Asserted Claims. As explained in detail below, it is my opinion that each of the Asserted Claims are valid.

## II.    Background and Qualifications

5.      A description of my academic and professional experiences, honors and awards, are set forth in paragraphs 4 through 9 of my Opening Report, filed on December 19, 2025, and in my *curriculum vitae*, a true and correct copy of which I attached thereto as Appendix A.

Dr. David Schaafsma Rebuttal Validity Report

§ 112 Invalidity

regarding semiconductor detectors, and in view of a POSA's understanding that semiconductor detectors are simply photodetectors that detect light using heterojunction semiconductor materials to convert light received at their active area into an electrical signal, *see, e.g.*, Saleh at 752, would have allowed a POSA to visualize or recognize the members of the genus so as to demonstrate that the inventor was in possession of a flow cytometer utilizing semiconductor detectors.  My opinion further holds true if, as Dr. Ilkov has opined, carbon nanotubes are simply a species within APDs.  *E.g.*, Ilkov Rep. ¶1006.

894.    In sum, it is my opinion that "semiconductor detector" as in Asserted Claims has full scope written description support.

### 2.  "Semiconductor detector" is fully enabled ('582, cls. 1, 2, 3, 6, 26)

895.    Dr. Ilkov opines that the term "semiconductor detector" encompasses carbon nanotubes, and thus is not fully enabled. (Ilkov Rep. ¶¶994-1003).  I disagree for the following reasons.

896.    As I explained above in Section XVI.C.1, which I incorporate here by reference, a POSA would understand that semiconductor detectors are simply photodetectors that detect light using heterojunction semiconductor materials to convert light received at their active area into an electrical signal.  Photodiodes, avalanche photodiodes, and carbon nanotubes each fit within this categorization, and the term "semiconductor detector" in the '582 Patent is fully enabled.

897.    **Wands Factor No. 1 – Breadth of the Claims**: I agree with Dr. Ilkov that the claimed "semiconductor detector" captures APDs and carbon nanotube detectors in its scope.  However, I do not agree that it also captures "carbon nanotube semiconductor APDs."  (*See, e.g.*, Ilkov Rep. ¶¶986, 1005).  Dr. Ilkov has selectively decided to combine "carbon nanotube" with "APD" to create a combination that allegedly lacks support.  As clearly demonstrated by the '582

355

Dr. David Schaafsma Rebuttal Validity Report

§ 112 Invalidity

Patent, APDs and carbon nanotube detectors are separate categories under "semiconductor detector" that are independent of each other.  I will take each of the relevant disclosure of the specification in turn:

898.    "The semiconductor detector may be a semiconductor photodetector. The semiconductor detector may be an avalanche photodiode *or* a carbon nanotube detector." ('582 Patent at 8:12-33 (emphasis omitted)).  Here, the specification clearly describes APDs and CNT detectors as alternative examples of semiconductor detectors.

899.    "The photodetector can be, but is not limited to, a semiconductor detector, an avalanche photodetector (APD), and a carbon nanotube detector." (*Id.* at 46:6-29).  "The photodetector can be, but not limited to, a semiconductor photodetector, a multi-pixel photon counter, and a carbon nanotube detector."  (*Id.* at 52:23-29).  Here, the specification describes types of photodetectors, in the first list including semiconductor photodetectors, APD, and CNT detectors, each as alternatives, and in the second list semiconductor photodetectors, multi-pixel photon counters, and CNT detectors, each as alternatives.  It is clear these options are offered as alternative examples, and inclusion of CNT detectors in a list with APDs does not make a CNT an APD—instead, a POSA reviewing the specification would reach the opposite conclusion, i.e., that an APD is distinct from a CNT.  Under Dr. Ilkov's logic, a CNT would also be considered a multi-pixel photon counter, which a POSA would clearly understand is not correct.  Instead, the specification clearly lists alternative options of photodetectors. This is explicitly stated later in the specification: "At least one of the semiconductor photo detectors is an avalanche photo diode detector. As an *alternative* or *in addition*, at least one of the semiconductor photo detectors is a carbon nanotube detector." (*Id.* at 58:44-47 (emphasis added)).  Here, the specification clearly identifies the CNT detector as an alternative to an APD detector, with the "in addition" referring

356

Dr. David Schaafsma Rebuttal Validity Report

§ 112 Invalidity

to an additional semiconductor photodetector of the WDM, not the same APD detector in the prior sentence.

