**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

BECKMAN COULTER, INC.,

                Plaintiff,

    v.

CYTEK BIOSCIENCES, INC.,

                Defendant.

C.A. No. 24-945-CFC

███████████████

**REDACTED - PUBLIC VERSION**

**EXHIBIT 16**

**PLAINTIFF'S MOTION _IN LIMINE_ NO. 1**
**OPENING, ANSWERING AND REPLY**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BECKMAN COULTER, INC.,<br><br>                Plaintiff,<br><br>         v.<br><br>CYTEK BIOSCIENCES, INC.,<br><br>                Defendant. | C.A. No. 24-0945-CFC |

**PLAINTIFF BECKMAN COULTER, INC.'S MOTION *IN LIMINE* NO. 1**
**TO PRECLUDE EVIDENCE, TESTIMONY, OR ARGUMENT**
**REGARDING UNASSERTED PATENTS AND PATENT APPLICATIONS**
**IN SUPPORT OF CYTEK'S NON-INFRINGEMENT,**
**INVALIDITY, OR DAMAGES ARGUMENTS**

**TABLE OF ABBREVIATIONS**

| Abbreviation | Term |
|---|---|
| Cytek's IP | Cytek's patents and patent applications |
| Beckman's Pending IP | Beckman Coulter's pending patent applications |
| Beckman's Unrelated IP | Beckman Coulter patents and patent applications not in the family of the Asserted Patents |
| '106 Patent | U.S. Patent Nos. 12,174,106 |
| '412 Patent | U.S. Patent Nos. 9,746,412 |

**TABLE OF EXHIBITS**[1]

| Exhibit No. | Exhibit |
|---|---|
| 1 | Cytek's 10th Supplemental Response and Objections to Interrogatories Nos. 1-15 (Dec. 12, 2025) |
| 2 | Deposition Transcript of Wenbin Jiang |
| 3 | Rebuttal Report of Mr. John Hansen |
| 4 | Rebuttal Non-Infringement Report of Dr. Fedor Ilkov |
| 5 | Rebuttal Non-Infringement Report of Dr. James Leary |
| 6 | Our Business, Danaher, https://www.danaher.com/our-businesses |
| 7 | Opening Invalidity Report of Dr. Bernhard Weigl |

---

[1] Exhibits cited in this opposition as "Ex. __" are attached to the Declaration of L. Matlock-Colangelo, filed as an attachment to this motion.

Cytek intends to rely on Cytek's IP, Beckman's Pending IP, Beckman's Unrelated IP, and Beckman's decision not to assert U.S. Patent Nos. 9,746,412 ("'412 Patent") and 12,174,106 ("'106 Patent") to suggest that Cytek does not infringe the Asserted Patents, to artificially suppress Beckman's damages, and to suggest that the Asserted Patents are invalid.  Such evidence and argument should be precluded as irrelevant, misleading, contrary to law, and likely to result in a wasteful "trial within a trial."  FRE 401-403.

*First*, the infringement inquiry "compares the accused product with the claims." *Johnson & Johnston Assocs. v. R.E. Serv.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002).  Whether Cytek has its own patents has no bearing whatsoever on that question, and Cytek should not be permitted to make such arguments to the jury.[2] *See Bio-Tech. Gen. v. Genentech*, 80 F.3d 1553, 1559 (Fed. Cir. 1996) ("one's own patent" is not "a defense to infringement"); *Sonos v. D&M Holdings*, 2017 WL 5633204, at *1 (D. Del. Nov. 21, 2017) (defendant's patent is "irrelevant"). Likewise, whether Cytek's patents "might read on" the accused products "is totally irrelevant" to infringement, including willful infringement.[3]   *Advanced Cardiovascular Sys. v. Medtronic*, 265 F.3d 1294, 1309 (Fed. Cir. 2001); *Xodus Med. v. Prime Med.*, 2022 WL 407090, at *3 (E.D. Tenn. Feb. 9, 2022) (defendant's

---

[2] *See, e.g.*, Ex. 2 at 188:1-24, 210:24-211:3; Ex. 4 at ¶¶52, 79, 82, 136; Ex. 5 at ¶¶106-110, 165, 344.
[3] Notably, Cytek has not offered any expert opinion that the Accused Products practice any Cytek patent.

1

patents did not affect its "knowledge of the asserted patents or the alleged infringement"). Nor does Cytek assert that its IP constitutes prior art. Cytek's IP is thus irrelevant to all issues to be tried to the jury. FRE 401-402.

Even if Cytek's IP were relevant (it is not), such evidence should be precluded because it "could mislead the jury into believing that" Cytek's "patents give it the right to practice" the Asserted Patents, leading to the erroneous conclusion that Cytek cannot infringe, willfully or not, because it has patents covering its products. *Sonos*, 2017 WL 5633204, at *1. Cytek can "make argument[s] as to the value added to its products" without arguing to the jury that value purportedly "relates to" Cytek's patents.[4] *Intell. Ventures I v. Symantec*, 2015 WL 82052, at *1 (D. Del. Jan. 6, 2015); *Malibu Boats v. Skier's Choice*, 2021 WL 1852085, at *1 (E.D. Tenn. May 6, 2021) (excluding defendant's patents despite defendant's argument that they were relevant to damages and willful infringement).

Allowing evidence of Cytek's IP would also waste time by "requir[ing] introduction of counter-evidence" regarding the scope, development, and (lack of) value of Cytek's IP and "unduly distract[] the jury from the main issues," forcing the parties to conduct a trial within a trial. *Glaros v. H.H. Robertson Co.*, 797 F.2d 1564, 1572-73 (Fed. Cir. 1986). Thus, Cytek's IP should be excluded.

***Second***, Beckman's Unrelated IP and '412 and '106 Patents do not bear on

---

[4] *See, e.g.*, Ex. 3 at ¶¶20-21.

whether Cytek infringes the Asserted Claims and are thus wholly irrelevant to the issues at trial. *Johnson & Johnston*, 285 F.3d at 1052. Allowing Cytek to argue non-infringement based on unasserted IP[5] would also cause "juror confusion" by suggesting non-asserted claims are relevant to whether Cytek infringes, *Masimo v. Philips Elecs. N. Am.*, 2010 WL 925864, at *2 (D. Del. Mar. 11, 2010), and "wast[e] time" with a mini trial on the relevance of unasserted IP, *Bombardier Recreational Prods. v. Arctic Cat*, 2017 WL 5256741, at *3 (D. Minn. Nov. 11, 2017).

Cytek should also be precluded from arguing that Beckman's Pending and Unrelated IP supports invalidity[6] because prosecution of other patents does not bear on the Asserted Claims' validity. *Kolcraft Enters. v. Chicco USA*, 2018 WL 10772693, at *2 (N.D. Ill. July 16, 2018). Further, as prosecution of the Pending IP is non-final and applies a different validity standard, such arguments would confuse the jury about Cytek's burden for invalidity. *See Personalized User Model v. Google*, 2014 WL 807736, at *3 (D. Del. Feb. 27, 2014) (nonfinal reexaminations prejudicial); *B. Braun Melsungen v. Terumo Med.*, No. 09-00347-LPS (D. Del. Nov. 8, 2010), D.I. 306 at 42:8-43:5, (excluding "related" prosecutions). Such arguments would also waste time forcing Beckman to explain the relevance and scope of the prosecution of these unasserted claims. *Sovay v. Honeywell Int'l*, No. 06-00557-SLR (D. Del. Sept. 13, 2011), D.I. 329 at 2. This unasserted IP should be excluded.

---

[5] *See, e.g.*, Ex. 4 at ¶89; Ex. 5 at ¶¶501-503.
[6] *See, e.g.*, Ex. 7 at ¶81, 87-90.

OF COUNSEL:

Omar A. Khan
Jeffrey A. Dennhardt
Laura Macro
Lauren Matlock-Colangelo
Jennifer L. Graber
Kelly A. Todd
Maggie Sawin
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

Akkad Y. Moussa
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave.
NW Washington, DC 20037
(202) 663-6000

Dated: June 26, 2026

/s/ Frederick L. Cottrell, III
Frederick L. Cottrell III (#2555)
Kelly E. Farnan (#4395)
Christine D. Haynes (#4697)
RICHARDS, LAYTON & FINGER P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
farnan@rlf.com
haynes@rlf.com

*Attorneys for Plaintiff*

<h1 style="text-align:center">CERTIFICATE OF SERVICE</h1>

I hereby certify that on June 26, 2026, true and correct copies of the foregoing document were served upon the following counsel of record in the manner indicated:

**BY E-MAIL**

Karen Jacobs
Jeremy A. Tigan
Cameron P. Clark
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19801

**BY EMAIL**

Reuben H. Chen
Cooley LLP
3175 Hanover Street
Palo Alto, CA 94304

Elizabeth M. Flanagan
Cooley LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402

Adam Pivovar
Dustin M. Knight
Rosalynd D. Upton
David Yun
Cooley LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004

*/s/ Christine D. Haynes*
Christine D. Haynes (#4697)
haynes@rlf.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BECKMAN COULTER, INC.,

          Plaintiff,

      v.

CYTEK BIOSCIENCES, INC.

          Defendant.

)
)
)
)
)
)
)
)
)
)
)

C.A. No. 24-0945-CFC

## D. DEL. L.R. 7.1.1 CERTIFICATION

The undersigned hereby certifies, pursuant to District of Delaware Local Rule 7.1.1, that counsel for Plaintiff and Defendant met and conferred on the foregoing motion. Defendant opposes the relief sought in the motion.

OF COUNSEL:

Omar A. Khan
Jeffrey A. Dennhardt
Laura Macro
Lauren Matlock-Colangelo
Jennifer L. Graber
Maggie Sawin
Kelly A. Todd
WILMER CUTLER PICKERING
HALE and DORR LLP
7 World Trade Center
250 Greenwich Street

*/s/ Frederick L. Cottrell III*
Frederick L. Cottrell III (#2555)
Kelly E. Farnan (#4395)
Christine D. Haynes (#4697)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
farnan@rlf.com
haynes@rlf.com

New York, NY 10007  *Attorneys for Plaintiff*
(212) 230-8800

Akkad Y. Moussa
WILMER CUTLER PICKERING
HALE and DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

Dated:  June 26, 2026

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| BECKMAN COULTER, INC., | |
| Plaintiff, | |
| v. | C.A. No. 24-0945-CFC |
| CYTEK BIOSCIENCES, INC., | |
| Defendant. | |

**[PROPOSED] ORDER GRANTING PLAINTIFF BECKMAN COULTER'S MOTION *IN LIMINE* NO. 1 TO PRECLUDE EVIDENCE, TESTIMONY, OR ARGUMENT REGARDING UNASSERTED PATENTS AND PATENT APPLICATIONS IN SUPPORT OF CYTEK'S NON-INFRINGEMENT, INVALIDITY, OR DAMAGES ARGUMENTS**

Plaintiff Beckman Coulter, Inc. ("Beckman") having filed a Motion to Exclude evidence, testimony, or argument regarding unasserted patents and patent applications in support of Cytek's non-infringement, invalidity or damages arguments, and the Court having considered the Motion and the accompanying briefs; now, therefore,

IT IS HEREBY ORDERED that Defendant and its witnesses and attorneys may not opine or present at trial any evidence or argument regarding unasserted patents and patent applications.

SO ORDERED this ___ day of _____, 2026.

_____
Hon. Colm F. Connolly
Chief, United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BECKMAN COULTER, INC., | |
| Plaintiff, | |
| v. | C.A. No. 24-0945-CFC  |
| CYTEK BIOSCIENCES, INC., | |
| Defendant. | |

**DECLARATION OF LAUREN MATLOCK-COLANGELO IN SUPPORT OF**
**PLAINTIFF BECKMAN COULTER, INC.'S MOTIONS *IN LIMINE***

I, Lauren Matlock-Colangelo, declare as follows:

1. I am licensed to practice law in the State of New York and have been admitted to this Court *pro hac vice* by Order dated September 3, 2024. D.I. 8 (so ordered).

2. I am an attorney with the law firm of Wilmer Cutler Pickering Hale and Dorr LLP, located at 7 World Trade Center, 250 Greenwich Street, New York, New York 10007, and counsel for Plaintiff Beckman Coulter, Inc. ("Beckman Coulter").

3. I have personal knowledge of the facts set forth herein and with the proceedings in this case, and if called to testify, I would competently testify thereto.

4. I submit this Declaration in support of the following motions by Beckman Coulter:

   a. Motion i*n Limine* To Preclude Evidence, Testimony, or Argument Regarding Unasserted Patents and Patent Applications in Support of Cytek's Non-Infringement, Invalidity, or Damages Arguments

   b. Motion *in Limine* to Preclude Evidence, Testimony, or Argument Regarding Non-Party Danaher Corporation, Speculation Regarding Danaher's Purported Mental State to Argue Non-Infringement, and Danaher's Non-Comparable Valuation of Cytek to Suppress Damages; and

c. Motion *in Limine* To Preclude Evidence, Testimony, or Argument that the Timing of This Lawsuit Evidences Non-Infringement or Impacts Damages.

5. A true and correct copy of excerpts from Defendant Cytek Biosciences, Inc.'s Tenth Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories, dated December 12, 2025, are attached hereto as **Exhibit 1**.

6. A true and correct copy of excerpts from the deposition transcript of Wenbin Jiang, dated November 26, 2025, are attached hereto as **Exhibit 2**.

7. A true and correct copy of excerpts from the Rebuttal Expert Report of John L. Hansen, dated January 20, 2026, are attached hereto as **Exhibit 3**.

8. A true and correct copy of excerpts from the Rebuttal Expert Report of Fedor Ilkov, dated January 20, 2026, are attached hereto as **Exhibit 4**.

9. A true and correct copy of excerpts from the Rebuttal Expert Report of James Leary, dated January 20, 2026, are attached hereto as **Exhibit 5**.

10. A true and correct copy of Danaher's webpage *Our Businesses* from https://www.danaher.com/our-businesses, is attached hereto as **Exhibit 6**.

11. A true and correct copy of excerpts from the Opening Expert Report of Bernhard Weigl, dated December 19, 2025, are attached hereto as **Exhibit 7**.

12. I declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and

further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 26th day of June, 2026.

/s/ Lauren E. Matlock-Colangelo

Lauren E. Matlock-Colangelo

**CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2026, true and correct copies of the foregoing

document were served upon the following counsel of record in the manner indicated:

**BY E-MAIL**

Karen Jacobs
Jeremy A. Tigan
Cameron P. Clark
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P. O. Box 1347
Wilmington, DE  19801

**BY EMAIL**

Reuben H. Chen
Cooley LLP
3175 Hanover Street
Palo Alto, CA 94304

Elizabeth M. Flanagan
Cooley LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402

Adam Pivovar
Dustin M. Knight
Rosalynd D. Upton
David Yun
Cooley LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004

*/s/ Christine D. Haynes*
Christine D. Haynes (#4697)
haynes@rlf.com

# EXHIBIT 1

████████████████████████████████████████

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BECKMAN COULTER, INC., | C.A. No. 24cv00945-CFC-EGT |
| Plaintiff, | **DEMAND FOR JURY TRIAL** |
| v. | |
| CYTEK BIOSCIENCES, INC., | |
| Defendant. | |

### DEFENDANT CYTEK BIOSCIENCES, INC.'S TENTH SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (NOS. 1- 15)

Pursuant to Federal Rules of Civil Procedure 26 and 33 and the Local Rules of the United States District Court for the District of Delaware, Defendant Cytek Biosciences, Inc. ("Cytek" or "Defendant") hereby supplements and/or amends its objections and responses to Interrogatories in the First Set of Interrogatories to Defendant Cytek Biosciences, Inc. (Nos. 1-15) served by Plaintiff Beckman Coulter, Inc. ("BC" or "Plaintiff").

### GENERAL OBJECTIONS

Cytek hereby incorporates its General Objections contained in its Responses and Objections to Plaintiff's First Set of Interrogatories (Nos. 1 – 15), dated December 16, 2024.

### SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

Without waiving or limiting in any manner any of the foregoing General Objections, but rather incorporating them into each of the following responses to the extent applicable, Cytek hereby supplements its responses to Interrogatory Nos. 1-15 as follows:

**INTERROGATORY NO. 1:**

Identify and describe in detail the facts and circumstances relating to information used to identify the Cytek Products and any component thereof. This includes but is not limited to

1

objections.

Cytek incorporates by reference its response and first supplemental response to Interrogatory No. 7 dated May 9, 2025.

Investigation and discovery are ongoing in this case. The objections and responses are based upon information currently available to Cytek and are made without prejudice to Cytek's right to use or rely on subsequently discovered information. Cytek specifically reserves the right to supplement, amend, modify, and/or correct its response in view of further progress of fact and expert discovery, and in light of any supplement by Plaintiff of its interrogatory responses.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11 (10/22/2025):**

Cytek hereby incorporates by reference its original response and first supplemental response, including its prior specific objections.

After issuance of the '412 patent, Cytek gave a management presentation in January 2018 to Danaher Corporation (Beckman Coulter's parent company) and Beckman Coulter providing them with extensive details about Cytek, its Aurora and Athena products, its intellectual property portfolio, and its sales projections and go-to-market strategy for its products. *See* CYTEK_0000893376-CYTEK0000893431. In the slide deck shared with Danaher and Beckman Coulter, Cytek identified multiple patents and patent applications that disclosed technical details as to the design, structure, and operation of its products, including the accused Aurora product(s):



(CYTEK_0000893405.) The slide deck specifically ██████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████ that Beckman Coulter now cites in

its infringement contentions as purported evidence of infringement.

Beckman Coulter and Danaher responded to Cytek's management, not by alleging

infringement, but instead offering to acquire Cytek. On February 14, 2018, Danaher sent an

indication of interest ("IOI") letter to Dr. Wenbin Jiang, Chief Executive Officer at Cytek, seeking

to purchase Cytek because Danaher believed that Cytek's "innovative cellular analysis platforms,

Aurora and Athena, with their broad range of spectra and resulting multiplexing capability

provide strong customer value." CYTEK_0000882748. Danaher indicated that a "transaction with

Cytek is compelling and will complement our business and enhance the value proposition we offer

to our customers" and ████████████████████████████████. *Id*. The proposal had "the

support of our senior management, but is subject to our completion of customary due diligence"

which Danaher claimed it would be able to "move quickly" on based on its ability to "leverage our own team's familiarity with the relevant technology." CYTEK_0000882749. Despite its awareness of Cytek's technology and products, at no time did Danaher or Beckman Coulter indicate concerns that Aurora infringed any claim in any Asserted Patent or Related Patent and/or Application.

Years passed without Danaher or Beckman Coulter notifying Cytek of potential infringement, even after the '582 patent issued. Instead, Danaher revisited acquisition discussions with Cytek prior to Cytek's IPO, when Kevin Chance, Vice President and Group Executive at Danaher Life Sciences (which includes Beckman Coulter), reached out to Dr. Jiang on September 14, 2020 to set up a call to discuss the Aurora product and Cytek. CYTEK_0000948858. Mr. Chance and Dr. Jiang conducted a video call on September 16, 2020. CYTEK_0000948859-CYTEK_0000948860. Mr. Chance never indicated concerns that Aurora infringed any claim in any Asserted Patent or Related Patent and/or Application on or after the call.

Mr. Chance again reached out to Dr. Jiang on May 11, 2021 to "touch base" and Dr. Jiang and Mr. Chance had a call regarding Cytek and Aurora on May 18, 2021. CYTEK_0000948856-CYTEK_0000948858. Again, Mr. Chance never indicated concerns that Aurora infringed any claim in any Asserted Patent or Related Patent and/or Application on or after the call.

Cytek subsequently gave a management presentation to Danaher and Beckman Coulter again on May 26, 2021 that included the following individuals on the call:

- Kevin Chance, Vice President & Group Executive, Danaher Life Sciences

- Greg Milosevich, President, Beckman Coulter Life Sciences

- Mario Koksch, Vice President & General Manager, Beckman Coulter Life Sciences/ Flow Cytometry

- Sidharth Kapileshwar, Vice President Strategy & Innovation, Beckman Coulter Life Sciences

████████████

- Anne Murphy, Chief IP Counsel, Beckman Coulter Life Sciences

- Laura Pajak, Director Flow Cytometry, Beckman Coulter Life Sciences

- Daniel Nothelfer, Vice President Business Development, Danaher Life Sciences

- Chris Korves, Vice President Corporate Development, Danaher

- Michael Mergler, Director Corporate Development, Danaher

CYTEK_0000882746. Danaher "debriefed internally and confirmed their interest in Cytek" after the call. CYTEK_0000949411. Michael Mergler from Danaher followed up after the call with several follow-up questions for Cytek that he passed through Cytek's banker, Vitalli Trotsko from PSC. CYTEK_0000949411-CYTEK_0000949413. But Danaher and Beckman Coulter never alleged infringement of its then-issued '412 and '582 patents in connection with the 2021 acquisition discussions, consistent with Dr. Jiang's August 2020 conclusion that the '412 and '582 patents did not (and could not) cover Cytek's flow cytometer products at the time. Indeed, it was not until June 14, 2024 did Cytek first learn of Beckman Coulter's infringement allegations as to a limited number of claims with respect to the '443 and '582 patents when Beckman Coulter's counsel served a letter on Cytek. CYTEK_0000909015. Cytek analyzed the infringement allegations in the letter and determined that there was no infringement by Cytek and that the then-asserted claims of the '443 and '582 patents were (and are) invalid. Cytek promptly sent a letter to Beckman Coulter prior to the lawsuit indicating its position with respect to non-infringement and invalidity on the '443 and '582 patent claims.

Cytek first learned of Beckman Coulter's infringement allegations as to a single claim in the '107 patent when Beckman Coulter amended its complaint and added these patents to the case.

Cytek learned of Beckman Coulter's infringement allegations generally on February 14, 2025, when Beckman Coulter served its Initial Infringement Contentions in this litigation.

Dated: December 12, 2025

Respectfully submitted,

COOLEY LLP

Adam Pivovar
Dustin M. Knight
Rosalynd D. Upton
David Yun
COOLEY LLP
1299 Pennsylvania Avenue NW,
Suite 700
Washington, DC 20004
(202) 842-7800
apivovar@cooley.com
dknight@cooley.com
rupton@cooley.com
dyun@cooley.com

By: */s/ Elizabeth M. Flanagan*
Karen Jacobs (#2881)
Jeremy A. Tigan (#5239)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
kjacobs@morrisnichols.com
jtigan@morrisnichols.com
cclark@morrisnichols.com

Elizabeth M. Flanagan (#5891)
COOLEY LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402
bflanagan@Cooley.com

Reuben Chen
HanByul Chang
Juan Pablo Gonzalez
COOLEY LLP
3175 Hanover Street
Pal Alto, CA 94304
(650) 843-5000
rchen@cooley.com
HanByul.chang@cooley.com
jgonzalez@cooley.com

Attorneys for Defendant
**CYTEK BIOSCIENCES, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing

**DEFENDANT CYTEK BIOSCIENCES, INC.'S TENTH SUPPLEMENTAL RESPONSES**

**AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (NOS. 1-**

**15)** was served to be served on the following persons by email on December 12, 2025:

Omar A. Khan
Jeffrey Dennhardt
Lauren E. Matlock-Colangelo
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
omar.khan@wilmerhale.com
Jeffrey.Dennhardt@wilmerhale.com
Lauren.Matlock-Colangelo@wilmerhale.com

Asher S. McGuffin
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
Asher.McGuffin@wilmerhale.com

Frederick L. Cottrell III (#2555)
Kelly E. Farnan (#4395)
Christine D. Haynes (#4697)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
farnan@rlf.com
haynes@rlf.com

*Attorneys for Plaintiff Beckman Coulter, Inc.*

*/s/ Elizabeth M. Flanagan*
Elizabeth M. Flanagan

# EXHIBIT 2



## Planet Depos®
*We Make It Happen®*



# Transcript of Wenbin Jiang, Ph.D., Corporate Designee & Individually

**Date:** November 26, 2025
**Case:** Beckman Coulter, Inc. -v- Cytek Biosciences

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BECKMAN COULTER, INC.,      )
                            )
        Plaintiff,          )
                            )
    VS.                     )   NO. 24-CV-00945
                            )
CYTEK BIOSCIENCES, INC.,    )
                            )
        Defendant.          )
_____)


-- H I G H L Y   C O N F I D E N T I A L --

OUTSIDE ATTORNEYS' EYES ONLY

IN-PERSON VIDEOTAPED DEPOSITION OF

CYTEK BIOSCIENCES, INC.,

By and through its Designated Representative,

WENBIN JIANG, PH.D.,

and in his Individual Capacity

WEDNESDAY, NOVEMBER 26, 2025

STENOGRAPHIC REPORTER:  CHRISTA YAN, CSR NO. 14316, RPR
                        _____

---

PERSONAL APPEARANCES:

FOR PLAINTIFF:
    WILMERHALE LLP
    BY:  JEFFREY DENNHARDT, ATTORNEY-AT-LAW
    250 Greenwich Street
    New York, New York 10007
    jeffrey.dennhardt@wilmerhale.com

FOR DEFENDANT:
    COOLEY LLP
    BY:  REUBEN CHEN, ATTORNEY-AT-LAW
         HANBYUL CHANG, ATTORNEY-AT-LAW
    3175 Hanover Street
    Palo Alto, California 94304
    rchen@cooley.com


ALSO PRESENT PERSONALLY:
TOMAS REYES, The Videographer


ALSO PRESENT REMOTELY:
KELLY TODD, WilmerHale
MAGGIE SAWIN, WilmerHale


--oOo--

---

INDEX OF EXAMINATIONS

                                    PAGE
BY MR. DENNHARDT                    9
BY MR. CHEN                         358
BY MR. DENNHARDT                    372




                   --oOo--




Witness's Changes or Corrections    380
Reporter's Certificate              381




                   --oOo--

---

E X H I B I T S

| EXHIBIT | MARKED FOR IDENTIFICATION | PAGE |
|---|---|---|
| Exhibit 1 | Wenbin Jiang LinkedIn Profile | 14 |
| Exhibit 2 | US Patent 7,280,204 October 9, 2007 | 55 |
| Exhibit 3 | CYTEK_0000976929 Cytek Launches DxP Athena System | 82 |
| Exhibit 4 | CYTEK_0000893707 Message from Ming Yan, sent June 17, 2018 | 85 |
| Exhibit 5 | CYTEK_0000975537 DxP Athena Flow Cytometer Analysis | 91 |
| Exhibit 6 | CYTEK_0000584758 Message from Dave Kennedy, January 18, 2023 | 100 |
| Exhibit 7 | CYTEK_0000967248 Objective/ Product Positioning | 102 |
| Exhibit 8 | CYTEK_0000894551 Message from Ming Yan, February 15, 2016 | 118 |
| Exhibit 9 | CYTEK_0000987089 Outline, Technology Introduction | 122 |
| Exhibit 10 | CYTEK_0000970732 Products and Services Overview | 142 |

185

THE WITNESS: Non-collimated and reimage on every other detector --

THE STENOGRAPHIC REPORTER: You said the image every other detector?

THE WITNESS: Reimage on every other detector.

MR. DENNHARDT: Reimage, r-e image.

THE WITNESS: Reimage, yeah.

And this one require collimated beam across, so obviously, we are very different. The scope is different. The implementation is different. And so we feel there's no need. It's so obvious. At that time, we didn't really go to consult with our legal counsel. Just too different.

BY MR. DENNHARDT:

Q When you say it's so obvious, are you referring to it's so obvious that, in your view, the Aurora doesn't infringe or are you referring to obviousness as it relates to invalidity?

**A No, not infringing. That term, yeah.**

Q I understand.

**A We didn't study really in detail. Nonvalidity require we really consult with the attorneys and, right, we basically look at the infringement mostly.**

Q So the first time you considered whether the Aurora product infringed Beckman Coulter's patents was after the Aurora product was launched, right?

187

THE STENOGRAPHIC REPORTER: I'm sorry, I didn't understand that. Earlier mentioned what?

THE WITNESS:

BY MR. DENNHARDT:

MR. CHEN: Objection; outside the scope.

THE WITNESS:

BY MR. DENNHARDT:

Q How did you determine which patents to analyze?



186

188

And so... that was the whole reason why. Right. And frankly speaking, and if you look at our -- that's also a reason why we have our own IP as well. **And when we look at those IP, and in fact, Cytek, the design really is following our own IP. And, you know, our IP, our patent has been issued by the U.S. Patent Office, over Yong Chen's patent. That's another reason --**

THE STENOGRAPHIC REPORTER: I'm sorry, over what?

THE WITNESS: **Over Yong Chen's patent. This one, '412, right.**

**And the U.S. Patent Office feels, we don't infringe. And there's a substantial difference of Cytek's IP from those early patents. Yeah.**

BY MR. DENNHARDT:

Q **So you believe that the U.S. Patent Office performed an infringement analysis of whether --**

**A I don't think --**

Q Let me finish my question.

**You believe that the U.S. Patent Office performed an infringement analysis of whether Cytek's products infringed Dr. Chen's patents?**

**A I'm not sure how U.S. patent reviews their process. I'm not an expert on that aspect. We cited Yong Chen's patents during our patent applications.**

Q You cited it because it was closely related

209

A  I think there are many other subjects involved. And earlier I mention the whole architecture. I already earlier, I mentioned with regarding to the detector capturing the light, right. In this particular design in Yong Chen's patent, and every detector signal, corresponding to the one particular dyes information. That's what's capturing. And it's -- it captures a discrete wavelength, right, and whole block.

In fact, our whole optical block captured the continuum and sequentially continuing the whole spectrum from the -- all the dyes. It's a spectral profile, that's what we are capturing. And in this Yong Chen's patent, each dye correspond, each detector, the signal, correspond to the light information fluorescence intensity of one particular dye. So there are many other things showing we don't actually infringe on this patent.

Q  Anything else? I just want to make sure I have a complete understanding.

A  I think you're asking me to go through every count... subject, with regard to any infringement. I have to rely on legal counsel and experts to go through those claims. Right.

Q  You're not a lawyer, right?

A  I'm not a lawyer. Exactly. That's why I'm saying is, I can't state everything complete. Right. I

210

have to rely on experts to help and do that.

Q  You don't have any legal training, correct?

A  No, I don't.

Q  You haven't reviewed the claims of the '443 or the '107, right?

A  No.

Q  You haven't reviewed the Court's claim construction in this case, right?

A  No.

Q  You haven't reviewed any of the prior art Cytek is asserting in this case, right?

A  No.

Q  You haven't reviewed Cytek's noninfringement contentions in this case, right?

A  Put it this way --

THE STENOGRAPHIC REPORTER: I didn't hear that. Repeat that.

THE WITNESS: Put it this way, it's so clear Cytek does not infringe on Yong Chen's patents because first is, right, Yong Chen's patents is about conventional flow cytometer, and Cytek is about flow spectral. Those are two very different concepts in terms of earlier explaining the whole architecture, whole data analysis algorithms. And U.S. Patent Office has already reviewed, and our patents, and over Yong Chen's patent and issued

211

Cytek's patents. And our practice, our implementation is actually based on our own patents, architecture so clear we don't infringe.

And in fact, even Beckman admit that, right. 2018, Beckman actually sent us a letter of intent with the intention to acquire Cytek. And in that letter, it clearly states Cytek has an innovative technology, because that time, we already have Yong Chen's patent over there. And nowhere in that letter of intent Beckman indicated Cytek infringed on Beckman's patent and Beckman in that letter of intent and give us valuation of ███ ███████  Right.

And a few years later, two years later, Beckman approached me again -- that's around 2020 -- and indicated the intention to acquire Cytek. That's also the time when Beckman's second patent was issued. During that conversation. And nowhere Beckman actually indicated we infringed on Yong Chen's patents.

And even just, I think, a few weeks or a few months before the allegation, I had a dinner with Greg Milosevich, and again during that dinner meeting, and he indicated Beckman's intention of acquiring Cytek. That was 2024. Right. And there was no indication about Cytek's infringing on Yong Chen's patents.

So clearly it was all those circumstances, right.

212

Plus all those what we have shown clearly, and those collimated beam and all of those other facts I have stated. Nowhere Cytek is infringing on Cytek -- in Yong Chen's patents. And otherwise, Beckman would have told us during all those engagement throughout the process, over six years. Right? And from 2018 through 2024, 6 years.

Nowhere Beckman has ever mentioned about Cytek infringing on any of Yong Chen's patents. Right. So... it's clear, Cytek does not infringe any of those patents.

BY MR. DENNHARDT:

Q  Sir, the question was: Have you reviewed Cytek's noninfringement contentions in this case, yes or no?

A  I have not really reviewed what our legal counsel has submitted. Of course, I'm not an expert. But on the other hand, I'm just talking about all the circumstances here. And it's not possible, in good faith, to claim our products are infringing on Beckman's patents, especially when Beckman already declared Cytek has an innovative technology on their letter to Cytek.

Q  Well, that's for the jury to decide, right?

A  Yeah.

Q  So no, you haven't reviewed Cytek's infringement contentions in this case, right, sir?

A  No, I haven't.

Q  You haven't reviewed Cytek's invalidity

257

the document.

THE WITNESS: Again, it's just to caution our investors. And there's a potential out there. And... it's not necessary. And we do but just want to be cautious here.

BY MR. DENNHARDT:



Q Beckman Coulter has a larger intellectual property portfolio than Cytek, right?

MR. CHEN: Objection; calls for speculation.

THE WITNESS: Beckman could have -- do have lots of patents, but we don't know with regarding to this particular space, this particular technology whether Beckman Coulter has or not. Frankly speaking, it's for the legal counsel to make the determination. What we have practiced is what we call the full spectral profiling and technology, and we practice our products actually and our technology based on our own IP, our own patents.

And in fact, patent office issued our patents over Yong Chen's patents, and therefore, we feel we do

258

have the freedom to operate. And I don't know if Beckman has any full spectral profiling based technology or patents out there and -- which we infringe. We don't think so. And based on all the information engagement, we have had since 2018, and clearly -- and in the best-faith basis, I don't think Beckman has any IPs.

Thinking about starting from 2018, the first engagement with the letter of intent to acquire Cytek, thereafter 2020 and '21 continued the engagement and to express interest. And thereafter, 2024, all the meeting I had with Greg Milosevich over dinner. Nowhere in the -- in the -- indicated by Beckman that Cytek infringed on Yong Chen's patents or Beckman's patents.

Beckman has had all those opportunities to indicate so over the period. We launched our product in 2017. Right? And Beckman didn't do anything until late 2024. And then come to actually associate with Beckman, launching their own product, spectral then come to accuse Cytek of infringement. You could have done so many years before then, right?

And Beckman didn't do that.

BY MR. DENNHARDT:

Q Is that it?

A Yes.

Q Move to strike as nonresponsive.

259

MR. CHEN: Disagree.

BY MR. DENNHARDT:

Q Beckman Coulter has a larger patent portfolio than Cytek, right?

MR. CHEN: Same objection.

THE WITNESS: Beckman clearly has a larger patent portfolio but doesn't mean Beckman has the patent portfolio on the technology we are practicing.

BY MR. DENNHARDT:

Q All right.

MR. CHEN: Before you go to another exhibit, we've actually been going for a while here.

MR. DENNHARDT: Happy to take a break.

MR. CHEN: Yeah, let's take a break.

MR. DENNHARDT: Yeah.

THE VIDEOGRAPHER: Okay, we're going off the record. Time, 3:35 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record. Time, 3:54 p.m.

(Whereupon Deposition Exhibit 26 was marked for identification.)

BY MR. DENNHARDT:

Q All right. Sir, you've just been handed Exhibit 26, which is a document bearing Bates Number

260

CYTEK 20892.

MR. CHEN: Objection; foundation.

THE WITNESS:

BY MR. DENNHARDT:

Q

MR. CHEN: Objection; lacks foundation, calls for a legal conclusion.

THE WITNESS:

BY MR. DENNHARDT:

Q

# EXHIBIT 3

**Beckman Coulter, Inc.**

**v.**

**Cytek Biosciences, Inc.**

**Civil Action No. 1:24-cv-00945-CFC**


**Expert Rebuttal Report of John L. Hansen**


**HKA Global, LLC**


**January 20, 2026**

_____

John L. Hansen

**Table 3: Ms. Riley's Claimed Total Damages by U.S. Only or Worldwide[7]**

| | | U.S. Only | Worldwide |
|---|---|---|---|
| *A* | Claimed Cell Lost Profits | ███████ | ███████ |
| *B* | Claimed Reasonable Royalties | ███████ | ███████ |
| *C=A+B* | **Ms. Riley's Claimed "Total Damages"** | ███████ | ███████ |

14. In an alternative scenario in Exhibit 1A, Ms. Riley presents claimed damages ranging from ███████████████████████████ when including the BD FACSARIA III in the alternative market share scenario for cell sorters.[8]

15. Ms. Riley also set forth an alternative reasonable royalty only damages scenario assuming "the Court determines that Defendant is not liable for lost profit damages" totaling ███████████████████████████████████████ ███████.[9]

16. I address flaws in Ms. Riley's lost profits and reasonable royalty analyses and opinions, as well as present adjusted damages figures (as summarized in **Section VI** below), in this Rebuttal Report.

## III.  BACKGROUND

### A. Beckman Coulter, Inc.

17. BEC is a Delaware corporation headquartered in Brea, California.[10] In 2011, BEC was acquired by Danaher Corporation ("Danaher") and today operates as a subsidiary of Danaher.[11] Beckman Coulter Life Sciences and Beckman Coulter Diagnostics are the two operating companies for Beckman Coulter, Incorporated, which is fully-owned by Danaher.[12] The two operating companies exist as one legal entity, however, they each have their own president and CFO.[13] Beckman Coulter-branded products are sold under

---

[7] Riley Report: Exhibit 1

[8] Riley Exhibits 1A, 3.1, 3.2.

[9] Riley Report: ¶693 and Exhibit 1.1.

[10] Complaint, August 14, 2024, p. 1.

[11] Danaher Corporation, SEC Form 10-K for the Fiscal Year ended December 31, 2024, p. 5, Exhibit 21.1.

[12] Deposition of Patricia Del Castillo (Director of Finance at Beckman), October 24, 2025: pp. 7, 39-40; Deposition of Pietro Lopriore (SVP of Global Commercial Operations at Beckman), October 29, 2025: pp. 12-13.

[13] Deposition of Patricia Del Castillo (Director of Finance at Beckman), October 24, 2025: pp. 40-41.

██████████████████  ▮

both Danaher's Life Sciences and Diagnostics business segments.[14] Beckman Coulter's life sciences offerings include centrifuges, air and liquid particle counters, genomic instruments, microbioreactors, and flow cytometers.[15] Beckman Coulter's Life Sciences division contains two further portfolio groups: Biotech and Flow Cytometry.[16] The Flow Cytometry division is further divided into Clinical and RUO (Research Use Only) subdivisions.[17] Previously, the CHC (Cell Health and Centrifuge) and BWS (Biotech Workflow Solutions) stood alongside the Flow Cytometry division, but the two groups have since been collapsed into the single Biotech group, which now exists alongside the continued Flow Cytometry division.[18]

### B. Danaher Corporation

18. Danaher is the Parent Company of Beckman Coulter.[19] Danaher is a Delaware corporation headquartered in Washington, D.C.[20] Danaher describes itself as comprising 15 operating companies within the biotechnology, life sciences, and diagnostics industries.[21] In 2024, Danaher's Diagnostics business segment was the largest revenue-generating division with nearly $9.8 billion in revenue followed by Life Sciences ($7.3 billion) and Biotechnology ($6.8 billion).[22]

### C. Cytek Biosciences, Inc.

19. Cytek was founded in 2014 as is headquartered in Fremont, California.[23] Cytek is a cell analysis solutions company offering a number of flow cytometers including its Northern Lights, Aurora, Guava, and Amnis product lines.[24] The company offers additional

---

[14] Danaher Corporation, SEC Form 10-K for the Fiscal Year ended December 31, 2024, pp. 5-7.
[15] https://www.beckman.com/shop.
[16] Deposition of Patricia Del Castillo (Director of Finance at Beckman), October 24, 2025: p. 9.
[17] Deposition of Patricia Del Castillo (Director of Finance at Beckman), October 24, 2025: p. 9.
[18] Deposition of Patricia Del Castillo (Director of Finance at Beckman), October 24, 2025: pp. 18-20.
[19] Danaher Corporation, SEC Form 10-K for the Fiscal Year ended December 31, 2024, p. 5, Exhibit 21.1.
[20] Danaher Corporation, SEC Form 10-K for the Fiscal Year ended December 31, 2024: p. 1.
[21] Danaher Corporation, SEC Form 10-K for the Fiscal Year ended December 31, 2024, p. 3.
[22] Danaher Corporation, SEC Form 10-K for the Fiscal Year ended December 31, 2024, p. 38.
[23] Cytek Biosciences, Inc., SEC Form 10-K for the Fiscal Year ended December 31, 2024, p. 20.
[24] Cytek Biosciences, Inc., SEC Form 10-K for the Fiscal Year ended December 31, 2024, pp. 4-5. https://cytekbio.com/pages/aurora; https://cytekbio.com/pages/northern-lights; https://cytekbio.com/pages/imagestream; https://cytekbio.com/pages/guava. See also, https://cytekbio.com/pages/muse-micro; https://cytekbio.com/pages/orion.

products including micro cell analyzers and reagent cocktail preparation systems.[25] Cytek's customers include pharmaceutical and biopharma companies, academic institutions, and clinical research organizations.[26] In the U.S., Cytek products are available for research use only.[27] Cytek's sales in the United States are primarily direct, meaning that Cytek's sales representatives will sell direct to a customer.[28] In a very small percentage of situations, Cytek will go through a partner, such as GSS, when selling to the government.[29] Outside of the United States, sales in Europe, Canada, Australia and China are mostly direct, however other regions such as Africa, South America and Taiwan are through distributors.[30]

20. Cytek touts its patented Full Spectrum Profiling ("FSP") technology as optimizing sensitivity and accuracy through a unique optical and electronic design.[31] According to Cytek, this patented optics design enables researchers to effectively collect the full range of light emissions in an extremely compact space, resulting in higher resolution and enabling the development of highly complex assays with numerous colors and biomarkers.[32]

21. In addition to its patented technology, Cytek's SEC filings lists several competitive strengths including a complete offering across price points, service of customers' unmet needs, diversified customer base and breadth of relationships, and global scale and reach.[33] ██████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████[34]

---

[25] https://cytekbio.com/pages/muse-micro; https://cytekbio.com/pages/orion.

[26] Cytek Biosciences, Inc., SEC Form 10-K for the Fiscal Year ended December 31, 2024, p. 4.

[27] https://investors.cytekbio.com/.

[28] Deposition of David Kennedy (VP of Global Sales at Cytek), October 2, 2025: pp. 222-223.

[29] Deposition of David Kennedy (VP of Global Sales at Cytek), October 2, 2025: p. 223.

[30] Deposition of David Kennedy (VP of Global Sales at Cytek), October 2, 2025: pp. 224-225.

[31] Cytek Biosciences, Inc., SEC Form 10-K for the Fiscal Year ended December 31, 2024, p. 4.

[32] Cytek Biosciences, Inc., SEC Form 10-K for the Fiscal Year ended December 31, 2024, p. 4.

[33] Cytek Biosciences, Inc., SEC Form 10-K for the Fiscal Year ended December 31, 2024, p. 5.

[34] CYTEK_0000124118-146 (at 120).

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BECKMAN COULTER, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CYTEK BIOSCIENCES, INC.,<br><br>Defendant. | C.A. No. 22-945-CFC-EGT |

## REBUTTAL EXPERT REPORT OF FEDOR A. ILKOV, PH.D. REGARDING NON-INFRINGEMENT OF U.S. PATENT NOS. 10,330,582; 11,703,443; and 12,174,107

Dated:     January 20, 2026

Respectfully submitted,

_____
Fedor A. Ilkov, Ph.D.

collecting light by wavelength.

**B.     The Asserted Patents Only Describe the Use of an Effectively Collimated Beam, Not Any Type of "Light"**

50.     Second, as explained in my Opening Report, in my opinion no written description support exists for the "light" recited in the Asserted Claims of the '107 and '443 patents to be any light other than an "effectively collimated" beam.  (Ilkov Op. Rep., Section XV.H.)

**C.     The Asserted Patents Only Describe the Use of Bandpass Filters**

51.     Third, as explained in my Opening Report, in my opinion no written description support exists for the "filters" recited in the Asserted Claims of the '107 and '443 patents to be any type of filter besides a dichroic filter.  (Ilkov Op. Rep., Section XV.H; *id.* at ¶¶1034-1036.)

**VIII.   OVERVIEW OF THE DISCLOSURES IN THE ASSERTED PATENTS AND THE MATERIAL DIFFERENCES IN CYTEK'S ACCUSED PRODUCTS**

**A.     Cytek's Full-Spectral Aurora & Northern Lights Flow Cytometers are Innovative**

**1.     Cytek launched its innovative full spectral Aurora with 20+ color capability and unmixing algorithms in June 2017**

52.     On June 7, 2017, Cytek announced the launch of its advanced full-spectral Aurora flow cytometer, noting its unique combination of patent pending and innovative technologies:

Fedor A. Ilkov, Ph.D. Rebuttal Report Regarding Non-Infringement



(*See* https://cytekbio.com/pages/cytek-biosciences-debuts-new-advanced-flow-cytometry-system.)

53. Cytek's innovative Aurora full spectral flow cytometer was developed based on Cytek having been on "the frontlines of the industry for decades to address the unmet need for "a user-friendly and truly affordable hyper-parametric flow cytometer" that would permit more labs to "have the ability to obtain deeper biological insights from a single sample," and noting that "[t]his will have a significant impact on research and clinical application files such as immunology, oncology, and systems biology":





Cytek has been on the frontlines of the industry for decades, providing services and customization to keep cytometry systems tuned and running at high performance levels. The introduction of Aurora combines the company's vast pool of technical expertise with its profound market understanding to mark its full circle evolution from a service provider to a solution provider. "Cytek has evolved to address an unmet need," noted Dr. Wenbin Jiang, CEO of Cytek Biosciences. "Years of experience have revealed to us that the cytometry community has lacked a user-friendly and truly affordable hyper-parametric flow cytometer. Our technology allows us to provide an instrument that offers outstanding performance and unparalleled reagent flexibility when it comes to dye selection and multicolor panel design. With Aurora, more labs will have the ability to obtain deeper biological insights from a single sample. This will have a significant impact on research and clinical application fields such as immunology, oncology and systems biology."

(*See* https://cytekbio.com/pages/cytek-biosciences-debuts-new-advanced-flow-cytometry-system.)



## Introduction

When working with conventional flow cytometers, researchers are often limited by the number of reagents they can combine into a single tube. To gather the desired amount of information from each sample, they need multiple tubes, often with some redundant markers across them, to fully characterize cells of interest. With Cytek's full spectrum cytometers, researchers can consolidate a larger number of parameters into a single tube assay. With more reagents combined per tube, less sample is needed, and the need for redundant markers is eliminated.

To demonstrate these sample-to-answer workflow efficiencies, Cytek's scientists designed and optimized a 1-tube acute myeloid leukemia (AML) minimum residual disease (MRD) detection assay based on a published 3-tube assay[1]. Data from the original 3-tube assay and the consolidated 1 tube assay were generated using a Cytek 3-laser full spectrum cytometer and compared.



55. In my opinion, Cytek's launch of the Aurora spectral flow cytometer was a critical and fundamental advancement in flow cytometry that went well above-and-beyond the capabilities of conventional flow cytometers like BEC's CytoFLEX. In my opening report on invalidity, I have already explained the fundamental differences between spectral flow cytometry and conventional flow cytometry, which I incorporate by reference herein. Additionally, however, Cytek's Aurora also provided capabilities and functionality within a less-complex, less-expensive, and more user-friendly system than the Sony spectral flow cytometer that had already been on the market for a few years as of 2017 but had not gained substantial traction within the flow cytometry community.

### 2. Danaher (BEC's corporate parent) recognized Cytek's innovative Aurora spectral flow cytometers just months after launch

56. I understand that on February 14, 2018 BEC's corporate parent, Danaher, sent a letter of intent to Cytek, noting Danaher's and "Beckman Coulter Life Sciences" recognition that Cytek's Aurora spectral flow cytometer was one of Cytek's "*innovative* cellular analysis platforms" and made a non-binding offer to acquire Cytek for $170-200 million:



**CONFIDENTIAL**

February 14, 2018

Wenbin Jiang
Chief Executive Officer
Cytek Biosciences, Inc.
46107 Landing Parkway
Fremont, CA 94538

Dear Dr Jiang:

Thank you for providing us an opportunity to evaluate a potential transaction involving Cytek Biosciences, Inc. ("**Cytek**" or the "**Company**"). We are pleased to submit this non-binding indication of interest ("**IOI**") for the Company.

Beckman Coulter Life Sciences believes a transaction with Cytek is compelling and will complement our business and enhance the value proposition we offer to our customers. We believe that the Company's innovative cellular analysis platforms, Aurora and Athena, with their broad range of spectra and resulting multiplexing capability provide strong customer value. Our global commercial infrastructure will accelerate the growth potential of your company and product platforms.

Our non-binding offer to acquire the Company on a cash-free, debt-free basis, is for aggregate potential consideration of █████████████████████ consisting of upfront consideration and contingent consideration based on mutually agreed milestones. This offer is based on the information in the Management Presentation. Our offer also presumes (i) that the transaction would be structured in a manner that is tax-efficient for us and (ii) that the Company is transferred with an adequate, normalized level of working capital.

(CYTEK_0000882748.)

57.     I agree with Danaher that Cytek's Aurora spectral flow cytometer was (and remains) an "***innovative*** cellular analysis platform." There are many innovative features within Cytek's Aurora and Northern Lights spectral flow cytometers, including, among others: ███████████████████████



58. I understand that Danaher never mentioned any alleged issues with any patent rights, including any of the presently Asserted Patents at the time of this letter of intent or anytime before BEC sent Cytek a letter alleging infringement in June 2024.

**3. Cytek's innovative spectral flow cytometers (Aurora and Northern Lights) continue to be recognized for how they have advanced the field of flow cytometry**

59. Cytek's innovative Aurora and Northern Lights spectral flow cytometers have continued to be recognized throughout the industry. Indeed, Cytek



Fedor A. Ilkov, Ph.D. Rebuttal Report Regarding Non-Infringement

78.

████████████████████

Fedor A. Ilkov, Ph.D. Rebuttal Report Regarding Non-Infringement





disclosure in the specification regarding how much beam divergence is permitted or what constitutes "large beam expansion" as part of the disclosure that "the present disclosure extends the collimated optical path length *without large beam expansion*."

88.    The patent further contends that "[i]t is apparent to those skilled in the art that dichroic filters may be inserted anywhere along the *long, narrow and collimated beam path* afforded by *the present disclosure's* relay imaging."  ('582 patent, 5:11-14.)  Again, the specification is referring to "the present disclosure" as requiring a "long, narrow, *collimated beam path*," which a POSA would understand as requiring a "collimated beam" along the entire "collimated beam path."  A POSA would have further recognized that the disclosure that "dichroic filters may be inserted anywhere" along a beam path only applies when the path is entirely a "collimated beam."

89.    Again contrary to the disclosures of the Asserted Patents, Cytek's Accused Products ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████  As such, contrary to the "WDM" disclosed in the specification of the Asserted Patents, ███████████████████████



Fedor A. Ilkov, Ph.D. Rebuttal Report Regarding Non-Infringement

The use of a relay architecture that directs defocused light onto even filters while reimaging light onto odd filters is a fundamental innovation of the optical design in Cytek's non-collimated focused/defocused array design, which was expressly recognized by the Patent Office as not being disclosed in the disclosure of the Asserted Patents (in the form of family member US Patent 9,746,412 as noted below):

***Allowable Subject Matter***

Claims 1, 3-15 and 30-33 are allowed.

The prior art does not disclose, in the claimed environment, a flow cytometer having an image array comprising a transparent block, a plurality of micro-mirrors and a plurality of filters, wherein each of the filters reflects light onto one of the plurality of micro-mirrors and passes light of a differing wavelength onto a detector channel, and wherein incident light within the image array zigzags back and forth between consecutive filters and consecutive micro-mirrors. The closest prior art is believed to be the Chen (US 9746412), Frazier (US 8284402) and Grann (US 6201908) references cited in Applicant's most recent information disclosure statements. Although these

Application/Control Number: 15/659,610                                    Page 3
Art Unit: 1799

references teach the state of the art regarding optical blocks that reflect light between mirror and filters to produce incident light that travels in a zigzag pattern, these references do not utilize micro-mirrors or mirrors having a radius of curvature that directs light onto even filters while reimaging light onto odd filters of a plurality of filters arranged in a row.

(*See* 2021-07-09 Notice of Allowability in prosecution of Cytek's '076 patent (Appl. No. 15/659,610), pp. 2-3.)

90.     I agree with the Examiner that there is no disclosure in the Asserted Patents of using a non-collimated focused/defocused beam within a curved-mirror relay architecture that reimages onto odd filters and directs defocused light onto even filters of a plurality of filters in a row. (*See* '582 patent, 45:22-29 ("The light beam between the concave mirror **907** and the second image at the lens **908** may have

> As explained in the previous response sent June 4, 2024 ("Prior Response"), Applicant respectfully disagrees that Oostman's objective lens 19 is configured to "focus fluorescent light" because the objective lens "collimate[s]" rather than focuses "the fluorescent signal from the target substance." Oostman at ¶ [0003] (emphasis added). A POSITA would have understood that collimation means generally maintaining the width of a beam for some distance, including by, for example, limiting its convergence or divergence. *E.g.*, Specification at 4:46-63. Oostman's objective lens 19's collimation—while not necessarily maintaining parallelism, given that achieving perfectly parallel rays of light is not realizable in practice—is not "focus[ing]" the fluorescent light, which instead involves converging the light. *See, e.g.*, Excerpts from Newport Catalog at 480, *available at* http://rpdata.caltech.edu/courses/aph162/2007 (attached as APPENDIX A to the Prior Response) (distinguishing between "Focusing" and "Collimating" in "Application 1" and "Application 2").
>
> Nevertheless, in an effort to expedite prosecution, independent claims 1, 13, and 18 are each amended to recite "that the fluorescent light leaving the collecting optical element converges," which makes clear that the fluorescent light "focus[ed]" by the "collecting optical element" converges instead of being collimated. Because Oostman's objective lens 19 collimates the fluorescent light, it is not configured to "focus [the] fluorescent light ... such that the fluorescent light leaving [the objective lens] converges" as the claims require. *See* Oostman at ¶ [0003]; *supra.*

(BEC-CYTEK-00004404 ('106 patent file history (July 18, 2024 Applicant Remarks), 15.)

135. In my opinion, Dr. Schaafsma and Dr. Houston are taking a position inconsistent with what BEC told the patent office during prosecution—i.e., that a "collimated beam" is distinguishable and substantially different from prior art that

uses a focused beam of converging light. (BEC-CYTEK-00004404 at -4753-754 ('106 patent file history (June 4, 2024 Applicant Remarks), 9-10).)

136. I also note that in granting Cytek's '076 patent, the U.S. Patent Office also recognized that Cytek's teaching of a focused/defocused beam that allows for "reimaging light onto odd filters of a plurality of filters arranged in a row" was inventive over the disclosure of the Asserted Patents. (CYTEK_0000989932 at -990378 ('076 patent file history (July 9, 2021 Notice of Allowability), 3).) This further supports my opinion that a "collimated beam" and Cytek's focused/unfocused beam are not equivalent.

> **b.    1(b): "a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam;"**

137. In my opinion, the Accused Products do not infringe claim limitation 1(b), "a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam." ('582 patent, cl. 1.) I incorporate my analysis in Sections VIII.B.2 and VIII.C above and Appendix A, my analysis on the claim construction of "collimating optical element," and my analysis in Section IX.A.1.a on "collimated beam," and I disagree with Dr. Schaafsma's and Dr. Houston's opinions.

138. For "**collimating optical element**," I understand that BEC has proposed a purported "plain and ordinary meaning" construction of "an optical

# EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BECKMAN COULTER, INC.,

      Plaintiff,

    v.

CYTEK BIOSCIENCES, INC.,

      Defendant.

C.A. No. 22-945-CFC-EGT

 

## REBUTTAL EXPERT REPORT OF JAMES F. LEARY, PH.D. REGARDING NON-INFRINGEMENT OF U.S. PATENT NOS. 10,330,582; 11,703,443; and 12,174,107

Dated: 1/20/2026

_____
James F. Leary, Ph.D.

James F. Leary, Ph.D. Rebuttal Report Regarding Non-Infringement

Becton Dickinson as early as 2004 employs a linear configuration demultiplexer), IX.B (BD LSR-II System, flow cytometer manufactured and distributed by Becton Dickinson as early as 2007 employs an octagonal configuration demultiplexer), IX.D (DxP System, flow cytometer manufactured and distributed by Cytek Development, Inc. as early as 2010 employs a zig-zag configuration demultiplexer), IX.E (Luminex FlexMap 3D System, flow cytometer manufactured and distributed by Diasorin as early as 2008 employs a linear configuration demultiplexer).)

## XII. CYTEK'S PATENTS

106. I understand that Cytek has its own patents on full spectral flow cytometers. For example, U.S. Patent No. 11,169,076 ("the '076 patent") by Yan et al. was published on November 9, 2021. (CYTEK_0000990444; *see also* U.S. Patent Nos. 11,333,597 and 10,739,245.) I understand that the specification of the '076 patent describes principles of Cytek's flow cytometry technology as embodied in the Accused Products. *See, e.g.,* M. Yan Dep. Tr. at 215:9-12 ("Q. █████████

████████████████████████████████████

██████████████████████ Notably, nowhere in the Cytek '076 patent is the term "Wavelength Division Multiplexer" or "WDM" ever used. Instead, Cytek's patent describes a demultiplexing process which is performed in a totally different way than by a WDM.

107. My review of the file history of the '076 patent further confirms my

James F. Leary, Ph.D. Rebuttal Report Regarding Non-Infringement

opinion that the Accused Products do not infringe any of the Asserted Patents.

108. The application that issued as the '076 patent was filed on July 25, 2017. (CYTEK_0000989932.) The Examiner issued a notice of allowance on February 2, 2021, stating that the prior art references do not disclose "imaging at plurality of detectors." (*Id.* at CYTEK_0000990302 (Feb. 2, 2021 Notice of Allowance, 2).)

109. After the Applicant filed a supplemental Information Disclosure Statement Form ("IDS"), which I understand concerns the submission of additional references for the Patent Office's consideration, the Examiner issued a notice of allowance on July 9, 2021 for the '076 patent, specifically allowing the claims over U.S. Patent No. 9,746,412 (which I understand is the parent patent in the same patent family as the Asserted Patents, shares a common specification with the Asserted Patents, and also names the same inventor as the Asserted Patents, Yong Chen), along with two other references. The Examiner allowed the claims of the '076 patent over the references because they did not disclose "reimaging light onto odd filters of a plurality of filters arranged in a row." (*Id.* at CYTEK_0000990378 (July 9, 2021 Notice of Allowance, 3).)

110. ████████████████████████████████████

████████████████████████████████████████

██████    ████████████████████████████████

James F. Leary, Ph.D. Rebuttal Report Regarding Non-Infringement

██████████████████████████████████ shows that the Accused Product "reimag[es] light onto odd filters of a plurality of filters arranged in a row," (CYTEK_0000989932 at -378 (July 9, 2021 Notice of Allowance, 3), just as disclosed.

111.   First, ████████████████████████████████████

████████████████████████████████████████████

(CYTEK_0000000089 at -103; '076, FIG. 2B, 11:1-4 (annotated).)

112.   ████████████████████████████████████

██████████████████████

James F. Leary, Ph.D. Rebuttal Report Regarding Non-Infringement

(email from Cytek's CTO stating █████████████████████████

████████████████████████████████████████████████████

(emphasis added)).)

165. This is further evidenced by Cytek's own patents. For example, nowhere does the Cytek '076 patent claim or describe a WDM device. Indeed, the specification of the patent repeatedly describes a "wavelength de-multiplexing system" and light that is "de-multiplexed" or "wavelength demultiplexed" into detector channels. (*See* '076 patent at 4:9-10 ("The detection module 100 is a wavelength *de-multiplexing* system." (emphasis added)); *see also id.* at 12:31-33 ("Accordingly, different wavelengths are *de-multiplexed* by the plurality of detectors in each of the first detection module 714 and second detection module 715." (emphasis added)).)

166. Cytek's CEO and CTO also repeatedly testified that the Accused Products do not contain a "wavelength division multiplexer," but instead, implement de-multiplexing technology. W. Jiang Dep. Tr. at 68:17-21 ("Q. ███████████████

████████████████████████████████████████████████████

████████ ████████ █████████████ ████████████ ); *id.* at 63:5-13 ("Q. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

342. Third, the beam in the Accused Products and the claimed "collimated beam" do not achieve substantially the same result. To the contrary, the converging and diverging beam allows the Accused Products to more efficiently perform full spectral flow cytometry. The converging and diverging optics of the Accused Products is not collimated optics, and is fundamental to the design of Cytek's spectral cytometers because it efficiently minimizes aberrations such that the full fluorescence spectrum can be captured by the higher number of detector channels so that subsequent unmixing algorithm software can resolve overlapping spectra from two or more fluorophores based on each dye's unique spectral signature. Hence, any trade-off incident to color separation between the use of a "collimated beam"— which the specification of the Asserted Patents says "*can only be accomplished economically with collimated light beam*" ('582 patent, 44:25-26 (emphasis added)) versus the aberration-limiting, non-collimated focused/defocused beam within the Accused Products clearly lands in favor of Cytek's design, which is specific to the needs of Cytek's spectral flow cytometers.

343. Therefore, in my opinion, the beam in Cytek's Accused Products and the claimed "collimated beam" do not perform substantially the same function, in substantially the same way, to achieve substantially the same result.

344. Again, the Patent Office allowing the claims of Cytek '076 patent over the disclosures in the Asserted Patents and other prior art because they did not

James F. Leary, Ph.D. Rebuttal Report Regarding Non-Infringement

disclose "reimaging light onto odd filters of a plurality of filters arranged in a row" (CYTEK_0000989932 at -990378 ('076 patent file history (July 9, 2021 Notice of Allowability), 3)), further supports my opinion.

> **b.** **1(b): "a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam;"**

345. In my opinion, limitation 1(b), "a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam" is not present in the Accused Products.

346. Drs. Houston and Schaafsma opine that the Accused Products meet this claim limitation by identifying two separate components in the Accused Products as the claimed "collimating optical element": the "collimating lens" and, in the alternative, odd-numbered "concave mirrors." (Houston Rep., ¶¶417-427; *see also* Schaafsma Rep., ¶¶196-197.) I disagree with either of Drs. Houston's and Schaafsma's mappings, and reference my opinions above on the claim construction of the term "collimating optical element" and my opinions above concerning "collimated beam." I further explain below why this limitation is not present in the Accused Products.

347. For the term "collimating optical element," as I noted in Section VIII.B.1 above, I understand that Beckman has proposed a purported "plain and ordinary meaning" construction of "an optical element, such as a lens, mirror, or

- 195 -

16, and 20.

499. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████



**FIG. 1**

500. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████ I reserve the

right to respond to any opinion should Dr. Houston be permitted to later provide a

new opinion.

501. ███████████████████████████████████

███ ██ ███ ██ ██ ██ ███ ██ ███ ███



502. Based on the above facts, it is my opinion that Dr. Jiang developed a reasonable belief that Cytek did not infringe claims 1, 3, 14, or 16 of the '412 patent.

James F. Leary, Ph.D. Rebuttal Report Regarding Non-Infringement

For example, I agree with Dr. Jiang that claim 3 is not infringed. ████████

████████████████, claim 1, which recites a "collimating optical element" is also not infringed, consistent with my opinions above on "collimating optical element." (CYTEK_0000988641 at –641-642.) ████████████████

████████████████████████ and instead concludes summarily that they are "not correct" based on her review of Dr. Schaafsma's report. (Houston Rep., ¶485 (citing Schaafsma Rep., ¶¶94-97, 188-192).) But Dr. Schaafsma also did not analyze the specific non-infringement positions articulated in the ████████████████. (*See* Schaafsma Rep., ¶¶94-97 (merely providing an overview of the '412 patent); *id.* at ¶¶188-192 (citing two non-infringement positions from the '582 chart, and concluding without explanation that

████████████████████████

████)[25] In my opinion, ████████████████████████

████████████████████████

████████████████ I further understand that, contrary to Dr. Houston's suggestion, "consult[ing] an[] attorney" is not required to develop a reasonable belief in non-infringement. (*See* Houston Rep., ¶485.) In any event, I understand that around ████████████████████████

---

[25] I address Dr. Schaafsma's opinions regarding Dr. Jiang's '582 claim chart below.

503. I have also reviewed Dr. Jiang's deposition testimony, which reinforces my opinion that Cytek had a reasonable belief in invalidity and non-infringement of the '412 patent. (W. Jiang Dep. Tr., 181:14-212:9 (discussing CYTEK_0000988641).) As Dr. Jiang explains, the '412 patent is directed to a conventional flow cytometer, while Cytek's products use full spectral flow cytometry. (W. Jiang Dep. Tr., 184:9-11 ("[A]fter reviewing [the '412 patent], it's so obvious, so different. And this is a conventional flow cytometer while Cytek's is full spectral profile technology"); *see also id.* at 210:18-23 ("[I]t's so clear Cytek does not infringe on Yong Chen's patents because . . . Yong Chen's patents [are] about conventional flow cytometer, and Cytek is about [full] spectral. Those are two very different concepts in terms of earlier explaining the whole architecture, whole data analysis algorithms.").) As explained in this report, I agree that conventional flow cytometry is fundamentally different from full spectral flow cytometry.

504. Dr. Houston asserts that "Cytek's spectral cytometer is predicated on the use of a WDM" and "[t]herefore, the use of spectral technology alone does not render Cytek's products non-infringing with respect to the [']412 Patent or the Asserted Patents." (Houston Rep., ¶485.) I disagree, because as I explain above, the Accused Products do *not* use a WDM as claimed in the Asserted Patents.

James F. Leary, Ph.D. Rebuttal Report Regarding Non-Infringement

2017, before even the parent '412 patent issued on August 29, 2017, and well before the '582 patent issued. And as explained above, even if Cytek knew that Beckman owned patents allegedly cover the CytoFLEX or the XTG product, knowledge of patents alone is insufficient to establish willful infringement.

514. Further, in my experience, all of Cytek's activities described in this section are common practice in the flow cytometry industry—it is normal and expected for competitors to monitor and analyze each others' products.

515. In fact, the evidence shows that Beckman and its parent company Danaher Corporation were well-aware of—and even interested in acquiring—Cytek's technology. (*See* Cytek's Second Suppl. Resp. to Interrog. No. 11 (Oct. 22, 2025).) Cytek gave a management presentation in January 2018 to Danaher and Beckman, including a comprehensive overview of Cytek's products and IP portfolio. (CYTEK_0000893376.) This occurred after Yong Chen's '412 patent had issued in August 2017. In the presentation shared with Danaher and Beckman, Cytek identified many of its own patents and patent applications covering principles of Cytek's flow cytometry technology. (*Id.* at -405.) I understand that, instead of alleging infringement or even raising the '412 patent and its disclosure as a concern vis-à-vis Cytek's technology, Beckman and Danaher responded to this presentation by offering to acquire Cytek. On February 14, 2018, Danaher sent an indication of interest ("IOI") letter to Cytek, stating that Cytek's "innovative cellular analysis

platforms, Aurora and Athena, with their broad range of spectra and resulting multiplexing capability provide strong customer value." (CYTEK_0000882748.) Danaher explained that "Beckman Coulter Life Sciences believes a transaction with Cytek is compelling and will complement our business and enhance the value proposition we offer to our customers" and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ (*Id.*) I am informed that neither Danaher nor Beckman ever shared any concerns that Aurora infringed any claim in any Asserted Patent or related patent or application, even after the '582 patent issued in June 2019, until the June 2024 letter mentioned above.

516. In September 2020, several years after Danaher's February 2018 IOI, Danaher again reached out to Cytek to resume acquisition discussions. (CYTEK_0000948858.) Kevin Chance, Vice President and Group Executive at Danaher Life Sciences (which I understand includes Beckman), met with Dr. Jiang over a video call on September 16, 2020. (CYTEK_0000948859.) I understand that, yet again, Mr. Chance never expressed any concerns that Cytek's products infringed any patents owned by Danaher or Beckman, which by then included the '582 patent. On May 26, 2021, Cytek gave another management presentation to Danaher and Beckman (CYTEK_0000882746), after which Danaher "debriefed internally and confirmed their interest in Cytek" (CYTEK_0000949411). A Danaher representative followed up with several questions. (CYTEK_0000949411.) I am

James F. Leary, Ph.D. Rebuttal Report Regarding Non-Infringement

<mark>informed that at no point in time did Danaher or Beckman allege infringement of its then-issued '412 and '582 patents.</mark>

517. In my opinion, these facts regarding Danaher and Beckman's repeated interest in Cytek—and their failure to allege infringement during those times—confirm that Cytek had no reason to believe it was infringing any patents owned by Beckman.

518. Turning back to Dr. Houston's opinions, Dr. Houston describes Dr. Ming Yan's former employment at Becton Dickinson and the ensuing trade secret litigation. (Houston Rep., ¶¶490-491.) I understand that case is separate from and has nothing to do with the instant litigation, and is certainly not relevant to willful infringement. Dr. Houston relies on this trade secret litigation as evidence that "Dr. Yan and Cytek had knowledge and awareness of Xitogen, the company that originally developed the claimed inventions, Dr. Chen, and Dr. Chen's work on the claimed inventions." (Houston Rep., ¶491.)

519. Dr. Houston then provides a bulleted list of documents allegedly showing that "Cytek frequently and repeatedly[] studied, examined, and analyzed the CytoFLEX and its performance throughout its development of the Accused Products and compared and analyzed the structure, function, operation, features, benefits, and performance of the CytoFLEX to the Accused Products." (Houston

# EXHIBIT 6



Our Businesses

# Solving today's critical challenges



# Danaher is comprised of a set of businesses across biotechnology,

# diagnostics, and life sciences united by a shared commitment to innovate for tangible impact.

## The Danaher ecosystem

The Danaher ecosystem — made up of more than 15 businesses with leadership positions in their respective end markets — is dedicated to advancing continuous improvement and accelerating innovation to make a meaningful impact. What differentiates Danaher is not only the strength of our individual businesses, but how they work together—connected by a shared operating system and a commitment to continuous improvement.

Each business is backed by Danaher and its resources, including the Danaher Business System, which empowers our businesses to make a tangible difference in lives around the world. We take on the most pressing challenges and leverage our expertise in science and technology to deliver transformative innovations.

This ecosystem allows us to orchestrate connected science across entire workflows—bringing together the right technologies, expertise, and scale to solve complex challenges faster and with greater certainty.



# Driving change around the world

With a global presence and a commitment to excellence, we are dedicated to making an impact in every corner of the world.

~$25B

total revenue in 2025

# >15

businesses across science and technology

# 60K

associates



# Biotechnology

Our biotechnology businesses deliver researchers and biopharmaceutical companies the expertise, tools, and services they need to develop and commercialize life-changing therapeutics. We support our customers from

discovery to delivery as they undertake life-saving activities ranging from fundamental biological research to developing and manufacturing innovative vaccines, biologic drugs, novel cell and gene therapies, and new technologies such as mRNA. As part of the Danaher ecosystem, these businesses benefit from shared capabilities and cross company collaboration—continuously accelerating ideas from discovery to real world impact.



**Learn about biotechnology  →**

# Diagnostics

We're generating proprietary insights into disease areas and innovation trends to develop inventive solutions of high clinical impact. Operating in both established and emerging markets, we provide our expertise to healthcare practitioners, researchers, and other leaders in the field, enabling them to save and improve lives. Our businesses come together for unparalleled breadth and depth of offerings, resulting in high-quality and accurate diagnostic confidence for a wide range of critical health conditions. Working together, our diagnostics businesses combine speed, scale and DBS-driven rigor to support faster, more confident decisions when they matter most.









 



**Learn about diagnostics  →**

# Life Sciences

Our life sciences businesses are dedicated to accelerating the discovery, development, and delivery of solutions that safeguard and improve human health. We bridge the gap between research and practical application, enabling the development of revolutionary innovations such as biopharmaceuticals and enhanced synthetic biologics—connecting science across disciplines and workflows, at global scale, to help people live longer, healthier lives.



 

 











**Learn about life sciences →**

# Explore all businesses

When the challenge is complex, the right answer rarely comes from a single company. Every Danaher business brings distinct strengths—together, they form a connected portfolio built to solve the hardest problems in science and healthcare.

Looking for a specific business or want to see the whole portfolio? Our business directory organizes all of Danaher's businesses in one place.

# See all businesses →

# EXHIBIT 7

████████████████████

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BECKMAN COULTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 24-945 (CFC) (EGT) |
| | ) | |
| CYTEK BIOSCIENCES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPENING EXPERT REPORT OF BERNHARD H. WEIGL, PH.D.</u>

Dated: December 19, 2025

Respectfully submitted,

_____

Bernhard H. Weigl, Ph.D., MSc

███████████████████████████

Brannen Dep Tr. 37:14-24, 43:17-46:8; Del Castillo Dep. Tr. 51:10-53:6; Koksch Dep. Tr. 187:22-189:5.) I understand that Beckman Coulter takes the position that CytoFLEX practices the '582, '443, and '107 patents.

80. I have reviewed the deposition testimony of named inventor Yong Chen and note that he did not have any involvement in the prosecution of the '443 and '107 patents, as Dr. Chen had already left Beckman Coulter. (Chen Rough Dep. Tr. 39:22-40:4.) This means that the additional limitation of "substantially full spectrum of visible light" was added by Beckman Coulter's patent attorneys without Dr. Chen's knowledge prior to the September 3, 2024 filing of the patent application that became the '107 patent.

81. Additionally, a decade after the asserted April 2012 priority date of the Asserted Claims, Beckman Coulter filed an unrelated patent application that attempts to disclose a full spectral flow cytometer. *See* U.S. Patent Publication No. 2025/0198904 at Para. [0043] ("At present, the flow cytometry is developing from the conventional multi-color fluorescence channel to the high-channel fluorescence full spectrum."). Beckman Coulter's patent application appears to claim priority to a foreign filing date of a Chinese patent application on March 23, 2022. Similarly, Beckman Coulter filed another patent application on October 17, 2023 which also mentions newly filed patents directed to "spectral flow cytometry" and "unmixing," in contrast to conventional flow cytometry using "compensation"/"spillover," long

███████████████████

Lopriore Dep. Tr. 109:9-13; Goff Dep. Tr. 77:9-13; Brannen Dep Tr. 37:14-24, 43:17-46:8; Del Castillo Dep. Tr. 51:10-53:6; Koksch Dep. Tr. 187:22-189:5.) It is further, in my opinion, demonstrated by the fact that it took Beckman Coulter over a decade to develop and launch the mosaic module. The long development timeline Beckman Coulter undertook further supports the conclusion that the technological implementation of the detector modules in a spectral flow cytometer was not enabled by the specification of the Asserted Patents

87. Moreover, I understand that on Feb. 1, 2023, Beckman Coulter filed U.S. Patent Application No. 18/847,394 entitled "Light Detecting System and Light Detecting Method for Flow Cytometer." (*See* U.S. Patent Application Publication No. 2025/0198904 to Jianhua Wang ("Wang").) In this 2023 patent application Beckman Coulter acknowledges the distinction between conventional flow cytometry and conventional flow cytometry:

> [0043] At present, the flow cytometry is developing from the conventional multi-color fluorescence channel to the high-channel fluorescence full spectrum. With the fluorescence full spectrum, more fluorescence information is acquired and more (**up to 40 or more or more channels** of) fluorescein and other information are analyzed at the same time, so as to acquire more sample expression information, thereby achieving a sensitive and accurate test result. **In order to achieve this objective, high-density channel acquisition of the fluorescence spectrum is required to reflect a spectral feature of the fluorescence.**

(Wang, [0043].)

88. Beckman Coulter's 2023 patent filing was directed to a "light

████████████████████████████████████████

detection system 100 for a flow cytometer" that "includes a beam separating device **102** and multiple wavelength division multiplexing devices **104.**" (*Id.*, [0031].) The "beam splitting device 102" and multiple wavelength division multiplexing devices 104" are described and depicted in FIG. 2: "As an example, the multiple first beams may be transmitted in a layered layout in a vertical direction (for example, a z-axis direction shown in FIG. **2** ), so that, for example, the size of the wavelength division multiplexing device **104** can be further reduced." (*Id.*, [0046].)



Figure 2

(*Id.*, [0043].)

89. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████













90.     The fact that Beckman Coulter has filed a patent application directed to its recently launch mosaic detector module indicates that Beckman Coulter believes the mosaic to be new and not previously disclosed or enabled by Yong Chen's Asserted Patents from a decade earlier. I agree. The Asserted Patents here are solely directed to one-dye-one-detector conventional flow cytometry and provides no disclosures, teachings, or guidance that would have enabled a POSA to create and design a spectral WDM that would be suitable for use within a spectral flow cytometer. In my opinion, the one-detector-one-dye conventional flow cytometer and WDM disclosures in the Asserted Patents would not have enabled a

POSA to make and use a "WDM capable of detecting a substantially full spectrum of visible light" to the extent the phrase could be interpreted as going being a one-detector-one-dye conventional flow cytometer detector configuration to a non-conventional all-detectors-all-dyes configuration of spectral flow cytometry.

91.     To convert the conventional flow cytometer WDM disclosed in the Asserted Patent would require substantial research, development, and trial-and-error testing considering the nascent state of spectral flow cytometry before 2014.  At that time, only Sony had already launched a commercial flow cytometer, based on a diffraction grating for separating the fluorescent signal and using PMTs for detection channels, and publications in the art by researchers at Purdue University had also used a diffraction grating.  There were no teachings or guidance within the art that I am aware of prior to the priority date of the Asserted Patents (i.e., prior to 2014), directed towards how to make and use a "flow cytometer . . . wherein the WDM is capable of detecting a substantially full spectrum of visible light" using the recited "zig-zag" WDM configuration required by claims 9 and 29 without undue experimentation.  Accordingly, it is my opinion that claims 9 and 29 are not enabled. I reached my conclusion based on my evaluation of the *Wands* Factors, which I apply below.

92.     **Breadth of the Claims (Wands Factor No. 1)**:  The "flow cytometer . . . wherein the WDM is capable of detecting a substantially full spectrum of visible

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| BECKMAN COULTER, INC.,<br><br>       Plaintiff,<br><br>  v.<br><br>CYTEK BIOSCIENCES, INC.,<br><br>       Defendant. | C.A. No. 24-cv-945 (CFC) (EGT)<br><br>██████████ |

## CYTEK'S OPPOSITION TO BECKMAN COULTER'S
## MOTION *IN LIMINE* NO. 1

MIL 1, to preclude evidence or argument about unasserted IP, is overbroad and prejudicial to Cytek by seeking to preclude material and relevant evidence to Cytek's invalidity and noninfringement defenses. This evidence is not unduly prejudicial and jury instructions can resolve any concerns. MIL 1 should be denied.

**Cytek's IP**. Cytek properly relies on material, relevant *prosecution history* from its IP. During prosecution of Cytek's '076 patent, the examiner allowed the claims over BEC's '412 patent, which shares the same written description as the Asserted Patents, stating that BEC's '412 patent does not disclose "mirrors having a radius of curvature that directs light onto even filters while reimaging light onto odd filters[.]" (Ex. 1, CYTEK_0000990377-378; Ex. 6, ¶¶89-90.) This supports Cytek's position that a "WDM" in the '107/'443 Asserted Claims and "[first / second] collimated beam" in claim 10 of the '443 patent lack written description support and enablement—because, as the examiner found, the specification does not disclose that scope. (Ex. 2, ¶¶926, 931, 1074.) *Cf. Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005) (examiner statements are evidence of POSA's understanding). The same evidence supports Cytek's "RDOE" argument that the Accused Products and Asserted Patents operate fundamentally differently. (Ex. 6, ¶¶90, 293-298, 307-310, 314-317.) For the '582 patent, the examiner's statement is also probative to rebut BEC's DOE theory that a "collimated beam" is equivalent to a non-collimated beam. *Sprint Commc'ns Co. v. Charter Commc'ns Inc.*, 2021 WL

982729, *7-9 (D. Del. Mar. 16, 2021) (denying exclusion of DOE rebuttal evidence).

Contrary to BEC's assertions, Cytek does not argue noninfringement based on mere comparison between the content of Cytek's patents and the Asserted Claims. Rather, it is BEC who puts Cytek's IP at issue by relying on Cytek's patents to support BEC's expert's infringement opinions. (*See, e.g.*, Ex. 3, ¶¶127, 149, 180, 220, 272, 313, 318, 368, 373-374, 383, 388, 420, 423.)

**Unrelated IP**. BEC is wrong that its "Unrelated IP" is "wholly irrelevant to the issues at trial"—it bears directly on Cytek's proper and disclosed invalidity defenses. ***First***, BEC's "Unrelated IP" definition captures U.S. Patent No. 8,284,402 ("Frazier"), assigned to BEC (Ex. 4), which Cytek relies on in its obviousness grounds. (*See, e.g,* Ex. 2, ¶¶14, 76, 77, 89, 130, 138, 180, 220-224, 235, 239, 248, 345, 571, 644, 652-653.) ***Second***, Cytek's expert relies on an unrelated, later BEC patent family that purports to cover spectral flow cytometry to support his § 112 opinion that the earlier Asserted Patents ***do not*** disclose a spectral flow cytometer. (Ex. 5, ¶81.) This same unrelated BEC patent family also corroborates Cytek's "RDOE" defense that the '107/'443 Asserted Patents disclose only a conventional flow cytometer that fundamentally differs from the accused spectral flow cytometers. (Ex. 6, ¶¶299-305, 312, 318.) None of these uses of "Unrelated IP" unfairly prejudices BEC, and exclusion would materially harm Cytek's defenses.

**'412 and '106 Patents**. BEC's related '412 and '106 patents are highly

relevant. ***First***, Cytek relies on their prosecutions and claims to discuss lack of written description and/or enablement for the terms "curved mirror," "wavelength division multiplexer (WDM)," "optical fiber," and "[first/second] collimated beam." (Ex. 2, ¶¶917-918, 921, 960, 966, 1009-1010, 1014-1019, 1074.) ***Second***, the parties dispute whether the Asserted Claims are entitled to the filing date of the '412 patent or an earlier provisional application; this dispute implicates the new matter in the '412 patent's disclosures. ***Third***, BEC admitted that a "collimated beam" is not a "focused beam" during the '106 patent's prosecution, corroborating (1) a POSA's understanding of the plain meaning for "collimated beam" recited in the related '582 and '443 Asserted Claims; and (2) that "image" is indefinite. (*See*, *id*., ¶¶897, 1066.) The probative nature of the evidence outweighs any alleged prejudice concerns.

**Pending IP**.  BEC's Pending IP is material to Cytek's § 103 defenses.  In rebuttal, BEC's expert contends that optical communications art is not analogous to flow cytometer art.  (Ex. 7, ¶¶174-181.)  An examiner repeatedly rejected this argument during prosecution of the asserted '107 patent's child application.  (Ex. 8, pp. 018, 025-26.)  *Cf. Salazar*, 414 F.3d at 1347.  Its exclusion would unfairly insulate BEC's analogous art opinions.  *See, e.g., Johns Hopkins Univ. v. Alcon Lab'ys*, 2018 WL 4178159, at *7 (D. Del. Aug. 30, 2018).  BEC's alleged prejudice and "waste [of] time" arguments are misplaced, outweighed by the evidence's probative value, and can be addressed in jury instructions.

Dated: July 9, 2026

Respectfully submitted,

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

By: */s/ Jeremy A. Tigan*
Karen Jacobs (#2881)
Jeremy A. Tigan (#5239)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
kjacobs@morrisnichols.com
jtigan@morrisnichols.com
cclark@morrisnichols.com

Adam Pivovar
Dustin M. Knight
David Yun
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 842-7800
apivovar@cooley.com
dknight@cooley.com
dyun@cooley.com

Elizabeth M. Flanagan (#5891)
COOLEY LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402
bflanagan@cooley.com

Reuben Chen
HanByul Chang
Juan Pablo Gonzalez
Alexandra Leeper
COOLEY LLP
3175 Hanover Street
Pal Alto, CA 94304
(650) 843-5000
rchen@cooley.com
hanbyul.chang@cooley.com
jgonzalez@cooley.com
aleeper@cooley.com

Attorneys for Defendant
**CYTEK BIOSCIENCES, INC.**

# EXHIBIT 1



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

79963        7590        07/09/2021

Alford Law Group, Inc.
23052H Alicia Parkway, No. 201
Mission Viejo, CA 92692

| EXAMINER |
| --- |
| BOWERS, NATHAN ANDREW |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 1799 | |

DATE MAILED: 07/09/2021

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 15/659,610 | 07/25/2017 | Ming Yan | 2067.P005US1 | 2241 |

TITLE OF INVENTION: COMPACT DETECTION MODULE FOR FLOW CYTOMETERS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | SMALL | $600 | $0.00 | $600.00 | $0 | 10/12/2021 |

THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT.
PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS.
THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON
PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING
DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD
CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT
FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN
THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST
TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.

HOW TO REPLY TO THIS NOTICE:

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that
entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled
"Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity
fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office
(USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b"
of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a
request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing
the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail
Stop ISSUE FEE unless advised to the contrary.

IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980.
It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at
www.uspto.gov/PatentMaintenanceFees.

PTOL-85 (Rev. 02/11)

CYTEK_0000990372

# PART B - FEE(S) TRANSMITTAL

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

By mail, send to: Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

By fax, send to: (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

79963      7590      07/09/2021

Alford Law Group, Inc.
23052H Alicia Parkway, No. 201
Mission Viejo, CA 92692

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

_____ (Typed or printed name)
_____ (Signature)
_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/659,610 | 07/25/2017 | Ming Yan | 2067.P005US1 | 2241 |

TITLE OF INVENTION: COMPACT DETECTION MODULE FOR FLOW CYTOMETERS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | SMALL | $600 | $0.00 | $600.00 | $0 | 10/12/2021 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| BOWERS, NATHAN ANDREW | 1799 | 422-073000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-09 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list

(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____
2 _____
3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

(B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted: ☐ Issue Fee ☐ Publication Fee (if required) ☐ Advance Order - # of Copies _____

4b. Method of Payment: (Please first reapply any previously paid fee shown above)

☐ Electronic Payment via EFS-Web ☐ Enclosed check ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____ Date _____

Typed or printed name _____ Registration No. _____

PTOL-85 Part B (08-18) Approved for use through 01/31/2020      OMB 0651-0033      U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

CYTEK_0000990373



UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/659,610 | 07/25/2017 | Ming Yan | 2067.P005US1 | 2241 |

| | | | EXAMINER |
|---|---|---|---|
| 79963 | 7590 | 07/09/2021 | BOWERS, NATHAN ANDREW |

Alford Law Group, Inc.
23052H Alicia Parkway, No. 201
Mission Viejo, CA 92692

| ART UNIT | PAPER NUMBER |
|---|---|
| 1799 | |

DATE MAILED: 07/09/2021

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

CYTEK_0000990374

# OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b) (2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

CYTEK_0000990375

| *Notice of Allowability* | Application No. 15/659,610 | Applicant(s) Yan et al. | |
|---|---|---|---|
| | Examiner NATHAN A BOWERS | Art Unit 1799 | AIA (FITF) Status Yes |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1.☑ This communication is responsive to the RCE filed 06 June 2021

   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2.☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____, the restriction requirement and election have been incorporated into this action.

3.☑ The allowed claim(s) is/are 1,3-15 and 30-33 . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information , please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4.☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

  **Certified copies:**

   a) ☐All   b) ☐ Some   *c) ☐ None of the:

     1. ☐ Certified copies of the priority documents have been received.

     2. ☐ Certified copies of the priority documents have been received in Application No. _____.

     3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5.☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.

   ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____

  **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6.☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1.☐ Notice of References Cited (PTO-892)

2.☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____.

3.☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____.

4.☐ Interview Summary (PTO-413), Paper No./Mail Date. _____.

5. ☐ Examiner's Amendment/Comment

6. ☑ Examiner's Statement of Reasons for Allowance

7. ☐ Other _____.

/NATHAN A BOWERS/
Primary Examiner, Art Unit 1799

CYTEK_0000990376

## DETAILED ACTION

### *Continued Examination Under 37 CFR 1.114*

A request for continued examination under 37 CFR 1.114, including the fee set

forth in 37 CFR 1.17(e), was filed in this application after final rejection.  Since this

application is eligible for continued examination under 37 CFR 1.114, and the fee set

forth in 37 CFR 1.17(e) has been timely paid, the finality of the previous Office action

has been withdrawn pursuant to 37 CFR 1.114.  Applicant's submission filed on 06 June

2021 has been entered.

### *Information Disclosure Statement*

The information disclosure statements filed 06 June 2021 and 29 June 2021

have been considered.

### *Allowable Subject Matter*

Claims 1, 3-15 and 30-33 are allowed.

The prior art does not disclose, in the claimed environment, a flow cytometer

having an image array comprising a transparent block, a plurality of micro-mirrors and a

plurality of filters, wherein each of the filters reflects light onto one of the plurality of

micro-mirrors and passes light of a differing wavelength onto a detector channel, and

wherein incident light within the image array zigzags back and forth between

consecutive filters and consecutive micro-mirrors.  The closest prior art is believed to be

the Chen (US 9746412), Frazier (US 8284402) and Grann (US 6201908) references

cited in Applicant's most recent information disclosure statements.  Although these

CYTEK_0000990377

references teach the state of the art regarding optical blocks that reflect light between mirror and filters to produce incident light that travels in a zigzag pattern, these references do not utilize micro-mirrors or mirrors having a radius of curvature that directs light onto even filters while reimaging light onto odd filters of a plurality of filters arranged in a row.

## *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to NATHAN ANDREW BOWERS whose telephone number is (571)272-8613. The examiner can normally be reached on M-F 7am-5pm.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Michael Marcheschi can be reached on (571) 272-1374. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see https://ppair-

CYTEK_0000990378

my.uspto.gov/pair/PrivatePair. Should you have questions on access to the Private

PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

If you would like assistance from a USPTO Customer Service Representative or access

to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-

272-1000.

/NATHAN A BOWERS/
Primary Examiner, Art Unit 1799

CYTEK_0000990379

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BECKMAN COULTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 24-945 (CFC) |
| | ) | (EGT) |
| CYTEK BIOSCIENCES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPENING INVALIDITY EXPERT REPORT OF FEDOR A. ILKOV, PH.D.

Dated: 12/19/2025

Respectfully submitted,

Fedor A. Ilkov, Ph.D.

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|

I. INTRODUCTION ................................................................................1

    B. Qualifications and Experience ...............................................1

    C. Assignment ...........................................................................4

    D. Materials Considered............................................................5

II. SUMMARY OF OPINIONS.............................................................5

III. LEGAL STANDARDS ......................................................................6

    A. Invalidity ...............................................................................7

    B. Claim Construction................................................................7

    C. Anticipation ...........................................................................7

    D. Obviousness...........................................................................9

    E. Conception and Reduction to Practice .................................15

    F. Written Description .............................................................16

    G. Enablement ..........................................................................17

    H. Indefiniteness ......................................................................18

IV. CLAIM CONSTRUCTION .............................................................19

V. PERSON OF ORDINARY SKILL IN THE ART ("POSA").......................20

VI. PRIORITY DATE ...........................................................................23

VII. TECHNOLOGY BACKGROUND...................................................31

    A. Flow Cytometers .................................................................31

    B. Wavelength Division Demultiplexers ..................................33

    C. Use of Avalanche Photodiodes (APDs) in Flow Cytometry..............41

VIII. ASSERTED PATENTS ...................................................................49

    A. Overview of the Shared Specification...................................49

    B. Listing of the Asserted Claims ............................................51

IX. OVERVIEW OF THE PRIOR ART ................................................51

    A. BD FACSArray System ......................................................51

    B. BD LSR-II System .............................................................56

C. Lemoff ...................................................................................59

D. Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors ("DxP System") ...................................61

E. Luminex FlexMap 3D System .........................................75

F. Oostman ..............................................................................80

G. Frazier ...............................................................................83

X. USE OF DISPUTED TERMS & TERMS LACKING § 112 SUPPORT FOR PRIOR ART ANALYSIS IN SECTIONS XI-XIII .........83

XI. PRIOR ART APPLIED TO THE '582 PATENT .......................................84

A. Ground 1: Claims 1, 3, 6 of the '582 Patent are Obvious Over the BD FACSArray System and Lemoff ...........................................84

B. Ground 2: Claims 1, 3, 6 of the '582 Patent Are Obvious Over the Luminex FlexMap 3D System and Lemoff ...............................127

C. Ground 3: Claims 1, 3, 6 of the '582 Patent Are Obvious Over Oostman, Lemoff, and Frazier.........................................................135

D. Ground 4: Claims 1, 3, 6, 23, 26 of the '582 Patent are Obvious Over Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors and BD FACSArray System..................155

E. Ground 5: Claims 1, 3, 6, 23, 26 of the '582 Patent Are Obvious Over Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors and Luminex FlexMap 3d System .......227

XII. PRIOR ART APPLIED TO THE '443 PATENT ......................................239

A. Ground 1: Claims 6, 10, 11, 15 of the '443 Patent Are Anticipated by Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors ("DxP System") ......................239

B. Ground 2: Claims 4 and 10 of the '443 Patent are Obvious Over Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors ...........................................................271

C. Ground 2a: Claim 4 of the '443 Patent is Obvious Over Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors ("DxP System") and Lemoff...........................................288

D. Ground 3: Claims 4, 6, 10, 11, 15 of the '443 Patent Are Obvious Over the BD LSR-II System and Lemoff .........................297

E.     Ground 4: Claims 4, 6, 10, 11, 15 of the '443 Patent are Obvious Over the Luminex FlexMap 3D System and Lemoff........331

F.     Ground 5: Claims 4, 6, 10, 11, 15 of the '443 Patent based on Oostman and Lemoff.................................................................342

XIII.   **PRIOR ART APPLIED TO THE '107 PATENT** ....................................352

A.     Ground 1: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent are Obvious Over the BD FACSArray System and Lemoff .................352

B.     Ground 2: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent are Obvious Over the Luminex FlexMap 3D System and Lemoff........399

C.     Ground 3: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent are Obvious Over Oostman, Lemoff, and Frazier.................................422

D.     Ground 3a: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent are Obvious over the BD FACSArray System, Oostman, and Lemoff ....................................................................................441

E.     Ground 4: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent are Obvious over Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors and the BD FACSArray System .......................................................................................451

F.     Ground 5: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent are Obvious Over Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors and the Luminex FlexMap 3D System .................................................................................506

XIV.   THERE ARE NO SECONDARY INDICIA OF NON-OBVIOUSNESS.................................................................................525

XV.   THE ASSERTED CLAIMS ARE INVALID UNDER 35 U.S.C. § 112 .............................................................................................530

A.     Introduction ...........................................................................530

B.     "Wavelength Division Multiplexer (WDM)"-Related Terms .........557

C.     "WDM is capable of detecting a substantially full spectrum of visible light" ............................................................................588

D.     Optical Fiber- / Light Source-Related Terms...................................608

E.     Detector-Related Terms ...............................................................625

F.     Mirror Terms ................................................................................642

G.     Flow Cell Terms ............................................................653

H.     The Claimed "light" in the Asserted Claims of the '443 and '107 Patents Lacks Full Scope Enablement and Associated Written Description ................................661

I.     Collimation-Related Terms ............................................668

J.     Image-Related Terms ....................................................694

K.     "Substantially"-Related Terms.......................................712

L.     Other Terms...................................................................714

XVI.  CONCLUSION.......................................................................718

## I. INTRODUCTION

1. I, Fedor A. Ilkov, Ph.D., have been retained by Cytek Biosciences, Inc. ("Cytek," "Cytek Biosciences," or "Defendant") as an independent technology expert in this patent infringement action brought by Plaintiff Beckman Coulter, Inc. ("Plaintiff" or "Beckman Coulter").

### B. Qualifications and Experience

2. I received a Bachelor of Science degree in Physics from State University of Tashkent, a Master of Science degree in Nuclear Physics from State University of Tashkent, and a Ph.D. in Non-Linear Spectroscopy, Molecular and Atomic Physics from General Physics Institute in Moscow.

3. I have worked at various companies as an optical engineer since 1996. For example, I joined Iolon, Inc. as the Principal Optical Design Engineer in 2001. In that role, I was responsible for designing, prototyping, and testing novel optical devices, which included selecting the optimal optical elements and light sources, such as lasers.

4. In my over thirty years in the field, I have developed special expertise in designing biological analytical instruments, such as flow cytometers, cell sorters, and super-resolution microscopy. For example, I served as the Chief Optical Engineer for Guava Technologies, Inc., now part of Merck-Millipore Corp., from 2005 to 2014. During that time, I led a project directed at modeling next-generation

1

██████████ – ███████████████

file histories, the Court's claim constructions, certain prior art patents and systems, as well as other documentation, I have concluded that each of the Asserted Claims of each of the Asserted Patents is invalid pursuant to 35 U.S.C. §§ 102, 103, and/or 112. I explain the reasons for my conclusions herein.

### D. Materials Considered

13. I have considered information from various sources in forming my opinions. Besides drawing from over thirty years of research and development in the area of flow cytometry, I also have reviewed the Asserted Patents, including their file histories, the Court's claim constructions and other documents, including certain prior art patents and systems. I have also considered and reviewed all materials cited and/or referenced in this Report, as well as all materials listed in **Exhibit 2** to this Report.

## II. SUMMARY OF OPINIONS

14. It is my opinion that the following prior art systems and references, either alone and/or in combination with each other as specified in the grounds discussed in my Report, disclose each limitation of each asserted claim of each Asserted Patent, as set forth in further detail in my analysis below. It is therefore my opinion that these prior art systems and references, either alone or in combination with each other, render each asserted claim of each Asserted Patent invalid as anticipated and/or invalid as obvious in view of Beckman Coulter's Infringement

Contentions served on February 14, 2025 and as amended on November 19, 2025 ("Beckman Coulter's Infringement Contentions"):

- The BD FACSArray System
- The Luminex FlexMap 3D System
- BD LSR-II System
- Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors
- U.S. Patent No. 6,198,864 to Lemoff ("Lemoff")
- U.S. Patent Pub. Appl. No. 2003/0048539 to Oostman ("Oostman")
- U.S. Patent No. 8,284,402 to Frazier ("Frazier")

15. It is also my opinion that the asserted claims of each of the Asserted Patents are invalid under 35 U.S.C. § 112 for the reasons I explain in further detail in Section XV below.

16. In addition to the materials set forth or otherwise referenced in this report and attached, I reserve the right to create additional demonstrative exhibits that are consistent with these opinions to help explain my opinions to the jury.

## III. LEGAL STANDARDS

17. I am neither a lawyer nor a legal expert and am not offering any opinions or testimony about the law. Nevertheless, I have been asked to provide my opinions in the context of certain legal standards that I have set forth below. I have no formal legal training. I have been informed of the following legal principles by counsel. I have applied them in my analysis to arrive at the conclusions set out in

(de)Multiplexer Detectors was also prior art as of October 18, 2012, May 30, 2012, or April 18, 2012 since it was on sale, either as a standalone upgrade or within complete systems, before any of those dates based on **Cytek's** sales to Principia, Stanford, and BMS-Zymogentics, and among others, such as Hospital for Special Surgery (HSS), Medical College of Georgia (MCG), and St. Louis University (SLU).  I reserve the right to further address the priority of the claims after reviewing the rebuttal report of Be**ckman Coulter's expert.**

## VII.  TECHNOLOGY BACKGROUND

### A.    Flow Cytometers

71.    Flow cytometry is a technique for taking rapid measurements on particles, cells, or beads flowing one-by-one in suspension through a flow channel as this material intercepts one or more beams of light radiation.  These particles, cells, or beads are often illuminated by lasers at different points within the flow channel.  Particles, cells, or beads are often prepared with fluorescent markers (e.g., dyes) that will fluoresce and emit light of a certain peak wavelength when illuminated by one or more lasers.  Laser light incident on the particles, cells, or beads is either scattered (forward and/or side) or absorbed by the fluorescent markers; the absorbed light causes a fluorescence emission from the fluorescent markers. The scattered light and/or fluorescent light can be collected, detected, and digitized to provide quantitative information about properties of the analyzed



**FIG._6**

(Oostman **'314**, FIG. 6.)

75.    Another detector array design, a linear WDM configuration, involves passing collected light through a series of dichroic filters arranged in a line, where each filter except the last in line reflects a certain color band toward an associated detector and transmits the remaining bands to the next detector.  The last filter reflects one color band to a detector and transmits the remaining light to a final detector.  An exemplary linear WDM configuration from U.S. Patent No. 5,317,162 to Pinsky **("Pinsky")** is shown below:

35



FIG-1

(Pinsky, FIG. 1, *see also id.*, Abstract, 6:19-57 (describing WDM arrangement); *see also* Howard M. Shapiro, Practical Flow Cytometry (4th ed. 2003) ("Shapiro") at 51 (Fig. 1-21); WO 2010/101623 to Thomas ("**Thomas**"), FIG. 1, [0017].)

76. The zig-zag WDM configuration depicted in the '582 patent was a well-known alternative to the above detector array configurations in flow cytometry. For example, Plaintiff also disclosed a zig-zag WDM configuration before April 2012 in U.S. Patent No. 8,284,402 to Frazier ("**Frazier**"). Like the '582 patent's purported invention, Frazier discloses **optical fibers that transport light collected from a flow cell, where the light is collimated by a lens and then spectrally separated for detection by zig-zagging between arrays of filters and mirrors.**

36



(Frazier, FIG. 1; *see also id.*, 4:14-5:17, 7:3-17, 7:34-61 (easily modified to extend number of dichroic filters and detectors per light beam).)

77. This zig-zag configuration was commonly used for both single-mode and multimode optical fiber waveguides in the optical communication industry, which would have been a further source of information to a POSA seeking light demultiplexing and detection designs in a flow cytometer system. Frazier refers in its specification to this detector array configuration by pointing to U.S. Patent No. 4,244,045 to Nosu (**"Nosu"**), a demultiplexer device in fiber optic communications. (Frazier, 2:9-24.) Nosu shows this zig-zag configuration in FIG. 12.

37

Fig. 12



<mark>(Nosu, FIG. 12; *see also id.*, Abstract, 6:28-44 (describing how light from optical fiber **100** is collimated through a graded index rod lens **40** then travels between, and is spectrally separated by, opposing optical filters for photo detection).)</mark>

78. The '582 patent admits that "WDM techniques well-established in the optical communication industry can be readily adapted for fluorescence light detection," indicating that the optical communication industry is an analogous field of art. ('582, 4:50-60.) A POSA would have expected such, particularly because the WDMs in both fields are "almost identical in function and architecture," addressing the same set of problems in light demultiplexing and detection. (*Id.*, 44:7-14.) U.S. Patent No. 8,537,468 to Wang ("Wang"), related to the area of optical communications, also shows a zig-zag WDM configuration that involves a zig-zag

would have readily understood that arranging filters and mirror arrays in a zig-zag WDM configuration was a common, accepted approach in wavelength division demultiplexing, including for flow cytometry applications. (*See, e.g.*, U.S. Patent No. 7,212,343 to He (**"He"**), 4:43-5:9, 5:62-6:4, FIG. 7 (concave mirror array used in WDM); U.S. Patent No. 5,835,517 to Jayaraman (**"Jayaraman"**), 3:37-4:11, FIG. 1 (curved microlens with reflective coating and interference filter substrate in optical block WDM); U.S. Patent No. 6,201,908 to Grann (**"Grann"**), 3:54-62, 4:4-26, FIG. 1.) U.S. Patent No. 6,542,306 to Goodman (**"Goodman"**), is a further example of this zig-zag WDM configuration that was already well-established in the art by 2012.

### C. Use of Avalanche Photodiodes (APDs) in Flow Cytometry

81. The '582 specification acknowledges that "[i]n many multicolor fluorescence detection instrumentations, such as flow cytometers … the fluorescence light emitted from the object of interest is: … detected by [a] photo detector, such as [a] photomultiplier tube (PMT), PIN photodiode or avalanche photodiode (APD)." ('582, 43:31-42.) The Asserted Claims are directed toward a "semiconductor detector" that a POSA would have understood to be a PIN photodiode or an APD, but not a PMT.

82. With respect to APDs, the '582 specification alleges that the "PMT has been the de-facto low-level light detector in many commercial fluorescence detection flow cytometers" and contends that "[o]nly in certain scientific

would have readily understood that arranging filters and mirror arrays in a zig-zag WDM configuration was a common, accepted approach in wavelength division demultiplexing, including for flow cytometry applications. (*See, e.g.*, U.S. Patent No. 7,212,343 to He (**"He"**), 4:43-5:9, 5:62-6:4, FIG. 7 (concave mirror array used in WDM); U.S. Patent No. 5,835,517 to Jayaraman (**"Jayaraman"**), 3:37-4:11, FIG. 1 (curved microlens with reflective coating and interference filter substrate in optical block WDM); U.S. Patent No. 6,201,908 to Grann (**"Grann"**), 3:54-62, 4:4-26, FIG. 1.) U.S. Patent No. 6,542,306 to Goodman (**"Goodman"**), is a further example of this zig-zag WDM configuration that was already well-established in the art by 2012.

### C. Use of Avalanche Photodiodes (APDs) in Flow Cytometry

81. The '582 specification acknowledges that "[i]n many multicolor fluorescence detection instrumentations, such as flow cytometers … the fluorescence light emitted from the object of interest is: … detected by [a] photo detector, such as [a] photomultiplier tube (PMT), PIN photodiode or avalanche photodiode (APD)." ('582, 43:31-42.) The Asserted Claims are directed toward a "semiconductor detector" that a POSA would have understood to be a PIN photodiode or an APD, but not a PMT.

82. With respect to APDs, the '582 specification alleges that the "PMT has been the de-facto low-level light detector in many commercial fluorescence detection flow cytometers" and contends that "[o]nly in certain scientific

41

("Lawrence"); William G. Lawrence et al., *A Comparison of Avalanche Photodiode and Photomultiplier Tube Detectors for Flow Cytometry*, Imaging, Manipulation, and Analysis of Biomolecules, Cells, and Tissues VI, Proc. of SPIE Vol. 6859, 68590M, (2008) ("Lawrence 2008")) discussing the development of a flow cytometer that used a 16-channel APD linear detector array for fluorescence detection of light in the 400 nm to 1000 nm wavelength range. (Lawrence at 1.) The authors acknowledged at the time that "[e]fforts to extend the usable spectral range into the near infrared have been limited by the poor detection efficiency of PMTs in that region" but that "[r]ecent reports on the modification of available instruments and new designs of commercial instruments have shown that avalanche photodiodes can be used for flow cytometry studies in the near IR spectral region." (*Id*. (citation omitted).) In developing its APD detector array, the authors observed of APDs that:

> The responsivity of the APD is better than the PMT in the near infrared. We report initial studies on cell proliferation measurements that demonstrate application of the APD detector in the near infrared. These results show the improved spectral operating range of the APD detector.

(*Id*. at 9; *see also* Lawrence 2008 at 10 ("In the red and near infrared spectral regions, the APD has better signal to noise performance than the PMT at low and high signal intensity conditions.").)

88.     APDs were a known and increasingly favored alternative to PMTs by 2012, being an "excellent photo-counting device, whose features include the

following: excellent photon detection efficiency; high gain $10^5$-$10^6$; room temperature operation; insensitive to magnetic fields; excellent time resolution, that are important for the laboratory-**built optical system.**" (Shutao Zhao et al., *High gain avalanche photodiode (APD) arrays in flow cytometer opitical [sic] system*, IEEE, 2151-**2153 (2011) ("Zhao") at 2152**; *see also* SensL SPMMini at 1 (noting that an APD **"combines the high gain (**$10^6$**)** and high quantum efficiency of the PMT with the well appreciated benefits of silicon including size, low operating voltage, robustness, reliability, magnetic field insensitivity, tolerance of excess/ambient **light, and suitability for miniaturization"** along with **"high signal to noise and fast timing properties").)**

89.     With advances in APD technology and their known benefits, use of APD photodetectors in flow cytometers arose with more frequency in commercial systems and the patent literature, including for Plaintiff.  For example, Frazier, discussed below in my prior art mappings, recognizes that its zig-zag WDM could be adapted to use APD detectors. (Frazier, 4:19-21.) Other pre-2012 flow cytometry patents similarly discuss use of APDs for fluorescence detection in flow cytometers. (*See, e.g.*, U.S. Patent No. **8,188,438 to Li ("Li-438"), 13:5-**19; Canadian Patent No. **2 771 324 to Patt ("Patt"), [0020];** U.S. Patent No. 7,580,120 to Hamada **("Hamada"), Abstract**.)

90.     Luminex    Corporation    also    developed    flow    cytometers    that

implemented APD detector arrays, obtaining patent rights to the technology as early as the late 1990s. (*See* WIPO Int. Pub. No. WO1998/059233 to Chandler ("Chandler-233"), 6:14-23; U.S. Patent No. 7,523,637 to Roth ("Roth-637"), Abstract; U.S. Patent No. 7,505,131 to Roth ("Roth-131"), 3:16-28; U.S. Patent Application Publication No. 2008/0305481 A1 to Whitman ("Whitman"), [0089]; U.S. Patent Application Publication No. 2007/0269345 A1 to Schilffarth ("Schilffarth-345"), [0036]; U.S. Patent Application Publication No. 2007/0207513 A1 to Sorensen ("Sorensen"), [0055]; U.S. Patent Application Publication No. 2009/0071225 A1 to Schilffarth ("Schilffarth-225"), [0028]; U.S. Patent Application Publication No. 2009/0237658 A1 to Calvin ("Calvin"), [0078].) U.S. Patent No. 6,139,800 to Chandler ("Chandler) is among the Luminex patents that implement APD photodetectors within a flow cytometer. These patent disclosures were hardly academic—Luminex commercially sold several flow cytometer systems (e.g., Luminex 100 IS System and Luminex FlexMap 3D System) before the date of invention of the '582 patent disclosing a flow cytometer with APD detectors. (*See* Luminex 100™ IS User Manual Version 2.3 (Oct. 2005) (CYTEK_0000013890) at 3-5; Luminex 200™ System User Manual (July 2005) (CYTEK_0000014118) at 2-1 – 2-2; Luminex FlexMap 3D® Hardware User Manual (Dec. 2009) (Diasorin00000570) at 9.) Commercial flow cytometers with APD detectors were also available from Partec, Optoflow, and Becton Dickinson as early as 2003.

48

███████████████ – ███████████████

(Shapiro at 164; BD Biosciences Immunocytometry Systems Technical Specifications BD FACSArray (Oct. 2003) (CYTEK_0000011699) at 2.)

## VIII. ASSERTED PATENTS

### A. Overview of the Shared Specification

91. Specific to the Asserted **Claims, the '582 patent recites WDM** configurations that pass light through a collimating optical element that projects a collimated beam into a cascaded relay architecture of filters and mirrors while **maintaining the beam's size throughout.** (*See, e.g.*, **'582, 2:26**-35, 4:34-55, 4:63-5:22, 6:39-50, 8:51-55, 9:51-65, 20:18-33, 20:62-21:10, 21:40-48.) FIG. 25, an optical ray tracing diagram, shows how light rays travel through the zig-**zag WDM's** 1:1 relay architecture as a collimated beam. Dichroic filters **903**, **909**, **914**, **915**, **916**, **917** separate the beam into color bands (i.e., wavelength ranges) passing the color band of interest for detection by photodetectors. Dichroic filters **903**, **909**, **914**, **915**, **916** reflect the remaining colors in the beam of light for further processing within the zig-zag WDM while the last dichroic filter **917** can either reflect some, absorb some, or pass all of the remaining light for detection by a photodetector. The zig-**zag WDM's 1:1 relay architecture maintains the collimated beam's si**ze as the beam zig-zags between mirrors **907, 910, 911, 912, 913** and the dichroic filters **903, 909, 914, 915, 916, 917**.

[0028].)  Laser beams interact with the fluorescent dye marked particles, "causing scattering and fluorescence that is spatially separated along a line parallel to the flow channel **109**." (*Id*., [0029].)  This impinging of the laser beams upon the fluorescent dye marked particles of the liquid sample of flow stream **103** in flow channel **109** creates an "illuminated zone." (*Id*., [0028].)

128.   Scattered and fluorescent light is then "imaged by a lens light collector 111 to four respective optical fibers 123, 125, 127 and 129," each of which is a multi-mode optical fiber. (Oostman, [0029].)  Light collected and focused into each optical fiber is then transmitted to a respective detector cluster 124, 126, 128, and 130, which comprises an array of detectors. (*Id*., [0030].)  "Each array of detectors differentially separates bands of light by filtering, using coatings on beam splitters and lenses, in a known manner." (*Id*.)

129.   Oostman's FIG. 5 and FIG. 6 each show a detector cluster with two polygonal WDM arrangements to demultiplex the fluorescent light into separate bands for each detector.



FIG._5

FIG._6

(Oostman, FIGs. 5, 6.)  An optical fiber **123** guides light into each of Oostman's

polygonal WDMs within each detector cluster.

### G. Frazier

130. U.S. Patent No. 8,284,402 to Frazier ("Frazier"), titled "Fluorescence Detection Instrument with Orthogonal Laser Entry," discloses a "detector assembly for analysis of light emitted form [*sic*] a fluorescent material, an optical alignment assembly for introducing an output beam into a detector array or demultiplexer, and methods of demultiplexing a beam of light into wavelength bands." (Frazier, Abstract.) In addition to the previously mentioned WDM disclosures, Frazier also indicates that its detectors can be "various … types of photodetectors, for example, photo avalanche detectors[.]" (*Id.*, 4:19-20.) I am informed that Frazier qualifies as prior art because it was filed on February 26, 2010, before the filing date of the earliest patent application to which the '582 patent claims priority.

### X. USE OF DISPUTED TERMS & TERMS LACKING § 112 SUPPORT FOR PRIOR ART ANALYSIS IN SECTIONS XI-XIII

131. As explained above, I understand that the Court's claim construction rulings apply as a matter of law, and I have applied the Court's claim construction rulings in my analysis and in arriving at my conclusions in this Report. Where the Court has not construed a term, and Plaintiff has offered a construction for that term (either explicitly, or implicitly, including by Plaintiff's infringement mapping on Cytek's products (*see, e.g.*, Beckman Coulter's Infringement Contentions), I have relied upon Plaintiff's proposed construction for my prior art analysis, unless

otherwise stated. To be clear, my adoption of Plaintiff's constructions is not an endorsement of these constructions. Nor is my mapping of prior art references across the claim limitations set forth in Sections XI-XIII meant to suggest that these claims have adequate § 112 support. Indeed, I incorporate by reference my opinions regarding § 112 deficiencies, as stated in Section XV, across each claim limitation in Section XI-XIII below.

## XI. PRIOR ART APPLIED TO THE '582 PATENT

### A. Ground 1: Claims 1, 3, 6 of the '582 Patent are Obvious Over the BD FACSArray System and Lemoff

#### 1. Motivation to Combine

132. A POSA would have found it obvious to combine BD FACSArray System flow cytometer with Lemoff's teachings regarding its wavelength division demultiplexer devices. BD FACSArray System, as modified by Lemoff, would have predictably resulted in the substitution of linear configuration of the filters and detector arrays with Lemoff's more modular, efficient, cost-effective demultiplexers (WDMs) having an optical block.

133. BD FACSArray System was marketed for being a "compact" flow cytometer, suited for small laboratory settings. BD FACSArray System also flouted its speed and sensitivity. (CYTEK_0000011699-11702 at CYTEK_0000011699 ("The BD FACSArray™ bioanalyzer sets a new standard for fast and sensitive high-content analysis of applications in cell biology, immunology, and drug discovery.

patent specifically identifies WDMs in the optical communication industry as analogous to WDMs in flow cytometry. ('582, 4:50-60 ("WDM techniques well-established in the optical communication industry can be readily adapted for fluorescence light detection."), 44:7-14 (WDMs in both fields are "almost identical in function and architecture").)

138.   A POSA would have been motivated to combine the BD FACSArray System with Lemoff because Lemoff's teachings address and provide an improvement in harmony with BD FACSArray System's design goals. Lemoff explains that its invention is intended to provide a demultiplexer device:

- "that can be easily produced with greater miniaturization";
- where "the necessary optical distance between the input fiber and the first interference filter is obtained in a relatively small space";
- that "occupies less space than prior designs while providing the same performance";
- that is designed to allow for "precise alignment" in the optical block; and
- is easy to fabricate without the need for specialized materials.

(Lemoff, 2:19-24, 2:63-67, 4:8-11, 4:16-19, 3:45-47.)  These motivations are confirmed by multiple references in the prior art. (*See, e.g.*, Oostman, [0008] (object of invention to provide an "improved" optical system with "a greater number of detectors than has been achieved in the prior art"), [0009], [0010], [0011] (discussing desirability of modularity); Frazier, 2:39-46 (discussing desire for scalability, and fine-tuning granularity of wavelength division); Wang, 1:65-2:2 ("[T]here is a great

need for such optical modules being made small, and at the same time, the modules so designed are amenable to small footprint, broad operating wavelength range, **enhanced impact performance, lower cost, and easier manufacturing process.**"); Lemoff, 2:19-23 (**"In view of the size constraints involved with bulk optical** multiplexers and the drawbacks involved with utilizing filters arranged in series along an optical path, what is needed is an optical demultiplexer that can be easily produced with greater miniatu**rization.**"); **He, 2:35-38 ("There thus has been a need** for compact WDM modules that minimize the problem of error amplification as **discussed above and provide high tolerance for manufacturing with high yield.**"); Grann, 2:51-**56 ("One of the key features and a primary object of** the present invention is to provide a compact and cost effective optical multiplexer and demultiplexer for both single-mode or multi-mode fiber optic communication systems wherein the device includes preformed and premolded passively aligned **optics.**"); Nosu, 3:31-52.)

139. **Lemoff's compact demultiplexer confers the benefits that a POSA** would have sought in seeking improvements to the BD FACSArray System for light separation. The Lemoff demultiplexers are smaller, more scalable, and more portable than BD FACSArray System. **Lemoff's simple geometric design provides** similar ease of access as BD FACSArray System**'s configuration while simplifying** fabrication/assembly, reducing the bill of material (BOM) costs by using less



optical relay element

first focusing optical element

first semiconductor detector

FIG. 3

**Dependent Claim 2: "The optical subsystem of claim 1, further comprising the light source, wherein the light source comprises light passing through a pinhole or light emitted from a facet of a multimode optical fiber."**

178. Claim 2 depends from Claim 1 and further recites **"further comprising the light source, wherein the light source comprises light passing through a pinhole or light emitted from a facet of a multimode optical fiber."** The combination of BD FACSArray System and Lemoff discloses and/or renders obvious Claim 2. Lemoff describes that "[w]hen implemented in a preferred four-channel WDM communications system, light from an <u>optical fiber</u> is coupled

███████████████ – ███████████████

directly into the main optical block through the input surface without the light being collimated." (Lemoff, 3:52-55 (underlining added).) While Lemoff does not specify that the optical fiber is a multimode optical fiber, a POSA would have understood that Lemoff's optical system discloses a multimode optical fiber based on Lemoff's description of a wavelength division multiplexed optical system where "light from several lasers, each having a different central wavelength, is combined into a single beam that is introduced into an optical fiber." (*Id.*, 1:9-13.)

179.   Lemoff teaches that a "light is coupled from an optical fiber **42** into the MOB[.]" (Lemoff, 4:47-51 (underlining added).) I have annotated optical fiber **42** (light green) in FIG. 3 below:



FIG. 3

(*Id.*, FIG. 3 (annotated).)

180.    **Implementation of Lemoff's optical fibers in** a flow cytometer, such as the BD FACSArray System, would have been obvious to a POSA by April of 2012. Use of optical fibers was well-known by April 2012, and numerous prior art teaches use of optical fibers to direct light into WDMs, including in flow cytometers. (*See, e.g.*, BD LSR-II System (CYTEK_000001262-12168 at CYTEK_0000012165), **Cytek's Curved**-Mirror DxP Wavelength Division (de)Multiplexer Detectors (*see* Section IX.D), Frazier, Li-438, Oostman; *see also* Grann, He, Jayamaran.) A POSA also would have been motivated to implement Lemoff's optical fibers to take advantage of the benefits and advantages of using optical fibers, equally applicable in flow cytometry applications, such as flexible configurations while minimizing loss of collected fluorescent and/or scattered light, increasing range of wavelengths for detection while maintaining compact/flexible design, efficiency, and cost-effectiveness.  (*See, e.g.*, Frazier, 8:7-16 (use of optical fiber in WDM allows flexibility in design); Grann, 1:16-30 (optical fiber transmits several wavelengths of light, increasing efficiency); He, 1:13-28 (combining multiple wavelengths of light into one optical fiber expands WDM functionality); Jayaraman, 4:34-56 (optical fiber lessens insertion loss); Lemoff, 1:9-18 ("[T]he data transmission capacity of a fiber is increased by a factor equal to the number of single-wavelength signals combined into a single fiber."); Oostman, [0029]-[0030] (optical fibers are easily

116

movable and adjustable to optimize input light from the sample)).

> **4. Dependent Claim 3: "The optical subsystem of claim 2, wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element to a size smaller than 1 millimeter in diameter."**

181.    Claim 3 depends from Claim 2 and recites **"wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element to a size smaller than 1 millimeter in diameter."** The combination of BD FACSArry System and Lemoff discloses and/or renders obvious Claim 3. I understand that the Court has provided the following constructions that apply to this limitation, which I have applied in my analysis:

| Claim Term | Construction |
|---|---|
| "collimate" / "collimating" / "collimated beam" ('582 patent, cls. 1, 3, 6, 20; '443 patent, cl. 10) | plain and ordinary meaning, and deferring the issue of indefiniteness (8/21/25 Hr'g Tr. at 133:11-17, 134:4-135:16) |
| "portion" ('582 patent, cls. 1, 3; '443 patent, cl. 1; '107 patent, cls. 1, 5, 16, 21) | "subset of the spectrum of wavelengths of light" (9/17/25 Hr'g Tr. at 92:23-24) |

182.    That is, the beam must be focused to an approximate circular area size of 0.785 mm$^2$ or less, or, for a rectangular configuration, less than 1 mm by 1 mm. Lemoff does not specifically describe the spot size that its focusing lenses focus the portion of the collimated beam down to but does acknowledge that, preferably, "the spatial extent of the beam incident on the filters is sufficiently smaller than the detector diameter to allow for alignment tolerances and divergence between the

117

**C.**     <u>Ground 3</u>**: Claims 1, 3, 6 of the '582 Patent Are Obvious Over Oostman, Lemoff, <mark>and Frazier</mark>**

        **1.**     **Motivation to Combine Oostman with Lemoff and Reasonable Expectation of Success**

211. A POSA would have found it obvious to combine Oostman's flow cytometers with Lemoff's teachings regarding its wavelength division (de)multiplexer devices. Oostman, as modified by Lemoff, would have predictably resulted in the substitution of Oostman's detector array cluster arrangements with Lemoff's more modular, compact, and efficient optical block demultiplexers that included Oostman's collimating lens.

212. Oostman describes the need to "provide an improved system for detecting fluorescent light having multiple colors emitted from a target using a greater number of detectors than has been achieved in the prior art." (Oostman, [0008].) Oostman strives for this objective with a modular design that feeds a "greater number of fibers" that can "feed a greater number of [detector] clusters" for color separation and detection. (*Id.*, [0010].) But a POSA would have recognized that the ability to perform color separation for additional spatially separate lasers in Oostman's system comes at the cost of overall footprint and scalability. Oostman's polygonal WDM clusters (including its star configuration WDM) only permit "between five and ten light detectors in a common plane," a potential design constraint that limits how finely grained light fed into a detector cluster from an

as Oostman's configuration while simplifying fabrication/assembly, reducing the bill of material (BOM) costs by using less materials, and still offering a design that is easily scaled or modified to the number of channels desired for a particular application.

217. These motivations, and the associated benefits, are consistent with my pre-2012 experience at Guava Technologies where I extensively reviewed demultiplexing technologies from the field of optical communications in the design of a next-generation mini flow cytometer.

218. **It would have been obvious to try Lemoff's demultiplexer device in Oostman's flow cytometer system.** Lemoff provides a zig-zag pattern for an optical path in an optical block that was widely accepted in optical communications and had long found adoption within flow cytometry applications. (*See* Section VII.B.) **Lemoff's WDM configuration is an alternate, known option to the polygonal arrangements in Oostman's detector arrays, and one of several options available to** a POSA at the time of the invention.

219. A POSA would have had a reasonable expectation that the combination would have been successful. Lemoff designed its invention to specifically provide **a demultiplexer that can be fabricated "using high volume, low cost techniques, such** as injection molding**, without the need to rely on specialized materials."** (Lemoff, 4:8-11.) The '582 specification confirms that a WDM from the optical

communication industry can be "readily adapted for fluorescence light detection," as such a WDM is "almost identical in function and architecture" to WDMs used in flow cytometry. ('582, 4:50-60, 44:7-14.)

### 2. Motivation to Combine Oostman and Lemoff with Frazier and Reasonable Expectation of Success

220. A POSA would have found it obvious to combine the Oostman-Lemoff optical subsystem with Frazier's teachings on the use of APDs within its WDM. (*See* Frazier, 4:19-21.) The Oostman-Lemoff optical subsystem, as further modified by Frazier's APD teachings, would have predictably resulted in the implementation of APDs as the fluorescence detectors in the Oostman-Lemoff optical subsystem. The small footprint of APDs would have been particularly conducive for integration in Lemoff's compact WDM design.

221. A POSA would have regarded the teachings of Frazier as naturally combinable with the optical subsystem discussed in Oostman as modified by Lemoff. Oostman, Lemoff, and Frazier are analogous references in the same field as the alleged invention related to wavelength division demultiplexing, fluorescence detection, and/or flow cytometry. (*See, e.g.,* Oostman, [0001], [0027]; Lemoff, 1:4-6; Frazier, Abstract, 1:15-20 ("[T]he present invention relates to fluorescence detection assemblies for analysis of fluorescent signals from target substances."), 4:5-13 (disclosed WDM configuration incorporated into flow cytometry system but also applicable to other "native environments" like blood analysis, cell sorting, DNA

analysis).) Frazier discloses a zig-zag WDM configuration that is similar to Lemoff (including use of detectors, interference filters, and mirrors) albeit with a central boulevard design. (*Compare, e.g.*, Frazier, FIG. 1, *with* Lemoff, FIG. 3.)

222. A POSA would have been motivated to combine Oostman and Lemoff with Frazier to achieve the benefits of using APDs (*see* Section VII.C) while furthering the previously discussed objective of improving Oostman's flow cytometer with design improvements that result in a more compact flow cytometer with expanded color separation and more detection capabilities. A POSA would have understood that APDs are significantly smaller than larger PMTs with bulkier housings, allowing for even more compact WDMs due to their "very small" size. (Doornbos at 594; *see also, e.g.*, SensL SPMMini at 1-2 (small chip areas).) APDs were also known to have high gain and higher cathode quantum efficiency than PMTs (particularly in the IR region), resulting in an expanded spectral operating range, higher spectral sensitivity, and better signal-to-noise ratio performance at longer wavelengths. (Shapiro at 164; Lawrence at 9; Stewart at 106, 109; Lawrence 2008 at 10; Zhao at 2152.) A POSA would have found these technical features of APDs to be highly desirable over PMTs, as APDs deliver (1) more sensitive and accurate photon detection where fluorescent light signals are weak, (2) more efficient photon detection at longer wavelengths (e.g., near infrared spectral regions); and (3) comparable performance at higher energy wavelengths. (Gjelsnes,

6:10-13; Lawrence at 9; Stewart at 106, 109; Lawrence 2008 at 10; Zhao at 2152; SensL SPMMini at 1; *see also* Hamamatsu Si APD S5343 to S5345, S9073 to S9075, Short wavelength type APD (Apr. 2004); Hamamatsu Si APD S8890 series, Long wavelength type APD (June 2010); Hamamatsu Si APD S2381 to S2385, S5139, S8611, S3884, S4315 series, Low bias operation, for 800 nm band (May 2010).)

223.   A POSA would have had a reasonable expectation that the combination would have been successful.  While Oostman discloses use of PMTs, researchers in the field had already demonstrated that PMTs could be substituted for APDs with relative ease and expected to be able to do so in the very commercial system (LSR-II) embodied in Oostman's polygonal arrangement.  (Stewart at 109.)  A POSA would not have anticipated any additional technical hurdles from implementing APDs, as opposed to using bulkier PMTs with Lemoff's zig-zag WDM configuration in the Oostman flow cytometer system.  Frazier's zig-zag WDM configuration is substantively similar to Lemoff's zig-zag WDM design and discloses use of APDs.  In addition, as described in Section VII.C incorporated here, skilled artisans in the field had already long since resolved the technical issues that early APD adopters had encountered when using APDs in flow cytometry applications (e.g., temperature dependence, high dark current).

224.   A POSA would not have perceived any teaching from Oostman or Lemoff that would discourage incorporation of Frazier's APDs into the combined

██████████████ – ████████████████

Oostman-Lemoff optical subsystem. Rather, the combination would have entailed only the routine techniques in integration, calibration, and optimization to implement APDs for fluorescence detection in the Oostman-Lemoff optical subsystem.

### 3. Independent Claim 1

#### i. Claim 1[pre]: "An optical subsystem for a flow cytometer, the optical subsystem comprising:"

225. I understand from counsel that the parties agree that Claim 1's preamble is limiting. In my opinion, **applying Plaintiff's** interpretation **that "optical subsystem" refers to a wavelength division** multiplexer (WDM) optical subsystem rather than a laser diode optical subsystem, the preamble reciting an optical subsystem for a flow cytometer is disclosed and/or rendered obvious by the combination of Oostman and Lemoff.

226. The '582 specification acknowledges that Oostman discloses a WDM for a flow cytometer, albeit in at least a star configuration. (*See* '582, 5:11-18.) Oostman describes how its "preferred embodiment features a flow cytometer" that is "illustrative of instruments which employ fluorescence detection and color separation." (Oostman, [0027].) Oostman's FIG. 4 depicts a flow cytometer setup comprising lasers **95**, **97**, **99**, and **101** irradiating a target sample within fluidic system **105**, with an optical subsystem where fluorescent and scattered light is collected by a light collector **111** and focused into optical fibers **123**, **125**, **127**, and **129** to route the light to respective detector clusters **124**, **126**, **128**, and **130** (in grey

collimating lens equally satisfies Plaintiff's proposed construction as well.

iii. **Claim 1[b]: "an optical relay element arranged to receive at least a portion of the collimated beam from the collimating optical element,"**

232. The combination of Oostman and Lemoff discloses and/or renders obvious Claim 1[b] for the same reasons I provided for Claim 1[b] in Ground 1, fully incorporated here.

iv. **Claim 1[c]: "the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a first image;"**

233. The combination of Oostman and Lemoff discloses and/or renders obvious Claim 1[c] for the same reasons I provided for Claim 1[c] in Ground 1, fully incorporated here.

v. **Claim 1[d]: "a first focusing optical element arranged to receive at least a portion of the collimated beam reflected by the optical relay element; and"**

234. The combination of Oostman and Lemoff discloses and/or renders obvious Claim 1[d] for the same reasons I provided for Claim 1[d] in Ground 1, fully incorporated here.

vi. **Claim 1[e]: "a first semiconductor detector,"**

235. The combination of Lemoff and Frazier discloses and/or renders obvious Claim 1[e]. Whereas Lemoff generally teaches that each of "an array of lenses **50, 52, 54,** and **56** is coupled to the output end **46** of the MOB **14** to direct

150

and focus the filtered light to the adjacent array of detectors **60, 62, 64, and 66,**" (Lemoff, 7:25-29 (underlining added)), Lemoff does not disclose whether its optical detector is a "semiconductor detector" or not. Frazier provides these implementation details, teaching that its photodetectors can include photo avalanche detectors (APDs), a **"semiconductor detector."** (Frazier, 4:19-21.) The **"first semiconductor detector"** in the combined Lemoff-Oostman-Frazier design is the APD associated with the focusing lens **52** that I identified in Claim 1[d] as the **"first focusing optical element."** Lemoff also discloses that this is the **"first"** semiconductor detector under Plaintiff's construction because it is distinguishable from other semiconductors in the Lemoff-Oostman-Frazier optical subsystem. A POSA would have been motivated to combine Lemoff with Frazier's APDs for the same reasons I provided in Section XI.C.2

> vii. **Claim 1[f]: "wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element onto the first semiconductor detector."**

236. The combination of Oostman and Lemoff discloses and/or renders obvious Claim 1[f] for the same reasons I provided for Claim 1[f] in Ground 1, fully incorporated here.

███████████████████ — ███████████████

### 4. Dependent Claim 2: "The optical subsystem of claim 1, further comprising the light source, wherein the light source comprises light passing through a pinhole or light emitted from a facet of a multimode optical fiber."

237. The combination of Lemoff and Oostman discloses and/or renders obvious Claim 2. Lemoff discloses Claim 2 for the same reasons I provided for Claim 2 in Ground 1, fully incorporated here.

238. Oostman also discloses a **"multimode optical fiber"** that directs collected light into a WDM. After light from multiple lasers intersects the flow stream and interacts with fluorescent marked particles in a fluid sample to cause scattering and fluorescence, a light collector "gathers fluorescent light from the fluorescent target material" and focuses the light into several optical fibers **123**, **125**, **127**, and **129**. (Oostman, [0029]-[0030].) "Light in each of the fibers **123**, **125**, **127** and **129** is transmitted to a respective detector cluster **124**, **126**, **128** and **130** which houses an array of detectors." (*Id.*, [0030].) A POSA would have understood Oostman's "array of detectors" to be wavelength division [de]multiplexers, as Oostman describes how the "array processes fluorescent light" and "[e]ach array of detectors differentially separates bands of light by filtering, using coatings on beam splitters and lenses, in a known manner." (*Id.*)



**FIG._4**

(*Id.*, FIG. 4 (annotated).) As shown above, the incident light into the light collector **111** is gathered and focused onto optical fibers, to be routed into the optical subsystems for demultiplexing and detection. Oostman explains that "[t]he focal spots produced by collector **111** enter the tip of each respective fiber **123**, **125**, **127** and **129**, each of which is a multi-mode fiber" and then "[l]ight in each of the fibers **123**, **125**, **127** and **129** is transmitted to a respective detector cluster **124**, **126**, **128** and **130** which houses an array of detectors" that differentially separates the light into color bands. (*Id.*, [0029]-[0030].) It would have thus been clear to a POSA that Oostman's flow cytometer and detection array setup, as modified to include Lemoff's WDMs, would necessarily result in a "**light emitted from a facet of a**

multimode optical fiber" within Lemoff's WDM.

> 5. **Dependent Claim 3: "The optical subsystem of claim 2, wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element to a size smaller than 1 millimeter in diameter."**

239. In my opinion, the combination of Oostman, Lemoff, and Frazier, in view of a POSA's general knowledge regarding the state of the art in small area APDs by at least April 2012, discloses and/or renders obvious Claim 3 for the reasons I provided in my analysis for Claim 3 in Ground 1, incorporated here.

> 6. **Dependent Claim 6: "The optical subsystem of claim 1, further comprising a first optical filter disposed along an optical path between the collimating optical element and the optical relay element, the first optical filter configured to separate the collimated beam into a first branch and a second branch."**

240. In my opinion, the combination of Frazier, Oostman and Lemoff discloses and/or renders obvious Claim 6 for the same reasons I provided in my analysis for Claim 6 in Ground 1, incorporated here.

241. **My annotations to FIG. 3 show how Lemoff's** wavelength-specific interference filter **20** is optically disposed between the collimating lens (**"collimating optical element"**) **from Oostman and** concave relay mirror **30** (**"optical relay element"**), **and how** wavelength-specific interference filter **20** separates a collimated beam into a first branch of collimated light directed to concave relay mirror **30** and a second branch of collimated light directed to focusing lens **50**.



FIG. 3

(Lemoff, FIG. 3 (annotated and including Oostman's collimating lens).)

D. **Ground 4: Claims 1, 3, 6, 23, 26 of the '582 Patent are Obvious Over Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors and BD FACSArray System[7]**

1. **Motivation to Combine**

242. A POSA as of April 2012 would have been motivated to combine the disclosures from the DxP System with the BD FACSArray System, including because both systems are directed to flow cytometry. Indeed, the DxP System was incorporated into at least two Becton Dickinson flow cytometry systems—the FACSCalibur and FACScan.

243. Specifically, a POSA would have found it obvious to combine the DxP

---

[7] Where not explicitly stated, I incorporate in full my analysis from Ground 1 as to why the BD FACSArray System renders Claims 1, 3, and 6 of the '582 Patent obvious.

(Doornbos at 594.) Shapiro et al. reached a similar conclusion, observing that an APD "combines some desirable properties of photodiodes and PMT's; like the former, it has high cathode quantum efficiency, like the latter, it has gain." (Shapiro at 164.) By 2012, APDs were readily available for commercial use (and had become increasingly less expensive).

246. Thus, a POSA would have recognized the advantages of implementing the BD FACSArray System's teachings regarding the implementation of APDs, and incorporate those teachings into the DxP System's WDM design. The BD FACSArray System provides the implementation details for APDs, by its use of avalanche photodiode ("APD") detectors, which provides sufficient detail for a POSA to exchange the array of PMTs incorporated into the DxP System design for a set of APDs. (*See* BD_Beckman_Cytek000019-153 at BD_Beckman_Cytek000035; *see also* BD_Beckman_Cytek000154-363 at BD_Beckman_Cytek000247, -338.) For example, BD FACSArray System uses Hamamatsu's detector model C 5460. (CYTEK_0000011675.) This specific model is an APD detector module, that was made available by October 2005. (CYTEK_0000011630; *see also* CYTEK_0000011629; CYTEK_0000011671; CYTEK_0000011631; CYTEK_0000014503-14519 at CYTEK_0000014509.)

247. In retrofitting the DxP System's WDM design to incorporate APDs, a POSA would have also been motivated to leverage additional, conventional and

well-known design configurations. For example, I describe in my Technology Background section on APDs, APDs had greater noise sensitivity than PMTs and an overall smaller detection area. Thus, a POSA would have been motivated to incorporate additional design elements to mitigate photon loss, and render a more **focused beam of light within the DxP System's WDM. Such design elements could** have included incorporating collimating lens and focusing lens, both of which can mitigate photon loss and further focus a beam of light.

248. Indeed, collimating lenses were well-known, conventional technologies in the field of flow cytometry as of April 2012, rendering known and predictable results concerning limiting divergence in a light beam. A POSA seeking to minimize photon lose (and increase efficiency) would have been motivated to incorporate a collimating lens and leverage associated advantages, including as taught by the prior art. (*See e.g.*, U.S. Patent No. 4,351,611 to Leif; Frazier; Oostman; and U.S. Patent No. 5,835,517 to Jayaraman,).

249. Similarly, focusing lenses were well-known, conventional technologies in the field of flow cytometry as of April 2012, rendering known and predictable results concerning focusing a light beam on a specified area. A POSA seeking to minimize photon loss and increase the ratio of photon to unit surface area would have been motivated to incorporate focusing lenses to focus the beam of light relayed to the APD detectors, including as taught by the prior art. (*See e.g.*, U.S.

████████████████ – ████████████████████

Patent No. 8,605,283 to Ilkov; Lemoff; Oostman; and CA2771324A1 to Patt.)

250. Thus, a POSA would have had the motivation to combine teachings from the DxP System and the BD FACSArray, including to retrofit the DxP System with APDs, and would have had the relevant knowledge to enable such implementation.

### 2. Independent Claim 1

#### i. Claim 1[pre]: "An optical subsystem for a flow cytometer, the optical subsystem comprising:"

251. Applying Plaintiff's interpretation that "optical subsystem" refers to a wavelength division multiplexer (WDM) optical subsystem rather than a laser diode optical subsystem, the combination of the DxP System and BD FACSArray System discloses and/or renders obvious Claim 1[pre].

252. Through my review of DxP System schematics and my inspection of the DxP Systems available at Cooley's Washington D.C. office, I confirmed that the DxP System discloses a **"[a]n optical subsystem for a flow cytometer."** Specifically, the DxP System discloses a system for flow cytometry that incorporates a curved-mirror wavelength division demultiplexing optical subsystem, also referred to as a **"PMT box."** The so-called PMT box includes PMT-based detectors, (dichroic and bandpass) filters, and curved mirrors enabling light to travel in the PMT box in a zigzag pattern. (*See e.g.*, L. Nichols Dep. Tr. 25:19-27:16, 29:19-34:4.)

253. Below are two figures showing a DxP System installed in a BD

160

commercially available by 2012, as BD FACSArray System contemplates, would have required the design or selection of a focusing lens for the DxP System's WDM that focused a collimated beam to a spot size approximately at the APD's effective active area to maximize signal-to-noise ratio and minimize photon loss. These small area APDs had diameters less than 1 mm, and a POSA implementing the small area APDs in the DxP-BD FACSArray System optical subsystem would naturally have focused the collimated beam down to a spot size less than the core diameter (1 mm or greater as suggested by the '582 patent) of a multimode optical fiber.

E. <u>Ground 5</u>: **Claims 1, 3, 6, 23, 26 of the '582 Patent Are Obvious Over Cytek's Curved-Mirror DxP Wavelength Division (de)Multiplexer Detectors and Luminex FlexMap 3d System[10]**

1. **Motivation to Combine**

339. A POSA as of April 2012 would have been motivated to combine the disclosures from the DxP System with the Luminex FlexMap 3D System, including because both systems are directed to flow cytometry.

340. A POSA would have found it obvious to combine the DxP Systems teachings regarding a flow cytometry system, comprising a wavelength division demultiplexer, with configuration elements disclosed by Luminex FlexMap 3D System, including its use of APDs. For example, the DxP System, as modified by

---

[10] Where not explicitly stated, I incorporate in full my analysis from Ground 2 as to why the Luminex FlexMap 3D System renders Claims 1, 3, and 6 of the '582 Patent obvious.

former, it has high cathode quantum efficiency, like the latter, it has gain." (Shapiro at 164.) By 2012, APDs were readily available for commercial use (and had become increasingly less expensive).

343. Thus, a POSA would have recognized the advantages of implementing the **Luminex FlexMap 3D System's teachings regarding the implementation of APDs, and incorporate those teachings into the DxP System's WDM design.** The Luminex FlexMap 3D System provides the implementation details for APDs, by its **use of avalanche photodiode ("APD") detectors, which provides sufficient detail for** a POSA to exchange the array of PMTs incorporated into the DxP System design for a set of APDs. (*See e.g.*, CYTEK_0000012685-12825 at CYTEK_0000012697; CYTEK_0000012684; Diasorin00000564-569 at Diasorin00000568; Diasorin00000570-641 at Diasorin00000588; Diasorin00000669; CYTEK_0000012587.) The specific APD module of the Luminex FlexMap 3D System that I inspected is shown below:

CYTEK_0000012587.



344. **In retrofitting the DxP System's WDM design to incorporate APDs, a** POSA would have also been motivated to leverage additional, conventional and well-known design configurations. For example, I describe in my Technology Background section on APDs, APDs had greater noise sensitivity than PMTs and an overall smaller detection area. Thus, a POSA would have been motivated to incorporate additional design elements to mitigate photon loss and render a more foc**used beam of light within the DxP System's WDM. Such** design elements could have included incorporating collimating lenses and focusing lenses, both of which can mitigate photon loss and further focus a beam of light.

345. Indeed, collimating lenses were well-known, conventional technologies in the field of flow cytometry as of April 2012, rendering known and predictable results concerning limiting divergence in a light beam. A POSA seeking to minimize

231

photon lose (and increase efficiency) would have been motivated to incorporate a collimating lens and leverage associated advantages, including as taught by the prior art. (*See e.g.*, U.S. Patent No. 4,351,611 to Leif; Frazier; Oostman; and U.S. Patent No. 5,835,517 to Jayaraman,).

Similarly, focusing lenses were well-known, conventional technologies in the field of flow cytometry as of April 2012, rendering known and predictable results concerning focusing a light beam on a specified area. A POSA seeking to minimize photon loss and increase the ratio of photon to unit surface area would have been motivated to incorporate focusing lenses to focus the beam of light relayed to the APD detectors, including as taught by the prior art. (*See e.g.*, U.S. Patent No. 8,605,283 to Ilkov; Lemoff; Oostman; and CA2771324A1 to Patt.)

346. Moreover, a POSA would have been motivated to incorporate features disclosed by the DxP System into the Luminex FlexMap 3D System. For example, the DxP System teaches a WDM and a fiber optic-based design that renders certain configurational benefits, including more effective and adaptable design configurations for light transmission. Incorporating these teachings into the Luminex FlexMap 3D System would in turn enable superior color separation and detection.

347. Thus, a POSA would have had the motivation to combine teachings from the DxP System and the Luminex FlexMap 3D System, including to retrofit

(CYTEK_0000011691-698 at CYTEK_0000011695 (underlining added); *see also* BD_Beckman_Cytek000019-153 at BD_Beckman_Cytek000028 ("a syringe pump is used to aspirate sample and <u>send it up to the flow cell</u>" (underlining added)).) This optical cuvette is in the flow cell. (BD_Beckman_Cytek000019-153 at BD_Beckman_Cytek000030 ("Fused silica cuvette flow cell").) The sample particles are transported to the flow cell via pressurized sheath fluid. (*Id.* at BD_Beckman_Cytek000039.)

iii.     **Claim 16[b]: "a laser configured to project light into the flow cell;"**

567.   BD FACSArray System discloses and/or renders obvious Claim 16[b]. BD FACSArray System utilizes a green laser and a red diode laser as excitation components. As shown in the below side-by-side comparison of a photo (CYTEK_0000011674) of the BD FACSArray System I personally inspected and graphic of the optical plate (BD_Beckman_Cytek000019-153 at BD_Beckman_Cytek000032 (annotated)), the BD FACSArray System has at least one "laser."

stream from each well to a flow-through optical cuvette <u>where they intercept with two laser beams</u>." (underlining added)).) Green beam is sent through a series of focus lenses until it is finally focused down "to a spot size of approximately 20 x 65 microns <u>at the stream</u>." (BD_Beckman_Cytek000019-153 at BD_Beckman_Cytek000031.) Red beam is also similarly sent through a series of lenses until it is focused down to a spot size "<u>at the stream</u>." (*Id.*)

### iv. Claim 16[c]: "a multimode optical fiber configured to receive light from the flow cell; and"

569. The combination of BD FACSArray System and Lemoff discloses and/or renders obvious Claim 16[c]. Lemoff discloses "**a multimode optical fiber**" for the reasons I provided for Claim 1[a], incorporated here. While Lemoff does not specify that the optical fiber is a multimode optical fiber, a POSA would have **understood that Lemoff's optical system discloses a multimode optical fiber based on Lemoff's description of a wavelength division multiplexed optical sys**tem where "light from several lasers, each having a different central wavelength, is combined into a single beam that is introduced into an optical fiber." (*Id.*, 1:9-13.)

570. Furthermore, Lemoff's "**multimode optical fiber**" in the combined BD FACSArray System-Lemoff system would have been placed after BD FACSArray **System's** flow cell to receive signals from the particles flowing through the flow cell (i.e., "**to receive light from the flow cell**"). (*See* Lemoff, 1:12-13 ("Each wavelength is associated with an independent data signal through the fiber.").)

571. Implementation of Lemoff's "multimode optical fiber" in a flow cytometer, such as the BD FACSArray System, would have been obvious to a POSA by April of 2012. Use of optical fibers was well-known by April 2012, and numerous prior art teaches use of optical fibers to direct light into WDMs, including in flow cytometers. (*See, e.g.*, BD LSR-II System (CYTEK_000001262-12168 at CYTEK_0000012165), **Cytek's Curved**-Mirror DxP Wavelength Division (de)Multiplexer Detectors (*see* Section IX.D), **Frazier,** Li-438, Oostman; *see also* Grann, He, Jayamaran.) A POSA also would have been motivated to implement Lemoff's optical fibers to take advantage of the benefits and advantages of using optical fibers, equally applicable in flow cytometry applications, such as flexible configurations while minimizing loss of collected fluorescent and/or scattered light, increasing range of wavelengths for detection while maintaining compact/flexible design, efficiency, and cost-effectiveness. (*See, e.g.*, Frazier, 8:7-16 (use of optical fiber in WDM allows flexibility in design); Grann, 1:16-30 (optical fiber transmits several wavelengths of light, increasing efficiency); He, 1:13-28 (combining multiple wavelengths of light into one optical fiber expands WDM functionality); Jayaraman, 4:34-56 (optical fiber lessens insertion loss); Lemoff, 1:9-18 ("[T]he data transmission capacity of a fiber is increased by a factor equal to the number of single-wavelength signals combined into a single fiber."); Oostman, [0029]-[0030] (optical fibers are easily movable and adjustable to optimize input light from the

sample)).

> v. **Claim 16[d]: "a wavelength division multiplexer (WDM) configured to receive light from the multimode optical fiber, wherein the WDM comprises:"**

572. The combination of BD FACSArray System and Lemoff discloses and/or renders obvious Claim 16[d] for the same reasons I provided for Claim 1[b], incorporated here.

> vi. **Claim 16[e]: "a plurality of mirrors,"**

573. Lemoff discloses and/or renders obvious Claim 16[e] for the reasons I provided for Claim 1[c] of this Ground, incorporated here. A POSA would have understood that an "array of mirrors" as discussed for Claim 1[c] constitutes a "plurality," which means more than one.

> vii. **Claim 16[e][i]: "wherein at least one of the mirrors is a concave mirror;"**

574. Lemoff discloses and/or renders obvious Claim 16[e][i] for the reasons I provided for Claim 3 of this Ground, incorporated here.

> viii. **Claim 16[f]: "a plurality of filters; and"**

575. Lemoff discloses and/or renders obvious Claim 16[f] for the reasons I provided for Claim 1[d] of this Ground, incorporated here. A POSA would have understood that an "array of filters" as discussed for Claim 1[d] includes a plurality of filters.

scalability to accommodate an array of demultiplexing channels and corresponding APDs that can demultiplex light across substantially the full visible light spectrum, as Lemoff teaches that "more or fewer channels can be demultiplexed by adding or subtracting filters and relay mirrors." (Lemoff, 6:47-50.)

C. <u>Ground 3</u>: **Claims 5, 16, 18, 26, 27, 29 of the '107 Patent are Obvious Over Oostman, Lemoff, and Frazier**

1. **Motivation to Combine**

644. A POSA would have been motivated to combine Oostman, Lemoff, and Frazier and would have had a reasonable expectation of success in doing so for the same reasons I provided for Ground 3 for the '582 patent. (*See supra* Sections XI.C.1-2.)

2. **Independent Claim 1**

i. **Claim 1[pre]: "A flow cytometer comprising:"**

645. I understand from counsel that the parties agree that Claim 1's preamble is limiting. In my opinion, the preamble reciting a flow cytometer is disclosed and/or rendered obvious by Oostman. Oostman describes how its "preferred embodiment features a flow cytometer" is "illustrative of instruments which employ fluorescence detection and color separation." (Oostman, [0027].) Oostman's FIG. 4 depicts a flow cytometer setup comprising lasers **95**, **97**, **99**, **101** irradiating a target sample within fluidic system **105**, with an optical subsystem where fluorescent and scattered light is collected by a light collector **111** and focused into optical fibers **123**, **125**,

████████████ – █████████████████

**127**, **129** to route the light to respective detector clusters **124**, **126**, **128**, **130**, each of which comprises an array of detectors for color separation and detection.



**FIG._4**

(*Id.*, FIG. 4.)

### ii.    Claim 1[a]: "an optical fiber; and"

646.    Both Oostman and Lemoff disclose and/or renders obvious Claim 1[a]. Oostman discloses an **"optical fiber."**  After light from multiple lasers intersects the flow stream and interacts with fluorescent marked particles in a fluid sample to cause scattering and fluorescence, a light collector "gathers fluorescent light from the fluorescent target material" and focuses the light into several optical fibers **123**, **125**, **127**, **129**.  (Oostman, [0029]-[0030].)



**FIG._4**

(*Id*., FIG. 4 (annotated).)

649. The combination of Oostman and Lemoff replaces the polygonal arrangement from Oostman's detector arrays with an alternate, known zig-zag demultiplexing configuration described in Lemoff.

#### iv. Claim 1[c]: "an array of mirrors"

650. Lemoff discloses and/or renders obvious Claim 1[c] for the same reasons I provided in my analysis for Claim 1[c] in Ground 1, fully incorporated here.

#### v. Claim 1[d]: "an array of filters; and"

651. Lemoff discloses and/or renders obvious Claim 1[d] for the same

426

reasons I provided in my analysis for Claim 1[d] in Ground 1, fully incorporated here.

> ### vi. Claim 1[e]: "an array of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters in the array of filters;"

652. The combination of Lemoff and Frazier discloses and/or renders obvious Claim 1[e] for the same reasons I provided in my analysis for Claim 1[e] in Ground 1, fully incorporated here. The only different in this Ground is that the implementation details wherein the optical detector is an "APD" is provided by Frazier.

653. While Lemoff generally teaches an array of focusing lenses where each focusing lens may "direct and focus the filtered light to the adjacent array of detectors **60**, **62**, **64**, and **66**," (Lemoff, 7:25-29), Lemoff does not disclose whether its optical detector is an "APD." Frazier provides these implementation details, teaching that its photodetectors can include "photo avalanche detectors" (i.e., "APDs"). (Frazier, 4:19-21.) The "**array of avalanche photodiodes (APDs)**" in the combined Oostman-Lemoff-Frazier system are the APDs (from Frazier) that would be "optical detectors" each associated with a focusing lens in Lemoff's set of lenses **50-56**.

**vii. Claim 1[f]: "wherein each of the filters in the array of filters is configured to receive light such that: a portion of the light passes through the filter; and another portion of the light is reflected; and"**

654. Lemoff discloses and/or renders obvious Claim 1[f] for the same reasons I provided in my analysis for Claim 1[f] in Ground 1, fully incorporated here.

**viii. Claim 1[g]: "wherein each of the mirrors in the array of mirrors is configured to: receive light reflected by a filter in the array of filters; and reflect light to another filter in the array of filters."**

655. Lemoff discloses and/or renders obvious Claim 1[g] for the same reasons I provided in my analysis for Claim 1[g] in Ground 1, fully incorporated here.

**3. Dependent Claim 2: "The flow cytometer of claim 1, wherein: the array of mirrors is substantially linear; the array of filters is substantially linear; and the array of APDs is substantially linear."**

656. Lemoff discloses and/or renders obvious the additional limitations of Claim 2 for the same reasons I provided in my analysis for Claim 2 in Ground 1, fully incorporated here.

**4. Dependent Claim 3: "The flow cytometer of claim 2, wherein at least one of the mirrors in the array of mirrors is a concave mirror."**

657. Lemoff discloses and/or renders obvious the additional limitations of Claim 3 for the same reasons I provided in my analysis for Claim 3 in Ground 1,

### 3. The Asserted Patents disclose a "WDM" for use in a conventional flow cytometer using a "collimated beam"

890. A POSA would have immediately recognized that optics for the "WDM" disclosed for use within the conventional flow cytometer in the Asserted Patents uses a "collimated beam" throughout. This is, in my opinion, abundantly clear from the description within the specification regarding the basis for the allegedly inventive WDM and the consistent and repeated statements within the specification:

> *Since efficient color separation can **only** be accomplished economically with **collimated light beam**,* small area APD has not been considered viable for multicolor fluorescence light detection applications. *Clearly, **a technology capable of collimating** a large etendue light beam* over an extended distance without significantly expanding the beam diameter would be highly desirable. ***Such a technology would enable a WDM like device for fluorescence light detection*** with characteristics comparable to low noise semiconductor detectors.

('582, 44:24-34 (emphasis added).)

> *[T]he present disclosure provides **a device capable of collimating a light beam** from an extended light source* over an extended distance without significantly expanding the beam diameter.

('582, 2:26-29 (emphasis added).)

> [A] wavelength division multiplexer ("WDM") may include at least two optical elements. *The first optical element collimates a beam of light* received from an extended light source, such as the light from a pinhole or from a multimode optical fiber. The first optical element magnifies the extended light source, for example, as defined by the pinhole, or the core of the multimode optical fiber, to an image having a size similar to the effective cross section of the first optical element *thereby creating a collimated light beam* between the first optical

543

896. The WDM disclosed in the Asserted Patents would not work without a collimating optical element to capture the light from the extended light source and project it as a collimated beam onto first focusing for several reasons that are apparent from the image above depicting how the defocused/diverging beam of light from extended light source 901 projects into the WDM without a collimating optical element 902. A WDM without any element to capture and project the light from the extended light source as a collimated beam would not work at least because substantial fluorescent signal would be lost because most of the light emitted by the extended light source would be directed onto the first focusing lens. Additionally, there would be substantial light that is not appropriately filtered and would result in significant unwanted signal leakage between the optical channels within the WDM, as shown by the light going directly into the second focusing lens (and likely the third focusing lens) that has bypassed any filter in the illustration I have provided above. This crosstalk would only be further increased by the defocused/diverging light being reflected in uncontrolled ways off of the filters and relay mirrors, such that there would be substantial light measured by a given detector that is not within the wavelength range of the detector channel because stray light from the extended light source would effectively permeate the entire optical path of the WDM. Accordingly, the collimating optical element (or similar optical element) to capture the light from the extended light source is an essential feature of the WDM disclosed

in the Asserted Patents. Without this essential element, the disclosed WDM would not work.

897. Furthermore, during prosecution Beckman Coulter stated that for an "objective lens 19 [that] "collimates fluorescent light, a POSITA would have understood that the objective lens 'brings all of the rays [] parallel to each other,' albeit with some 'beam divergence' in view of practical limitations . . . This is not 'focus[ing] the fluorescent light, which instead involves converging the light.'" (D.I. 115-7, Joint Claim Construction Br., Ex. 7 ('106 patent file history, applicant arguments/remarks), at 9-10; *see also* D.I. 115-27, Joint Claim Construction Br., Ex. 28 (June 26, 2025 Ilkov Decl.), at ¶¶42-55; D.I. 117-36, Ex. 90 (July 25, 2025 Ilkov Surreply Decl.), at ¶17.) As Beckman Coulter properly recognized, a collimated beam of light has "some divergence," as I explained in my declarations regarding claim construction:



**Figure 1.1** If a broadband-wavelength source, like a lamp or LED, is placed one focal length ($f$) away from a lens, light from each point on the source is individually collimated. The full divergence angle ($\theta \sim d / f$) of the output beam depends on the focal length and source diameter ($d$).

(Thorlabs, *Collimated Light's Non-Zero Beam Divergence, Does collimated light maintain a constant beam diameter out to infinity?*, at 3 (Apr. 20, 2021), https://www.thorlabs.com/newgrouppage9.cfm?objectgroup_id=14489; *see also* Edmund Optics, *Considerations in Collimation*, at 1, https://www.edmundoptics.com//knowledge-center/application-notes/optics/considerations-in-collimation/, ("Some level of divergence will always be present when collimating light. . . . The divergence exists because, as the size of the source increases, the source's distance from the optical axis increases, and thus

████████████ — ████████████

==the resultant ray bundle's angle increases with respect to the optical axis.").)==



**Figure 1.1** If a broadband-wavelength source, like a lamp or LED, is placed one focal length ($f$) away from a lens, ==light from each point on the source is individually collimated.== The full divergence angle ($\theta \sim d / f$) of the output beam depends on the focal length and source diameter ($d$).

==(Thorlabs, *Collimated Light's Non-Zero Beam Divergence*, at 3 (annotations added);==

==*see also* Edmund Optics, *Considerations in Collimation*, at 1 ("Figures 2 and 4 can==

==be thought of as a collection of closely spaced ideal point sources. Individually, each==

==point creates a ray bundle of parallel rays, but as a collection the series of 'point==

==sources' create a beam with some divergence.").)==

898.  Thus, in my opinion, the full scope of the "collimated beam" for input into the WDM also lacks written description and enablement.  The Asserted Patents never mention the focal length of the lens to be used as the "collimating optical element" and never indicate that the light source is placed at the focal length of the "collimating optical element."  Moreover, a "collimated beam" or even an "effectively collimated beam" (that Beckman Coulter stated in the file history "is

554

not converging") will always possess "some divergence" that arises when an extended light source is placed at the focal length of a lens. Because the disclosed WDM would not work with a defocused (diverging) input beam, as I have explained above, it likewise would not work with all types of a "collimated beam" because the "some divergence" inherently present in a "collimated beam" would cause the same problems as I have noted above for the defocused/diverging beam that results in the absence of a "collimating optical element" (or similar optical element) to capture the light from the extended light source. But, again, there is no description in the patent as to how much divergence is permitted in the "collimated beam" projected by the "collimating optical element" and still permit the WDM to be functional.

899. Since there is no reasonable limit or any reasonably quantified amount of divergence—which could have been defined by, for example, divergence angle or another similarly quantifiable measure–taught or disclosed for the "collimated beam" within the specification, the claims are broad enough to capture any "collimated beam" regardless of how much divergence the "collimated beam" has. Accordingly, in my opinion, a POSA also would also not have found the disclosed WDM in the Asserted Patents to have been enabled using *any* "collimated beam," since a collimated beam can have substantial beam divergence such as when the extended light source is relatively larger in comparison to the size of the lens serving as the "collimating optical element." Accordingly, even a "collimated beam" can

████████████████ – ████████████████

>     v.  The **omitted "collimating optical element"** that projects a **"collimated beam" is an** essential feature to operate the claimed WDM

911. The purportedly inventive WDM in the '107 and '443 written descriptions separates fluorescent light into distinct color bands using a specific configuration that *requires* use of a "collimating optical element" and projects a "collimated beam" throughout a unit-magnification relay architecture. This critical component appears throughout the written description and is featured in every WDM embodiment.

912. In its summary disclosures, the '107 patent and '443 patent describe how the WDM must include "at least two optical elements," among them an optical element that "collimates a beam of light received from an extended light source[.]" ('582, 4:34-44.) Other optical elements relay the projected collimated beam to "further extend the collimated optical path" such that "[t]he cascaded unit-magnification image relay architecture *of the present disclosure* extends the collimated optical path length without large beam expansion." ('582, 4:44-53.) A collimated beam projected from a "collimating optical element" is relayed at unit magnification in varying filter and mirror configurations. (*See* '582, 5:7-20.) Even the disclosures that state that "in FIG. 25, a collimating optical element, in this case an achromatic doublet lens … project[s] a magnified image of the object near the final focusing lens **905**" means that the "beam of light propagating between the

'107 patent and '443 patent also recite a "collimating optical element," confirming its criticality to the purported invention.

916. To start, the original PCT App. recites a "collimating optical element" in all independent claims that recite a WDM. Claim 1 directed to a flow cytometer is partially reproduced below and shows how the "collimating optical element" is recited as an element of the claimed WDM.

e) a wavelength division multiplexer 90 ("WDM (90)") for separating into multiple colored bands a beam of light emitted initially from the viewing zone and imaged by the composite microscope objective (60) into an optical fiber for transmission to the WDM (90), the WDM (90) comprising:

i. a collimating optical element that magnifies an to produce an image of substantially the same size as the effective size of said collimating optical element;

ii. at least one dichroic filter located between said collimating optical element and said image, wherein said dichroic filter separates the collimated beam of light into two (2) branches of distinctive colors;

iii. a focusing optical element located in one of said branches, wherein the beam of light in said branch is focused to a spot having a diameter of less than 1.0 mm by said focusing optical element; and

iv. an image relay optical element located near the image produced by said collimating optical element in the other branch, wherein said image relay optical element produces an image of said collimating optical element at substantially unit magnification.

(PCT App., at p. 59 (highlighting added).) Claim 162 directed to a WDM, separate from a flow cytometer, also recites a "collimating optical element":

162. A WDM (90) for separating a beam of light emitted from an into multiple colored bands, the WDM (90) comprising:

a) a collimating optical element that magnifies an to produce an image of substantially the same size as the effective size of said collimating optical element;

b) at least one dichroic filter located between said collimating optical element and said image, wherein said dichroic filter separates the collimated beam of light into two (2) branches of distinctive colors;

c) a focusing optical element located in one of said branches, wherein the beam of light in said branch is focused to a spot having a diameter of less than 1.0 mm by said focusing optical element; and

d) an image relay optical element located near the image produced by said collimating optical element in the other branch, wherein said image relay optical element produces an image of said collimating optical element at substantially unit magnification.

(*Id.*, p. 83 (highlighting added).)

917. The next patent application in the purported priority chain, issuing into the '412 patent, also recites a "collimating optical element" in its only independent claim, claim 1 directed to a flow cytometer having a WDM.

What is claimed is:

1. A flow cytometer having a wavelength division multiplexer (WDM), the WDM comprising:

an extended light source providing light that forms an object;

a collimating optical element that captures light from the extended light source and projects a magnified image of the object as a first light beam; and

a first focusing optical element configured to focus the first light beam to a size smaller than the object of the extended light source to a first semiconductor detector.

(U.S. Patent No. 9,746,412 B2 to Yong Qin Chen, at cl. 1 (filed Nov. 26, 2014; published Aug. 29, 2017) ("'412") (highlighting added).)

918. I note that, during the prosecution of the patent application that issued into the '412 patent, the Examiner issued what I understand is called a "restriction requirement." (Prosecution history of U.S. Patent No. 9,746,412, at pp.029-034.) I understand from counsel that a "restriction" in patent prosecution means that the examiner has indicated that the applicant's specification includes more than one distinct invention and requires the applicant to make an election of the invention it seeks to pursue for each subsequent patent application. I also understand that the applicant for the '412 patent later pursued multiple patent applications directed to different distinct inventions separately discussed in the '412 specification.

919. I understand that the applicant filed one "continuation" application from the '412 patent, the '582 patent, reciting claims related to the WDM (claimed as an "optical subsystem"). I have reviewed the '582 patent's claims. In every

independent claim reciting an "optical subsystem for a flow cytometer," the claims

further recite a "collimating optical element." Claim 1 is reproduced below:

> 1. An optical subsystem for a flow cytometer, the optical subsystem comprising:
>
> a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam;
>
> an optical relay element arranged to receive at least a portion of the collimated beam from the collimating optical element, the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a first image;
>
> a first focusing optical element arranged to receive at least a portion of the collimated beam reflected by the optical relay element; and
>
> a first semiconductor detector,
>
> wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element onto the first semiconductor detector

('582, cl. 1 (highlighting added).)

920. I understand that the applicant filed four divisional applications in addition to the '582 continuation: U.S. Patent Publ. Appl. No. 2018/0059000 (abandoned); and U.S. Patent Nos. 11,255,772, 10,126,227 and 10,209,174. I understand from counsel that a "divisional" application refers to an application where the applicant made an election to pursue an invention contained in the shared disclosures with the parent application but not otherwise pursued in the parent application's claims. I understand that the '772 patent, an ancestor application to

██████████ – ██████████

the '107 patent, is a divisional application to the '412 patent that claims certain methods for the fluidic pump used with a flow cell in a flow cytometer. I have reviewed the claims of the '772 patent and confirm that they do not claim a WDM.

921. I understand that the applicant filed a "continuation" application from the '772 patent, U.S. Patent No. 12,174,106, with claims directed to flow cytometers that recite a WDM including a "collimating optical element" in every independent claim. Claim 13 is reproduced below:

> 13. A flow cytometer comprising:
> a light source arranged to illuminate a stream of particles in a viewing zone;
> a collecting optical element configured to collect and focus fluorescent light emitted by a particle illuminated by the light source such that the fluorescent light leaving the collecting optical element converges; and
> a wavelength division multiplexer (WDM) configured to separate into color bands the fluorescent light collected by the collecting optical element, the WDM including:
> a collimating optical element that is separate from the collecting optical element and is arranged to receive the fluorescent light collected by the collecting optical element, the collimating optical element configured to collimate the fluorescent light;
> a row of mirrors arranged and configured to sequentially reflect different color bands of the fluorescent light collected by the collecting optical element after the fluorescent light has passed through the collimating optical element, the row of mirrors including at least one curved mirror;
> a row of dichroic filters opposed to the row of mirrors, each of the dichroic filters configured to pass one color band of the fluorescent light reflected by a mirror in the row of mirrors, and to reflect another color band of the fluorescent light reflected by the mirror;
> a row of semiconductor detectors, each of the semiconductor detectors arranged and configured to detect and quantitate the band of fluorescent light passing through a dichroic filter in the row of dichroic filters.

(U.S. Patent No. 12,174,106 B2 to Yong Qin Chen, at cl. 13 (filed December 22, 2021, issued December 24, 2024) (**"'106 patent"**) (highlighting added).)

922. A POSA would have understood—based on the '107's and '443's written description's extensive disclosures on collimating fluorescent light and its

importance as allegedly the "only" economical way to efficiently separate color bands, and the various techniques disclosed to extend the collimated beam distance in the WDM—that a "collimating optical element" is an essential feature of the purported invention.

923.   Claims 1 and 16 of the '107 patent, however, fail to recite a "collimating optical element" and are instead broadly directed toward a "wavelength division multiplexer (WDM)" comprising an "[array / plurality] of mirrors," an "[array / plurality] of filters," and an "[array / plurality] of avalanche photodiodes (APDs)." Similarly, Claim 1 of the '443 patent fails to recite a "collimating optical element" and instead is broadly directed toward a "wavelength division multiplexer (WDM)" comprising "a set of filters," "at least one mirror," and a "set of detectors." A POSA would have understood from this broad recitation that the inventor sought to claim WDMs that did not necessarily **include a "collimating optical element" and were** nevertheless allegedly operable in relaying any type of light (e.g., diverging, **collimated, converging), in any conceivable configuration.  With respect to the '443 patent, this is confirmed by Claim 8, which recites "further comprising a collimating** optical element positioned in an optical path of the light and upstream of the set of filters, the collimating optical element configured to receive the light and output a **collimated beam of the light," and would indicate to a POSA that broader Claim 1** appears to include either a collimated beam or a non-collimated beam through the

████████████ – ████████████

claimed "wavelength division multiplexer (WDM)." This is further implied by the generically recited "light" in the independent claims of both the '443 and '107 patents that would include non-collimated beams that focus (converge) and defocus (diverge). (*See* '443, cl. 1 ("portions of light"); '107, cl. 1 ("receive light"), cl. 16 (same).)

924. In my opinion, a POSA would not have understood with a reasonable degree of certainty that the inventor had in his possession any WDM other than one that included a "collimating optical element" and relayed a collimated beam through a unit-magnification relay architecture. This is the *only* technology disclosed in the '107 and '443's written descriptions' several WDM embodiments, as discussed above. Nowhere do the written descriptions provide any disclosure on the design and use of a WDM with a non-collimated beam, let alone one without a collimating optical element.

925. Nor would a POSA have recognized the '107 and '443 written description to suggest a WDM that lacks a "collimating optical element" or propagates a non-collimated beam through its relay architecture. The '107 and '443 written descriptions teach *against* such a WDM configuration, indicating that "efficient color separation can only be accomplished economically with [a] collimated light beam" and addressing a problem with collimating fluorescent light from an extended light source. ('582, 44:14-34.) A POSA would also understand

this statement as being directed to ensuring that the rays of light impinging upon a color-separating filter would need to have the uniform orientation of a "collimated beam" because off-angle rays of light incident onto such filters results in loss of intensity and inefficient color separation, which is precisely what would occur when such filters are used with non-collimated beams, which is directly contrary to the teachings in the specification. Thus, a POSA would further recognize that the parallel nature of the rays within a "collimated beam" were an essential aspect of the claimed invention, since using a non-collimated beam would not enable "efficient color separation" and "efficient color separation can *only* be accomplished economically with [a] collimated light beam." ('582 patent, 44:25-26 (emphasis added).)

926. For these reasons, it is my opinion that Claims 1, 2, 3, 5, 16, 17, 18, 20, 21, 22, 26, 27, 28, and 29 of the '107 patent, and Claims 1, 4, 6, 10, 11, and 15 of the '443 patent, lack written description support for the full scope of the recited "wavelength division multiplexer (WDM)," which does not recite the essential element of the light into and relayed within the "WDM" be collimated. My conclusion is supported by the Examiner's conclusion in the file history of U.S. Patent No. 11,196,076 (the "'076 Cytek patent"). There, having considered the '412 patent, the parent patent to the '443 and '107 patents, during prosecution of the application that led to the '076 Cytek patent, the Examiner allowed the claims of the

███████████ – ███████████

'076 Cytek patent over the '412 patent (which shares a specification with the '443 and '107 patents), explaining that the '412 patent does "not utilize micro-mirrors or mirrors having a radius of curvature that directs light onto even filters while reimaging light onto odd filters of a plurality of filters arranged in a row." (CYTEK_0000989932 at CYTEK_0000990372-374 (July 9, 2021 Notice of Allowance ('076 Cytek patent file history)).) In other words, consistent with my analysis of the bounds of the specifications for the claimed "WDM," the Examiner also concluded that the specifications of the '443 patent and the '107 patent lack written description for a "WDM" that propagates a non-collimated beam throughout its relay architecture.

2. **The Claimed "wavelength division multiplexer (WDM)" Lacks Full Scope Enablement ('443, cls. 1, 4, 6, 9, 10, 11, 13, 15; '107, cls. 1, 2, 3, 5, 16, 17, 18, 20, 21, 22, 26, 27, 28, 29)**

927. In my opinion, Claims 1, 2, 3, 5, 16, 17, 18, 20, 21, 22, 26, 27, 28, and 29 of the '107 patent, and Claims 1, 4, 6, 10, 11, 13, and 15 of the '443 patent are not fully enabled as to the term "wavelength division multiplexer (WDM)." As discussed for Section XV.B.1 above, incorporated here, the specifications disclose a WDM that uses a collimating optical element to project a collimated beam through a unit-magnification relay architecture as purportedly the "only" way to achieve economical and efficient color separation of fluorescent light. But the claims more broadly recite any WDM with filters, mirrors, and APDs/detectors, including WDMs

583

that propagate any type of light in any filter/mirror configuration. These other WDM configurations are undisclosed in the specifications, and a POSA would not have understood how to make or use them without undue experimentation.

928. I have considered the so-called *Wands* Factors for undue experimentation, listed in the Legal Principles section (Section III.G) above, and which consist of: (1) the breadth of the claims; (2) field or nature of the invention; (3) the state of the prior art; (4) the level of skill of a POSA; (5) the predictability of the art; (6) the amount of direction or guidance provided by the patent's specification; (7) working examples included in the patent's specification; and (8) the amount of experimentation necessary. Below, I apply the *Wands* Factors to determine that the recited "wavelength division multiplexer (WDM)" is not enabled for use without a "collimating optical element" projecting a collimated beam at unit magnification through its (cascaded) relay architecture.

929. ***Wands Factor No. 1 – Breadth of the Claims***. Claims 1 and 16 of the '107 patent are broadly directed toward a "wavelength division multiplexer (WDM)" comprising an "[array / plurality] of mirrors," an "[array / plurality] of filters," and an "[array / plurality] of avalanche photodiodes (APDs)." ('107, cls. 1, 16.) Similarly, Claim 1 of the '443 patent is broadly directed toward a "wavelength division multiplexer (WDM)" comprising "a set of filters," "at least one mirror," and a "set of detectors." The claims are silent as to the shape of the light beam that is

584

input into and propagates through the WDM, a marked change from the claims in earlier-filed applications to which the '107 and '443 patents claim priority. With respect to the '443 patent, Claim 8 recites "further comprising a collimating optical element positioned in an optical path of the light and upstream of the set of filters, the collimating optical element configured to receive the light and output a collimated beam of the light," indicating that the broader Claim 1 contemplates use of either a collimated beam or a non-collimated beam into and through the claimed "wavelength division multiplexer (WDM)." The breadth of the claims would extend to, and thus require enablement for, WDM embodiments, in any conceivable configuration, that propagate any light, regardless of whether it is or is not collimated, such as a beam that is focused and defocused through the relay architecture. The '107 and '443 specifications' teachings are directed toward a cascaded unit-magnification relay architecture using a collimated beam, yet the claims omit any collimating optical element, an essential feature in the purported invention.

930. ***Wands Factor Nos. 2 and 4 – Field or Nature of the Invention and Level of Ordinary Skill***. The relevant technical fields of the invention, as I noted in Section V, are flow cytometry, fiber optics, and wavelength demultiplexing and detection. (*See also* '582, 1:32-35, 1:64-67, 2:30-35.) The '107 and '443 patents discuss various subassemblies in a flow cytometer, among them a WDM that

includes a collimating optical element and a cascaded unit-magnification relay architecture that propagates a collimated beam throughout. (*See, e.g.*, '582, 4:34-53.) I also identify the level of ordinary skill in Section V, incorporated here, though I note that my overall *Wands* analysis would not change if another level of ordinary skill were adopted, given the lack of guidance from the specification and excessive experimentation required to enable these overbroad claims.

931. ***Wands Factor Nos. 6 and 7 – Guidance from the Specification and Working Examples***. As discussed for Section XV.B.1 above, the specification's guidance is limited to WDM embodiments that include a collimating optical element and a cascaded unit-magnification relay architecture that propagates a collimated beam throughout. The specification provides no guidance or working examples for any WDM that propagates a non-collimated beam through the relay architecture. Instead, the specification teaches against such a WDM configuration, indicating that "efficient color separation can only be accomplished economically with [a] collimated light beam" and addressing a problem with collimating fluorescent light from an extended light source. ('582, 44:14-34.) The Examiner's conclusion with respect to how the '076 Cytek patent overcame the '412 patent (and what the '412 patent does not disclose) supports the lack of teaching, motivation, or suggestion in the specification concerning use of a "WDM" that projects a non-collimated beam throughout its relay architecture.

932. ***Wands Factor Nos. 3, 5, and 8 – State of the Art, Predictability, and Amount of Experimentation***.  In my opinion, because of the absence of any teaching or working example in the specification for a WDM configuration that propagates a non-collimated beam, a POSA would have had to engage in excessive experimentation to design a WDM configuration using a non-collimated beam that practices the Asserted Claims.  As an example with respect to the '107 patent, a POSA would have had to understand how to design a WDM where filters in the array of filters receive light directly from the optical fiber for demultiplexing and processing of sufficient signal strength to overcome known technical signal-to-noise issues with APDs.  A POSA, regardless of the level of ordinary skill, would not have understood how to develop an operable WDM with the input of a diverging beam that also included the other '107 recited elements of a mirror, filter, and APD arrays (with their respective functionalities).  The same can be said for an operable WDM with the input of a diverging beam that also included the other '443 recited elements of a set of filters, at least one mirror, and a set of detectors  (with their respective functionalities).  As of 2012 (and after), fluorescence detection systems that used diverging light with APDs and PMTs separated wavelengths of light by diffraction with, e.g., a diffraction grating or prism.  (*See, e.g.*, Robinson, FIG. 1, 8:59-9:1, 9:5-12, 9:21-26, 10:37-46.)  This separate technology involved a fundamentally different configuration relying on different optical principles than the claimed invention.

never indicated to the examiner during prosecution its intention to interpret such language as covering non-conventional spectral flow cytometers during prosecution.

### D. Optical Fiber- / Light Source-Related Terms

#### 1. The Claimed "optical fiber" Lacks Full Scope Written Description Support ('107, cls. 1, 2, 3, 5)

956. Claim 1 of the '107 patent recites an "optical fiber," which a POSA would have understood to include both single-mode and multi-mode optical fibers. The breadth of the term "optical fiber" in Claim 1 is confirmed by Claim 16 of the '107 patent, which more narrowly recites a "multimode optical fiber." The '107 written description identifies both single-mode and multimode optical fibers but directs its disclosures of the claimed WDM solely toward an implementation with a multimode optical fiber. In my opinion, a POSA reviewing the '107 written description would not have thought that the inventor had possession of a WDM that operates with the broader class of optical fibers when only the use of a multimode optical fiber with a WDM is supported by the written description.

957. The '107 written description provides no disclosures for how its WDM would operate with a single-mode optical fiber but instead *distinguishes* the purported invention from technology that relays light from a single-mode optical fiber. The '107 written description claims that "[t]he only industry where APD has found wide acceptance is in optical communication" and (incorrectly) contends that "[i]n optical communication, the light is a laser beam out of single mode optical

608

959. The '107 written description lacks any disclosures that use a single-mode optical fiber as a light source with the disclosed WDMs, nor would a POSA have recognized that the inventor had in his possession a purported invention that used a single-mode optical fiber. While the '107 written description includes a generalized statement that "various aspects of the present disclosure are not limited to specific numbers of … optical fibers," no parallel statements exist as to the *kind* of optical fiber that may be used. ('582, 49:40-46.)

960. The applicant also did not consider a single-mode optical fiber to be an "extended light source" in the '107's written description to suggest the use of a single-mode optical fiber with the disclosed WDMs. In the prosecution history for the parent '412 patent, the applicant indicated that a single-mode optical fiber was a "point light source." The applicant argued that the use of a single-mode optical fiber in the optical system disclosed in U.S. Publication No. 2004/0165828 filed by Capewell taught against combining Capewell with Oostman that used a multimode optical fiber instead.

and focusing elements to form a beam emitted from a light source, and a photomultiplier tube to detect the beam. *See Oostman*, at col. 6, lns. 40-49. In *Oostman*, the photomultiplier tube is used to detect light emitted from a pinhole or a multimode optical fiber (common light source of the detector) in fluorescence detection instrument, e.g., flow cytometer. The size of an object of such light source is usually measured in millimeters. *See* specification, on p. 69, lns. 19-22; *see also Oostman*, at col. 10, lns. 25-47. However, such light source has an etendue hundreds of times greater than that of a laser beam out of a single mode optical fiber, and, therefore, it is more difficult to focus a beam from such light source down to a small size. *See* specification, on p. 69, lns. 1-8. As such, a photomultiplier tube, as illustrated by *Oostman* in detail, instead of a semiconductor detector with a small active area, is normally used to detect light with greater etendue in fluorescence detection instrument in the prior art. *Id*.

On the contrary, *Capewell* teaches an optical communication system that includes multiple optical assemblies to collimate and redirect a beam emitted from a light source, and a detector to detect the beam. *See Capewell*, at ¶s [0002] and [0039]. In *Capewell*, the detector is used to detect light emitted from a point light source, such as a single mode optical fiber, in a WDM to be used with a communication system. *Id.*, at ¶ [0030]. The size of an object of such point light source is usually measured in micrometers. *See* specification, on p. 69, lns. 22-23; *see also Capewell*, at ¶ [0049]. As such, such point light source has much less etendue than a bigger light source. *See* specification, on p. 69, lns. 1-8.

From the foregoing, it is clear that *Oostman* and *Capewell* discuss different kinds of optical systems (fluorescence detection instrument v. optical communication system) with different sizes of light sources. The Office Action fails to provide any explicit analysis to

(Prosecution history of U.S. Pat. No. 9,746,412 at p. 84 (Oct. 27, 2016 Reply to Office Action of June 27, 2016) (highlighting added).)

961. Use of a single-mode optical fiber is also not inherent to the '107's description of using an optical fiber to transport light from the flow cell to the WDM. Single-mode optical fibers were (and are) usually manufactured for a limited bandwidth, i.e., a single center wavelength with minimal spread. This design choice

is contrary to the '107 written description's goal to guide fluorescent light of many different wavelengths to the WDM for demultiplexing and processing. (*See also* Shapiro 1986, p.003 (describing advantageous use of multimode optical fibers from telecom for guiding light from objective to detectors because of high numerical aperture).)

962. In summary, the multiple disclosures in the '107 written description and related file history would have demonstrated to a POSA to a reasonable degree of certainty that the inventor lacked possession of any WDM that used a single-mode optical fiber. Rather, the '107 written description teaches away from using a single-mode optical fiber with the disclosed WDMs.

### 2. The Claimed "optical fiber" Lacks Full Scope Enablement ('107, cls. 1, 2, 3, 5)

963. As no written description support exists for the broader class of "optical fiber" in Claims 1, 2, 3, and 5, I similarly find that these claims are not fully enabled as to the use of a single-mode optical fiber with the recited WDMs. The specification lacks any enabling disclosures for making or using the claimed WDM with a single-mode optical fiber, and a POSA would not have been able to implement such a design without undue experimentation, including, for example, how to get sufficient fluorescent signal into a single mode optical fiber considering their relatively small numerical aperture (NA) and to focus sufficient intensity of the emitted fluorescent light into the single-mode optical fiber, considering "the diameter of single mode

optical fibers that are measured in micrometers." ('582, 44:44-47.) I provide my analysis under the *Wands* factors below.

964. ***Wands Factor Nos. 1 and 2 – Breadth of the Claims and Field or Nature of the Invention and Level of Ordinary Skill***. With respect to *Wands* Factor No. 1, Claims 1, 2, 3, and 5 recite an "optical fiber" that is broader than "multi-mode optical fiber" recited in Claim 16 and would capture single-mode optical fibers. *Wands* Factor No. 2 that I discussed in my enablement analysis for "wavelength division multiplexer (WDM)" above in Section XV.B.2 is also incorporated here.

965. ***Wands Factors Nos. 3 and 4 – State of the Prior Art at the Time of the Invention and Level of a POSA***. As of April of 2012, a POSA would have been aware of using multimode optical fibers to transport light from collection optics to a WDM in a flow cytometer, but not single-mode optical fibers. This is because a POSA would have understood that optical fiber used to deliver light to the WDM must have high light collection efficiency, low sensitivity to bending and mechanical displacements, low sensitivity for mechanical positioning, and be cost-efficient. Single-mode optical fibers lack these key technical features and are an inferior choice compared to multimode optical fibers for routing light collected and focused by the collection optics of the flow cytometer to a WDM. I am not aware of any flow cytometers in the art that use a single-mode optical fiber for this purpose.

966. ***Wands Factors Nos. 5-8 – Predictability, Guidance from the***

████████████ – ████████████

*Specification, Working Examples, and Amount of Experimentation*. As explained in Section XV.D.1 above, incorporated here, the specification offers no guidance or working examples to teach a POSA how to make or use the claimed WDM with a single-mode optical fiber and instead teaches away from its implementation. The applicant also expressly distinguished the claimed invention from optical communications systems (e.g., *Capewell*) during prosecution of the parent '412 patent on the distinction between using single-mode optical fiber versus multi-mode optical fiber (and collimating a large etendue light beam).

967. In my opinion, a POSA would have had to engage in an excessive amount of experimentation required to implement an operable version of the claimed WDM (with APDs) using a single-mode optical fiber. Single-mode optical fibers have considerably smaller core diameters and numerical apertures that, if used, would result in a signal loss of almost ninety-percent compared to multimode optical fibers.

968. The '107 specification teaches that an optical fiber is positioned between a composite microscope objective and the WDM to serve the purpose of routing fluorescent light gathered and focused by the composite microscope objective to the WDM for processing. (*E.g.*, '582, 28:6-13, FIG. 1 (item **852**).) The composite microscope objective gathers and focuses light scattered and/or fluoresced by particles to images on an image plane (*see id.*, FIG. 9A, 34:32-55),

615

████████████ – ████████████

4. **The Claimed "[array/plurality] of avalanche photodiodes (APDs)" Lack Full Scope Written Description Support ('107, cls. 1, 2, 3, 5, 16, 17, 18, 20, 21, 22, 26, 27, 28, 29)**

1008. For the same reasons I discussed above that "semiconductor detector" lacks written description support for a carbon nanotube detector, so too does "[array/plurality] of avalanche photodiodes (APDs)" in the Asserted Claims of the '107 patent lack written description support for a carbon nanotube detector. The written description refers to a carbon nanotube detector four times, and only once in identifying it as an APD. (*See* '582, 8:32-33, 46:27-29, 52:27-29, 58:45-47.) As discussed above, by the effective filing date of the '107 patent and even as of today, carbon nanotube detectors were not and are not commercially available, a POSA would not have had the requisite experience to design or implement one without undue experimentation, and the written description provides no teachings to guide a POSA toward the design of a carbon nanotube detector or its implementation within the claimed "wavelength division multiplexer (WDM)."

### F. Mirror Terms

1. **The Claimed "curved mirror" Lacks Full Scope Written Description Support ('443, cls. 1, 4, 9, 10, 11, 13, 15; '582, cls. 1, 2, 3, 6, 20, 22, 23, 26)**

1009. Claim 1 of the '443 patent recites a "curved mirror." Claim 1 of the '582 patent recites "a curved mirror." Claim 20 of the '582 patent also recites "wherein the optical relay element comprises a curved mirror or a concave-shaped dichroic filter." The claimed curved mirror elements are linked in the '772 patent,

██████████████████ – ██████████████

'412 patent, and the PCT App. to concave mirrors **907, 910, 911, 912, 913** from FIG. 25 (also in the '582 patent). These mirrors (in blue) relay a collimated beam (yellow) throughout the WDM.



*FIG. 25*

('582, FIG. 25 (annotated); *see also* PCT App., FIG. 25; '412, FIG. 25; '772, FIG. 25.) The written description explains that concave mirrors **907, 910, 911, 912, 913** are intended to extend the collimated light beam path without expanding the diameter of the light beam. ('582, 45:16-29; '772, 45:26-39; '412, 45:6-19; PCT App, p.170 (43:14-26).)

643

██████████████ – ████████████

### i. A POSA Would Have Understood That a "Curved Mirror" Includes Many Types of Mirrors Beyond Concave Mirrors with Distinct Properties

1010. I understand that the term "curved mirror" has not been construed by the Court and should be given its plain and ordinary meaning, as understood by a POSA as of the time of invention in view of the written description. A POSA at the time of the invention would have understood the term "curved mirror" to include any mirror with curvature.[21]

1011. A POSA at the time of invention would have appreciated that "curved mirror" encompasses a broad group, including multiple types of mirrors with different types of curvatures and characteristics. Curved mirrors can be concave or convex depending on whether the mirrors are curved inward (concave) or outward (convex) mirrors, though more complex curved geometries exist. A concave mirror has a positive radius of curvature that indicates an inward curve for the mirror and causes incident light rays to converge (or become less divergent) from the surface of

---

I understand that in patent law, the principle of claim differentiation dictates that when interpreting the claims of a patent, distinct claim terms across patents that share a common specification should be understood to cover distinct subject matter. Here, the U.S. Patent No. 11,703,443 ("'443") patent shares the same specification as the '582 patent, and Claim 6 of the '443 patent recites: "The WDM of claim 1, wherein: the set of filters include at least one dichroic filter, and the **at least one curved mirror is a concave mirror**." ('443, cl. 6 (emphasis added).) A POSA would have understood that "curved mirror" as used by the '582 patent cannot be read interchangeably with "concave mirror." Rather, a POSA would have understood that "curved mirror" is broader and encompasses more than a concave mirror.

the mirror. This is shown below where the reflected light rays (in yellow) converge at the focal point F located in front of the concave mirror:



In contrast, a convex mirror has a negative radius of curvature that indicates an outward curve for the mirror and causes light rays to diverge from the surface of the mirror. This is shown below where reflected light rays (in yellow) diverge from the mirror's surface as if traveling from a virtual focal point F located behind the convex mirror:

---

[22] Optics: Concave and Convex Mirrors and Lenses, ScienceReady (2025), https://scienceready.com.au/pages/mirrors-and-lenses (annotated).



Principal axis

Focal length [23]

1012. Even among convex or concave mirrors, multiple types of curved mirrors exist that introduce additional geometric and optical properties. For example, the figure below shows examples of a concave parabolic mirror (a) next to two concave spherical mirrors (b) and (c), and how exemplary light rays would be reflected from these surfaces:



(a)    (b)    (c)    [24]

Spherical mirrors with different degrees of curvature or different apertures will result

---

[23] *Id.* (annotated).
[24] 2.3: Spherical Mirrors, Bowdoin College, Phys1140: Introductory Physics II: Part 2, https://phys.libretexts.org/Courses/Bowdoin_College/Phys1140:_Introductory_Physics_II:_Part_2/02:_Geometric_Optics_and_Image_Formation/2.03:_Spherical_Mirrors.

in different levels of aberration, as shown by mirror **(b)** versus mirror **(c)** in the figure above. In contrast, a parabolic mirror (a) focuses all reflected rays on a single focal point, avoiding aberration. Other examples of an aspherical curved mirror with distinct geometric and optical properties include ellipsoidal, hyperboloidal, and cylindrical mirrors. Ellipsoidal and hyperboloidal mirrors each have two focal points and impart distinct optical effects on incident light, including based on whether the mirror is concave or convex. Cylindrical mirrors have curvature in only one dimension and will reflect light rays so that they converge or diverge along a single axis depending on whether they are concave or convex.[25]

1013. Each of the mirrors discussed—spherical, parabolic, ellipsoidal, hyperboloidal, and cylindrical, and concave/convex versions of each—comprise **"curved mirrors" that have specific applications based on each mirror's properties** and performance requirements (e.g., a specific sized/shaped mirror could be introduced to minimize aberration if that is important to the application at hand). A **POSA at the time of invention would have understood the term "curved mirror" as** used in the claims could include any of these mirror types.

---

[25] Michael W. Davidson, Molecular Expressions, Optical Microscopy Primer, Physics of Light and Color, Florida State University (Nov. 13, 2015), https://micro.magnet.fsu.edu/primer/lightandcolor/mirrorsintro.html.

### ii. Concave Mirrors Are the Only "Curved Mirror" the '412 Patent and PCT App. Identify for Use in a "Wavelength Division Multiplexer (WDM)"

1014. While Claims 1 and 20 of the '582 patent use the term "curved mirror," this term appears nowhere in the '772 patent, '412 patent, or PCT App. written descriptions, and every reference in the written descriptions to a mirror element in the WDM is to a *concave* mirror. The '772 patent, '412 patent, and PCT App. written descriptions fail to provide any other specific details regarding the shape of the mirror elements used in the WDM other than a general requirement that they be concave. FIG. 25 depicts these mirrors as planar.

1015. As explained in the portion of the '772 patent, '412 patent, and PCT App. written descriptions reproduced below, the concave mirror in the WDM serves the dual purpose of (1) reflecting, and thereby extending, the beam of light (text in yellow below), while (2) maintaining substantially the same diameter of the collimated light beam (text in teal below):

> Light reflected from the dichroic filter **903** may impinge upon a second optical element **907**, **such as a concave mirror.** The **concave mirror 907** may a [sic] radius of curvature approximately equal to the distance between the collimating optical element **902** and the image near focusing lens **905**. The **concave mirror 907** therefore creates a second image of the collimating lens **902** near a second focusing lens **908**. The light beam between

the **concave   mirror 907** and   the   second   image   at the lens **908** may have substantially the same diameter as the beam of light between the collimating lens **902** and the first   image   near   the   focusing lens **905**.   The   relay imaging **concave mirror 907** therefore effectively doubles the collimated beam path without expanding the beam's diameter.

('772,  45:26-39;  '412,  45:6-19;  PCT  App.,  p.170  (43:14-26)  (emphasis  and highlighting added).)

1016.  While the '772 patent, '412 patent, and PCT App. written descriptions state "other types of refractive and/or reflective optical components," ('772, 4:63-64;  '412,  4:59-60;  PCT  App.,  p.22  (15:20-22)),  may  be  used  for  certain embodiments  of  the  WDM,  a  POSA  would  not  have  understood  this  general disclosure to refer to non-concave curved mirrors.   In fact, the '772 patent, '412 patent, and PCT App. written descriptions further explain that "[i]nstead of concave mirrors, the WDM may be replaced by curved dichroic filters to further increase the number  of  colored  bands  selected  by  the  WDM."   ('772,  5:20-22;  '412,  5:16-18; PCT App., p.143 (16:7-10).)  A curved dichroic filter is not interchangeable with a curved mirror, and a POSA as of the time of invention would not have understood this (or any other)  portion of the '772 patent, '412 patent, and PCT App. written descriptions to describe or suggest use of other types of curved mirrors.  Rather, a POSA would have recognized that concave mirrors are well-suited for causing light

rays to converge and/or become less divergent (*see, e.g.*, Goodman, 10:25-28) and would not have inferred any portion of the '772 patent, '412 patent, or PCT App. written descriptions to teach the use of a non-concave curved mirror to extend and maintain the diameter of the collimated beam in the WDM.

### iii. A POSA Would Not Understand the Inventor to Have Been in Possession of the Full Scope of "Curved Mirror"

1017. While both concave and convex mirrors are used in optics, a POSA would not have understood the inventor to be in possession of the full scope of "curved mirror" for use in the claimed WDM. As I explained above, curved mirrors encompass a broad variety of mirror types—including spherical, parabolic, ellipsoidal, hyperbolic, and cylindrical, and concave/convex versions of each—with unique geometric and optical properties. Due to the fundamental differences in how concave, convex, and different curved aspherical mirrors converge and diverge light rays, these types of mirrors are not functionally interchangeable.

1018. Accordingly, a POSA reviewing the '772 patent, the '412 patent and PCT App. written descriptions as of their filing dates would only have understood that concave mirrors could have been used with respect to the recited "curved mirror." This is because a POSA would have recognized that substituting any other mirror type within the claimed WDM would require substantially redesigning the system to account for the different geometric and optical properties each mirror would introduce to the beam path. Nothing in the '772 patent, '412 patent, or PCT

████████████████████ – ██████████████

App. contemplates such a redesign.

    **2.    The Claimed "mirror" Lacks Full Scope Written Description Support ('107, cls. 1, 2, 3, 5, 16, 17, 18, 20, 21, 22, 26, 27, 28, 29)**

1019. Claims 1 and 16 of the '107 patent recite an "[array / plurality] of mirrors" that a POSA would have understood to broadly comprise *any* type of mirror, whether planar, concave, convex, or other geometries (e.g., distorting). This understanding is confirmed by Claim 3 of the '107 patent, which recites that "at least one of the mirrors in the array of mirrors is a concave mirror," indicating to a POSA that the term "mirrors" is broader. Claim 16 contains a near-identical element, reciting "a plurality of mirrors, wherein at least one of the mirrors is a concave mirror." The specification, however, lacks written description support for any type of mirror other than a planar mirror (*see* FIG. 25) and a concave mirror with respect to the claimed "wavelength division multiplexer (WDM)" for the reasons I provided for in my analysis for "curved mirror" above, which I incorporate here. It is thus my opinion that the '107 specification lacks written description support for the full scope of the "mirrors" recited in the claims.

    **3.    The Claimed "concave mirror" Lacks Full Scope Written Description Support ('107, cls. 3, 5, 16, 18, 26, 27, 29; '443, cl. 6)**

1020. Claims 3 and 16 of the '107 patent recite a "concave mirror." Similarly, claim 6 of the '443 patent recites that "at least one curved mirror is a concave

████████████ – ████████████████

mirror." In my opinion, the specifications lack written description support for *any* concave mirror within the claimed "wavelength division multiplexer (WDM)." As discussed above with respect to "curved mirror," incorporated here, a "concave mirror" is defined by its radii of curvature, for which there may be many differing radii for different axes of the mirror that varies from concave mirror to concave mirror depending on the application (*e.g.,* spherical, parabolic, ellipsoidal, hyperboloidal, and cylindrical).

1021. The specifications do not account for these many potential geometries of a concave mirror. Instead, the specifications recite a ***single*** radius of curvature, stating that "[t]he concave mirror **907** may [*sic*] a radius of curvature approximately equal to the distance between the collimating optical element **902** and the image near focusing lens **905**." ('582, 45:18-20.) A POSA would have understood the use of the singular, i.e., "*a* radius of curvature," to indicate use of a spherical concave mirror. Nothing in the specification indicates to a POSA that the inventor had possession of any other type of concave mirror.

1022. Even the specifications' disclosure of a single radius of curvature is insufficient to show possession of any particular "concave mirror" because the radius of curvature is "approximately equal" to an undefined optical distance. The specification's only "guidance" on the distances is by setting an endpoint to a purported "image," which a POSA would have found unintelligible. The only way

because a lens or mirror "can" collimate light, a mere lens or mirror is insufficient structure to actually collimate light without specifying that the lens or mirror is properly positioned relative to and based on the nature of the light it receives. Accordingly, since the patents do not disclose sufficient structure for the recited "collimating optical element" for performing the function of (1) receive light from a light source; and (2) project a "collimated beam," the term is, in my opinion, indefinite.

### iii. "collimating optical element" as recited in claim 20 of the '582 patent is indefinite for lack of sufficient corresponding structure

1065. Claim 20 of the '582 patent recites a "collimating optical element" that the parties agree must perform the functions of (1) "receiv[ing] light from a light source" and (2) "project[ing] a first image." I understand that the Court construed "image" as meaning a "representation of an object created by light or emanating from a light source." I explain below my opinion that the term "image" is indefinite under this proposed construction, particularly as it relates to a purported "collimated afocal image," which is a term I have never heard. Accordingly, in my opinion, the claimed function as recited herein is likewise indefinite.

1066. Further, in my opinion, regardless of the indefiniteness of the construction of "image" to include a "collimated afocal image," the specification lacks corresponding structure for a "collimating optical element" that will "project

686

a first image." A POSA would have understood an "image" to require ray convergence at the image plane (and that a "collimated afocal image" is a nonsensical, meaningless term that is not used in the field and to the extent it seeks to capture a collimated beam, then the image plane for a collimated beam occurs, if anywhere, at infinity). Additionally, as I previously stated in my claim construction declarations, the patentee admitted during prosecution that a "collimating optical element" does not cause light rays to converge. (*See* D.I. 117-36 (July 25, 2025 Declaration of Fedor A. Ilkov Ph.D., in Support of Cytek's Sur-Reply Claim Construction Brief) ("Ilkov Sur-Reply Decl."), ¶17; D.I. 115-7, Joint Claim Construction Br., Ex. 7 ('106 patent file history, applicant arguments/remarks), 10 ("light 'effectively collimated' by collimating optical element 902 is not converging").) A POSA would not have understood the specification's reference to a "collimating optical element **902**" to comprise a structure that projects an image where light rays converge. This distinction matters for purposes of claim 20 because the recited function is "project a first image," not "project a first collimated afocal image," indicating to a POSA that the "image" would include real images. However, patent owner has already indicated that "light 'effectively collimated' by collimating optical element 902 is not converging," which indicates that patent owner did not consider the disclosures relating to "collimating optical element 902" as disclosing a configuration wherein the "collimating optical element" is configured to project a

687

███████████ – ███████████

real image since a real image requires converging the light to an image plane.

1067. Nevertheless, there is no disclosure within the specification of any structure for the "collimating optical element" that projects either a real image or a "collimated afocal image." I understand that during claim construction Dr. Schaafsma and Beckman Coulter identified a mere lens as providing sufficient structure for performing the function of "project a first image." As I have described above and during claim construction, whether a lens projects a defocused(diverging) beam, a collimated(parallel) beam, or a focused (converging) beam depends on where the light source is placed relative to the focal length of the lens. As I detailed above, there is no structure in the specification that discloses where the light source is to be places in order to "project a collimated beam" and there is likewise no disclosure in the specification as it relates to where a lens must be placed as a structure that would "project a first image." Accordingly, in my further opinion, there is insufficient structure disclosed in the specification for the recited "collimating optical element" of claim 20.

3. **The Claimed "first collimated beam" and "second collimated beam" Terms Lack Written Description Support and Are Not Enabled ('443, cl. 10)**

1068. Claim 10 of the '443 patent recites a "second filter" that is "configured to receive a first collimated beam of the light from the first mirror" and a "fourth filter" that is "configured to receive a second collimated beam of the light from the

688

██████████ ─ ██████████████

1073. It is my opinion that Claim 10 of the '443 patent was drafted long after the drafting of the original specification to read onto the disclosures of FIG. 2B and accompanying written description from the '076 Cytek patent. The '076 Cytek patent describes with respect to FIG. 2B an "image array 106B" that includes a plurality of micro-mirrors M(1)'-M(N)' and a plurality of long pass dichroic filters D(1) through D(N). ('076 Cytek patent, 5:55-57.) As shown in FIG. 2B below, at M(1)' through M(2)' and M(3)' through M(4)' of the optical path, there is a "collimating space" of the non-collimated beam in the relay architecture.



FIG. 2B

(*Id.*, FIG. 2B.) A POSA would not have recognized each "collimating space" as a "collimated beam," as this segment of the optical path represents part of an overall beam that is plainly not collimated, as FIG. 2B above readily shows.

1074. The prosecution history for the Cytek '076 patent supports my conclusion that the beam configuration in Cytek's '076 patent disclosures is novel over the purported inventions of the Asserted Patents. The specifications of the Asserted Patents were known to the Examiner during prosecution of the application

692

that led to the '076 patent, as Cytek disclosed the '412 patent to the Examiner in a June 28, 2021 IDS. (*See* '076 Cytek patent, References Cited; June 28, 2021 Information Disclosure Statement, '076 Cytek patent file history.) The Examiner considered the '412 patent and nevertheless issued the '076 Cytek patent over the '412 patent days later on July 9, 2021. The Examiner further concluded that the '412 patent does "not utilize micro-mirrors or mirrors having a radius of curvature that directs light onto even filters while reimaging light onto odd filters of a plurality of filters arranged in a row." (July 9, 2021 Notice of Allowance, at 3, '076 Cytek patent file history.) That is, the Examiner recognized that the specifications of the Asserted Patents, consistent with my analysis above, only disclose a single collimated beam projected through a unit magnification relay architecture, where there is no break in the continuity of the collimated beam from the collimating optical element, such that there exists a first collimated beam" and "second collimated beam" as recited in Claim 10 of the '443 patent. The Examiner's interpretation confirms my conclusion that Claim 10 of the '443 patent lacks written description support and is not enabled.

1075. I have evaluated the *Wands* factors that, in my opinion, support my conclusion that Claim 10 of the '443 patent lacks enablement. First, the recited "first collimated beam" and "second collimated beam" suggests that the claim scope captures use of multiple beams within the claimed "WDM" and/or some intermediary beam between the "first collimated beam" and the "second collimated

693

████████████████ – ████████████████

beam" that may or may not be collimated. (*Wands* Factor No. 1 – Breadth of the Claims). Second, the structure for Claim 10, as stated above, suggests the existence of multiple beams within the WDM, or potentially an intermediary non-collimated beam, neither of which are supported by the '443 written description. As I have discussed at length with respect to the "wavelength division multiplexer (WDM)" term above, the '443 specification provides no teaching, suggestion, motivation, guidance, or working examples for a "WDM" that propagates anything other than a unitary "effectively collimated" beam at unit magnification through its relay architecture. Accordingly, a POSA would not have understood how to develop and build, without excessive experimentation, an operable version of the purported "WDM" of Claim 10, that may or may not have a collimating optical element but apparently has two separate "collimated beams" that originate from odd-numbered mirrors," based on any teaching from the '443 specification (*Wands* Factor Nos. 5-8 – Predictability, Guidance from the Specification, Working Examples, and Amount of Experimentation).

### J. Image-Related Terms

#### 1. The Claimed "image" is Indefinite ('582, cls. 1, 20)

1076. I understand the Court construed "image" as "representation of an object created by light or emanating from a light source" and deferred the issue of indefiniteness for later in the case. In my opinion, **"image"** as used in the asserted

694

# EXHIBIT 3

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| BECKMAN COULTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 24-0945-CFC-EGT |
| | ) | |
| CYTEK BIOSCIENCES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**OPENING EXPERT REPORT OF DR. JESSICA P. HOUSTON, PHD
REGARDING INFRINGEMENT OF U.S. PATENT NOS. 10,330,582, 11,703,443, AND
12,174,107**

December 19, 2025

_Jessica P. Houston_

Dr. Jessica P. Houston

# TABLE OF CONTENTS

I.  Introduction..................................................................................................................... 1

II.  Background and Qualifications....................................................................................... 1

III.  Materials Considered ..................................................................................................... 4

IV.  Legal Principles ............................................................................................................. 4

    A.  Claim Construction ................................................................................................ 4

    B.  Infringement............................................................................................................ 4

        1.  Literal Infringement ...................................................................................... 5

        2.  Infringement Under the Doctrine of Equivalents.......................................... 5

        3.  Direct Infringement........................................................................................ 7

        4.  Indirect Infringement .................................................................................... 7

        5.  Infringement by Supply of All or a Substantial Portion of the Components of a Patented Invention to Another Country ..................................................................... 8

        6.  Infringement by Supply of Components Especially Made or Adapted for Use in the Patented Invention into Another Country ................................................................... 9

        7.  Willful Infringement .................................................................................... 10

    C.  State of the Art ...................................................................................................... 10

    D.  Damages................................................................................................................ 10

V.  Summary of Opinions .................................................................................................. 12

VI.  Person of Ordinary Skill in the Art ............................................................................. 12

VII.  Technology Background ............................................................................................... 13

    A.  Overview of Flow Cytometry ............................................................................... 13

        1.  Scattered Light Detection ............................................................................ 14

        2.  Fluorescence Detection ............................................................................... 16

    B.  Optical Subsystems & Wavelength Division Multiplexers ................................... 19

    C.  Spectral Flow Cytometry ...................................................................................... 22

VIII.  Overview of the Asserted Patents ................................................................................ 23

    A.  Background of the Inventions................................................................................ 23

    B.  Patent Specification .............................................................................................. 24

    C.  File History ........................................................................................................... 26

        1.  '412 Patent .................................................................................................. 26

        2.  '582 Patent .................................................................................................. 27

        3.  '772 Patent .................................................................................................. 30

4.  '106 Patent ........................................................................................... 30

5.  '443 Patent ........................................................................................... 36

6.  '107 Patent ........................................................................................... 37

D.  Asserted Claims ............................................................................................ 37

1.  '582 Patent ........................................................................................... 38

2.  '443 Patent ........................................................................................... 39

3.  '107 Patent ........................................................................................... 41

IX.  Claim Construction ................................................................................................. 43

X.  Cytek's Flow Cytometers ........................................................................................ 44

A.  Overview of Accused Products...................................................................... 44

1.  Cytek Aurora.......................................................................................... 45

2.  Cytek Aurora EVO ................................................................................ 46

3.  Cytek Aurora CS.................................................................................... 48

4.  Cytek Northern Lights and Cytek Northern Lights NL-CLC ................ 49

B.  Laser Upgrades ............................................................................................. 51

C.  Components of the Accused Products ........................................................... 51

XI.  Cytek's Accused Products Infringe the Asserted Patents ....................................... 54

A.  '107 Patent ................................................................................................... 54

1.  Claim 5.................................................................................................... 54

2.  Claim 16.................................................................................................. 117

3.  Claim 18.................................................................................................. 132

4.  Claim 26.................................................................................................. 142

5.  Claim 27.................................................................................................. 161

6.  Claim 29.................................................................................................. 166

B.  '443 Patent ................................................................................................... 173

1.  Claim 4.................................................................................................... 173

2.  Claim 6.................................................................................................... 193

3.  Claim 10.................................................................................................. 195

4.  Claim 11.................................................................................................. 199

5.  Claim 15.................................................................................................. 200

C.  '582 Patent ................................................................................................... 213

1.  Claim 1.................................................................................................... 213

2.  Claim 3.................................................................................................... 223

3.  Claim 6.................................................................................................... 226

4. Claim 23 ............................................................................................................ 227

5. Claim 26 ............................................................................................................ 231

XII. Cytek's Knowledge of the Patents; Knowledge of Xitogen, Dr. Chen, and CytoFLEX; and Copying .............................................................................................................. 232

A. Cytek's Knowledge of the Patents .......................................................................... 232

B. Cytek's Knowledge and Analysis of Xitogen and the CytoFLEX Products ................. 235

C. Copying .............................................................................................................. 241

XIII. Cytek's Willful Infringement of the Asserted Patents .................................................... 243

XIV. Beckman Coulter's CytoFLEX Flow Cytometers ......................................................... 244

A. The CytoFLEX Platform ........................................................................................ 244

1. Development of CytoFLEX ............................................................................... 244

2. Products .......................................................................................................... 245

3. Key Features of CytoFLEX .............................................................................. 246

XV. Beckman Coulter's CytoFLEX Platform Embodies the Claimed Inventions ..................... 304

A. '107 Patent .......................................................................................................... 305

1. Claim 5 ........................................................................................................... 305

2. Claim 16 ......................................................................................................... 316

3. Claim 18 ......................................................................................................... 321

4. Claim 26 ......................................................................................................... 326

5. Claim 27 ......................................................................................................... 333

6. Claim 29 ......................................................................................................... 333

B. '443 Patent .......................................................................................................... 338

1. Claim 4 ........................................................................................................... 338

2. Claim 6 ........................................................................................................... 344

3. Claim 10 ......................................................................................................... 345

4. Claim 11 ......................................................................................................... 348

5. Claim 15 ......................................................................................................... 349

C. '582 Patent .......................................................................................................... 353

1. Claim 1 ........................................................................................................... 353

2. Claim 3 ........................................................................................................... 358

3. Claim 6 ........................................................................................................... 360

4. Claim 23 ......................................................................................................... 361

5. Claim 26 ......................................................................................................... 364

XVI. Technical Advantages and Impacts of the Claimed Inventions and Additional Considerations ........................................................................................................... 365

A.    Prior to the Asserted Patents, APDs' Main Use Cases Were for Red and Near Infrared Channels of Specialized Particle Analyzers ................................................................ 366

B.    Blue Lasers Have Historically Been, and Still Are, the Most Important Laser for Flow Cytometry ............................................................................................................................. 367

C.    Cytek's Flat-Top Beam Technology Has Comparatively Low Importance for the Flow Cytometers ........................................................................................................................... 367

D.    The Asserted Patents' Claimed WDM Allows for Cytek's Full Spectrum Cytometry .. 369

XVII.     Lack of Non-Infringing Alternatives ........................................................................ 371

XVIII.    Comparable Licenses and Products ........................................................................... 373

XIX.      35 U.S.C. § 271................................................................................................................ 378

A.    Induced Infringement Under 35 U.S.C. § 271(b) ............................................................. 378

B.    Contributory Infringement Under 35 U.S.C. § 271(c).................................................... 380

C.    Supply Under 35 U.S.C. § 271(f)(1)................................................................................... 382

D.    Supply Under 35 U.S.C. § 271(f)(2)................................................................................... 384

XX.       Supplementation of Opinions ..................................................................................... 384

## TABLE OF APPENDICES

Appendix A: Jessica P. Houston Curriculum Vitae

Appendix B: Components of the Accused Products

Appendix C: List of Materials Considered

## I. Introduction

1. I have been retained as an expert in this case by WilmerHale on behalf of Plaintiff Beckman Coulter, Inc. ("BEC"). I expect to testify at trial regarding the matters set forth in this report, if asked about these matters by the Court or by the parties' attorneys.

2. I understand that BEC has asserted U.S. Patent Nos. 10,330,582, 11,703,443, and 12,174,107 to Yong Qin Chen ("the '582 patent," "the '443 patent," and "the '107 patent," or collectively the "Asserted Patents"), entitled "Flow Cytometer" against certain products offered by Defendants Cytek Biosciences, Inc. ("Cytek"). Specifically, I understand that BEC is asserting claims 1, 3, 6, 23, and 26 of the '582 patent, claims 4, 6, 10, 11, and 15 of the '443 patent, and claims 5, 16, 18, 26, 27, and 29 of the '107 patent against certain Cytek products (collectively referred to as the "Asserted Claims").

3. I have been asked for my expert opinion regarding, among other things, whether Cytek products infringe the Asserted Claims of the Asserted Patents. As explained in detail below, it is my opinion that the accused Cytek products infringe the Asserted Claims.

## II. Background and Qualifications

4. My qualifications are described in detail in my *curriculum vitae*, which is attached as Appendix A. I have not previously testified at trial or deposition.

5. I have twenty years of research experience in biomedical engineering with the subdisciplines of cytometry, biophotonics, and imaging. Currently I am a Professor of Chemical & Materials Engineering at New Mexico State University (NMSU) in Las Cruces, NM. At NMSU, I am the principal investigator of the Laboratory for Flow Cytometry and Related Biophotonics (https://flowcytometry.nmsu.edu/). As director of this laboratory, I supervise postdoctoral fellows, graduate students, and undergraduates on projects that are related to flow

1

cytometer "may include one or more" components or subsystems, but the specification nowhere states that the specific features identified by Cytek are required for a device to be considered a "flow cytometer." *Id.* at 27:3-20. In fact, Cytek notably omits from its quoted language in the specification that the flow cytometer "*may* include" or "*may* have" certain components. *Id.* at 27:3-40. The Asserted Claims of the '107 Patent simply require a "flow cytometer." Any arguments otherwise merely attempt to import limitations from the specification into the claims, which I understand is inappropriate.

121. In alleging that the Accused Products do not infringe "a flow cytometer," Cytek further asserts (without evidence or argument) that the Asserted Claims are invalid. *See* Cytek's Eighth Supplemental Responses to Beckman Coulter's First Set of Interrogs., Exhibit D at 3. The validity of the Asserted Claims is beyond the scope of this report, and I reserve the right to respond to any opinions regarding invalidity.

**b) Element 1(b): "an optical fiber; and"**

122. Each Accused Product comprises "an optical fiber." Moreover, I understand that Cytek does not specifically allege that element 1(b) of the '107 Patent is not infringed. *See* Cytek's Eighth Supplemental Responses to Beckman Coulter's First Set of Interrogs., Exhibit D at 3 (referring back to Element 1[pre], which provides no argument or evidence to refute infringement of "an optical fiber"). That is, Cytek concedes that each of the Accused Products comprise an optical fiber.

123. In the flow cytometer of the Accused Products, fluorescent light from the flow cell is detected by a series of avalanche photodiode detectors in a wavelength division multiplexer. *See, e.g.*, CYTEK_0000003882 at CYTEK_0000003999-4003; CYTEK_0000002507 at CYTEK_0000002625-2629; *see also infra* Section XI.A.1.f. The service manual for the Cytek Aurora System explains that the light is transmitted through an

multimode fiber."), 156:11-24; Bing Shan Dep. Tr. at 78:9-14 (Q. And a 600-micrometer fiber is a multimode fiber; right? A. Yes.).

127. Cytek's patent marking page states that U.S. Patent No. 11,913,868 (the "'868 Patent") covers the Cytek Aurora, Cytek Aurora EVO, and Cytek Aurora CS, and the Northern Light system.[4] https://cytekbio.com/pages/patents-and-published-patent-applications. ████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████.

128. Taken together, the evidence clearly demonstrates that the Accused Products comprise an optical fiber that is a multimode optical fiber.

> **c)** **Element 1(c): "a wavelength division multiplexer (WDM) configured to receive light from the optical fiber, wherein the WDM comprises:"**

129. Each of the Accused Products comprise "a wavelength division multiplexer (WDM) configured to receive light from the optical fiber."

---

[4] The '868 Patent states that it "is a divisional and claims the benefit of United States (US) Patent application Ser. No. 15/659,610 titled COMPACT DETECTION MODULE FOR FLOW CYTOMETERS filed on Jul. 25, 2017," CYTEK_0000009787 at 1:7-10, which published as US2018/0024040 (BEC-CYTEK-00039357) and issued as U.S. Patent No. 11,169,076 (the "'076 Patent"). U.S. Patent No. 11,333,597 (the "'597 Patent") states that it "is also a continuation in part application claiming priority to U.S. patent application Ser. No. 15/659,610," which issued as the '076 Patent. The '597 Patent includes additional figures relating to the overall flow cytometry system, but otherwise has a similar specification as the '076 and '868 Patents. When discussing Cytek's patents, I primarily cite to the '868 Patent and the published application for the '076 Patent, but my citations similarly apply to corresponding sections in the issued '076 and '597 Patents.

Products" operate on a fundamentally different principle of operation. *Id.* at 1-2, 10. I have spoken with Dr. David Schaafsma and reviewed his Expert Report. Dr. Schaafsma explains why Cytek's assertion that the claimed require that a WDM be configured such that a beam remains collimated along the entire optical path is baseless and incorrect and confirms my opinion that Cytek's Accused Products infringe this limitation.

137. I also understand that on December 12, 2025, Cytek further stated that "[t]he Accused Products do not contain a 'wavelength division multiplexer;' because they do not multiplex light." Cytek's Eighth Supplemental Responses to Beckman Coulter's First Set of Interrogs. at 32. As discussed above in this Element and in Section VII, the '107 Patent describes "a Wavelength Division Multiplexing (WDM) system to separate a light beam into multiple colored bands." *See* '107 Patent at 2:40-42. A POSA would thus understand that reference the wavelength division multiplexing refers to "optically separating [e.g., demultiplexing] light received via the optical fiber into color bands." *Id.* at 2:62-65. As discussed above for this claim limitation, Cytek documents frequently refer to the Accused Products as including wavelength division multiplexers or utilizing that technology, and Cytek's engineer, their CTO, and their CTO similarly testified to this effect.

138. Taken together, the evidence clearly demonstrates that the optical subsystem of the Accused Products is a WDM as recited in the claims of the '107 Patent because the optical subsystem receives light from the optical fiber and separates a beam of light into beams of different colors.

### d) Element 1(d): "an array of mirrors;"

139. Each of the Accused Products comprises a WDM comprising "an array of mirrors."



148. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ which I discuss in more detail below. CYTEK_0000009840; CYTEK_0000009841; CYTEK_0000009843; CYTEK_0000009844; CYTEK_0000011083; *see also* CYTEK_0000011236; CYTEK_0000011237; CYTEK_0000011238. I have also reviewed the Bills of Material ("BOMs") produced by Cytek which cover the Accused Products. ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████ *See infra* Section XI.A.1.n. regarding "concave"

mirrors.

149.    Additionally, Cytek's '868 Patent, which as discussed above ████████████

████████████████████████████, repeatedly describes similar components as "mirrors"

or "micro-mirrors." *See, e.g.*, CYTEK_0000009787 at 5:23-6:3 (discussing how, e.g.,

"[g]enerally, the image array consists of an array of micro-mirrors and an opposing array of

bandpass and/or dichroic filters for each detection channel"), 9:44-47 (describing "fifteen mirrors

(M(1) through M(15) on an opposite side" of a "solid transparent block").



CYTEK_0000009787 at FIG. 4B.  Further, the '868 Patent states that "[a] reflective material 811

is formed (e.g., disposed) on a spherical transparent micro-lens shape of the solid transparent

material 800 to form each spherical micro-mirror 810 in **one** side of the transparent block 806."

*Id.* at 16:10-13.  ██████████████████████████████████████████████

████████████████████████████.

150. Regarding Cytek's argument here and elsewhere that Beckman Coulter has not identified which specific subset of components (here, mirrors) satisfies the limitation, see, e.g., Cytek's Eighth Supplemental Responses to Beckman Coulter's First Set of Interrogs., Exhibit D at 10, I note that the multiple subsets of the components may satisfy the limitation. For example and without limitation, the first three mirrors in the APD module may satisfy the limitation, as well as the first four mirrors, five mirrors, six mirrors etc. within the APD module. Any of these, and various other combinations of mirrors, constitute the claimed array of mirrors.

151. Taken together, the evidence clearly demonstrates that the optical subsystem of the Accused Products (i.e., the WDM) includes an array of mirrors.

### (1) The array of micro-lenses in the Accused Products are equivalent to an array of mirrors

152. As discussed above, it is my opinion that the Accused Products comprise "an array of mirrors." However, to the extent that the array of microlenses in the Accused Products do not literally comprise an array of mirrors, they are equivalent to an array of mirrors. I have spoken with Dr. David Schaafsma and reviewed his Expert Report. Dr. Schaafsma explains why the array of microlenses are equivalent to an array of mirrors and thus confirms my opinion that Cytek's Accused Products infringe this limitation.

### e) Element 1(e): "an array of filters; and"

153. Each of the Accused Products comprises a WDM comprising "an array of filters."

154. I understand that Cytek does not specifically allege that Element 1(e) of the '107 Patent is not infringed and only asserts that Beckman Coulter has not identified which specific subset of filters satisfies the limitation. *See* Cytek's Eighth Supplemental Responses to Beckman Coulter's First Set of Interrogs., Exhibit D at 11 (providing no argument or evidence to refute

174. Taken together, the evidence clearly demonstrates that the optical subsystem of the Accused Products (i.e., the WDM) includes an array of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters in the array of filters.

> **g) Element 1(g): "wherein each of the filters in the array of filters is configured to receive light such that: a portion of the light passes through the filter; and another portion of the light is reflected;"**

175. I understand that the Court construed the term "portion of the" light in this element to mean "subset of the spectrum of the wavelengths of light." 9/17/2025 Hr'g Tr. at 92:21-24. Under the Court's construction, each of the Accused Products comprises a WDM "wherein each of the filters in the array of filters is configured to receive light such that: a portion of the light passes through the filter; and another portion of the light is reflected."

176. As discussed above with regard to Element 1(e), which I incorporate by reference here, the Accused Products comprise a WDM comprising "an array of filters." In particular, bandpass filters are arranged to selectively transmit certain wavelengths of light (i.e., "a portion of the light") toward semiconductor detectors as well as to reflect other wavelengths of light (i.e., "another portion of the light") toward the curved mirrors. *See, e.g.*, CYTEK_0000003882 at CYTEK_0000003999-4003; CYTEK_0000002507 at CYTEK_0000002625-29. Illustrations depicting the optical subsystem in the service manual show the use of these filters:

First Set of Interrogs., Exhibit D at 11. Cytek also states that "[w]ith respect to Plaintiff's identification of the full set of dichroic filters, the Accused Products do not meet this claim element because the last dichroic filter in the set of dichroic filters does not reflect light. Light is either absorbed or passes through the filter." *Id.* at 12.

179. With respect to Cytek's arguments regarding bandpass filters and dichroic filters, as discussed above in Section XI.A, the BOMs for the Accused Products confirm that the Accused Products do not contain separate sets of filters in each channel, but instead contain one bandpass filter, which, as shown in the schematics above, pass one band of light and reflect other bands of light. This is further confirmed by Cytek engineers. *See, e.g.*, Qing Shao Tr. at 83:18-25 ("So the band-pass filter in each APD module passes certain wavelengths of light; right? A. Yes. Q. And the band-pass filter in each APD module reflects certain wavelengths of light; right? A. Yes. That's the band-pass filter function."); Bing Shan Tr. at 72:7-13 ("Q. So you're aware that the band-pass filters in the APD modules reflect a subset of the wavelengths of light; right? A. Yes. Q. And they transmit a subset of the wavelengths of light; right? A. Yes."), 82:2-83:2. Thus, Cytek is incorrect that the bandpass filters do not reflect light.

180. Cytek's '868 Patent, ███████████████████ ████████████████████████████████ confirm that bandpass filters and dichroic filters are not mutually exclusive (i.e., bandpass filters can be dichroic filters). For example, Cytek's '868 Patent states that "light reflected off a micro-mirror 712E can be bandpass filtered by a dichroic filter 709E and coupled into a lens/detector 711E." CYTEK_0000009787 at 15:7-9 ("The alignment of the mounting block 1200 with the transparent block 806,1006 of the imaging array 708 and the angle of the angled curved openings 1201 is such that light reflected off a micro-mirror 712E can be bandpass filtered by a dichroic

filter 709E and coupled into a lens/detector 711E."). Cytek's '868 Patent similarly states that "[t]he plurality of long-pass dichroic filters D(1) through D(N) can alternatively be passband or bandpass optical filters or include both a dichroic optical filter and a bandpass optical filter in combination together to assure a limited range of wavelengths of light pass through. Dichroic optical filters use the principle of thin-film interference and can also be referred to as an interference filter. For each channel, the bandpass or passband optical filter is tuned to pass a different selected range of wavelength of light (the passband) to each detector and reflect the rest of the light wavelengths back to a micro-mirror in the micro mirror array." CYTEK_0000009787 at 6:11-21.

181.    With respect to Cytek's arguments regarding subsets, I discussed in Element 1(e) how multiple subsets of the components may satisfy the limitation.  For example and without limitation, the first three filters may satisfy the limitation, as well as the first four filters, five filters, six filters etc. within the APD module.  Any of these, and various other combinations of filters, constitutes the claimed array of filters and it is not required that the last filter be included in the array to meet the claim limitations. Thus, regardless of whether the terminal filter in the Accused Products does not further reflect any remaining light, the Accused Products still contain an array of filters configured to receive light such that a portion of the light passes through the filter; and another portion of the light is reflected.

182.    Taken together, the evidence clearly demonstrates that each of the filters in the array of filters is configured to receive light such that a portion of the light passes through the filter; and another portion of the light is reflected.

> **h)        Element 1(h): "wherein each of the mirrors in the array of mirrors is configured to: receive light reflected by a filter in the array of filters; and reflect light to another filter in the array of filters."**

demonstrates that the mirror is concave, not convex.  Therefore, the ███████████ is a

concave mirror.

213.    I understand that Cytek has alleged that the Accused Products lack a concave

mirror because the relevant components "are micro-lenses that are convex and not concave," and

which "do[] not have the same function as a concave mirror, nor does it perform that function in

the same way to yield the same result."  Cytek's Eighth Supplemental Responses to Beckman

Coulter's First Set of Interrogs., Exhibit D at 12.  I have spoken with Dr. David Schaafsma and

reviewed his Expert Report. Dr. Schaafsma explains why Cytek's assertion is baseless and

incorrect and confirms my opinion that Cytek's Accused Products infringe this limitation.

214.    Taken together, the evidence clearly demonstrates that at least one of the mirrors

in the array of mirrors in the Accused Products is a concave mirror.

> **(1)    The components in the Accused Products are equivalent
> to a "concave mirror."**

215.    To the extent that the micro-lenses (i.e., mirrors) in the Accused Products are not

literally concave mirrors, they are equivalent to concave mirrors.  I have spoken with Dr. David

Schaafsma and reviewed his Expert Report. Dr. Schaafsma explains why the micro lenses are

equivalent to concave mirrors and thus confirms my opinion that Cytek's Accused Products

infringe this limitation.

> **o)    Element 5(a): "The flow cytometer of claim 3, wherein"**

216.    As I explain in Section XI.A.1.a above, which I incorporate by reference here, the

Accused Products comprise a flow cytometer and thus meet this limitation.

> **p)    Element 5(b): "the WDM is configured such that a portion of
> an optical path between the array of mirrors and the array of filters
> forms a zig-zag pattern."**

217. The Accused Products comprise a WDM "configured such that a portion of an optical path between the array of mirrors and the array of filters forms a zig-zag pattern."

218. In the flow cytometer of the Accused Products, at least a portion of the optical path between the band-pass filters and the concave mirrors forms a zig-zag pattern, as Cytek's service manual shows below:



CYTEK_0000003882 at CYTEK_0000004001; CYTEK_0000002507 at CYTEK_0000002626-2627; *see also* Qing Shao Tr. at 104:4-105:3, 235:1-12. This optical path is demonstrated in multiple additional Cytek illustrations and documents, as well as Cytek's public-facing materials. *See, e.g.*, CYTEK_0000082467 at CYTEK_0000082481-2483; CYTEK_0000103871 at CYTEK_0000103872; CYTEK_0000104010 at CYTEK_0000104010; CYTEK_0000296125 at CYTEK_0000296128; BEC-CYTEK-0003973.

219. This optical path is similarly demonstrated by ray traces performed by Cytek's consultant Jay Hsieh to help design the Accused Products:

Products' APD modules to the 15th and 16th channels, and further demonstrate the zig-zag pattern between mirrors and filter.

220. I understand that Cytek alleges that "the non-collimated beam in the Accused Products follows an optical path where the beam vacillates in cross-sectional diameter and circumference that is dissimilar to the zig-zag pattern of the 'effectively collimated' beam disclosed in the '107 specification." *See* Cytek's Eighth Supplemental Responses to Beckman Coulter's First Set of Interrogs., Exhibit D at 13. I disagree. Cytek's '868 Patent, which as discussed above is marked on the Accused Products and which Cytek fact witnesses testified is practiced by the Accused Products, demonstrates a similar beam path as the Accused Products but still describes "the zigzag light path in the array" or "zigzag path in the imaging array." CYTEK_0000009806 at 6:52-53, 7:2-3. Element 5(b) of the '107 Patent requires a "zig-zag pattern," and any arguments otherwise merely attempt to import limitations from the specification into the claims, which I understand is inappropriate.

221. I have spoken with Dr. David Schaafsma and reviewed his Expert Report. Dr. Schaafsma explains Cytek's Zemax file further demonstrates how Cytek infringe this limitation and confirms my opinion that Cytek's Accused Products infringe this limitation.

222. Taken together, the evidence clearly demonstrates that the WDM of the Accused Products is configured such as a portion of an optical path between the array of mirrors and the array of filters forms a zig-zag pattern.

> **(1) The WDM configuration forming the optical path between the array of mirrors and array of filters is equivalent to one forming a zig-zag pattern**

223. To the extent that the portion of the optical path is not literally a zig-zag pattern, the WDM configuration forming the optical path, and the resulting optical path, is equivalent to one forming a zig-zag pattern. I have spoken with Dr. David Schaafsma and reviewed his Expert

Report. Dr. Schaafsma explains why the optical path in the WDM is equivalent to one forming a zig-zag pattern and thus confirms my opinion that Cytek's Accused Products infringe this limitation.

### q) Conclusion for claim 5

224. Because the evidence clearly demonstrates that each of the Accused Products meets all the claim limitations of claim 5, it is my opinion that claim 5 of the '107 patent is infringed.

### 2. Claim 16

#### a) Element 16(a) (Preamble): "A flow cytometer comprising:"

225. As I explain in Section XI.A.1.a above, which I incorporate by reference here, each of the Accused Products comprises "[a] flow cytometer."

#### b) Element 16(b): "a flow cell configured to permit liquid to flow through the flow cell;"

226. Each of the Accused Products comprises "a flow cell configured to permit liquid to flow through the flow cell." Moreover, I understand that Cytek does not specifically allege that Element 16(b) of the '107 Patent is not infringed. *See* Cytek's Eighth Supplemental Responses to Beckman Coulter's First Set of Interrogs., Exhibit D at 15 (referring back to "Claim 16 [pre]" and not providing any evidence or argument to refute infringement of "a flow cell configured to permit liquid to flow through the flow cell"). That is, Cytek concedes that the Accused Products comprise a flow cell configured to permit liquid to flow through the flow cell.

227. In the flow cytometer of each of the Accused Products, a flow cell "hydrodynamically focuses the cells as they enter a stream of sheath fluid and pass through a cuvette," where the flow cytometer's "system lasers interrogate the cells." CYTEK_0000003882 at CYEK_0000003906; CYTEK_0000002507 at CYTEK_0000002533-34. The service manual

incorporate by reference here, the Accused Products comprise a plurality of mirrors for the same

reasons that they comprise an array of mirrors. Element 16(j) otherwise recites the same

limitations as Element 1(h). Thus the Accused Products comprise a WDM wherein each of the

plurality of mirrors is configured to: receive light reflected by a filter of the plurality of filters;

and reflect light to another filter of the plurality of filters, for the same reasons as I discuss above

with regard to Element 1(h), which I incorporate by reference here.

### k) Conclusion for claim 16

265. Because the evidence clearly demonstrates that each of the Accused Products

meets all the claim limitations of claim 16, it is my opinion that claim 16 of the '107 patent is

infringed.

### 3. Claim 18

### a) Element 17(a): "The flow cytometer of claim 16,"

266. As I explain in Section XI.A.2.a above, which I incorporate by reference here,

each of the Accused Products comprises "[t]he flow cytometer of claim 16."

### b) Element 17(b): "wherein the WDM further comprises: a plurality of focusing lenses,"

267. The Accused Products comprise a WDM with "a plurality of focusing lenses." I

understand that Cytek does not specifically allege that Element 17(b) of the '107 Patent is not

infringed under the Court's construction, and instead asserts that Beckman Coulter has not

identified which specific subset of focusing lenses satisfies the limitation. [9] *See* Cytek's Eighth

Supplemental Responses to Beckman Coulter's First Set of Interrogs., Exhibit D at 20-21

---

[9] As discussed above with regard to Claim 1, I note that the multiple subsets of the components may satisfy the limitation. For example and without limitation, the first three focusing lenses in the APD module may satisfy the limitation, as well as the first four focusing lenses, five focusing lenses, six focusing lenses etc. within the APD module. Any of these, and various other combinations of focusing lenses, constitute the claimed is an plurality of focusing lenses.

CYTEK_0000103871 at CYTEK_0000103872; *see also* CYTEK_0000104010 at

CYTEK_0000104010:



270. In the Accused Products,



CYTEK_0000000014 at CYTEK_0000000015; CYTEK_0000001173 at CYTEK_0000001174;

CYTEK_0000011085 at CYTEK_0000011086.



CYTEK_0000000014 at CYTEK_0000000024; CYTEK_0000001173 at CYTEK_0000001183;

CYTEK_0000011085 at CYTEK_0000011095.



CYTEK_0000000014 at CYTEK_0000000025; CYTEK_0000001173 at CYTEK_0000001184;

CYTEK_0000011085 at CYTEK_0000011095; *see also* Bing Shan Tr. at 70:12-18, 72:14-20;

Qing Shao Tr. at 91:24-93:2, 159:5-24, 192:3-193:9.

271.    I have also reviewed CAD files for the Accused Products, which further supports

the relationship between the focusing lenses, APDs, and the remainder of the components of the

WDM:



Shan Tr. Exhibit 6 ███████████████████████████████████████████

███████████████████ at 7, 4.

272.　Cytek's '868 Patent, which as discussed above is marked on the Accused Products and practiced by the Accused Products, similarly describes how "[t]he focusing lens 316 focuses the fluorescence light passing through the filter down onto a small area size of the detector 318."　CYTEK_0000009787 at 9:58-60; *see also* BEC-CYTEK-00039357, ¶65.

273. I have also spoken with Dr. David Schaafsma and reviewed his Expert Report. Dr. Schaafsma discusses ray traces of the light path of the Accused Products produced as part of this litigation and demonstrates the light being captured and converged by the focusing lenses. This confirms my opinion that Cytek's Accused Products infringe this limitation.

274. Taken together, the evidence clearly demonstrates that the WDM of the Accused Products comprises a plurality of focusing lenses.

> c)      Element 17(c): "wherein each of the plurality of focusing lenses is configured to focus light that passed through a filter of the plurality of filters to a spot on an APD of the plurality of APDs,"

275. The Accused Products comprise a WDM "wherein each of the plurality of focusing lenses is configured to focus light that passed through a filter of the plurality of filters to a spot on an APD of the plurality of APDs."

276. I understand that Cytek does not specifically allege that Element 17(c) of the '107 Patent is not infringed and only refers back to its general comments on claim 16 and Element 17(a), which I discussed above. *See* Cytek's Eighth Supplemental Responses to Beckman Coulter's First Set of Interrogs., Exhibit D at 21. That is, Cytek concedes that the focuses lenses of the Accused Products are configured to focus light that passed through a filter of the plurality of filters to a spot on an APD of the plurality of APDs.

277. As discussed above with regard to Element 17(b), which I incorporate by reference here, the focusing lenses in the Accused Products captures and converges light after it passes through the filters of the WDM. As also explained with regard to Element 17(b), which I incorporate by reference here, the focusing lenses in the Accused Aurora Product are assembled together with the APDs such that light passing through the focusing lenses impinges to a spot on the APDs. *See* CYTEK_0000104010; *see also infra* Element 17(d) incorporated here by reference.

307.    As I explain in Section XI.A.4.e-f above, which I incorporate by reference here, each of the Accused Products comprises "[t]he flow cytometer of claim 22."

> **h)    Element 26(b): "wherein the WDM further comprises a block comprising a first surface; and"**

308.    Each of the Accused Products comprises a WDM "which further comprises a block comprising a first surface."  Moreover, I understand that Cytek does not specifically allege that Element 26(b) of the '107 Patent is not infringed.  *See* Cytek's Eighth Supplemental Responses to Beckman Coulter's First Set of Interrogs., Exhibit D at 22 (referring back to prior claims and providing no argument or evidence to refute infringement of "the WDM further comprises a block comprising a first surface").  That is, Cytek concedes that the WDM of the Accused Products includes a block comprising a first surface.

309.    The Accused Products all contain a "mirror block" made of glass, which includes a first surface, as Cytek's Service Manual demonstrates below:



CYTEK_0000296125 at CYTEK_0000296128. Each of the mirror blocks in these modules comprises a first surface for the same reasons as I've discussed above.

313.    Cytek's '868 Patent, which as discussed above is marked on the Accused Products and practiced by the Accused Products, similarly describes "using a transparent block" in its system. CYTEK_0000009787 at 5:23-26; *see also* BEC-CYTEK-00039357, ¶ 40.

314.    Taken together, the evidence clearly demonstrates that the flow cytometer of the Accused Products comprises a block comprising a first surface.

> i)    **Element 26(c): "each of the plurality of filters is coupled to the first surface of the block."**

315.    Each of the Accused Products comprises a WDM wherein "each of the plurality of filters is coupled to the first surface of the block."

316.    As discussed above with regard to Element 26(b), which I incorporate by reference here, the Accused Products' WDMs contains blocks, each with a first surface. In the Accused Products, the plurality of filters are coupled to the block's first surface to ensure proper alignment of the filters relative to the block, as demonstrated below:

156



CYTEK_0000003882 at CYTEK_0000004001; CYTEK_0000002507 at CYTEK_0000002626-27; *see also* CYTEK_0000082467 at CYTEK_0000082481.



Cytek internal documents further show the filters positioned along the first surface of the mirror block:



CYTEK_0000000903.



CYTEK_0000103871 at CYTEK_0000103872.



CYTEK_0000104010 at CYTEK_0000104010.

317. I understand that Cytek alleges, without argument, that the bandpass filters in the Accused Products are not "coupled" to the first surface of the block. *See See* Cytek's Eighth Supplemental Responses to Beckman Coulter's First Set of Interrogs., Exhibit D at 23. To the

extent Cytek argues that the bandpass filters are not "coupled" to the first surface of the block

because there is a 130 µm "air gap" between the block and the filters, I disagree. Coupling does

not require direct physical touching of the two components. As demonstrated by CAD files

below, the filters and block are held together in place relative to each other.





Shan Tr. Exhibit 6 (screenshots of native file APD-16-Assy(YG RED UV).SLDASM in

CYTEK_0000005606) at 7, 2.  The fact that these components holding the filters and mirrors

against each other allow for a small air gap does not prevent them from being "coupled."

318.    The '868 Patent, which as discussed above is marked on the Accused Products

and practiced by the Accused Products, similarly states that "[t]he compact light detection

module includes an image array with a transparent **block, a plurality of micro-mirrors in a row**

**coupled to a first side of the transparent block, and a plurality of filters in a row coupled to a**

**second side of the transparent block opposite the first side**."  CYTEK_0000009787 at Abstract.

319.    Taken together, the evidence is clear that the Accused Products comprise a WDM

with a block comprising a first surface, wherein "each of the plurality of filters is coupled to the

first surface of the block.

### j)      Conclusion for claim 26

320. Because the evidence clearly demonstrates that each of the Accused Products meets all the claim limitations of claim 26, it is my opinion that claim 26 of the '107 patent is infringed.

### 5. Claim 27

#### a) Element 27(a): "The flow cytometer of claim 26"

321. As I explain in Section XI.A.4 above, which I incorporate by reference here, the Accused Products comprise "[t]he flow cytometer of claim 26."

#### b) Element 27(b): "wherein the flow cytometer is a benchtop flow cytometer."

322. The Accused Products comprise "a benchtop flow cytometer." Moreover, I understand that Cytek does not specifically allege that Element 27(b) of the '107 Patent is not infringed. *See* Cytek's Eighth Supplemental Responses to Beckman Coulter's First Set of Interrogs., Exhibit D at 23 (referring back to five separate claims and not including argument or evidence to infringement of Element 27(b)). That is, Cytek concedes that the Accused Products are benchtop flow cytometers.

323. Cytek's own materials consistently refer to the Accused Products as "benchtop" flow cytometers. For example, Cytek refers to its Northern Lights-CLC flow cytometer and Northern Lights flow cytometer, Cytek Aurora flow cytometer, Cytek Aurora CS cell sorter, and Cytek Aurora Evo flow cytometer each individually as "an air-cooled, compact ***benchtop*** instrument." CYTEK_0000009557 at CYTEK_0000009571; CYTEK_0000009029 at CYTEK_0000009039; CYTEK_0000241418 at CYTEK_0000241428; CYTEK_0000008383 at CYTEK_0000008393; CYTEK_0000021502 at CYTEK_0000021512.

324. Indeed, each of the Accused Products are sized to fit on lab benches.

afterwards, the beam goes across the optical block and gets reimaged on every other detectors --

or actually, every other bandpass filter. Then goes through. Across. That's the whole beam

basically, the – it's first get onto the first bandpass filter. Then gets reimaged on every other

bandpass filter and eventually, exit from the optical block. That was the current design.").

361. I have also spoken with Dr. David Schaafsma and reviewed his Expert Report.

Dr. Schaafsma discusses ray traces of the light path of the Accused Products produced as part of

this litigation and demonstrates the light transmitting through the mirror block. This confirms

my opinion that Cytek's Accused Products infringe this limitation.

362. Thus, the Accused Products comprise a block positioned between the at least one

mirror and the set of filters, the block configured to enable transmission of the light.

> **i) Element 4(c): "a set of elements, each element of the set of elements positioned in an optical path between a different pair of a filter of the set of filters and a detector of the set of detectors, wherein each element of the set of elements includes a bandpass filter, a lens, or a combination thereof."**

363. The Accused Products comprise "a set of elements, each element of the set of

elements positioned in an optical path between a different pair of a filter of the set of filters and a

detector of the set of detectors, wherein each element of the set of elements includes a bandpass

filter, a lens, or a combination thereof." Moreover, I understand that Cytek does not specifically

allege that Element 4(c) of the '443 Patent is not infringed. *See* Cytek's Eighth Supplemental

Responses to Beckman Coulter's First Set of Interrogs., Exhibit B at 11 (providing no argument

or evidence to refute infringement of "a set of elements, each element of the set of elements

positioned in an optical path between a different pair of a filter of the set of filters and a detector

of the set of detectors, wherein each element of the set of elements includes a bandpass filter, a

lens, or a combination thereof"). That is, Cytek concedes that the Accused Products comprise a

set of elements, each element of the set of elements positioned in an optical path between a

different pair of a filter of the set of filters and a detector of the set of detectors, wherein each element of the set of elements includes a bandpass filter, a lens, or a combination thereof.

364. As discussed above with regard to element 17(b) of the '107 Patent, which I incorporate by reference here, the Accused Products comprise focusing lenses (ball lenses) positioned in front of each APD detector. Each of the ball lenses are positioned in an optical path between a corresponding bandpass filter and APD detector, as demonstrated by the Cytek Aurora Service Manual:



CYTEK_0000002507 at CYTEK_0000002626-27; CYTEK_0000003882 at CYTEK_0000004001. As annotated in the Figure above, optical paths extend beyond each bandpass filter (i.e., the light that passes through each bandpass filter) and passes through the lens before being focused onto an APD detector.

365.     Internal Cytek diagrams depicting the optical path in the Accused Products further demonstrate that the lens in each channel is positioned in an optical path between the filter and the detector.



366.

367.     CYTEK_0000104010 at CYTEK_0000104010.

368.     The '868 Patent, which as discussed above is marked on the Accused Products and practiced by the Accused Products, further demonstrates the relative positioning of the filters, lenses, and detectors in the optical path.



FIG. 4B

CYTEK_0000009787 at FIG. 4B.

369.     I have also spoken with Dr. David Schaafsma and reviewed his Expert Report. Dr. Schaafsma discusses ray traces of the light path of the Accused Products produced as part of this litigation which further demonstrate the relative positioning of the filters, lenses, and detectors.  This confirms my opinion that Cytek's Accused Products infringe this limitation.

370.     Taken together, the evidence clearly demonstrates that the Accused Products comprise a set of elements, each element of the set of elements positioned in an optical path between a different pair of a filter of the set of filters and a detector of the set of detectors, wherein each element of the set of elements includes a bandpass filter, a lens, or a combination thereof.

### j)     Conclusion for claim 4

371. Because the evidence clearly demonstrates that each of the Accused Products meets all the claim limitations of claim 4, it is my opinion that claim 4 of the '443 patent is infringed.

### 2. Claim 6

#### a) Element 6(a): "The WDM of claim 1, wherein:"

372. As I explain in Section XI.B.1.a-f above, which I incorporate by reference here, the Accused Products comprise "[t]he WDM of claim 1."

#### b) Element 6(b): "the set of filters include at least one dichroic filter, and"

373. The Accused Products comprise a WDM wherein "the set of filters include at least one dichroic filter." A dichroic filter is an optical component that passes a subset of wavelengths of light and reflects another subset of wavelengths of light. *See, e.g.*, '443 patent at 4:65-5:3 ("In particular, multiple colored bands present in the beam of light can be separated using dichroic filters…."), 45:20-23 ("The dichroic filter 903 may pass the color band of interest and reflects the remaining colors in the beam of light for further processing within the WDM 90."). Cytek's '868 Patent, which as discussed above is marked on the Accused Products and which Cytek fact witnesses testified was practiced by the Accused Products, further confirms that "a dichroic filter is an accurate color filter used to selectively pass light of a range of wavelengths of color light while reflecting other wavelengths of color light." CYTEK_0000009787 at 4:24-29. As discussed above with respect to Element 1(g) of the '107 Patent, which I incorporate by reference here, the filters in the array of filters in the Accused Products are "configured to receive light such that: a portion of the light passes through the filter; and another portion of the light is reflected." I identified the same components as the "array of

filters" as I did with the "set of filters" in Element 1(b), and thus the Accused Products comprise at least one dichroic filter for the reasons I discussed above in Element 1(g) of the '107 Patent.

374. Cytek's '868 Patent confirms that bandpass filters and dichroic filters are not mutually exclusive (i.e., bandpass filters can be dichroic filters). Cytek's '868 Patent states that "light reflected off a micro-mirror 712E can be bandpass filtered by a dichroic filter 709E and coupled into a lens/detector 711E." CYTEK_0000009787 at 15:4-9 ("The alignment of the mounting block 1200 with the transparent block 806,1006 of the imaging array 708 and the angle of the angled curved openings 1201 is such that light reflected off a micro-mirror 712E can be bandpass filtered by a dichroic filter 709E and coupled into a lens/detector 711E."). Cytek's '868 Patent similarly states that "[t]he plurality of long-pass dichroic filters D(1) through D(N) can alternatively be passband or bandpass optical filters or include both a dichroic optical filter and a bandpass optical filter in combination together to assure a limited range of wavelengths of light pass through. Dichroic optical filters use the principle of thin-film interference and can also be referred to as an interference filter. For each channel, the bandpass or passband optical filter is tuned to pass a different selected range of wavelength of light (the passband) to each detector and reflect the rest of the light wavelengths back to a micro-mirror in the micro mirror array." CYTEK_0000009787 at 6:11-21. Cytek engineers further agreed that a bandpass filter may be dichroic. *See* Qing Shao Tr. at 81:7-82:1; *see also id.* at 83:18-25, 84:16-85:15, 86:2-14. Indeed, in the industry, it is common to use the term bandpass filters to indicate a filter that passes certain wavelengths of light and reflects others - that is, bandpass filters and dichroic filters are not mutually exclusive. For example, the User Guide for the BD LSR II states that "LP, BP, and SP filters are referred to as dichroic filters." CYTEK_0000011991 at CYTEK_0000012086.

375. Taken together, the evidence clearly demonstrates that the set of filters includes at least one dichroic filter.

### (1) The bandpass filters in the Accused Products are equivalent to dichroic filters

376. To the extent that the bandpass filters in the Accused Products are not literally dichroic filters, they are equivalent to dichroic filters. I have spoken with Dr. Schaafsma and reviewed his Expert Report. Dr. Schaafsma explains why the bandpass filters are equivalent to dichroic filters and thus confirms my opinion that Cytek's Accused Products infringe this limitation.

### c) Element 6(c): "the at least one curved mirror is a concave mirror."

377. As I explain in in Element 4(c) above, which I incorporate by reference here, the Accused Products comprise "at least one curved mirror." Further, as I explain in Element 3(b) in Section XII.A.1. above with respect to the same component, which I incorporate by reference here, the "at least one curved mirror" in the Accused Products is a "concave mirror."

### d) Conclusion for claim 6

378. Because the evidence clearly demonstrates that each of the Accused Products meets all the claim limitations of claim 6, it is my opinion that claim 6 of the '443 patent is infringed.

### 3. Claim 10

### a) Element 9(a): "The WDM of claim 1, wherein"

379. As I explain in Section XI.B.1.a-f above, which I incorporate by reference here, the Accused Products comprise "[t]he WDM of claim 1."

### b) Element 9(b): "an optical path of the light includes a first filter of the set of filters, followed by a first mirror of the at least one mirror, followed by a second filter of the set of filters, followed by a

**second mirror of the at least one mirror, followed by a third filter of the set of filters, followed by a third mirror of the at least one mirror, and followed by a fourth filter of the set of filters.**

380.　I understand that the District Court construed "first filter" as "initial filter" and "second filter" as second sequential filter." 8/21/2025 Hr'g Tr. at 73:24-25. Under the Court's construction, the Accused Products comprise a WDM wherein "an optical path of the light includes a first filter of the set of filters, followed by a first mirror of the at least one mirror, followed by a second filter of the set of filters, followed by a second mirror of the at least one mirror, followed by a third filter of the set of filters, followed by a third mirror of the at least one mirror, and followed by a fourth filter of the set of filters."

381.　Cytek internal documents illustrating the detector modules of the Accused Products identify an initial filter (i.e., the first filter in the optical path after the light first enters the mirror block), which is followed along the optical path by a first mirror, then a second filter, a second mirror, a third filter, a third mirror, and a fourth filter:



382.　CYTEK_0000082467 at CYTEK_0000082481-83; *see also, e.g.,* CYTEK_0000103871 at CYTEK_0000103872.

383.　Cytek's '868 Patent, which as discussed above is marked on and practiced by the Accused Products, further demonstrates the optical path zig-zagging between filters and mirrors:



CYTEK_0000009787 at FIGs.2A, 2B; BEC-CYTEK-00039357 (U.S. Pub. No. 2018/0024040 A1) at FIGs. 2A, 2B. Cytek's public documents depict a similar optical path. *See, e.g.,* BEC-CYTEK-00030733.

384. I have spoken with Dr. David Schaafsma and reviewed his Expert Report. Dr. Schaafsma discusses ray traces of the light path of the Accused Products produced as part of this litigation and demonstrates the optical path including a first filter of the set of filters, followed by a first mirror of the at least one mirror, followed by a second filter of the set of filters, followed by a second mirror of the at least one mirror, followed by a third filter of the set of filters, followed by a third mirror of the at least one mirror, and followed by a fourth filter of the set of filters. This confirms my opinion that Cytek's Accused Products infringe this limitation.

385. Thus, the Accused Products comprise a WDM wherein an optical path of the light includes a first filter of the set of filters, followed by a first mirror of the at least one mirror,

followed by a second filter of the set of filters, followed by a second mirror of the at least one

mirror, followed by a third filter of the set of filters, followed by a third mirror of the at least one

mirror, and followed by a fourth filter of the set of filters.

### c) Element 10(a): "The WDM of claim 9, wherein:"

386. As I explain in Section XI.B.3.a-b above, which I incorporate by reference here,

the Accused Products comprise "[t]he WDM of claim 9."

### d) Element 10(b): "the first filter is an initial filter of the set of filters configured to receive the light, the second filter is configured to receive a first collimated beam of the light from the first mirror, and the fourth filter is configured to receive a second collimated beam of the light from the third mirror."

387. The Accused Products comprise a WDM wherein "the first filter is an initial filter

of the set of filters configured to receive the light, the second filter is configured to receive a first

collimated beam of the light from the first mirror, and the fourth filter is configured to receive a

second collimated beam of the light from the third mirror."

388. Cytek marketing materials demonstrate that initial filter receives the light, the

second filter receives a collimated beam from the first mirror, and the fourth filter also receives a

collimated beam from the third mirror:



First and second collimated beam and second and fourth filters

BEC-CYTEK-00039733. Cytek's '868 Patent, which as discussed above is marked on the Accused Products and is practiced by them, further describes how "the plurality of micro-mirrors images the fiber aperture onto the odd filters and collimates the light beam on the even filters." CYTEK_0000009787 at CYTEK_0000009789 (Abstract).

389. I have spoken with Dr. David Schaafsma and reviewed his Expert Report. Dr. Schaafsma explains why Cytek's Accused Products infringe this limitation and confirms my opinion that Cytek's Accused Products comprise a WDM wherein "the first filter is an initial filter of the set of filters configured to receive the light, the second filter is configured to receive a first collimated beam of the light from the first mirror, and the fourth filter is configured to receive a second collimated beam of the light from the third mirror."

### e) Conclusion for claim 10

390. Because the evidence clearly demonstrates that each of the Accused Products meets all the claim limitations of claim 10, it is my opinion that claim 10 of the '443 patent is infringed.

### 4. Claim 11

#### a) Element 11(a): "A flow cytometer comprising the WDM of claim 1."

391. As I discuss above with regard to Element 1(a) (Preamble) of the '107 Patent, which I incorporate by reference here, it is my opinion that each of the Accused Products is a "flow cytometer."

#### b) Conclusion for claim 11

392. Because the evidence clearly demonstrates that each of the Accused Products meets all the claim limitations of claim 11, it is my opinion that claim 11 of the '443 patent is infringed.

414.     I understand that Beckman Coulter and Cytek agree, and the Court has construed, that the preamble to claim 1 of the '582 Patent (i.e., "An optical subsystem for a flow cytometer, the optical subsystem comprising") limits the claim scope.

415.     It is my opinion that each of the Accused Products comprises "an optical subsystem for a flow cytometer" because it includes optical components and parts which are part of a flow cytometer. *Accord* Qing Shao Tr. at 75:13-16 ("Q. So an APD module is an optical system; right?  A. You can call it optical system.  Sometimes we just call it the optical module or subsystem.").  I note that the '582 Patent and the '107 Patent share a common specification.  For the same reasons as discussed in Section XI.A.1.a above with respect to the '107 Patent, which I incorporate by reference here, the Accused Products are flow cytometers.

> **b)      Element 1(b): "a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam;"**

416.     I understand that the Court has construed that the term "collimated" beam should have its plain and ordinary meaning.  8/21/2025 H'rg Tr. at 135:14-16, 193:5-7.  In particular, I understand that the Court declined to adopt Cytek's construction that would require the beam to be perfectly parallel and exclude beams that converge.  *Id.*  In my opinion, a POSA would understand that the plain and ordinary meaning of "collimated" beam is a beam with nearly parallel rays.  It is physically impossible to make the rays of a real beam of light (with a radius greater than 0) perfectly parallel.  *See, e.g.*, Hsieh Tr. at 126:5-23, 130:9-131:2, 132:22-133:9, 137:13-25, 139:11-140:25, 146:9-147:3, 148:21-25, 151:1-152:2, 170:16-20.  People of skill in the art commonly use the term "collimated" in real-world systems, such as systems with fluorescent light like a flow cytometer, to describe to a real beam which maintains substantially the same diameter and with rays that are slightly converging and/or diverging but remain "nearly parallel."  *See, e.g.*, '582 Patent at 44:28-34, 45:22-31, 45:55-60, 57:39-45.

417. ***Collimating Lens Is a Collimating Optical Element:*** Each APD Module in each Accused Product comprises a "collimation lens," sometimes referred to as "lens 1," which collimates the beam of light from a multimode optical fiber. *See, e.g.*, CYTEK_0000000089 at CYTEK_0000000090, CYTEK_0000000096-97; CYTEK_0000001392 at CYTEK_0000001393, CYTEK_0000001399-400; HSIEH_0000000008 ("collimating lens to collimate the 0.12NA fiber output"); CYTEK_0000002507 at CYTEK_0000002626-27; CYTEK_0000003882 at CYTEK_0000004001; Qing Shao Tr. at 122:16-123:6; Bing Shan Tr. at 67:9-69:6. This collimation lens is demonstrated, for example, by Cytek's field service manual:



CYTEK_0000003882 at CYTEK_0000004001; CYTEK_0000002507 at CYTEK_0000002626-27.

418.



Qing Shao Tr. at 148:18-125:24.

CYTEK_0000000089; CYTEK_0000001392.

This demonstrates that the beam of light projected by the "collimation lens" is collimated.

419.     Cytek's documents and optical engineers confirm that the collimation lens in the Accused Products is a "collimating lens" and that the beam of light projected by the collimating lens is "collimated."  *See, e.g.*, CYTEK_0000000089 at CYTEK_0000000090, CYTEK_0000000096-97; CYTEK_0000001392 at CYTEK_0000001393, CYTEK_0000001399-400; HSIEH_0000000008 ("collimating lens to collimate the 0.12NA fiber output"); CYTEK_0000002507 at CYTEK_0000002626-27; CYTEK_0000003882 at CYTEK_0000004001; Qing Shao Tr. at 122:21 ("Every APD including a collimating lens."); *id.* at 122:25-123:6, 124:18-125:24, 194:23-195:19; Bing Shan Tr. at 67:9-69:6; Jay Hsieh Tr. at 134:20-135:7, 164:24-165:11.

420.     As discussed above, Cytek's '868 Patent, which as discussed above is marked on the Accused Products and practiced by the Accused Products, describes the collimation lens as a "collimating lens" that "collimates the light."  *See, e.g.*, CYTEK_0000009787 at CYTEK_0000009809-10.

421.     ***Concave Mirrors Is A Collimating Optical Element:*** As discussed above for claim limitations 1(d), 1(h), and 3(b) of the '107 patent, each APD Module in each Accused Product comprises multiple curved, concave mirrors.  As explained above, Cytek' documents sometimes refer to the curved mirrors as "microlenses" even though they are mirrors.  In addition to receiving light from the filters and reflecting light back towards the filters, certain curved mirrors in each APD Module in each Accused Product collimate the beam of light they receive. In particular, for similar reasons as I discuss above with regard to Element 10(b) of the '443 Patent (in which the second and fourth filters receive collimated beams from the first and third mirrors), which I incorporate by reference here, each odd-numbered curved mirror (along the

optical path) in each APD Module in each Accused Product is a collimating optical element that projects a collimated beam of light.

422. Cytek's documents and optical engineers confirm that the initial, third sequential, fifth sequential, and other odd-numbered mirrors (along the optical path) in each APD module in each Accused Product is a "collimating optical element." *See, e.g.*, Qing Shao Tr. at 149:22-150:8; Jay Hsieh Tr. at 131:16-132:20; 132:22-134:5, 170:24-171:22. Cytek's documents and engineers further confirm that the beams of light projected by the initial, third sequential, fifth sequential, and other odd-numbered mirrors (along the optical path) are each "collimated." *Id.*

423. Moreover, Cytek's patents further confirm that the Accused Products contain a collimating optical element. Cytek's '868 Patent describes the mirrors as "the optical light beam is alternatively imaged and collimated through the reflection surfaces of the micromirrors and dichroic filters." *See, e.g.*, CYTEK_0000009787 at CYTEK_0000009807-10, CYTEK_0000009792-98. Cytek's patents describe that "[t]he first micro-mirror … collimates and reflects the light back onto a second detection module D2." *See, e.g., id.*

424. Thus, a POSA would understand that Cytek's affirmative position is that the initial, third sequential, fifth sequential, and other odd-numbered mirrors (along the optical path) in each APD module in each Accused Product is a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam.

425. I understand that The Court declined to adopt Cytek's construction of "collimating optical element." 9/17/2025 Hr'g Tr. at 199:6-204:3. I have spoken with Dr. David Schaafsma and reviewed his Expert Report. Dr. Schaafsma explains why Cytek infringe this

# EXHIBIT 4



US008284402B2

# (12) United States Patent
## Frazier et al.

(10) Patent No.: **US 8,284,402 B2**
(45) Date of Patent: Oct. 9, 2012

(54) **FLUORESCENCE DETECTION INSTRUMENT WITH ORTHOGONAL LASER ENTRY**

(75) Inventors: Erich Frazier, Fort Lauderdale, FL (US); Helen A. Minnich, Fort Lauderdale, FL (US)

(73) Assignee: Beckman Coulter, Inc., Brea, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 147 days.

(21) Appl. No.: 12/713,881

(22) Filed: Feb. 26, 2010

(65) **Prior Publication Data**

US 2010/0220326 A1 Sep. 2, 2010

**Related U.S. Application Data**

(60) Provisional application No. 61/156,063, filed on Feb. 27, 2009.

(51) Int. Cl.
*G01N 21/25* (2006.01)

(52) U.S. Cl. ............................................... 356/419

(58) Field of Classification Search ................. 356/419; 250/226; 385/36, 52
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,244,045 A | * | 1/1981 | Nosu et al. | | 398/86 |
| 5,737,104 A | | 4/1998 | Lee et al. | | |
| 5,859,717 A | | 1/1999 | Scobey et al. | | |
| 6,042,249 A | | 3/2000 | Spangenberg | | |
| 6,084,994 A | | 7/2000 | Li et al | | |
| 6,125,221 A | | 9/2000 | Bergmann et al. | | |

(Continued)

### OTHER PUBLICATIONS

Lebo, Roger V. et al., "Design and Application of a Versatile Triple-Laser Cell and Chromosome Sorter," *Cytometry*, 8:71-82, 12 pages, 1987.

Steinkamp, John A et al., "Improved multilaser multiparameter flow cytometer for analysis and sorting of cells and particles," *Rev. Sci Instrum.*, 62(11) 2751-2764, 14 pages, Nov. 1991.

(Continued)

*Primary Examiner* — Tarifur Chowdhury
*Assistant Examiner* — Abdullahi Nur
(74) *Attorney, Agent, or Firm* — K&L Gates LLP; Louis C. Cullman; Thomas A. Turano

(57) **ABSTRACT**

A detector assembly for analysis of light emitted form a fluorescent material, an optical alignment assembly for introducing an output beam into a detector array or demultiplexer, and methods of demultiplexing a beam of light into wavelength bands. The detector assembly generally includes an optical alignment assembly to introduce an output beam having a projected optical axis into an array of filters. The optical alignment assembly is mounted substantially orthogonally to a plane of reflective light defined by the path of the output beam through the filter array. The array includes filters arranged in two rows in parallel. Each filter transmits a particular band of the output beam and reflects the remaining bands to the next filter in the opposite row of filters. The array further includes a plurality of detectors mounted in detector ports. The optical alignment assembly presented herein generally includes a housing configured to receive an optical fiber, at least one collimating lens, a rotatable housing member with a beam reflecting element attached thereto. The optical alignment assembly is adjustable to introduce an output beam into a detector array utilizing a rotational adjustment mechanism and a goniometric tilt adjustment mechanism. These two mechanisms ensure that the point of entry of a light beam into the array remains at a fixed point in space despite the rotation or tilt of the rotatable housing member.

**26 Claims, 9 Drawing Sheets**



CYTEK_0000991775

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,198,864 B1 | 3/2001 | Lemoff et al. | |
| 6,870,976 B2 | 3/2005 | Chen et al. | |
| 7,038,778 B2 * | 5/2006 | Yamauchi | 356/419 |
| 7,129,505 B2 | 10/2006 | Oostman, Jr. et al. | |
| 2002/0154428 A1 | 10/2002 | Nasu et al | |
| 2007/0274364 A1 * | 11/2007 | Brown et al. | 372/71 |

## OTHER PUBLICATIONS

International Search Report and the Written Opinion of the International Searching Authority, application No. PCT/US2010/25546, dated Apr. 16, 2010.

* cited by examiner

CYTEK_0000991776



**FIG. 1**

CYTEK_0000991777



FIG. 2

CYTEK_0000991778



**FIG. 3**

CYTEK_0000991779



FIG. 4

CYTEK_0000991780



FIG. 5A      FIG. 5B      FIG. 5C

CYTEK_0000991781



FIG. 6A



FIG. 6B



FIG. 6C

CYTEK_0000991782



FIG. 7A        FIG. 7B

CYTEK_0000991783



**FIG. 8**

CYTEK_0000991784



**FIG. 9**

CYTEK_0000991785

# FLUORESCENCE DETECTION INSTRUMENT WITH ORTHOGONAL LASER ENTRY

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a non-provisional application claiming the benefit under 35 U.S.C. §119(e) of U.S. Provisional Application No. 61/156,063, filed on Feb. 27, 2009, which is incorporated herein by reference in its entirety.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to systems and methods for fluorescence detection.

More specifically, the present invention relates to fluorescence detection assemblies for analysis of fluorescent signals from target substances.

2. Background

Flow cytometry is commonly used to differentiate various types of cells and other "formed bodies" comprising a biological fluid, e.g., whole blood. Conventional flow cytometers commonly comprise an optically-transparent flow cell, usually made of quartz, having a central channel through which a stream of cells to be individually identified is made to flow. Movement of the cell stream through the flow cell channel can be hydrodynamically entrained to the central longitudinal axis of the flow cell channel by a cell-free sheath liquid that concentrically surrounds the cell stream and flows along with the cell stream as it passes through the flow cell channel. As each cell passes through a cell-interrogation zone of the flow cell channel, it is irradiated with a focused beam of radiation (as commonly provided by a laser source). Upon impinging upon each cell, the laser beam is scattered in a pattern characteristic of the morphology, density, refractive index and size of the cell. Further, the spectral characteristics of the laser beam may act to excite certain fluorochromes associated with selected cells, as may be the case when a cell's DNA has been previously stained with such fluorochromes, or when a fluorochrome molecule has been previously conjugated with a selected type of cell, either directly or via an intermediate bead or the like. Photodetectors strategically positioned about the optical flow cell serve to convert the light scattered by each cell and the fluorescence emitted by the excited fluorochromes to electrical signals which, when suitably processed, serve to identify the irradiated cell. A conventional light scatter and fluorescence-sensing flow cytometer of the type noted above is disclosed in U.S. Pat. No. 7,392,908 to Frazier, the disclosure of which is incorporated herein by reference in its entirety.

As an alternative to positioning photodetectors directly about the optical flow cell, a light collector can be used to gather fluorescent light emitted by the excited fluorochromes. The light collector, which can be a group of lens elements, images the emitted light to a plurality of optical fibers. Each optical fiber transmits light to an array of photodetectors, which in turn convert the fluorescence emitted by the excited fluorochromes to electrical signals for analysis.

Various types of photodetector arrays have been used to separate light into discrete wavelengths to aid in fluorescence analysis. One such detector array is disclosed by "Improved Multilaser/Multiparameter Flow Cytometer for Analysis and Sorting of Cells and Particles," John A. Steinkamp et al., Review of Scientific Instruments, Vol. 62, No. 11, pp. 2751-2764, November 1992 ("the Steinkamp publication"). The Steinkamp publication describes a detector configuration that includes four dichroic filters to separate light into discrete wavelengths. The dichroic filters are arranged in one line, and each filter except the last in line reflects a certain band of light to an associated detector and transmits the remaining bands to the next detector. The last filter reflects one band of light to a detector and transmits the remaining wavelengths of light to a final detector.

A second type of detector array configuration is disclosed by U.S. Pat. No. 4,244,045 to Nosu et al. ("the Nosu patent"). Optical fibers introduce a beam of light into the demultiplexer, which is designed to separate light into multiple wavelengths. The demultiplexer includes six optical filters, each of which transmits certain wavelengths therethrough and reflects light waves with wavelengths sufficiently different from the transmitted wavelengths. Three optical filters are arranged on each side of an avenue. A light beam is introduced into the array via an optical fiber and a collimating rod lens positioned in parallel to the avenue at an angle of incidence of 15 degrees. The first optical filter, on the opposite side of the avenue from the collimating lens, receives light directly from the collimating lens. The next four optical filters receive light from a reflected beam coming from another of the optical filters located on the opposite side of the avenue.

Detector assemblies such as that described by the Steinkamp publication and the Nosu patent are generally prefabricated blocks. As a result, multiple detector assemblies must be used if it is desired to analyze multiple light beams, for example, light beams of different color spectrums. Another problem with known detector assemblies and demultiplexers is that the blocks must be prefabricated based on the number of wavelengths of light to be separated, i.e., each block is manufactured with space for a predetermined number of dichroic filters and detectors. As a result, these prefabricated detector assemblies are not customizable to accommodate multiple light beams, each of which may require separation of a different amount of wavelengths.

The present invention provides detector arrays that can be customized with regard to the number of optical inputs that can be analyzed in order to accommodate changing numbers of optical inputs. Such detector arrays can be adjusted such that the number of dichroic filters and detectors associated with each optical input can be adjusted in order to separate a light beam into more or fewer wavelengths without requiring multiple detector assemblies.

## BRIEF SUMMARY OF THE INVENTION

The detector assemblies described herein seek to remedy one or more of the disadvantages of previous detector assemblies by providing assemblies that can be customized as to the number of optical inputs that can be analyzed and the number of dichroic filters and detectors associated with each optical input. The various detector assembly embodiments described herein can be used to analyze light emitted from a fluorescent material. Also provided herein are various embodiments of an optical alignment assembly for introducing an output beam into a detector array or demultiplexer. Various embodiments of methods of demultiplexing a beam of light into its component wavelength bands are also described herein. The presented detector assemblies generally include optical alignment assemblies to introduce an output beam having a projected optical axis into an array of filters. The optical alignment assemblies are mounted substantially orthogonally to a plane of reflective light defined by the path of the output beam through the filter array. The array includes filters

CYTEK_0000991786

3

arranged in two rows in parallel. The filters transmit a particular band of the output beam and reflect the remaining bands to the next filter in the opposite row of filters. The array further includes a plurality of detectors mounted in detector ports. The detectors receive the transmitted legs of the output beam. The presented methods include steps for using the presented detector arrays for demultiplexing a beam of light into its component wavelengths. The optical alignment assembly presented herein generally includes a housing configured to receive an optical fiber, at least one collimating lens, and a rotatable housing member with a beam reflecting element attached thereto. The optical alignment assembly is adjustable to introduce an output beam into a detector array utilizing a rotational adjustment mechanism and a goniometric tilt adjustment mechanism. These two mechanisms ensure that the point of entry of a light beam into the array remains at a fixed point in space despite the rotation or tilt of the rotatable housing member.

## BRIEF DESCRIPTION OF THE FIGURES

The accompanying figures, which are incorporated herein, form part of the specification and illustrate embodiments of a detector assembly for analysis of light emitted form a fluorescent material. Together with the description, the figures further serve to explain the principles of and to enable a person skilled in the relevant art(s) to make and use the detector assembly and methods described herein. In the drawings, like reference numbers indicate identical or functionally similar elements.

FIG. 1 is a cross-section view of a detector assembly in accordance with one embodiment presented herein.

FIG. 2 is a bottom view of a detector assembly in accordance with one embodiment presented herein.

FIG. 3 is a perspective view of the top of a detector assembly in accordance with one embodiment presented herein including three optical alignment assemblies.

FIG. 4 is a cross-sectional view of an optical alignment assembly in accordance with one embodiment presented herein.

FIGS. 5A-5C are side views of the optical alignment assembly shown in FIG. 4.

FIGS. 6A-6C are bottom views of the optical alignment assembly shown in FIG 4

FIGS. 7A and 7B are additional side views of the optical alignment assembly shown in FIG. 4.

FIG. 8 is a perspective view of the top of a detector assembly in accordance with one embodiment presented herein having additional detector ports and optical alignment assembly mounting positions.

FIG. 9 is a perspective view of the top of a detector assembly in accordance with one embodiment presented herein including a cover plate for a through-hole opening in the top of the detector assembly.

## DETAILED DESCRIPTION OF THE INVENTION

The following detailed description of detector assemblies and methods for demultiplexing a beam of light refers to the accompanying figures that illustrate exemplary embodiments. Other embodiments are possible. Modifications can be made to the embodiments described herein without departing from the spirit and scope of the present invention. Therefore, the following detailed description is not meant to be limiting. Further, it would be apparent to one of skill in the art that the systems and methods described below can be implemented in many different embodiments of hardware. Any actual hard-

4

ware described is not meant to be limiting. The operation and behavior of the systems and methods presented are described with the understanding that modifications and variations of the embodiments are possible given the level of detail presented. For example, while the description provided incorporates the detector assembly into a flow cytometry system, the detector assembly and optical alignment assemblies and methods presented herein should not be limited to the field of flow cytometry. One of skill in the art would readily understand how to incorporate the presented detector assembly and demultiplexing methods into other native environments, such as, for example, blood analysis systems, cell sorting systems, DNA analysis systems, etc.

FIG. 1 is a cross-section view of a detector assembly 100. In the embodiment presented, detector assembly 100 includes a plurality of dichroic filters 102, a plurality of bandpass filters 104, and a plurality of detectors 106 housed in detector ports 105. In one embodiment, detectors 106 are photomultiplier tubes (PMTs). It is understood that various other types of photodetectors, for example, photo avalanche detectors, can be used in embodiments of detector assembly 100. Light beams 110, 116, and 120 are introduced into a central boulevard 122 of the detector assembly by three optical alignment assemblies 400 (shown in FIGS. 3-7B), each of which includes a beam reflecting element 108. Optical alignment assemblies 400 are mounted substantially orthogonal to the central boulevard 122. Each optical alignment assembly includes a beam reflecting element 108, which is a mirror, or, more preferably, a prism, that reflects a beam of light from the optical alignment assembly into the central boulevard 122. A prism has the advantage of providing total internal reflections, i.e., no reflective coating is required on the prism surface. A mirror generally requires a reflective coating, which is disadvantageous because of expense and manufacturing difficulties. Although detector assembly 100 is shown with three beam reflecting elements 108 corresponding to three optical alignment assemblies 400, detector assembly 100 can be adjusted to include more or fewer optical alignment assemblies according to the number of inputs to be analyzed. Specifically, embodiments of the detector assembly can include at least two optical alignment assemblies, four or more optical alignment assemblies, and even seven or more alignment assemblies. Because the optical alignment assemblies 400 are mounted orthogonally to the central boulevard 122, the number of optical alignment assemblies can be adjusted without altering the spacing of detector ports 105. In addition, although the detector assembly shown in FIG. 1 includes thirteen detector ports, embodiments of the detector assembly can include more or fewer detector ports as desired. As will be explained in further detail herein, the ability to customize the number of optical alignment assemblies, and the number of detectors associated with each optical alignment assembly, without requiring multiple detector assembly blocks provides multiple benefits over previous detector assemblies.

In operation, a first light beam 110 is reflected into the central boulevard 122 by a beam reflecting element 108. Light beam 110 travels in the indicated direction towards a first dichroic filter 103. Dichroic filter 103 splits light beam 110 such that a portion of the beam that falls within a particular band of optical signals is transmitted through the dichroic filter 103 while light in other bands is reflected towards a second dichroic filter 107. Although filters 102 are described herein as dichroic filters, it is understood that other types of filters, mirrors, or reflectors can be used in place of dichroic filters to pass a particular band of optical signals while reflecting remaining bands. Thus, as used herein, the term dichroic filter refers to any device that passes a particular band of

optical signals while reflecting remaining bands. The transmitted portion of beam 110 then passes through a bandpass filter 104 and into a detector 106 for analysis. Bandpass filters 104 further isolate a desired band of wavelengths from the transmitted portion of beam 110. The reflected portion of beam 110 travels to dichroic filter 107, where a second band of optical signals is transmitted to a second detector while the remaining bands are reflected onward. Each dichroic filter 102 along the path of light beam 110 removes a selected band of light in the same manner, but with different wavelengths of light being separated. In the embodiment shown in FIG. 1, beam 110 encounters five dichroic filters 102 before the remaining band of optical signals passes into a detector port 112. Although the embodiment shown in FIG. 1 does not illustrate a detector in detector port 112, it is understood that a detector could be included in port 112 to receive any remaining bands of optical signals.

The embodiment shown in FIG. 1 illustrates a detector assembly 100 including three beam reflecting elements 108 corresponding to three optical alignment assemblies 400. Each beam reflecting element 108 introduces a light beam into the central boulevard 122, and each light beam reflects off one or more dichroic filters 102 before impinging upon a final detector housed in a detector port 105. As explained in further detail with reference to FIGS. 3-7B, beam reflecting elements 108 are preferably mirrors, or more preferably prisms, each of which is secured to an optical alignment assembly 400 mounted to the top of the detector assembly 100. The words top and bottom are used herein only as convenient relative terms for description purposes, and are not intended to limit what is referenced to any particular orientation relative to some absolute reference orientation. It is understood that alignment assemblies other than those shown in FIGS. 3-7B could be used to deliver a beam of light to beam reflecting elements 108. Preferably, the beam reflecting elements 108 are positioned such that the angle of incidence of the beam on the dichroic filters 102 is less than twenty degrees. More preferably, the angle of incidence is less than nineteen degrees, and most preferably less than eighteen degrees. Lower angles of incidence provide less polarization of light compared to higher angles.

In the embodiment illustrated in FIG. 1, a first beam 110 reflects off of five dichroic filters, a second beam 116 reflects off of three dichroic filters, and a third beam 120 reflects off of one dichroic filter. The number of dichroic filters encountered by each light beam is merely exemplary. Both the location and number of optical alignment assemblies can be adjusted such that less or more than three optical alignment assemblies are included in the detector assembly, and the number of dichroic filters 102 associated with the beam of light emitted from each optical alignment assembly can be increased or decreased without reconfiguring the position of the detector ports 105 along central boulevard 122. In a preferred embodiment, the detector assembly 100 includes thirteen detector ports. Alternately, detector assembly 100 can be provided with any number of detector ports, with the number limited only by the physical size of the detector assembly 100.

FIG. 2 is a view of the bottom 200 of a detector assembly in accordance with one embodiment presented herein. As shown in FIG. 2, detector assembly 100 is formed with a plurality of dichroic filter slots 202 therein. Dichroic filter slots 202 are formed in two rows in parallel. The slots 202 in each row are evenly spaced, and, depending on the desired configuration of the detector assembly 100, may or may not have dichroic filters 102 inserted therein. Each dichroic filter slot 202 has a bandpass filter slot 204 associated therewith. The bandpass filter slots 204 are formed at an angle to the dichroic filter slots

202, and the slots 204 in each row are evenly spaced. A detector port 105 is located behind each bandpass filter slot 204, and a detector 106 can be mounted in each detector port 105. Dichroic filters 102, bandpass filters 104, and detectors 106 can be added or removed from the detector assembly 100 as necessary for a desired application.

FIG. 3 is a perspective view of the top of a detector assembly 100 in accordance with one embodiment presented herein. Detector assembly 100 includes three optical alignment assemblies 400, which are mounted on the top surface 300 of detector assembly 100. An endcap 304 is attached to each end of the detector assembly in order to enclose central boulevard 122. Top surface 300 of detector assembly 100 is provided with a plurality of threaded mounting holes 306 and a plurality of unthreaded mounting holes 305. Each detector assembly is also provided with a plurality of screw receiving holes 307 on a bottom support plate 605 of the assembly. As shown in FIG. 6A, mounting pins 606 are also positioned on bottom support plate 605 of optical alignment assembly 400 in order to assist in positioning the optical alignment assembly 400 on the top surface 300 of detector assembly 100. Optical alignment assemblies 400 are mounted to the detector assembly by aligning mounting pins 606 with unthreaded mounting holes 305 and securing the optical alignment assemblies to the detector assembly 100 using mounting screws that pass through screw receiving holes 307 and are secured in threaded mounting holes 306.

Although various fastening members are described herein, it is understood that a wide variety of devices and methods can be used to fasten optical alignment assemblies 400 to detector assembly 100, and to attach the components of the optical alignment assemblies to each other. For example, bolts, pins, tongue and groove arrangements, brackets, or even welding can be used instead of screws, or in addition thereto, to fasten any of the various components of detector assemblies 100 and optical alignment assemblies 400 together. Any reference herein to a particular fastening method is merely exemplary.

By arranging the optical alignment assemblies 400 in the above described manner such that a light beam enters the detector assembly 100 orthogonally to a plane defined by the path of the output beam through the detector array allows the number of optical alignment assemblies to be increased or decreased on location by an end user of the detector assembly without sacrificing one or more detector positions. As noted above in the Background of the Invention section, detector arrays are generally prefabricated blocks. As a result, multiple detector assembly blocks had to be used to analyze multiple light beams, for example, light beams of different color spectrums. In addition, prior art detector assemblies were not easily scalable and could not be easily adapted on location to accommodate advances in fluorescence detection. Specifically, prior art detector assemblies could not be modified to include additional detectors once the detector assembly block was delivered to an end user. In order to split a beam of light into more bands than the detector assembly block was initially configured for, an entirely new detector assembly would have to be ordered. In contrast, the detector assemblies described herein allow for rapid adjustment of the number of detectors associated with a particular optical alignment assembly.

In previous detector arrays utilizing a boulevard arrangement, light was introduced into the array via a mechanism arranged in parallel to a plane defined by the path of the output beam through the detector array. Because of this parallel arrangement, even if one was inclined to include multiple optical alignment assemblies in a single pre-manufactured detector assembly block, the block would have an unneces-

CYTEK_0000991788

7

sarily large footprint. It would also be impossible to increase the number of detectors associated with each optical alignment assembly. Specifically, as shown in FIGS. 1-3, orthogonal entry into the central boulevard 122 allows for a detector assembly block to be used with multiple optical alignment assemblies while simultaneously preserving even spacing between dichroic filters 102. This provides multiple benefits. For example, with reference to FIGS. 1 and 2, light beam 110 terminates at detector port 112. However, because the dichroic filter slots 202 and their corresponding detectors 106 are arranged in evenly spaced rows around the central boulevard 122, the number of dichroic filters associated with the first light beam 110 can be increased by removing the second optical alignment system from the assembly and including an additional dichroic filter in the dichroic filter slot associated with detector port 112. In this manner, light beam 110 can be filtered into additional wavelengths without the need for a new detector assembly block.

Similarly, detector assembly 100 can be reconfigured to include additional optical alignment assemblies, with the understanding that at least one wavelength range is separated from the light beam before the light beam reaches its final detector. For example, with reference to FIG. 1, light beam 110 could terminate at detector 125 and a fourth light beam could be introduced into the detector assembly 100 at a point between detector 125 and detector 126. Furthermore, a detector assembly as described herein could be provided with any number of detector ports in order to accommodate further expansion of both the number of optical alignment assemblies 400 included in the detector assembly 100 as well as the number of detectors associated with each light beam introduced into the filter array. Such customization was not possible with prior art detector assemblies.

Arranging an optical alignment assembly in parallel to the central boulevard, as disclosed by the prior art, requires a significant amount of space. Even if one attempted to extend the detector arrays of the prior art in order to accommodate multiple optical alignment assemblies, the dichroic filters and corresponding detector ports would not be evenly spaced. This is because, at the entry point of a second light beam, a large space between detector ports would be needed to accommodate a second optical alignment assembly. Because of this space, an end user would be limited to the number of light beam entry points provided in the pre-fabricated detector assembly block, and would not be able to add additional light beam entry points to the assembly. Furthermore, the end user would not have the ability to increase the number of detector ports associated with a particular light beam because of the space required between detectors to accommodate the optical alignment assemblies. As noted above with reference to FIG. 1, the number of dichroic filters associated with the first light beam 110 can be increased by removing the second optical alignment system from the assembly and including an additional dichroic filter in the dichroic filter slot associated with detector port 112. Because the detector ports are evenly spaced, the light beam would be aligned with the next detector port without the need for further adjustment to the assembly. In the hypothetical extended detector assembly using parallel entry, the light beam would not be aligned with the next detector port even if the second optical alignment assembly was removed.

FIG. 4 is a cross-sectional view of an optical alignment assembly 400 in accordance with one embodiment presented herein. Optical alignment assembly 400 allows for rotational and goniometric movement that preserves the optical center of the start of the collimated beam, while allowing adjustments to maintain alignment with detectors 106 along the

8

central boulevard 122. In the embodiment shown in FIG. 4, the tubular portion of the optical alignment assembly 400 includes a collimator housing 404, an upper barrel 410, and a lower barrel 412. It is understood that instead of being formed in a tubular or barrel shape, the collimator housing 404, including the upper barrel 410 and the lower barrel 412 portion could be formed in a variety of other shapes. An optical fiber port 402 with a focusing disk is provided to receive and an optical fiber and focus the light transmitted by the optical fiber. First and second collimator lenses 406 and 408 are secured in collimator housing 404. Although, in the present embodiment, two collimator lenses and a focusing disk are utilized to receive and focus light from the optical fiber, it is understood that alternate lens arrangements can be provided in collimator housing 404 to focus light received from the optical fiber. Collimator housing 404 is secured to upper barrel 410, preferably by a screw 405. Upper barrel 410 is secured to lower barrel 412, preferably by a screw 420. A beam reflecting element 108 is provided at the bottom of the lower barrel 412. As described herein with reference to FIG. 1, the beam reflecting element 108 reflects a collimated beam of light from the first and second collimator lenses 406 and 408 such that the beam of light emitted from the optical alignment assembly 400 travels along the central boulevard 122. Spring 418 biases the beam reflecting element 108 away from upper barrel 410. Although spring 418 is depicted as a coil spring, it is understood that other elements, such as a gasket, could be used to provide a biasing force to bias reflecting element 108 away from upper barrel 410.

Optical alignment assembly 400 further includes a slidable base 414 and a fixed base 416. In at least one embodiment, slidable base 414 and fixed base 416 are curved such that the concave curvature of the bottom surface of slidable base 414 generally matches the convex curvature of the top surface of fixed base 416. In operation, the position of slidable base 414 in relation to fixed base 416 can be adjusted in order to align the output beam with the detectors 106 positioned along the central boulevard 122. This adjustment is accomplished by manipulation of a tilt screw 415 that applies pressure to one side of slidable base 414. A spring (not shown) biases the slidable base 414 towards the tilt screw 415. The spring is anchored at one end to the slidable base 414, and at the other end to a screw 708, shown in FIGS. 7A and 7B. Thus, in operation, the screw can be tightened in order to push the slidable base 414 away from the screw, while loosening the tilt screw 415 results in the slidable base 414 moving in the direction of the screw due to the biasing effect of the spring.

As shown in FIGS. 5A-5C, optical alignment assembly 400 allows adjustment of the output angle of a light beam 511 relative to the central boulevard 122. In a present embodiment, the curved surfaces of slidable base 414 and fixed base 416 allows the optical alignment assembly to function as a positioning goniometer such that manipulation of tilt screw 415 rotates the beam reflecting element 108 about a fixed axis in space. As a result of this goniometric motion, the point of entry 510 of a light beam 511 into the central boulevard 122 remains unchanged as the optical alignment assembly is tilted. Regardless of the direction or amount of tilt of the tubular portion of optical alignment assembly 400, the point of entry 510 remains at substantially the same point in three dimensional space. Light beam 511 therefore enters the central boulevard 122 from the same point no matter how much the mechanism is tilted, thus preserving alignment with the detectors arranged along the central boulevard 122.

Several other features of one embodiment are shown with reference to FIG. 5B. The optical alignment assembly 400 is provided with a left side plate 504. Mounting holes 512 are

CYTEK_0000991789

9

formed in left side plate 504 to assist in anchoring fixed base 416 thereto. Plungers 506 enable fine tuning of the position of slidable base 416, and an adjustment screw 514, coupled with a tensioning spring (not shown) provide further left to right adjustments of C-bracket 515, which is secured to the side of upper barrel 410 by locating pin 715 and fastening screw 714, which are shown in FIG. 7A.

The rotational adjustment of optical alignment assembly 400, and more specifically the rotational adjustment of beam reflecting element 108, is described in further detail with reference to FIGS. 6A-6C. FIGS. 6A-6C are bottom views of optical alignment assembly 400, with arrows demonstrating the rotational adjustment. Rotational adjustment of the beam reflecting element 108 provides a second mechanism to direct light beam 511 into central boulevard 122 at a desired angle. Rotational adjustment of the beam reflecting element 108 is effectuated by manipulation of screw 514, shown in FIGS. 5B and 7A. As screw 514 is pushed against C-bracket 515, upper barrel 410 rotates in a clockwise direction causing beam reflecting element 108 to rotate in a clockwise direction. A spring (not shown) biases the C-bracket 515 towards the screw 514. Thus, as the screw is withdrawn, C-bracket 515 and beam reflecting element 108 rotate in a counterclockwise direction. As with the tilting adjustment mechanism described with reference to FIGS. 5A-5C, the rotational adjustment mechanism ensures that the point of entry 510 of light beam 511 into the central boulevard 122 remains at the same point in three dimensional space regardless of the direction or amount of rotation of beam reflecting element 108. By utilizing optical alignment assembly 400, only two adjustments (tilt adjustment and rotation adjustment) are necessary in order to align a light beam with the detectors 106 in central boulevard 122. The goniometric tilt adjustment and rotational adjustment also operate independently of each other. Traditional optical alignment systems typically required four adjustments, and the four adjustments were interdependent.

FIGS. 7A and 7B are additional side views of the optical alignment assembly shown in FIG. 4. When in use, an optical fiber 702 is inserted into the top of optical alignment assembly 400. The optical fiber 702 introduces a light beam into the optical alignment assembly 400. With reference to FIG. 4, once introduced into the optical alignment assembly, the light beam passes through a focusing disk 402, a first collimator lens 406, and a second collimating lens 408 before being reflected by a beam reflecting element 108 into the central boulevard 122.

In certain embodiments, left side plate 504 and right side plate 602 are identical. However, as explained with reference to FIG. 5B, two plungers 506 are inserted into the upper holes of left side plate 504 to enable fine tuning of the position of slidable base 416. Both left and right side plates 504 and 602 are provided with mounting screw holes 512. In one embodiment, mounting screws 710 are inserted into the mounting screw holes 512 of both left and right side plate 504 and 602 to secure fixed base 416 in position. A screw 711 is inserted into a center upper hole in right side plate 602 to secure slidable base 414 once it has been adjusted to the desired position. Rolling-ball tip set screws 716 are inserted through the top surface of left and right side plates 504 and 602 in order to further secure slidable base 414. The rolling-ball tip screws 716 secure slidable base 414 in the desired position without damaging the base, and without the need for specially designed screws to match the curvature of slidable base 414. However, in other embodiments, specially designed screws or standard tip screws could be used in place of rolling-ball tip set screws 716.

10

FIG. 8 illustrates a detector assembly in accordance with another embodiment of the present invention. Detector assembly 800 includes sixteen detector ports 105. FIG. 8 also illustrates through-hole 801 formed in the top surface 300 of detector assembly 800, into which a fourth optical alignment assembly 400 can be mounted. Through-holes can also be provided, though are not illustrated, in the embodiments described above with reference to FIGS. 1-3. For example, detector assembly 100, as shown in FIG. 3, is provided with three through-holes into which the lower barrels 412 of optical alignment assemblies 400 are inserted. Both detector assemblies 100 and 800 can be provided with additional through-holes to accommodate additional optical alignment assemblies. For example, additional through-holes and corresponding optical alignment assemblies 400 can be provided between the first and second optical alignment assemblies in detector assemblies 100 and 800. Further, embodiments of detector assemblies according to the present invention can be longer than those shown in the Figures, and can accommodate more than sixteen detector ports 105 and more than four optical alignment assemblies 400. An optical alignment assembly can be mounted at the location of through-hole 801 in order to provide analysis of additional wavelengths of light. As shown in FIG. 9, a cover plate 901 can be used to cover any through-holes that are not used for a particular light analysis application. Such a cover ensures that no external light enters the central boulevard 122. In some applications, detector assemblies according to the present invention can be operated in a light-sealed enclosure, in which case there is no need for a cover plate 901 to cover open through-holes. In these applications, unused through-holes can remain open with no harm to the performance of the detector assembly.

### EXAMPLES

The following paragraphs serve as examples of the above-described embodiments.

#### Example 1

One embodiment provides a detector assembly for analysis of light. The detector assembly comprises an optical alignment assembly configured to provide an output beam having a projected optical axis and a dichroic filter array having a plurality of dichroic filters arranged in two rows in parallel. Preferably, a majority of the dichroic filters are configured to receive light from another dichroic filter. The dichroic filters are located in slots, and each row of slots includes a plurality of evenly spaced slots. At least half of the dichroic filters split the output beam into a reflected leg and a transmitted leg. The reflected legs of the output beam preferably have a dichroic reflection angle of less than twenty degrees, more preferably less than nineteen degrees, and most preferably less than 18 degrees. The dichroic filters in each parallel row are evenly spaced from the other dichroic filters in their respective parallel row. The detector assembly further includes a plurality of detector ports for receiving detectors therein, wherein said detectors receive a transmitted leg of the output beam. The optical alignment assembly is mounted substantially orthogonally to a plane of reflective light defined by the path of the output beam. Each output beam is associated with one or more detectors that receive light from the output beam, and the number of detectors receiving light from an output beam can be increased without altering the number or position of the detectors. The optical alignment assembly comprises a housing configured to receive an optical fiber, a collimating lens configured to collimate a beam of light emitted by the

CYTEK_0000991790

**11**

optical fiber, a rotatable housing member, a beam reflecting element attached to the rotatable housing member, and an alignment system utilizing two adjustment mechanisms, wherein a first adjustment mechanism adjusts rotation of the rotatable housing member and a second adjustment mechanism adjusts the goniometric tilt of the rotatable housing member.

Alternately, two or more optical alignment assemblies, each mounted substantially orthogonally to the plane of reflective light, are included in the detector assembly of Example 1. Each optical alignment assembly is configured to provide a respective output beam having a projected optical axis.

### Example 2

Another embodiment provides a detector assembly for analysis of light emitted from a fluorescent material. The detector assembly comprises a dichroic filter array having a plurality of dichroic filters arranged in two rows in parallel. The dichroic filters are located in slots, and each row of slots includes a plurality of evenly spaced slots. The dichroic filters are configured to split the output beam into a reflected leg and a transmitted leg. The detector assembly further includes a first optical alignment assembly configured to generate a first output beam having a first projected optical axis and a second optical alignment assembly configured to generate a second output beam having a second projected optical axis. The first and second optical alignment assemblies are mounted substantially orthogonally to a plane of reflective light defined by the path of the output beam. The first output beam enters the dichroic filter array at a first location and the second output beam enters the dichroic filter array at a second location. A plurality of detector ports for receiving detectors therein are also included in the detector assembly, wherein said detectors receive a transmitted leg of the output beams. At least the second optical alignment assembly is configured to be removed from or repositioned on the detector assembly. One or more detector ports are configured to receive light from the first output beam, and the detector assembly is configured such that the number of detector ports receiving light from the first output beam can be increased by removing one of the optical assemblies and adding a corresponding dichroic filter. The first and second optical alignment assemblies comprise a housing configured to receive an optical fiber, a collimating lens configured to collimate a beam of light emitted by the optical fiber, a rotatable housing member, a beam reflecting element attached to the rotatable housing member, and an alignment system utilizing two adjustment mechanisms, wherein a first adjustment mechanism adjusts rotation of the rotatable housing member and a second adjustment mechanism adjusts the goniometric tilt of the rotatable housing member.

The detector assembly may also include a third optical alignment assembly configured to generate a third output beam having a third projected optical axis, wherein the third output beam enters the dichroic filter array at a third location.

### Example 3

In another embodiment providing an optical alignment assembly for introducing an output beam into an array of dichroic filters, the optical assembly comprises a housing configured to receive an optical fiber, a collimating lens configured to collimate a beam of light emitted by the optical fiber, a rotatable housing member, a beam reflecting element, such as a prism, attached to the rotatable housing member.

**12**

and an alignment system utilizing two adjustment mechanisms, wherein a first adjustment mechanism adjusts rotation of the rotatable housing member and a second adjustment mechanism adjusts the goniometric tilt of the rotatable housing member. The beam reflecting element is configured to reflect the collimated beam into the array of dichroic filters, and the beam reflecting element reflects light at an angle of approximately 90 degrees. The beam reflecting element reflects light at a reflection point inside the beam reflecting element, and the position of the reflection point remains substantially the same as the tilt of the rotatable housing member is adjusted. The rotatable housing member has a barrel shape. The first adjustment mechanism is independent from the second adjustment mechanism, and the second adjustment mechanism comprises a first curved surface and a second curved surface, wherein the first curved surface abuts the second curved surface and is slidable in relation to the second curved surface. The optical alignment assembly further includes a spring configured to bias the beam reflecting element away from the second adjustment mechanism.

The optical alignment assembly may further include a second collimating lens. The optical assembly may further include a focusing disk or a lens configured to focus the light emitted by the optical fiber on the collimating lenses.

### Example 4

In one example, detector assembly 100 is used for demultiplexing a beam of light, for example, a fluorescent pulse, transmitted by an optical fiber. The method for demultiplexing includes the following steps:

  a) collimating the beam of light with a collimating lens;
  b) redirecting the beam of light with a beam reflecting element, such as a prism, such that the beam of light enters a dichroic filter array having a plurality dichroic filters arranged in two rows in parallel, and goniometrically adjusting the angle at which the beam of light exits the beam reflecting element;
  c) separating the beam of light into its component wavelengths by reflecting the beam of light off at least one of the dichroic filters and reflecting the beam of light off two or more of the dichroic filters, wherein the beam of light is alternately reflected between a dichroic filter located in the first row and a dichroic filter in the second row; and
  d) filtering the beam of light with a bandpass filter, wherein the beam of light, prior to being redirected by the beam reflecting element, is approximately orthogonal to a plane of reflective light defined by the path of the beam after the beam is redirected by the beam reflecting element.

In step b), the beam of light is reflected off the at least one dichroic filter at an angle preferably less than about 20 degrees, more preferably less than about 19 degrees, and most preferably less than about 18 degrees.

The foregoing description of the invention has been presented for purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. Other modifications and variations may be possible in light of the above teachings. The embodiments and examples were chosen and described in order to best explain the principles of the invention and its practical application and to thereby enable others skilled in the art to best utilize the invention in various embodiments and various modifications as are suited to the particular use contemplated. It is intended that the appended claims be construed to include other alternative embodiments of the invention.

CYTEK_0000991791

US 8,284,402 B2

13

What is claimed is:

1. A detector assembly for analysis of light, the detector assembly comprising:

an optical alignment assembly having a longitudinal axis and configured to provide an output beam having a projected optical axis;

a dichroic filter array having a plurality of dichroic filters arranged in two rows in parallel; and

a plurality of detector ports for receiving detectors therein, wherein said detectors receive a transmitted leg of the output beam,

wherein the projected optical axis of the output light beam, when reflected between the rows of dichroic filters, lies in a plane, and

wherein the optical alignment assembly is mounted with the longitudinal axis of the optical alignment assembly substantially orthogonal to the plane.

2. The detector assembly of claim 1 comprising two or more optical alignment assemblies each having a respective longitudinal axis mounted substantially orthogonally to the plane of reflective light, wherein each optical alignment assembly is configured to provide a respective output beam having a projected optical axis.

3. The detector assembly of claim 2, wherein the dichroic filters in each parallel row are evenly spaced from the other dichroic filters in their respective parallel row.

4. The detector assembly of claim 2, wherein each output beam is associated with one or more detectors that receive light from the output beam, and wherein the number of detectors receiving light from an output beam can be increased without altering the number or position of the detectors.

5. The detector assembly of claim 1, wherein at least half of the dichroic filters split the output beam into a reflected leg and a transmitted leg, and wherein the reflected legs of the projected optical axis have a dichroic reflection angle of less than about 20 degrees.

6. The detector assembly of claim 5, wherein the reflected legs of the projected optical axis have a dichroic reflection angle of less than about 19 degrees.

7. The detector assembly of claim 6, wherein the reflected legs of the projected optical axis have a dichroic reflection angle of less than about 18 degrees.

8. The detector assembly of claim 1, wherein said dichroic filters are located in slots, and wherein each row of slots includes a plurality of evenly spaced slots.

9. The detector assembly of claim 1, wherein the optical alignment assembly comprises:

a housing having a longitudinal axis and configured to receive an optical fiber;

a collimating lens configured to collimate a beam of light emitted by the optical fiber;

a rotatable housing member having a goniometric tilt;

a beam reflecting element attached to the rotatable housing member; and

an alignment system utilizing two adjustment mechanisms,

wherein a first adjustment mechanism adjusts rotation of the rotatable housing member and a second adjustment mechanism adjusts the goniometric tilt of the rotatable housing member.

10. A detector assembly for analysis of light emitted, the detector assembly comprising:

a dichroic filter array having a plurality of dichroic filters arranged in two rows in parallel, wherein said dichroic filters are located in slots, and wherein each row of slots includes a plurality of evenly spaced slots;

14

a first optical alignment assembly having a longitudinal axis and configured to generate a first output beam having a first projected optical axis, wherein the first projected optical axis of the first output light beam, when reflected between the rows of dichroic filters, lies in a plane; and

a second optical alignment assembly having a longitudinal axis and configured to generate a second output beam having a second projected optical axis wherein the second projected optical axis of the second output light beam, when reflected between the rows of dichroic filters, lies in the plane,

wherein the first output beam enters the dichroic filter array at a first location and the second output beam enters the dichroic filter array at a second location, and

wherein the first optical alignment assembly and the second output alignment assembly are positioned such that their respective longitudinal axes are each oriented orthogonal to the plane.

11. The detector assembly of claim 10 further comprising a third optical alignment assembly having a longitudinal axis and configured to generate a third output beam having a third projected optical axis, wherein the third output beam enters the dichroic filter array at a third location, and

wherein the third projected optical axis of the third output light beam, when reflected between the rows of dichroic filters, lies in the plane, and

wherein the third optical alignment assembly is positioned such that its respective longitudinal axis is oriented orthogonal to the plane.

12. The detector assembly of claim 10, wherein the dichroic filters are configured to split the output beam into a reflected leg and a transmitted leg.

13. The detector assembly of claim 10 further comprising a plurality of detector ports for receiving detectors therein, wherein said detectors receive a transmitted leg of the output beams.

14. The detector assembly of claim 10, wherein at least the second optical alignment assembly is configured to be removed from or repositioned on the detector assembly.

15. The detector assembly of claim 10, wherein the first optical alignment assembly comprises

a housing configured to receive an optical fiber;

a collimating lens configured to collimate a beam of light emitted by the optical fiber;

a rotatable housing member having a goniometric tilt;

a beam reflecting element attached to the rotatable housing member; and

an alignment system utilizing two adjustment mechanisms;

wherein a first adjustment mechanism adjusts rotation of the rotatable housing member and a second adjustment mechanism adjusts the goniometric tilt of the rotatable housing member.

16. An optical alignment assembly for introducing an output beam into an array of dichroic filters, the optical assembly comprising:

a housing having a longitudinal axis and configured to receive an optical fiber;

a collimating lens configured to collimate a beam of light emitted by the optical fiber;

a rotatable housing member having a goniometric tilt;

a beam reflecting element attached to the rotatable housing member; and

an alignment system utilizing two adjustment mechanisms, wherein a first adjustment mechanism adjusts

SYTEK_0000991792

15

rotation of the rotatable housing member and a second adjustment mechanism adjusts the goniometric tilt of the rotatable housing member.

wherein when the output beam is introduced into the array of dichroic filters, the output beam is reflected by the array of dichroic filters and lies in a plane that is orthogonal to the longitudinal axis of the housing.

17. The optical alignment assembly of claim 16, wherein the beam reflecting element is configured to reflect the collimated beam into the array of dichroic filters.

18. The optical alignment assembly of claim 16, wherein the first adjustment mechanism is independent from the second adjustment mechanism.

19. The optical alignment assembly of claim 16, wherein the beam reflecting element reflects light at a reflection point inside the beam reflecting element, and wherein the position of the reflection point remains substantially the same as the tilt of the rotatable housing member is adjusted.

20. The detector assembly of claim 16, wherein the beam reflecting element is a prism.

21. A method of demultiplexing a beam of light transmitted by an optical fiber, comprising:

a) collimating the beam of light with a collimating lens;

b) redirecting the beam of light with a beam reflecting element such that the beam of light enters a dichroic filter array having a plurality dichroic filters arranged in

16

two rows in parallel, and is reflected within the dichroic filter array such that the reflected beam of light lies within a plane; and

c) separating the beam of light into its component wavelengths by reflecting the beam of light off at least one of the dichroic filters.

wherein the beam of light, prior to being redirected by the beam reflecting element, is approximately orthogonal to the plane of the reflected beam of light.

22. The method of claim 21, further comprising:

d) filtering the beam of light with a bandpass filter.

23. The method of claim 21, wherein the beam of light is reflected off the at least one dichroic filter at an angle less than about 20 degrees.

24. The method of claim 21, step c) further comprising reflecting the beam of light off two or more of the dichroic filters, wherein the beam of light is alternately reflected between a dichroic filter located in the first row and a dichroic filter in the second row.

25. The method of claim 21, step b) further comprising goniometrically adjusting the angle at which the beam of light exits the beam reflecting element.

26. The detector assembly of claim 21, wherein the beam reflecting element is a prism.

* * * * *

CYTEK_0000991793

# EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BECKMAN COULTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 24-945 (CFC) (EGT) |
| | ) | |
| CYTEK BIOSCIENCES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPENING EXPERT REPORT OF BERNHARD H. WEIGL, PH.D.</u>

Dated: December 19, 2025

Respectfully submitted,

Bernhard H. Weigl, Ph.D., MSc

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...................................................................................1

    A. QUALIFICATIONS AND EXPERIENCE .........................................1

    B. ASSIGNMENT ................................................................................4

    C. MATERIALS CONSIDERED..........................................................5

II. SUMMARY OF OPINIONS................................................................5

III. LEGAL STANDARDS .......................................................................7

    A. INVALIDITY................................................................................8

    B. CLAIM CONSTRUCTION...........................................................8

    C. WRITTEN DESCRIPTION..........................................................8

    D. ENABLEMENT ...........................................................................9

IV. CLAIM CONSTRUCTION ..............................................................10

V. PRIORITY DATE .............................................................................12

VI. PERSON OF ORDINARY SKILL IN THE ART ("POSA").....................20

VII. TECHNOLOGY BACKGROUND....................................................22

    A. FLOW CYTOMETRY ...............................................................22

VIII. THE ASSERTED CLAIMS OF THE '107 PATENT, '443 PATENT, AND '582 PATENT ARE INVALID UNDER 35 U.S.C. § 112 ...............39

    A. ALL ASSERTED CLAIMS OF THE '107 PATENT LACK WRITTEN DESCRIPTION SUPPORT BECAUSE CLAIMS 9 AND 29 RECITING THE CLAIM ELEMENT "WDM IS CAPABLE OF DETECTING A SUBSTANTIALLY FULL SPECTRUM OF VISIBLE LIGHT" LACK WRITTEN DESCRIPTION SUPPORT .................................................................**39**

    B. ALL ASSERTED CLAIMS OF THE '107 PATENT LACK ENABLEMENT BECAUSE THE TEACHINGS OF THE PATENT DO NOT ENABLE A POSA TO PRACTICE THE CLAIMED "WDM IS CAPABLE OF DETECTING A SUBSTANTIALLY FULL SPECTRUM OF VISIBLE LIGHT" WITHOUT UNDUE EXPERIMENTATION ...................62

C.   ALL ASSERTED CLAIMS OF THE '443 PATENT LACK WRITTEN DESCRIPTION SUPPORT AND LACK FULL SCOPE ENABLEMENT BECAUSE THEY ALSO RECITE A "WAVELENGTH DIVISION MULTIPLEXER (WDM)" ...............82

D.   ALL ASSERTED CLAIMS OF THE '582 PATENT LACK WRITTEN DESCRIPTION SUPPORT AND LACK FULL SCOPE ENABLEMENT BECAUSE THE CLAIM PREAMBLES RECITE A "FLOW CYTOMETER" THAT IS LIMITING ...................................................................................83

E.   ALL ASSERTED CLAIMS OF THE '443 AND '107 PATENTS ARE INVALID BECAUSE THE CLAIMED "FILTER" LACKS WRITTEN DESCRIPTION SUPPORT AND FULL SCOPE ENABLEMENT ('443, CLS. 1, 4, 6, 9, 10, 11, 13, 15; '107, CLS. 1, 2, 3, 5, 16, 17, 18, 20, 21, 22, 26, 27, 28, 29) ..........................................................................84

F.   CLAIM 6 OF THE '582 PATENT IS INVALID BECAUSE THE CLAIMED "OPTICAL FILTER" LACKS WRITTEN DESCRIPTION SUPPORT AND FULL SCOPE ENABLEMENT ('582, CL. 6) ...........................................................100

IX.   CONCLUSION .................................................................................101

## I. INTRODUCTION

1.      I, Bernhard H. Weigl, Ph.D., have been retained by Defendant Cytek Biosciences, Inc. ("Cytek," "Cytek Biosciences," or "Defendant") as an independent technology expert in this patent infringement action brought by Plaintiff Beckman Coulter, Inc. ("Plaintiff" or "Beckman Coulter").

### A.      Qualifications and Experience

2.      I earned my doctoral and master's degrees in Analytical Chemistry from Karl-Franzen-Universität Graz, in Graz, Austria.  I started my chemistry studies at Leopold-Franzens-Universität Innsbruck, in Innsbruck Austria, then transferred to Karl-Franzen-Universität where I earned my Mag. rer. nat. (the equivalent of master of science) and Dr. rer. nat. (the equivalent of a PhD) degrees, both in Analytical Chemistry.  My PhD thesis was in the field of optical chemical sensors.  Thereafter, I completed my post-doctoral studies at the University of Southampton, UK and the University of Washington in Seattle.  I also received a Certificate in Technology Management from the University of Washington in 1998.

3.      I am currently an Affiliate Professor at the University of Washington's Department of Bioengineering, in Seattle, Washington, a position I have held since May 2004.  During this same timeframe, from June 2020 to August 2025 I worked as Senior Director of Diagnostics Research and Development at Global Health Labs, where I oversaw the development of diagnostic technology,

_wcB (last visited Dec. 18, 2025).)  Spectral flow cytometry capabilities were unavailable with the Patent Owner's CytoFLEX flow cytometer before then.

**My further opinions:**

79. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████ Beckman Coulter only recently announced a spectral flow cytometry add-on module for its CytoFLEX on March 18, 2025, over a decade after Beckman Coulter's alleged April 2012 priority date. (Spectral Flow Cytometry Solution; CytoFLEX mosaic.)  Spectral flow cytometry capabilities were unavailable with Beckman Coulter's CytoFLEX flow cytometers before then; Beckman Coulter witnesses testimony confirms that the CytoFLEX products outside of the Mosaic Spectral Detection Module ("Mosaic") are conventional flow cytometers.  (Lopriore Dep. Tr. 109:9-13; Goff Dep. Tr. 77:9-13;

███████████████████████

Brannen Dep Tr. 37:14-24, 43:17-46:8; Del Castillo Dep. Tr. 51:10-53:6; Koksch Dep. Tr. 187:22-189:5.)  I understand that Beckman Coulter takes the position that CytoFLEX practices the '582, '443, and '107 patents.

80.     I have reviewed the deposition testimony of named inventor Yong Chen and note that he did not have any involvement in the prosecution of the '443 and '107 patents, as Dr. Chen had already left Beckman Coulter.  (Chen Rough Dep. Tr. 39:22-40:4.)  This means that the additional limitation of "substantially full spectrum of visible light" was added by Beckman Coulter's patent attorneys without Dr. Chen's knowledge prior to the September 3, 2024 filing of the patent application that became the '107 patent.

81.     Additionally, a decade after the asserted April 2012 priority date of the Asserted Claims, Beckman Coulter filed an unrelated patent application that attempts to disclose a full spectral flow cytometer.  *See* U.S. Patent Publication No. 2025/0198904 at Para. [0043] ("At present, the flow cytometry is developing from the conventional multi-color fluorescence channel to the high-channel fluorescence full spectrum.").  Beckman Coulter's patent application appears to claim priority to a foreign filing date of a Chinese patent application on March 23, 2022.  Similarly, Beckman Coulter filed another patent application on October 17, 2023 which also mentions newly filed patents directed to "spectral flow cytometry" and "unmixing," in contrast to conventional flow cytometry using "compensation"/"spillover," long

after the asserted priority date for Yong Chen's Asserted Patents:

[0115] Those of skill in the art will recognize that the systems, methods, and principles described above are also applicable to spectral flow cytometry, though some alternative or additional considerations exist. Spectral flow cytometry is a variation of flow cytometry that uses the entire emission spectrum of fluorochromes to detect and differentiate multiple fluorochromes simultaneously. Traditional flow cytometry relies on using specific optical filters or detectors to detect fluorescence emissions from different fluorochromes, but spectral flow cytometry captures the entire fluorescence emission spectrum for each particle (cell) as it passes through the laser beam.

[0117] Generally speaking, in spectral flow cytometry, unmixing is performed to find the abundances of each fluorochrome per sample. In flow cytometry, where multiple fluorochromes emit overlapping fluorescence signals, spectral unmixing helps identify and quantify each fluorochrome's contribution to the overall signal. This process relies on reference spectra called endmembers, which represent the pure spectral signatures of individual fluorochromes or cell populations. By comparing measured spectra to these endmembers, spectral unmixing algorithms can deconvolute the complex data, enabling accurate determination of the presence and abundance of different fluorochromes in a mixed sample. Spectral unmixing is essential for multiplexed experiments, quality control, and precise data analysis in spectral flow cytometry and related fields.

(*See* PCT/US2024/050571, [0115], [0117]; *see also* [0044] ("As discussed herein, 'compensation' is used to refer to the total process of accounting for spectral spillover.").)

82.    In contrast, Cytek began filing for patents on spectral flow cytometry at least as early as July 25, 2016.  (*See, e.g.*, U.S. Patent No. 11,169,076 to Ming Yan et al. ("Yan").)

**B.      All asserted claims of the '107 patent lack enablement because the teachings of the patent do not enable a POSA to practice the claimed "WDM is capable of detecting a substantially full spectrum of visible light" without undue experimentation**

83.      I understand that Dr. Fedor Ilkov has provided opinions as to whether Claims 9 and 29 of the '107 patent, and thus whether a WDM that "is capable of detecting a substantially full spectrum of visible light," are enabled.  I have reviewed Dr. Ilkov's opinions with respect to the lack of enablement for Claim 9 and 29 and I endorse those opinions.   I have reproduced Dr. Ilkov's opinions below for completeness while also adding further details in support of the analysis.  I further note that, because Claims 9 and 29 recite a "WDM capable of detecting a substantially full spectrum of visible light" and these claims are dependent claims, a POSA would have understood that the "WDM" recited in independent Claims 1 and 16 would likewise have had to encompass a spectral flow cytometer within the recited "flow cytometer" preambles.[11]   Therefore, all asserted claims of the '107 patent lack enablement.

84.      In my opinion, a POSA would not have been able to practice a "WDM [that] is capable of detecting a substantially full spectrum of visible light" without **undue experimentation.**  I  reached my conclusion based on my evaluation of the

-----

[11] I understand from counsel that Beckman Coulter treats a "wavelength division multiplexer (WDM)" as a "wavelength division demultiplexer."  I disagree with this interpretation, but for purposes of this report, I apply Plaintiff's interpretation in my analysis.

# EXHIBIT 6

**OUTSIDE**

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

BECKMAN COULTER, INC.,

        Plaintiff,

    v.

CYTEK BIOSCIENCES, INC.,

        Defendant.

C.A. No. 22-945-CFC-EGT

## REBUTTAL EXPERT REPORT OF FEDOR A. ILKOV, PH.D. REGARDING NON-INFRINGEMENT OF U.S. PATENT NOS. 10,330,582; 11,703,443; and 12,174,107

Dated:      January 20, 2026

Respectfully submitted,

_____
Fedor A. Ilkov, Ph.D.

**TABLE OF CONTENTS**

Page

I. QUALIFICATIONS, FEES & PRIOR EXPERT TESTIMONY............1

II. ASSIGNMENT AND MATERIALS CONSIDERED FOR THIS REPORT........................................................................................1

III. SUMMARY OF OPINIONS AND EXPECTED TESTIMONY............2

IV. LEGAL FRAMEWORK ON WHICH MY OPINIONS ARE BASED.......................................................................................7

    A. Infringement Principles................................................7

        1. Reverse Doctrine of Equivalents .........................9

V. A PERSON OF SKILL IN THE ART ("POSA") .........................9

VI. CLAIM CONSTRUCTION ......................................................10

    A. The Court's Constructions ........................................11

    B. Additional Means-Plus-Function Terms......................13

        1. Collimating Optical Element...............................13

        2. Focusing Optical Element .................................21

VII. COMMENTS ON THE ASSERTED PATENTS' DISCLOSURES ....................................................................27

    A. The Asserted Patents Only Describe a "WDM" That Works with Collimated Light and a Collimating Optical Element.........27

    B. The Asserted Patents Only Describe the Use of an Effectively Collimated Beam, Not Any Type of "Light"............28

    C. The Asserted Patents Only Describe the Use of Bandpass Filters .........................................................................28

VIII. OVERVIEW OF THE DISCLOSURES IN THE ASSERTED PATENTS AND THE MATERIAL DIFFERENCES IN CYTEK'S ACCUSED PRODUCTS ...............................................28

    A. Cytek's Full-Spectral Aurora & Northern Lights Flow Cytometers are Innovative.........................................28

        1. Cytek launched its innovative full spectral Aurora with 20+ color capability and unmixing algorithms in June 2017 .......................................................28

2. Danaher (BEC's corporate parent) recognized Cytek's innovative Aurora spectral flow cytometers just months after launch......................................................33

3. Cytek's innovative spectral flow cytometers (Aurora and Northern Lights) continue to be recognized for how they have advanced the field of flow cytometry .......35

B. Cytek's Innovative Aurora and Northern Lights Full Spectrum Flow Cytometers Employ Advanced Technologies That Was Not Disclosed in the Asserted Patents .......................................................................................43

1. The Asserted Patents are for a conventional flow cytometer and Cytek's Accused Products are spectral flow cytometers ................................................................43

2. Cytek's Accused Products use a *non-collimated* focused beam of converging light as the input beam into the detector assembly ...............................................47

a. The "collimating optical element" of the Asserted Patents does not cover a focusing lens that projects a *non-collimated* focused beam of converging light .......................................47

b. The input stage of Cytek's detector assemblies have a focusing lens that projects a non-collimated focused beam onto the first filter ..........53

3. The detector assembly in Cytek's Accused Products uses a non-collimated focused/defocused beam................60

a. The disclosed and claimed "WDM" does not cover a detector assembly that uses a non-collimated focused/defocused beam with substantially different beam size for color separation ...............................................60

b. Cytek's detector assembly uses a focused input beam of converging light and thereafter propagates that input beam as a non-collimated focused/defocused beam of substantially different size ...........................................................70

C. Dr. Schaafsma Relies on Sequential Optical Models That Do Not Accurately Model the Real-World Components and Beam Optics in Cytek's Innovative Aurora and Northern Lights Detector Assemblies ........................................................86

IX. CYTEK DOES NOT INFRINGE THE ASSERTED PATENTS .........95

A. BEC's Experts Fail to Demonstrate All Elements of the **'582 Asserted Claims Are Present in the Accused Products** Either Literally or Under the Doctrine of Equivalents ................95

1. Asserted Claim 1 ............................................................97

a. "collimated beam"...................................................97

b. 1(b): "a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam;" ...................................111

c. 1(c): "an optical relay element arranged to receive at least a portion of the collimated beam from the collimating optical element, the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a first image;" ............124

d.　1(c): "an optical relay element arranged to receive at least a portion of the collimated beam from the collimating optical element, the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a *first image*;" 1(d) "a *first focusing optical element* arranged to receive at least a portion of the collimated beam reflected by the optical relay element"; and 1(e) "a *first semiconductor detector*," 1(f) wherein the *first focusing optical element* is configured to focus the portion of the collimated beam received from the optical relay element onto the *first semiconductor detector*." ...............................................126

e.　Conclusion: Asserted Claim 1 ...............................130

2.　Asserted Claim 3 ...........................................................130

a.　3(b): "wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element to a size smaller than 1 millimeter in diameter." ........................................130

b.　Conclusion: Asserted Claim 3 ...............................130

3.　Asserted Claim 6 ...........................................................131

a.　6(b): "further comprising a first optical filter disposed along an optical path between the collimating optical element and the optical relay element, the first optical filter configured to separate the collimated beam into a first branch and a second branch." ...............................131

b.　Conclusion: Asserted Claim 6 ...............................132

4.　Asserted Claim 20 .........................................................133

a.    20(b): "a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a first image; and" ....................................133

b.    20(c): "an optical relay element arranged near the first image, the optical relay element configured to receive light from the collimating optical element and to project a second image;" .......................................137

c.    20(d): "wherein the size of the first image is substantially the same as the size of the second image; and" ..........................................139

d.    Conclusion: Asserted Claim 20.............................142

5.    Asserted Claims 23 and 26.............................................142

a.    22(c): "wherein the first image is a magnified image of the object" ...............................................143

b.    Conclusion: Asserted Claim 23.............................144

c.    26(b): "further comprising a first focusing optical element arranged near the second image," .................................................144

d.    Conclusion: Asserted Claim 26.............................147

B.    BEC's Experts Fail to Demonstrate All Elements of the '443 Asserted Claims Are Present in the Accused Products Either Literally or Under the Doctrine of Equivalents ..............147

1.    Asserted Claim 4 ..........................................................149

a.    1(a): "A wavelength division multiplexer (WDM) for a flow cytometer comprising:" ..........149

b.    1(b): "a set of filters, each filter of the set of filters configured to pass a corresponding portion of multiple portions of light"; 1(d): "the at least one mirror configured to: receive one or more portions of the light from the set of filters"; and 1(e): "reflect the one or more portions of the light to the set of filters" ...............154

c.    Conclusion: Asserted Claim 4...............................159

2.    Asserted Claim 6 ...........................................................160

a.    6(b): "the set of filters include at least one dichroic filter, and" ................................................160

b.    Conclusion: Asserted Claim 6...............................162

3.    Asserted Claim 10 .........................................................162

a.    9(b): "wherein an optical path of the light includes a first filter of the set of filters, followed by a first mirror of the at least one mirror, followed by a second filter of the set of filters, followed by a second mirror of the at least one mirror, followed by a third filter of the set of filters, followed by a third mirror of the at least one mirror, and followed by a fourth filter of the set of filters." ...........................163

b.    10(b): "the first filter is an initial filter of the set of filters configured to receive the light, the second filter is configured to receive a first collimated beam of the light from the first mirror, and the fourth filter is configured to receive a second collimated beam of the light from the third mirror."...........................................164

c.    Conclusion: Asserted Claim 10: ...........................167

4.    Asserted Claim 11 .........................................................167

a.    "A flow cytometer comprising the WDM of claim 1." ................................................................167

b.	Conclusion: Asserted Claim 11..............................170

5.	Asserted Claim 15 .........................................171

a.	Conclusion: Asserted Claim 15..............................171

C.	BEC's Experts Fail to Demonstrate All Elements of the '107 Asserted Claims Are Present in the Accused Products Either Literally or Under the Doctrine of Equivalents ..............171

1.	Asserted Claim 5 .........................................174

a.	1(a):  "A flow cytometer comprising:" .................174

b.	1(c): "a wavelength division multiplexer (WDM) configured to receive light form the optical fiber, wherein the WDM comprises:".......177

c.	1(e): "an array of filters" ........................................178

d.	1(g): "wherein each of the filters in the array of filters is configured to receive light such that: a portion of the light passes through the filter; and another portion of the light is reflected; and" 1(h): "wherein each of the mirrors in the array of mirrors is configured to: receive light reflected by a filter in the array of filters; and reflect light to another filter in the array of filters.".................................................................178

e.	Conclusion: Asserted Claim 5..............................183

2.	Asserted Claim 16 .........................................184

a.	16(a):  "A flow cytometer comprising:" ...............184

b.	16(b): a flow cell configured to permit liquid to flow through the flow cell; 16(c): a laser configured to project light into the flow cell ........187

c.	16(d): "a multimode optical fiber configured to receive light from the flow cell; and" ...................189

d. 16(e): "a wavelength division multiplexer (WDM) configured to receive light from the multimode optical fiber, wherein the WDM comprises:"............................................................191

e. 16(g): "a plurality of filters" ...............................192

f. 16(i): "wherein each of the plurality of filters is configured to receive light such that: a portion of light passes through the filter; and another portion of light is reflected; and" 16(j): "wherein each of the plurality of mirrors is configured to: receive light reflected by a filter of the plurality of filters; and reflect light to another filter of the plurality of filters.".................193

g. Conclusion: Asserted Claim 16: ............................197

3. Asserted Claim 18 ............................................................197

a. Conclusion: Asserted Claim 18.............................198

4. Asserted Claims 26, 27, and 29........................................198

a. Conclusion: Asserted Claims 26, 27, and 29:.......199

X. CYTEK DOES NOT INFRINGE UNDER 35 U.S.C. § 271 ..............199

XI. CYTEK'S PRODUCTS DO NOT INFRINGE THE ASSERTED PATENTS UNDER THE REVERSE DOCTRINE OF EQUIVALENTS ......................................................................................199

A. The Fair Scope of the Invention of the Asserted Patents and the Principles of Operation of the Accused Products Are Fundamentally Different.............................................................201

B. The Reverse Doctrine of Equivalents Applies to the Asserted '443 Claims...................................................................212

C. The Reverse Doctrine of Equivalents Applies to the Asserted '107 Claims...................................................................215

XII. CONCLUSION .......................................................................................218

1. At the request of counsel for Defendant Cytek Biosciences, Inc. ("Cytek"), I hereby submit the following report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).

## I. QUALIFICATIONS, FEES & PRIOR EXPERT TESTIMONY

2. I provided my educational background, career history, publications, curriculum vitae, other relevant qualifications, my compensation for the services I render in this case, and my prior expert testimony in my Opening Report dated December 19, 2025, which I fully incorporate here by reference.

## II. ASSIGNMENT AND MATERIALS CONSIDERED FOR THIS REPORT

3. I understand that Beckman Coulter ("Beckman" or "BEC") asserts that Cytek infringes claims 1, 3, 6, 23, and 26 of U.S. Patent No. 10,330,582 (the "'582 patent," "'582 Asserted Claims"); claims 4, 6, 10, 11, and 15 of U.S. Patent No. 11,703,443 (the "'443 patent," "'443 Asserted Claims"); and claims 5, 16, 18, 26, 27, and 29 of U.S. Patent No. 12,174,107 (the "'107 patent," "'107 Asserted Claims") (collectively, the "Asserted Claims" and the "Asserted Patents").

4. I understand that Beckman Coulter served two expert reports regarding infringement, redacted versions of which I have reviewed. (*See* Dec. 19, 2025 Opening Expert Report of Dr. Jessica P. Houston Regarding Infringement of U.S. Patent Nos. 10,330,582, 11,703,443, and 12,174,107 ("Houston Rep."); Dec. 19, 2025 Opening Expert Report of Dr. David Schaafsma Regarding Infringement of

85.   BEC's infringement contentions in this case, however, wrongly asserted that the focused beam of converging light projected by the focusing lens was a collimated beam (*see* below: "Collimated Beam from COE"). No POSA would consider the yellow shaded focused beam to be a "collimated beam."



(Nov. 19, 2025 Second Am. Infringement Contentions, Ex. 1 at 42 (Beckman's own annotations with my yellow shading).)

3.   **The detector assembly in Cytek's Accused Products uses a non-collimated focused/defocused beam**

a.   **The disclosed and claimed "WDM" does not cover a detector assembly that uses a non-collimated focused/defocused beam with substantially different beam size for color separation**

86.   As I noted above, the specification asserts that "efficient color separation can only be accomplished economically with collimated light beam." ('582 patent, 44:25-26.)   The specification states that "the present disclosure

███████████████████████████

provides a device capable of collimating a light beam from an extended light source over an extended distance without significantly expanding the beam diameter." ('582 patent, 2:26-29.) I note that the specification never clarifies what it ambiguously refers to as "an extended distance" and never provides any quantification for what it means by "without significantly expanding the beam diameter" of the "collimat[ed] []light beam."

87. The key allegedly inventive feature of the Asserted Patents is the use of a "second optical element" or "optical relay element" that relays the beam "with *unit magnification* down the optical path" such that "the second optical element effectively doubles the collimated path length," and further that "[a]dditional optical elements *in the same 1:1 image relay configuration* may also be included to further extend the *collimated optical path*." ('582 patent, 4:44-50.) The specification then notes that "[t]he cascaded *unit magnification* image relay architecture *of the present disclosure* extends the *collimated* optical path length without *large beam expansion*." ('582 patent, 4:50-53; 45:44-51 (As shown in Fig. 25, *additional relay collimating optical elements*" and "due to the present disclosure's 1:1 imaging relay architecture").) A POSA reading these disclosures would have understood that "the present disclosure" is directed to the use of a "collimated beam" having essentially the same size (i.e., "unit magnification," "1:1") along the optical path. A POSA, however, would have found these teachings ambiguous because there is no

disclosure in the specification regarding how much beam divergence is permitted or what constitutes "large beam expansion" as part of the disclosure that "the present disclosure extends the collimated optical path length *without large beam expansion*."

88.     The patent further contends that "[i]t is apparent to those skilled in the art that dichroic filters may be inserted anywhere along the *long, narrow and collimated beam path* afforded by *the present disclosure's* relay imaging."  ('582 patent, 5:11-14.)  Again, the specification is referring to "the present disclosure" as requiring a "long, narrow, *collimated beam path*," which a POSA would understand as requiring a "collimated beam" along the entire "collimated beam path."  A POSA would have further recognized that the disclosure that "dichroic filters may be inserted anywhere" along a beam path only applies when the path is entirely a "collimated beam."

89.     Again contrary to the disclosures of the Asserted Patents, Cytek's Accused Products use a non-collimated focused/defocused beam that does not have "unit magnification down the optical path," a "1:1 image relay configuration," or a "cascaded unit magnification image relay architecture," because it uses a non-collimated focused/defocused beam such that the beam is focused on the odd filters and defocused onto the even filters.  As such, contrary to the "WDM" disclosed in the specification of the Asserted Patents, the filters within the detector assemblies of

Cytek's Accused Product *cannot* "be inserted anywhere" along the beam path because the beam in Cytek's detector assembly is a non-collimated beam and instead requires that the filters to be placed at a specific location along the beam path to re-image on each of the odd filters. The use of a relay architecture that directs defocused light onto even filters while reimaging light onto odd filters is a fundamental innovation of the optical design in Cytek's non-collimated focused/defocused array design, which was expressly recognized by the Patent Office as not being disclosed in the disclosure of the Asserted Patents (in the form of family member US Patent 9,746,412 as noted below):

***Allowable Subject Matter***

Claims 1, 3-15 and 30-33 are allowed.

The prior art does not disclose, in the claimed environment, a flow cytometer having an image array comprising a transparent block, a plurality of micro-mirrors and a plurality of filters, wherein each of the filters reflects light onto one of the plurality of micro-mirrors and passes light of a differing wavelength onto a detector channel, and wherein incident light within the image array zigzags back and forth between consecutive filters and consecutive micro-mirrors. The closest prior art is believed to be the Chen (US 9746412), Frazier (US 8284402) and Grann (US 6201908) references cited in Applicant's most recent information disclosure statements. Although these

Application/Control Number: 15/659,610
Art Unit: 1799

Page 3

references teach the state of the art regarding optical blocks that reflect light between mirror and filters to produce incident light that travels in a zigzag pattern, these references do not utilize micro-mirrors or mirrors having a radius of curvature that directs light onto even filters while reimaging light onto odd filters of a plurality of filters arranged in a row.

(*See* 2021-07-09 Notice of Allowability in prosecution of Cytek's '076 patent (Appl. No. 15/659,610), pp. 2-3.)

90. I agree with the Examiner that there is no disclosure in the Asserted Patents of using a non-collimated focused/defocused beam within a curved-mirror relay architecture that reimages onto odd filters and directs defocused light onto even filters of a plurality of filters in a row. (*See* '582 patent, 45:22-29 ("The light beam between the concave mirror **907** and the second image at the lens **908** may have

***substantially the same diameter*** as the beam of light between the collimating lens **902** and the first image near the focusing lens **905**. The relay imaging concave mirror **907** therefore effectively doubles ***the collimated beam path*** without expanding the beam's diameter. Again, the extended yet ***collimated beam*** . . . .").) As I've noted above and in my opening invalidity report, the disclosures of the Asserted Patents are directed towards the use of a "collimated beam" with 1:1 cascaded unit magnification down the collimated beam path and wherein the beam is kept "substantially the same diameter." Even though there is no measure for what "substantially the same" means, no POSA would reasonably consider the non-collimated focused/defocused beam in Cytek's detector assemblies to be a "collimated beam" and would similarly recognize that the beam diameter of the non-collimated focused/defocused beam changes substantially along the optical path.

91. Moreover, in my opinion, both Dr. Schaafsma and Dr. Houston effectively ignore the specifications consistent, repeated, and exclusive disclosures regarding a "collimated beam" to implement the "cascaded unit magnification image relay architecture of the present disclosure [to] extend ***the collimated optical path length*** without large beam expansion" within the disclosed "WDM" considering the express disclosure that "efficient color separation ***can only be accomplished economically with collimated light beam***." (*See* '582 patent, 4:51-53, 44:25-26.) Instead, they both appear to contend that any beam shape can be used so long as the

light beam is confined within a given "maximum" beam diameter. (*See, e.g.,* Schaafsma Rep., ¶84 ("The WDM de CYTEK_00000000104scribed in the Asserted Patents uses a collimated or relayed beam of *consistent maximum diameter . . . .*"), ¶109 ("A POSA would understand that collimation in many applications is about controlling *the maximum size of beam*."), ¶113 ("controlling *the maximum width of the beam* as it propagates through the system"), ¶116 ("*the beam maintains the same maximum diameter* throughout the optical path"), ¶117 ("the beam and all portions thereof maintain substantially *the same maximum diameter* as it travels along the optical path by having controlled divergence and/or convergence with the result that the projected beam can be efficiently color separated by filters").) I disagree.

92.    A POSA would have understood that the specification's disclosures teach that at least a "collimated beam" with substantially the same diameter throughout the "cascaded unit magnification architecture of the present disclosure" was required. In effect, Dr. Schaafsma and Dr. Houston are ignoring the requirement for a "collimated beam," contrary to the specification's assertion that "efficient color separation *can only be accomplished economically with collimated light beam*," by interpreting any beam that does not expand beyond some arbitrary "maximum" diameter as a "collimated beam" even if that beam is focused or defocused, which is incorrect.

"light" rather than a "collimated beam" as recited in the '582 Asserted Claims and as used to describe the alleged inventions in the specification, it is my opinion that the reverse doctrine of equivalents applies, and should bar a finding of infringement of the Asserted Claims of the '443 and '107 patents.

A. **The Fair Scope of the Invention of the Asserted Patents and the Principles of Operation of the Accused Products Are Fundamentally Different**

293. The alleged invention extends to a wavelength division (de)multiplexer that requires a "collimating optical element" and the use of a "collimated beam." Indeed, the specification of the Asserted Patents refers to the use of a single lens **902** as the "collimating optical element" that projects a "collimated beam" in the WDM. (*E.g.*, '582 patent, *id.*, 21:40-45 (". . . [A] flow cytometer having a wavelength division multiplexer (WDM), which includes an extended light source providing light that forms an object, *a collimating optical element that captures* light from the extended light source and *projects a magnified image of the object as a first light beam* . . ." (emphasis added)); *id.*, 44:58-61 ("As depicted in FIG. 25, *a collimating optical element*, in this case an achromatic doublet lens **902**, may capture the light from source **901**, and project  a magnified image of the object near a final focusing lens **905**" (emphasis added); *see also id.*, 4:34-38 ("[A] wavelength division multiplexer ('WDM') may include at least two optical elements [wherein t]he first optical element collimates a beam of light received from an extended light source,

such as the light from a pinhole or from a multimode optical fiber.").) This is illustrated in the Figure 25, reproduced below:



'582 Patent, Figure 25 (annotated & magnified)

*FIG. 25*

Thus, the specification of the Asserted Patents consistently teaches the use of a wavelength division (de)multiplexer having a collimating optical element to collimate the input beam, such that a POSA would have understood the inventor to have disclosed a requirement of using an initially collimated beam within the wavelength division (de)multiplexer invention.

294.   As I have explained in detail above, Cytek's input beam is a "focused beam," not a "collimated beam," that is generated by the "fiber focus lens" which is not a "collimating optical element." Accordingly, Cytek's Accused Products do not use a wavelength division demultiplexer with a collimating optical element and

collimated input beam.



295. The alleged invention extends to a wavelength division (de)multiplexer that requires the use of a "collimated beam" or a "re-collimated beam" throughout the relay architecture. (*E.g.*, '582 patent, 45:26-29 ("The relay imaging concave mirror **907** therefore effectively doubles the collimated beam path without expanding the beam's diameter."); *id.*, at 4:48-50 ("Additional optical elements in the same 1:1 image relay configuration may also be included to further extend the collimated optical path."); *id.*, at 45:66-46:1 (" [O]ne may also use refractive optics . . . as a relay element to extend the path of the collimated beam of light.").) In fact, the specification of the Asserted Patents states that "efficient color

separation can *only* be accomplished economically with collimated light beam."

('582 patent, 44:25-26 (emphasis added).)

296. Dr. Schaafsma's annotations of FIG. 25 illustrate how the alleged invention relies on a collimated beam throughout the detector module to achieve color separation:



Thus, the specification of the Asserted Patents consistently teaches a 1:1 relay architecture for maintaining a collimated beam throughout the detector module, such that a POSA would have understood the inventor to have disclosed a requirement that the wavelength division demultiplexer use a collimated beam throughout the relay architecture.

297.   As I have explained above, Cytek's APD assembly module relies on a non-collimated, alternating converging and diverging beam throughout the relay architecture for achieving color separation.  As I have shown with reference to my Zemax file analyses, the Accused Products do not propagate a "collimated beam" throughout the relay architecture, and no segment of the beam is collimated as it propagates through the relay architecture.  Rather, a beam that alternately converges and diverges (and focuses and defocuses) propagates through the relay architecture in the Accused Products.  Accordingly, Cytek's Accused Products do not use a wavelength division demultiplexer that uses a collimated beam throughout the relay architecture.

298.   In my opinion, the use of a focused input beam as opposed to a collimated input beam, and the propagation of an alternately converging and diverging beam as opposed to a "collimated beam" is material to how the Cytek Accused Products function to detect fluorescence, which is by full spectral analysis.

299.     The alleged invention is directed to a conventional, one-detector-one-dye flow cytometer.  I have explained this in Section XI.A.2 of my Opening Report, which I incorporate here. The specification expressly describes the one-detector-one-dye approach to capture a dye's fluorescent emission peak: "Detecting and analyzing brightness changes in a combination of scattered and fluorescent light at each detector (one for each fluorescent emission peak) permits deriving various

types of information about the physical and chemical structure of each individual particle." ('582, 27:33-37.) The specification contains no disclosure relating to spectral flow cytometry.

300. The Accused Products practice spectral, non-conventional flow cytometry as opposed to the conventional flow cytometry described in the Asserted Patents' specification. As I explained in Section XI.A.1 of my Opening Report, spectral flow cytometry is fundamentally different from conventional flow cytometry. For example, conventional flow cytometers utilize a one-detector-one dye approach and configuration, whereas spectral flow cytometers use an all-detectors-all-dyes approach to capture the complete fluorescence spectra emitted by the cells being sampled and utilize the complete spectral signature of each dye for data collection and analysis. (CYTEK_0000993426 at -427 ("In contrast to conventional flow cytometry, spectral flow cytometry uses multiple detectors to capture the full spectrum emission of each fluorochrome across multiple lasers used in the system, to create a detailed spectral signature.").)

301. The Accused Products practice spectral, all-detectors-all-dyes flow cytometry, using the full emission spectral signature across multiple lasers to resolve these combinations from the spectral signature of each individual dye:

**Cytek Aurora System, at 4**



(https://cytek-web.s3.us-east-1.amazonaws.com/cytekbio.com/documentation-center/Brochures/N9-20001+Rev.+M_Brochure,+Cytek+Aurora_WEB.pdf.)

302. To work, spectral flow cytometry requires configuration elements and spectral unmixing algorithms that are fundamentally different than the filter-specific detection and spillover-based compensation employed by conventional flow cytometry. (Beckman Coulter, *Spectral Flow Cytometery: A Detailed Scientific Overview*, https://www.beckman.com/resources/reading-material/application-notes/spectral-flow-cytometry-detailed-scientific-overview ("Spectral flow

cytometry is an advanced analytical technique that enhances traditional flow cytometry by capturing the complete emission spectra of fluorochromes. Unlike conventional flow cytometry, which uses dichroic mirrors and discrete bandpass filters to measure specific wavelengths, spectral flow cytometry captures a variety of points across the entire emission spectrum of each fluorochrome.").) The distinctions between spectral unmixing algorithms, and conventional compensation methods are well-known in the field of flow cytometry, including as explained in the following Beckman Coulter publication:

## Unlocking Insights: The Vital Role of Unmixing Algorithms in Spectral Flow Cytometry[7]

### Introduction

Spectral flow cytometry offers significant improvements in performance and multiplexing capabilities beyond conventional flow cytometry. Unlike conventional flow cytometry, which collects only a discrete portion of the emission spectrum using single filters per fluorochrome, spectral flow cytometry captures the full spectrum for all fluorochromes on each cell using multiple detectors. Therefore, spectral flow cytometry requires more complex methods than compensation to distinguish fluorochromes. This is necessary because the instrument must distinguish between multiple fluorescent profiles across the entire visible light spectrum rather than from a few distinct channels. The process of deconvoluting fluorochrome emission spectra across an array of detectors in spectral flow cytometry is referred to as *spectral unmixing*. Unmixing requires single-stained reference controls, as well as noise-reducing mathematical algorithms. This article will give a brief explanation of the ideas behind compensation and unmixing, highlighting their differences, and discuss the current unmixing algorithms being used



Figure 1. Compensation in Conventional Flow Cytometry: In conventional flow cytometry, each detector uses a bandpass filter to capture the peak emission of specific fluorophores. Any spillover from other fluorophores is corrected using a mathematical process called a "compensation" matrix.

*Denotes peak emission.



Figure 2. Unmixing in Spectral Flow Cytometry: Spectral flow cytometers use a detector array to capture the full spectral signature of all fluorophores. These combined signals create a single complex waveform, which is then separated into individual fluorophore signatures using an unmixing algorithm.

Thus, spectral flow cytometers collect all information for each dye across all lasers and detectors to use the spectral signature of each dye and perform unmixing algorithms to determine the experimental signal for each dye. In contrast, conventional flow cytometers are limited to collecting only bands of light at the peak of each dye (i.e., one-detector-one-dye), for which they rely on simple spillover compensation for a single laser and a single detector module to determine the experimental signal for one dye.

303. As a result of the differences between spectral and conventional flow cytometry, the number of different colors that can be analyzed in a spectral flow cytometer in a single experiment is substantially higher than what can be done in a conventional flow cytometer. For example, Cytek's Aurora has been shown to detect 40 colors using fluorescent signal detections with up to 16 channels per laser. (Cytek Aurora System; pp. 2, 15; https://cytek-web.s3.us-east-1.amazonaws.com/cytekbio.com/documentation-center/Brochures/N9-20001+Rev.+M_Brochure,+Cytek+Aurora_WEB.pdf.) In contrast, CytoFLEX LX, which Beckman Coulter alleges embodies the Asserted Claims and describes as "our most advanced solution for multicolor analysis, (Research Flow Cytometers,

---

[7] CYTEK_0000993426 at -993426-427 (Beckman Coulter, *Unlocking Insights: The Vital Role of Unmixing Algorithms in Spectral Flow Cytometry*, https://www.beckman.com/resources/reading-material/application-notes/unmixing-algorithms-in-spectral-flow-cytometry).

https://www.beckman.com/flow-cytometry/research-flow-cytometers#:~:text=This%20platform%20of%20benchtop%20flow,easy%2Dto%2Duse%20instrument), is limited to a maximum of 21 colors with 6 lasers, wherein each detector module is limited to 5 fluorescent detector channels associated with the peaks of the dyes (i.e., one-detector-one-dye). (CytoFLEX LX Flow Cytometer; https://www.beckman.com/flow-cytometry/research-flow-cytometers/cytoflex-lx).

304. The Accused Products limit aberrations by use of an alternately converging/diverging beam, giving rise to more efficient beam control that permits efficient propagation of the beam and color separation across more detectors (together with the flat-top laser) to achieve full spectral cytometry, which is substantially different than the teaching in the Asserted Patents' specification that "efficient color separation *can only* be accomplished economically with collimated light beam." ('582 patent at 44:25-26 (emphasis added).)

305. In sum, the substantial differences between the Accused Products and the claimed invention, including those I identify above, demonstrate fundamental differences in operation principles and are reflected in the design configurations of the optical architectures associated with each, including differences in the types of optical components used and their placement and function within the respective designs, and how they detect fluorescence. Thus, any similarities between the Accused Product and the claimed inventions are merely incidental and do not

improve the operation of the Accused Products or impart any measurable advantage on them.

**B.** **The Reverse Doctrine of Equivalents Applies to the Asserted '443 Claims**

306. In my opinion, there are two key aspects of claim 1 of the '443 patent for which the reverse doctrine of equivalents should apply to negate any finding of literal infringement: the "WDM" and "light."

307. Limitation 1(a) recites "[a] wavelength division multiplexer (WDM) for a flow cytometer comprising," and if the Accused Products are found to literally meet this limitation, in my opinion, the reverse doctrine of equivalents should result in a finding of non-infringement. As explained above, the principles of the "WDM"[8] described in the Asserted Patents require (a) a collimating optical element and a collimated input beam, and (2) use of a collimated beam throughout the relay architecture. In contrast, the Accused Products' WDM does not have a collimating optical element, but instead uses a fiber focusing lens to generate a converging input beam, after which the Accused Products use an alternately converging and diverging beam; the Accused Products never use a collimated beam.

308. In my opinion, while both the claimed and accused WDMs similarly

---

[8] I use the acronym WDM here according to the language of the Asserted Claims, despite the misnomer, describe above, that technology disclosed in the Asserted Patents and Accused Products make use of a wavelength division *de*multiplexer.

serve the function of propagating light across the relay architecture, they do so in a substantially different way based on the input optics and relay optics, which results in the propagation of manifestly different light beams (collimated vs. diverging/converging). As discussed above, the specification of the Asserted Patents nowhere describes the type of WDM employed in the Accused Products, and so if the Accused Products are found to literally contain a WDM—e.g., since the claim does not specify anything about the WDM's input architecture or what type of light beam it generates—in my opinion the reverse doctrine of equivalents should apply to recognize that the Accused Products contain a fundamentally different type of WDM than described in the specification and fairly within the scope of the disclosed invention.

309. Limitations 1(b), 1(f), 1(g), and 1(h) all recite "light," and relate to how the "light" interacts with the filters, mirrors, and detectors recited within claim 1 to propagate across the relay architecture. In my opinion, if the Accused Products are found to literally meet these limitations, the reverse doctrine of equivalents should result in a finding of non-infringement. As explained above, the principles of the alleged invention described in the Asserted Patents require use of a collimated beam throughout the relay architecture. The Accused Products, however, use an alternately converging and diverging beam, and never use a collimated beam.

310. In my opinion, while both the claimed and accused WDMs similarly

serve the function of propagating light across the relay architecture to detect fluorescence, they do so in a substantially different way based on the type of light they propagate (collimated vs. diverging/converging). As discussed above, the specification of the Asserted Patents nowhere describes propagation of alternately converging and diverging light as occurs in the Accused Products, and so if the Accused Products are found to literally reflect or receive "light" as recited in limitations 1(b), 1(d), 1(e), and 1(f)—e.g., since the claim does not specify anything about the WDM's input architecture or what type of light beam it generates and is propagated through the relay architecture—in my opinion the reverse doctrine of equivalents should apply to recognize that the Accused Products propagate a fundamentally different type of light (converging/diverging) than described in the specification (collimated) and fairly within the scope of the disclosed invention.

311. I understand that asserted claims 4, 6, 10, 11, and 15 all depend from claim 1 and include all its limitations. Because, in my opinion, the reverse doctrine of equivalents should bar a finding of literal infringement of claim 1, it should also bar a finding of literal infringement for claims 4, 6, 10, 11, and 15, since they contain all the same requirements of claim 1.

312. In addition, claim 11 of the '443 patent recites "[a] flow cytometer comprising the WDM of claim 1." In my opinion, if the Accused Products are found to literally meet this limitation, the reverse doctrine of equivalents should result in a

finding of non-infringement. As explained above, the principles of the alleged invention described in the Asserted Patents are consistent with and describe conventional flow cytometry. The Accused Products, however, do not practice conventional flow cytometry, but rather spectral cytometry, as discussed above. In my opinion, the reverse doctrine of equivalents should bar a finding of literal infringement of claim 11 for this additional reason.

### C. The Reverse Doctrine of Equivalents Applies to the Asserted '107 Claims

313. In my opinion, there are three key aspects of claims 1 and 16 of the '107 patent for which the reverse doctrine of equivalents should apply to negate any finding of literal infringement: "WDM," "light," and "flow cytometer"

314. Limitations 1(c) and 16(e) recite "[a] wavelength division multiplexer (WDM)," and if the Accused Products are found to literally meet this limitation, in my opinion, the reverse doctrine of equivalents should result in a finding of non-infringement. As explained above, the principles of the WDM described in the Asserted Patents require (a) a collimating optical element and a collimated input beam, and (2) use of a collimated beam throughout the relay architecture. In contrast, the Accused Products' WDM does not have a collimating optical element, but instead uses a fiber focusing lens to generate a converging input beam, after which the Accused Products use an alternately converging and diverging beam; the Accused Products never use a collimated beam.

315.    In my opinion, while both the claimed and accused WDMs similarly serve the function of propagating light across the relay architecture, they do so in a substantially different way based on the input optics and relay optics, which results in the propagation of manifestly different light beams (collimated vs. diverging/converging).  As discussed above, the specification of the Asserted Patents nowhere describes the type of WDM employed in the Accused Products, and so if the Accused Products are found to literally contain a WDM—e.g., since the claims do not specify anything about the WDM's input architecture or what type of light beam it generates—in my opinion the reverse doctrine of equivalents should apply to recognize that the Accused Products contain a fundamentally different type of WDM than described in the specification and fairly within the scope of the disclosed invention.

316.    Limitations 1(f), 1(g), and 1(h), and 16(h), 16(i) and 16(j) all recite "light," and relate to how the "light" interacts with the filters, mirrors, and APDs recited within claims 1 and 16 to propagate across the relay architecture.  In my opinion, if the Accused Products are found to literally meet these limitations, the reverse doctrine of equivalents should result in a finding of non-infringement.  As explained above, the principles of the alleged invention described in the Asserted Patents require use of a collimated beam throughout the relay architecture.  The Accused Products, however, use an alternately converging and diverging beam, and

never use a collimated beam.

317. In my opinion, while both the claimed and accused WDMs similarly serve the function of propagating light across the relay architecture, they do so in a substantially different way based on the type of light they propagate (collimated vs. diverging/converging). As discussed above, the specification of the Asserted Patents nowhere describes propagation of alternately converging and diverging light as occurs in the Accused Products, and so if the Accused Products are found to literally reflect or receive "light" as recited in limitations 1(f), 1(g), and 1(h), and 16(h), 16(i) and 16(j) —e.g., since the claim does not specify anything about the WDM's input architecture or what type of light beam it generates and is propagated through the relay architecture—in my opinion the reverse doctrine of equivalents should apply to recognize that the Accused Products propagate a fundamentally different type of light (converging/diverging) than described in the specification (collimated) and fairly within the scope of the disclosed invention.

318. In addition, limitations 1(a) and 16(a) of the '107 patent recite "[a] flow cytometer comprising." In my opinion, if the Accused Products are found to literally meet this limitation, the reverse doctrine of equivalents should result in a finding of non-infringement. As explained above, the principles of the alleged invention described in the Asserted Patents are consistent with and describe conventional flow cytometry. The Accused Products, however, do not practice conventional flow

cytometry, but rather spectral cytometry, as discussed above. In my opinion, the reverse doctrine of equivalents should bar a finding of literal infringement of claims 1 and 16 for this additional reason.

319. I understand that asserted claim 5 depends from claim 1 and includes all its elements. Because, in my opinion, the reverse doctrine of equivalents should bar a finding of literal infringement of claim 1, it should also bar a finding of literal infringement for claim 5, since it contains all the same requirements of claim 1.

320. I understand that asserted claims 18, 26, 27, and 29 all depend from claim 16 and include all its elements. Because, in my opinion, the reverse doctrine of equivalents should bar a finding of literal infringement of claim 16, it should also bar a finding of literal infringement for claims 18, 26, 27, and 29, since they contain all the same requirements of claim 16.

## XII. CONCLUSION

321. For at least the reasons set forth in this Report and based on the documents and other evidence referenced herein, it is my opinion that the Accused **Products do not infringe the Asserted Patents, including the '582 Patent, '443 Patent, and '107 Patent.**

322. My work on this matter is ongoing. As I examine additional materials and perform further analyses, I reserve the right to revise and supplement my opinions and this Report.

323. I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

# EXHIBIT 7

|  |  |  |
| --- | --- | --- |
| BECKMAN COULTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 24-0945-CFC-EGT |
| | ) | |
| CYTEK BIOSCIENCES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# REBUTTAL EXPERT REPORT OF DR. DAVID SCHAAFSMA, PHD
# REGARDING VALIDITY OF U.S. PATENT NOS. 10,330,582, 11,703,443, AND
# 12,174,107

## HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

January 20, 2026

Dr. David Schaafsma

i

Dr. David Schaafsma Rebuttal Validity Report

## TABLE OF CONTENTS

I. Introduction……………………………………………………………………………..1

II. Background and Qualifications……………………………………………………1

III. Materials Considered……………………………………………………………...2

IV. Legal Principles……………………………………………………………….….. 2

V. Claim Construction…………………………………………………………… 14

VI. Person of Ordinary Skill in the Art……………………………………………… 16

VII. Conception, Reduction to Practice, and Priority Date…………………………… 16

VIII. Technology Background and State of the Art…………………………………17

   A. Imaging Systems ................................................................................................ 17

   B. Flow Cytometers ............................................................................................... 18

   C. Wavelength Division Multiplexers and APDs.................................................. 21

   D. Minimum Detectable Power ............................................................................. 21

   E. Flow Cytometry Fluorescence Detection and Optical Communications Signal Detection Require Different Optical Fibers ................................................................. 27

IX. Asserted Patents………………………………………………………………32

X. Overview of the Prior Art………………………………………………….33

   A. BD FACSArray System .................................................................................... 33

   B. BD LSR-II System ............................................................................................ 36

   C. Lemoff................................................................................................................ 36

   D. DxP System....................................................................................................... 40

   E. Luminex FlexMap 3D System .......................................................................... 53

   F. Oostman ............................................................................................................. 57

   G. Frazier ............................................................................................................... 60

   H. Assorted References to APDs in Flow Cytometry ............................................ 62

XI. There Is No Motivation To Combine The Prior Art As Proposed by Dr. Ilkov………… 63

   A. A POSA Would Have Had No Motivation to Combine Lemoff With Any Flow Cytometry System or Particle Analyzer with a Reasonable Expectation of Success ............... 65

     1. A POSA Would Not Have Looked to a Reference From Optical Communications to Solve Problems in Flow Cytometry ..................................................................... 65

     2. Dr. Ilkov Does Not Address Why a POSA Would Overlook the Differences Between Flow Cytometry and Optical Communications ................................................... 73

     3. Lemoff is not Analogous Art to the Claimed Inventions............................................ 78

     4. Dr. Ilkov misinterprets the teachings of Lemoff...................................................... 82

     5. Dr. Ilkov Misunderstands Other Optical Concepts Such as Multimode Fibers............ 83

i

6. Dr. Ilkov Fails to Adequately Explain Why Lemoff Would Reduce the Size of Any System.................................................................................................. 86

7. Dr. Ilkov fails to explain how Lemoff would improve any prior art system specifically. ................................................................................................................ 95

8. Dr. Ilkov Fails to Demonstrate a Reasonable Expectation of Success ....................... 106

B. A POSA Would Have Had No Motivation to Combine Lemoff with Oostman Alone or with Oostman and Frazier/BD FACSArray with a Reasonable Expectation of Success ....... 110

1. Lemoff with Oostman ('443 cls 4, 6, 10, 11, 15 – Ground 5) .................................... 110

2. Oostman, Lemoff, and Frazier ('582 Patent at cls. 1, 3, 6 – Ground 3; '107 cls. 5, 16, 18, 26, 27, 29 – Ground 3) .............................................................................. 115

3. BD FACSArray, Oostman, and Lemoff ('107 cls. 5, 16, 18, 26, 27, 29 – Ground 3a).... ................................................................................................................ 116

C. A POSA Would Have Had No Motivation to Combine the DxP System with the BD FACSArray System or the Luminex FlexMap 3D System With a Reasonable Expectation of Success ................................................................................................................ 117

1. DxP System and the BD FACSArray System ('582 Patent at cls. 1, 3, 6 – Ground 4; '107 cls. 5, 16, 18, 26, 27, 29 – Ground 4) or the Luminex Flex Map 3D System ('582 Patent at cls. 1, 3, 6, 23, 26 – Ground 5; '107 cls. 5, 16, 18, 26, 27, 29 – Ground 5)......... 117

2. A POSA Would Not Be Motived to Exchange the PMTs in the DxP System for APDs . ................................................................................................................ 123

XII. Defendant's Alleged Prior Art Does Not Render the '582 Patent Claims Obvious…… 128

A. Ground 1: Claims 1, 3, 6 of the '582 Patent Are Not Obvious Over the BD FACSArray System and Lemoff.................................................................................................. 128

1. A POSA Would Have Had No Motivation to Combine Lemoff With the BD FACSArray System With a Reasonable Expectation of Success ..................................... 128

2. '582 Independent Claim 1: "An optical subsystem for a flow cytometer, the optical subsystem comprising: a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam; an optical relay element arranged to receive at least a portion of the collimated beam from the collimated optical element, the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a first image, a first focusing optical element arranged to receive at least a portion of the collimated beam reflected by the optical relay element; and a first semiconductor detector, wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element onto the first semiconductor detector." ................................................................................... 128

3. '582 Dependent Claim 2: "The optical subsystem of claim 1, further comprising the light source, wherein the light source comprises light passing through a pinhole or light emitted from a facet of a multimode optical fiber.".......................................................... 132

4.    '582 Dependent Claim 3: "The optical subsystem of claim 2, wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element to a size smaller than 1 millimeter in diameter." .............................. 133

5.    '582 Dependent Claim 6: "The optical subsystem of claim 1, further comprising a first optical filter disposed along an optical path between the collimating optical element and the optical relay element, the first optical filter configured to separate the collimated beam into a first branch and a second branch." ....................................................................................... 134

B.    Ground 2: Claims 1, 3, 6 of the '582 Patent Are Not Obvious Over the Luminex FlexMap 3D System and Lemoff ......................................................................................................... 135

1.    A POSA Would Have Had No Motivation to Combine Lemoff With the Luminex FlexMap 3D System With a Reasonable Expectation of Success ..................................... 135

2.    '582 Independent Claim 1: "An optical subsystem for a flow cytometer, the optical subsystem comprising: a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam; an optical relay element arranged to receive at least a portion of the collimated beam from the collimated optical element, the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a first image, a first focusing optical element arranged to receive at least a portion of the collimated beam reflected by the optical relay element; and a first semiconductor detector, wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element onto the first semiconductor detector." ....................................................................................... 135

3.    '582 Dependent Claim 2: "The optical subsystem of claim 1, further comprising the light source, wherein the light source comprises light passing through a pinhole or light emitted from a facet of a multimode optical fiber." ............................................................ 139

4.    '582 Dependent Claim 3: "The optical subsystem of claim 2, wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element to a size smaller than 1 millimeter in diameter." .............................. 140

5.    '582 Dependent Claim 6: "The optical subsystem of claim 1, further comprising a first optical filter disposed along an optical path between the collimating optical element and the optical relay element, the first optical filter configured to separate the collimated beam into a first branch and a second branch." ....................................................................................... 141

C.    Ground 3: Claims 1, 3, 6 of the '582 Patent Are Not Obvious Over Oostman, Lemoff, and Frazier ..................................................................................................................................... 143

1.    A POSA Would Have Had No Motivation to Combine Lemoff With Oostman, or Lemoff and Oostman With Frazier With a Reasonable Expectation of Success ................ 143

2.    '582 Independent Claim 1: "An optical subsystem for a flow cytometer, the optical subsystem comprising: a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam; an optical relay element arranged to receive at least a portion of the collimated beam from the collimated optical element, the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a first image, a first focusing optical element arranged to receive at least a

portion of the collimated beam reflected by the optical relay element; and a first semiconductor detector, wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element onto the first semiconductor detector." ........................................................................................... 143

3. '582 Dependent Claim 2: "The optical subsystem of claim 1, further comprising the light source, wherein the light source comprises light passing through a pinhole or light emitted from a facet of a multimode optical fiber."........................................................ 145

4. '582 Dependent Claim 3: "The optical subsystem of claim 2, wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element to a size smaller than 1 millimeter in diameter."............................... 146

5. '582 Dependent Claim 6: "The optical subsystem of claim 1, further comprising a first optical filter disposed along an optical path between the collimating optical element and the optical relay element, the first optical filter configured to separate the collimated beam into a first branch and a second branch." ..................................................................... 147

D.   Ground 4: Claims 1, 3, 6, 23, 26 of the '582 Patent Are Not Obvious Over the DxP and BD FACSArray System................................................................................................. 147

1.   A POSA Would Have Had No Motivation to Combine the DxP and BD FACSArray System With a Reasonable Expectation of Success .......................................................... 148

2. '582 Independent Claim 1: "An optical subsystem for a flow cytometer, the optical subsystem comprising: a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam; an optical relay element arranged to receive at least a portion of the collimated beam from the collimated optical element, the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a first image, a first focusing optical element arranged to receive at least a portion of the collimated beam reflected by the optical relay element; and a first semiconductor detector, wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element onto the first semiconductor detector." ..................................................................................... 148

3. '582 Dependent Claim 2: "The optical subsystem of claim 1, further comprising the light source, wherein the light source comprises light passing through a pinhole or light emitted from a facet of a multimode optical fiber."........................................................ 150

4. '582 Dependent Claim 3: "The optical subsystem of claim 2, wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element to a size smaller than 1 millimeter in diameter."............................... 151

5. '582 Dependent Claim 6: "The optical subsystem of claim 1, further comprising a first optical filter disposed along an optical path between the collimating optical element and the optical relay element, the first optical filter configured to separate the collimated beam into a first branch and a second branch." ..................................................................... 154

6. '582 Independent Claim 20: "An optical subsystem for a flow cytometer, the optical subsystem comprising: a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a first image; and an optical relay element arranged near the first image, the optical relay element configured to receive

light from the collimating optical element and to project a second image; wherein the size of the first image is substantially the same as the size of the second image, and wherein the optical relay element comprises a curved mirror or a concave-shaped dichroic filter." ..... 155

7.    '582 Dependent Claim 22: "The optical subsystem of claim 20, further comprising the light source, wherein the light source comprises an extended light source that forms an object, wherein the first image is a magnified image of the object." ................................. 155

8.    '582 Dependent Claim 23: "The optical subsystem of claim 22, wherein the light source comprises light passing through a pinhole or light emitted from a facet of a multimode optical fiber." ................................................................................. 156

9.    '582 Dependent Claim 26: "The optical subsystem of claim 22 further comprising a first focusing optical element arranged near the second image, the first focusing optical element configured to focus the light from the optical relay element to a size smaller than the object of the light source to a first semiconductor detector." ....................................... 157

E.    Ground 5: Claims 1, 3, 6, 23, 26 of the '582 Patent Are Not Obvious Over DxP and the Luminex FlexMap 3D System ................................................................................. 158

1.    A POSA Would Have Had No Motivation to Combine the DxP and the Luminex FlexMap 3D System With a Reasonable Expectation of Success ..................................... 158

2.    '582 Independent Claim 1: "An optical subsystem for a flow cytometer, the optical subsystem comprising: a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a collimated beam; an optical relay element arranged to receive at least a portion of the collimated beam from the collimated optical element, the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a first image, a first focusing optical element arranged to receive at least a portion of the collimated beam reflected by the optical relay element; and a first semiconductor detector, wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element onto the first semiconductor detector." ................................................................................. 159

3.    '582 Dependent Claim 2: "The optical subsystem of claim 1, further comprising the light source, wherein the light source comprises light passing through a pinhole or light emitted from a facet of a multimode optical fiber." ............................................................. 160

4.    '582 Dependent Claim 3: "The optical subsystem of claim 2, wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element to a size smaller than 1 millimeter in diameter." .............................. 160

5.    '582 Dependent Claim 6: "The optical subsystem of claim 1, further comprising a first optical filter disposed along an optical path between the collimating optical element and the optical relay element, the first optical filter configured to separate the collimated beam into a first branch and a second branch." ................................................................................. 162

6.    '582 Independent Claim 20: "An optical subsystem for a flow cytometer, the optical subsystem comprising: a collimating optical element arranged to receive light from a light source, the collimating optical element configured to project a first image; and an optical relay element arranged near the first image, the optical relay element configured to receive light from the collimating optical element and to project a second image; wherein the size of

the first image is substantially the same as the size of the second image, and wherein the optical relay element comprises a curved mirror or a concave-shaped dichroic filter.".…... 162

7. '582 Dependent Claim 22: "The optical subsystem of claim 20, further comprising the light source, wherein the light source comprises an extended light source that forms an object, wherein the first image is a magnified image of the object.".................................. 163

8. '582 Dependent Claim 23: "The optical subsystem of claim 22, wherein the light source comprises light passing through a pinhole or light emitted from a facet of a multimode optical fiber."................................................................................................. 164

9. '582 Dependent Claim 26: "The optical subsystem of claim 22 further comprising a first focusing optical element arranged near the second image, the first focusing optical element configured to focus the light from the optical relay element to a size smaller than the object of the light source to a first semiconductor detector." ...................................... 164

XIII.   Defendant's Alleged Prior Art Does Not Render the '443 Patent Claims Anticipated or Obvious……………………………………………………………………………………………… 166

A.   Ground 1: Claim 6, 10, 11, 15 of the '443 Patent Are Not Anticipated by the DxP ...... 166

1. '443 Independent Claim 1: "A wavelength division multiplexer (WDM) for a flow cytometer comprising: a set of filters, each filter of the set of filters configured to pass a corresponding portion of multiple portions of light; a set of filters, each filter of the set of filters configured to pass a corresponding portion of multiple portions of light; at least one mirror including at least one curved mirror, the at least one mirror configured to: receive one or more portions of the light from the set of filters; and reflect the one or more portions of the light to the set of filters; and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector.".................... 166

2. '443 Dependent Claim 6: "The WDM of claim 1, wherein: the set of filters include at least one dichroic filter, and the at least one curved mirror is a concave mirror." ............. 169

3. '443 Dependent Claim 10: "The WDM of claim 9, wherein: the first filter is an initial filter of the set of filters configured to receive the light, the second filter is configured to receive a first collimated beam of the light from the first mirror, and the fourth filter is configured to receive a second collimated beam of the light from the third mirror." ........ 169

4. '443 Patent, Dependent Claim 11: "A flow cytometer comprising the WDM of claim 1." ...................................................................................................................... 170

5. '443 Dependent Claim 13: "The flow cytometer of claim 11, further comprising: a flow cell including a flow channel configured to enable passage of a particle; and an optical element configured to detect scattered light emitted by the particle in the flow channel and illuminated by a light source."............................................................................ 172

6. '443 Dependent Claim 15: "The flow cytometer of claim 13, further comprising: a plurality of lasers including a first laser configured to illuminate the particle in the flow channel at a first location; and a second laser configured to illuminate the particle at a second location in the flow channel; a second laser configured to illuminate the particle at a second location in the flow channel."............................................................................ 174

B.   Ground 2: Claims 4 and 10 of the '443 Patent are Not Obvious Over the DxP ............. 175

1. '443 Independent Claim 1: "A wavelength division multiplexer (WDM) for a flow cytometer comprising: a set of filters, each filter of the set of filters configured to pass a corresponding portion of multiple portions of light; a set of filters, each filter of the set of filters configured to pass a corresponding portion of multiple portions of light; at least one mirror including at least one curved mirror, the at least one mirror configured to: receive one or more portions of the light from the set of filters; and reflect the one or more portions of the light to the set of filters; and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector.".................... 176

2. '443 Dependent Claim 4: "The WDM of claim 1, further comprising: a block positioned between the at least one mirror and the set of filters, the block configured to enable transmission of the light; and a set of elements, each element of the set of elements positioned in an optical path between a different pair of a filter of the set of filters and a detector of the set of detectors, wherein each element of the set of elements includes a bandpass filter, a lens, or a combination thereof.".............................................. 177

3. '443 Dependent Claim 9: "The WDM of claim 1, wherein the optical path of the light includes a first filter of the set of filters, followed by a first mirror of the at least one mirror, followed by a second filter of the set of filters, followed by a second mirror of the at least one mirror, followed by a third filter of the set of filters, followed by a third mirror of the at least one mirror, and followed by a fourth filter of the set of filters.".............................. 179

4. '443 Dependent Claim 10: "The WDM of claim 9, wherein: the first filter is an initial filter of the set of filters configured to receive the light, the second filter is configured to receive a first collimated beam of the light from the first mirror, and the fourth filter is configured to receive a second collimated beam of the light from the third mirror." ........ 181

C. Ground 2a: Claim 4 of the '443 Patent is Not Obvious Over the DxP and Lemoff....... 183

1. A POSA Would Have Had No Motivation to Combine the DxP and BD FACSArray System With a Reasonable Expectation of Success ........................................................... 183

2. '443 Dependent Claim 4: "The WDM of claim 1, further comprising: a block positioned between the at least one mirror and the set of filters, the block configured to enable transmission of the light; and a set of elements, each element of the set of elements positioned in an optical path between a different pair of a filter of the set of filters and a detector of the set of detectors, wherein each element of the set of elements includes a bandpass filter, a lens, or a combination thereof.".............................................. 184

D. Ground 3: Claims 4, 6, 10, 11, 15 of the '443 Patent Are Not Obvious Over the BD LSR-II System and Lemoff .......................................................................................................... 185

1. No Motivation to Combine and No Reasonable Expectation of Success................... 185

2. '443 Independent Claim 1: "A wavelength division multiplexer (WDM) for a flow cytometer comprising: a set of filters, each filter of the set of filters configured to pass a corresponding portion of multiple portions of light; a set of filters, each filter of the set of filters configured to pass a corresponding portion of multiple portions of light; at least one mirror including at least one curved mirror, the at least one mirror configured to: receive one or more portions of the light from the set of filters; and reflect the one or more portions of the light to the set of filters; and a set of detectors, each detector of the set of detectors

corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector."..................... 185

3.    '443 Dependent Claim 4: "The WDM of claim 1, further comprising: a block positioned between the at least one mirror and the set of filters, the block configured to enable transmission of the light; and a set of elements, each element of the set of elements positioned in an optical path between a different pair of a filter of the set of filters and a detector of the set of detectors, wherein each element of the set of elements includes a bandpass filter, a lens, or a combination thereof.".............................................. 186

4.    '443 Dependent Claim 6: "The WDM of claim 1, wherein: the set of filters include at least one dichroic filter, and the at least one curved mirror is a concave mirror." ............. 187

5.    '443 Dependent Claim 9: "The WDM of claim 1, wherein the optical path of the light includes a first filter of the set of filters, followed by a first mirror of the at least one mirror, followed by a second filter of the set of filters, followed by a second mirror of the at least one mirror, followed by a third filter of the set of filters, followed by a third mirror of the at least one mirror, and followed by a fourth filter of the set of filters."................................ 187

6.    '443 Dependent Claim 10: "The WDM of claim 9, wherein: the first filter is an initial filter of the set of filters configured to receive the light, the second filter is configured to receive a first collimated beam of the light from the first mirror, and the fourth filter is configured to receive a second collimated beam of the light from the third mirror." ........ 188

7.    '443 Dependent Claim 11: "A flow cytometer comprising the WDM of claim 1."... 189

8.    '443 Dependent Claim 13: "The flow cytometer of claim 11, further comprising: a flow cell including a flow channel configured to enable passage of a particle; and an optical element configured to detect scattered light emitted by the particle in the flow channel and illuminated by a light source.".............................................................................. 189

9.    '443 Dependent Claim 15: "The flow cytometer of claim 13, further comprising: a plurality of lasers including a first laser configured to illuminate the particle in the flow channel at a first location; and a second laser configured to illuminate the particle at a second location in the flow channel; a second laser configured to illuminate the particle at a second location in the flow channel.".............................................................................. 189

E.    Ground 4: Claims 4, 6, 10, 11, 15 of the '443 Patent Are Not Obvious Based On the Luminex FlexMap 3D System and Lemoff ............................................................................ 190

1.    A POSA Would Have Had No Motivation to Combine Lemoff With the Luminex FlexMap 3D System With a Reasonable Expectation of Success ....................................... 190

2.    '443 Independent Claim 1: A wavelength division multiplexer (WDM) for a flow cytometer comprising: a set of filters, each filter of the set of filters configured to pass a corresponding portion of multiple portions of light; at least one mirror including at least one curved mirror, the at least one mirror configured to: receive one or more portions of the light from the set of filters; and reflect the one or more portions of the light to the set of filters; and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector................................................ 190

3.	'443 Dependent Claim 4: "The WDM of claim 1, further comprising: a block positioned between the at least one mirror and the set of filters, the block configured to enable transmission of the light; and a set of elements, each element of the set of elements positioned in an optical path between a different pair of a filter of the set of filters and a detector of the set of detectors, wherein each element of the set of elements includes a bandpass filter, a lens, or a combination thereof.".............................................................. 191

4.	'443 Dependent Claim 6: "The WDM of claim 1, wherein: the set of filters include at least one dichroic filter, and the at least one curved mirror is a concave mirror." ............. 192

5.	'443 Dependent Claim 9: "The WDM of claim 1, wherein the optical path of the light includes a first filter of the set of filters, followed by a first mirror of the at least one mirror, followed by a second filter of the set of filters, followed by a second mirror of the at least one mirror, followed by a third filter of the set of filters, followed by a third mirror of the at least one mirror, and followed by a fourth filter of the set of filters.".................................. 192

6.	'443 Dependent Claim 10: "The WDM of claim 9, wherein: the first filter is an initial filter of the set of filters configured to receive the light, the second filter is configured to receive a first collimated beam of the light from the first mirror, and the fourth filter is configured to receive a second collimated beam of the light from the third mirror" ......... 193

7.	'443 Dependent Claim 11: "A flow cytometer comprising the WDM of claim 1."... 194

8.	'443 Dependent Claim 13: "The flow cytometer of claim 11, further comprising: a flow cell including a flow channel configured to enable passage of a particle; and an optical element configured to detect scattered light emitted by the particle in the flow channel and illuminated by a light source.".......................................................................................... 194

9.	Dependent Claim 15: "The flow cytometer of claim 13, further comprising: a plurality of lasers including a first laser configured to illuminate the particle in the flow channel at a first location; and a second laser configured to illuminate the particle at a second location in the flow channel." ...................................................................................................... 195

F.	Ground 5: Claims 4, 6, 10, 11, 15 of the '443 Patent are Not Obvious Over Lemoff and Oostman ......................................................................................................................... 196

1.	No Motivation to Combine and No Reasonable Expectation of Success ................... 196

2.	'443 Independent Claim 1: "A wavelength division multiplexer (WDM) for a flow cytometer comprising: a set of filters, each filter of the set of filters configured to pass a corresponding portion of multiple portions of light; a set of filters, each filter of the set of filters configured to pass a corresponding portion of multiple portions of light; at least one mirror including at least one curved mirror, the at least one mirror configured to: receive one or more portions of the light from the set of filters; and reflect the one or more portions of the light to the set of filters; and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector.".................... 196

3.	Independent Claim 1: "A wavelength division multiplexer (WDM) for a flow cytometer comprising: a set of filters, each filter of the set of filters configured to pass a corresponding portion of multiple portions of light; a set of filters, each filter of the set of filters configured to pass a corresponding portion of multiple portions of light; at least one mirror including at least one curved mirror, the at least one mirror configured to: receive

one or more portions of the light from the set of filters; and reflect the one or more portions of the light to the set of filters; and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector." ..................... 197

4.    '443 Dependent Claim 4: "The WDM of claim 1, further comprising: a block positioned between the at least one mirror and the set of filters, the block configured to enable transmission of the light; and a set of elements, each element of the set of elements positioned in an optical path between a different pair of a filter of the set of filters and a detector of the set of detectors, wherein each element of the set of elements includes a bandpass filter, a lens, or a combination thereof." ............................................... 198

5.    '443 Dependent Claim 6: "The WDM of claim 1, wherein: the set of filters include at least one dichroic filter, and the at least one curved mirror is a concave mirror." ............. 198

6.    '443 Dependent Claim 9: "The WDM of claim 1, wherein the optical path of the light includes a first filter of the set of filters, followed by a first mirror of the at least one mirror, followed by a second filter of the set of filters, followed by a second mirror of the at least one mirror, followed by a third filter of the set of filters, followed by a third mirror of the at least one mirror, and followed by a fourth filter of the set of filters." ................................ 199

7.    '443 Dependent Claim 10: "The WDM of claim 9, wherein: the first filter is an initial filter of the set of filters configured to receive the light, the second filter is configured to receive a first collimated beam of the light from the first mirror, and the fourth filter is configured to receive a second collimated beam of the light from the third mirror." ........ 199

8.    '443 Dependent Claim 11: "A flow cytometer comprising the WDM of claim 1." ... 200

9.    '443 Dependent Claim 13: "The flow cytometer of claim 11, further comprising: a flow cell including a flow channel configured to enable passage of a particle; and an optical element configured to detect scattered light emitted by the particle in the flow channel and illuminated by a light source." ............................................................................. 200

10.   '443 Dependent Claim 15: "The flow cytometer of claim 13, further comprising: a plurality of lasers including a first laser configured to illuminate the particle in the flow channel at a first location; and a second laser configured to illuminate the particle at a second location in the flow channel." ..................................................................... 201

XIV.   Defendant's Alleged Prior Art Does Not Render the '107 Patent Claims Obvious...... 201

A.   Ground 1: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent are Not Obvious Over the BD FACSArray System and Lemoff.................................................................................. 201

1.    '107 Independent Claim 1: "A flow cytometer comprising: an optical fiber; and a wavelength division multiplexer (WDM) configured to receive light from the optical fiber, wherein the WDM comprises: an array of mirrors; an array of filters; and an array of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters in the array of filters; wherein each of the filters in the array of filters is configured to receive light such that: a portion of the light passes through the filter; and another portion of the light is reflected; and wherein each of the mirrors in the array of mirrors is configured to: receive light reflected by a filter in the array of filters; and reflect light to another filter in the array of filters." ..................................................................................... 201

2. '107 Dependent Claim 2: "The flow cytometer of claim 1, wherein: the array of mirrors is substantially linear; the array of filters is substantially linear; and the array of APDs is substantially linear." ........................................................................... 202

3. '107 Dependent Claim 3: "The flow cytometer of claim 2, wherein at least one of the mirrors in the array of mirrors is a concave mirror." ......................................................... 203

4. '107 Dependent Claim 5: "The flow cytometer of claim 3, wherein the WDM is configured such that a portion of an optical path between the array of mirrors and the array of filters forms a zig-zag pattern." .............................................................................. 203

5. '107 Independent Claim 16: "A flow cytometer comprising: a flow cell configured to permit liquid to flow through the flow cell; a laser configured to project light into the flow cell; a multimode optical fiber configured to receive light from the flow cell; and a wavelength division multiplexer (WDM) configured to receive light from the multimode optical fiber, wherein the WDM comprises: a plurality of mirrors, wherein at least one of the mirrors is a concave mirror; a plurality of filters; and a plurality of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters of the plurality of filters; wherein each of the plurality of filters is configured to receive light such that: a portion of light passes through the filter; and another portion of light is reflected; and wherein each of the plurality of mirrors is configured to: receive light reflected by a filter of the plurality of filters; and reflect light to another filter of the plurality of filters." ................................................................................... 203

6. '107 Dependent Claim 17: "The flow cytometer of claim 16, wherein the WDM further comprises: a plurality of focusing lenses, wherein each of the plurality of focusing lenses is configured to focus light that passed through a filter of the plurality of filters to a spot on an APD of the plurality of APDs, wherein the spot has a diameter that is smaller than a diameter of a core of the multimode optical fiber." ............................................................ 206

7. '107 Dependent Claim 18: "The flow cytometer of claim 17, wherein for each of the plurality of focusing lenses, the diameter of the spot is less than 1 mm." ........................... 207

8. '107 Dependent Claim 20: "The flow cytometer of claim 16, wherein the plurality of mirrors includes more than one concave mirror." ............................................................. 208

9. '107 Dependent Claim 21: "The flow cytometer of claim 20, wherein the WDM is configured such that a portion of an optical path between the plurality of mirrors and the plurality of filters forms a zig-zag pattern." ...................................................................... 208

10. '107 Dependent Claim 22: "The flow cytometer of claim 21, wherein the laser is configured to emit blue light, yellow-green light, violet light, or ultraviolet light." .......... 208

11. '107 Dependent Claim 26: "The flow cytometer of claim 22, wherein: the WDM further comprises a block comprising a first surface; and each of the plurality of filters is coupled to the first surface of the block." ............................................................................ 209

12. '107 Dependent Claim 27: "The flow cytometer of claim 26, wherein the flow cytometer is a benchtop flow cytometer." ........................................................................ 209

13. '107 Dependent Claim 28: "The flow cytometer of claim 26, wherein the flow cytometer is compact." .................................................................................................... 209

Dr. David Schaafsma Rebuttal Validity Report

14.     '107 Dependent Claim 29: "The flow cytometer of claim 28, wherein the WDM is capable of detecting a substantially full spectrum of visible light." ................................... 210

B.    Ground 2: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent Are Not Obvious Over the Luminex FlexMap 3D System and Lemoff ........................................................................... 210

1.    A POSA Would Have Had No Motivation to Combine Lemoff With the Luminex FlexMap 3D System With a Reasonable Expectation of Success ..................................... 210

2.    '107 Independent Claim 1: "A flow cytometer comprising: an optical fiber; and a wavelength division multiplexer (WDM) configured to receive light from the optical fiber, wherein the WDM comprises: an array of mirrors; an array of filters; and an array of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters in the array of filters; wherein each of the filters in the array of filters is configured to receive light such that: a portion of the light passes through the filter; and another portion of the light is reflected; and wherein each of the mirrors in the array of mirrors is configured to: receive light reflected by a filter in the array of filters; and reflect light to another filter in the array of filters." .................................................................................................................. 210

3.    '107 Dependent Claim 2: "The flow cytometer of claim 1, wherein the array of mirrors is substantially linear; the array of filters is substantially linear; and the array of APDs is substantially linear." ...................................................................................................... 212

4.    '107 Dependent Claim 3: "The flow cytometer of claim 2, wherein at least one of the mirrors in the array of mirrors is a concave mirror." ....................................................... 212

5.    '107 Dependent Claim 5: "The flow cytometer of claim 3, wherein the WDM is configured such that a portion of an optical path between the array of mirrors and the array of filters forms a zig-zag pattern." ...................................................................................... 212

6.    '107 Independent Claim 16: "A flow cytometer comprising: a flow cell configured to permit liquid to flow through the flow cell; a laser configured to project light into the flow cell; a multimode optical fiber configured to receive light from the flow cell; and a wavelength division multiplexer (WDM) configured to receive light from the multimode optical fiber, wherein the WDM comprises: a plurality of mirrors, wherein at least one of the mirrors is a concave mirror; a plurality of filters; and a plurality of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters of the plurality of filters; wherein each of the plurality of filters is configured to receive light such that: a portion of light passes through the filter; and another portion of light is reflected; and wherein each of the plurality of mirrors is configured to: receive light reflected by a filter of the plurality of filters; and reflect light to another filter of the plurality of filters." .................................................................................................................. 212

7.    '107 Dependent Claim 17: "The flow cytometer of claim 16, wherein the WDM further comprises: a plurality of focusing lenses, wherein each of the plurality of focusing lenses is configured to focus light that passed through a filter of the plurality of filters to a spot on an APD of the plurality of APDs, wherein the spot has a diameter that is smaller than a diameter of a core of the multimode optical fiber." ........................................................... 214

8.    '107 Dependent Claim 18: "The flow cytometer of claim 17, wherein for each of the plurality of focusing lenses, the diameter of the spot is less than 1 mm." .......................... 215

9.    '107 Dependent Claim 20: "The flow cytometer of claim 16, wherein the plurality of mirrors includes more than one concave mirror." ............................................................. 216

10.    '107 Dependent Claim 21: "The flow cytometer of claim 20, wherein the WDM is configured such that a portion of an optical path between the plurality of mirrors and the plurality of filters forms a zig-zag pattern."........................................................................ 216

11.    '107 Dependent Claim 22: "The flow cytometer of claim 21, wherein the laser is configured to emit blue light, yellow-green light, violet light, or ultraviolet light.".......... 217

12.    '107 Dependent Claim 26: "The flow cytometer of claim 22, wherein: the WDM further comprises a block comprising a first surface; and each of the plurality of filters is coupled to the first surface of the block."........................................................................ 217

13.    '107 Dependent Claim 27: "The flow cytometer of claim 26, wherein the flow cytometer is a benchtop flow cytometer." ........................................................................ 217

14.    '107 Dependent Claim 28: "The flow cytometer of claim 26, wherein the flow cytometer is compact.".................................................................................................... 217

15.    '107 Dependent Claim 29: "The flow cytometer of claim 28, wherein the WDM is capable of detecting a substantially full spectrum of visible light."................................... 218

C.    Ground 3: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent Are Not Obvious Over Oostman, Lemoff, and Frazier ................................................................................................. 218

1.    A POSA Would Have Had No Motivation to Combine Lemoff With Oostman, or Lemoff and Oostman With Frazier With a Reasonable Expectation of Success................ 218

2.    '107 Independent Claim 1: "A flow cytometer comprising: an optical fiber; and a wavelength division multiplexer (WDM) configured to receive light from the optical fiber, wherein the WDM comprises: an array of mirrors; an array of filters; and an array of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters in the array of filters; wherein each of the filters in the array of filters is configured to receive light such that: a portion of the light passes through the filter; and another portion of the light is reflected; and wherein each of the mirrors in the array of mirrors is configured to: receive light reflected by a filter in the array of filters; and reflect light to another filter in the array of filters." ....................................................................................................... 218

3.    '107 Dependent Claim 2: "The flow cytometer of claim 1, wherein: the array of mirrors is substantially linear; the array of filters is substantially linear; and the array of APDs is substantially linear." ............................................................................................... 219

4.    '107 Dependent Claim 3: "The flow cytometer of claim 2, wherein at least one of the mirrors in the array of mirrors is a concave mirror.".......................................................... 219

5.    '107 Dependent Claim 5: "The flow cytometer of claim 3, wherein the WDM is configured such that a portion of an optical path between the array of mirrors and the array of filters forms a zig-zag pattern." ................................................................................... 220

6.    '107 Independent Claim 16: "A flow cytometer comprising: a flow cell configured to permit liquid to flow through the flow cell; a laser configured to project light into the flow cell; a multimode optical fiber configured to receive light from the flow cell; and a wavelength division multiplexer (WDM) configured to receive light from the multimode optical fiber, wherein the WDM comprises: a plurality of mirrors, wherein at least one of

the mirrors is a concave mirror; a plurality of filters; and a plurality of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters of the plurality of filters; wherein each of the plurality of filters is configured to receive light such that: a portion of light passes through the filter; and another portion of light is reflected; and wherein each of the plurality of mirrors is configured to: receive light reflected by a filter of the plurality of filters; and reflect light to another filter of the plurality of filters.".............................................................................................................. 220

7.    '107 Dependent Claim 17: "The flow cytometer of claim 16, wherein the WDM further comprises: a plurality of focusing lenses, wherein each of the plurality of focusing lenses is configured to focus light that passed through a filter of the plurality of filters to a spot on an APD of the plurality of APDs, wherein the spot has a diameter that is smaller than a diameter of a core of the multimode optical fiber."........................................................... 221

8.    '107 Dependent Claim 18: "The flow cytometer of claim 17, wherein for each of the plurality of focusing lenses, the diameter of the spot is less than 1 mm.".......................... 222

9.    '107 Dependent Claim 20: "The flow cytometer of claim 16, wherein the plurality of mirrors includes more than one concave mirror." ............................................................. 222

10.    '107 Dependent Claim 21: "The flow cytometer of claim 20, wherein the WDM is configured such that a portion of an optical path between the plurality of mirrors and the plurality of filters forms a zig-zag pattern."........................................................................ 223

11.    '107 Dependent Claim 22: "The flow cytometer of claim 21, wherein the laser is configured to emit blue light, yellow-green light, violet light, or ultraviolet light.".......... 223

12.    '107 Dependent Claim 26: "The flow cytometer of claim 22, wherein: the WDM further comprises a block comprising a first surface; and each of the plurality of filters is coupled to the first surface of the block.".......................................................................... 223

13.    '107 Dependent Claim 27: "The flow cytometer of claim 26, wherein the flow cytometer is a benchtop flow cytometer." ........................................................................... 224

14.    '107 Dependent Claim 28: "The flow cytometer of claim 26, wherein the flow cytometer is compact."................................................................................................... 224

15.    '107 Dependent Claim 29: "The flow cytometer of claim 28, wherein the WDM is capable of detecting a substantially full spectrum of visible light."................................... 224

D.   Ground 3a: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent Are Not Obvious Over the BD FACSArray System, Oostman, and Lemoff ........................................................................ 225

1.    No Motivation to Combine and No Reasonable Expectation of Success................... 225

2.    Independent Claim 1: "A flow cytometer comprising: an optical fiber; and a wavelength division multiplexer (WDM) configured to receive light from the optical fiber, wherein the WDM comprises: an array of mirrors; an array of filters; and an array of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters in the array of filters; wherein each of the filters in the array of filters is configured to receive light such that: a portion of the light passes through the filter; and another portion of the light is reflected; and wherein each of the mirrors in the array of mirrors is configured to: receive light reflected by a filter in the array of filters; and reflect light to another filter in the array of filters." ............................................................................... 225

3.   '107 Dependent Claim 2: "The flow cytometer of claim 1, wherein: the array of mirrors is substantially linear; the array of filters is substantially linear; and the array of APDs is substantially linear." ........................................................................... 226

4.   '107 Dependent Claim 3: "The flow cytometer of claim 2, wherein at least one of the mirrors in the array of mirrors is a concave mirror." .......................................................... 226

5.   '107 Dependent Claim 5: "The flow cytometer of claim 3, wherein the WDM is configured such that a portion of an optical path between the array of mirrors and the array of filters forms a zig-zag pattern." ........................................................................... 226

6.   '107 Independent Claim 16: "A flow cytometer comprising: a flow cell configured to permit liquid to flow through the flow cell; a laser configured to project light into the flow cell; a multimode optical fiber configured to receive light from the flow cell; and a wavelength division multiplexer (WDM) configured to receive light from the multimode optical fiber, wherein the WDM comprises: a plurality of mirrors, wherein at least one of the mirrors is a concave mirror; a plurality of filters; and a plurality of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters of the plurality of filters; wherein each of the plurality of filters is configured to receive light such that: a portion of light passes through the filter; and another portion of light is reflected; and wherein each of the plurality of mirrors is configured to: receive light reflected by a filter of the plurality of filters; and reflect light to another filter of the plurality of filters." ................................................................................ 226

7.   '107 Dependent Claim 17: "The flow cytometer of claim 16, wherein the WDM further comprises: a plurality of focusing lenses, wherein each of the plurality of focusing lenses is configured to focus light that passed through a filter of the plurality of filters to a spot on an APD of the plurality of APDs, wherein the spot has a diameter that is smaller than a diameter of a core of the multimode optical fiber." .......................................................... 227

8.   '107 Dependent Claim 18: "The flow cytometer of claim 17, wherein for each of the plurality of focusing lenses, the diameter of the spot is less than 1 mm." .......................... 228

9.   '107 Dependent Claim 20: "The flow cytometer of claim 16, wherein the plurality of mirrors includes more than one concave mirror." ........................................................... 229

10.   '107 Dependent Claim 21: "The flow cytometer of claim 20, wherein the WDM is configured such that a portion of an optical path between the plurality of mirrors and the plurality of filters forms a zig-zag pattern." ................................................................. 229

11.   '107 Dependent Claim 22: "The flow cytometer of claim 21, wherein the laser is configured to emit blue light, yellow-green light, violet light, or ultraviolet light." .......... 230

12.   '107 Dependent Claim 26: "The flow cytometer of claim 22, wherein: the WDM further comprises a block comprising a first surface; and each of the plurality of filters is coupled to the first surface of the block." ........................................................................ 230

13.   '107 Dependent Claim 27: "The flow cytometer of claim 26, wherein the flow cytometer is a benchtop flow cytometer." ........................................................................ 230

14.   '107 Dependent Claim 28: "The flow cytometer of claim 26, wherein the flow cytometer is compact." ................................................................................................ 231

15.    '107 Dependent Claim 29: "The flow cytometer of claim 28, wherein the WDM is capable of detecting a substantially full spectrum of visible light.".................................... 231

E.    Ground 4: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent Are Not Obvious Over the DXP and the BD FACSArray System .............................................................................................. 231

1.    A POSA Would Have Had No Motivation to Combine the DxP and BD FACSArray System With a Reasonable Expectation of Success .......................................................... 231

2.    '107 Independent Claim 1: "A flow cytometer comprising: an optical fiber; and a wavelength division multiplexer (WDM) configured to receive light from the optical fiber, wherein the WDM comprises: an array of mirrors; an array of filters; and an array of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters in the array of filters; wherein each of the filters in the array of filters is configured to receive light such that: a portion of the light passes through the filter; and another portion of the light is reflected; and wherein each of the mirrors in the array of mirrors is configured to: receive light reflected by a filter in the array of filters; and reflect light to another filter in the array of filters." ............................................................................................................ 232

3.    '107 Dependent Claim 2: "The flow cytometer of claim 1, wherein: the array of mirrors is substantially linear; the array of filters is substantially linear; and the array of APDs is substantially linear." ............................................................................................ 234

4.    '107 Dependent Claim 3: "The flow cytometer of claim 2, wherein at least one of the mirrors in the array of mirrors is a concave mirror." ........................................................ 234

5.    '107 Dependent Claim 5: "The flow cytometer of claim 3, wherein the WDM is configured such that a portion of an optical path between the array of mirrors and the array of filters forms a zig-zag pattern." ............................................................................ 235

6.    '107 Independent Claim 16: "A flow cytometer comprising: a flow cell configured to permit liquid to flow through the flow cell; a laser configured to project light into the flow cell; a multimode optical fiber configured to receive light from the flow cell; and a wavelength division multiplexer (WDM) configured to receive light from the multimode optical fiber, wherein the WDM comprises: a plurality of mirrors, wherein at least one of the mirrors is a concave mirror; a plurality of filters; and a plurality of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters of the plurality of filters; wherein each of the plurality of filters is configured to receive light such that: a portion of light passes through the filter; and another portion of light is reflected; and wherein each of the plurality of mirrors is configured to: receive light reflected by a filter of the plurality of filters; and reflect light to another filter of the plurality of filters." ............................................................................................................ 235

7.    '107 Dependent Claim 17: "The flow cytometer of claim 16, wherein the WDM further comprises: a plurality of focusing lenses, wherein each of the plurality of focusing lenses is configured to focus light that passed through a filter of the plurality of filters to a spot on an APD of the plurality of APDs, wherein the spot has a diameter that is smaller than a diameter of a core of the multimode optical fiber." ............................................................ 238

8.    '107 Dependent Claim 18: "The flow cytometer of claim 17, wherein for each of the plurality of focusing lenses, the diameter of the spot is less than 1 mm." ........................... 241

9.    '107 Dependent Claim 20: "The flow cytometer of claim 16, wherein the plurality of mirrors includes more than one concave mirror." ............................................................ 242

10.    '107 Dependent Claim 21: "The flow cytometer of claim 20, wherein the WDM is configured such that a portion of an optical path between the plurality of mirrors and the plurality of filters forms a zig-zag pattern."......................................................................... 243

11.    '107 Dependent Claim 22: "The flow cytometer of claim 21, wherein the laser is configured to emit blue light, yellow-green light, violet light, or ultraviolet light.".......... 243

12.    '107 Dependent Claim 26: "The flow cytometer of claim 22, wherein: the WDM further comprises a block comprising a first surface; and each of the plurality of filters is coupled to the first surface of the block.".......................................................................... 244

13.    '107 Dependent Claim 27: "The flow cytometer of claim 26, wherein the flow cytometer is a benchtop flow cytometer." ......................................................................... 246

14.    '107 Dependent Claim 28: "The flow cytometer of claim 26, wherein the flow cytometer is compact.".......................................................................................................... 247

15.    '107 Dependent Claim 29: "The flow cytometer of claim 28, wherein the WDM is capable of detecting a substantially full spectrum of visible light." .................................... 248

F.    Ground 5: Claims 5, 16, 18, 26, 27, 29 of the '107 Patent Are Not Obvious Over the DxP and the Luminex FlexMap 3D System ...................................................................................... 249

1.    A POSA Would Have Had No Motivation to Combine the DxP and the Luminex FlexMap 3D System With a Reasonable Expectation of Success ...................................... 249

2.    '107 Independent Claim 1: "A flow cytometer comprising: an optical fiber; and a wavelength division multiplexer (WDM) configured to receive light from the optical fiber, wherein the WDM comprises: an array of mirrors; an array of filters; and an array of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters in the array of filters; wherein each of the filters in the array of filters is configured to receive light such that: a portion of the light passes through the filter; and another portion of the light is reflected; and wherein each of the mirrors in the array of mirrors is configured to: receive light reflected by a filter in the array of filters; and reflect light to another filter in the array of filters." ...................................................................................... 249

3.    '107 Dependent Claim 2: "The flow cytometer of claim 1, wherein: the array of mirrors is substantially linear; the array of filters is substantially linear; and the array of APDs is substantially linear." ................................................................................................ 251

4.    '107 Dependent Claim 3: "The flow cytometer of claim 2, wherein at least one of the mirrors in the array of mirrors is a concave mirror."......................................................... 252

5.    '107 Dependent Claim 5: "The flow cytometer of claim 3, wherein the WDM is configured such that a portion of an optical path between the array of mirrors and the array of filters forms a zig-zag pattern." ................................................................................... 252

6.    '107 Independent Claim 16: "A flow cytometer comprising: a flow cell configured to permit liquid to flow through the flow cell; a laser configured to project light into the flow cell; a multimode optical fiber configured to receive light from the flow cell; and a wavelength division multiplexer (WDM) configured to receive light from the multimode optical fiber, wherein the WDM comprises: a plurality of mirrors, wherein at least one of

Dr. David Schaafsma Rebuttal Validity Report

the mirrors is a concave mirror; a plurality of filters; and a plurality of avalanche photodiodes (APDs) configured to receive light that passed through one or more filters of the plurality of filters; wherein each of the plurality of filters is configured to receive light such that: a portion of light passes through the filter; and another portion of light is reflected; and wherein each of the plurality of mirrors is configured to: receive light reflected by a filter of the plurality of filters; and reflect light to another filter of the plurality of filters.".................................................................................. 253

7. '107 Dependent Claim 17: "The flow cytometer of claim 16, wherein the WDM further comprises: a plurality of focusing lenses, wherein each of the plurality of focusing lenses is configured to focus light that passed through a filter of the plurality of filters to a spot on an APD of the plurality of APDs, wherein the spot has a diameter that is smaller than a diameter of a core of the multimode optical fiber.".......................................................... 255

8. '107 Dependent Claim 18: "The flow cytometer of claim 17, wherein for each of the plurality of focusing lenses, the diameter of the spot is less than 1 mm.".......................... 257

9. '107 Dependent Claim 20: "The flow cytometer of claim 16, wherein the plurality of mirrors includes more than one concave mirror." ............................................................. 258

10. '107 Dependent Claim 21: "The flow cytometer of claim 20, wherein the WDM is configured such that a portion of an optical path between the plurality of mirrors and the plurality of filters forms a zig-zag pattern."....................................................................... 258

11. '107 Dependent Claim 22: "The flow cytometer of claim 21, wherein the laser is configured to emit blue light, yellow-green light, violet light, or ultraviolet light.".......... 259

12. '107 Dependent Claim 26: "The flow cytometer of claim 22, wherein: the WDM further comprises a block comprising a first surface; and each of the plurality of filters is coupled to the first surface of the block.".......................................................................... 260

13. '107 Dependent Claim 27: "The flow cytometer of claim 26, wherein the flow cytometer is a benchtop flow cytometer." ....................................................................... 261

14. '107 Dependent Claim 28: "The flow cytometer of claim 26, wherein the flow cytometer is compact.".............................................................................................. 262

15. '107 Dependent Claim 29: "The flow cytometer of claim 28, wherein the WDM is capable of detecting a substantially full spectrum of visible light.".................................. 263

XV. Objective Indicia of Non-Obviousness....................................................................264

A. Long Felt But Unsolved Need .................................................................................. 265

B. Failure of Others ..................................................................................................... 271

C. Skepticism.............................................................................................................. 274

D. Unexpected Results.................................................................................................. 275

E. Industry Praise ........................................................................................................ 278

F. Teaching Away ........................................................................................................ 280

G. Copying................................................................................................................... 282

H. Commercial Success ................................................................................................ 289

I. Nexus ..................................................................................................................... 295

XVI. § 112 Invalidity…………………………………………………………………………297

   A.   The Asserted Patent Claims Are Not Invalid Due To "Collimation Related" Terms .... 297

       1.   The Asserted Patent Claims Are Not Limited To A WDM That Uses A Collimated Beam "Throughout"..................................................................................................... 297

       2.   The Asserted Patent Claims Are Not Invalid............................................................ 300

   B.   The Asserted Claims Are Not Invalid Due to "Optical Fiber/Light Source" Related Terms .................................................................................................................................... 345

       1.   "Optical fiber" has full scope written description support ('107, cls. 1, 2, 3, 5) ........ 345

       2.   "Optical fiber" is fully enabled ('107, cls. 1, 2, 3, 5).................................................. 348

       3.   "Light Source" is fully enabled and has full written description support ('582, cls. 1 and 20) ....................................................................................................................... 348

   C.   The Asserted Claims Are Not Invalid Due to "Detector-Related" Terms...................... 353

       1.   "Semiconductor detector" has full scope written description support ('582, cls. 1, 2, 3, 6, 26) ....................................................................................................................... 353

       2.   "Semiconductor detector" is fully enabled ('582, cls. 1, 2, 3, 6, 26)........................... 355

       3.   "Detector" has full scope written description support ('443, cls. 1, 4, 9, 10, 11, 13, 15). ....................................................................................................................................... 359

       4.   "Detector" is fully enabled ('443, cls. 1, 4, 9, 10, 11, 13, 15) .................................... 360

       5.   "[Array/plurality] of avalanche photodiodes (APDs)" has full scope written description support ('107, cls. 1, 2, 3, 5, 16, 17, 18, 20, 21, 22, 26, 27, 28, 29) ................................... 361

       6.   "[Array/plurality] of avalanche photodiodes (APDs)" is fully enabled ('107, cls. 1, 2, 3, 5, 16, 17, 18, 20, 21, 22, 26, 27, 28, 29) ....................................................................... 362

   D.   The Asserted Claims Are Not Invalid Due to "Mirror" Terms ...................................... 364

       1.   "Curved mirror" has written description support ('443, cls. 1, 4, 9, 10, 11, 13, 15; '582, cls. 1, 2, 3, 6, 20, 22, 23, 26 ..................................................................................... 364

       2.   "Mirror" has full scope written description support ('107, cls. 1, 2, 3, 5, 16, 17, 18, 20, 21, 22, 26, 27, 28, 29) ..................................................................................................... 374

       3.   "Concave mirror" has full scope written description support ('107, cls. 3, 5, 16, 18, 26, 27, 29; '443, cl. 6)............................................................................................................ 376

   E.   The Asserted Claims Are Not Invalid Due to "Image-Related" Terms........................... 378

       1.   "Image" is not indefinite ('582, cls. 1, 20) ................................................................ 378

       2.   "Optical relay element configured to reflect a portion of the collimated beam to produce a first image" ('582, cl. 1), and "collimating optical element configured to project a first image" and "optical relay element configured to receive light from the collimating optical element and to project a second image" ('582, cl. 20) have full scope written description support............................................................................................................ 382

       3.   "Optical relay element configured to reflect a portion of the collimated beam to produce a first image" ('582, cl. 1), and "collimating optical element configured to project a

first image" and "optical relay element configured to receive light from the collimating optical element and to project a second image" ('582, cl. 20) are fully enabled ................ 384

4.   "Arranged near" in "an optical relay element arranged near the first image" has full scope written description, is fully enabled, and is not indefinite ('582, cl. 20) .................. 387

F.   The Asserted Claims Are Not Invalid Due to "Substantially"-Related Terms ............... 388

1.   "Substantially linear" is not indefinite ('107, cl. 2) ..................................... 388

2.   "Substantially the same … size" is not indefinite ('582, cl. 20) ................................ 390

G.   "A first semiconductor detector, wherein the first focusing optical element is configured to focus the portion of the collimated beam received from the optical relay element onto the first semiconductor detector" has full scope written description support ('582, cl. 1) ........... 391

H.   The Asserted Claims Are Not Invalid Due to "Flow Cell" Terms ................................. 392

1.   "Flow cell" is fully enabled and has full scope written description support ('443, cls. 11, 13, 15; '107, cls. 16, 18, 26, 27, 29) ............................................................ 392

2.   "Flow cytometer" is fully enabled and has full scope written description support ('107, cls. 1, 2, 3, 5) ................................................................................................. 395

3.   "Multimode optical fiber configured to receive light from the flow cell" is fully enabled and has written description support ('107, cls. 16, 18, 26, 27, 29) ....................... 396

I.   The Asserted Claims Are Not Invalid Due to "Spectral" Flow Cytometry .................... 397

1.   Spectral Flow Cytometry Does Not Fundamentally Differ From "Conventional" Flow Cytometry" .................................................................................................. 397

2.   The Asserted Patents Are Not "Directed To" or "Only Disclose" a Conventional Flow Cytometer ................................................................................................. 398

3.   Validity Opinions ........................................................................................ 398

J.   "Compact" is not indefinite ('107, cls. 28, 29) ............................................................ 399

K.   All asserted claims of the '443 and '107 patents are not invalid because the claimed "filter" lacks written description support and full scope enablement ('443, cls. 1, 4, 6, 9, 10, 11, 13, 15; '107, cls. 1, 2, 3, 5, 16, 17, 18, 20, 21, 22, 26, 27, 28, 29) .................................... 399

L.   Claim 6 of the '582 patent reciting "optical filter" has full scope written description support and is fully enabled. ................................................................................. 402

XVII.   Supplementation of Opinions……………………………………………………….. 403

<u>**TABLE OF APPENDICES**</u>

- Appendix A: List of Materials Considered

- Appendix B: Claim Construction Declarations

Dr. David Schaafsma Rebuttal Validity Report

Introduction

## I.      Introduction

1.      I have been retained as an expert in this case by WilmerHale on behalf of Plaintiff Beckman Coulter, Inc. ("BEC"). I expect to testify at trial regarding the matters set forth in this report, if asked about these matters by the Court or by the parties' attorneys.

2.      I understand that BEC has asserted U.S. Patent Nos. 10,330,582; 11,703,443; and 12,174,107 to Yong Qin Chen ("the '582 patent," the '443 patent," and "the '107 patent," or collectively the "Asserted Patents"), entitled "Flow Cytometer" against certain  products offered by Defendants Cytek Biosciences, Inc. ("Cytek"). Specifically, I understand that BEC is asserting claims 1, 3, 6, 23, and 26 of the '582 Patent at cls. 4, 6, 10, 11, and 15 of the '443 patent, and claims 5, 16, 18, 26, 27, and 29 of the '107 patent against certain Cytek products (collectively referred to as the "Asserted Claims").

3.      I previously submitted an expert report dated December 19, 2025, titled "Opening Expert Report of David Schaafsma, Ph.D." ("Schaafsma Opening Report") in this case, which I incorporate by reference.

4.      I have been asked for my expert opinion regarding, among other things, the validity of the Asserted Claims. As explained in detail below, it is my opinion that each of the Asserted Claims are valid.

## II.     Background and Qualifications

5.      A description of my academic and professional experiences, honors and awards, are set forth in paragraphs 4 through 9 of my Opening Report, filed on December 19, 2025, and in my *curriculum vitae*, a true and correct copy of which I attached thereto as Appendix A.

Dr. David Schaafsma Rebuttal Validity Report

There Is No Motivation To Combine The Prior Art As Proposed by Dr. Ilkov

area APD in fluorescence detection instrumentation," despite APDs having "wide acceptance []

in optical communication." '582 patent at 44:1-34. And as I discuss in more detail below in

Section XV., incorporated by reference here, POSAs in the flow cytometry field were heavily

skeptical that APDs could be effectively used in flow cytometers.

172.     In sum, Dr. Ilkov's statements that a POSA would combine a demultiplexing

device from optical communications to improve a flow cytometer is, in my opinion, based on

pure hindsight. The fields of optical communications and flow cytometry fluorescence detection

were markedly different, and Dr. Ilkov does not provide evidentiary support, e.g., in the

literature, to demonstrate that a POSA would have turned to the optical communications field

despite these differences.

### ii.     Dr. Ilkov Does Not Explain How a POSA Would Have Overcome the Obstacles in Combinations with Lemoff

173.     Dr. Ilkov also does not explain how Lemoff's demultiplexing device—or any

device from optical communications generally—would work with light emitted from a flow

cytometry fiber optic, nor how Lemoff's (or any optical communication) fiber optic would work

in a flow cytometer or particle analyzer, and he does not propose any modifications to Lemoff

that would allow it to function as a WDM for a flow cytometer or optical subsystem as recited in

the Asserted Patents' independent claims. Thus, in my opinion, Dr. Ilkov's combinations

utilizing Lemoff for a flow cytometer WDM or optical subsystem fail to demonstrate why a

POSA would be motivated to look to any optical communications reference in the first instance,

and thus fails to render any Asserted Claim obvious for this reason alone. I discuss further below

additional reasons the proposed prior art combinations are incompatible.

### 3.   Lemoff is not Analogous Art to the Claimed Inventions

78

Dr. David Schaafsma Rebuttal Validity Report

There Is No Motivation To Combine The Prior Art As Proposed by Dr. Ilkov

174. Dr. Ilkov states that Lemoff is in "the same fields of the alleged invention related to compact modular optical instruments for color separation and detection." Ilkov Rep. ¶ 135 (describing Lemoff and BD FACSArray); *see also id.* ¶ 194 ("Lemoff and Luminex FlexMap 3D System are analogous references in the same fields of the alleged invention related to compact optical instruments for color separation and detection, configurable for each user's needs."), ¶ 214 ("Lemoff and Oostman are analogous references in the same fields of the alleged invention related to optical fibers and, more particularly, modular optical instruments for color separation and detection."), ¶ 221 ("Oostman, Lemoff, and Frazier are analogous references in the same field as the alleged invention related to wavelength division demultiplexing, fluorescence detection, and/or flow cytometry."), ¶ 449 ("Lemoff and BD LSR-II System are analogous references in the same fields of the alleged invention related to optical fibers and, more particularly, compact optical instruments for color separation and detection."), ¶687 ("Oostman, Lemoff, and BD FACSArray System are analogous references in the same field as the alleged invention related to wavelength division demultiplexing, fluorescence detection, and/or flow cytometry."); ¶434 ("[T]he DxP System and Lemoff are directed to the same problems faced by the inventor of efficiently demultiplexing and detecting light. And while Lemoff is rooted in the optical communication industry, the '582 patent specifically identifies WDMs in the that industry as analogous to WDMs in flow cytometry."). In my view, these characterizations of the field of endeavor for the Asserted Patents—which inexplicably change depending on the combination of references—overgeneralizes and mischaracterizes the field and improperly sweeps in numerous fields beyond even optical communications and flow cytometry.

175. As I explained above in Section IV., I understand and have been informed by counsel that prior art references must qualify as "analogous art" to be considered in an

Dr. David Schaafsma Rebuttal Validity Report

There Is No Motivation To Combine The Prior Art As Proposed by Dr. Ilkov

obviousness analysis. I understand that, to be analogous art, the reference must (1) be from the same field of endeavor as the challenged claims; or (2) be reasonably pertinent to the particular problem with which the inventor is involved. I understand that a reference is reasonably pertinent if it, as a result of its subject matter, logically would have commended itself to an inventor's attention in considering his problem.

176. For similar reasons as I discuss in the preceding section and incorporate here, it is my opinion that Lemoff is not analogous art that can be afforded any weight in the obviousness analysis.

177. First, it is my opinion that Lemoff is not from the same field of endeavor as the challenged claims.[15] As I discuss in the preceding section and incorporate here, Dr. Ilkov characterizes Lemoff and the Asserted Patents far too broadly and variably to meaningfully group technologies into the same "field."

178. Second, it is my opinion that Lemoff is not reasonably pertinent to the particular problem with which the invention solved. I do not agree with Dr. Ilkov's statements that Lemoff is "directed to the same problems faced by the inventor of efficiently demultiplexing and detecting light." Ilkov Rep. ¶¶ 137, 194, 214, 434, 449. As I have previously noted, the problem of "efficiently detecting" light in optical communications would have been interpreted as having low insertion loss, measured at the level of tenths of milliwatt, whereas in a fluorescence system, efficiency would have been recognized as more a matter of millionths of milliwatts. *See, e.g.*, Section XI.A.iii; *see also* Schaafsma Opening Rep. ¶ 71. The Asserted Patents specifically describe the problems that its inventor was able to solve: to create "an improved flow cytometer"

---

[15] Dr. Ilkov concedes that optical communications and flow cytometry were different fields when he opines that he "extensively reviewed demultiplexing technologies *from the field of optical communications* in the design of a next-generation mini flow cytometer." Ilkov Rep. ¶217.

Dr. David Schaafsma Rebuttal Validity Report

There Is No Motivation To Combine The Prior Art As Proposed by Dr. Ilkov

that is "reliable, compact and easy to manufacture," and "provide[] a Wavelength Division Multiplexing (WDM) system to separate a light beam into multiple colored bands" that "may be compatible with low noise semiconductor detectors" and "may be reconfigurable." '582 Patent at 1:64-2:35.

179. As discussed above, in reviewing Lemoff, I identified no discussion or evidence suggesting relevance of its disclosure to flow cytometry, life sciences applications, or even anything beyond the specific field of optical communications. Lemoff even expressly states that "[t]he invention relates generally to wavelength division multiplexed *optical communications systems* and more particularly to an optical wavelength division demultiplexer." Lemoff at 1:4-6 (emphasis added). Lemoff also makes clear that "in a preferred four-channel WDM system, the four channels are centered at approximately 1280, 1300, 1320, and 1340 nanometers (nm). Another preferred four-channel spacing distribution includes wavelengths of 820, 835, 850, and 865 nm." Lemoff at 6:42-50. These channel spacing and wavelengths were each typical of optical communications systems at the time of Lemoff's disclosures. *See* Azadeh at 49-54. Dr. Ilkov cites to no statements in Lemoff suggesting that it could be adapted for use in any other optical system, let alone a flow cytometer or even any life sciences application.

180. As I explained above, Lemoff does *not* disclose or suggest that the described demultiplexers can be implemented or adapted for other fields, such as flow cytometry, further demonstrating why a POSA would not have looked to Lemoff. Nor does the purported advantage of Lemoff's demultiplexers lie in their adaptability for other uses. Notably, Lemoff describes the technical field as "wavelength division multiplexed *optical communication systems*."

81

Dr. David Schaafsma Rebuttal Validity Report

There Is No Motivation To Combine The Prior Art As Proposed by Dr. Ilkov

181.    <mark>Thus, for all the reasons I discussed in this section and the preceding sections, in my opinion, a POSA faced with the problems of trying to control and focus a large, diffuse beam diameter over an extended distance, would not have found optical communications references dealing with narrow, intense beam diameters reasonably pertinent to that particular problem.</mark>

### 4.  Dr. Ilkov misinterprets the teachings of Lemoff

182.    In his Lemoff-based grounds, Dr. Ilkov states that Lemoff uses a "collimating optical element" to project a "collimated beam" toward the relay elements, Ilkov Rep. ¶¶ 148-52 thus ignoring Lemoff's explicit statements to the contrary (Lemoff at 2:32-35, 3:52-55, 4:48-51, etc) and ignoring general concepts from the field of optics.  Dr. Ilkov produces an annotated version of FIG. 3 of Lemoff to support his contentions:



Ilkov Rep. ¶ 152.

183.    Lemoff describes the beam emanating from both 82 and 80 as "being focused," Lemoff at 5:60, and Dr. Ilkov concedes that "a POSA would not have understood a 'focused light,' as taught by Lemoff, to be a 'collimated light,'" Ilkov Rep. ¶ 150  As I have noted above,

Dr. David Schaafsma Rebuttal Validity Report

There Is No Motivation To Combine The Prior Art As Proposed by Dr. Ilkov

the dashed lines of Lemoff do not behave as light rays but are simply a cartoon illustration of light in the system.

184.    Dr. Ilkov's arguments are presented under the assumption that if a POSA cannot, for example, measure the divergence of a beam and by some mathematical standard determine that it is collimated or not, then every beam of light is collimated (or none are?). *E.g.*, Ilkov Rep. ¶ 1058.[16]  I disagree.  As I will explain later in this report, a POSA as of 2012 could determine with reasonable certainty whether light is or is not collimated.  *Infra* Section XVI.A.  The field of optics does in fact distinguish collimated from non-collimated light, as evidenced by Cytek's own procedure for collimating the beam from the fiber in the Aurora.  CYTEK_0000000089; CYTEK_0000001392.

### 5.   Dr. Ilkov Misunderstands Other Optical Concepts Such as Multimode Fibers

185.    Dr. Ilkov opines that Lemoff discloses, e.g., "a multimode optical fiber."  Ilkov Rep. ¶¶ 150, 178-180, 208, 237, 569-571, 619-620, 663, 705.  I disagree with this opinion. Optical communications WDMs primarily utilize single-mode optical fibers with core diameters of 10 microns or smaller.  *See, e.g.*, Smith at 287.  As I discussed above in Section VIII.E and incorporate here by reference,  ("The fibers used for telephone and data transmission are typically single-mode fibers (with core diameters on the order of $10 \ \mu m$) which will not support propagation of a light wave except directly down the length of the fiber.").  One reason that multi-mode fibers were not preferred is due to high modal dispersion for a large wavelength range in multimode fibers, meaning that different wavelengths had very different bandwidth

---

[16] Dr. Ilkov also appears to misunderstand Beckman Coulter's infringement contentions, Ilkov Rep. ¶¶ 150-51, which I respond to in Section XVI.A.2.

# EXHIBIT 8



UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 18/939,263 | 11/06/2024 | Yong Qin CHEN | BECC.P0002US.CP1.D2C4 | 2230 |

| | | |
|---|---|---|
| 129381          7590          05/08/2026 | EXAMINER | |
| NORTON ROSE FULBRIGHT US LLP - BCI | AKANBI, ISIAKA O | |
| 98 San Jacinto Blvd., Suite 1100 | | |
| Austin, TX 78701 | ART UNIT | PAPER NUMBER |
| | 2877 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 05/08/2026 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

PatentDocket@Beckman.com
aoipdocket@nortonrosefulbright.com

PTOL-90A (Rev. 04/07)

**Page 001**

<table>
<tr><td rowspan="2"><em><strong>Office Action Summary</strong></em></td><td>Application No.<br>18/939,263</td><td>Applicant(s)<br>CHEN, Yong Qin</td></tr>
<tr><td>Examiner<br>ISIAKA O AKANBI</td><td>Art Unit<br>2877</td><td>AIA (First Inventor to File) Status No</td></tr>
</table>

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE **3** MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☑ Responsive to communication(s) filed on 04/09/2026.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☑ This action is **FINAL.**    2b) ☐ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s) __1-30__ is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☑ Claim(s) 1-30 is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☑ The drawing(s) filed on 11/06/2024 is/are: a)☑ accepted or b)☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
      a)☐ All    b)☐ Some**    c)☐ None of the:
         1.☐ Certified copies of the priority documents have been received.
         2.☐ Certified copies of the priority documents have been received in Application No. _____.
         3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)

2) ☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date _____

3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date _____

4) ☐ Other: _____

**Page 002**

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent

provisions.

### DETAILED ACTION

### *Amendment*

The amendment filed on 04/09/2026 has been entered into this application.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis

for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described
> as set forth in section 102, if the differences between the subject matter sought to be patented
> and the prior art are such that the subject matter as a whole would have been obvious at the
> time the invention was made to a person having ordinary skill in the art to which said subject
> matter pertains. Patentability shall not be negated by the manner in which the invention was
> made.

**Claims 1-30 are rejected under pre-AIA 35 U.S.C. 103(a) as being**

**unpatentable over Oostman, JR. et al. (2003/0048539 A1, previously cited**

**reference) in view of Sorin et al. (WO2013032474, using Published**

**asUS2014/0219606 A1, previously cited reference) and/or He et al. (7,212,343 B1,**

**previously cited reference).**

Regarding claim 1, **Oostman** discloses a flow cytometer **included in analytical**

**instruments for light analysis (figs. 1-15)** comprising:

a flow cell **flow cell 41/flow stream 78/103/flow channel 109** configured to

permit liquid to flow through the flow cell;

**Page 003**

one or more lasers **laser 11/ lasers 52 and 54**, each of the laser(s) configured to project light into the flow cell, **as can be seen in depicted drawing (i.e. figs. 1, 3 and 4)**; and

a plurality of wavelength division multiplexers (WDMs) **is/are plurality of dichroic mirror and/or combination of dichroic mirrors 25-44**, wherein each of the WDMs is configured to receive a portion of light **(28)** from the flow cell and comprises:

**each of the combination of dichroic mirrors 25-44 make-up** a plurality of filters **(dichroic mirror(s) is also an optical filter that reflects some wavelengths (colors) of light and transmits others)**, **inherently** wherein each of the filters is configured to receive light such that: a portion of light passes through the filter; and another portion of light is reflected by the filter **[pars. 0029-33] (Oostman, claims 1-2 and 8)**;

**Oostman discloses a plurality of photodetector(s) a respective detector cluster 124, 126, 128 and 130 which houses an array of detectors)** is configured to receive light that passed through a filter of the plurality of filters **that make-up dichroic mirror(s) integrated as a single unit [pars. 0029-33] (Oostman, claims 1-2 and 8).**

Oostman fail to explicitly specify the type of the photodetector as being avalanche photodiodes (APDs), wherein each of the APDs is configured to receive light that passed through a filter of the plurality of filters.

However, even though Oostman fail to disclose the type of photodetector used in the system as being avalanche photodiodes (APDs), since he does not limit the photodetector to be used, it would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to choose any suitable

photodetector for the intended application, since avalanche photodiodes (APDs) is photodetector, and the propose modification of the prior art would not change the principle of operation of the prior art invention being modified.

Therefore, it would have been obvious to one of ordinary skill in the art before the effective filing date of the claimed invention to adapt the recited type of photodetector in view of the feature is merely a variation in design and the results would have been predictable. Further, it would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to choose any suitable photodetector for the intended application, such as, in the manner set forth in applicant's claim(s), since avalanche photodiodes (APDs) is a photodetector, and it has been held that the provision of adjustability, where needed, involves only routine skill in the art, In re Stevens, 101 USPQ 284 (CC1954).

Furthermore, Oostman fail to explicitly specify the bending mirror(s) constructional/structural change(s) is/are included in the multiplexer(s) (WDMs), such as, one or more mirrors, wherein: each of the one or more mirrors comprises at least one reflective surface; at least one of the reflective surface(s) of the one or more mirrors is concave; and the reflective surface(s) of the one or more mirrors are configured to: receive light reflected by a filter of the plurality of filters; and reflect light to another filter of the plurality of filters.

Sorin and/or He from the same field of endeavor teaches of constructional/structural changes such as claimed by Applicant's claim(s) 1 is known in the art in order to recollimated the beam as travels through the splitter(s)/filter(s) and/or in order to compensate the filter tilting errors and in order to minimize errors and

corrected immediately tilting errors. Sorin teaches of a WDM demultiplexer, and/or partially reflective, comprises/comprising collimating mirrors 448 are **curved reflecting mirrors (i.e. concave)** to re-collimate the beam as travels through the splitter 430. The collimating mirrors 448 may compensate for beam divergence, e.g., caused by diffraction Sorin (Sorin, [par. 0043] (fig. 4)) and/or He teaches of compact multiplexer WDM comprises/comprising a/one concave mirror 316 that reflects the beam to the next filter for further demultiplexing till all remaining wavelengths are respectively coupled out, the concave mirror 316 is to compensate the tilting error propagation commonly seen in the prior art modules, for example, in FIG. 3 and 7 (fig. 7: 702) He, (He, col. 5, lines 2-24; and lines 62-col. 6, lines 7) in order to compensate the filter tilting errors and in order to minimize errors and corrected immediately tilting errors, in other words, positional and angular errors generated by any prior filter tilting are completely compensated for all following channels through the oblate spheroid concave mirror array, as per teachings of He.

Therefore, it would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to modify Oostman with the constructional/structural change(s) above, in the manner set forth in applicant's claim 1, in view of the teaching(s) of Sorin and/or He in order to re-collimate the beam as travels through the splitter/filter as the concave mirror(s) compensate for beam divergence, e.g., caused by diffraction, as per teachings of Sorin and/or in order to compensate the filter tilting errors and in order to minimize errors and corrected immediately the tilting errors, in other words, positional and angular errors generated by any prior filter tilting

are completely compensated for all following channels through the oblate spheroid concave mirror array, as per teachings of He.

As to claims 2-5, **Oostman** when modified by Sorin and/or He, **the combination** also discloses a structure that is use in a flow cytometer/system comprising **plurality dichroic mirrors 25-44 [pars. 0029-33] (Oostman, claims 1-2 and 8), dichroic mirror(s) that part of inherent function is beam splitting and is an optical filter that reflects some wavelengths (colors) of light and transmits others,** the system is/are implementing limitations such as; wherein the one or more mirrors comprise a plurality of reflective surfaces (claim 2); wherein more than one of the plurality of reflective surfaces is concave **curved reflecting mirrors (Sorin, (fig. 4:448) [par. 0043]) and/or (He, fig. 3 and 7: 316 and 702))**(claim 3); wherein each of the WDMs is configured such that a portion of a light path between the plurality of reflective surfaces of the one or more mirrors and the plurality of filters forms a zig-zag pattern, **as can be seen in depicted drawing (figs. 5-6) [pars. 0031-33]** (claim 4); **and**

**plurality dichroic mirrors 25-44 [pars. 0029-33] (Oostman, claims 1-2 and 8), dichroic mirror(s) that part of inherent function is beam splitting and is an optical filter that reflects some wavelengths (colors) of light and transmits others** a splitter, wherein: the plurality of WDMs **the plurality dichroic mirrors** include a first WDM and a second WDM; and the splitter is configured to: **perform inherent function of** receive light from the flow cell; direct a first portion of the light received from the flow cell to the first WDM **within the plurality dichroic mirrors 25-44**; and direct a second

portion of the light received from the flow cell to the second WDM **within the plurality dichroic mirrors 25-44** (claim 5).

As to claims 6-14, **Oostman** when modified by Sorin and/or He, **the combination** also discloses a structure that is use in a flow cytometer/system comprising **plurality dichroic mirrors 25-44 [pars. 0029-33] (Oostman, claims 1-2 and 8), dichroic mirror(s) that part of inherent function is beam splitting and is an optical filter that reflects some wavelengths (colors) of light and transmits others, configured to operate in a wavelength range at least from 400 mm to 700 mm (the entire visible light range) [par. 0042] and further comprise a plurality of focusing lenses, wherein each of the focusing lenses is configured to focus light that passed through a filter of the plurality of filters to a spot [pars. 0040, 0043, (claim 16)],** as applied to claim 1.

Oostman fail to explicitly specify the constructional/structural changes of; the one or more mirrors comprise at least five reflective surfaces; and the plurality of filters comprises at least six filters (claim 6); wherein the plurality of WDMs comprise at least 24 APDs (claim 7); wherein the plurality of WDMs comprise at least 48 APDs (claim 8); wherein the plurality of WDMs comprise at least 64 APDs (claim 9); wherein at least one WDM of the plurality of WDMs is configured to detect a substantially full spectrum of visible light (claim 10); wherein the plurality of WDMs are collectively configured to detect a substantially full spectrum of visible light (claim 11); wherein at least one WDM of the plurality of WDMs is configured to detect substantially every wavelength of light between 380 nm and 780 nm (claim 12); wherein the first WDM and the second WDM: each further comprise: an additional filter configured to receive light reflected by a filter

of the plurality of filters such that a portion of light passes through the additional filter; and an additional APD configured to receive light that passed through the additional filter; and each are configured such that substantially all the light that the WDM is configured to receive is received by the plurality of APDs and the additional APD (claim 13); **and** wherein the first WDM and the second WDM each further comprise a plurality of focusing lenses, wherein each of the focusing lenses is configured to focus light that passed through a filter of the plurality of filters to a spot on an APD of the plurality of APDs, wherein the spot has a diameter that is less than 1 mm (claim 14).

However, even though, Oostman fail to teach the constructional changes in the system of the claim 1, as that claimed by Applicant's claims 6-14, the constructional changes are considered obvious design variation, alternatives and/or duplication of parts that is within the ordinary skill of one in the art to choose any suitable combination(s) for the intended application.

Therefore, it would have been obvious to one of ordinary skill in the art before the effective filing date of the claimed invention to adapt the recited constructional changes as desired appropriate, such as, in the manner set forth in applicant's claims 6-14, in view of the feature is merely a variation, alternatives and/or duplication of part(s) in design, and the results would have been predictable, since it has been held that the provision of adjustability, where needed, involves only routine skill in the art, In re Stevens, 101 USPQ 284 (CC1954), and it has been held that mere duplication of the essential working parts of a device involves only routine skill in the art. St. Regis Paper Co. v. Bemis Co., 193 USPQ 8.

As to claims 15, **Oostman** when modified by Sorin and/or He, **the combination** also discloses a structure that is use in a flow cytometer/system comprising a light source **laser 11/ lasers 52 and 54** arranged to illuminate a stream of particles **43/flow cell 78** in a viewing zone **as can be seen in depicted drawing (i.e. figs. 1, 3 and 4), lasers configured to emit multiple wavelength [pars. 0002, 0009]**

Oostman fail to explicitly specify the constructional/structural changes of the laser(s) being configured in certain way; such as, wherein at least one of the laser(s) is configured to emit ultraviolet light or violet light (claim 15); wherein the one or more lasers comprise a plurality of lasers, each of the lasers configured to emit a wavelength of light that is different than the wavelength of light that each other of the lasers is configured to emit (claim 16); wherein each of the lasers is configured to project light into the flow cell at a respective one of a plurality of spatially separated locations in the flow cell (claim 17); **and** comprising a set of one or more optical elements that are each configured to reflect light emitted by a respective one of the lasers toward the flow cell (claim 18).

However, even though Oostman fails to teach the exact configuration used in the system such as in the manner set forth in applicant's claims 15-18, the constructional/structural changes are considered obvious design variation, alternatives that is within the ordinary skill of one in the art to choose any suitable combination(s) for the intended application.

Therefore, it would have been obvious to one of ordinary skill in the art before the effective filing date of the claimed invention to adapt the recited constructional changes as desired appropriate, such as, in the manner set forth in applicant's claims 15-18, in

view of the feature is merely a variation, and alternatives in design, and the results would have been predictable, since it has been held that the provision of adjustability, where needed, involves only routine skill in the art, In re Stevens, 101 USPQ 284 (CC1954), and it has been held that mere duplication of the essential working parts of a device involves only routine skill in the art. St. Regis Paper Co. v. Bemis Co., 193 USPQ 8.

As to claims 19-22, **Oostman** when modified by Sorin and/or He, **the combination** also discloses a structure that is use in a flow cytometer/system comprising **fluorescent light stimulated by the different sources is imaged into a plurality of optical fibers [pars. 0009-11 and 0028-29], each lens 265 is movable for adjusting the focal spot [pars. 0033, 0037 and 0041],** the system is/are implementing limitations such as;

a plurality of multimode optical fibers **optical fibers 123, 125, 127 and 129 [par. 0028]**, wherein each of the multimode optical fibers is configured to: receive light from a respective one of the spatially separated locations in the flow cell; and direct the light received from a respective one of the spatially separated locations in the flow cell to one of the plurality of WDMs (claim 19);

wherein each of the WDMs **plurality of dichroic mirror and/or combination of dichroic mirrors 25-44** further comprises a plurality of focusing lenses, wherein each of the focusing lenses is configured to focus light that passed through a filter of the plurality of the filters to a spot on **photodetectors (i.e.** an APD) of the plurality of APDs, the spot having a diameter that is less than 1 mm (claim 20); **using a plurality of lasers of different colors (see abstract) [par. 0009] includes** one of the lasers is

configured to emit ultraviolet light; one of the lasers is configured to emit violet light; one

of the lasers is configured to emit blue light; and/or one of the lasers is configured to

emit yellow-green light (claim 21); **and** wherein: **using a plurality of lasers of different**

**colors (see abstract) [par. 0009] includes** one of the lasers is configured to emit red

light; one of the lasers is configured to emit blue light; and one of the lasers is

configured to emit violet light (claim 22).

As to claims 23-30, **Oostman** when modified by Sorin and/or He, **the**

**combination** also discloses a structure that is use in a flow cytometer/system

comprising **plurality dichroic mirrors 25-44 [pars. 0029-33] (Oostman, claims 1-2**

**and 8), dichroic mirror(s) that part of inherent function is beam splitting and is an**

**optical filter that reflects some wavelengths (colors) of light and transmits others,**

**configured to operate in a wavelength range at least from 400 mm to 700 mm (the**

**entire visible light range) [par. 0042] and further comprise a plurality of focusing**

**lenses, wherein each of the focusing lenses is configured to focus light that**

**passed through a filter of the plurality of filters to a spot [pars. 0040, 0043, (claim**

**16)], fluorescent light stimulated by the different sources is imaged into a**

**plurality of optical fibers [pars. 0009-11 and 0028-29], each lens 265 is movable**

**for adjusting the focal spot [pars. 0033, 0037 and 0041], using a plurality of lasers**

**of different colors (see abstract) [par. 0009],** as applied to claim 1.

Oostman fail to explicitly specify the constructional/structural changes of; wherein

the plurality of WDMs comprise at least 24 APDs (claim 23); wherein at least one of the

lasers is configured to emit yellow-green light (claim 24); wherein the plurality of WDMs

comprise at least 48 APDs (claim 25); wherein at least one of the lasers is configured to

emit ultraviolet light (claim 26); wherein the plurality of WDMs comprise at least 64 APDs (claim 27); wherein at least one WDM of the plurality of WDMs is configured to detect a substantially full spectrum of visible light (claim 28); wherein: each of the WDMs further comprises: an additional filter configured to receive light reflected by a filter of the plurality of filters such that a portion of light passes through the additional filter; and an additional APD configured to receive light that passed through the additional filter; and each of the WDMs is configured such that substantially all the light that the WDM is configured to receive is received by the plurality of APDs and the additional APD (claim 29); **and** wherein for each of the first WDM and the second WDM: the WDM comprises a block comprising a first surface and each of the filters of the WDM is coupled to the first surface of the block; the one or more mirrors comprise at least five reflective surfaces; and the plurality of filters comprise at least six filters (claim 30).

However, even though, Oostman fail to teach the constructional changes in the system of the claim 1, as that claimed by Applicant's claims 23-30, the constructional changes are considered obvious design variation, alternatives and/or duplication of parts that is within the ordinary skill of one in the art to choose any suitable combination(s) for the intended application.

Therefore, it would have been obvious to one of ordinary skill in the art before the effective filing date of the claimed invention to adapt the recited constructional changes as desired appropriate, such as, in the manner set forth in applicant's claims 23-30, in view of the feature is merely a variation, alternatives and/or duplication of part(s) in design, and the results would have been predictable, since it has been held that the

provision of adjustability, where needed, involves only routine skill in the art, In re

Stevens, 101 USPQ 284 (CC1954), and it has been held that mere duplication of the

essential working parts of a device involves only routine skill in the art. St. Regis Paper

Co. v. Bemis Co., 193 USPQ 8.


### *Response to Arguments*


Applicant's arguments/remarks, see pages 2-15, filed on 04/09/2026, with

respect to the rejection(s) of claim(s) have been fully considered but are not persuasive.


**<u>Applicant's arguments:</u>**


**a) Applicant argues beginning in page 2- 4 that** "A. The References Do Not

Teach or Suggest Avalanche Photodiodes (APDs) for Oostman's Flow Cytometer

Independent claim 1 recites a flow cytometer comprising, in part, "a plurality of

wavelength division multiplexers (WDMs)" that each comprise "a plurality of avalanche

photodiodes (APDs), wherein each of the APDs is configured to receive light that

passed through a filter of the plurality of filters."

"Obviousness requires a suggestion of all limitations in a claim." Ex parte

Ruchart, Appeal No. 2016-001415, slip op. at 4 (PTAB Mar. 25, 2024) (citing CFMT,

Inc. V. Yieldup Int'l Corp., 349 F.3d 1333, 1342 (Fed. Cir. 2003)) (emphasis added). By

its own admission, the Office has not established that Oostman would have suggested

using APDs for its photodetectors because Oostman does not disclose APDs. Action at

4. Rather, Oostman consistently discloses using a "photo multiplier tube (PMT)" for

each of its detectors. Oostman at 11 [0003]-[0004], FIG. 1; see also id. at " [0031],

[0034], [0037] ("the detectors being photomultiplier tubes")...........................

.........................................................................................................................................

.............. For example, the Office does not explain why a person of ordinary skill in

the art ("POSITA") would have viewed Oostman's fluorescence detection as one of the

"certain scientific applications" where losing the "excellent noise characteristics" of

PMTs was acceptable. See Specification at 64:25-65:8, 69:9-17. To the contrary,

evidence-of- record shows the use of APDs for only "certain color bands with known

bright fluorescence," which is incongruent with Oostman's objective to use "a larger

number of spectrally diverse detectors" to detect "a wide range of spectral responses."

Id. at 69:9-17; Oostman at T [0009]; see also Oostman at 1 [0030]. The Office thus has

not established that it would have been obvious to incorporate APDs into Oostman's

instrument in the manner claimed.

For at least these reasons, independent claim 1 and its dependent claims are

patentable over Oostman. Applicant respectfully requests reconsideration and

withdrawal of the rejections.

**Examiner's response:**

**With respect to argument (a),** it is respectfully pointed out to applicant that this argument is not persuasive because it has been held that during examination See In re Zletz, 893 F.2d 319, 321, 13 USPQ2d 1320, 1322 (Fed. Cir. 1989) ("During patent examination the pending claims must be interpreted as broadly as their terms reasonably allow."); and further, Applicant is reminded that, during examination, claim terms are given their broadest reasonable construction consistent with the Specification. In re ICON Health & Fitness, Inc., 496 F.3d 1374, 1379 (Fed. Cir. 2007). In this case, it is respectfully pointed out to applicant that by applicant's own account the rejection was made as 103 not 102 and the examiner did recognize that the limitation "a plurality of avalanche photodiodes (APDs), wherein each of the APDs is configured to receive light that passed through a filter of the plurality of filters." was not taught by Oostman but used obviousness and the combination of Sorin and/or He to find this limitation in view of Oostman teaching of employing optical detectors such as a high-speed detector [pars. 0082-83].

As such, one of ordinary skill before the effective filing date of the claimed invention and/or at the time the invention was made would have fairly and reasonably recognized that avalanche photodiodes (APDs) is/are known and recognized in the art as optical detector(s) for high-speed detection that is/are employed in system such as high-speed laser scanners, spectroscopy, laser microscopy and optical time-domain reflectometers (OTDR), radiation detection, and sensor systems as imaging receiver(s), and/or used for monitoring systems and analyzing polarization. It would have been obvious to one of

ordinary skill in the art before the effective filing date of the claimed invention and/or at the time the invention was made to fairly and reasonably recognized that avalanche photodiodes (APDs) is/are known and recognized in the art as optical detector(s) for high-speed detection can be employed or used in the system such as in the improved system for detecting fluorescent light having multiple colors, high-speed laser scanners, spectroscopy, laser microscopy and optical time-domain reflectometers (OTDR), radiation detection, and sensor systems as imaging receiver(s), and/or for monitoring and analysis of the system(s) based on Oostman suggestion of using a high-speed optical detectors. It is respectfully pointed out to applicant that this argument is not persuasive, as the examiner did recognize that obviousness can only be established by combining or modifying the teachings of the prior art to produce the claimed invention where there is some teaching, suggestion, or motivation to do so found either in the references themselves or in the knowledge generally available to one of ordinary skill in the art. See In re Fine, 837 F.2d 1071, 5 USPQ2d 1596 (Fed. Cir. 1988) and In re Jones, 958 F.2d 347, 21 USPQ2d 1941 (Fed. Cir. 1992).

Additionally, both the instant application claims and the cited primary reference Oostman is/are reasonably concern with monitoring and analyzing cytometer and/or multi-color flow cytometer considering the BRI, consistent with the instant specification. As such, it is respectfully pointed out to applicant that this argument is not persuasive because it has been held that a prior art reference must either be in the field of applicant's endeavor or, if not, then be reasonably pertinent to the particular problem with which the applicant was concerned, in order to be relied upon as a basis for rejection of the claimed invention. See In re Oetiker, 977 F.2d 1443, 24 USPQ2d 1443

(Fed. Cir. 1992). In this case, since both the instant application claims and the cited primary reference(s) is/are reasonably concern with the flow cytometer which the applicant is involved, the cited reference(s) is/are considered as an analogous art. The rejections under 35 U.S.C. 103 is/are proper.

Furthermore, both the instant application claims (disclosure as published [par.0032] ) and the prior art cited references Oostman, Sorin and He are fairly and reasonably concern with using wavelength-division multiplexing (WDMs), (WDMs) a technology which multiplexes a number of optical carrier signals onto a single optical fiber by using different wavelengths (i.e., colors) of laser light or using multiple light wavelengths to send signal over the same medium is known in the art in order to monitoring and analyzing cytometer and/or multi-color flow cytometer considering the BRI, consistent with the instant specification. As such, the cited references are considered as an analogous art, and the reason to combine and the rejections is/are proper.

It is respectfully pointed out to applicant that these arguments are not persuasive because it is well settled that, one cannot show nonobviousness by attacking references individually where the rejections are based on combinations of references. See In re Keller, 642 F.2d 413, 208 USPQ 871 (CCPA 1981); In re Merck & Co., 800 F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986). In this case, since both the instant application claims (disclosure as published [par.0032]) and the prior art cited references Oostman, Sorin and He are fairly and reasonably concern with using wavelength-division multiplexing (WDMs), the cited references are considered as an analogous art, and the rejections under 35 U.S.C. 103 is/are proper. It is respectfully

**Page 018**

pointed out to applicant that this/these argument(s) is/are not persuasive because applicant has not provided any factual evidence that suggest or obviate the examiner's position would not have been obvious since the cited references are considered as an analogous art.

In addition, a dichroic or dichroic mirror considering the BRI, consistent with the instant specification (see [pars. 0032-33]) and with some reliance on the knowledge of one of ordinary skill at the time the invention was made in order to provide an enabling disclosure, In re BODE et al, 193 USPQ 12 at 16 (CCPA, 1977), - refers to any optical device which can split a beam of light into two beams with differing wavelengths. Such devices include mirrors and filters, usually treated with optical coatings, which are designed to reflect light over a certain range of wavelengths and transmit light which is outside that range. Each of the dichroic mirror(s) make-up of each of the dichroic mirror(s) is made up of plurality of filters (dichroic mirror(s) that include(s) optical filter that reflects some wavelengths (colors) of light and transmits others), obviously the makeup includes plurality of filters.

It would have been obvious to one of ordinary skill in the art before the effective filing date of the claimed invention and/or at the time the invention was made would fairly and reasonably recognized that Oostman when modified with obviousness and the combination of the cited references above, one of ordinary skill in the art would fairly and reasonably recognize that each of the optical high-speed detection that avalanche photodiodes (APDs) is configured to receive light that passed through a filter of the plurality of filters. As such, it is respectfully pointed out to applicant that this argument(s) (a) is/are not persuasive because one of ordinary skill before the effective

filing date of the claimed invention and/or at the time the invention was made would

have fairly and reasonably recognized that the prior art does properly support a

rejection of the claimed invention under 35 U.S.C. 103.

### Applicant's arguments:

**b) Applicant argues beginning in page 5 - 14 that** "B. Sorin and He Would Not

Have Led a POSITA to the Claimed Arrangement of Mirror(s) and Filters In Oostman's

Flow Cytometer Independent claim 1 also recites that each of the WDMs of the flow

cytometer comprises

"a plurality of filters" and "one or more mirrors." Each of the filters is "configured

to receive light such that[] a portion of light passes through the filter[] and another

portion of light is reflected by the filter." The mirror(s) each comprise "at least one

reflective surface" where "at least one of the reflective surface(s) of the one or more

mirrors is concave" and "the reflective surface(s) are configured to[] receive light

reflected by a filter of the plurality of filters[] and reflect light to another filter of the

plurality of filters." ...................................................................................

...................................

**Applicant argues that** "1. A POSITA Would Not Have Turned to Sorin or He to

Modify Oostman"

First, the Office, in evaluating obviousness, has not addressed "whether [a POSITA] would have plucked [Sorin and He] out of the sea of prior art and combined it with [Oostman]" to arrive at the claimed invention. WBIP, LLC v. Kohler Co., 829 F.3d 1317, 1337 (Fed. Cir. 2016).

In particular, neither Sorin nor He relates to Oostman's flow cytometer where the "optical instrument [is used] to stimulate scattering and fluorescence from fluorescent biological particulate matter." Oostman at Abstract. Rather, both Sorin and He relate to optical communications: .............................................................................................

..........................................................

**Applicant argues that**, ............the Office "cannot say that [Sorin or He] 'fairly suggests' that [their] teachings should be combined with those of [Oostman], since [they] nowhere suggest how to apply [their] teachings to" flow cytometers, and the Office has not otherwise shown that a POSITA would have made that leap. In re Bell, 991 F.2d 781, 785 (Fed. Cir. 1993).

**Applicant argues that............. 2. The Office Has Not Shown That Oostman's Flow Cytometer Suffered From the Problems That Sorin and He Purportedly Address**

Notwithstanding that a POSITA would not have turned to Sorin and/or He for the proposed modification of Oostman in the first place, the Office has not established that the purported benefits of their filter and mirror arrangements would have been applicable to Oostman.

**Applicant argues that ...... (1) The Office Has Not Shown Beam Divergence Was a Problem for Oostman's Flow Cytometer**

..........................., the Office has not shown that the beam in Oostman's flow cytometer would have required re-collimation.

..............., Oostman does not teach that its alleged filters-dichroic mirrors 25-44"- cause "beam divergen[ce], e.g., caused by diffraction" as "beam 28" travels through its alleged WDM or that any such beam divergence is problematic for its FIG. 1 flow cytometer. ...........................................................................................................

**Applicant argues that** ..., the alleged WDM in Oostman FIG. 1 and the alleged WDM in Sorin's FIG. 4 differ with respect to what portions of light their alleged filters-dichroic mirror 25-44" and "selective mirrors 450," respectively-allow to travel therethrough for wavelength division. Oostman at " [0003]-[0004], FIG. 1; Sorin at 1 [0043], FIG. 4. ...........................................................................

**Applicant argues that** ...., unlike the arrangement in Oostman's FIG. 1, in Sorin's FIG. 4 it is the reflected portions of light-not the transmitted portions-that travel through the alleged WDM and that, according to Sorin, may have "beam divergence, e.g., caused by diffraction." Compare Oostman at 1 [0003], FIG. 1 with Sorin at 1 [0043], FIG. 4.

**Applicant argues that** ...., Accordingly, even if Sorin's collimating mirrors 448 were beneficial for its system "to re-collimate the beam as [it] travels through the splitter 430" at least because the "beam travel[ling] through the splitter" comprised the reflected portions of light that were more-susceptible to beam divergence, the Office has not shown that a POSITA would have seen the same need for such collimating mirrors 448 in Oostman's FIG. 1 embodiment where the transmitted portions of light that did not

have the same susceptibility to beam divergence are what travel through the alleged WDM.

**Applicant argues that ...., (2) The Office Has Not Shown Tilting Errors Were a Problem for Oostman's Flow Cytometer**

"........................." the Office has not shown that Oostman's FIG. 1 flow cytometer suffered from such tilting errors and thus has not shown that a POSITA would have included a concave mirror like He's to address such errors. Action at 5-6; see also He at 5:5-24. ........................................................................

.....................

Nor has the Office shown that that a POSITA otherwise would have understood the arrangement of Oostman's dichroic mirrors 25-44 to give rise to such tilting- error issues, a showing that-again-the Office would not have been able to make in view of the differences between Oostman's FIG. 1 arrangement and the arrangement He addresses.

**Applicant argues that** ....... In particular, He addresses a specific problem that affected compact zigzag WDM modules like the module of He's FIG. 1 ......... .........

..........................................................................................................

............. He thus identified "a need for compact WDM modules that minimize the problem of error amplification and provide high tolerance for manufacturing with high yield" for these zigzag configurations. ...................................  ...............  ...............

............. He's proposed solution using "at least a concave mirror" in which "each of the concave mirrors is placed where an incident traveling distance of a light beam is substantially similar or equal to the reflected traveling distance of the light beam" was

thus meant for such zigzag configurations so "any tilting errors carried in the light beam are compensated by the light beam going to and reflecting from the concave mirror[(s)]."

…………,…………

**Further, Applicant argues that** On the other hand, as noted above and as shown below, in the alleged WDM of Oostman (see Action at 3), the dichroic mirrors 25-44 are serially arranged in a row on axis 24, not in the zigzag pattern that, per He, was susceptible to tilting error propagation. …………………,………………,…………………  ……,……

…… … …… ……… …………………………………………………………………………………………………………………………………………………………………………

…………………………………………………… Thus, while the "tilting error propagation" that He addresses affects zigzag WDM configurations where reflected legs are propagated throughout the WDM, in Oostman's FIG. 1 the transmitted legs are propagated throughout the WDM, with each of the "reflected leg[s]" merely being reflected to a single "detector PMT" in a manner that does not give rise to "tilting error propagation" to subsequent optical elements.

**Applicant argues that** …………………..., Accordingly, the Office has not identified any portion of this optical path in Oostman's FIG. 1 that experiences the kind of lateral and angular error amplification that He describes for zigzag compact WDM devices. Absent that predicate problem, He's compensating concave mirror has no demonstrated relevance to Oostman, rendering the Office's rationale premised on addressing "tilting errors" in Oostman's FIG. 1 unsupported (Action at 6).

**In conclusion, Applicant argues that** Because the Office has not shown that Oostman's dichroic mirrors 25-44 give rise to the "beam divergence" and "tilting error[]"

issues that the Office contends would have motivated the inclusion of a concave mirror

in Oostman's FIG. 1, the Office has not offered a creditable rationale to support the

obviousness rejection, which accordingly should be withdrawn as lacking rational

underpinnings. For at least these reasons, independent claim 1 and its dependent

claims are patentable over Oostman, Sorin, and He. Applicant respectfully requests

reconsideration and withdrawal of the rejections.


**Examiner's response:**


**With respect to argument (b),** it is respectfully pointed out to applicant that for

the same reasons as discussed above in relation to arguments (a), applicant

arguments regarding arguments (b) is/are not persuasive. Applicant has/have argue

specifically attacking references individually, wherein or whereas the rejection(s) is

based on obviousness and based on combinations of references. Applicant is

reminded that it is well settled that, one cannot show nonobviousness by attacking

references individually where the rejections are based on combinations of references.

See In re Keller, 642 F.2d 413, 208 USPQ 871 (CCPA 1981); In re Merck & Co., 800

F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986). In this case, the prior art cited references

Oostman, Sorin and He are fairly and reasonably concern with using wavelength-

division multiplexing (WDMs), (WDMs) a technology which multiplexes a number of

optical carrier signals onto a single optical fiber by using different wavelengths (i.e.,

colors) of laser light or using multiple light wavelengths to send signal over the same

medium is known in the art in order to monitoring and analyzing cytometer and/or multi-color flow cytometer considering the BRI, consistent with the instant specification. As such, the cited references are considered as an analogous art, and the reason to combine and the rejections is/are proper because one of ordinary skill at the time the invention was made would have fairly and reasonably recognized that the prior art does properly support a rejection of the claimed invention under 35 U.S.C. 103 as detailed above.

Additionally, it is respectfully pointed out to applicant that this/these argument(s) is/are not persuasive because Applicant have not provided any proof and/or any factual evidence that are not obvious and applicant has not provided any factual evidence that suggest or obviate the examiner's position would not have been obvious since the cited references are considered as an analogous art. Rather, the arguments merely appear to be a recitation with respect to the manner in which a claimed apparatus/device/system is intended to be employed which does not differentiate the claimed apparatus/device/system from a prior art apparatus/device/system. It is respectfully pointed out to applicant that these arguments are not persuasive because, it has been held that a recitation with respect to the manner in which a claimed apparatus/device/system is intended to be employed does not differentiate the claimed apparatus/device/system from a prior art apparatus satisfying the claimed structural limitations. Ex parte Masham, 2 USPQ 2d 1647 (1987). Further, Applicant is reminded that the test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references.

Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art. See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981). It is respectfully pointed out to applicant that these arguments are not persuasive because the fact that the inventor has recognized another advantage which would flow naturally from following the suggestion of the prior art cannot be the basis for patentability when the differences would otherwise be obvious. See *Ex parte Obiaya*, 227 USPQ 58, 60 (Bd. Pat. App. & Inter. 1985).

In conclusion, it is respectfully pointed out to applicant that these arguments are not persuasive since both the instant application claims (disclosure as published [par.0032]) and the prior art cited references Oostman, Sorin and He are fairly and reasonably concern with using wavelength-division multiplexing (WDMs), the cited references are considered as an analogous art, and the rejections under 35 U.S.C 103 is/are proper. It is respectfully pointed out to applicant that this/these argument(s) is/are not persuasive because applicant has not provided any factual evidence that suggest or obviate the examiner's position would not have been obvious since the cited references are considered as an analogous art. A dichroic or dichroic mirror - refers to any optical device which can split a beam of light into two beams with differing wavelengths. Such devices include mirrors and filters, usually treated with optical coatings, which are designed to reflect light over a certain range of wavelengths and transmit light which is outside that range. Each of the dichroic mirror(s) make-up or each of the dichroic mirror(s) is made up of plurality of filters (dichroic mirror(s) that include(s) optical filter that reflects some wavelengths (colors) of light and transmits

others), obviously the makeup includes plurality of filters and mirror(s). Therefore, it is respectfully pointed out to applicant that these arguments are not persuasive.

Finally, it is respectfully pointed out to applicant that this argument(s) (a) is/are not persuasive because one of ordinary skill before the effective filing date of the claimed invention and/or at the time the invention was made would have fairly and reasonably recognized that the prior art does properly support a rejection of the claimed invention under 35 U.S.C. 103 because the cited references are considered as an analogous art to instant applicant claims. As such, the rejections are proper, and the argument/remarks for request for reconsideration does not appear to place the application in condition for allowance, and the claims are still rejected as shown in the detail above.

### *Conclusion*

**THIS ACTION IS MADE FINAL.** Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE MONTHS from the mailing date of this action. In the event a first reply is filed within TWO MONTHS of the mailing date of this final action and the advisory action is not mailed until after the end of the THREE-MONTH shortened statutory period, then the shortened statutory period will expire on the date the advisory action is mailed, and any nonprovisional extension fee (37 CFR 1.17(a)) pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of the advisory action. In no event, however, will the

statutory period for reply expire later than SIX MONTHS from the mailing date of this final action.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Isiaka Akanbi whose telephone number is (571) 272-8658. The examiner can normally be reached on 8:00 a.m. - 4:30 p.m.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Tarifur R. Chowdhury can be reached on (571) 272-2287. The fax phone number for the organization where this application or proceeding is assigned is 703-872-9306.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).


/ISIAKA O AKANBI/
Primary Examiner, Art Unit 2877

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| BECKMAN COULTER, INC., | |
| Plaintiff, | C.A. No. 24-0945-CFC |
| v. |  |
| CYTEK BIOSCIENCES, INC., | |
| Defendant. | |

**PLAINTIFF BECKMAN COULTER, INC.'S REPLY BRIEF IN SUPPORT
OF ITS MOTION *IN LIMINE* NO. 1 TO PRECLUDE EVIDENCE,
TESTIMONY, OR ARGUMENT REGARDING UNASSERTED PATENTS
AND PATENT APPLICATIONS IN SUPPORT OF CYTEK'S NON-
INFRINGEMENT, INVALIDITY, OR DAMAGES ARGUMENTS**

| Abbreviation | Term |
|---|---|
| Cytek's IP | Cytek's patents and patent applications |
| Beckman's Pending IP | Beckman Coulter's pending patent applications |
| Beckman's Unrelated IP | Beckman Coulter patents and patent applications not in the family of the Asserted Patents |
| '106 Patent | U.S. Patent Nos. 12,174,106 |
| '412 Patent | U.S. Patent Nos. 9,746,412 |

**TABLE OF EXHIBITS**[1]

| Exhibit No. | Exhibit |
|---|---|
| 8 | File History of U.S. Patent No. 9,746,412 |
| 9 | Expert Rebuttal Report of John L. Hansen, Jan. 20, 2026 |

---

[1] Exhibits cited in this reply as "Ex. ___" are attached to the Declaration of L. Matlock-Colangelo, filed as an attachment to this Motion.

Cytek does not dispute most of Beckman's Motion,[2] and largely attacks strawmen.[3] Its other arguments fail. ***First***, Cytek cannot use ***examiner statements*** about ***Cytek's IP*** or ***Beckman's Unasserted IP*** to establish a POSA's understanding of the Asserted Claims. *See Salazar*, 414 F.3d at 1347 (no acquiescence to unilateral examiner statements).[4] Cytek does not establish that the examiners were, in fact, POSAs and risks confusing jurors into substituting examiners' findings for their own judgment. Cytek's approach would require a wasteful "mini trial" on out-of-court statements from *ex parte* proceedings, which would require rebuttal evidence that, e.g., Cytek's cited examiner addressed a ***different*** art combination not at issue here (Opp.3), and another examiner found telecoms and cytometry art references would ***not*** have been combined (Ex.8). ***Second***, Cytek's IP is irrelevant to RDOE (Opp.1) and, unlike in *Sprint*, Cytek offers no expert opinion that the Accused Products practice Cytek's IP. Br. n.3. ***Third***, Cytek cites (Opp.2-3) no case holding that "unrelated" patents affect the Asserted Claims, § 112, or RDOE. ***Fourth***, Cytek should not be presenting claim construction arguments (Opp.3) to the jury.

---

[2] Cytek does not rebut that (1) non-assertion of the '412 and '106 Patents is irrelevant; (2) Cytek's IP is irrelevant to infringement and willfulness and could mislead the jury; (3) Cytek's IP is not prior art; (4) Cytek's IP does not affect damages; and (5) Beckman's Pending IP would confuse the jury.

[3] Beckman does not seek to exclude the Frazier reference in Cytek's obviousness grounds (Opp.1), or use of the '412 and '106 Patents to establish a priority date (Opp.2-3). And Beckman will not use Cytek's IP (Opp.2) if MIL 1 is granted.

[4] *Johns Hopkins* (Opp.3) involved abandonment, not examiner statements. 2018 WL 4178159, at *7.

1

OF COUNSEL:

Robert J. Gunther, Jr.
Omar A. Khan
Jeffrey A. Dennhardt
Laura Macro
Lauren Matlock-Colangelo
Jennifer L. Graber
Maggie Sawin
Kelly A. Todd
WILMER CUTLER PICKERING
HALE and DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

James Dowd
WILMER CUTLER PICKERING
HALE and DORR LLP
350 South Grand Avenue
Suite 2400
Los Angeles, CA 90071
(213) 443-5300

Akkad Y. Moussa
WILMER CUTLER PICKERING
HALE and DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

Dated:  July 15, 2026

<u>*/s/ Frederick L. Cottrell III*</u>
Frederick L. Cottrell III (#2555)
Kelly E. Farnan (#4395)
Christine D. Haynes (#4697)
RICHARDS, LAYTON & FINGER,
P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
farnan@rlf.com
haynes@rlf.com

*Attorneys for Plaintiff*

2

**CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2026, true and correct copies of the foregoing

document were served upon the following counsel of record in the manner indicated:

| **BY E-MAIL** | **BY EMAIL** |
|---|---|
| Karen Jacobs | Reuben H. Chen |
| Jeremy A. Tigan | Cooley LLP |
| Cameron P. Clark | 3175 Hanover Street |
| Morris, Nichols, Arsht & Tunnell LLP | Palo Alto, CA 94304 |
| 1201 N. Market Street | |
| P. O. Box 1347 | Elizabeth M. Flanagan |
| Wilmington, DE  19801 | Cooley LLP |
| | 30 S. 9th Street, 7th Floor |
| | Minneapolis, MN 55402 |
| | |
| | Adam Pivovar |
| | Dustin M. Knight |
| | Rosalynd D. Upton |
| | David Yun |
| | Cooley LLP |
| | 1299 Pennsylvania Avenue NW |
| | Suite 700 |
| | Washington, DC 20004 |

*/s/ Christine D. Haynes*
Christine D. Haynes (#4697)
haynes@rlf.com

| | |
|---|---|
| BECKMAN COULTER, INC., | |
| Plaintiff, | |
| v. | C.A. No. 24-0945-CFC |
| CYTEK BIOSCIENCES, INC., |  |
| Defendant. | |

**DECLARATION OF LAUREN MATLOCK-COLANGELO IN SUPPORT OF
PLAINTIFF BECKMAN COULTER, INC.'S REPLY BRIEFS IN
SUPPORT OF ITS MOTIONS *IN LIMINE***

I, Lauren Matlock-Colangelo, declare as follows:

1. I am licensed to practice law in the State of New York and have been admitted to this Court *pro hac vice* by Order dated September 3, 2024. D.I. 8 (so ordered).

2. I am an attorney with the law firm of Wilmer Cutler Pickering Hale and Dorr LLP, located at 7 World Trade Center, 250 Greenwich Street, New York, New York 10007, and counsel for Plaintiff Beckman Coulter, Inc. ("Beckman Coulter").

3. I have personal knowledge of the facts set forth herein and with the proceedings in this case, and if called to testify, I would competently testify thereto.

4. I submit this Declaration in support of the following oppositions by Beckman Coulter:

> a. Plaintiff Beckman Coulter, Inc.'s Reply Brief in Support of Its Motion *in Limine* No. 1 to Preclude Evidence, Testimony, or Argument Regarding Unasserted Patents and Patent Applications in Support of Cytek's Non-Infringement, Invalidity, or Damages Arguments

> b. Plaintiff Beckman Coulter, Inc.'s Reply in Support of its Motion *in Limine* No. 2 to Preclude Evidence, Testimony, or Argument Regarding Non-Party Danaher Corporation, Speculation Regarding Danaher's Purported Mental State to Argue Non-

2

Infringement, and Danaher's Non-Comparable Valuation of Cytek to Suppress Damages

    c.  Plaintiff Beckman Coulter, Inc.'s Reply in support of Its Motion *in Limine* No. 3 to Preclude Evidence, Testimony, or Argument That the Timing of This Lawsuit Evidences Non-Infringement or Impacts Damages

5.    A true and correct copy of excerpts from the File History of U.S. Patent No. 9,746,412, are attached hereto as **Exhibit 8**.

6.    A true and correct copy of excerpts from the Expert Rebuttal Report of John L. Hansen, dated January 20, 2026, are attached hereto as **Exhibit 9**.

7.    I declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 15th day of July, 2026.

/s/    Lauren E. Matlock-Colangelo

Lauren E. Matlock-Colangelo

# CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2026, true and correct copies of the foregoing

document were served upon the following counsel of record in the manner indicated:

**BY E-MAIL**

Karen Jacobs
Jeremy A. Tigan
Cameron P. Clark
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P. O. Box 1347
Wilmington, DE  19801

**BY EMAIL**

Reuben H. Chen
Cooley LLP
3175 Hanover Street
Palo Alto, CA 94304

Elizabeth M. Flanagan
Cooley LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402

Adam Pivovar
Dustin M. Knight
Rosalynd D. Upton
David Yun
Cooley LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004

*/s/ Christine D. Haynes*
Christine D. Haynes (#4697)
haynes@rlf.com

# EXHIBIT 8

and focusing elements to form a beam emitted from a light source, and a photomultiplier tube to detect the beam. *See Oostman*, at col. 6, lns. 40-49. In *Oostman*, the photomultiplier tube is used to detect light emitted from a pinhole or a multimode optical fiber (common light source of the detector) in fluorescence detection instrument, e.g., flow cytometer. The size of an object of such light source is usually measured in millimeters. *See* specification, on p. 69, lns. 19-22; *see also Oostman*, at col. 10, lns. 25-47. However, such light source has an etendue hundreds of times greater than that of a laser beam out of a single mode optical fiber, and, therefore, it is more difficult to focus a beam from such light source down to a small size. *See* specification, on p. 69, lns. 1-8. As such, a photomultiplier tube, as illustrated by *Oostman* in detail, instead of a semiconductor detector with a small active area, is normally used to detect light with greater etendue in fluorescence detection instrument in the prior art. *Id.*

On the contrary, *Capewell* teaches an optical communication system that includes multiple optical assemblies to collimate and redirect a beam emitted from a light source, and a detector to detect the beam. *See Capewell*, at ¶s [0002] and [0039]. In *Capewell*, the detector is used to detect light emitted from a point light source, such as a single mode optical fiber, in a WDM to be used with a communication system. *Id.*, at ¶ [0030]. The size of an object of such point light source is usually measured in micrometers. *See* specification, on p. 69, lns. 22-23; *see also Capewell*, at ¶ [0049]. As such, such point light source has much less etendue than a bigger light source. *See* specification, on p. 69, lns. 1-8.

From the foregoing, it is clear that *Oostman* and *Capewell* discuss different kinds of optical systems (fluorescence detection instrument v. optical communication system) with different sizes of light sources. The Office Action fails to provide any explicit analysis to support the combination of optical elements from different kinds of optical systems, as taught by *Oostman* and *Capewell*. For instance, the Office Action asserts that since *Capewell* has disclosed that the size of the focused light beam can be minimized in order to maximize the tolerance to detector misalignment, it would have been obvious to one of ordinary skill in the art to modify the focusing element of *Oostman* to be able to focus to a size smaller than the object of the extended light source. *See* Office Action, on p. 4. However, the Office Action fails to address *how* to modify a focusing element in *fluorescence detection instrument* with a focusing

element in an *optical communication system* to focus a beam to a size smaller than the object of the extended light source to a first semiconductor detector, as claimed. *See In re Kumar*, 418 F.3d 1361, 1369 (Fed. Cir. 2005) ("To render a later invention unpatentable for obviousness, the prior art must enable a person of ordinary skill in the field to make and use the later invention."). As discussed above, it is more difficult to focus a beam with greater etendue in fluorescence detection instrument than to focus a beam with less etendue in an optical communication system.

According to the above, a *prima facie* conclusion of obviousness has not been established. *Oostman* in view of *Capewell* fails to render claim 364 obvious. Hence, Applicant respectfully requests that the Examiner withdraw the rejection under 35 U.S.C. § 103(a) of claim 364.

### 2. Dependent claims 366-379

#### a. Claim 366

Claim 366 recites that "an image relay optical element arranged to receive a color band of interest of the first light beam, the image relay optical element configured to project a second image as a second light beam, wherein the second light beam is substantially a unit magnification of the first light beam." The Office Action asserts that *Oostman* has disclosed the above features. *See* Office Action, on ps. 4-5. In particular, the Office Action asserts that beam splitting element 151 in *Oostman* meets the image relay optical element as claimed. *Id.* Applicant respectfully disagrees with such assertion.

For example, *Oostman*'s beam splitting element 151 does *not receive a color band of interest* of the first light beam as the claimed image relay optical element does. Instead, *Oostman*'s beam splitting element 151 receives beam 147 output from a fiber *in its entirety* and splits beam 147 into beam 155 and beam 153. *See Oostman*, at col. 6, lns. 45-47 and 55-57. Further, the cited selections of *Oostman* do not teach or suggest the size of beam 147 received by beam splitting element 151, or beams 155 and 153 output from beam splitting element 151. In fact, controlling the beam size is important for a WDM. As specified in the specification, utilizing an image relay optical element to extend a collimated beam path without expanding the

## DETAILED ACTION

The present application is being examined under the pre-AIA first to invent provisions.

### *Response to Arguments*

Applicant's arguments, see page 8, filed October 27, 2016, with respect to independent claim 364 have been fully considered and are persuasive. Upon reconsideration, Capewell suggests minimizing the size of the image to maximize the optical energy and tolerance to detector misalignment. However, there's no teaching to focus the light beam to **a size smaller than the object**. Therefore, the rejection of claim 364 and those depend from 364 has been withdrawn.

Thus, claims 364-382 and 387 are allowed.

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to MINDY VU whose telephone number is (571)272-8539. The examiner can normally be reached on M-F 9am - 5:30pm.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Dave Porta can be reached on 571-272-2444. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

# EXHIBIT 9

# Beckman Coulter, Inc.

## v.

## Cytek Biosciences, Inc.

## Civil Action No. 1:24-cv-00945-CFC

## Expert Rebuttal Report of John L. Hansen

## HKA Global, LLC

## January 20, 2026

John L. Hansen

both Danaher's Life Sciences and Diagnostics business segments.[14] Beckman Coulter's life sciences offerings include centrifuges, air and liquid particle counters, genomic instruments, microbioreactors, and flow cytometers.[15] Beckman Coulter's Life Sciences division contains two further portfolio groups: Biotech and Flow Cytometry.[16] The Flow Cytometry division is further divided into Clinical and RUO (Research Use Only) subdivisions.[17] Previously, the CHC (Cell Health and Centrifuge) and BWS (Biotech Workflow Solutions) stood alongside the Flow Cytometry division, but the two groups have since been collapsed into the single Biotech group, which now exists alongside the continued Flow Cytometry division.[18]

## B. Danaher Corporation

18. Danaher is the Parent Company of Beckman Coulter.[19] Danaher is a Delaware corporation headquartered in Washington, D.C.[20] Danaher describes itself as comprising 15 operating companies within the biotechnology, life sciences, and diagnostics industries.[21] In 2024, Danaher's Diagnostics business segment was the largest revenue-generating division with nearly $9.8 billion in revenue followed by Life Sciences ($7.3 billion) and Biotechnology ($6.8 billion).[22]

## C. Cytek Biosciences, Inc.

19. Cytek was founded in 2014 as is headquartered in Fremont, California.[23] Cytek is a cell analysis solutions company offering a number of flow cytometers including its Northern Lights, Aurora, Guava, and Amnis product lines.[24] The company offers additional

---

[14] Danaher Corporation, SEC Form 10-K for the Fiscal Year ended December 31, 2024, pp. 5-7.
[15] https://www.beckman.com/shop.
[16] Deposition of Patricia Del Castillo (Director of Finance at Beckman), October 24, 2025: p. 9.
[17] Deposition of Patricia Del Castillo (Director of Finance at Beckman), October 24, 2025: p. 9.
[18] Deposition of Patricia Del Castillo (Director of Finance at Beckman), October 24, 2025: pp. 18-20.
[19] Danaher Corporation, SEC Form 10-K for the Fiscal Year ended December 31, 2024, p. 5, Exhibit 21.1.
[20] Danaher Corporation, SEC Form 10-K for the Fiscal Year ended December 31, 2024: p. 1.
[21] Danaher Corporation, SEC Form 10-K for the Fiscal Year ended December 31, 2024, p. 3.
[22] Danaher Corporation, SEC Form 10-K for the Fiscal Year ended December 31, 2024, p. 38.
[23] Cytek Biosciences, Inc., SEC Form 10-K for the Fiscal Year ended December 31, 2024, p. 20.
[24] Cytek Biosciences, Inc., SEC Form 10-K for the Fiscal Year ended December 31, 2024, pp. 4-5.
https://cytekbio.com/pages/aurora; https://cytekbio.com/pages/northern-lights;
https://cytekbio.com/pages/imagestream; https://cytekbio.com/pages/guava. See also,
https://cytekbio.com/pages/muse-micro; https://cytekbio.com/pages/orion.