900.    In view of the above, it is clearly demonstrated by the '582 Patent, that APDs and carbon nanotube detectors are separate categories under "semiconductor detector" that are independent of each other.

901.    **Wands Factor No. 2 – Field or Nature of the Invention**: The field of the invention of the Asserted Patents are flow cytometers, and particularly, an optical subsystem for color separation and fluorescence detection in flow cytometry.  *See supra* Section XVI.A.2.ii.

902.    **Wands Factors Nos. 3 and 4 – State of the Prior Art at the Time of the Invention and Level of a POSA**: Dr. Ilkov's analysis is factually flawed.  I have consulted with Dr. Arnold, who is an expert in the field of carbon nanotubes detectors.  He explained to me that at the time of the invention, a POSA could have made and used carbon nanotube photodetectors in a flow cytometer without undue experimentation, and at least could have obtained carbon nanotube photodetectors from research labs and made and use a flow cytometer in accordance with the claimed inventions.  I agree with Dr. Arnold's assessment.

903.    Notably, Dr. Ilkov admits that carbon nanotube photodetectos were available within research labs and appears to only take issue with them because they are not commercially available.  I understand commercial availability is not the standard and therefore Dr. Ilkov does not dispute that they could be made without undue experimentation or that a flow cytometrist could have one made and used if they desired.  (Ilkov Report, ¶¶ 990-993).

904.    **Wands Factors Nos. 6 and 7 – Guidance from the Specification and Working Examples**: The specification of the '582 patent demonstrates working examples for APDs, a semiconductor species, and also discusses how the inventions can be used for semiconductor

357

Dr. David Schaafsma Rebuttal Validity Report

§ 112 Invalidity

detectors more broadly.  Specifically, the specification instructs how to maintain beam diameter through a flow cytometer WDM to be able to focus light to a small spot size.  *See, e.g.,* '582 Patent at 2:26-29, 4:55-60, 6:47-48, 9:51-65, 12:40-49, 20:18-33, 20:40-49, 20:62-21:27, 44:35-45:7, 45:8-43, 45:44-44, 47:13-21, 56:57-57:31, 57:31-36, 57:36-19, 58:20-47.  Thus, the specification explains how its invention works with semiconductor detectors that are improved by small spot sizes, which include carbon nanotube detectors.  In my opinion, this guidance and working examples in the specification, including specific work examples using APDs, would allow a POSA to practice the invention using other semiconductor detectors, including carbon nanotube detectors.  I have also spoken to Dr. Arnold regarding this analysis, and Dr. Arnold similarly agrees that the guidance from the specification and working examples provide POSAs with the necessary information to practice the full scope of semiconductor detector without undue experimentation.    I agree with Dr. Arnold's assessment.

905.    I further note that Dr. Ilkov's opinions are premised on the semiconductor detector having certain requirements.  (Ilkov Report ¶989).  However, while some flow cytometers operate at 1000 cells per second, that is not required by the claims and some run at slower rates (e.g., CytoFLEX nano) so it is not necessarily the case that a certain response rate is required.  Regardless, Dr. Arnold explained to me that carbon nanotube photodetectors could operate within the requirements of a detector for flow cytometry.

906.    **Wands Factors Nos. 5 and 8 – Predictability & Amount of Experimentation**: Dr. Ilkov's analysis is factually flawed.  I have consulted with Dr. Arnold.  He explained to me that at the time of the invention, a POSA could have made and used carbon nanotube photodetectors in a flow cytometer without undue experimentation, and at least could have

358

Dr. David Schaafsma Rebuttal Validity Report

§ 112 Invalidity

obtained carbon nanotube photodetectors from research labs and made and use a flow cytometer in accordance with the claimed inventions.  I agree with Dr. Arnold's analysis.

907.    Finally, Dr. Ilkov does not opine that the specification fails to enable any semiconductor detector other than carbon nanotube detectors, particularly APDs.  Ilkov Rep. ¶¶994-1003.  In my opinion the guidance, working examples in the specification, and the state of the art would have allowed a POSA to predictably implement the claimed inventions.  Although my opinion is that carbon nanotube detectors are enabled by the specification as I state throughout this section, my opinion still holds true regardless whether a POSA could have made or used the claimed invention using carbon nanotube detectors without undue experimentation, and it further holds true if, as Dr. Ilkov has opined, carbon nanotubes are simply a species within APDs.  *E.g.*, *id.* ¶1006.

908.    In sum, it is my opinion that "semiconductor detector" is fully enabled.

### 3.    "Detector" has full scope written description support ('443, cls. 1, 4, 9, 10, 11, 13, 15)

909.    As I explained above in Section XVI.C.1, which I incorporate here by reference, a POSA would understand that a "detector" recited in Asserted Claims, like semiconductor detectors, is a photodetector that detects light to convert light received at their active area into an electrical signal.  Dr. Ilkov incorporates his discussions regarding carbon nanotube detectors to opine that "detectors" are not enabled.  Ilkov Rep. ¶1007.  I disagree with Dr. Ilkov's opinion that "detector" does not have written description support.   The description of detectors in the '443 Patent provides more than sufficient direction to a POSA on the structural and functional properties of semiconductor detectors the inventor possessed as of the provisional application.  *See, e.g.*, '443 Patent at 4:65-5:3 ("In particular, multiple colored bands present in the beam of

Dr. David Schaafsma Rebuttal Validity Report

§ 112 Invalidity

light can be separated using dichroic filters located along the optical path with the separated light being tightly focused into small spots compatible with low noise semiconductor photodetectors.").

910.    Regardless, the claims of the '443 Patent recite "detector," and the specification of the Asserted Patents further describes how PMTs may be used in flow cytometers. '582 Patent at 43:31-42. Dr. Ilkov only opines regarding written description support for a specific species of semiconductor detectors (carbon nanotubes) and does not consider any other detectors, Ilkov Rep. ¶1007. In my opinion, the disclosure of representative species (*e.g.*, PMTs, semiconductors, and certain types of semiconductors) provides sufficient structural and functional characteristics such that a POSA would be able to visualize or recognize the genus of detectors that could be utilized in the claimed inventions, including because of my discussion regarding semiconductor detectors as well as my discussions regarding POSAs' use of PMTs in flow cytometers as I discuss in the Technology Backgrounds of this report and my Opening Report. Schaafsma Opening Report ¶¶ 69-77.

911.    For the same reasons explained above in Section XVI.C.1, it is also my opinion that the written description supports a "detector."

### 4.    "Detector" is fully enabled ('443, cls. 1, 4, 9, 10, 11, 13, 15)

912.    As I explained above in Section XVI.C.2, which I incorporate here by reference, a POSA would understand that a "detector" as in the '443 Patent, like semiconductor detectors, detects light by converting light received at their active area into an electrical signal. Photodiodes, avalanche photodiodes, and carbon nanotubes each fit within this categorization. Dr. Ilkov is therefore wrong that "detector" is not fully enabled. (Ilkov Rep. ¶1004). For at least the same reasons explained in Section XVI.C.2, the term "detector" in the '443 Patent is fully

360

Dr. David Schaafsma Rebuttal Validity Report

§ 112 Invalidity

enabled.  Further, as I discussed in the preceding Section, the breadth of the claimed "detector"

encompasses PMTs.  The specification's discussion regarding PMTs, *e.g.*, '582 Patent at 43:31-

42, is more than sufficient guidance for a POSA to predictably implement PMTs into the claimed

inventions.  Dr. Ilkov opines as to enablement only for a specific species of semiconductor

detectors (carbon nanotubes) and does not consider any other detectors, Ilkov Rep. ¶1007.  For

this additional reason, it is my opinion that a POSA would be able to make and use the full scope

of the claimed inventions without undue experimentation.

**5.   "[Array/plurality] of avalanche photodiodes (APDs)" has full scope written description support ('107, cls. 1, 2, 3, 5, 16, 17, 18, 20, 21, 22, 26, 27, 28, 29)**

913.   As I explained above in Section XVI.C.1, which I incorporate here by reference, a

POSA would understand that "avalanche photodiodes (APDs)," as recited in the claims of the

'107 patent, and carbon nanotubes semiconductor detectors, each fall within an independent

category of photodetector that detect light using semiconductor materials to convert light

received at their active area into an electrical signal. Specifically, the specification of the '107

Patent, and particularly the description of semiconductor detectors in the '107 Patent, makes

clear to a POSA that APDs and carbon nanotube detectors are separate categories of

semiconductor detectors. *See, e.g.*, '107 Patent at 4:67-5:5 ("In particular, multiple colored bands

present in the beam of light can be separated using dichroic filters located along the optical path

with the separated light being tightly focused into small spots compatible with low noise

semiconductor photodetectors."), 8:46-47 ("The semiconductor detector may be an avalanche

photo diode or a carbon nanotube detector.").  Dr. Ilkov does not opine that the specification

lacks written description support for APDs under any other understanding than APDs

Dr. David Schaafsma Rebuttal Validity Report

§ 112 Invalidity

encompassing carbon nanotube detectors, and he is therefore wrong in his opinion that the written description does not support "[array/plurality] of avalanche photodiodes (APDs)." (Ilkov Rep. ¶1008).

914.    Dr. Ilkov argues that APDs as used in the Asserted Claims of the '107 Patent do not have written description solely because APDs, in his opinion, encompass carbon nanotube detectors. *Id.* Dr. Ilkov is incorrect that the specification fails to provide written description support for carbon nanotube detectors as used in the claimed invention, as I discuss above in Section XVI.C.1. and incorporate here by reference. Further, if APDs do in fact encompass carbon nanotube detectors as Dr. Ilkov suggests, Dr. Ilkov does not provide any individualized analysis about written description support for the genus of APDs encompassing carbon nanotube detectors, nor does he opine that the specification lacks written description support for any species of APDs other than carbon nanotube detectors. *Id.* In my opinion, the specification's description and discussion of APDs (*e.g.*, '582 Patent at 43:40-44:4, 45:44-54, 46:27-29) provides sufficient information and characteristics such that a POSA would be able to visualize or recognize the scope and members of the genus encompassed within the scope of the claims. Although my opinion is that carbon nanotube detectors are supported by the specification, my opinion holds true regardless whether carbon nanotube detectors are supported by the specification.

915.    Thus, for the reasons provided in this Section, as well as the same reasons explained above in Section XVI.C.1, it is also my opinion that the written description supports "[array/plurality] of avalanche photodiodes (APDs)."

### 6.    "[Array/plurality] of avalanche photodiodes (APDs)" is fully enabled ('107, cls. 1, 2, 3, 5, 16, 17, 18, 20, 21, 22, 26, 27, 28, 29)

362

Dr. David Schaafsma Rebuttal Validity Report

§ 112 Invalidity

916.    As I explained above in Section XVI.C.2, which I incorporate here by reference, a POSA would understand that "avalanche photodiodes (APDs)" as recited in the claims of the '107 patent, and carbon nanotubes semiconductor detectors, each fall within an independent category of photodetector that detect light using semiconductor materials to convert light received at their active area into an electrical signal.

917.    I do not agree that the '107 Patent claims "carbon nanotube APDs." (Ilkov Rep. ¶1006). As clearly demonstrated by the '107 Patent, and as I discussed above in Section XVI.C.5 (and incorporate here by reference), APDs and carbon nanotube detectors are separate categories under "semiconductor detector" that are independent of each other. Dr. Ilkov provides no individualized analysis for enablement of "APDs" other than his specific discussion of carbon nanotube detectors, and regardless, in my opinion the guidance, working examples in the specification, and the state of the art would have allowed a POSA to predictably implement the claimed inventions. Although my opinion is that carbon nanotube detectors are enabled by the specification as I state in the following paragraph, my opinion holds true regardless whether a POSA could have made or used the claimed invention using carbon nanotube detectors without undue experimentation.

918.    Even if the claim scope of the '107 Patent captures "carbon nanotube semiconductor APDs," Dr. Arnold has explained to me that at the time of the invention, a POSA could have made and used carbon nanotube semiconductor APDs in a flow cytometer without undue experimentation, and at least could have obtained carbon nanotube photodetectors from research labs and made and used a flow cytometer in accordance with the claimed inventions without undue experimentation. I agree with Dr. Arnold's assessment.

Dr. David Schaafsma Rebuttal Validity Report

§ 112 Invalidity

919.    Therefore, for the same reasons explained in Section XVI.C.2, the term "[Array/plurality] of avalanche photodiodes (APDs)" in the '107 Patent is fully enabled.

### D. The Asserted Claims Are Not Invalid Due to "Mirror" Terms

#### 1. "Curved mirror" has written description support ('443, cls. 1, 4, 9, 10, 11, 13, 15; '582, cls. 1, 2, 3, 6, 20, 22, 23, 26

920.    Dr. Ilkov opines that the claims reciting "curved mirror" lack written description support.  (Ilkov Rep. ¶¶1009-1018).  I disagree with Dr. Ilkov.

921.    Dr. Ilkov acknowledges that the '772 patent, '412 patent, and PCT Application all teach a "concave mirror," but he notes that these patents and applications did not use the exact words "curved mirror." *Id.* ¶1009.  According to Dr. Ilkov, "[a] POSA at the time of invention would have appreciated that 'curved mirror' encompasses a broad group, including multiple types of mirrors with different types of curvatures and characteristics," and that "[c]urved mirrors can be concave or convex depending on whether the mirrors are curved inward (concave) or outward (convex) mirrors, though more complex curved geometries exist." *Id.* ¶1011.  While this generally may be true in isolation, it ignores the rest of the claim language, the context of the claimed inventions, the knowledge of a POSA in the relevant field, and the disclosures in the specification of the Asserted Patents from which a POSA would understand that the curved mirror of the Asserted Claims has a positive radius of curvature (positive optical power).

922.    Dr. Ilkov cites that claim 6 of the '443 Patent recites "the set of filters include at least one dichroic filter, and the at least one curved mirror is a concave mirror" to argue that the claims include a mirror with any curvature. *Id.* ¶1010 n.21 (emphasis omitted).  I understand that claim differentiation is a rebuttable presumption that different terms used in different claims indicate that the claims have different meanings and scopes.  I understand that the presumption

364

Dr. David Schaafsma Rebuttal Validity Report

Supplementation of Opinions

1009. Furthermore, as I discuss in Section XVI.K, which I incorporate herein by reference, Dr. Weigl attempts to narrow the scope of the disclosure of the specification by applying an inaccurately narrow understanding of the term "dichroic filter." Moreover, the working examples of "dichroic filters" included in the specification provide support for a generic claim to "optical filters," as recited in the Claim 6 of the '582 patent.

1010. Thus, in my opinion, Claim 6 of the '582 patent has full scope written description support and is fully enabled.

## XVII. Supplementation of Opinions

1011. 481. I reserve the right to supplement my opinions in the future to respond to any arguments and/or additional evidence that Cytek raises and to take into account new information as it becomes available to me.

1012. I declare under penalty of perjury that the foregoing is true and correct to the best of my own personal knowledge.