IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BECKMAN COULTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C. A. No.  24-945-CFC |
| | ) | |
| v. | ) | ██████████████ |
| | ) | |
| CYTEK BIOSCIENCES, INC., | ) | |
| | ) | **REDACTED - PUBLIC VERSION** |
| Defendants. | ) | |
| | ) | |

**EXHIBIT 21**

**CYTEK'S MOTION *IN LIMINE* NO. 3
OPENING, ANSWERING AND REPLY**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BECKMAN COULTER, INC.,           )
                                 )
        Plaintiff,               )        C. A. No.  24-945-CFC
                                 )
        v.                       )
                                 )
CYTEK BIOSCIENCES, INC.,         )
                                 )
        Defendants.              )
                                 )

**CYTEK'S MOTION *IN LIMINE* NO. 3 TO EXCLUDE EVIDENCE,
TESTIMONY, AND ARGUMENT RELATING TO THE COURT'S
COMMENTARY REGARDING CLAIM CONSTRUCTION**

Cytek moves to exclude any evidence, testimony, and argument relating to the Court's commentary regarding claim construction from the two *Markman* hearings (Ex. 1 (8/21/2025 Tr.); Ex. 2 (9/17/2025 Tr.)) and the February 24, 2026 Order (Ex. 3 (D.I. 226))—aside from the Court's formally adopted claim constructions—under Fed. R. Evid. 402 and 403.  The Court's constructions will be read aloud during jury instructions and provided in the juror binders.  This is sufficient to inform the jury which constructions to apply when deciding infringement and invalidity.  To be sure, Cytek's motion would preclude either party from arguing that its own or the other party's proposed construction was adopted or rejected by the Court.  Cytek's motion would not, however, preclude an expert from explaining the plain meaning of a term, or opining that the claim terms "collimate," "collimating," "collimated beam" and "image" are indefinite.  Indeed, the Court reserved the issue of indefiniteness on these terms.  (*See* Ex. 1 at 133:11-15 (collimating, collimate, and collimated beam: "I'm not going to construe this term.  I'm going to give it its plain and ordinary meaning.  I do think it raises, though serious concerns about indefiniteness."); Ex. 2 at 205:22-206:6 (image:  "[A]s I've alluded to earlier is, there's some issues that [] my antenna says aren't right with some of this patent, issue[s] like a collimated afocal image. … It just doesn't make a lot of sense.").)  Similarly, a party should not be permitted to argue that the Court's adoption of plain meaning precludes indefiniteness or indicates definiteness.

1

Discussion of the claim construction hearings and order—including the Court's reasoning and other dicta—would be prejudicial and potentially confusing to the jury. *See, e.g.*, *Integra Lifesciences Corp. v. HyperBranch Med. Tech., Inc.*, C.A. No. 15-819-LPS-CJB, 2018 WL 2186677, at *1 (D. Del. May 11, 2018) (refusing to inform jury about pre-trial rulings "other than providing the jury the Court's claim constructions, but not the Court's claim construction opinion or reasoning" due to prejudice, confusion, and waste of time).  Courts routinely grant motions to exclude references to claim construction orders aside from the adopted constructions. *E.g.*, *id.* ("exclud[ing] evidence and arguments relating to the Court's pre-trial rulings"); *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, No. 17-1390-LPS, 2021 WL 5275780, at *2 (D. Del. Nov. 10, 2021) ("exclud[ing] any argument or evidence relating to the Court's prior rulings or orders (other than the Court's final claim constructions)"); *Tot Power Control, S.L. v. Apple, Inc.*, C.A. No. 21-1302-MN, D.I. 437, at ¶ 5 (D. Del. June 20, 2025) (precluding any references to positions taken during claim construction or the court's statements in the claim construction order) (Ex. 4)[1]; *accord France Telecom S.A. v. Marvell Semiconductor Inc.*, No. 12-cv-04967-WHO, 2014 WL 4272771, at *1 (N.D. Cal. Aug. 28, 2014).

---

[1] *Id.*, D.I. 436-1, at Ex. 14 (plaintiff's motion *in limine* No. 1) (Ex. 5); *id.*, D.I. 434 at 13:14-15:21 (pretrial conference transcript discussing plaintiff's motion *in limine* No. 1) (Ex. 6).

Here, the risk of confusion far outweighs any potential probative value of informing the jurors of the parties' competing proposed constructions or the Court's underlying rationale for choosing one proposed construction over another. *E.g., Sunoco*, 2021 WL 5275780, at *2 ("Even assuming there would be some probative value in informing the jury of the Court's prior rulings, that value would be substantially outweighed by the countervailing concerns of Federal Rule of Evidence 403, including confusing the jury, wasting time, and unfairly prejudicing Sunoco."); *accord Integra*, 2018 WL 2186677, at *1. This evidence may lead the jurors to infer that the Court supports one party's ultimate infringement and invalidity positions over another, thus wrongly influencing the jurors and usurping their role as fact-finder. *See id*. Accordingly, the Court should preclude any evidence, testimony, or argument relating to the Court's commentary regarding claim construction from the two *Markman* hearings (Exs. 1-2) and the February 24, 2026 Order (Ex. 3)—aside from the actual adopted constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Reuben H. Chen
Alexandra Leeper
Juan Pablo González
HanByul Chang
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

Elizabeth M. Flanagan
COOLEY LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402

Adam Pivovar
Dustin M. Knight
David Yun
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 842-7800

Dated: June 26, 2026

*/s/ Jeremy A. Tigan*
Karen Jacobs (#2881)
Jeremy A. Tigan (#5239)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
kjacobs@morrisnichols.com
jtigan@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Defendant*
*Cytek Biosciences, Inc.*

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BECKMAN COULTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C. A. No.:  24-0945-CFC |
| | ) | |
| v. | ) | |
| | ) | |
| CYTEK BIOSCIENCES, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PROPOSED ORDER GRANTING CYTEK'S MOTION *IN LIMINE* NO. 3 TO EXCLUDE EVIDENCE, TESTIMONY, AND ARGUMENT RELATING TO THE COURT'S COMMENTARY REGARDING CLAIM CONSTRUCTION**

On this _____ day of _____, 2026, the Court having considered Cytek Biosciences Inc.'s ("Cytek's") Motion *in Limine* to Exclude Evidence, Testimony, and Argument Relating to the Court's Commentary Regarding Claim Construction, and all papers and arguments submitted therewith,

IT IS ORDERED that the motion is GRANTED.  Cytek and Plaintiff Beckman Coulter, Inc. (collectively, "Beckman Coulter") are PRECLUDED from introducing any evidence, testimony, and argument relating to the Court's commentary regarding claim construction from the two *Markman* hearings (Ex. 1 (8/21/2025 Tr.); Ex. 2 (9/17/2025 Tr.)) and the February 24, 2026 Order (Ex. 3 (D.I. 226))—aside from the Court's formally adopted constructions.  The parties are

5

PRECLUDED from arguing that either party's proposed construction was adopted or rejected by the Court.  This Order does NOT preclude experts from explaining the plain and ordinary meaning of a term, or opining on whether the claim terms "collimate," "collimating," "collimated beam" and "image" are indefinite.  The parties are also PRECLUDED from arguing that the Court's adoption of plain meaning for these terms precludes indefiniteness or indicates definiteness.

Dated: _____          _____
                                    United States District Court Judge

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BECKMAN COULTER, INC.,          )
                                )
          Plaintiff,            )
                                )  C.A. No. 24-945-CFC
     v.                         )
                                )
CYTEK BIOSCIENCES, INC.,        )
                                )
          Defendant.            )
                                )

Thursday, August 21, 2025
12:58 p.m.
Markman Hearing

844 King Street
Wilmington, Delaware

BEFORE: THE HONORABLE COLM F. CONNOLLY
United States District Court Judge

APPEARANCES:

          RICHARDS, LAYTON & FINGER
          BY:  CHRISTINE D. HAYNES, ESQ.
          BY:  FREDERICK L. COTTRELL III, ESQ.

          -and-

---

APPEARANCES CONTINUED:

          WILMERHALE
          BY:  OMAR KAHN, ESQ.
          BY:  JEFFREY DENNHARDT, ESQ.

               Counsel for the Plaintiff


          MORRIS NICHOLS ARSHT & TUNNELL
          BY:  KAREN JACOBS, ESQ.

          -and-

          COOLEY LLP
          BY:  REUBEN CHEN, ESQ.
          BY:  ADAM PIVOVAR, ESQ.
          BY:  DUSTIN KNIGHT, ESQ.
          BY:  BETSY FLANAGAN, ESQ.
          BY:  ROSALYND UPTON, ESQ.

               Counsel for the Defendant

          _ _ _ _ _ _ _ _ _ _

               P R O C E E D I N G S

     (Proceedings commenced in the courtroom beginning at 12:58 p.m.)

          **THE COURT:**  Good afternoon.  Please be seated.

          **MS. HAYNES:**  Good afternoon, Your Honor. Christine Haynes on behalf of the plaintiff, Beckman

---

Coulter.  With me from my office is Fred Cottrell.

          Also with me are my cocounsel, Omar Khan and Jeffrey Dennhardt from Wilmer Hale, and from our client, Mony Ghose and Mike Levy.

          **THE COURT:**  All right.  Thank you.

          Ms. Jacobs.

          **MS. JACOBS:**  Good afternoon, Your Honor. Karen Jacobs from Morris Nichols for Cytek Biosciences, and we have here with us today Reuben Chen.

          **MR. CHEN:**  Good afternoon, Your Honor.

          **MS. JACOBS:**  Adam Pivovar, Dustin Knight, Betsy Flanagan, Rozzie Upton, all from Cooley.

          And Mr. Chen Mr. Pivovar, and Mr. Knight will be taking the lead in the arguments today.

          **THE COURT:**  Okay.  Great.  Thank you.

          Just give me a second.

          Okay.  Let's begin.  Plaintiff, you guys want to go first?

          **MR. KHAN:**  Thank you, Your Honor.  Omar Khan for plaintiff Beckman Coulter.

          So this is a case as Judge, you know, about flow cytometers.  And with the Court's indulgence, I'm just going to talk a little bit about the basic concepts just to flow into the rest of the claim construction, just for a couple of minutes.

---

          So what we have on Slide 3 of the demonstratives, which I think we've handed up to the Court now, is sort of a conceptual drawing that's often depicted in textbooks or in treatises about the very high-level conceptual operation of a flow cytometer. And, essentially, you have a laser -- cells passing through a flow cell, and then the laser is hitting the flow cell, the cells in the flow cell, and there are dyes on the cells that then emit fluorescence or scatter that are then detected by the detectors.

          And that's sort of a conceptual overview, like I said, that's often depicted or discussed in various treatises and textbooks and tutorials.

          Here, in the prior art and commercial embodiments that were present at the time of the invention, flow cytometers were rather large and bulky. I don't know whether we are having some technical issues.  We're good.

          So were rather large and bulky, often took up half of a room, or third of a room.  And one of the things that the prior art flow cytometers had was a photo multiplier tube.  This was a detector agent, the detector all the way to the right of the conceptual figure that I had, Your Honor, at the beginning.

          And the photo multiplier tubes were fragile,

they were large, and they were expensive. And this was a recognized problem in the industry at the time.

At the time it was also known that there were these smaller, more efficient, more sensitive detecters known as APDs, or Avalanche photodiode. And there was a problem in the industry of being able to -- not being able to use APDs in flow cytometers. And that's really one of the problems that the patents are trying to solve.

And what they do, and Dr. Chen invented, essentially the combination, a unique WDM, a wavelength division multiplexing scheme that, essentially, combines a WDM architecture with APDs where the light that comes in is peeled off in successive layers through this zigzag pattern. And there's also a picture of what became the ultimate commercial embodiment of the Beckman Coulter CytoFLEX products, which have been an incredible success in the marketplace.

Just to see what this looks like in practice, we have a short video. This is just a commercial video from the Beckman Coulter website that shows how the flow cytometer works.

So if we sort of zoom in and then open up the hood, what you have, essentially, is the -- this is the fiber that's coming from the flow cell. So light is passing through here. These are the optical filters, these are the mirrors. And the APDs are back here, all the way at the end.

And each WDM has optical and detector components and this improves, as we have been talking about, the sensitivity.

The CytoFLEX was marketed as the first commercial flow cytometer that had advanced photo -- Avalanche photo multiplier tubes -- or APDs, sorry.

And, again, the idea was to peel back each of the wavelengths in successive intervals every time you go through the zigzag pattern. And on the video again, on the commercial website, we have a depiction of that as well.

So, again, the light is coming through from the flow cell. This is the zigzag pattern that's created. The light is bouncing around between the filters and the mirror. This is the mirror, and a curved mirror on this end. These are the filters. You can see on the back individual wavelengths of light are coming through and being detected by the APDs on this end.

And so this was the design that was one of the embodiments that was described in the specification. Very importantly for this case, and for the claim

construction proceedings here today, that embodiment was described very clearly as an exemplary embodiment, and it's described as illustrative and nonlimiting.

There's not going to be in this case a statement of the invention or a disclaimer or a definitional statement that's going to limit any of the claim terms here to that embodiment.

THE COURT: So would you agree that there is no preferred embodiment in the written description?

MR. KHAN: This is one of the preferred embodiments.

THE COURT: I thought "preferred" is you have one.

MR. KHAN: You can have multiple preferred embodiments in the --

THE COURT: Do you have any case law that says that?

MR. KHAN: I believe there is case law, and we're happy to submit it to the Court, if that would be of interest.

Usually, that's how the specifications, Your Honor, are structured, which is you have sort of a number of different preferred embodiments in the specification that are described and disclosed. And in this case, I think even in this patent, the word

"preferred" is used to describe a number of different disclosures and different embodiments.

THE COURT: Do you want to show me? You're saying in the written description itself, it refers to multiple embodiments as preferred?

MR. KHAN: So --

THE COURT: I don't think the word "preferred" is in the '582 patent, is it?

MR. KHAN: It's described sometimes as exemplary.

THE COURT: I know. But you said it was preferred. I mean, that's what you said.

MR. KHAN: Right.

THE COURT: When I do a word search of the '582 patent, the word "preferred" doesn't come up, but my search engine might be wrong.

MR. KHAN: I don't doubt, Your Honor, that the word "preferred" is not used.

THE COURT: Oh, okay. Well, I thought that was pretty important. So, actually, the patent doesn't identify the preferred embodiment?

MR. KHAN: It identifies a number of exemplary embodiments.

THE COURT: Right. So I heard that.

MR. KHAN: Okay.

THE COURT: Just answer my question.

MR. KHAN: Yes.

THE COURT: It doesn't identify a preferred embodiment, correct?

MR. KHAN: It doesn't use those words, but it's pretty clear, Your Honor, from the overall disclosure, that Figure 25 is being discussed and depicted as a preferred embodiment, if we can use that term. And there are exemplary embodiments, of which that is one, for sure.

THE COURT: But the case law, it matters, right? Case law distinguishes between an exemplary and a preferred embodiment, right?

MR. KHAN: Correct, Your Honor.

THE COURT: How does it do so?

MR. KHAN: I'm sorry?

THE COURT: How does it do so? You just said it does distinguish it. Tell me how.

MR. KHAN: One of the ways is that the claims can't -- of course, can't be limited to -- either to exemplary or preferred embodiments.

But in this case, Your Honor, I think what the Cytek is doing is essentially arguing that Figure 25 is the invention itself.

THE COURT: Put that aside. Go to the legal

point. You agreed, you said the case law distinguishes between preferred and exemplary. Can you tell me how it does?

MR. KHAN: I think -- you know, it's not exactly going to be sort of crystal clear in the case law, Your Honor, just to be honest.

I think the idea is that in the specification, there are going to be -- there are certain embodiments that are the focus of the specification that are disclosed as sort of what ultimately in this case became the commercial embodiment, right? And those might be viewed as preferred, even if they're not termed as preferred.

THE COURT: Let me ask you this, then. I'm not getting a real straight answer.

Are all the exemplary embodiments preferred embodiments?

MR. KHAN: I don't think we could go that far, Your Honor. Right.

THE COURT: Okay. So how do I tell the difference in the written description of the '582 patent what's a preferred embodiment versus what's an exemplary embodiment?

MR. KHAN: Yeah. Absent the use of the term "preferred" --

THE COURT: Well, we've already agreed the term "preferred" is not in there, right?

MR. KHAN: Right.

THE COURT: I mean, isn't that a starting point?

MR. KHAN: Yes. Yes, Your Honor.

THE COURT: Okay. So since the term "preferred" isn't in there and since you are saying there are preferred embodiments that are disclosed in the '582 written description, and since you're saying there's a difference between preferred and exemplary, tell me, what should I do when I read the '582 patent to discern what's a preferred embodiment versus what's an exemplary embodiment?

What do I do? How do I do that?

MR. KHAN: I think absent the use of the word "preferred," it would mostly be sort of how much of the specification is discussing the various embodiments, and Figure 25 is subject of a significant amount of discussion.

So I think it would be fair, even though it doesn't say the word "preferred," that it is a preferred.

For purposes of claim construction, the preferred embodiment, essentially, the claims can't be

limited to the preferred embodiment, they can't be limited to exemplary embodiments. For purposes of claim construction, sometimes, under some circumstances, there is case law that says the claims should be interpreted to encompass the preferred embodiment.

And so that -- to the extent it matters for the Court, that's the implication of preferred or exemplary. Usually that's the only -- that's one of the few implications of that outcome.

THE COURT: Hold up, please.

MR. KHAN: Yes.

THE COURT: I'm going to ask you to clarify. I mean, the transcript, which obviously we're doing it real time, so it may not be exactly right. The court reporter is pretty good, but it says you said, according to this transcript, For purposes of claim construction, the preferred embodiment, essentially, the claims can't be limited to the preferred embodiment. They can't be limited to exemplary embodiments. For purposes of claim construction, sometimes, under some circumstances, there is case law that says the claims should be interpreted to encompass the preferred embodiment, and so that to the extent it matters for the Court, that's the implication of preferred or exemplary.

No offense, but I still don't know what you

are saying.

MR. KHAN: Right.

THE COURT: So I want you to help me out.

So I understand that there's cases out there that say you can't interpret a claim to exclude a preferred embodiment.

MR. KHAN: Exactly, Your Honor.

THE COURT: Okay.

I don't know of a case that... and I'm asking. There might be one. Is there a case that says you can't construe a claim to not cover an exemplary embodiment?

MR. KHAN: There's not. I don't believe that there's that kind of a case, correct, Your Honor.

THE COURT: Okay. And how many claims do we have in this patent? I mean, we have a bunch of patents, so let's say the '582.

Fair enough, we have more than one claim for every patent?

MR. KHAN: That is correct, Your Honor.

THE COURT: Do we have more than one independent claim for every patent?

MR. KHAN: Yes, sir. Yes, Judge.

THE COURT: Okay. So then, why shouldn't I...

And you agree under the case law, this is

really clear, each claim is a separate invention, right?

MR. KHAN: Each claim is a separate invention that, in principle, could be directed to a different exemplary embodiment, yes.

THE COURT: Right. So if I have at least two independent claims for every patent, they are independent of each other, why should I be worried in interpreting one claim about whether I read or don't read out an embodiment?

MR. KHAN: Generally speaking, Your Honor, we shouldn't be worried about that.

THE COURT: Okay.

MR. KHAN: Right? And I think sometimes what we're trying to illustrate to the Court in the briefing, and we're going to do try to do today, is we're going to use some aspects of what we're now calling the most exemplary embodiment, if I can put it that way.

THE COURT: Oh, "the most exemplary." Okay. And that's Figure 25?

MR. KHAN: And that, I think, would be Figure 25.

THE COURT: And it's the most exemplary?

MR. KHAN: Well, I don't -- I am using that colloquially. I'm saying that that is an --

THE COURT: I don't even know what colloquial

means, in terms of patent construction, so...

MR. KHAN: Right. What I'm basically trying to suggest, Your Honor, is that Figure 25, we would agree, is the embodiment in the patent that is the subject of greatest discussion.

It is -- you're right, it is only described as an exemplary embodiment. The word "preferred" I don't think is in there.

But for our purposes, Your Honor, the claims don't -- should not be limited to any of the exemplary embodiments or to any of the preferred embodiments. And I think that's what we're saying.

And -- but there are -- you know, aspects of Figure 25 may be relevant to understanding particular claim terms and understanding how they should be understood in the intrinsic evidence in light of the state of the art.

THE COURT: Right. But it would be perfectly consistent with the case law for one claim, one independent claim to read on Figure 25 and for another independent claim of the patent to not read on 25, right?

MR. KHAN: That would be consistent with the case law.

THE COURT: That would be allowed?

MR. KHAN: That would be allowed in a -- it

would not impermissible in a multi-patent, multi-claim, multi-independent claim situation. There's no requirement that every single independent claim cover the preferred embodiment.

THE COURT: Right.

MR. KHAN: You are right about that, yes.

THE COURT: All right. So I can read the patent. I can read at least one independent claim in the patent to not cover Figure 25.

MR. KHAN: Yes, Your Honor.

THE COURT: Okay. All right. Go ahead.

MR. KHAN: And just to pick up on that point, you know, Figure 25 being described as exemplary and, you know, the -- there is this discussion about whether there can be convergence in the relay. The zigzag has a relay element.

And the patent expressly talks about how the concave mirror in the WDM can be used to converge and relay the beam of light.

So that is not a particularly -- you know, as far as we're concerned, right, there's no statement of the invention that would preclude the concave mirror resulting in a convergence as part of the relay.

And that's going to become important for a number of different terms as we go down the patent.

So in terms of the disputed claim terms, we have nine sets of disputed claim terms. From our perspective, Your Honor, each of the terms is either a, you know, straightforward term, word that a jury could mostly understand, first and second portion, image.

And then the other terms, what they are seeking to --

THE COURT: Why don't we wait see if we can --

MR. KHAN: Sure.

THE COURT: -- figure this out, the technical glitch out.

MR. KHAN: Maybe I should stand over here.

THE COURT: Okay.

MR. KHAN: Okay. And then the other terms are terms that comprise one, two, or three words, essentially, in each instance, in our view, are used in the industry in the science in a particular way. They're standard terms that are used in the intrinsic evidence in exactly the same way.

As I've said already, there's no statement of the invention that would limit these terms. There's no disclaimer. There's no definition that would limit these terms.

And as a result, what Cytek is, in our perspective, trying to do is mostly limit -- overly

narrow or overly limit the claims and in ways that, quite frankly, don't seem particularly helpful to a jury in how to figure out how to parse out infringement or non-infringement, or the invalidity issues.

THE COURT: Okay.

MR. KHAN: So if I could just start in to --

THE COURT: Well, you're going to go to the claims right now?

MR. KHAN: Yes.

THE COURT: All right. So what I would think, why don't we do this, and maybe...

Do you have a similar kind of overview?

MR. CHEN: I do, Your Honor.

THE COURT: So why don't you do your overview, and they can figure out if they can get their computer working or what the issue is, and maybe were going to find out it's both computers, so meaning the court is the problem.

MR. CHEN: Thank you, Your Honor.

Good afternoon, Reuben Chen for Cytek Biosciences.

I'll go ahead and begin with a brief background that will help inform the proposed constructions today.

THE COURT: Right. And do you have... it

looks like you might have slides too?

MR. CHEN: I do.

THE COURT: Great, thank you.

MS. FLANIGAN: May I approach, Your Honor?

THE COURT: Yeah, please.

MR. CHEN: Thank you.

THE COURT: Thank you.

MR. CHEN: As you heard counsel say, these patents are directed to flow cytometers, and flow cytometers are used to analyze cells or particles that flow through a flow channel.

And how this basically works is there's a light source that is shined onto the cells or particles, then the light will actually both scatter, as well as fluoresce. The scattered light will be detected by what are called forward and side scatter detectors.

And importantly, the separate fluorescent light will be sent to what are called wavelength division multiplexers. Or more accurately, they're actually demultiplexers because what they do, Your Honor, is they separate wavelengths of light.

And so you see in the upper right-hand corner there that there are these detectors, there are these filters that separate the wavelengths of light, and then separate detectors that detect the different color

bands, and then that's used by a computer with algorithms to analyze the fluorescent light, as well as the scattered light.

Now, flow cytometers are not new. The first flow cytometer was developed in 1965, Your Honor. The use of WDMs in flow cytometers is also not new. That was introduced in the 1990s and early 2000s.

Our client, Cytek, actually had some early flow cytometers that used WDMs.

What BEC's asserted patents are directed to is a specific configuration of flow cytometers that have particular WDM components that are borrowed from the optical communications industry and then put into a flow cytometer.

And we see that from its own patents which state: "WDM techniques well-established in the optical communication industry can be readily adapted for fluorescent light detection."

And let me just explain, because the optical path of the light here is key to these inventions. It's key to the -- these inventions, the optical path of the light.

So BEC's patents describe that there's a laser, 501, that shines laser light, which is then relayed off of this component 503, and then it travels

through the flow cell, which is in 60 there.  The tube there is the flow cell within 60, which is an objective.

And what happens when the light hits that flow cell is that it both scatters and it fluoresces. The scatter light, as it goes through this flow cell, 409, in this particular Figure 38, both is forward scattered and side scattered.

The forward scattered light is relayed off of this 406 mirror and then detected by a detector, 408. That's a forward-scatter detector, 408.  The specification makes that very clear.

The side scattered light goes directly sideways, so there's no need for a optical relay -- a separate optical relay element there.  And it's detected by the side-scatter detector 413.

What happens to the fluorescent light?  Well, the fluorescent light --

THE COURT:  By the way, just a simple thing, if you stick on this figure.

MR. CHEN:  Yes.

THE COURT:  So the reason why it goes sideways is because there's holes?

MR. CHEN:  The reason it goes sideways is because it -- when it hits the particles, it splits.  It goes into all directions, forward direction, side

directions.

THE COURT:  When it hits 409, it goes in all these directions?

MR. CHEN:  That's right.  It goes in all directions.  That's correct.

THE COURT:  But then the reason why it goes 90 degree...

And by side, you mean, like, 90 degrees, right?

MR. CHEN:  90 degrees and sometimes a little bit off of 90 degrees, Your Honor.

THE COURT:  Okay.  But it's doing that...

Like is it going up?

MR. CHEN:  It's going, yes, up in that direction.

THE COURT:  Going down?

MR. CHEN:  It's also -- it's also going down as well.  And in the back there, there's a --

THE COURT:  Does it emanate out of the optimizer?  In other words, is it because I'm seeing a see-through box, but, in reality, it would only have holes on the side and in the front?

MR. CHEN:  Oh, it is -- it is either glass or plastic, Your Honor, so --

THE COURT:  So the entire thing is

see-through?

MR. CHEN:  That's correct, Your Honor.

THE COURT:  So what about the stuff that's going up and down?  It's just not measured?

MR. CHEN:  Up and down, that's correct, Your Honor.

THE COURT:  Okay.

MR. CHEN:  That's correct.

THE COURT:  I see.  But you could measure it. You just don't need to.

MR. CHEN:  You could have a design that measures it.  That's correct, Your Honor.

THE COURT:  Why do you do the side and forward only?  Do you only do one side, by the way or do you do --

MR. CHEN:  No.  This particular embodiment, you're doing both.  You're doing both.

THE COURT:  Okay.

MR. CHEN:  Yes.  You're doing -- the forward scatter is 408 because it's forward scattering, but then it's being reflected off 406, being detected by 408.  So the patent describes 408 as the forward scatter detector.

THE COURT:  Right.

MR. CHEN:  413 is the side scatter detector because that's --

THE COURT:  There's only one of them, right?

MR. CHEN:  There's only one of them.

THE COURT:  I'm just curious.  Sometimes I get curious.  Why does it only go up one side?  Why doesn't it go up the side?

MR. CHEN:  Well, it does go off the other side.

THE COURT:  There's only one 413.  Right? There's not multiple 413s.

MR. CHEN:  That's correct, Your Honor.  Yeah.

So what happens when the light goes off the other side is there's a concave mirror 415 that will then gather that light and then actually direct it back out into that upwards direction.  That's the --

THE COURT:  So the entire wall of 415 is a mirror?

MR. CHEN:  That's correct.

THE COURT:  So it is, it's diverting anything coming out.  Anything going in --

MR. CHEN:  Yeah.

THE COURT:  -- getting bounced right, gets bounced back left by the mirror?

MR. CHEN:  That's correct.

THE COURT:  Okay.

MR. CHEN:  It's a concave mirror 415 that is

bouncing light upwards through -- there's an aberration corrector plate which we'll talk about later. That's 414 in this figure, and then it hits the side scatter detecter 413, Your Honor.

THE COURT: So it's funneling everything to that one side.

MR. CHEN: That is correct, yes. That's side scattered light. And then there's also fluoresced light. And that fluoresced light will be gathered, like I said, by the concave mirror and aberration corrector plate, which are now 601 and 602 in this Figure 31.

And then that will be output to an optical fiber 852, which then travels to the wavelength division multiplexer, which you see in the upper right-hand corner there. And Figure 25 is BEC's annotations of the WDM.

And we don't agree with all their annotations here, but it is helpful to walk through their annotations, which shows the -- how the optical path of light is manipulated by various WDM components.

It's actually very important that this is a specific configuration that in informs the claim construction here.

So 901 is where the optic fiber is, and the light is coming out of the optical fiber. And the

component 902 collimates that light and collimation runs through the entire WDM, that collimated beam runs through the entire WDM.

What happens next, after the light is collimated from 902, it's received by dichroic filter 903. What a dichroic filter does, it allows certain range of wavelengths to travel through it and reflects the other wavelengths of light.

So here, the red-colored band is allowed to pass through the dichroic filter. The component 904, which isn't particularly relevant for purposes of claim construction, further filters -- it's called a band-pass filter, and it further filters the red light. Basically further narrows the range of red light, sharpens the light.

And then the light, then, is received by 905, which is a focusing lens, which focuses the light. And this is where we have some disagreement with the way that counsel has drawn the light, but there's a focusing of the light onto the semiconductor or detector -- not necessarily a semiconductor detector, but a detector, and they give the example of the detector being a semiconductor detector there.

And then the reflected light, which has the other color bands, will travel to a relay element 907,

which could be a mirror, and that mirror will then send the other color bands all the way down to the second dichroic filter, which will pass another range of light through the focusing lens to a second semiconductor detector and, you know, so on throughout the system, Your Honor.

Now, one thing I want to point out -- and this is BEC's patent family. It's actually not the complete patent family because there are additional continuations that have since issued -- is that the earliest U.S. patent is the '412 patent. It issued on August 29, 2017.

Cytek's first accused product -- not its first product, but it's first accused product -- was released in June of 2017, mid 2017. Notably, the -- and it received its own patents. It has its revolutionary technology, not relevant for purposes of today, but you'll learn more about that as the case continues.

Notably, the '412 patent is not asserted in this case. And what we see is that in subsequent patents, what Beckman Coulter has done is to expand the scope of the claims in a way that's not supported by the specification. You'll hear more about that today, Your Honor. Thank you.

THE COURT: All right. Thank you.

Want to start with the first term.

Looks like their computer worked. Lot of pressure on you guys.

MR. KHAN: Pressure is on.

THE COURT: Might be up here.

All right. We will have to do it the old-fashioned way.

MR. KHAN: All right. Your Honor, the first set of terms is "first" and "second." At Slide 17, we have -- at Slide 17, we've set out the parties' competing constructions in the case.

If the -- Slide 18 lays out what we think is of -- is the dispute here. So the question is whether "first" and "second" identify different elements in a set or whether they instead require sequencing or ordering.

And if we start with just the basic proposition from the Federal Circuit, Your Honor, at Slide 19, this is a *3M* case. It is very common patent law convention to just use "first" and "second" to refer to various elements in the claims. That's the starting presumption that we're looking at.

If we go to the claims at Slide 20. The claims repeatedly and throughout use other language, not "first" and "second," to refer, essentially, to whether

or not there's a sequencing order in connection with the claim limitation.

THE COURT: All right. I'm good with the claims. There are other claims that clearly distinguish sequentially or temporally "first" and "second." I'm okay with that. I'm not that persuaded by it.

So what I want you to do is I want you to focus on the written description and tell me where in the written description would it be clear to me that "first" and "second" are not limited or don't have a temporal or sequential limitation, essentially. All right?

MR. KHAN: Right. I think the crux of their argument, Your Honor, essentially --

THE COURT: Don't worry about their argument. You just show me in the written description.

MR. KHAN: Sure. In the written description, Your Honor, Slide 24.

THE COURT: Okay.

MR. KHAN: So here's use of "first" and "second," essentially to refer to -- there's a T-junction that's created, T coupling 703, and "first" and "second" is used not to refer to any sequence, but just first fraction received by the first outlet and the second fraction received by the second outlet. No ordering, no

sequence.

If we go to Slide --

THE COURT: Hold up.

MR. KHAN: Yeah.

Go to Slide 25, Your Honor, now we're into the optical components. So there's a description of the composite microscope objective, which we're going to hear more about later this afternoon.

And it describes that the aspheric lens has a first zone with negative optical power and a second zone with positive optical power, radially inside the first zone. The second zone inside the first zone. So that's not sequence or order.

At the bottom of Slide 25, there's a description of how the dichroic filter arrangement separates the beam of light into a first branch and a second branch. Those are, again, not sequence, not order.

And then this may have been, Your Honor, on Slide 26 what Your Honor was getting at -- Judge, you were getting at, with the notion of whether there's a preferred embodiment or whether that matters or not.

We're just -- the only reason to point out and use Figure 25 in this context is that at least in Figure 25, the use of the word "first" is not actually

the first of the focusing optical elements. The use of the word "first," if you did it in sequence or order, it's the second.

The written description refers to the sequentially or ordered first focusing element as the initial. So, again, in sequence or order, "first" is being used to refer to the second in the sequence.

Claim -- Slide 27, Your Honor, we're just illustrating what, essentially, Cytek is trying to do by striking the words from the claims and substituting words such as "initial" and "second sequential," where -- to the extent that there's a relational requirement between the various limitations that should be set out in the other limitations of the claims, which use words like "additional" or "following" or other words like that. There is case law --

THE COURT: I don't need case law. Let's hear from them. All right?

MR. KHAN: Okay. Thank you.

THE COURT: Thank you.

By the way, I'm cutting you short because we've got a lot to do.

MR. KHAN: Yes, Your Honor. Understood.

THE COURT: I only need to hear what I need to hear.

So where I want you to start is, won't you concede if I limited my focus to just the claims, they should win? I mean, the claims --

MR. CHEN: I do not because all the claims that they point to, Your Honor, are readily distinguishable and actually do not support their position. I'm happy to walk through those. There's, like, three claims that they point to, and I can address those really quickly. And then I can also address the specification. I can start with the specification, actually.

THE COURT: Well, do the claims. I'll let you start with the claims and just show me. Because I think their arguments are pretty compelling about at least some of the claims.

MR. CHEN: Understood, Your Honor.

THE COURT: Mind you, I mean, it seems to me I ought to put less weight on the claims anyway because, you know, that's where the attorney manipulation comes in and, you know, it just really bothers me to say, well, I'm going to the fact that one claim is sequential and another is not is really probative, you know, because some lawyer came up with that. I really need to turn to the written description to find out what the invention is talking about, it seems to me.

33

MR. CHEN: I completely agree with you, especially since these are subsequent claims that came after the original application, Your Honor. That's correct.

THE COURT: All right. You think you can distinguish them anyway, so go ahead.

MR. CHEN: I believe I can, Your Honor.

THE COURT: All right.

MR. CHEN: Let's start with '582 patent, dependent Claim 6, which I don't have the language on here.

THE COURT: Hold up. I've got it.

MR. CHEN: This is their argument where there is a first and second branch.

THE COURT: Hold on. You want to go to...

Hold on. We go to the '582.

MR. CHEN: '582 patent, dependent Claim 6. This is one of the claims that they point --

THE COURT: I'm there.

MR. CHEN: Okay. Thank you, Your Honor.

And so they talk about a first branch and a second branch.

And may I actually approach the screen, Your Honor? I think it might be a little easier.

THE COURT: Yes.

34

MR. CHEN: Okay. So what they are referring to here is that there is a first branch and a second branch of light after the light reaches the dichroic filter.

And my point is that it's irrelevant which one you're going to call the first --

THE COURT: Hold up. Sorry. So I just want to get my bearings here on the diagram.

So would you point to the first optical filter in this Figure 25. What's that?

MR. CHEN: Absolutely. So the first optical filter, which is supported by the specification, is this first dichroic filter, 903 --

THE COURT: Okay. But I think he...

You don't think that, right? Or do you? Do you agree with that?

MR. KHAN: I believe that that specification, that's the first filter. I was --

THE COURT: Okay. All right. So you agree with it.

Go ahead.

MR. CHEN: And this is the second dichroic filter. And so --

THE COURT: Wait. The second is which one?

MR. CHEN: Is the blue one.

35

THE COURT: You agree with that, Mr. Khan?

MR. KHAN: Yes, Your Honor.

THE COURT: Okay.

MR. KHAN: The specification described --

THE COURT: Thank you. Go ahead.

MR. CHEN: Okay. And what Beckman Coulter has pointed to is that there is a first branch and a second branch of light.

And what I'm saying, it's irrelevant which one you call the first branch and the second branch here, and here's the reason why.

The light is being split at the same point and the same time. That's very different when the -- when you're talking about the flow of light being received first by a first dichroic filter and a second dichroic filter.

So that's a readily distinguishable way to distinguish their '582 Claim 6 argument.

THE COURT: Okay. Hold up. Give me a second.

Okay. So, in other words, in Joe six-pack terms, Claim 6 doesn't have to be read that the first and second filters are sequential because you can read it consistent with Figure 25 to say that the first and second rays -- or what do they call it -- first and second branches are actually sequentially simultaneous?

36

MR. CHEN: That's correct, Your Honor.

THE COURT: Or not sequential, actually. They occur at the same time.

MR. CHEN: Oh, that -- that's correct.

THE COURT: Do you dispute that, Mr. Khan?

MR. KHAN: No, Your Honor, but --

THE COURT: Okay. Thank you.

MR. CHEN: Thank you, Your Honor.

THE COURT: I will give you your chance. You get to come back. Don't worry.

All right. So, yeah, okay, so Claim 6, not that good.

MR. CHEN: Okay.

THE COURT: I was thinking of another claim that was more compelling but you go ahead.

What else?

MR. CHEN: '443, dependent Claim 10, they point to that.

THE COURT: Yep. Hold up.

MR. CHEN: This is our Slide 16.

THE COURT: Yep.

MR. CHEN: And I have the claim language here this time.

So they argue that based on claim differentiation, when they wrote the words "initial" --

37

and, again, this is in a subsequent patent, that that -- they distinguish that from "first." Not true.

When we look at their infringement contentions with regards to the claim term "initial filter," this is what they say. They say: "Any of the filters in a coarse wavelength division multiplexer is a first filter."

Any of them. Any of them in a series can be the first one, or according to them, which is actually opposite of what we heard from counsel a few minutes ago when we were talking about Figure 25 and the first dichroic filter being 903 --

**THE COURT:** Well, maybe that's important, but I think you're going off on, from my mind, a tangent, and yet this is a pretty compelling point.

Because when I read this, I thought this was one of their better arguments.

**MR. CHEN:** Right.

**THE COURT:** So, and what you're telling me is...

Was this in the brief that you had?

**MR. CHEN:** I believe we addressed this in the brief. No? Okay. Sorry, Your Honor, if we didn't, so yeah.

**THE COURT:** Yeah, I think I would have

38

remembered this.

**MR. CHEN:** Okay.

**THE COURT:** Okay.

**MR. CHEN:** My apologies, Your Honor.

**THE COURT:** Hold on a second.

I don't remember it. Okay. So it wasn't in the brief.

All right. Well, actually, so what you're saying, as I understand it here...

And what slide is this?

**MR. CHEN:** Slide 16, Your Honor.

**THE COURT:** Why don't you let Mr. Khan speak for a second, please.

**MR. CHEN:** Sure. Of course.

**THE COURT:** Thanks.

So, Mr. Khan, I told you I thought the claims kind of went in your favor, and actually I had this claim in mind.

**MR. KHAN:** Right.

**THE COURT:** But I've got to admit, reading your infringement contentions of February 14, 2025, causes me to think that maybe I gave you too much credit. So help me out.

**MR. KHAN:** Yes, Your Honor. So --

**THE COURT:** And just to be clear, why, right?

39

Because the reason why I thought it was a compelling argument in the briefing was because Claim 10, which depends from Claim 9, which depends from Claim 1, speaks of, in Claim 10, of a first filter that is the initial filter.

**MR. KHAN:** Right.

**THE COURT:** And since that's claimed, again putting aside the potential for attorney manipulation and whatnot, but since it's claimed, that would suggest that you can have a first filter that's not the initial filter.

**MR. KHAN:** Right.

**THE COURT:** I thought that was pretty compelling argument. But then it looks like in your infringement contentions you are saying, no, no, no, no. Any of the filters in a coarse wavelength division multiplexer is a first filter.

It's not. So can you respond to that, what's going on?

**MR. KHAN:** I think, Your Honor, the issue here is that these are the...

So, first of all, the infringement contentions here are incomplete. So first --

**THE COURT:** They're what? Sorry.

**MR. KHAN:** They're incomplete, right? So

40

first, what we're talking about here is the first filter is an initial filter of the set of filters.

**THE COURT:** Right.

**MR. KHAN:** So the dispute we're having with them is about which one would qualify as an initial filter.

And, you know, that is not a question -- that's not a dispute about which one is the first filter. The -- and so that's a different dispute from the one that's before the Court right now.

**THE COURT:** No, no, no. Sorry.

**MR. KHAN:** Yeah.

**THE COURT:** I think I ought to press you back on this.

**MR. KHAN:** Sure.

**THE COURT:** So the infringement contention is for Claim 10. And Claim 10 reads, in relevant part, "The first filter is an initial filter of the set of filters."

And then the contention made by your client is that any of the filters in a coarse wavelength division multiplexer is a first filter, including filters which are not immediately subsequent to the collimation lens along the optical paths.

In other words, you're not limiting it to what I would have thought was an initial filter because

you've got a different definition of initial. So, in other words...

Yeah, well, I've got to say, I don't understand it.

MR. KHAN: Yeah, let me try a different way.

First, this is referring to Claim 9. So the Claim 9 does not have the initial filter limitation, right?

So this is saying any Claim 9, when we were looking at Claim 9, any of the first filters can be a filter that's not subsequent to the collimation lens, right?

THE COURT: Yeah.

MR. KHAN: So this is not saying that -- which one is the first -- which one is the initial filter. Right?

THE COURT: Okay. So did you have...

Then maybe, because it is cut off, did you then clarify that for Claim 10.

I mean, do you have your entire contention? Can I see it?

MR. KHAN: I don't believe they're in the record, Your Honor. This is not in the record.

THE COURT: I know, but this is really important.

---

MR. KHAN: Yeah.

THE COURT: You know, I found pretty compelling the "initial."

MR. KHAN: Right.

THE COURT: The use of the word "initial" in Claim 10. I thought it was your most compelling argument.

MR. KHAN: Right. And what I would say, Your Honor, just to back up, is that to the extent that there's an infringement dispute over what is or is not initial filter, that's not an issue before the Court today.

The only issue before the Court is whether first and second across the claims that --

THE COURT: No. Time out. Time out.

MR. KHAN: Yeah.

THE COURT: You're right infringement's not at issue right now.

MR. KHAN: Right.

THE COURT: But what's at issue is the construction of first filter.

MR. KHAN: Right.

THE COURT: And, necessarily because of the argument you've made, the construction of initial.

MR. KHAN: Yeah.

---

THE COURT: So I thought initial would have meant first temporally, or first sequentially. But according to your infringement contentions of February 14, 2025, that's not the case. You're not reading initial to be first sequentially or temporally.

MR. KHAN: We are -- I don't have the rest of the contentions in front of me, Your Honor, and we can find them. But if you look at the claim, it says "initial filter of the set of filters."

THE COURT: Right.

MR. KHAN: I have no doubt that in that instance what we did was identify the first sequential filter in the set of filters.

THE COURT: Why don't you pull up the Interrogatories. Because the excerpts that are presented here would suggest the... would not suggest that at all.

MR. KHAN: Right.

THE COURT: In fact, it would suggest the opposite.

MR. KHAN: Right. But it's referenced to Claim 9 here.

But anyway, we can pull that up and take a look in the break. But the basic point is initial filter would be the initial, the first sequential in the set of filters.

---

THE COURT: Okay.

MR. KHAN: And we can agree with that, to the extent that the Court is concerned about that, I can agree to that today. And --

THE COURT: Well, then I'm concerned about the contention you served.

So do me a favor, we will come back to it. You pull up the contentions, and then I'll have Mr. Chen come back.

MR. KHAN: Okay.

THE COURT: All right?

MR. KHAN: Thank you.

THE COURT: Thank you.

So look, you know, until they come up with it, I can understand...

I mean, look, very good argument. It wasn't in your brief, so I've got to figure out what that means.

What else do you have as far as the claims before we get to the written description?

MR. CHEN: Absolutely, Your Honor. And I do have the rest of contentions if you want to see them.

THE COURT: Yeah, actually, but give them to them and then let's hand them up.

But you agree, what they're saying in the

45

contentions, and that's why you put it up there, right?

MR. CHEN:  Absolutely.

THE COURT:  To use my language is that in their infringement contention with respect to Claim 10, they are saying initial doesn't mean first sequentially or first temporally.

MR. CHEN:  That's correct.

THE COURT:  It could be anything.

MR. CHEN:  That's correct, Your Honor.

THE COURT:  Yeah, okay.

MR. CHEN:  That is absolutely correct.  And my apologies for not including it in the briefing.  And we can certainly submit it as an additional exhibit after the hearing if Your Honor would like to see it.

THE COURT:  Well, I opened up by saying I'm not putting a lot of stock in their claim anyway.  That was the most compelling one I had.

So why don't you move to the written description.

MR. CHEN:  Okay.  I will, Your Honor.  So moving to the written description.

As Your Honor already saw earlier, the written description supports Cytek's --

THE COURT:  This Figure 25 --

MR. CHEN:  Right.

46

THE COURT:  -- basically, or it's agnostic. It would support both sides in a way, right?

MR. CHEN:  It's an exemplary embodiment, but the specification actually refers to a first and second dichroic filter and labels the first dichroic filter as the initial filter 903 and a second dichroic filter as the second dichroic filter.

THE COURT:  Oh, I see what you're saying. Right.

MR. CHEN:  Thank you, Your Honor.

Yes.  So --

THE COURT:  For instance, it's agnostic, you know, as first branch, second branch, because the branches are simultaneous.

MR. CHEN:  Oh, I agree, yes.  Yeah.  Yeah.  I wanted to point out that issue with respect to the claim that they're relying on, it doesn't help them.

THE COURT:  Right.  But where it helps you, Figure 25, is that in terms of its discussion of the --

MR. CHEN:  Correct.

THE COURT:  -- first and second, the second follows sequentially from the first.  It's sequentially after.

MR. CHEN:  Absolutely, Your Honor.

THE COURT:  Okay.

47

MR. CHEN:  That's correct.

THE COURT:  Yep.

MR. CHEN:  And so BEC pointed to two passages in the specification.  If I can actually go to their slides.

THE COURT:  Well, do you want to point to anything else?  I agree Figure 25 supports you.  I totally get that.

By the way, what do you think about it, is there a preferred embodiment in this patent?

MR. CHEN:  No, Your Honor.  It's an exemplary embodiment, like Your Honor stated.  And, actually, we do address that.

They make an argument that we are excluding the preferred embodiment.  Again, it's not a preferred embodiment.  That's their argument in their briefing. We are not excluding that embodiment.  The earlier parent, '412 patent, has a claim that maps onto Figure 25.

So like Your Honor stated, as long as there's one independent claim that maps onto the embodiment, it's not being excluded, and it's not being excluded here, Your Honor.

THE COURT:  Right.  Now, the reason why you say, actually, figure...

48

Let me step back.  You both say Figure 25 supports your respective positions.  Right?

MR. CHEN:  Yeah.

THE COURT:  Okay.  And the reason why you say Figure 25 supports your position is because of the labeling of the dichroic filter.

MR. CHEN:  Dichroic filter.  Also other components, Your Honor, not just the dichroic filter.

THE COURT:  Yeah?

MR. CHEN:  That's actually in our briefing.

THE COURT:  Yep.

MR. CHEN:  There's a reference to --

THE COURT:  Hold up.

MR. CHEN:  This is on Page 15 of the Joint...

THE COURT:  Yep.

MR. CHEN:  It's actually Page 14 of the Joint Claim Construction Brief.

So there's also a reference to a collimating optical element 902, which we'll get to later on, because we believe that's a means-plus-function term, but they label that as a collimating optical element and then they refer to a second optical element being 907, Your Honor.

So that's again, you have first dichroic filter, second dichroic filter.  You've got one optical

element here, you have another optical element, 907. So you have first optical element, 902, and second optical element, 907, Your Honor.

THE COURT: Hold up.

Okay. So are there any other instances in the written description, besides these two, where first and second are shown to be sequential?

MR. CHEN: Not that we are relying on, Your Honor. There may be other places, but we also do point to the claim language as well, and that's cited in our briefing and one example --

THE COURT: When you say the claim language, go ahead and give me the claim language you're talking about.

MR. CHEN: As one example, Claims 1 and 5 of the '106 patent make very clear that there is a sequence to the first and second as they're used throughout this claim.

THE COURT: Right.

MR. CHEN: Happy to diagram it. But in the interest of time, I would actually like to address the two passages of the specification that they pointed to in their argument, Your Honor.

THE COURT: Yeah. Just give me one second. You can do that.

---

Okay. So the first one is the T at Figure 14; is that right? Right there?

MR. CHEN: Correct. Their Slide 24. They talk about a first fraction and a second fraction.

What we're talking about here is the liquid. We're not talking about a optical path. We're just talking about separating liquid into a first fraction and second fraction. Has nothing to do with the claim language here with the WDM, the wavelength division multiplexer or de-multiplexer that we're talking about here. We're not talking about the optical path. We're talking about liquid.

Their second argument is on Page 25. They talk about a first zone and second zone. I'm going to use my slides for a later term to explain what is going on here.

THE COURT: I just want to follow up, though, on the liquid, right?

MR. CHEN: Yes.

THE COURT: I'm not a science guy, but if you shove liquid down a tube, and it hits the T, it's going to go in both directions. I mean, I think it has to go in both directions, right?

MR. CHEN: That's correct.

THE COURT: Right.

---

If you shove light down a tube, it's just going to reflect back at you, isn't it? Or what happens? I don't know. That's what I would have thought. In other words, this is not comparable at all.

MR. CHEN: So if there's a dichroic filter, it's going to allow a color band through and it's going to reflect the other color band through.

The same argument that I made --

THE COURT: No. No. But Figure 14, 703 is what? It's a tube, right?

MR. CHEN: That's correct. It's a tube of liquid. And what happens is --

THE COURT: Like a pipe?

MR. CHEN: There is a first fraction and there's a --

THE COURT: First fraction, liquid. Okay.

MR. CHEN: First fraction and a second fraction. And it doesn't matter which one -- again, it's actually very similar to the argument about first branch, second branch. It's happening actually at the same time.

But the greater point here is this passage of the specification has nothing to do with the optical path.

THE COURT: No. No, I agree. I think you're right. But I just want to understand. You started

---

mentioning the dichroic filter again. You mentioned that as if it were analogous to the pipe of 703.

MR. CHEN: It's not.

THE COURT: I wouldn't have thought that. I thought the analogue to 703 with optical stuff would be a ray or something. I don't know, what's the analogue?

MR. CHEN: Yeah. Yeah. I think -- I'm not sure there's a clean analogue. I'm not sure there's a clean analogue, Your Honor. I was just saying that it does hit that T at the same time, and so you have a first branch -- you have a first fraction and a second fraction.

In that sense, it's similar to a first branch and a second branch, but I agree it's not a perfect analogy when you're talking about a dichroic filter because that has to deal with the optical path of light. Here, we're talking about a liquid, and it's not relevant to the claim language here.

THE COURT: Okay. Go ahead now. Next, they've got the zone. This is their Slide 25.

MR. CHEN: Correct, Your Honor.

THE COURT: Okay. What do you say to that?

MR. CHEN: So what they're talking about here, Your Honor, is this piece, right here, which we're going to talk about more later.

THE COURT: What slide is that?

MR. CHEN: This is Slide 101 of Cytek Bio's demonstratives.

THE COURT: Okay.

MR. CHEN: They're talking about this piece 602, which is an aberration corrector plate. And what they're talking about is that there are negative and positive zones. And you can see right here through the little cutouts, negative and positive zones, the surface. Right?

THE COURT: No. I don't know what I'm looking at. What do you mean?

MR. CHEN: Oh, sorry. So, Your Honor, do you see my laser pointer?

THE COURT: Yeah.

MR. CHEN: There's negative and positive zones here. There like is a shape -- see where the curve is?

THE COURT: Oh, yeah. I see the curve. Okay.

MR. CHEN: Yeah. So that's what that's referring to. And, again, the light is hitting those at the same time. It's -- they are different zones, sure, but it's not relevant to the claim language here. The claim language isn't claim zones, right? That's not in the claims. The claims are talking about dichroic filters, talking about semiconductor detectors, first

semiconductor detector, second semiconductor detector. It's not talking about zones.

And so my point is, similar to the first branch, second branch argument, the light is hitting this aberration corrector plate at the same time. And this first zone and second zone is just saying there are different -- there are different zones on that surface of the aberration corrector plate.

THE COURT: Okay. Now, the second example they give, the first branch and the second branch is what you pointed out, or it's not, right? Or is it? Is it the same issue that's occurred that's illustrated in Figure 25?

MR. CHEN: No, that's claim -- claim language, Your Honor. The first branch and second branch was in their claim language.

And then first fraction, second fraction was in Figure 14 that Your Honor pointed out.

THE COURT: But look at their Slide 25.

MR. CHEN: Yes, Your Honor.

THE COURT: So you just dealt with the first box, which is first zone and second zone.

MR. CHEN: Oh, oh. Yes. You are correct, Your Honor.

THE COURT: The second box, I just want you to

address, where they are referring to the separation of the beam of light into a first branch and a second branch of distinctive colors.

Is this description what you pointed out is in Figure 25 where the two branches are actually occurring simultaneously?

MR. CHEN: Correct, your Honor. My apologies for not noticing that second part on Slide 25. But, yes, that is absolutely correct.

THE COURT: Okay. All right. Anything else?

MR. CHEN: No, Your Honor. Thank you.

THE COURT: All right. Mr. Khan.

MR. KHAN: Thank you, Your Honor.

So just to level set where I think we are now, is there's an acknowledgment from Cytek that in the specification, first and second are used sequentially, albeit they have reasons why it may not be relevant. But just the words "first" and "second" are used not to denote sequence or order.

THE COURT: Wait. Wait. What?

They acknowledge that at least one of your examples, actually two. They acknowledge that two of your examples about first and second do not necessarily require sequencing.

MR. KHAN: Actually, I heard all three.

THE COURT: What's the third?

MR. KHAN: The first and second fractions with the liquid.

THE COURT: Yeah.

MR. KHAN: The first and second zones.

THE COURT: Yeah.

MR. KHAN: First and second branches.

THE COURT: Oh. Okay. Yes.

MR. KHAN: All three, right?

THE COURT: Yes.

MR. KHAN: So the specification uses the words first and second not to refer to a sequencing or order, but to just refer to one element of a set of elements. So I think we -- I'm going to talk about Figure 25 in a second, Your Honor.

THE COURT: Yeah, but the difference is...

Well, first of all, I think we can dispense with the zone and the liquid. They're just not relevant.

We're talking about the optical path, right?

MR. KHAN: The zone is in the optical path.

THE COURT: It might be in it, but it is...

Actually, I mean, I'm trying to figure out if there's a way to articulate it, but it seems to me very obvious that the referencing to the zone at Column 51,

57

Lines 45 through 50, does not help your...

I just don't see how it's relevant.

MR. KHAN:  So the composite microscope objective is what is collecting the light --

THE COURT:  Right.

MR. KHAN:  -- from the flow cell.  So it is in the optical path.

And I think Mr. Chen's diagrams actually showed the light flowing through that composite microscope objective.  So it is in the optical path.

THE COURT:  Is it bouncing it back, right?  I mean, is it coming in and bouncing off the concave mirror or is it going through it?

MR. KHAN:  The composite microscope objective is there to collect the light that's coming off the cell that's going through the flow cell.  And then, as we discussed earlier, there are -- it's passed down to the fiber optic cable, and then essentially to the detectors downstream through the WDM.

But the composite microscope objective is definitely in the optical path.  It is responsible for collecting light from the flow cell.

THE COURT:  All right.  We will come back to the objective branch or to the concave mirror and the corrector plate.

58

MR. KHAN:  And so then I want to talk about Figure 25, Your Honor.

THE COURT:  Yeah.  That's the one you need to talk about, which you just said is the more exemplary embodiment in the patent.

MR. KHAN:  It is discussed the most, yes.

THE COURT:  Right.  And it seems pretty clear it is discussing first and second sequentially.

MR. KHAN:  Not quite, Your Honor.

So with respect to the filters, it may be saying that the first filter is in sequence -- is also the first in sequence.

THE COURT:  Right.

MR. KHAN:  With respect to the branch of the optical path, remember Mr. Chen agreed that first branch and second branch in the optical path, it splits.

THE COURT:  Agree.

MR. KHAN:  So it's not referring to a sequence order there.

And then if we can look at Slide 25, right, of -- sorry, Slide 26 of Beckman's presentation, the focusing lenses all the way to the right, right, the focusing lenses, there's an initial focusing element and then a first focusing element.

THE COURT:  Right.  And your point is that 908

59

is --

MR. KHAN:  Exactly.  That's the 906 and 908 point.

THE COURT:  Right.

MR. KHAN:  The 908 is referred to as the first focusing element, but the initial focusing element is 905.

THE COURT:  Right.

MR. KHAN:  And so in Figure 5, we've discussed today, Your Honor, three different aspects of Figure 5. I would submit two out of three of them are usage of first and second in a nonsequential way.

We've talked about the filters.  Maybe the filters first and second are used in sequence.  Not in the branches, not in the focusing element.

The specification is pretty clear, Your Honor, that first and second are not exclusively limited to use or usage in any aspect of the device in a sequential or ordered manner.

THE COURT:  Okay.  Now, hold on.  The claimed language that's at issue is the first what?

MR. KHAN:  It is -- they have claims that are referring to first and second branch, first and second filters, first and second -- they want first and second to be applied to all of the elements that are in --

60

THE COURT:  Okay.  Would you agree at least, though, that when it comes to filters, first and second should be sequential?

MR. KHAN:  No, Your Honor.

THE COURT:  Well, how can you not when the only...

Well, then, can you point to any other filter besides the two filters identified in Figure 25 where first and second are used non-sequentially?

MR. KHAN:  I don't think we have that, Your Honor.  But the answer to that is we don't limit to the preferred embodiment.

So the first and second throughout the specification is used in a nonsequential way.  In one instance, perhaps, it's use in a sequential way.

THE COURT:  Right.  But you said "preferred embodiment," and you keep doing it.  We don't have a preferred embodiment.

MR. KHAN:  Oh, sorry.  Exemplary embodiment.

THE COURT:  But I think it's telling that you keep referring to it that way.  It really is.  And your whole brief is telling.  When you keep saying it's the preferred embodiment, it's not reading it out.

And, in fact, looking at *Phillips*, I'm supposed to read the claims in light of the

specification, in light of the written description. What could be more probative than the written description?

MR. KHAN: Agree with you.

THE COURT: And the only filters that are discussed as first and second are sequential.

MR. KHAN: Right. And, but there are focusing -- so just because the words "first" and "second" in that instance are used in a sequential way, doesn't mean that the written description as a whole is intending to use "first" and "second" in a sequential way. We've got lots of instances of the written description not using the words "first" and "second" in a sequential way.

THE COURT: Okay. But I just want to sum up. Can you point to any instance in the written description where "first" and "second" are used to describe a filter and not used sequentially?

MR. KHAN: I can look into that, Your Honor. I don't think there is such an example.

THE COURT: I don't think there is either.

MR. KHAN: But, and then I wanted to come back to the claim -- the infringement contentions that --

THE COURT: Yes, you should come back to that.

MR. KHAN: So, essentially, in that instance,

Your Honor, I am willing to stipulate here that initial set -- initial filter of a set of filters is going to be the first in the sequence.

THE COURT: All right. Well, you --

MR. KHAN: So I don't think the contentions -- you know, they are irrelevant in --

THE COURT: Well, wait. Time out. Time out. Time out.

MR. KHAN: Yes.

THE COURT: Why did you take that position in your infringement contentions in February? Did you write them?

MR. KHAN: We wrote them, Your Honor.

THE COURT: Why did you write them?

MR. KHAN: The contentions are referring to -- they're saying look up to Claim 9. In Claim 9 it doesn't say initial filter.

So we're incorporating by reference the prior discussion of Claim 9, and we're saying look at Claim 9, any one of them can be the first filter, and then what follows is a discussion of the initial filter.

And I think we can show you that in a letter submission to the Court. We don't have the -- none of this was briefed, so it's sort of hard to understand what to do.

But what I'm willing to say, Your Honor, is the initial filter of a set of filters is going to be the first in the sequence.

THE COURT: Okay.

MR. KHAN: So, hopefully, that resolves the issue. To the extent that there's a problem with the infringement contentions -- I don't think there is -- that would resolve it.

THE COURT: All right.

MR. KHAN: And then, Your Honor, if I could make one more point.

THE COURT: Yeah, go ahead.

MR. KHAN: It's a real quick one.

I think, essentially, their issue is basically that they want the ordering to be done in connection with the optical path. But there's a claim that talks about that and the other claims don't talk about that.

That claim is on Slide 20. That's Claim 9 of the '443 patent that says, "Wherein an optical path of the light includes a first set of the filters followed by a first mirror."

And that claim tells you, well, I am in the optical path. I've got a first filter of the set of filters followed by a first mirror.

So in -- so where the claims are talking about the filters and mirrors being organized in relation to the optical path, that's claimed in that way. We don't -- there's no requirement that they be claimed that way in every single claim. And I think that's, basically, the point, Your Honor.

THE COURT: Okay. Can you point to any embodiment...

Actually, I've already asked that question sorry. We're good. All right.

MR. CHEN: Can I make just two quick points?

THE COURT: Yeah. But the first question I have for you is; why don't I just construe first filter, when first and second are describing filters, it has to be sequential, but when it's describing branches, it doesn't. Or zones or whatever.

Are you good with that?

MR. CHEN: Zones and branches, I'm fine with that. But with respect to the other components in the WDM, first and second also have positional significance. That's supported by --

THE COURT: So show me the written description where there's first and second is sequential other than Figure 25, where there is the dichroic filter.

MR. CHEN: Yes. So in the figure --

65

THE COURT: And especially given, I think a problem for you --

MR. CHEN: Uh-huh.

THE COURT: -- your biggest problem in the written description are the optical relays, the 908 and the 905, right, where the 908 is described as the first, but actually sequentially it's second?

MR. CHEN: In the -- can we pull up Figure 25. Thank you.

The specification talks about an optical component, a collimating optical component 902, and then talks about 907 as being the second optical component.

So again, there's a sequence with respect to other components in the WDM.

THE COURT: Hold up.

So 907 is a concave mirror, right?

MR. CHEN: 907 can be a concave mirror, correct, Your Honor.

THE COURT: Okay. But I'm talking about, I thought there was in the written description reference to 908 being designated as the first.

Is that an optical relay? What is it?

MR. CHEN: Oh, no. I want to address that argument, in fact, Your Honor.

THE COURT: Okay. That's what I'm saying,

66

that's, I think, your hardest...

That's their best argument on the written description.

MR. CHEN: They're pointing to the claim language, not written description. There's no written description support in their Slide 25. If you look at their Slide 25, what they're pointing to is Claim 1 of the '582 patent.

This is their argument that there are no claims that read onto the preferred or exemplary embodiment, an argument that we disagree with, because the '412 parent patent claims certainly map on to Figure 25.

So there's no support in the written description argument for their Slide 25. That is an incorrect labeling. There is no be initial focusing element in the specification and a first focusing element being 908.

That's from their claim language, and the claim language doesn't use the numbers 906 or 908. That's their own mapping of Claim 1 of the '582 patent to Figure 25.

So all of the written description supports our position, and so that was one point that I wanted to make, Your Honor.

67

The second point is, just to clarify did I go to the aberration corrector plate.

Mr. Knight, it's Slide 100.

Your Honor asked this question earlier, and what's important to point out is that this is not part of the WDM. It is part of the optical path, correct. And if we could go to Figure 31, Mr. Knight. That would be Slide 5.

Slide 5. This is the objective with the concave mirror and the aberration corrector plate. That's the WDM up to the right side, upper right side there.

And what I was stating earlier, if we can go back to Slide 100, the aberration corrector plate has that surface, and the light is going to hit that surface at the same time that has the first zone and the second zone. So it's at the same time in the optical path.

But in any event, that's before the WDM.

THE COURT: Right. But his point, I think, is because it's hitting at the same path, it doesn't have to be sequential. They're both at the same time, yet they're described as two zones.

MR. CHEN: Correct, because it's irrelevant to the optical path -- with respect to the issue of is it first or is it second, it's irrelevant whether you want

68

to call one a first zone or a second zone. It's not claimed. There's no first zone in the claim language.

What we're focused on is a specific configuration of the WDM in Figure 25 and how various components in the WDM manipulate light.

And that requires a specific sequencing of the components, and so that's why the patents describe a first dichroic filter, second dichroic filter, a optical element, and then a second optical element.

THE COURT: Right, but they describe a first and second branch. You are saying that's --

MR. CHEN: That's only in the claims language, Your Honor.

THE COURT: Only in the claim language.

MR. CHEN: That's in the claim language, and they -- you're right that there's that one passage in Slide 25, where they are describing the first branch and the second branch. Right?

THE COURT: Right.

MR. CHEN: Yeah, 57, 4 to 7.

THE COURT: Right.

MR. CHEN: Let me go to 57, 4 to 7. Correct.

THE COURT: So that would suggest that they don't have to be sequential.

MR. CHEN: For that particular instance,

because they're at the same time. They're not sequential. That just supports our position because the light's basically hitting that component, that dichroic filter.

Could you put up Figure 25. There we go.

Whereas light is being received first by the dichroic filter and then second by the second dichroic filter. The branching is occurring here at exactly the same time.

THE COURT: Right.

MR. CHEN: So whether you call one a first branch or a second branch, that doesn't matter because they're actually -- the light is hitting that same space and same point in time.

THE COURT: Okay. But I thought you want me to construe...

Hold on a second.

MR. CHEN: So maybe what will help is I think if we go to our proposed construction.

THE COURT: Hold up.

MR. CHEN: So in our...

THE COURT: Is a curved mirror and concave mirror the same thing?

MR. CHEN: No, they're not.

THE COURT: Is a concave mirror a curved

mirror?

MR. CHEN: A concave mirror falls under curved mirror, correct.

THE COURT: Correct. So it's a subset of it.

MR. CHEN: That's correct, Your Honor.

So --

THE COURT: Hold on a second.

MR. CHEN: Understood.

THE COURT: Okay. Go ahead.

MR. CHEN: If I may, Your Honor, our proposed construction is for the terms "curved mirror," "focusing optical element filter," "optical filter," "dichroic filter," "semiconductor detector," and "image."

There's no "branch" in there. That's not what we're asking the Court to construe.

THE COURT: What about optical relay? That would be a focusing optical element? What would that be?

MR. CHEN: That would be a -- potentially it could be the curved mirror, optical relay element, yes.

THE COURT: All right. Anything else you want to say?

MR. CHEN: No. Thank you, Your Honor.

THE COURT: Let's take a break. Give the court reporter a break. Be back in ten minutes.

(Whereupon, a recess was taken.)

THE COURT: Please be seated.

All right. So I think we need to change the term, the disputed term, and make it "disputed terms." And I'm going to construe at least one of those terms today. And then I'm going to have you break up and agree on what the other disputed terms are, and we'll submit some additional briefing.

You can address those terms. So, for instance, I don't think it's helpful to just do "first" and "second" with the litany of terms.

I do note that branch, first branch, and second branch were not asked to be construed. That's important. First zone and second zone were not asked to be construed. That's important.

The problem is, the sub-terms of the first and the sub-terms of the second that I was asked to construe, I'm not sure we've addressed the meaning of those sub-terms sufficiently so that I can offer a construction today. The one exception would be filters, for instance. All right?

Now, the Federal Circuit has frequently stated that the words of a claim are generally given their ordinary and customary meaning. And the Court has also made clear in *Phillips* and *Vitronics* that the ordinary and customary meaning of a claim term is the

meaning that that term would have to a person of ordinary skill in the art in question at the time of the invention.

Now, this inquiry into how a person of ordinary skill in the art understands the claim term provides an objective baseline from which to begin claim interpretation.

Consistent with the standard construction rule announced by the Supreme Court in *Markman*, Federal Circuit made clear in *Phillips* that, quote, "The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but also in the context of the entire patent, including the specification." Unquote. That's at 415 F.3d Page 1313.

Now, the plaintiff pointed me to the *3M* decision, and that's at 350 F.3d, not sure what the first page is, but it's in the 1300s, 1372. And in that case, the Court held that there was nothing in the intrinsic evidence that was at issue in that case that required a limitation of sequential creation of the multiple embossed pattern.

And I agree here with the plaintiff, for instance, that the intrinsic evidence would not require, that the "first" and "second" would impose a sequence or

temporal order if it were describing branches or zones.

We've discussed already this afternoon at length the fact, and the defendant doesn't contest that there are branches that are discussed, for instance, in Figure 25, where there is no sequence, that both branches occur simultaneously.

And the zones, Figure 9A, again, the light is hitting them both at the same time. I think that's undisputed they're simultaneously.

So if I were faced with a claim language that was describing zones or branches, first and second zones or first or second branches, I would agree that read in light of the written description, there would be no limitation, sequential or temporal limitation.

The problem for the plaintiff, though, is the only disclosure of first and second filters is in Figure 25, and that's it. There's nothing else.

And what that says to me is when, therefore, I construe a first and second filter in a claim, I should read it in light of that disclosure and construe first and second filters to require that the first filter occur sequentially before or temporally before the second filter.

So I agree with the defendant's construction of first and second filters.

Now, what I'm going to do is I'm going to ask that you go back and look at the terms for which there is a first and second designation in the asserted claims and then just go through each of them.

So, for instance, the first one I recall was a curved mirror, correct? And there appears to be, in Figure 25, strong evidence that when it comes to at least one subset of a curved mirror, there ought to be a sequential or temporal limitation. But I don't know enough, and I haven't heard enough argument to be able to determine whether the temporal or sequential limitation should be required for any kind of curved mirror. I just don't know.

So what I'd like you to do is just go back and maybe meet and confer and come up with a list, the universe of those terms that you want me to construe, all right? And then just submit something, and I can construe it at a later date.

Now, what you need to do is you need to look at, in terms of just guessing what I'm going to do, you need to look at the written description. I do not find as compelling the plaintiff's reliance on the claims, which are written after the fact, which are not consistent with their discussion of first and second, if you go across patents. And I do not think are entitled

to much, if any, weight.

That will be, I guess, an appeal issue that you all can argue. But it just seems to me that I'm really, really focusing on *Phillips'* admonition that the claims are to be read in light of the written description.

All right. So that's where I am on the first term. I'm going to leave it at that and then let you all go back and submit to me further briefing, and we'll work out the other particulars. All right?

Okay. Let's go to the next term.

By the way, I am a little worried about time. Should we go to the last term? What do you all think? What's most helpful to you? What do you want to leave here, if you could only have a limited number of constructions?

MR. CHEN: I think "collimating" and "optical element" would be the next most important terms, Your Honor.

THE COURT: Okay. Mr. Khan, what do you think?

MR. KHAN: I think, Your Honor, if we could do, yeah, those two.

THE COURT: Okay.

MR. KHAN: And then "collimating optical

element," which is certainly related to the two terms.

THE COURT: Okay. Let's do it. Let's go right next to "collimating" then.

MR. DENNHARDT: Good afternoon, Judge. Jeffrey Dennhardt for Beckman Coulter. And, fortunately, it looks like we've got the technical issues resolved, so we are able to use the screen.

The next term is "collimating," "collminate," and "collimated beam."

And we put the constructions here, but maybe I think the place to start is this is a common term used in optics. This is not a term that's coined for purposes of the patents. You've seen many references describe this term. Both parties have components in their products that are identified as "collimating lenses."

So this is a well-known term that should be afforded its plain and ordinary meaning.

And the dispute, as we see on Slide 32, is whether collimation permits some convergence or divergence as we propose or, instead, requires perfect parallelization, as Cytek proposes.

And the second issue is whether the rays must originate from a point source as reflected in Cytek's construction.

**THE COURT:** Do you think I can resolve this without resort to extrinsic evidence?

**MR. DENNHARDT:** I think you can, Your Honor, and I'm happy to go -- I know you're not as interested in the claims. I'm happy to go right to the specification.

**THE COURT:** When you say I'm not interested in the claims, I'm very interested in the claims. Okay?

**MR. DENNHARDT:** Okay.

**THE COURT:** Nothing I have said --

**MR. DENNHARDT:** I didn't mean to overstate.

**THE COURT:** You would be mischaracterizing what I said if you were to say, for instance, to the Federal Circuit that, "Oh, he ignored the claims."

That's not true. I'm starting with the claims. What I am saying is claim differentiations, I don't find to be a very compelling argument because of the ability of attorneys, as opposed to scientists and inventors, to manipulate claims, to add claims subsequent to the invention, years after, and then to come to a court and ask me to interpret the scope of the invention and the meaning of claims based on those additional claims that were really, as I say, drafted by lawyers.

So just refer back to that if it comes up in the Third Circuit, or the Federal Circuit.

Thank you. Go ahead.

**MR. DENNHARDT:** Understood, Judge. And, I'm sorry. I was just trying to go right to the written description here, because I think this can help resolve the dispute.

I do have a claim on here, but it's consistent with the written description that we see. And when the patents describe "collimation," they indicate that the collimated beam has substantially the same diameter. We see that both in the '582 patent, Claim 16, and in the specification at Column 45.

Column 45, again, just to indicate what we're looking at or what we're talking about, if we look at Figure 25 on the right, the two portions that it's discussing that have substantially the same diameter, the two collimated beams are the two that we've highlighted in yellow there.

And why does this resolve the dispute? Well, if perfect parallelization was required as Cytek proposes, it wouldn't say the word "substantially," it would say "it has the same diameter."

"Substantially" is intended to acknowledge that in the real world, in the way light actually behaves, there can be some convergence and divergence. Their expert agrees with that. He talks about the fact

that light scatters and there are aberrations. And we have this in the slides as well.

But the way that light actually behaves does not require perfect parallelization. And there are numerous references that say that, both intrinsic to the patent and extrinsic. And I'm happy to go through a few of those.

So starting with the intrinsic evidence. This is from the file history. And Cytek puts a lot of weight on the fact that the file history distinguishes between collimation and focusing.

We don't disagree with that. Collimation, for example, in the context of a collimating optical element and focusing optical element, those are two different things. And we seek to construe them differently. But we acknowledge that as a practical matter and in the real word, as it says here, "Collimation means generally maintaining the width of a beam."

It doesn't say it perfectly maintains the width of a beam. It says that it limits its convergence or divergence. We see the same in the second excerpt there.

That's consistent with the extrinsic evidence. Again, it talks about having nearly parallel

rays. It talks about having minimum ray divergence or convergence. And, again, on the bottom, we see nearly parallel rays.

Their own expert talks about the fact that collimation can include some convergence. So here's a patent for which their expert, Dr. Ilkov, who is one of the named inventors, and it says, "The collimating optical element focuses."

So their own expert agrees that there can be some convergence in a collimating optical element or in a collimating beam.

That's in the case law as well. In talking about the term "collimator," it says that it bends the incoming light rays towards the parallel. It doesn't say that it makes them perfectly parallel because, again, perfect parallelization doesn't exist in the real world. It's a physical impossibility.

And --

**THE COURT:** By the way, does the patent say that?

**MR. DENNHARDT:** Does the patent say...

**THE COURT:** That it's a physical impossibility.

**MR. DENNHARDT:** No. Well, because it doesn't need to.

**THE COURT:** All right. So then you are relying on extrinsic evidence.

**MR. DENNHARDT:** No, Your Honor. The file history is intrinsic evidence under the Federal Circuit case law.

**THE COURT:** Does the --

**MR. DENNHARDT:** So I will go back to that.

**THE COURT:** Sure. Does the file history say it's impossible?

**MR. DENNHARDT:** If you look -- here, let me go to it. I was actually just on that slide.

**THE COURT:** It's all right.

**MR. DENNHARDT:** Here's -- this is from the file history. This is Exhibit 6. It says, "Collimation, while not necessarily maintaining parallelism, given that achieving perfectly parallel rays is not realizable in practice."

So, yes, it expressly said --

**THE COURT:** Well, in practice. Okay.

**MR. DENNHARDT:** Yes. So in the real world, right, when you actually have a product like we're talking about here, collimation is referring to limiting the convergence or divergence, not eliminating it entirely.

**THE COURT:** Okay.

**MR. DENNHARDT:** This is from our expert, that perfect collimation does not exist in the real world. It's from other references that Edmond Optics talks about the fact --

**THE COURT:** So that's what I meant. In the real world, it's not possible, then you are relying on intrinsic evidence as opposed to it's not practicable or it's not done in practice, which is the file history.

**MR. DENNHARDT:** Your Honor, I think that the patent discussing the fact that it's a beam of substantially the same diameter is an acknowledgment of that real world reality, right?

If perfect parallelization was possible and could be achieved, there would be no need to include the word "substantially."

**THE COURT:** How about the reference in the patent to "nearly collimated."

**MR. DENNHARDT:** Yes, Your Honor.

**THE COURT:** How about that? That would suggest, I mean, if collimated can never be achieved, why do you have to have "nearly collimated" as a term?

**MR. DENNHARDT:** Yes. Judge, I think on that -- first of all, "nearly collimated" isn't a claim term. Right? So it's not one of the terms that we need to construe, but it's a further acknowledgment that there

can be some flexibility in that.

And let me give you an analogy. If you think about a water bottle, right? The water bottle is full. Right? Your water bottle is next to you. When they come out, before you open them, it's full. But there's still some space in the top, right? It's not -- the volume is not 100 percent full.

Then you take a sip of the water bottle. The water bottle is not nearly full, right? So it's acknowledging that there is -- full, in and of itself has some variance, right? Nearly full means a little bit less than the variance that's permitted for full.

It's the same thing here, right? Collimation means substantially the same diameter. Nearly collimated provides a little bit more flexibility.

But, again, it's not a claim term, so I don't think that's really necessary for Your Honor to construe in this case.

**THE COURT:** Last question. How is this going to play out in the case? If I agree with you, their expert's going to say what, it's not collimated? Your expert is going to say it is. They are going to, basically, dispute, what, how parallel the lines are?

**MR. DENNHARDT:** I think that's right -- Your Honor, it's not totally clear to me. You know, I guess

what it seems to me to be happening is because their construction requires perfect collimation, it seems to me that they might then try and turn around and argue, well, of course we don't do that because you can't achieve that in the real world.

And so if that's the case, well, then they've precluded any product from ever doing that, right? Because it doesn't exist. You can't -- you can't achieve it.

Would you be okay with saying it's got to be construed at substantially collimated?

**MR. DENNHARDT:** Your Honor, I think if you were looking to resolve this dispute using exclusively the intrinsic evidence, I think we would be okay with saying that "collimation" means "substantially the same diameter."

**THE COURT:** All right. Do you think the bottle is nearly full now or not?

**MR. DENNHARDT:** Sure. I think that's nearly full.

**THE COURT:** Okay. All right. Thank you.

**MR. DENNHARDT:** Thank you, Your Honor.

**THE COURT:** Before you start, I know you've got a nice chart there, can you live with "substantially collimated"?

85

MR. PIVOVAR: I don't think so, Your Honor.

THE COURT: No? Okay.

MR. PIVOVAR: I can explain why.

First of all, it's indefinite, variability. We're going to have experts, one saying it is and it's going to be a fight over that. So it is really something that has to be resolved. And what we think is that -- I hope that this is large enough.

THE COURT: It's not.

MR. PIVOVAR: Okay. May I move it closer?

THE COURT: Yeah, but I've got news for you, you're probably going to have to hand it up to me to see it.

MR. PIVOVAR: Well, I have slides as well.

THE COURT: Probably be good.

MR. PIVOVAR: So as long as it's not blocking the slides, that's fine. I just want to put this up here.

Just for the record, the board here is an excerpt of the file history at Exhibit 7, Pages 9 through 10, and is a portion of the file history that we pointed out in our briefing that was completely ignored by plaintiff in their argument today, which I will be referring to. I just wanted to get that up there for the benefit of this.

86

THE COURT: Okay.

MR. PIVOVAR: I really did, Your Honor, want to come back to exactly what you pointed out as well, and that is --

Can I go to the document viewer?

-- is that if you look at the '582 patent in Column 28, around Line 29, it refers to, you know, "A nearly collimated circular Gaussian beam."

Right? Nearly collimated. That's a -- that's different than what the claim language is that we're dealing with, which is collimated, collimating. It doesn't say "nearly collimated" in the claims.

And then if we look at -- it's a term of degree, really. What they're trying to do is inject a term of degree that's ambiguous and subjective into their construction for this term, which will be well understood, which I will get to.

But I also did want to point out to Your Honor that Column 44, down near the bottom, at Line 65 through 67, they refer to "effectively collimated."

Right? So there's a category here that we have that is collimated beam. Then somewhere past that you have something that's nearly collimated.

The claim language here says "collimating," "collimated beam." That's what we're focused on.

87

I do want to address, just briefly, briefly, some of the arguments that were being made by plaintiff because they're not consistent with our construction.

Okay? When they say "perfect parallelization is not possible," they never explain to you what that means. What they're saying there is that if I have a beam of light, I cannot make every single ray within that beam parallel. It's practically impossible to do that. And we agree. And our construction does not require that. And I can explain this in a second.

But just so we're clear on that, that in their briefing they try to make a big deal about that. We're not trying to construe this to a physical impossibility. Our construction is true to what collimating means. It requires parallel rays.

I will explain briefly, if I can, because we'll get a look at optics and other things, why our construction doesn't require that. And our construction is true to what we have.

The other thing is you mentioned -- and this kind of came up in their briefing a little bit -- but in optics, going back to Newton, actually, who was the first one who came up with optics, there's a construct, this idea of, like, well, let's start with a point source of light, like a very small source of light.

88

And I think this kind of bears a little bit on what you asked Mr. Chen about with respect to the collecting optical element, what happens.

So when the laser beam hits a cell or a particle, the light goes everywhere, just like our sun emits light in all directions, right? So when you do that, what you want to look at when you think about a point source, is that, okay, the source is very small. So when I see the light coming out of it, all we do is kind of projecting, kind of as a nice kind of cone shape.

And that only happens if the point source is very small. And it gets a little complicated. But if you look at the sun, right, the sun is not a small point. There are -- you can see it as a big spot. The rays that are coming to you from one side of the sun versus the ones on the other side are not going to be part of this perfect kind of cone.

So because -- but if you look at a star in the night sky and it's very, very far away, it does look just like a point, right?

And one of the ways that you can actually get collimated light that's used in this is you look at star light, and they actually use star light with lenses because the beam is collimated because it's coming from

89

so far away.  There's no divergence, you know, it's a very small point, to actually measure what the focal length is of lenses doing that.

So the point is, this idea that in their briefing they are like, oh, point source doesn't exist.  You can't rely on it to interpret anything here, I did want to bring you to this --

Can we go to the document viewer?

Mr. Chen mentioned the '412 patent that they have that's not asserted here.  So if we look at the file history -- and this is plaintiff's statement.  You can see here -- zoom in a little bit, Your Honor -- they're describing the prior art, and they say, "The detecter from the prior art is used to detect light emitted from a point light source such as a single mode optical fiber in a WDM to be used with a communication system."

Then they say, "The size of an object of such point light source is usually measured in micrometers."

Then they explain, "As such, such point light source has much less etendue than a bigger light source."

So this is plaintiff going to the Patent Office and saying, "I can understand this prior art reference.  It uses a single-mode optical fiber.  The

90

size of that is measured in micrometers.  And I'm going to refer to that as a point light source."

Right?  So all of the things that they say in their briefing of point light sources don't exist and you can't use that as construct, is belied by their own use of the term here.

Right?  So what we mean by, in our construction, points on a source, first of all, is different than a point light source.  It's, we're looking at points that collectively make up a light source.  So a little bit different there.

But, also, as used in the context of this technology, what you have are sizes of light sources that are on the order of micrometers by plaintiff's own admission, are considered point light sources.

This last statement here says, "This point light source has much less etendue than a bigger light source."

Okay?  And what that means is if I have a very small light source, like a point light source here, it is very easy to collimate that beam.  That's what the patent says.  You can do that.

As the light source gets bigger and bigger and bigger, on the order of milliliters, not microns, it becomes more difficult.  It becomes more difficult.

91

But I just want to point out, if you were in any way persuaded by their arguments in their brief that a point light source doesn't exist, they are using it in their own -- in their own file history here, Your Honor.

Can we go to the slides.

**THE COURT:**  This is the file history for what?

**MR. PIVOVAR:**  This is the file history for the '412 patent.  And, Your Honor, this was not, admittedly, submitted as an exhibit as part of all of the exhibits that we have.

I just wanted to explain to you there are constructs that we have here that are, you know, based on theory.  And then we apply them, which is totally fine.  Just to get into why our construction actually works and our construction has to do -- you have to understand, like ray tracing, all this stuff, not really easy from the briefing.  But I did want to start with those overall points.

So when you look at the parties' proposed constructions here, I think there's -- you know, there's a difference, but there's also some similarities.

So we both agree that you have to look at the rays of light in the beam.  And then we both agree that it has something to do with those rays of light being parallel.  Right?

92

And then the dispute we have is we have a different way of how you can analyze what a collimated beam is, which is consistent with even the exhibits they've submitted.  And what they're saying is, "Render rays of light more nearly parallel."

Now, for collimating as a verb, so it says in their proposed construction, Your Honor, this is why I think it's highly problematic is that it says, "More nearly parallel."

So, one, it has the ambiguity of what it means to be nearly parallel.  And it's just saying more.  "More" relative to what?  Right?  I can have a beam that's very, very divergent, like this, and if I -- if I make it a little less divergent, it's still a divergent beam, but I have made it more nearly parallel because I've reduced the divergence.

That's not a collimated beam.  That's not collimating.  That's not what's meant in the art.

So that is just something I want to point out, with that kind of injection of term of degree, ambiguity, and something that really isn't supported by any of the intrinsic record here.

And then when it comes to "collimated beam," they say it's a beam with nearly parallel rays.  I'm going to explain to you how they've read that to read on

93

to beams that are focusing and diverging in ways that are much more broader than what I think plaintiff has indicated how they're going to read it in their briefing or how they've kind of represented it here today.

What we have is a more specific, from dictionary definitions, consistent with the file history as to what a collimated beam actually is. So I will get into why that is, but our construction is "a beam wherein all rays of light originating from a point on the source."

Right? So I can think about a light source as a collection of points of light, and all of those need to be projected parallel with each other. And those rays within the beam are neither converging or diverging.

THE COURT: My problem, though, is where is all this in the patent? I didn't come away from reading the brief, your briefing, thinking, oh, it's all there in the patent.

MR. PIVOVAR: Yeah. There's no definitional statement, right? And I think this is in some ways why we are arguing that the term "collimating," "collimated," and "collimated beam" is indefinite.

THE COURT: I know you are, but why didn't you just put up there, I mean, it sounds like there's no

94

dispute that...

What's the POSA? What would I call a POSA in this case?

MR. PIVOVAR: We have some of that. But --

THE COURT: Something short, like give me, like, a three --

MR. PIVOVAR: Yeah. I --

THE COURT: If I were going to a university, what department?

MR. PIVOVAR: Exactly. Like a bachelor's degree, a few years of experience in optics and optical systems, that kind of stuff.

THE COURT: So an optician? Some sort of optics guy? What do I call him?

MR. PIVOVAR: Yeah, not -- well, you -- somebody who's trained in optical systems is part of it. Is part of it, yeah.

THE COURT: Okay. And optical systems person. Okay.

So if I've got to two optical system persons, they run into each other at a coffee shop, do you think that they would be able to have a discussion and refer to collimating, and they'd each know what the other is talking about?

MR. PIVOVAR: No.

95

THE COURT: Really?

MR. PIVOVAR: No. And here's why. The term is used in all different ways. You can look at their dictionary definitions. It's used differently --

THE COURT: The fact that it's in a dictionary, doesn't that tell you they could have a discussion?

MR. PIVOVAR: Well, let -- can I just, like, address that in a slightly different way?

So let me -- if we can go to the document viewer, please.

THE COURT: Let me ask you this: Do you think they could have a discussion what the meaning of optics is?

MR. PIVOVAR: No, they could. And they could get to a common understanding. But they couldn't just be, like, hey, my beam is collimated. Like, they would have a general understanding of what that means.

The issue is this: Every instrument or system requires a certain amount of collimation or a certain amount of precision with it in a certain amount of things.

THE COURT: Right. You're saying it's degrees.

MR. PIVOVAR: It's degrees, exactly, right.

96

THE COURT: Right, but then the fact that you said, you started with collimation tells me they could have a discussion. Now, they may debate what degree of collimation is required to meet a claim in the patent.

Isn't that really what POSA --

MR. PIVOVAR: That's -- that's right.

THE COURT: So then, why don't I just not construe this term and let your experts go to town, and you can, your expert could say, well, look, I've got to tell you, I don't know what the degree of collimation is that's required here. If I had to guess, if you forced me, maybe I'd say this, but in my mind, it's indefinite.

MR. PIVOVAR: Your Honor, I would say that it is necessary for you to review the intrinsic record and give some guideposts to the jury on this or else you are just going to have battling experts.

THE COURT: Okay. So if you want me, then...

I'll tell you what. If you want to construe it based on the intrinsic evidence, then why don't you, going forward, only refer to intrinsic evidence.

MR. PIVOVAR: Okay. Go back to the slides.

And so some of this, I don't want to, like, belabor this because maybe you get it, maybe you don't, but, like, you know, there are basically three different ways that lenses can interact with -- so you have a

diverging beam of light. And then it can go into some kind of, you know, lens or something like that.

It can be converging. These are looking at the rays. They would be converging. That would be a focus beam.

When you have light that's collimated, again, parallel --

THE COURT: Hold up. Hold up.

MR. PIVOVAR: I'm sorry. I just want to make sure we're all kind of calibrated around what we're doing before I jump in because I am going to get right into the intrinsic record for Your Honor.

THE COURT: Yeah, I know, but you started with extrinsic.

So just to be clear, the slide you are showing me is from a declaration, right?

MR. PIVOVAR: So the slide, if we go to this -- so the intrinsic record refers to this book *Practical Flow Cytometry*.

THE COURT: Yeah.

MR. PIVOVAR: Right? So it's in this book. It's referring to, like, the flow cytometer. And then with this, what we have here is a description of how that book that's cited in the intrinsic -- so it's part of the intrinsic record kind of indirectly because it's cited.

And all we're doing here, Your Honor, is trying to explain, you know, what the difference is between light rays that converge, and obviously you can see that, these light rays all converge to a point. That's a focus beam.

THE COURT: Right.

MR. PIVOVAR: If they are parallel after they go through it, that's collimated.

THE COURT: Right.

MR. PIVOVAR: And then if they're still diverging after they go through it, that's a -- like the rays are diverging, that's called a defocus beam.

THE COURT: Okay. So there's three broad categories that people talk about.

MR. PIVOVAR: Exactly. And light that's collimated sits in this very specific --

THE COURT: Yep.

MR. PIVOVAR: -- parallel ray point.

So we have some other things that kind of get into this and explain what all that is, but let's go to the intrinsic record.

So in the intrinsic record, there was -- and the poster board there is Exhibit 7, but as part of that for the intrinsic record in Exhibit 7, there was a definition from an optics glossary that was submitted by

the patent owner. Right?

So this is their submission to the Patent Office saying this is how we want you to understand what collimated beam is. It says a beam in which all the rays are parallel to each other. Right?

So if you were to construe this just from the intrinsic record, you could say that. That's not their construction, that would be consistent with ours.

THE COURT: So, wait. Hold up. Let's get this straight. I thought their...

I don't really like their alternative construction. I don't like it at all nearly, you know, but in fairness to them, they're saying it doesn't have to be construed, right?

Isn't that what you're saying?

MR. DENNHARDT: Yes, Your Honor.

THE COURT: Which seems like to me the right answer here. I'm going to guess...

Well, maybe I...

MR. PIVOVAR: Your Honor, if I could.

Can you jump down to the slide. So -- hold on. Hold on.

Can I have two minutes to explain?

THE COURT: Yeah.

MR. PIVOVAR: Okay. Watch. So here's the

file history. This is on the poster board. Okay? This was in our briefing. It's there.

And what plaintiff was doing here in this context of the file history is saying, okay, I'm faced with having to differentiate what collimating means from focusing. Okay? And they are dealing with this in the context of a patent that's being asserted against their claims.

And to do that, they say -- and you can see this in the highlights on our Slide 29, right? This is just all the differentiations. "The objective lens collimates rather than focuses the light." Okay?

So there's a difference between collimating and focusing.

THE COURT: Yep.

MR. PIVOVAR: Then they say, because the lens collimates the light, a person of ordinary skill in the art would have understood that the objective lens brings all of the rays parallel to each other, albeit with some beam divergence in view of practical limitation.

So we're talking about practical limitations, right? You can't make a perfectly parallel beam. And the practical limitation here also has to do with how big is your light source, right?

If I have a small point source, it's going to

have less beam divergence. If I have a bigger light source, it's going to have more beam divergence. And that's one of the practical limitations that they're talking about here.

But then let's look at what it goes into the next sentence, which I think is the key one for you to look at. Collimating fluorescent light. This is not focusing the fluorescent light, which instead involves converging the light. Right?

So they're saying, hey, when it comes to us differentiating our understanding of these terms to the Patent Office to differentiate form the prior art, we clearly understand that collimating fluorescent light is not focusing the light because it instead involves converging the light.

So this is the intrinsic record. They understand that. So --

THE COURT: Okay. All right. So why don't we construe it that it's collimating is bringing all of the rays parallel to each other, albeit with some divergence in view of practical limitations.

Can you live with that?

MR. PIVOVAR: I think that's close, Your Honor.

THE COURT: Okay. Can you live with that?

MR. DENNHARDT: Your Honor, I think that would be picking and choosing portions of the intrinsic record.

THE COURT: Yeah, but that's not my question. My question is: Can you live with it?

MR. DENNHARDT: I don't think it would be accurate to construe the term in that, way and I'm happy to explain why.

THE COURT: Okay. All right. Have a seat.

MR. PIVOVAR: All right. So I just want to get to the point that you were making is that -- and also we're going to be having discussions about this and what it means. But just to show you how this matters.

So collimating fluorescent light is not focusing fluorescent light when they need it to be that way. And even more importantly, Your Honor, on the end of this it says light that's effectively collimated. We looked at this in the specification of the '582 patent, "By collimating, optical element 902 is not converging."

THE COURT: Right.

MR. PIVOVAR: Right? So collimating light is not focused or converging. And even effectively collimated light is not converge.

THE COURT: Okay.

MR. PIVOVAR: So Dustin, let's go to the slides that are near the end. I will -- all right.

So I'm going to put this into context for you. This was something I was going to do after the terms, but what you have here on our Slide 49 is a depiction of one of Cytek's patents. Okay? It's Figure 2A from the '076 patent. This is Exhibit 34 attached to the Joint Claim Construction Brief.

THE COURT: Time out. Time out.

MR. PIVOVAR: Yep.

THE COURT: This is what patent?

MR. PIVOVAR: If you have the joint -- we do this in the Joint Claim Construction Brief as well. But this is Exhibit 34.

THE COURT: Exhibit 34. Okay. But go back to what patent is it?

MR. PIVOVAR: So I was just going to use this because these are the images that plaintiff relies on in their infringement contentions to explain to you how they're reading their terms.

THE COURT: Okay. I don't want to hear any more about contingent claims. It's already almost 3:30. I've got to get to claim construction.

So why am I looking at -- again, I've asked you to look at the intrinsic evidence, and now you're talking about some written description from another patent.

MR. PIVOVAR: I'm not, Your Honor. So all I was doing here is -- just so you know, like, these are converging rays in yellow. In green they're diverging. There's no collimated beam here whatsoever.

THE COURT: Okay.

MR. PIVOVAR: Okay. Here is plaintiff's infringement contentions. Under their proposed construction, this converging focused beam is a collimated beam. This is exactly why you have to construe it. Right?

They're coming in and they're going to say, well, hey, if we say nearly more, we can say whatever we want. Even though the file history expressly says focused light, converging rays is not a collimated beam. They want to get away from that. Right?

And that's why, you know, the question is, when you look at this, and you can look at it again, but when you look at their briefing on this -- and we pointed this out -- they're saying, oh, this is the collimated beam that's parallel and this is the second collimated beam that's parallel.

We agree. You have to have parallel rays in the beam for it to be collimated. The question you to ask yourself, Your Honor, is, like, why didn't they identify this to you?

105

It's because they want you to construe it, they want you to construe it vaguely with their indefinite terms. They want to point to things and say, well, I can't be perfect. And then they want to take that and say, well, if it's not perfect, we can go back and read it onto a focused beam, which if we go back to the file history and you look at the slide -- the board right here, they expressly said it's not focusing. Collimated light doesn't focus.

So this is really why from the intrinsic record, Your Honor, you can see that their construction is wrong, and it can't be what we have. We can't be defining the patent claim terms around that.

Now, I think that, you know, the proposal that you have -- so -- is to basically say brings all the light rays parallel to each other.

THE COURT: Right. You can say it can't be convergent, it can't be focusing. And we could put that in the definition. I mean, I think that's very, very clear. And if they're playing a game, that will take it.

Now, you know, that would be one way to tackle this.

So do you have a proposal?

You know, I don't like "nearly." I mean, that strikes me as --

106

MR. PIVOVAR: So, Your Honor, I think you -- your proposal is only -- you're reading on what's -- we're pointing to in Exhibit 7 of the file history that says "brings all of the rays parallel to each other, albeit with some divergence in view of practical limitations," and does not include "focusing" or "converging the light" or "converging light rays" would be something that would probably be pretty acceptable to us. I want to, like, make sure that that's fine. But I think in principle, that would work.

THE COURT: Okay. Why don't you confer with your client? Is your client here?

MR. PIVOVAR: Our client is not here, actually.

THE COURT: Okay. So why don't you confer with your colleagues. And then let's hear from the plaintiff.

MR. PIVOVAR: Yeah, substantively, Your Honor, that is our construction. You get -- it's different words describing different ways, but substantively that's what it is, so that's fine.

THE COURT: Okay.

MR. PIVOVAR: And I think just, you know, if you have -- I know we're running short of time. If you have any other questions, I can explain all of the optics

107

and all that, but if we're looking at doing this just from the intrinsic record, it's clear from there, right? Parallel, some divergence, not converging, not focusing.

THE COURT: Okay.

Let's hear from this side.

MR. PIVOVAR: All right. Thank you, Your Honor.

THE COURT: Thank you.

All right. So how parallel do they have to be?

MR. DENNHARDT: Well, Your Honor, I think, first of all, let me start with what we have in the intrinsic record. Right?

You asked counsel: Would you be okay with saying collimating means substantially the same diameter? He said no. Right?

This comes from the specification in the claim.

THE COURT: Well, actually, so "substantially the same diameter," again, I don't find that that helpful. Substantially parallel, isn't that really what we mean?

MR. DENNHARDT: Well, it's effectively the same thing because once --

THE COURT: Okay. So then, you could live

108

with...

So could you live with substantially parallel?

MR. DENNHARDT: I think we could live with substantially parallel.

THE COURT: Can you live with noncovergent?

MR. DENNHARDT: I don't think we can.

THE COURT: Why not?

MR. DENNHARDT: Let me show you why. The file history -- if you remember, when we talked about when he put up his board, he said we distinguish focusing from collimating --

(Reporter clarification.)

MR. DENNHARDT: I'm so sorry.

We said from the outset that I don't disagree that focusing and collimating are two different things. Right? But he's picking and choosing certain portions of file history and ignoring other portions. Looking at --

THE COURT: You just said... hold on.

Okay. You just said, "We have said from the outset, I don't disagree that focusing and collimating are two different things."

Great. So why can't you agree as part of the construction that collimating is not focusing?

109

**MR. DENNHARDT:** Because, Your Honor, when a beam is collimated, there may be some convergence. So if you want to take this from the file history and say generally maintaining the width of the beam, including, for example, limiting its convergence or divergence, but not focusing, we would be okay with that.

But the point is --

**THE COURT:** Hold up. Hold up. Hold up.

**MR. DENNHARDT:** Yes, Your Honor.

**THE COURT:** See, I don't like the... I just feel like you're...

Why do you keep going back to the width of the beam as opposed to referring to parallel?

**MR. DENNHARDT:** That would be fine too. Generally parallelizing the beam, limiting its convergence or divergence but not focusing, that's okay.

They want to eliminate any convergence at all, right, and that's not what the file history says. It says limiting convergence or divergence.

If we wanted to add to that "but not focusing," that's okay with us. We don't disagree that collimating and focusing are different.

**THE COURT:** I think a compromise is reachable here if people are being reasonable.

**MR. DENNHARDT:** Sure.

110

**THE COURT:** Right? I think each side is trying to maintain absolute positions. You don't want to have anything...

You want to avoid precluding any convergence or any focusing.

**MR. DENNHARDT:** I would say any convergence. To the extent that there's limited convergence --

**THE COURT:** Or divergence.

**MR. DENNHARDT:** Limited convergence or divergence. That's right. We don't an absolute that says you can't have any convergence or divergence.

**THE COURT:** Right. Right. Okay. And they want some precision.

**MR. DENNHARDT:** I think, Your Honor --

**THE COURT:** And I think at the end of the day, the experts, this is boiling down to experts. I mean, the experts are going to have to come in and tell me and tell the jury what is an acceptable degree of divergence or convergence that would not render something non-collimating.

And presumably their expert would say the position your expert is taking is so extreme, it's allowing for so many convergence and divergence, that either it can't be accepted as falling within collimation or it's rendered the notion of collimation

111

indefinite. That's really what this boils down to.

**MR. DENNHARDT:** Judge, I think you're exactly right. And I think, going back to your original suggestion of not construing the term and letting it go to the experts, I think would be an acceptable solution here.

**THE COURT:** Well, the other alternative would be to come up with something in between what your friend said a few minutes ago was acceptable and what you're saying. And it strikes me that we ought to be able to come up with something.

So give me your best. What's your best proposal?

**MR. DENNHARDT:** Judge, I think if we said limiting its convergence or --

**THE COURT:** Hold on. And let's start with "collimating." Right? Just construe collimating.

**MR. DENNHARDT:** Collimating means rendering the rays substantially parallel, limiting its --

**THE COURT:** Hold on. "Rendering the rays substantially parallel" such that what?

**MR. DENNHARDT:** There's limited convergence or divergence.

**THE COURT:** "There is limited convergence and divergence."

112

**MR. DENNHARDT:** And if they want "but not focusing," that's okay with us.

**THE COURT:** How about "substantially such that any convergence and divergence is limited to the extent possible."

"Rendering the rays parallel such that there is..."

Sorry. "Rendering the rays substantially parallel such that any convergence or divergence is limited to the extent possible."

**MR. DENNHARDT:** Your Honor, I think generally that's in the right direction.

I think the challenge that comes to mind is how do we determine to what extent convergence or divergence is, you know, limited to the extent possible, right?

**THE COURT:** I know. But that's why they're saying its indefinite. I mean, frankly, what I also think we ought to do is we ought to tee up summary judgment for indefiniteness and let's do that before we go too far down the road in this case. So that's where I think we're going to end up. All right?

All right. Can you live with: "Rendering the rays substantially parallel such that the amount of convergence and divergence is limited to the extent

113

possible."

Can you live with that?

MR. PIVOVAR: I'm thinking about it.

THE COURT: Well, think about it, then don't talk. Just go back and talk to your partner and think about it.

MR. PIVOVAR: I'm sorry, Your Honor. It's just because if you minimize the amount of convergence or divergence that could be in a beam, you end up with our construction of a collimated beam. That's the point. So --

THE COURT: Well, then you win. If you like it, then you should say I like it.

MR. PIVOVAR: And I just want to make sure that, like, if we're going to agree to something like that, where it's minimizing -- and the question is to me, minimizing the convergence or divergence, is that a comparable?

Like if I can minimize the divergence relative to the convergence, which way do I go? There are some issues on that.

But anyhow, Your Honor, I did want to, if I could -- I know you're trying to reach an agreement here. And I just want to be clear here that having a collimated beam when it comes to light -- when it comes

114

to light, having convergence of a collimated beam is a physical impossibility.

And I know they're pointing to all this extrinsic evidence. There's nothing in the intrinsic record that ever says a contracting beam. They say maintaining the spots eye or the diameter of the beam and limiting or not significantly expanding the beam, because everybody understands that a collimated beam will have some divergence and no convergence. And I do want to address this --

THE COURT: We will have divergence but not convergence?

MR. PIVOVAR: Not convergence, Your Honor. And I did want to point this out because the main -- can we go to the --

THE COURT: All right. But hold on. I think I can address that. Hold on.

MR. PIVOVAR: Okay.

Can you go to the document.

THE COURT: I think I've addressed this. "Rendering the rays substantially parallel such that any convergence and any divergence are limited to the extent possible."

So it's any divergence, any convergence. So even if it is only divergence, you still get your way.

115

You could do it. Doesn't have to be both convergence and divergence. Can be either or both.

MR. PIVOVAR: I'm sorry that I'm pausing there. I'm thinking about the active on this. Right? What's the --

THE COURT: The what?

MR. PIVOVAR: There's like an active aspect to this, right, because it's saying -- I believe you said, like, limiting to the extent possible.

THE COURT: Limited.

MR. PIVOVAR: Limited?

It's to the extent possible, right? So...

THE COURT: I thought you wanted that.

MR. PIVOVAR: No. We do. We do. I'm just thinking about it -- I'm sorry -- in an application of let's say I have, you know, light coming into a lens and it's a focused beam. And, like, well, to the extent possible --

THE COURT: Aren't you going to still say it's still indefinite? Even with that definition, it's indefinite?

What does "to the extent possible" mean?

MR. PIVOVAR: Well, that's a good question.

THE COURT: Yeah. Well, that's what I'm wondering.

116

MR. PIVOVAR: But if we're saying if I'm going to -- I'm going to minimize the amount of beam divergence that a ray of light has, right, just that, that's a -- that's the definition of a collimated beam. When it comes to light, that is it. It has divergence and it's minimized.

If I have a diverging ray, it's going to be bigger, and it's not going to be minimizing the amount of divergence.

THE COURT: I thought you also want convergence?

MR. PIVOVAR: No.

THE COURT: I mean, I thought originally you did until just the last two minutes but --

MR. PIVOVAR: Right. We pointed out how in the file history here it says no convergence.

You can bring up the slide, Dustin.

And I did want to point this out. So here's how this went down from a file history standpoint. Exhibit 7 that you see on the board that we talked about before, they're first confronted with the rejection by the examiner. This is what they say, right?

A person of ordinary skill in the art would not understand that the objective lens brings all of the rays -- would understand, sorry -- parallel to each

117

other... some beam divergence... this is not focusing --

THE REPORTER:  Can you read slower.

MR. PIVOVAR:  I'm sorry.

This is not focusing... light effectively collimated...

This is on Slide 30.  This is what they said.

Now, they had a parallel argument with this, but this is what they told the examiner when they were trying to do this.

Now they came back and this is the portion of file history that plaintiff's counsel is pointing to. They came back later after the examiner had already agreed for a different reason that they would be able to get their claims through and they changed.  They changed what they said in some ways, and they kept what they said in other ways.

They're like collimates rather than focus. Collimation is not focusing.  They're distinguishing between focusing and collimation.  So they're still doing this.

If this look in this middle of this on Slide 31, our Slide 31, it says -- it changes what a POSA's understanding was from the previously what they said to what they're saying later to try and expand this out.

118

And I did want to point this out, Your Honor, because this -- it says see, for example, Specification 4:46 to 63.  That has the indication that it's pointing to the specification, and it has support in the intrinsic record.

The file history specification --

THE COURT:  I am losing you.  What's the main point here?

MR. PIVOVAR:  So the main point here is that he is pointing to a second part -- or counsel for plaintiff is pointing to a second part of the file history, saying you should just adopt this and let's broker a deal from this.

This is wrong.  This is wrong on Slide 31.

THE COURT:  Okay.  So then, you just...

Are you saying you just get convergence out of it and just talk about divergence only?  Is that your point?

MR. PIVOVAR:  That is my point.

THE COURT:  Okay.  Well, then, "Rendering the rays substantially parallel such that any divergence is limited to the extent possible."

You can live with that?

MR. PIVOVAR:  As long as the understanding is it doesn't involve converging beams or convergence,

119

that's fine.

THE COURT:  But then I put convergence in I thought precisely --

MR. PIVOVAR:  No, no, no, no.

THE COURT:  -- because you said you are concerned about convergence too.

MR. PIVOVAR:  No, no, no.  I'm sorry, Your Honor.  It excludes convergence.

So if you put on that phrase, "comma, excluding focused light or converging light," fine. Right?

It's the interpretation of the words, right? If you take out -- we think --

THE COURT:  You want to say there can be no convergence whatsoever, but there can be divergence?

MR. PIVOVAR:  Yes, Your Honor, that's right.

And I did just want to point out in this --

THE COURT:  And...

MR. PIVOVAR:  This is exactly what they said in their previous thing, "parallel to each other with some beam divergence."

Right?  Not focusing, which involves converging light, light effectively collimated is not converging.

This is the whole point of what they're

120

saying here.  And what they do in their follow-up, this is on Slide 30 from the file history of Exhibit 7.

But if you go to our Slide 31, which is Exhibit 6, which is the follow-up, well, they try to back off that because they know that the examiner has already done something, and they want to make it seem like this is supported by the specification.

And the point I wanted to make here, Your Honor, is there is no citation in the specification in this file history that is that.  And the file history --

THE COURT:  They just made it up?

MR. PIVOVAR:  I have no idea where it came from.

So the file history is double-spaced.  It stops at Line 30.  And if you look on Page 4 of the specification, there's nothing there.  Another thing, you don't have these lines on Page 4 of the specification of the file history.

THE COURT:  Was this in the brief?

MR. PIVOVAR:  Our expert addressed it, but this was a lot there.  They pretty much -- we had to fight them a little bit about the file history.

But the point I was just trying to make here, Your Honor, is this has no support other than attorney argument.  Right.  Okay.  We are going to say this now.

He's saying something that's different than what he said before. All we're saying is that's not right. And he's still admitting that collimation is not focusing, none of these other things. And if you look -- sorry, Your Honor. I know I'm going pretty fast.

If you look at Slide 31, then, in conjunction with all of this, what they did is they said, well, we think -- we all understand that collimated beams are not focused beams with any converging rays or anything like that.

What we're going to do though anyway is we're going to amend our claims because -- to make clear that light that's focused by collecting optical element convergences instead of being collimated. Right? Instead of being collimated. Not -- I understand that. But I'm just pointing out why the convergence, even in -- even in the portion of the specification that they're talking about -- they're distinguishing between focused light, collimated light, and light that's converging further down.

Collimates the fluorescent light, is not configured to focus the fluorescent light such that the fluorescent light leaving the objective beam converges as the claims require.

So even in this excerpt that they have where they cite to a portion of the specification that doesn't exist, they are still admitting that collimating light doesn't read on converging or focused light.

So this is all supportive of why what you said, and you've recognized, from our perspective is the collimated beam never has focused or converging light. And --

THE COURT: The intrinsic evidence that you are quoting from right now --

MR. PIVOVAR: Uh-huh.

THE COURT: -- came after the patents were issued, right?

It's a response to the May 2, 2024, Final Office Action.

MR. PIVOVAR: This is from the file history of -- that was part of the family being prosecuted over time. That's right.

THE COURT: But it's based on the same written description. In other words, the patent that it is addressing, which is not one of the asserted patents here, but it's the same family of patents and it shares the same written description; is that the case?

MR. PIVOVAR: It shares the same written description, and I am nearly certain this is from the file history of one of the asserted patents, the '106

right? Yeah, the '106 patent. This is one of the asserted patents.

THE COURT: It is in one of the asserted patents?

MR. PIVOVAR: Yes.

THE COURT: But it's after its issuance? No? It's before?

MR. PIVOVAR: Yeah. This is part of the file history leading to --

THE COURT: Sometimes people call file history intrinsic evidence, you know, PTAB. That's what I am trying to get at.

MR. PIVOVAR: Yeah. Yeah. This was part of -- so in this case -- not to go back, originally plaintiff asserted two patents. Patents issued in December, asserted those to this case.

THE COURT: Okay.

MR. PIVOVAR: Those two -- of those two that were newly asserted, one of them is the -- it's the '106 and '107 patents that were added to this case. This is the file history from the '106 patent before it issued.

THE COURT: All right. Thank you.

MR. PIVOVAR: So this is all part of the kind of non-after disputes of the PTAB.

And the key thing is that they are characterizing and telling the examiner what these terms mean. And all we are saying is, like, be consistent, right? Stick with what you said in the file history.

And then, if you go back to our slide -- I'll get there. It will take me a second, a little while.

It's this, Your Honor. It's this. Their allegation of infringement under this term is completely divorced from what they told the Patent Office. Even in the excerpt, like I said, of the file history that they truncated, within the broader part of that they say "focused light like this is not collimated."

Didn't stop them from making the allegation as part of their -- as part of their infringement contentions.

So that's why we need to construe this. And if you have any specific other proposals, I think you understand our position. Our position is a collimated beam can never have focusing or converging light. It can have beam divergence.

THE COURT: Right.

MR. PIVOVAR: And we accept that. Our construction does that. It's not necessarily in the same words. Substantively, that's what it does. So form over substance.

THE COURT: Okay. Thank you.

125

MR. PIVOVAR: Thank you, Your Honor.

THE COURT: Just wait a second, please.

All right. Can you point me to anywhere in the written description where there's any statement that to the effect that collimating or collimation, if that's a word, would allow for convergence?

MR. DENNHARDT: Yes, Your Honor. It's right here. Its' talking about substantially the same diameter. It could have said "substantially the same diameter but without any convergence," but it didn't say that. It just said "substantially the same diameter."

Right? So it's not limited to just divergence, as they want to say.

THE COURT: Okay. Do you have anything else?

MR. DENNHARDT: I think that's what I have at my fingertips. Again, I would note that the file history itself specifically says --

THE COURT: The file history, I just want to start right now with the written description of the patent.

MR. DENNHARDT: Sure.

THE COURT: Hold on.

MR. DENNHARDT: Yes, Judge.

THE COURT: What is a divergence angle?

MR. DENNHARDT: I believe, Judge, a divergence

126

angle talks about, if you assume what perfect parallelization would be, divergence angle refers to how far a beam might diverge beyond what you would assume to be a perfectly parallel beam.

THE COURT: Is there such a thing as a convergence angle?

MR. DENNHARDT: I believe there is, Your Honor, yes.

THE COURT: What's etendue mean?

MR. DENNHARDT: Your Honor, it is a complex optical term that does refer to the amount of which a beam varies from a perfectly parallel beam. I would have to defer to an expert on that, which I admittedly am not.

THE COURT: Okay. Would you agree that that's generally a good definition for etendue? Is that how you pronounce it?

MR. DENNHARDT: Etendue?

THE COURT: Yeah.

MR. PIVOVAR: I didn't catch all of it, but --

THE COURT: What do you think etendue means?

MR. PIVOVAR: So etendue is a concept that is a measure for how large a light source is, multiplied by how wide the beam divergence is.

So it kind of gets to this notion of, like, how far -- when we talked about a point source, you have

127

a point source and it's going to have all these rays of light that are emanating from a single point. It's going to come out like a cone.

Whereas, if you have etendue in a bigger light source, it's not going to come to a point on the cone, it's going to have light emitting from different things. Etendue is a concept that tries to quantify the distinction between what would be a point source and a larger source and how the light is shaped and what implications that has on collimating light and things like that. So it is a concept.

THE COURT: You had that word in one of your slides, right, etendue?

MR. PIVOVAR: It's in the patent. That's how they describe it.

THE COURT: Well, I just want to know, when you have it in your slide, is that from Column 44 of the patent or is that from something else?

In other words, is it from another source or is it from the written description of the patent?

MR. PIVOVAR: It's certainly in the written description of the patent.

THE COURT: I know it is. In your slide, when you say "it" --

MR. PIVOVAR: Yeah, I'm sorry.

128

THE COURT: -- is the slide that you had where you used the word "etendue," was that taken from the patent?

MR. PIVOVAR: I believe what I did was I put up a part of the file history of '412 patent. So it's not a slide I have. I used that as a depiction and in that, when I read it, it referred to etendue. It did.

I don't believe -- the specification certainly says that. I just want to be clear that -- I think what you may be referring to was when I was reading from the file history on an actual physical document.

MR. DENNHARDT: Judge, if I recall, I believe it was from the file history of a patent that is not asserted in this case.

THE COURT: Right.

MR. PIVOVAR: But it's a concept, and we would agree that experts would get into that. But it's sort of a proxy for saying I have an extended light source. I have, like -- I have a big light source. It's not a point source. That's going to complicate things. We have to adjust for that.

THE COURT: Do you agree that there's such a thing as a convergence angle?

MR. PIVOVAR: I don't know that I've ever seen

**129**

that, but that doesn't mean it doesn't exist, Your Honor.

THE COURT: But you know what a divergence angle is?

MR. PIVOVAR: Yes. I mean, that's in our slides and part of our proposed construction, how we mapped it out.

MR. DENNHARDT: Judge, I do just want to note that this notion that there can be no convergence is not something that -- excuse me -- is not something that is supported by the references. And the notion that a collimated beam can have some convergence or divergence is not something that we made up.

I know, Judge, that you are less interested in the extrinsic evidence, but this is from the Fiber Optics Standard Dictionary. This is their reference. It says, "Collimation has minimum possible ray divergence or convergence."

So the notion that a person of skill in the art would believe that collimation precludes any convergence is inconsistent with the Fiber Optics Standard Dictionary that Cytek, itself, cites for you.

So this is not an idea that we created. I know that my friend on the other side doesn't like this portion of the file history, but it's true. And it's supported by both intrinsic and extrinsic evidence.

**130**

THE COURT: His point, I think, is that it's inconsistent with prior statements made in the file history, and they are very self-serving. That's what happens in these file histories.

As you get later patents, you try to get later patents on an earlier written description. To be quite candid, I see it all the time. There's manipulation. And I think it really calls into question how much you can rely on the subsequent file history.

I think if the subsequent file history is inconsistent with earlier statements, it's telling.

MR. DENNHARDT: Judge, I don't -- first of all, I don't think that we're talking about a long variance here. I think that the portion of the file history that we're talking about here comes just a few months after the version that they like. Right?

So it's not like this was something that was prosecuted ten years ago, and then ten years later, we said, oh, and by the way, it's limited convergence or divergence. It was within a very short period of months.

The second point that I would make is it's not inconsistent. I started, again, from the outset that collimation and focusing are two different things, and we don't dispute that. Right? And that's what that

**131**

portion, I think, that he has --

THE COURT: They seem to be saying that they would have an expert who would say absolutely when optics experts are talking about collimation, they would say you can't get perfect parallel waves.

Is it waves? Is that the right word?

MR. DENNHARDT: Rays.

THE COURT: Rays. Sorry.

You can't get them perfect, consistent with what was discussed with the Patent Office, right, in these patents.

And there will be some divergence. But it sounds like their expert is going to say, but no one would agree that there's going to be convergence.

MR. DENNHARDT: And, Judge, if that's what their expert wants to say, we would love to cross him with the Fiber Optics Standard Dictionary.

THE COURT: That's what strikes me. The word "divergence" is used. "Divergence angle" is used in the patent. "Convergence" is not used. Actually, hold on one second.

"Converge" is used once in the patent, but does not appear to be, its usage, to be in any way helpful to construing this term.

MR. DENNHARDT: Judge, I think the right

**132**

result here is where you started initially, which is, I think this is going to be a battle of the experts as to what amount of convergence, if any, or divergence, if any, is acceptable.

And the right way to approach this is, don't construe the term. Allow the experts to battle it out at trial. Again, we'll ask them, "Well, tell us why the Fiber Optics Standard Dictionary says you can have some convergence."

Right, the standard dictionary says you can have some convergence. But you, expert, saying that we don't infringe, says, oh, actually we think it can't. And we'll have that battle at trial.

THE COURT: But I do not find satisfactory the nearly parallel language that you have in there. I think it's --

MR. DENNHARDT: Understood, Judge. And I would just, again, point back to the file -- excuse me -- the written description that says "substantially the same diameter."

It doesn't limit it to convergence or divergence. It just says "substantially the same."

And there are numerous cases that say you can talk about substantially. Why can you do that? Because a person of skill knows how much substantially is

133

appropriate.

And that includes in connection with substantially parallel in a Delaware case decided by Judge Andrews in which he said "substantially parallel is not indefinite because a person of ordinary skill would know what 'substantially parallel' means," and that's exactly the case here.

THE COURT: All right. Hold on a second.

Okay. Thank you.

MR. DENNHARDT: Thank you, Judge.

THE COURT: All right. I'm not going to construe this term. I'm going to give it its plain and ordinary meaning.

I do think it raises, though, serious concerns about indefiniteness. I also think there may reach a point where I would have to construe it, but I could only do so after hearing expert testimony.

So we'll go to trial, and I will do what I did last week, or two weeks ago in a patent trial, they all go together, where I left it to construe it at trial. Both sides had some risk when they went to trial.

In that case, turns out I didn't have to construe it because of the way the expert testimony came in, and we let the jury decide, based on plain and

134

ordinary meaning. And both sides agreed, before the case went to the jury, that we didn't need claim construction. So that could happen here.

Let me say a couple things. I mean, I am very sympathetic to the defendant. And I think it's undisputed, first of all, that, one, you cannot achieve, at least in practice, if not even possibly in this world, absolute parallel rays. And yet, it's also undisputed that "collimating" is a concept that's understood by the experts in this field.

I think it's undisputed that there can be some divergence in rays that are recognized as collimated. Very much disputed whether you could have convergent angles in a collimated beam.

The patent, in various instances, discusses substantial or substantially collimated beams. If you look at, for instance, Column 2, 26 through 29, the lines of Column 2, they discuss a device capable of collimating a light beam from an extended light source over an extended distance without significantly expanding the beam diameter.

So consistent with there can be a divergent angle, that sentence seems to me to suggest that you can have a collimated beam with some divergence. But it's without significant divergence. And then that begs, you

135

know, the question is, is it possible to have any really definite sense of what this patent is claiming.

And then in the claims, but I put less stock in the claims on this, there is discussion about substantially the same diameter. I find it more probative, the written description citation I just gave. But I don't think I have to go further on that because I think it's pretty much undisputed about divergence.

And I just think that it's likely this will boil down to a question of degree that the experts will have differing viewpoints on; i.e, what degree of divergence and, perhaps, convergence could be accepted and still have a collimated beam.

So I am just going to give it its plain and ordinary meaning. I'm not going to construe it, and we'll have a battle of the experts.

All right. Next?

You are going to have to pick it up.

MR. KHAN: Thank you, Your Honor. So based on the parties' discussions, next term will be "optical element."

THE COURT: Okay.

MR. KHAN: And so on this one, Your Honor, the term is "optical element." It is situated within a larger term. Optical element configured to detect.

136

And, essentially, the difference is between whether the optical element term has a well-understood meaning in the art or whether it should be construed as means -- means-plus-function. And then they contend if it is means-plus-function, then there's no appropriate construction. And it's indefinite.

So, really, when we're talking about sort of whether it's means-plus-function term or not, in the context of this claim, there's really, Your Honor, two issues. The first is whether optical element is a structural term. The second is whether that structure performs the function.

So we're going to take those in pieces, Your Honor, if you don't mind. So we'll start with the claims.

As I said, "optical element" is situated in this claim as "optical element configured to detect," but there are other terms, Your Honor, where optical element is used differently.

So, in other terms, there's a collimating optical element that's coming later in our discussion as a later-to-be-construed term. Collecting optical element, focusing optical element.

But here, we're talking about an optical element configured to detect. If the Court were to find

**137**

that optical element is a structural term that confers structure, that would have consequences for all of the terms.

If the Court were to find that optical element is not a structural term, then we would have to deal with each term on its own.

**THE COURT:** Right. Which I am inclined to do.

So what I need you to do to help me out, what concerns me, or rather why I am inclined to say it's a means-plus-function, is because I'm not sure I see sufficient structure in the patent claims.

And you would agree as a matter of law, right, I must start with, there must be sufficient structure in the claims. Correct?

**MR. KHAN:** Correct.

**THE COURT:** Okay. So let's quickly go, where in the claims is there sufficient structure?

**MR. KHAN:** Right. So the structure in this claim is the optical element term.

**THE COURT:** Right. Now, you're referring right now to Claim 13 of the '443 patent, correct?

**MR. KHAN:** Correct.

**THE COURT:** And it reads, quote, "An optical element configured to detect scattered light emitted by the particle in the flow channel and illuminated by a

**138**

light source," unquote.

Where is the structure there in that claim?

**MR. KHAN:** Right. And so first we start with the presumption. It is not --

**THE COURT:** You're going back. I'm already on the law. Come on. We know what the law is. Let's get to sufficient structure --

**MR. KHAN:** So here is the structure --

**THE COURT:** Time out. Time out. Because we are short on time. And I'm being generous with time.

The question is, and I think you already agreed to this, you have to show that there's sufficient structure in the claim.

**MR. KHAN:** Yes.

**THE COURT:** If it's not going to be means-plus-function. Correct?

**MR. KHAN:** Correct.

**THE COURT:** Okay. Let's go to that. You just had the language up.

**MR. KHAN:** Right.

**THE COURT:** Where is the structure?

**MR. KHAN:** The words in the claim were "optical element," and here, Your Honor, widely understood, just like we talked about how the word "collimate" and "collimation," two experts could have an

**139**

understanding of what that means, "optical element" is defined in dictionaries, treatises. We cited at least a half dozen dictionaries and treatises where "optical element" is a well-understood structural term.

Just like the Federal Circuit said, with respect to fasteners. And in that case, Your Honor, fasteners, the Federal Circuit said, you know what's a fastener? A rivet, a button, Velcro. Lots of different classes of structures. And here, "optical element" is a well-understood structural term that says, basically, I know what I'm talking about.

In each instance, it's a component that's acting upon light. And the -- and the specification confirms that. It basically says, hey, here's an optical element. It could be a lens. Just like the definitions that the experts would understand. It could be a concave mirror, just like -- as in the experts' definitions can understand. And then there are other aspects, like prisms that are described in the specification.

So --

**THE COURT:** So it could be anything having to do with optics. This has got to be any kind of structure having to do with optics, right?

**MR. KHAN:** It's a structure that acts upon

**140**

light and, as understood widely in the glossary of optical terms, Your Honor, in the Fiber Optic Standard Dictionary, these are definitions of the term to understand that it's a class of structures.

And it's a class of structures that's going to have -- just like fastener, it's going to have various -- a class of structures. And the -- but it's defined in the dictionary, in the treatises in exactly the way that you would expect, just like fastener, just like all the other Federal Circuit cases that we've given you.

**THE COURT:** All right. Now, bottom line, really what the real term here is element. Its element in the field of optics. That's really what the structure is, right?

**MR. KHAN:** No, Your Honor. We would -- it's optical element. An optical element is an understood structural term. And there are cases that talk about how element is not always a nonce term if it's a well-understood structural term.

So there's cases talking about article feeder -- feeder element. Even in Delaware, Your Honor, there's -- there are -- by the way, there are other cases, including one in Delaware, that says optical element means an element that refracts -- refracts,

141

deflects, diverts or focuses light beams.

Another Delaware case, Your Honor, the physical structure, namely one or more optical elements or lenses.

THE COURT: All right. I'm just going to rule. Do you have anything else, any other structure you want to point to?

MR. KHAN: In the claims, Your Honor, in that claim, it's optical element.

THE COURT: Okay. That's not sufficient. I can explain why. You want to say anything else?

MR. KHAN: Would you like me to address the means-plus-function, corresponding structure, or --

THE COURT: Well, you want to finish the other claims? Because, right, you have to have sufficient structure in the claims. We've agreed on that.

MR. KHAN: Correct.

THE COURT: For Claim 13, you have, the only structure you point to is the optical element.

Is there any other structure in any of the other claims besides optical element you want to point to?

MR. KHAN: In these claims, no, Your Honor.

THE COURT: When you say "these claims," are there other claims?

142

MR. KHAN: Not ones that are at issue before you. That's correct, yeah.

THE COURT: Okay. Right.

So, in other words, what I'm getting at is, there's nothing in any of the language, it's not in your brief, but I thought maybe there's a lot of stuff coming up in this hearing that wasn't in the briefing. So I'm thinking, well, maybe there's something else you want to rely on.

But just to be clear, the structure in the claims you're pointing to are the words "optical element," unquote.

MR. KHAN: Correct, Your Honor.

THE COURT: Okay. So I don't think that that's sufficient structure. I think element is a nonce word, and when I read the claims, it's very clear to me element is being used as a generic nonce word that, basically, it operates as a substitute for means, it does not connote structure.

And while I think you could make that determination solely from the intrinsic evidence, I think the defendant has offered a persuasive affidavit that demonstrates that optical element does not connote a class of structures.

I think, bottom line, is that it essentially

143

means, I believe, Mr. Khan, with all due respect, I think if you read back what you said, it's effectively a structure used within optics. And it can refer to, it sounds like, almost any device used within optics.

And what the key here is that the language of the claims makes clear that it's functional because what's being claimed is an optical element configured to do something, to perform a function. And there's no other structure in the applicable claims besides optical element that reveals what that structure would be.

So I think the presumption against means-plus-function is overcome, and I think it's easily overcome. So if you want to talk about corresponding structure, we should do that.

MR. KHAN: Let's do that.

So, your Honor, if we go to the corresponding structure. So for the corresponding structure, on this -- on Claim 13, 17, and 18 of the '443 patent. So the issue is whether the function is detects scattered light emitted by the particle and flow channel illuminated by a source.

And so the corresponding structure in the specification that is directly linked to those functions is the composite microscope objective. And, here, the -- here's an example where it says "The composite

144

microscope objective provides into an optical fiber for transmission into WDM."

THE COURT: I didn't hear you. What?

MR. KHAN: "The composite microscope objective is the corresponding structure."

And I skipped over a number of slides, but I'm going to go back to them because -- sorry -- because the issue here, Your Honor, is what does the word "detect," mean?

And, essentially, if the word "detect" means what they say it means, which is to say that an optical -- that the structure has to be something that converts into an electrical light into a signal, like an electrical signal, right? That's what they're saying.

The detect -- that's not what detect means in the art. "Detect," in the art, just means to find or discover something, to determine the presence. And that's exactly what the cases say, which is that the claimed function of displaying information could be implemented using off-the-shelf code."

THE REPORTER: Can you speak up.

MR. KHAN: Sorry.

So -- and then we've given you two cases, Your Honor, the *Intel* case and *Tech Licenses* cases. Here is the Federal Circuit saying that the

145

specification doesn't have to tell you how to modify the structure or how to configure the structure to perform the function. You just need the corresponding structure to be linked to the function. You just need to recite some structure.

And here, the -- here's the linking statement in the specification, Your Honor. "The composite microscope includes a concave mirror and aberration corrector plate. This allows a contact buildup and the illumination and detection of light scattered from and fluoresced by the object in the viewing zone may be conducted from the same side of the microscope objective."

This is exactly what the claims is talking about. This is the function and it's being described as being done by the microscope objective.

So this is exactly what the cases are talking about. And I think at the end of the day, what the real dispute is about what does "detect" mean. Because if we're right on what detect means, Your Honor, then there's no dispute that this would be a corresponding structure in the specification. And that's why I was focusing on that so much.

THE COURT: Can you stop there for a second?

MR. KHAN: Yes.

146

THE COURT: Because I agree. That is what this dispute boils down to, it's really what does "detect" mean, right?

MR. KHAN: Yes.

THE COURT: Okay. Hold on.

Their argument is that the objective that's disclosed is collecting, right, gathering an imaging?

MR. KHAN: Right.

THE COURT: Right? That's what they're pointing to?

MR. KHAN: Exactly.

THE COURT: Now, but you're pointing to the language here that --

MR. KHAN: We would say, Your Honor, that the specification directly relates and links the microscope objective to detection.

THE COURT: Okay.

MR. KHAN: Not just gathering, collecting, and imaging. Directly relates it to the detection of the light.

And they are going to point you to some passages much later in the specification that also talk about other detecters, but this passage is focused on the microscope objective. And the microscope objective is described as performing the function of detection of

147

light.

So it's not just gathering, collecting, and --

THE COURT: Is there anything else besides...

Hold on a second.

MR. KHAN: There is more in the specification.

THE COURT: Just hold on. Just give me a second.

MR. KHAN: Yes, Your Honor.

THE COURT: Is that in your brief?

MR. KHAN: It is, Your Honor.

THE COURT: Where?

I'm looking at Page 70, 71.

MR. KHAN: It's, for example, at Page 56.

THE COURT: Fifty-six?

You're right. You got it. Okay. I was focused on later down. All right.

All right. Let me hear them on this corresponding structure.

So that seems to me, Mr. Chen, your big argument was wrong function. It's not detection.

MR. CHEN: That's correct.

THE COURT: But this passage, I hadn't focused on it, to be honest.

MR. CHEN: Yeah.

148

THE COURT: I mean, it seems to address detection. No?

MR. CHEN: It does not, Your Honor. And, actually, I'm glad we can start right here.

So let's actually go to our slides, please. Seventy-five, please.

So this is on Page 70 of the claim construction brief. And this is what BEC points to.

They say in their brief that the specification explains that an objective, an optical element, gathers and images light and that detection of that light may be conducted from the side of the microscope objective.

That's what they included in their brief, Your Honor. That's misleading. They left out a key word. The same side. The same side of the microscope objective. Why does that matter?

THE COURT: Hold up.

Okay.

MR. CHEN: It's not the side of the objective that's detecting light. All this passage says in the specification is that detection occurs on the same side of the microscope objective.

What does that mean? This is the microscope objective 60. We talked about this a little bit

149

earlier.  It has a concave mirror 415 in the back, it has an aberration corrector plate 414 in the front there, at the top.

THE COURT:  Yeah.

MR. CHEN:  Light passes through, it hits the flow cell.  Light scatters and it also fluoresces.

The only things in the specification that perform detection are 408 and 413.  Those are the only passages in the specification that talk about detection.

The passage that we looked at earlier where it says that detection of light scattered and fluoresced, scattering and fluorescing, may be conducted from the same side of the microscope objective.

All that means is that you're having detection of side scattered light and fluorescent light on the same side of the microscope objective.

An objective is a piece of glass or plastic.  It does not detect.  We cited to numerous dictionaries -- optical dictionaries, not the Collins Dictionary -- optical dictionaries that say that a detector in Exhibit 45 is an example -- and I can just put it on the Elmo here.

THE COURT:  It's all extrinsic evidence, though, is the bottom line.

MR. CHEN:  Oh, I agree.  I think the intrinsic

150

evidence makes it very clear that the only things that could be a detector are 408 and 413, Your Honor.  Scattered detecter, side scatter detecter.

But the extrinsic evidence says a detector -- and there's multiple dictionaries that we cited to, Exhibits 45 through 50, that say a detector is a device that generates an electrical signal when illuminated by light.  Electrical signal.

THE COURT:  Okay.  Hold on.  I want you to just look.

So the passage you're referring to where they -- where you think they're misleading, it's relying on Column 5, 62 to 65.  Okay?

But earlier on, when I said was it in your brief, it was a different cite, it was 56.  So it starts at Line 56.  Okay.  But it's right before this passage, but it must incorporate it.  It's 56 to 65.  All right.

Okay.  Let me hear from them.

MR. KHAN:  Your Honor, the notion that we sort of misquote that quote is totally wrong because I pointed you to Page 56 of the brief.  And we had exactly the same side.  The language that Mr. Chen is saying we apparently omitted, we did no such thing.

THE COURT:  Hold up.

Okay.  So he's focused on what you said on

151

Page 70.  And today, you've pointed me to Page 56.  But let's not get into worry about whether there was a fast one or not.  I think the bigger issue is this:

Now that I've had the benefit of oral argument, and I skipped over 56 or just didn't see it as much, focused more on 70; although, it's in 70.

Well, bottom line, put all that aside.  I'm looking right now at Column 5, Lines 56 to 65.  Okay?  That's the only language that you are pointing to for structure, right?

MR. KHAN:  No, Your Honor.  We're also pointing to --

THE COURT:  Before you go further, I don't see the structure there.  It seems to me what's being discussed in those lines of the patent is the fact that some light emanates from the objective and is then detected by another structure.  And, I mean, can you point to -- do you even dispute that?

MR. KHAN:  Yeah, we do, Your Honor.

THE COURT:  You're telling me the objective actually detects it?

MR. KHAN:  Because, Your Honor --

THE COURT:  Hold up.  Because this I do want, I'm going to press you.

MR. KHAN:  Yes.

152

THE COURT:  Because it's one thing to say that the objective allows for the detection by something else.  And I think that would be a credible statement.  It's another thing to say that it is the objective within this language here, Lines 56 to 65, that detects it.

Which one are you saying?

MR. KHAN:  If we think of "detect" as gathering, collecting, imaging, right, then it is, in fact, detected.

THE COURT:  Okay.  Where, what source would tell me to equate...

In the context of this patent, in this discussion here specifically --

MR. KHAN:  Right.

THE COURT:  -- you're telling me that "detect" is referring to a function performed by the objective?

MR. KHAN:  Your Honor, if we're talking about what the word "detect" means, the claims, themselves, tell you that it's an optical element that detects.  And so we have to under- -- we have been in a world where it's a possibility of an optical element detecting.

Here, the composite microscope objective does collect imaging light, it does gather an imaged light, and it is gathering light from or fluoresced by the illuminated particle.  That is tracking almost exactly

153

the language of the claim -- of the claims that we were just talking about. And so --

THE COURT: Wait, wait, wait. Hold on.

The claim we were talking about?

Claim 13, right?

MR. KHAN: Correct.

THE COURT: Sorry.

What claim again? Is it 13?

MR. KHAN: '443 is Claim 13.

THE COURT: Okay. By the way, for the record, I was referring by the lines of the patent in Column 5. I was referring to the '532 patent. I think everybody has used the written description of the '532 patent.

MR. KHAN: '582 patent.

THE COURT: '582. Sorry. Apologize.

MR. KHAN: Yes, Judge.

THE COURT: Yeah. So --

Hold on.

So you want to go to the language of the claims. Is that what you wanted to do?

MR. KHAN: I wanted to -- we can do that, Your Honor. So here's the language of the claim. So the language of the claim is "Optical element configured to detect scattered light emitted by the particle in the flow channel" --

154

THE COURT: Right.

MR. KHAN: -- in the light source. If "detect" means --

THE COURT: Hold on. What's the light source?

MR. KHAN: The light source here would be the laser.

THE COURT: Okay. And then the particle?

MR. KHAN: The particle is -- particle generally means any particle, but here it would be the cell.

THE COURT: The cell of the light wave that's in the objective, correct?

MR. KHAN: No. The cell that's flowing through the flow channel.

THE COURT: It's flowing through. And then the scattered light that's emitted by that particle occurs in the objective, right, the scattering of the light?

MR. KHAN: Correct. The scattered light is collected by the objective.

How do we know that? The specification itself says, you know, the composite, the microscope objective gathered light scattered from --

THE COURT: Right.

MR. KHAN: -- or fluoresced by --

155

THE COURT: Right.

MR. KHAN: -- the illuminated particle.

THE COURT: Right. In other words, what's going on in the objective is the scattering and the fluorescing of the light of the particle, correct?

MR. KHAN: Correct.

THE COURT: You call it illumination, if you want to, as well.

MR. KHAN: Of the illuminated particle.

THE COURT: Right.

MR. KHAN: In tracking the language of the claim --

THE COURT: Right.

MR. KHAN: -- if "detect" is understood to mean just discover or find, right, if we go back to the claim -- sorry. Here. "An optical element configured to discover or find scattered light emitted by the particle in the flow channel illuminated by a light source, that's the composite microscope objective. That's what it's doing. That's its function. It's clearly linked in the specification.

The trick is, what my colleague on the other side is saying is, no, no, no, detect means you have to convert it, convert the light into a signal.

That's not necessarily what detect means.

156

Detect just means find or discover something. And that's what the composite microscope objective is doing in this context.

It is -- and it's doing it with exactly the elements that are described in the claim. It is doing it with respect to the scattered light emitted by the particle in the flow channel and illuminated by the light source.

THE COURT: So then, you're saying Claim 13...

Put up Figure 25. Or not Figure 25. Put up the first figure in the patent.

All right. Now, 90. What's 90?

MR. KHAN: 90, I believe, is the fiber optic cable to the WDM.

THE COURT: What's 852?

MR. KHAN: I'm sorry?

THE COURT: What's 852?

MR. KHAN: I believe that's a fiber optic cable. That's the --

THE COURT: Yeah. I thought you just said that's 90?

MR. KHAN: Oh. 852 is -- 90 appears to be the -- oh, 90 is the WDM. Sorry.

THE COURT: The WDM.

MR. KHAN: Right.

157

THE COURT:  What's the WDM do?

MR. KHAN:  It is --

THE COURT:  What's it called?  What does "WDM" mean?

MR. KHAN:  I means wavelength division multiplexer.

THE COURT:  Okay.  And what does it do?

MR. KHAN:  It's basically the optical components that are going to convert the optical signal into an electrical signal to determine what is present in the flow cell.

THE COURT:  To determine what is present in the what?

MR. KHAN:  In the flow cell.

THE COURT:  In the what?  What did you say?

MR. KHAN:  The flow cell.  So the --

THE COURT:  Flow cell.  In the flow cell. Yep.  I know what you mean.  I just wanted to get your exact words.  Okay.

MR. KHAN:  The --

THE COURT:  Hold up.  Hold up.

MR. KHAN:  Sure.

THE COURT:  And just for definitions, what's a cytometer?

MR. KHAN:  What's that?

158

THE COURT:  Cytometer?

MR. KHAN:  A cytometer is an instrument to -- to analyze cells.  A flow cytometer --

THE COURT:  Hold on.  I just want to --

MR. KHAN:  Sure.

THE COURT:  It's an instrument to analyze cells.

MR. KHAN:  So cyto means cell.

THE COURT:  Yep.

MR. KHAN:  And meter means, basically, an instrument.

THE COURT:  And is WDM a cytometer.

MR. KHAN:  WDM would be a component of a cytometer, yes.

THE COURT:  And it, what it does is it determines what's present in the flow cell?

MR. KHAN:  It's giving you --

THE COURT:  Literally, I wrote that down. That's what you --

MR. KHAN:  The electrical signals --

THE COURT:  That's what you incidentally, and the record will reflect this, I just read back what you said to me.  You said a WDM, it determines what is present in the flow cell.  That's your definition.

Are you backing off that?

159

MR. KHAN:  No, no, no.

THE COURT:  Okay.

MR. KHAN:  What I'm saying is it's giving you the electrical signals to tell you what's in the flow cell, yes.

So that's why we need --

THE COURT:  Hold up.  Hold up.

MR. KHAN:  Yeah.

THE COURT:  Now, this figure that we're pointing to, Figure 1, what does it depict?  Does it depict a cytometer?

MR. KHAN:  The full flow cytometer, correct.

THE COURT:  Okay.  All right.  Now, where is there scattered light?

MR. KHAN:  Scattered light is here.  So --

THE COURT:  Hold up.  You're just doing that. Just tell me just point.  Is it in the objective?

MR. KHAN:  Correct, Your Honor.

THE COURT:  It's in the objective.

MR. KHAN:  Yes.

THE COURT:  Is it anywhere else?

MR. KHAN:  I don't think there would be -- there might be -- there's going to be scattered light in the system generally because light is, as we've talked about, not perfect, right?  So it's being scattered

160

everywhere.

But in the context of what the patent is talking about when it's trying to capture the scattered light, the scattered light --

THE COURT:  When the objective is trying to capture.  So the objective captures the scattered light?

MR. KHAN:  That's exactly what the specification says, Your Honor.

THE COURT:  Okay.

MR. KHAN:  And I pointed --

THE COURT:  Does the scattered light leave the objective?

MR. KHAN:  The scattered light is -- yeah, it's captured and then it leaves the objective, yes.

THE COURT:  Where does it go to?

MR. KHAN:  It then -- the objective then leads to the WDM.

THE COURT:  Right.

MR. KHAN:  To the fiber optic cable.

THE COURT:  That's what I thought.

MR. KHAN:  Right.

THE COURT:  And the scattered light, though, exists before the objective.  Is that what you're saying? It exists in the laser?

Like what precedes?  There's a laser beam

161

going into the objective, right?

**MR. KHAN:**  Right.

**THE COURT:**  Yeah.  You're saying there's scattered light in the laser beam?

**MR. KHAN:**  It's not going to be in the laser beam.

**THE COURT:**  Okay.

**MR. KHAN:**  So when the laser hits a cell, that -- and when it -- so there's a flow cell, so cells are going through the flow cell.

**THE COURT:**  Yep.

**MR. KHAN:**  And when a laser beam hits a cell, it's going to create scatter --

**THE COURT:**  Right.

**MR. KHAN:**  -- and fluoresces light.

**THE COURT:**  I thought this, but maybe I'm wrong.  I thought the laser beam hit the cell when the cell's in the objective?

**MR. KHAN:**  Correct.

**THE COURT:**  Okay.

**MR. KHAN:**  Yes.

**THE COURT:**  So the scattering occurs in the objective?

**MR. KHAN:**  The scattered light is occurring inside the objective, which collects the scattered light,

162

yes.  Gathers up the scattered light.

**THE COURT:**  And then the scattered light leaves the objective to go to the WDM, right?

**MR. KHAN:**  Yes.

**THE COURT:**  Okay.  And then the WDM, now you want to use the word "determines."

What in that, is in that scattered light in order to determine what is present in the flow cell, right?

**MR. KHAN:**  Right.  It's going to -- the WDM is converting light into signals, electrical signals.

**THE COURT:**  Yep.

**MR. KHAN:**  That are telling you what's in the cell, right.

**THE COURT:**  Right.  And you need that in order to determine what's in the flow cell?  You need that change into electric signals, correct?

**MR. KHAN:**  In a flow cytometer, yes, Your Honor.

**THE COURT:**  Right.

**MR. KHAN:**  Right.

But in the first instance --

**THE COURT:**  Hold on.

**MR. KHAN:**  Oh, yes.

**THE COURT:**  And where is the flow channel in

163

Figure 1?

**MR. KHAN:**  Inside the microscope objective. So it's this.

**THE COURT:**  Does it leave it?

**MR. KHAN:**  Does it leave?

**THE COURT:**  You're saying and the flow channel only exists within the objective?  Is that what you are saying?

**MR. KHAN:**  In the exemplary embodiment, yes, the flow channel is inside the composite microscope objective.

**THE COURT:**  All right.  So doesn't include, for instance, the 90, right?

**MR. KHAN:**  It would not.

**THE COURT:**  You don't think it does.  All right.

And then 852, how is 852 different than 90?

So you agreed, actually, 90 you agree is the WDM?

**MR. KHAN:**  The fiber optics plus the other semiconductor components here and the --

**THE COURT:**  Yes.

**MR. KHAN:**  -- mirrors and the filters that we spent a lot of time talking about, together those would be qualified as the WDM.

164

90 is, Your Honor, if we look at -- it's 28, Column 12.

**THE COURT:**  Yeah.

**MR. KHAN:**  It says Column 8, 9, a wavelength division multiplexer 90.

**THE COURT:**  Right.  Okay.

**MR. KHAN:**  For optically processing scattered and/or fluoresced light received from the fiber, 852.

**THE COURT:**  And it's received from the fiber, which is 852.

**MR. KHAN:**  Yes.

**THE COURT:**  And so all the scattered light that leaves the objective, goes through that 852 to the WDM?

**MR. KHAN:**  It should, yes.

**THE COURT:**  Well, you're counting the 852 as being part of the WDM, I guess.  Are you?

**MR. KHAN:**  The specification considers it as part of the WDM, yes.

**THE COURT:**  Okay.

Mr. Chen, why do you think the person responsible for drafting this patent chose to use the verb "to detect"?

**MR. CHEN:**  I do think it's imprecise, Your Honor.  Your Honor is correct to focus on the claim

language which I have up here.

The parties agree that the functions are to detect scattered light. Scattered light. And then also the second function is that there needs to be an outputting based on the detected scattered light, the light to the WDM via the optical fiber, Your Honor.

And so Your Honor is correct to focus on the claim language. And when we look at only the specification, only the specification, the only components that perform detecting are -- of scattered light.

There's -- as I said at the beginning there's both scattered light and fluoresced lights. The only components that detect scattered light, as required in the claim language, are 408 and 413. That's the forward scatter light detector and the side scatter detector. And that's in the specification passage at Column 53, Lines 63 to Column 54 --

THE COURT: And you would agree, they're part of the WDM?

MR. CHEN: They are not actually part of the --

THE COURT: You don't think they are?

MR. CHEN: They are not, actually, Your Honor, so I wanted to actually clarify that point.

---

I think what counsel said for Beckman Coulter actually supports our position in that the -- there's another set of detectors in the WDM that performs detection. Not all the components, but for example, the detectors that detect the fluoresced light --

THE COURT: Right.

MR. CHEN: -- the fluoresced light goes into the WDM, into the optical fiber.

THE COURT: Not the scattered light?

MR. CHEN: That's right. Not the scattered light. So --

THE COURT: So where does the scattered light go? I mean, in Figure 1, where does it go?

MR. CHEN: Yeah. So Figure 1, which is similar to Figure 31, so if you wouldn't mind, I'll just use Figure 31, Your Honor. It's very similar to Figure 1.

THE COURT: Okay.

MR. CHEN: Okay. So the scattered light, it scatters, and it fluoresces. And the scattered light, there's forward scattered light and side scattered light.

THE COURT: Right.

MR. CHEN: And it's not depicted on this Figure 31, but if you go to Figure 38, it shows that the forward scattered light is then going to be reflected off

---

of a relay element to the forward scatter detector 408, and the side scattered light is going to be side scattered to a detector 413.

THE COURT: Right. But, I mean, it seems to me that this figure, is it 31? Where's Figure 31?

MR. CHEN: Yeah, Figure 31.

THE COURT: See, Figure 31, like that's what they show on the front page of the patent.

MR. CHEN: Yeah.

THE COURT: I mean, you think that's the real invention here.

MR. CHEN: Yeah.

THE COURT: But I don't see 408, I don't see how they fit in. Where would they fit into this?

MR. CHEN: Yeah. I mean, where they would fit in, Your Honor, and if -- you're right that it's Figure 1, I believe, that's shown at the -- on the face of the patent.

THE COURT: Oh, 31. Okay.

MR. CHEN: It's very similar to Figure 31. It's exactly as Figure 38 describes it, right, the light is coming from a laser source, 412, here.

THE COURT: Right.

MR. CHEN: The laser shines onto the flow cell. The light, then, both scatters and fluoresces.

---

THE COURT: I get that, but I'm just curious, like, why isn't it in the Figure 1 or the Figure 31?

MR. CHEN: Yeah, I'm know not sure why the patentee didn't include it there.

I think because they're mainly focused on the WDM as their alleged invention. They're not as focused on the forward scatter detectors or side scatter detectors, but the claim language says that there are optic elements that perform the claimed functions to detect scattered light, and then also to output that scattered light to a fiber optic to the WDM, right? That's what it says.

THE COURT: Uh-huh.

MR. CHEN: Uh-huh.

THE COURT: But to be clear, you don't dispute...

I mean, like, because, for instance, Claim 1 talks about the WDM having a set of detectors.

MR. CHEN: Uh-huh.

THE COURT: Not only do you not dispute but you're saying, you're telling me don't get misled. That's got nothing to do with scattered light.

The detection of Claim 1 has nothing to do with scattered light, right? I just want to be clear.

MR. CHEN: Yes, there's a separate -- there's

169

a separate claim element, for example, in Claim 18 of the '443 patent, there is a separate recitation to detectors that detect fluoresced lights.

To be clear, you can have some configurations where the scattered light does actually go into the WDM. I'm not saying that's not possible.

But at least based on this example, this exemplary embodiment, this does not appear to be part of the WDM. It appears to be outside. And there certainly are real-world systems, including Beckman Coulter's, where the scatter detectors are outside of the WDM.

But regardless, it's not the objective.

THE COURT: It's not. That's the point.

MR. CHEN: Yeah. That's the most important point is the objective is not doing any detection whatsoever. That's not possible.

Our position is that an optical element does not detect, therefore, these terms are indefinite. However, if there is any structure that performs the claimed functions, it is these detectors, 408 and 413.

THE COURT: Okay.

All right. Do you want to say anything else?

MR. CHEN: No, thank you, Your Honor.

THE COURT: All right.

You can come up but give me a second.

170

MR. KHAN: Sure.

THE COURT: Go ahead.

MR. KHAN: Your Honor, I'm just going to put Figure 1 back up. So if we can go to that.

THE COURT: By the way, I've been saying Figure 1. And when I do it, I was referring to the front page of the patent. I don't know if it's really called Figure 1. I might be wrong.

MR. KHAN: It is Figure 1 --

THE COURT: It is? Okay.

MR. KHAN: -- of the '582 patent, right.

THE COURT: Okay. And it looks a lot like Figure 31.

MR. KHAN: It is quite similar --

THE COURT: Okay.

MR. KHAN: -- in the overall layout.

So, Your Honor, this is the overall layout of the system. And what's happening is there's a viewing zone here on the flow cell. The composite microscope objective surrounds it.

And what does the specification tell us?

Can we go to 83?

The specification tells us, and I am quoting here, "The composite microscope objective further includes a concave mirror configured to gather light

171

from -- scattered from or fluoresced by the illuminated particle."

That is exactly the whole point of the objective is to find the light, to collect the light, including the scattered light. The specification directly tells you that --

THE COURT: It actually doesn't. I'm sorry. You know what? I mean, I'm not definitely saying you're wrong.

MR. KHAN: Right.

THE COURT: Why did you use the word "detect"? I just, I'm trying to figure out why you decided to use "detect." Especially when, do you dispute 408 and 413 are detectors?

MR. KHAN: We don't dispute that they're detectors, Your Honor, but I haven't --

THE COURT: I mean, isn't that a problem for you?

MR. KHAN: Well --

THE COURT: Do they detect scattered light?

MR. KHAN: They are part of -- they are forward scatter -- they are different components in the system.

So if we can go back to the Elmo.

So here is 408. So exactly, Judge, as you

172

said, they're sort of an optional component in the system that's basically --

THE COURT: What are you reading from, what column?

MR. KHAN: I'm reading from Column 52.

THE COURT: Which patent are you on?

MR. KHAN: On the '582 patent.

THE COURT: All right. And you are on Column 52?

MR. KHAN: Fifty-two.

THE COURT: Okay.

MR. KHAN: And just to discuss Figure 37, which is, I think, what most of what they've been pointing to. And the elements are 408 and --

THE COURT: Yeah, by the way, before you go further, what's 45? I could not find 45 in the patent anywhere. It says 45, right?

MR. KHAN: This is exactly what Figure 37 is, what they have been pointing to.

THE COURT: Well, wait. So go look at...

You help me out. I don't see a 45 in Figure 37. My clerk and I were, like, knocking our heads.

MR. KHAN: Oh. I think it's just described as including 408 and the other components.

173

THE COURT: Well, can you show me? We couldn't find it.

MR. KHAN: Yeah.

THE COURT: Just go to Figure 37.

(Speaking simultaneously.)

THE COURT: I don't see a 45.

MR. KHAN: Yeah. I think you might be right, Your Honor. There may not be --

THE COURT: How much do you guys pay your patent examiners? I mean, you know...

MR. KHAN: I think you're right. You're right, Your Honor.

THE COURT: So 45 doesn't mean anything even though you referred to it a bunch of times?

MR. KHAN: Well, it's described insofar as it needs a number, and so then it's used throughout to talk about. But it's -- basically, Your Honor, it's an axial loss detention system.

THE COURT: Right.

MR. KHAN: So it's separate from the gathering of the scattered light that the composite microscope objective.

It's not core to the -- to what's going on in the patent, essentially. It's an optional system. In fact, it's even described as "in accordance with some

174

embodiments of the --

THE COURT: Well, when you say it's optional, maybe it's what's being claimed in Claim 13, I mean, for all I know.

MR. KHAN: I think, Your Honor -- if we can go back to the slide.

To me, Your Honor, it does just come down to the word "detect." And I think if detection requires conversion into a signal, it's true that the objective doesn't do that.

But I don't think that's what detect means. And indefiniteness is a really high bar.

THE COURT: Hold on. Hold on.

But you've got an actual disclosure in the patent that you've just pointed to, which it actually defines as a, quote, "axial light loss detection system."

MR. KHAN: Yes, Your Honor.

THE COURT: You would think that light loss might cover scattered light. Seems pretty reasonable to infer, right?

MR. KHAN: No doubt, Your Honor.

THE COURT: Okay. So no doubt. That's good.

Then it says, so if you want to see a diagram of that, that system, look at Page 37 and it's labeled

175

45.

I look at 37, I don't see anything.

But I'm guessing because Figure 37 is, in fact, the axial light loss detection system that's being discussed.

MR. KHAN: I believe it is, Your Honor.

THE COURT: Okay. And that apparently is in accordance with some embodiments in the present disclosure, right?

MR. KHAN: Yes.

THE COURT: Okay. Now, why isn't that what's claimed in Claim 13 of the '443 patent?

MR. KHAN: Your Honor, that's because it's an optical -- it needs to be an optical element.

THE COURT: Yeah. But, I mean, you said that an optical element can include a concave mirror, right, or lens, right?

I mean, can't an optical element include...

I mean, what doesn't it include? I mean, what precludes it from including 408 and 412 in Figure 37?

MR. KHAN: Because it's the element that's core and responsible for gathering light in the first instance. Gathering the scattered light --

THE COURT: No, it's detecting the scattered

176

light. It didn't say gathering, it says detecting it.

MR. KHAN: In the claim, yes, Your Honor, right.

THE COURT: Yeah. But that's what I've got to go by is what's in the claim.

All right. Defendant, are you good with the corresponding structure? What do you think the corresponding structure should be?

MR. CHEN: Our position, Your Honor, is that it should be indefinite.

THE COURT: Yeah.

MR. CHEN: But if it's not indefinite, then the corresponding structure has to be the specific 408 and 413 detectors disclosed in the specification for detecting scattered light.

THE COURT: Yeah. All right. Hold on one second.

MR. KHAN: Your Honor -- go ahead.

THE COURT: Hold on a second.

Go ahead, Mr. Khan.

MR. KHAN: Your Honor, it just can't be those detectors. And I'm going to show you why. And here it is.

Here's Claim 18, one of the claims that they're seeking to construe, right. And one or more

optical fibers. Each optical fiber configured to receive light from the optical element.

So the optical element is providing the light to the fiber. If --

THE COURT: Well, time out. Time out.

So I'm construing Claim 13 right now, optical element.

MR. KHAN: This is one of the terms that -- it's 13, 17, and 18.

THE COURT: No, time out.

Right. But I actually think we have to go claim by claim. And I thought you even said that. You said if I'm going to go means-plus-function, then we have to go claim by claim. I actually agree with you.

MR. KHAN: I misunderstood.

THE COURT: I'm on Claim 13.

MR. KHAN: I see. I misunderstood, Your Honor.

So I thought we were talking about 13, 17, and 18 as a group. But --

THE COURT: I don't think so. I mean, I think the whole point is, I think optical element is a nonce word. I mean, well, element is.

And I think, that's why, precisely, I think it's really a functional claim. They are all functional

claims, and I'm on Claim 13. And so I'm looking at the corresponding structure to Claim 13.

I mean, maybe you don't dispute it. I mean, it makes sense to me that it's 408 and it's 413 is the corresponding structure to Claim 13.

Do you dispute that?

MR. KHAN: We do, Your Honor.

THE COURT: Okay. Well, then, I need to take a little bit of a time out, and I will come back.

MR. KHAN: Okay.

THE COURT: But I am only, right now, looking at Claim 13. And I am going to take like five minutes, that's it, and then we're going to have to end pretty soon and we're just not going to finish today. We'll talk about what to do about that. All right.

(Whereupon, a recess was taken.)

THE COURT: Have a seat.

All right. So for Claim 13, I studied the language. I think the only possible corresponding structure for Claim 13 would be 408 and 413.

Did I get the numbers, right? Just to make sure. Yes. Okay.

I have not been persuaded by the plaintiff that collecting or gathering constitutes detection, but the patent, the claims, distinguish... the claims, and

especially if you look at Claim 1, I think it's undisputed that 408, 413, and the WDM detect. And so that's the only possible corresponding structure I can see with 413. Sorry, with Claim 13.

Okay. Now, the problem becomes, as I look at the other claims, I can't even come up with a structure. But, again, especially, you know, I'll give you a chance to just brief that question only, the corresponding structure on the remaining claims that claim an optical element.

And I've got to say, from studying the claims, I'm inclined to conclude there is no corresponding structure that I see.

All right. Now, folks probably know, I normally start my *Markman* hearings at 9:00 for a reason, not 1:00, so we didn't finish.

Now, first of all, does my optical element ruling that it's means-plus-function, how does that affect some of the other disputed claim terms?

MR. KHAN: Your Honor, on the other disputed claim terms, so we're just going to have to take it claim by claim --

THE COURT: We are.

MR. KHAN: -- to figure out what the corresponding structure is going to be, just as, Judge,

you suggested.

THE COURT: Okay. All right. And then, so let's talk about what's the best way to proceed, given this.

Where are you in terms of the case, Mr. Chen?

MR. CHEN: Your Honor, I don't think the rest of the case schedule is going to be feasible given what we have coming up.

So we are supposed to have a narrowing of claims 21 days after a *Markman* order. We've got close of fact discovery October 8. That's coming up quickly. Expert reports are supposed to be November 5, and then trial is August of 2026, Your Honor, so --

THE COURT: Well, that should not have to move.

MR. CHEN: Yeah.

THE COURT: Now, hold on. Let's look at the calendar.

You all can sit. Thank you, though.

All right. What about September 17, can we pick up then, and then hopefully dispense with everything else?

MR. CHEN: You mean for the claim construction?

THE COURT: To finish this hearing, yep. And

181

you can brief this stuff beforehand, and I can have the benefit of looking at what you wrote.

MR. CHEN: I'm supposed to take my parents, who are in their late 70s, to Hawaii, Your Honor.

THE COURT: Oh, okay. Well, that's a good thing. We don't do that. Won't risk all that.

Where are you from?

MR. CHEN: California. And I've got a jury trial coming up between September 5th and the 11th here in Delaware, Your Honor, before Judge Hall, the Netgear case.

THE COURT: Where are you from, Mr. Khan?

MR. KHAN: New York, Your Honor.

THE COURT: All right. When are you taking them to Hawaii? I mean, when do you get back?

MR. CHEN: It would be the -- it's a short trip. It's the 7th -- oh, actually, I'm sorry, Your Honor. The 17th. The 17th would work, Your Honor. I'm taking them the following week, the 24th. The 17th would work.

THE COURT: Just think about that, you'll have that off your shoulders. It'll be incredible.

Which island are you going to?

MR. CHEN: We're going to go to the big island.

182

THE COURT: All right. All right. Mr. Khan, can you do the 17th?

MR. KHAN: Yes, Your Honor, that will work.

THE COURT: All right. Let's do the 17th, 9:00 a.m.

Okay. Now, the briefing, I'll leave it up to you. You know, I think the sooner, the better. I could have more time to look at it.

But remember, you can have experts at these hearings, and I sometimes wonder why folks don't.

But nobody's stopping you from having experts if you thought it was important. And what I would say about that is, especially have them ready, so that if I all of the sudden say, gee, I really could benefit from an expert, you know, it's there.

So I'm not saying you need to bring your experts, but I'm just saying if you thought it was advantageous to do it, it's up to you.

Actually, we haven't had any depositions, though, of experts, right?

MR. CHEN: We have not.

MR. KHAN: Correct, Your Honor.

THE COURT: Okay. But, and as I say, I'm not saying I need any experts, right? But okay. Then we'll continue on the 9th, but I've already ruled about

183

"optical element" is means-plus-function.

Corresponding structure for Claim 13 is to be found in Figures 408 and 413.

If anybody can find what happened to Number 45, let me know, in Figure 37.

Yes?

MR. KHAN: One clarification, Your Honor. I think the 408 or -- it would be 408 or 413? Because it would be alternative structures, each of them reciting a curved mirror or optical element that would perform a detection function, but I don't know if that's the way the Court...

(Reporter clarification.)

THE COURT: Hold on.

MR. KHAN: I didn't understand -- I just wanted to clarify how, Judge, you were ruling on that.

THE COURT: That's a good question.

MR. CHEN: Your Honor, one of them performs forward scatter detection, the other one performs side scatter detection.

THE COURT: And those, I think it's undisputed that they're the only two types of detection that exist, right?

MR. CHEN: For scattered light --

THE COURT: For scattered light that --

184

MR. KHAN: Right. But, Your Honor, the claim just says detects scattered light. It doesn't say forward or side.

And so I think the correct way to think about 408 or -- would be to be either 408 or 413, because both of them in the axial loss system are described as detecting scattered light. So it could be one or both. It doesn't have to be both.

THE COURT: Oh, I see.

Yeah, well, actually...

MR. KHAN: It could be either one is kind of what I'm saying.

THE COURT: What do you think?

MR. CHEN: I think it has to be both. The embodiment talks about both. It collects both, forward scattered light and side scattered light.

MR. KHAN: They're both scattered light. And one is detecting --

THE COURT: All right. You know what? I'll tell you what, we can address that September 17th.

MR. KHAN: Okay.

THE COURT: So, I mean, what I would say is this. What I'm going to go back to decide that is I am going to look at the patent, and if the patent discloses a system that has both of them, it's got to be both.

185

But I'll look at the law too.  You know, that's what I'm saying.

So you can brief that.  You've got supplemental briefing.  If you want to...

I told you to discuss the corresponding structure, so if you want, you can discuss, only with respect to Claim 13, whether it's one or both.  That's it.  Nothing else.  It's going to be one or both.

MR. CHEN:  Understood, Your Honor.

THE COURT:  It's going to be...

MR. CHEN:  Either or both.

THE COURT:  It's going to be either or both.

MR. KHAN:  Yes.

THE COURT:  Thank you.

MR. CHEN:  Understood, Your Honor.  Thank you.

MR. KHAN:  And on the briefing, Your Honor, given that these are their terms, we think we should have the opportunity to respond.

Would it make sense to have them go first, and then us to respond, and we can make a joint submission to you together?

THE COURT:  No.

MR. KHAN:  Okay.

THE COURT:  I want simultaneous.  Then you've really got to decide what you're going to do.  So pick a

186

date.  You want to pick it now, let's pick a date, and we'll pick a time.

By the way, I mean, I think one thing for...

Like is Claim 13 no longer indefinite because now that there is structure?

MR. CHEN:  I think it's indefinite, Your Honor.

THE COURT:  Oh, you still think it's indefinite?

MR. CHEN:  That is our position is that we think it's indefinite, Your Honor.  Can we brief that further?

THE COURT:  Well, no, but what I wanted to talk...

MR. CHEN:  Because it's not an optical element.  A detector is not an optical element.

MR. KHAN:  I think, Your Honor, the basis for their argument that it was those detectors was that they had optical elements in them, they had mirrors and things like that, and so I think it wouldn't be indefinite, but --

THE COURT:  I mean, my question would be is, on whether it's indefinite is who cares what it's called?  If it's a nonce word, and it's means-plus-functioning, means-plus-function claiming, they could have called it a

187

zebra.  I mean, they could have said it's a zebra configured to do this and this, and you seem to be okay with now that the functions are undisputed, and I agreed with you that if I'm interpreting it this way, means-plus-function, it's detection and the only structure that corresponds is 408 and/or 413, that part, and/or, to be decided.

I'm like why isn't it indefinite anymore?

Now, the other claims, you might be right.

MR. CHEN:  Because one of ordinary skill in the art looking at the term "optical element" wouldn't understand that that can perform the function of detecting --

THE COURT:  I thought that's the whole part --

MR. CHEN:  -- and that's -- that's the confusion.

THE COURT:  I thought the whole point of functional claiming is that that they're allowed to claim functionally, and I think, like, it seems to me, at that stage, for you to prove it indefinite, assuming there's a corresponding structure, you'd have to say it's impossible.

See, I mean, it seems to me that if you want to say that a means-plus-function claim is indefinite, you've got to do it on the absence of a structure.

188

MR. CHEN:  I understand what you are saying, Your Honor.

THE COURT:  You think about it, but I don't know how you could pursue an indefiniteness claim if I'm going to construe this means-plus-functioning and limit the function to the 408 and 413.

MR. CHEN:  For that particular element.  There's other elements with different functions --

THE COURT:  That's a different story.  In fact, like I said, I actually have already volunteered, I'm looking at them, and I'm thinking I don't know how there's any corresponding structure to some of these other ones.

MR. CHEN:  Right.  Understood.

THE COURT:  So that's where it's fair, I think, for you to say indefiniteness could still be pursued.

MR. CHEN:  Understood.

On the briefing, Your Honor.

THE COURT:  Yeah, dates.

MR. CHEN:  The dates.  And then also you had mentioned early summary judgment briefing on the issue of indefiniteness --

THE COURT:  Well, I think we should wait and see what happens with these --

189

MR. CHEN: Okay.

THE COURT: -- with these claims. I mean, pretty much, I think what's going to happen at this hearing on September 17 is for the remaining claims for "optical element," if we don't come up with a structure that's corresponding, don't I then say it's indefinite?

MR. CHEN: Yes.

THE COURT: Isn't that what happens?

MR. KHAN: We think there is going to be a corresponding structure.

THE COURT: I know you do. But, I mean --

MR. KHAN: Right.

THE COURT: -- in fairness, if I don't, if I say I don't see that there's a corresponding structure here, then I think we're on to indefiniteness. I mean, I think it is indefinite at that point, right?

MR. KHAN: If there's no corresponding structure to the means-plus-function term.

THE COURT: It's indefinite.

MR. CHEN: It is.

THE COURT: Okay. Good. We agree on that. All right. So briefing, when do you want?

MR. CHEN: The 10th, Your Honor.

THE COURT: The 10th of what?

MR. CHEN: September. It's a week before.

190

THE COURT: Yeah. Does that work for you?

MR. KHAN: Yes, Your Honor. That works fine.

THE COURT: Okay. All right. Get it in.

MR. CHEN: Page limit, Your Honor?

THE COURT: Yeah, I mean, look, Ms. Upton clerked for me. She'll tell you, if it's long, you know. Look at the way I write my opinions. If you've got to say so much, it's kind of shame on you. And you lose stuff. I lost stuff with this briefing, in fairness. I mean it's a good briefing, actually, but, I mean, I lost stuff. I lost your...

You know, I was on Page 56 because I am looking at 70. You repeat yourself a lot, it's whatever. Short is better. So, I mean, the great briefers are short briefers.

So I can set a limit if you want. What do you think?

MR. CHEN: We'll be reasonable. Thank you, Your Honor.

MR. KHAN: Yeah, we can work that out, Your Honor.

THE COURT: Work it out.

MR. KHAN: Yes.

THE COURT: You're better off being short because, I mean, you are going to hurt yourself if you're

191

not.

MR. CHEN: Understood.

MR. KHAN: Understood.

THE COURT: Okay. All right. Anything else?

MR. CHEN: We'll figure out the other dates. September 17, Your Honor, just because there's the October 8 fact discovery deadline and expert reports.

THE COURT: Right. By the way, is the claim narrow destruction...

Destruction? Freudian slip that was very worthwhile.

Is that moot? Do I have to resolve the objections to Judge Tennyson's report?

MR. CHEN: It's moot.

MR. KHAN: Your Honor, I think --

THE COURT: We've got the claim narrow anyway. As soon as I'm done, you know...

MR. KHAN: I think now it's moot.

THE COURT: Okay.

MR. KHAN: So I think you can -- Your Honor, you don't have to rule on that.

THE COURT: Okay. Good. I'll enter an order tomorrow saying, hearing from the parties, denied as moot.

MR. KHAN: So, Your Honor, just to be clear on

192

what the briefing is supposed to cover --

THE COURT: Yeah, that's good. That's fine. Let's be really clear. Go ahead.

MR. KHAN: So for Claim 13 of the '443 patent, whether it's either or both --

THE COURT: Yep.

MR. KHAN: -- 408 and 413.

THE COURT: Yep.

MR. KHAN: And then for the other optical element terms.

THE COURT: Yep.

MR. KHAN: And each claim, optical element, collimating optical element, collecting optical element, focusing optical element.

THE COURT: You need to identify corresponding structure.

MR. KHAN: Corresponding structure.

THE COURT: Right. I think that's right.

I mean, is there anything...

And the reason why, to the extent you've already done that in the briefing, I think you need to... I'm giving you the opportunity to rethink. You know now which way I've ruled. I mean, I've said it's means-plus-function. So, you know...

In other words, are there any, were there any

other terms that you thought should be means-plus-function that would not be encompassed by optical element?

MR. CHEN: No, Your Honor.

THE COURT: Okay. All right. And then collimating, that's plain and ordinary. I've construed that.

And what else was there?

MR. CHEN: First and second.

THE COURT: Oh, first and second. Oh, so first and second, I've construed that with regard to filters, but then if there's follow-up, you want to address that?

MR. CHEN: Yes, we do.

THE COURT: Okay. So then that's what they're saying is --

MR. KHAN: That's what I was trying to clarify is making sure that we understood that there was going to be clarification on that.

THE COURT: Yep. First and second, you just need to address the particulars elements.

MR. KHAN: Other than the filters.

THE COURT: Right. That should be really, really short.

MR. CHEN: Understood, Your Honor.

THE COURT: Okay. Anything else?

MR. CHEN: No, Your Honor. Thank you.

MR. KHAN: That's it. Thank you.

THE COURT: Okay. Thanks, all.

(The proceedings concluded at 5:21 p.m.)


CERTIFICATE OF COURT REPORTER


I hereby certify that the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Bonnie R. Archer
Bonnie R. Archer, RPR, FCRR
Official Court Reporter
U.S. District Court

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BECKMAN COULTER, INC.,            )
                                  )
            Plaintiff,            )
                                  )    C.A. No. 24-945-CFC
      v.                          )
                                  )
CYTEK BIOSCIENCES, INC.,          )
                                  )
            Defendant.            )
                                  )


                Wednesday, September 17, 2025
                        9:02 a.m.
                     Markman Hearing


                    844 King Street
                 Wilmington, Delaware

BEFORE: THE HONORABLE COLM F. CONNOLLY
United States District Court Judge


APPEARANCES:


            RICHARDS, LAYTON & FINGER
            BY:  CHRISTINE D. HAYNES, ESQ.
            BY:  FREDERICK L. COTTRELL III, ESQ.

                -and-

---

APPEARANCES CONTINUED:


            WILMERHALE
            BY:  OMAR KAHN, ESQ.
            BY:  JEFFREY DENNHARDT, ESQ.
            BY:  ASHER S. MCGUFFIN, ESQ.


            Counsel for the Plaintiff



            MORRIS NICHOLS ARSHT & TUNNELL
            BY:  JEREMY TIGAN, ESQ.
            BY:  CAMERON CLARK, ESQ.


            -and-

            COOLEY LLP
            BY:  REUBEN CHEN, ESQ.
            BY:  ADAM PIVOVAR, ESQ.
            BY:  DUSTIN KNIGHT, ESQ.
            BY:  BETSY FLANAGAN, ESQ.
            BY:  ROSALYND UPTON, ESQ.


            Counsel for the Defendant

            _ _ _ _ _ _ _ _ _ _


            P R O C E E D I N G S


     (Proceedings commenced in the courtroom beginning at 9:02 a.m.)

            THE COURT:   Please be seated.  Good morning.

---

            All right.  Ms. Hayes.

            MS. HAYNES:   Good morning, Your Honor. Christine Haynes from Richards, Layton & Finger on behalf of the plaintiff.  With me from my office is Fred Cottrell.  And also with us are our cocounsel from Wilmer Hale, Omar Khan, Jeffrey Dennhardt, and Asher McGuffin. And in the gallery, we have Mike Levy from our client. Thank you, Your Honor.

            MR. TIGAN:   Good morning, Your Honor. Jeremy Tigan with Morris Nichols on behalf of Cytek.  I'm joined by my associate, Cameron Clark.

            From the Cooley firm I have Reuben Chen, Adam Pivovar, Dustin Knight, and Betsy Flanagan at counsel table.  And in the back, our expert witness, Dr. Ilkov.

            THE COURT:   Thank you.

            All right.  You know, counsel are so nice in this case, I hate to have to start the hearing this way, but I'm going to.  So this is what you all gave for me to read.  And I'd like you all to turn to the plaintiff's supplemental brief at Page 28.

            Look at the first full paragraph, the first eight lines.  So there are multiple quotes from the specification of the patent.  There are no citations. So I stopped reading the brief at that point.

            So the plaintiffs, your brief, I stopped

---

reading, and I won't read it after Page 28.

            I can't be clearer.  It's in my scheduling order.  I've talked to you.  I talk to lawyers all the time.  You've got to pinpoint.  In fact, you don't even pinpoint; you don't cite.

            I am not doing that.  It is not fair.  It's horrible advocacy.  It's a waste of client's money.  I didn't read the arguments.  So keep that in mind when you do your presentations.

            All right.  Now, I think, from what I did read in the briefing, two terms have been dispensed with.  Can you confirm that?  So first and second dichroic filter, I believe, is no longer an issue in dispute; is that right?

            MR. CHEN:   That's correct, Your Honor.

            MR. KHAN:   Your Honor, our understanding of the Court's ruling from last time was that first and second filter in the '443 was resolved.

            With respect to first dichroic filter in the '106 Patent, Claim 1, that filter is differently situated than the first and second filters in the '443 patent.  And, specifically because the claim language is different in the first dichroic filter in the '106 Patent, Claim 1, in the claim itself, comes after a curved mirror.  And so we think that warrants separate

**5**

consideration.

THE COURT:   You didn't brief it.  You didn't brief it.

MR. KHAN:   We did, Your Honor, at -- it's at Page 11 through 13 of our supplemental brief, Your Honor.

THE COURT:   No.  Sorry.  They didn't brief it.  Sorry.  They don't contest it.  I mean, like, in other words -- sorry.  Confused the sides.  Didn't you sit on that side?

Okay.  They are not challenging anymore.

MR. CHEN:   Your Honor, our understanding is that Your Honor already decided on the filter term, so there's no reason to be submitting additional briefing about the filter when Your Honor already decided that the written description supports the positional significance of first and second with respect to the filter term.  That covers all filter terms.  We were talking about the dichroic filter at the last hearing.

THE COURT:   Well, maybe you made assumptions I didn't.  But the bottom line is, you didn't brief it, so I'm going to go with plain and ordinary meaning.  I'm going to go with Beckman's approach.

MR. KHAN:   We understand, Your Honor.

THE COURT:   Okay.

I'm just going to decline to construe the

**6**

term.  All right.  So I think the same thing applies for first and second optical filter.

MR. KHAN:   It does, Your Honor.

THE COURT:   Okay.  So same thing.  There was no argument offered.  I'm just going to go with --

MR. CHEN:   Your Honor, I would like to just comment.  I believe last time we were talking about the dichroic filters and optical filters, and Your Honor had decided, based on the transcript that we read, that the filter term was already decided.

You wanted additional briefing with respect to the other first and second terms, and that's exactly the instruction that was followed, respectfully, Your Honor.

THE COURT:   Well, respectfully, I construed first and second filter.  And when you briefed it on Page 10 of the joint claim construction brief, what I followed when I construed the terms at the first hearing, I talked about how you wanted me to globally do first and second.  I wasn't willing to do that.  I was going to break it down term by term.

And if I look at Page 10, the first term is curved mirror.  The second term is focusing optical element.  The third term is filter, which I construed.

MR. CHEN:   Right.

**7**

THE COURT:   The third term is optical filter.  I did not construe it.

The next term is dichroic filter.  I did not construe it.  The next term is semiconductor detector.  The next term is image.  And I expected that we were going to have supplemental briefing that will address each of those terms, as you all presented to me.

So I didn't see anything.  I'm not construing first and second dichroic filter.  And I am not construing first and second optical filter.

MR. CHEN:   Understood, Your Honor.

THE COURT:   Now, obviously *02 Micro*, we go to trial, it comes up, we have to construe it; I'll deal with it then.  I'm just not doing it now.

MR. CHEN:   Appreciate that, Your Honor.  Thank you.

THE COURT:   Okay.

All right.  Why don't we start with first and second curved mirror.

MR. KHAN:   All right.  Thank you, Your Honor.

So on first and second curved mirror, it's part of a set of terms in the '106 Patent Claim 1.  And those three terms are first curved mirror, first dichroic filter, which, Judge, you just said is going to be plain and ordinary meaning until -- and then the

**8**

third term -- they're all connected in the claims, Your Honor, so that's why we're going to try to -- it would be use useful to treat them together.

Before we get to the actual term, we thought, with the Court's indulgence, if we could just have a quick background on the specification which bears on, actually, this very term and how it uses the term in the specification.

So in the specification, Your Honor, there's a passage that talks about a first optical element and a second optical element, but they are not the first and second optical elements in the optical path, which is what Cytek wants.

And if we look at the passage here and the Figure 25 that we've annotated with the first optical element is something that produces the beam of light with an image.  That corresponds to element 902.

Then there's a dichroic filter in the passage.  It says the dichroic filter located between said first optical element and said image, and then there's a second optical element located in one of the branches.  And there's an image relay optical element near the other image.

So here, Your Honor, here's the passage and specification talking about two -- a first optical

element and a second optical element and -- but there's a third optical element in the middle, and it's -- the use of the word "first" and "second" is out of order because there are -- it would have referred to the dichroic filter as the second optical element and that last focusing lens as the third optical element, and so what --

THE COURT:    Sorry.  I'm losing you.  I don't get it.

MR. KHAN:    Sure.

THE COURT:    So you may want to start over because I'm just not --

MR. KHAN:    Understood, Your Honor.

So in this passage, there are --

THE COURT:    This is from the '582 Patent.

MR. KHAN:    This is from the '582 Patent at 639, 50, Your Honor.  And it's describing a first optical element and then it says that's the optical element that produces a beam of light.

And then it says there's a dichroic filter, and it identifies a dichroic filter.  And then it identifies a second optical element located in one of the branches created by the filter.

And then it says there's an image relay optical element located near the image produced by the

optical element in the other branch.

And so the point, Your Honor, that we're trying to make is that the passage is talking about four different optical elements, but only two of them are labeled first and second.  And they're actually labeled first and second non-sequentially because the dichroic filter is in the middle of the first and the second optical element.  And that's the point, Your Honor.

So the terms "first" and "second" are used non-sequentially in this passage because the dichroic filter qualifies as an optical element, as we discussed last time around.

It's an object -- it's an element that acts on light.  So it's just like all the other elements in the system.  It's an optical element.

And what the passage is saying is that:  I'm going to call this the first optical element, and I'm going to call this the second optical element, but I'm going to -- it's using the terms "first" and "second" merely to refer to two different elements in the system.

THE COURT:    You know, what you're saying is every single part of that figure is an optical element.

MR. KHAN:    Exactly, Your Honor.  All of them are optical elements.  But I'm focused on the use of the words "first" and "second" as well.  And critically, the

use of the words "first" and "second" is not, in this passage, connoting order or sequence.

THE COURT:    Hold on.  Hold on.

MR. KHAN:    Yes.

THE COURT:    Go ahead.

MR. KHAN:    And so the point is kind of what I was saying, Your Honor, that this passage is saying -- is using the words "first" and "second" not to talk about how components are ordered in the optical path because there's a dichroic filter -- sorry.  There is --

THE COURT:    Haven't I already ruled that Figure 25 shows a sequential first and second?

MR. KHAN:    I don't think, Judge, you ruled exactly that.  I think -- but I don't think anybody is disputing that Figure 25 has a certain configuration, and that the sets are ordered, that the semiconductors and all the other optical elements are lined up in the way that they are.  There's actually no factual dispute about how Figure 25 works.

And all we are pointing out here, Your Honor, is that there's a usage of the first and second in a nonsequential way.  And actually, the patent does it again.  And now it's talking about different optical elements.  And this is at -- again in the '582 Patent. And here it's saying, "I have a collimating optical

element, which is Element 902."  And then it says, "I have a dichroic filter."  That's, of course, an optical element here as well.  And then there's a second optical element that receives light from the dichroic filter. Here -- that's over here.

And so, again, the use of the word "second" is nonsequential.  It's a nonsequential optical element, because if the passage were wanting to use first and second sequentially, what would it say?  It would say, "I've got a first optical element, I've got a second optical element, and I've got a third optical element." And it doesn't do that.  The passage just says, "I've got a collimating optical element, a dichroic filter, and a second optical element."

THE COURT:    Right.  It doesn't treat dichroic filter as an optical element in this discussion.

MR. KHAN:    But as of --

THE COURT:    So, I mean, you agree, right, it expressly defines the first optical element as 902.

MR. KHAN:    It does not say the words "first optical element."  But optical element --

THE COURT:    Can you go back to the prior passage?

MR. KHAN:    Yes.

THE COURT:    So expressly, like, the first

optical element is undisputed.  I can't see anymore because it's so far away.  Is it 902?

MR. KHAN:   Yes, Your Honor.

THE COURT:   Right.  So that passage, which is Column 6, Lines 39 through 50, expressly identifies as the first optical element 902, correct?

MR. KHAN:   It does, yes, Your Honor.

THE COURT:   Right.  And it defines a second optical element as what?

MR. KHAN:   The second optical element is the lens that captures -- that's in one of the branches that captures the light, right.

THE COURT:   Correct.  What is it?

MR. KHAN:   It's a focusing lens.  It's an optical --

THE COURT:   No, no, no.  What number is it?

MR. KHAN:   Oh.  905.

THE COURT:   905.  Okay.

And that occurs sequentially after the first optical element?

MR. KHAN:   After the first optical element, but not immediately second sequentially, right, because the --

THE COURT:   But in terms of what has been defined in this passage as an optical element, or what's

being characterized as an optical element, it is sequential.  I'm done.  It's sequential.  I've already ruled.  I don't want to rehash this.  I have limited time.

MR. KHAN:   Okay.

THE COURT:   I have very limited time.  I have given you guys way too much time.

And the way you briefed it, you don't deserve any time, right, because of what I said.  I mean, look, and just for the record, I want to make sure the Federal Circuit appreciates that, it's literally 2 feet of documents, 2 feet of documents that you want me to review without pointing me to a cite.

It's ridiculous, so move on.  I don't repeat argument.  I dealt with this argument on the last hearing, on the Figure 25.  Let's go.

MR. KHAN:   All right.  We apologize for that, Your Honor.  We meant to incorporate the prior cites.  But can we go to the curved mirror, please.

So here's the curved mirror section, Your Honor.  So on curved mirror, the language in the claim is that it's a first curved mirror.  And the other language in the claim is what tells you where the position of the curved mirror is.  It's not first and second.

The other language in the claim tells you that the curved mirror is receiving light passed through the collimating optical element.  And then the other language in the claim tells you that the curved mirror reflects light towards the first semiconductor detector.

So the word "first" is not, in this claim language, noting positional sequence, because the rest of claim tells you what it is.

It's also, Your Honor -- Judge, it's a comprising claim.

THE COURT:   Hold on.  Sorry.  Give me a second.

Okay.  Sorry.  Go ahead.

MR. KHAN:   All I'm saying, Judge, it's a comprising claim.  And so what that means is that there can be elements that come before the first curved mirror -- a first curved mirror, including other curved mirrors that come before the first curved mirror.

And the specification, Your Honor, never uses the word "first" in connection with curved mirror or any other similar elements.  And instead, it just identifies optical element 907 as a second optical element.

In the claims --

THE COURT:   What about Claim 5?  In Claim 5 depends ultimately from Claim 1, right?

MR. KHAN:   It does, Your Honor.  So --

THE COURT:   Can you address that, please?

MR. KHAN:   So Claim 5 is an unasserted claim, Your Honor.  And --

THE COURT:   I realize.  But it has a second curved mirror, right?

MR. KHAN:   It does have a second curved mirror.

THE COURT:   So can you just address that?  And that comes sequentially after the first curved mirror, right?  It has to, right?

MR. KHAN:   It does not.  Your Honor, the -- in this instance, a second curved mirror, perhaps, sort of comes after, but it doesn't have to come sequentially after, right?

THE COURT:   I'm sorry.  I lost you.  "After" seems to me sequentially.  I mean, well, "after," by definition is a relative term referring to sequence.

MR. KHAN:   Exactly.  So in Claim 5 --

Can we switch to the ELMO?

THE COURT:   It might be the source button on the podium maybe.

Okay.  Great.  Thank you.  Need optics.

MR. KHAN:   Trying to figure out how to...

There it is.  Okay.

So in Claim 5, Your Honor, there's a second curved mirror and a second dichroic filter. And it's arranged to reflect at least a portion of light reflected by the first dichroic filter.

And so what we would agree with Your Honor is that a first curved mirror has to come before a second curved mirror. We agree with that.

THE COURT: Okay.

MR. KHAN: But it doesn't have to be the immediate next. So what Cytek is arguing is that the first and second curved mirrors have to be back to back.

THE COURT: Hold up.

MR. KHAN: First and second in sequence.

THE COURT: I don't think they are saying that. It just has to come after. It doesn't say that it can't be something in between it.

MR. KHAN: We would agree with that, Your Honor.

THE COURT: Maybe we don't have a dispute because all they're saying is that the second has to come after the first.

Correct, Mr. Chen?

MR. CHEN: It has to be the second curved mirror. There can be other components in between.

THE COURT: Right.

MR. CHEN: There has to be a first mirror and then the second mirror.

THE COURT: In other words, the only thing that can't be in between is a curved mirror.

MR. CHEN: Correct.

MR. KHAN: Well, that's maybe the area of dispute then, Your Honor.

THE COURT: Okay. Well...

MR. KHAN: Thank you for that.

THE COURT: In Claim 5, there's no curved mirror in between the first and second curved mirror.

MR. KHAN: Right. But all -- it says the second curved mirror is receiving, essentially, the light from the first -- from a first curved mirror.

THE COURT: Yeah.

MR. KHAN: But there can be intervening curved mirrors that may have also received the light. It's a comprising claim, Your Honor, so it doesn't preclude the notion that the light could have passed through an intermediate curved mirror. That's all -- that's essentially my point.

THE COURT: Okay. I see. All right. I understand now. Sorry.

MR. KHAN: All right.

So, Your Honor, in this claim in '106 Patent, Claim 1 --

THE COURT: I do want to go back to, is there any disclosure in the written description where between the first and second curved mirror, there's another curved mirror?

MR. KHAN: The words "first" and "second" are not used to describe the curved mirrors at all.

THE COURT: Okay.

MR. KHAN: And so the figure just labels a plurality of curved mirrors. And so the words -- the usage of the words "first" and "second" in connection with curved mirrors is nonexistent in the specification.

THE COURT: Okay. Is there any indirect reference to a curved mirror in the written description using the words "first" or "second"?

MR. KHAN: I don't believe so, Your Honor.

THE COURT: In other words, there's no first optical element or first --

MR. KHAN: Second optical element.

THE COURT: So there is a second optical element that refers to a curved mirror?

MR. KHAN: There's a second optical element that refers to a curved mirror. Turns out that it's the first curved mirror, actually.

THE COURT: Right. Exactly. I just wanted to make sure. And that would be Figure 25?

MR. KHAN: In Figure 25, right. So in a sense, the use of the word "second optical element" to refer to the first initial curved mirror tells you the first and second are not doing any work with respect to usage to suggest sequentiality or order or sequence as it applies to curved mirrors.

THE COURT: Okay.

MR. KHAN: And the point that I would make, Your Honor, is in this claim, there are three elements. It says that there's a first dichroic filter between a first curved mirror and a first semiconductor detector.

And, Your Honor, what we would submit --

THE COURT: Hold on. When you say "it says" --

MR. KHAN: The claim.

THE COURT: The claim. I just want to make sure. Claim 1. All right.

MR. KHAN: '106 Patent, Claim 1 says, "A first dichroic filter between a first curved mirror and a first semiconductor detector."

THE COURT: Okay.

MR. KHAN: And that's the language in the claim.

And, Your Honor, we submit that to the extent

that there's the word "first" is doing any work in this claim, it's actually grouping these limitations together and saying, hey, I've got a first group of a curved mirror, a dichroic filter, and a semiconductor detector.

And that's one of the usages of "first" and "second" that the Federal Circuit has embraced and said, hey, you know, first and second -- to find that its usage is sequential, you have to necessarily find that the specification requires that usage.

But combining the various elements into a first group, that is something that patent drafters and claim drafters do all the time.

And so the word "first" is doing work in this claim. It's not without meaning. It's sort of saying, here's my first group.

As I was pointing out earlier, Your Honor, it's a comprising claim. So when I defined the first group as curved mirror, dichroic filter, semiconductor detector, I can have elements that come before it. And that's sort of what -- that's basically what we're trying to get at.

Thank you, Your Honor.

THE COURT:    Thank you.

MR. CHEN:    Good morning, Your Honor. Reuben Chen for Cytek Biosciences.

THE COURT:    Good morning.

MR. CHEN:    May I approach with the slides?

THE COURT:    Yes, please.

MR. CHEN:    Your Honor, I'd like to just quickly point out that with respect to plaintiff's slides that they just showed you, that Slide 4 is talking about a specification passage that's not described in Figure 25.

So I just want the record to reflect that that discussion is not with respect to Figure 25; even though, they included Figure 25 and try to map those particular elements onto Figure 25, which we don't think is accurate.

The other --

THE COURT:    Hold up. I do want to check something out now.

MR. CHEN:    Sure.

THE COURT:    Column 6 was the discussion, right?

MR. CHEN:    That's correct, Your Honor. Column 6 is not specifically with reference to Figure 25.

THE COURT:    The discussion in the written description of Figure 25 is in Column --

MR. CHEN:    Forty-four, Your Honor, and 45.

THE COURT:    Yeah, 25 and 44.

Okay. Thank you. And 45.

MR. CHEN:    Thank you.

THE COURT:    Thank you. All right.

MR. CHEN:    Correct.

The second thing I wanted to point out is with respect to their Slide 54, where they are talking about --

THE COURT:    I don't have their slides. When you say 54 --

Sorry. All right. Go ahead. I found their slides. Go ahead.

MR. CHEN:    Thank you, Your Honor.

THE COURT:    What are you on, Slide?

MR. CHEN:    Fifty-four.

THE COURT:    Fifty-four. Okay. Great. Got it.

MR. CHEN:    With respect to Slide 54, where there is the discussion of the actual asserted claim, the asserted claim they're trying to map on to Figure 25, but, again, there's no such requirement.

And as we pointed out at the last hearing and that we'll point out with respect to some additional terms, the original claims of the parent '412 Patent do map on to Figure 25, Your Honor.

THE COURT:    Right.

MR. CHEN:    Okay.

THE COURT:    And federal case law is explicit that I can treat the claim of the original application as part of the prosecution history, correct?

MR. CHEN:    That's correct, Your Honor.

THE COURT:    Right. I mean, it's not a question of, like, there's ambiguity. There is express Federal Circuit case law which talks about that original claim, which makes sense, right, because that's the inventor, that's their first shot, and it kind of reveals a lot.

MR. CHEN:    Absolutely, Your Honor. Correct.

So turning to the first curved mirror term. If we can go to the next slide, please.

There is a specification passage that talks about concave mirrors. There isn't a labeling of a first or second with respect to the concave, which is a subset of curved mirrors, but they are sequential.

And you can see Figure 25A is sort of the reverse of Figure 25.

So the optical fiber is now coming in from the right instead of the left, and it's coming in from the top instead of the bottom. So you have the optical fiber 852 and then there's the collimating optical element 902. And then it travels through the same

25

components as you see in Figure 25, which is a dichroic filter. And then 905 is a focusing lens.

And then 940 are the semiconductor detectors here. And what you see is that 907 is the first curved mirror or concave mirror. And then it just continues sequentially, 910, 911, 912, 913.

And when you read the specification as a whole, and specifically Columns 44 to 46, you see that the specification is providing positional significant sequence with respect to these various claim terms.

For example, first image is a really good example. And perhaps we can turn to that just real quick. I'll talk about that in more detail soon.

THE COURT: Well, actually, here's the deal: I've heard enough.

MR. CHEN: Okay. Thank you.

THE COURT: What about, just quickly address Claim 1 and Claim 5 in the '106 Patent and why you think that that also supports your position.

MR. CHEN: Absolutely. And we've got a slide on that. So just pulling up the claim language here.

We do believe that it supports our position because you have a second curved mirror and a second dichroic filter. And specifically, as you read through the claim language, the second dichroic filters arranged

26

and configure to allow the second color band in the fluorescent light to pass through the second dichroic filter onto the second semiconductor detector.

THE COURT: Right. Now, what do you say to his argument that, all right, he admits, Mr. Khan admits that, all right, the second has to come after the first, but it doesn't preclude there being a mirror in between?

MR. CHEN: Yeah.

THE COURT: In the claim language.

MR. CHEN: Yeah. It doesn't make any sense, because if you look at all the first and seconds, and there's a third semiconductor detector here, they're all in sequence and they have to receive like the third color band of light. There's a second color band and there's a third color band of light.

It doesn't make any sense if you say, Well, a third one could be the second one, a second one can be the third one. It just doesn't make sense.

And even if you were to say, "Okay. There's a multi-detector system. And, you know, the first curved mirror is broken, I need to replace it," a person of ordinary skill in the art would know which is the right first curved mirror to replace. They wouldn't think, "Oh, I've got to replace the third one."

I mean, a person of ordinary skill in the art

27

would know that. And, frankly, a layperson would know that, too, Your Honor.

THE COURT: All right. So I agree with you. And I think that Claims 1 and 5, but more importantly, coupled with Figure 25, and the original claims of the patent, which read on Figure 25, in addition, I would add even 25A, which again, shows positional sequencing. I think when you read all those together, it's very clear that there should be sequencing here.

MR. CHEN: Thank you, Your Honor.

THE COURT: So I'm going to construe it that way.

All right. So that dispenses with the first and second curved mirror terms.

Let's go to the next term. Actually, let's go next to... I don't want to do "focusing optical element" next. I want to leave that.

Let's do "focusing lens" next.

MR. KHAN: Focusing lens is configured to focus light?

THE COURT: No.

MR. KHAN: Or focusing optical element?

THE COURT: Focusing lens, I thought, was part of the original briefing we didn't cover at the last hearing.

28

MR. KNIGHT: You're correct, Your Honor. It wasn't relative to the first and second terms.

THE COURT: Right.

MR. KNIGHT: Right.

THE COURT: I know that. Well, actually, you say "it wasn't relative to," I don't know. Part of the reason I want to do "focusing lens" is because I'm wondering what it's going to do when I think about "focusing optical element."

MR. KHAN: Understood, Your Honor.

MR. DENNHARDT: Good morning, Judge. Jeff Dennhardt.

All right. So the dispute here is our construction is that a focusing lens configured to focus light means a lens to converge light. "Focus" means converge. The parties, I think, agree on that point.

Cytek's construction by contrast additionally requires that the lenses must capture all collimated light rays that pass through a filter and project them as converging rays onto the focal point of the lens.

So the question is whether they need -- a focusing lens need only converge to light to focus, or whether it requires all of the additional requirements that Cytek is seeking to impute to those claims.

And if we look at the specification, this is

on our Slide 122, the specification repeatedly confirms that a focusing lens is used to converge light.

This is a very simple term, we think, Your Honor. The first one --

THE COURT: Just a second. Sorry.

Would you agree to construe it as "lenses that capture and converge collimated light"?

MR. DENNHARDT: I don't think we have an issue with "capture."

I think "collimated light" would not be right, Your Honor, because the '107 Patent claims don't mention the word "collimated" at all.

So that would be clearly improperly imputing a requirement from the specification into the claims. There's simply no requirement that the light be collimated.

I'm sorry. Can you repeat the rest of your construction? I want to make sure I'm addressing your question.

THE COURT: I just wondered if you would accept "lenses that capture and converge collimated light."

And you're saying you would accept "lenses that capture and converge light."

MR. DENNHARDT: That's right. I think if you took out the word "collimated," we would be okay with that.

And I would note, Your Honor, this is our Slide 128. Cytek recognizes that the '107 claims don't require collimating. In fact, they told you so expressly.

(Reporter clarification.)

MR. DENNHARDT: I'm so sorry.

The '107 claims may omit claiming a collimating optical element or a collimated beam. It's simply not in the claims. There's no reason to impute that requirement into the claims.

I understand --

THE COURT: Hold on a second.

What's this from?

MR. DENNHARDT: This is from the joint brief. This is their answering position. It's the joint brief at Page 114.

THE COURT: Okay. Thank you.

MR. DENNHARDT: Now, I understand, Your Honor, that they say the specification only supports collimated light.

That's a written description question, Your Honor. That can be a dispute that the parties address later in the case. But for purposes of claim

construction, it would be improper to impute this requirement into the claims.

I'll also just submit, so you have it, Your Honor, that Columns 56 through 58 repeatedly describe a WDM that does not include collimated light.

There's one use of the word "collimated" in that entire set of columns, and it's specifically identifies it as a hypothetical.

So we would submit that the written description argument is wrong. But in any case, that's not a question for claim construction.

I'm happy to address the rest of the specification, but I think you get it.

THE COURT: All right. Let's hear what the other side says.

MR. DENNHARDT: Thank you, Your Honor.

THE COURT: Thank you.

MR. KNIGHT: Good morning, Your Honor. Dustin Knight.

I'm focusing on -- focusing lens, Cytek's original briefing, we do acknowledge the fact that the '107, Claim 1, does not include a collimated optical element configured to project a collimated beam.

But as we state in our briefing, this is a significant written description issue.

And our proposed construction is an attempt, albeit a meager one, to try to reconcile issues with the written description what's in the claims.

THE COURT: So then, could you live with "lenses that capture and converge light," right? Well, actually...

So your biggest problem is Claim 1? Or sorry, yeah, Claim 1, right, of the '107 Patent?

MR. KNIGHT: That's right, Your Honor.

THE COURT: And you admit that the descriptions in Columns 56, maybe it's 55 and 56, only use... only disclose a "collimating light rays passing through" in the context of hypothetical; you agree with that?

MR. KNIGHT: Can I confer with my colleagues?

THE COURT: Sure.

MR. KNIGHT: Thank you.

(Counsel confer.)

MR. KNIGHT: Your Honor, if I look at Column 56 through 58, it's discussing a WDM. They use the same item numbers as Figure 25. They've just -- but now they're talking about an imaging optical arrangement.

What we briefed, and what we talked about, and what we're aware of is the disclosures related to Figure 25 for Columns 44 and 45.

And I don't think I can tell you here today having not looked at this more closely, having not been brought up, that we would say there's written description support for a WDM that does not propagate --

THE COURT:   I'm not asking, actually, whether there's written description support for it.

MR. KNIGHT:   I'm sorry.

THE COURT:   That's not what I meant.

In fact, what I'm getting at is, I'm just wondering whether it's just better to give them what they asked for, and then we just have written description briefing.

MR. KNIGHT:   One moment, Your Honor.  Thank you.

(Counsel confer.)

MR. KNIGHT:   Your Honor, as long as it's set for the record that we're preserving a written description argument for later in the case, then we can live with that.

THE COURT:   Okay.  Then that's what I'm going to do.  All right.  Thank you very much.

MR. DENNHARDT:   Thank you.

THE COURT:   All right.  So then, let's go to focusing optical element.  So wait, maybe you all have that then.  So I construed "focusing lenses" as...

Well, actually, I don't know whether we want to me say there's no construction necessary or that it's lenses that converge light.  Does it matter?

MR. KHAN:   We don't think it matters, Your Honor.

THE COURT:   What do you all?  I am content.

MR. KNIGHT:   If we could have a formal construction, that would be helpful to us.

THE COURT:   All right.  Well, then, I will just construe it as, I'm giving it its plain and ordinary meaning that constitutes lenses that converge light.

The reason why I asked is I was persuaded that it probably encapsulates capturing.  The plaintiff doesn't dispute it.  I don't know if that makes a difference to you all.

MR. KNIGHT:   It does, Your Honor.

THE COURT:   Okay.  You don't object, so I'm going to construe it as the plain and ordinary meaning, as lenses that capture and converge light.  Okay?  That's how I've construed it.  Thank you.

All right.  Next.  Let's do focusing optical elements.

MR. KHAN:   On focusing optical element, Your Honor, there's a couple of sort of legal principles we just want to lay out very quickly.

THE COURT:   Okay.

MR. KHAN:   So it's a longstanding claim construction principle, Your Honor, that where there's a reasonable interpretation to cover an embodiment, that it's incorrect to construe claims to exclude that embodiment.

This passage and this principle is not necessarily about preferred embodiments or exemplary embodiments.  It's just saying if there's a reasonable way to interpret the claim to include a specific embodiment, then it's incorrect to exclude it.

And, specifically, it's a separate claim construction principle, Your Honor, that a construction that excludes all disclosed embodiments is especially disfavored.

I just wanted to talk about those because that's going to come up in the context of second focusing optical element.

THE COURT:   These quotes are from what, means-plus-function cases?  What's the context that these statements that you've got on the screen are addressing?

MR. KHAN:   These are statements of -- these are the statements of claim construction law, Your Honor, in these cases.  They are well-established principles that are not sort of, you know, really in dispute.

There's no -- there's nothing to read into in terms of understanding the application of the case because we're just quoting exactly what the background section, the legal section of these cases say.

THE COURT:   Okay.  So the first sentence, "The specification discloses embodiments that appear to be excluded under defendant's narrower construction an outcome our precedence disfavor."

I don't understand that.  I mean, that sentence is taken so out of context.  You agree that each claim is a separate invention, correct?

MR. KHAN:   Claims are required to be patentably distinct.

THE COURT:   Correct.

(Reporter clarification.)

MR. KHAN:   Patentably distinct.

THE COURT:   Okay.  So if we're talking about a construction of Claim 1, the fact that the construction a party asks for about Claim 1 reads out disclosed embodiments is of no consequence if Claim 2 doesn't, right?

MR. KHAN:   It may be, Your Honor.  There's no requirement that -- there's not -- I'm being very clear.  There's no requirement that every claim cover all the embodiments.

THE COURT: Couldn't be. Wouldn't make sense.

MR. KHAN: Yeah. So we agree on that, Your Honor.

THE COURT: Okay.

MR. KHAN: But we're just saying that excluding all the embodiments is especially disfavored.

THE COURT: If all the claims excluded all the embodiments, I hear you.

MR. KHAN: But if any single claim excludes -- construction excludes all the embodiments that are disclosed, that's contrary to what --

THE COURT: That can't be right. That cannot be right as a matter of law. It cannot be.

MR. KHAN: Well, your Honor --

THE COURT: In fact, think about it, because you're a patentee. You want all the time to be able to have a claim read on something that is not disclosed in the written description, an embodiment that's not disclosed. You want that all the time if you're a patentee.

MR. KHAN: And if there's a reasonable construction that would read on to an embodiment, that's all we're saying, Your Honor.

It is not a rule. It's not saying it's

required. That's not --

THE COURT: Well, actually, I'm just telling you that sentence doesn't make sense to me. I actually think it flies in the face of patent law and I think, as a patentee, you wouldn't want it. So I'm not sure how it helps you. Just go ahead.

MR. KHAN: And the second principle, Your Honor, laid out that that -- I think we had a discussion last time, Your Honor, about claim differentiations and, you know, claim language being rendered superfluous sort of maybe in this context, Judge, you found that less persuasive than in other contexts.

And I wanted to point out that one of the things we're going to talk about in connection with this set of claims and this limitation is we're not just rendering claim terms -- dependent claims superfluous. We are rendering them -- striking them from the claim -- we are rendering them inconsistent.

In other words, the independent claim becomes inconsistent with dependent claims once we start adopting Cytek's construction.

And the Federal Circuit recognizes that those are two different things. That's not just rendering claims superfluous, that you've rendered the independent and dependent claims completely inconsistent, and that's

the only point.

So can we go to focusing optical element? So if we start on focusing optical element, Your Honor. The Slide 17, okay.

So here's Claim 1, Your Honor. And in Claim 1, there's a first focusing optical element. The positional language comes not from the word "first," it comes from other elements of the claim.

So the claim tells you that it's going to receive light reflected by the optical relay and then it's going to focus it down to a semiconductor detector.

And so the claim tells you what the relevant optical path is. It's the light, it's the path from the relay to the focusing element down and to the first semiconductor. And, Your Honor, it's a comprising claim.

THE COURT: Can I just ask, before we get started and go down this road, because I may not have been as clear as I should have been at the last hearing. I was very clear at the last hearing that I was construing optical element to be means-plus-function term.

You all agree on that, right?

MR. KHAN: Yeah.

THE COURT: Okay. I just want to make sure.

Do you agree that because I've construed "optical element" as means-plus-function, then necessarily "focusing optical element" is means-plus-function?

MR. KHAN: We understood your ruling to have been that.

THE COURT: I didn't ask what you understood because I think in fairness to you, other than not put pinpoint citations, you did the briefing that a reasonable advocate would have done based on my ruling.

That's not my question. I just want to start from scratch.

I construed "optical element" to be means-plus-function. Now we're talking about "focusing optical element." I haven't formally ruled that "focusing optical element" is means-plus-function.

I just want to make sure. I'm gathering, in your view, having construed "optical element" as means-plus-function, as a matter of logic, I would construe "focusing optical element" as means-plus-function; is that right?

MR. KHAN: No, Your Honor. We think "focusing optical element," the word "focusing" now starts to create structure that tells you what exactly we're talking about.

THE COURT: All right. What I would encourage

you to do, I know Mr. Chen is shaking his head, but address that because that's why I wish I had been clearer in my hearing, in my statement last hearing, which is I am not precluding you from asserting today, I'm not saying I'm going to agree with you, but I'm not precluding you from asserting that "focusing optical element" is not means-plus-function.  All right?

And so particularly what I would like you to focus on, jeepers what a pun, is what things other than a lens and possibly a curved mirror focus?

MR. KHAN:   Right.  And, your Honor, that's the key, is that once you've added the word "focusing," you very much narrow the class of structures.

THE COURT:   What is the class of structures that, by adding the word "focusing," I've narrowed the universe to?

MR. KHAN:   I think it's lens, mirror, and diffraction grading.  I think it's those things, essentially.  And so that is why in the original briefing, Your Honor, in the joint brief, we had taken the position that once -- even if an optical element does not, in and of itself, connote structure, that focusing optical element would, because it reduces the -- radically reduces the class of structures to now qualify.

We also provided evidence, Your Honor, that that -- those three words in tandem connected, focusing optical element, are used in dictionaries, treatises, publications, et cetera, to refer to the specific structures we were talking about.

THE COURT:   Just give me a second.

Does a mirror always converge light?

MR. KHAN:   I don't believe so, Your Honor.

THE COURT:   Yeah.  I wouldn't think so.  How about a grading?

MR. KHAN:   I don't -- I think each of those elements can converge or diverge.

THE COURT:   I didn't say "can."  I purposely didn't say "can," right?

MR. KHAN:   Yeah.

THE COURT:   And I'm a layman.  But doesn't make sense to me that a mirror always would converge light.  And you agree it doesn't.

MR. KHAN:   Right.

THE COURT:   I don't know what a grading is, really.  I don't know that I've ever seen one, so...

But you're telling me a grading always converges light that reflects off it?

MR. KHAN:   I don't believe it does, Your Honor.

THE COURT:   Yeah.  I don't think so either.

But a lens, you would say, converges light?

MR. KHAN:   A lens would converge light.  And that's the quintessential example of a focusing optical element.

THE COURT:   Right.  Well, that's why I'm wondering why not we just construe "focusing optical element" to be a lens.

Mr. Chen.

MR. CHEN:   Lens can also diverge light, Your Honor.  It can be a different kind of lens of this shape and light can diverge through it.

THE COURT:   Right.  But if we had a focusing lens, in other words, if it's a focusing optical element... could you live with "focusing optical element is a focusing lens"?

MR. CHEN:   No.  Because we do think it's subject to means-plus-function, Your Honor.

THE COURT:   All right.  All right.  I'll come back to that.

MR. KHAN:   We could live with that, Your Honor.

THE COURT:   You could live with "focusing lens"?

MR. KHAN:   I think we could live with "focusing optical lens" as opposed to "focusing lens."

THE COURT:   All right.  Let me hear from them.

MR. CHEN:   So, Your Honor, "focusing" is a functional term, so it doesn't add any additional structure to the term "optical element."

THE COURT:   But what to a POSA, what structure is out there that could focus something?

MR. CHEN:   There's a variety of structures.  You could have a concave mirror that focuses.  You could have a lens that focuses.  Those are just two examples.  There's a variety of structures that can perform the function of focusing.  That's why it's not appropriate.

THE COURT:   I mean, you could have... all right.  So we could have a concave... we could have, in other words, you agree that a mirror, a grading, and a lens can all focus.  You're not going to dispute that.

MR. CHEN:   I don't dispute that, that's correct.  And there's other structures as well.

THE COURT:   What other structures?

MR. CHEN:   Dr. Ilkov could probably answer those questions better than me, actually.

But there are, you know, a variety of structures that can do that.  I mean, one that's disclosed in the patent is this back plane, concave mirror that's connected to the objective 60, which makes it a composite microscope objective.  And that actually

focuses, converges light. So there's a variety of even types of mirrors.

THE COURT: So actually, let's go over that. Let's just talk about, what do you agree that the patent... because this is relevant to your means-plus-function.

MR. CHEN: Yes.

THE COURT: If I accepted it as means-plus-function, right --

MR. CHEN: Yes.

THE COURT: -- you wanted to... what would you admit is disclosed in the patent as an optical element that focuses?

MR. CHEN: Right.

We say, Your Honor, focusing lens that is of a size that captures all light rays of at least a portion of a collimated beam.

And that's because that performs the two recited functions for the focusing optical element. So there's specific recited functions, one being to receive at least a portion of a collimated beam reflected by the optical relay element; and, Number 2, to focus the portion of the collimated beam received from the optical relay element onto a semiconductor detector. That's for the '582, Claim 1.

Your Honor, for other claims, we take the position, for example, in Claim 17 in the '582, that it's indefinite.

So that's in our briefing, Your Honor. I'm happy to repeat what's in the briefing, but our position as to what the appropriate structure is, is captured in Pages 22 through 28 of our briefing.

THE COURT: Okay. All right. Thank you. Just give me a second, all right?

MR. CHEN: Absolutely. And I'm also happy to address the sequential positional significance of the first focusing and second focusing optical element.

THE COURT: This is part of the disadvantage. I didn't read their supplemental briefing on this issue. I don't want to prejudice you by that, so...

MR. CHEN: Understood, Your Honor.

THE COURT: But it makes it much more difficult for me.

MR. CHEN: Understood.

THE COURT: I mean, in fact, if you would rather, I will give you this option. Since they didn't, because of their failure, you want me to just leave this for trial?

MR. CHEN: Yeah. Yes, Your Honor.

THE COURT: That's what I'm going to do --

MR. CHEN: Okay. Thank you.

THE COURT: -- leave it for trial. I'm not going to construe it.

MR. CHEN: And that's with respect to means-plus-function. But on first and second --

THE COURT: I'm not going to touch the term --

MR. CHEN: Okay.

THE COURT: -- because I'm not going to revisit it. I'm not going to touch the term.

I dedicated all that time, spent hours, spent hours on this. Got to read their brief, got to the point where, like, you've got to be kidding me. I'm going to now go through literally thousands of pages and find this? I'm not going to do it. But I don't want to prejudice the other party.

So if you'd rather, I'll just leave it and we'll proceed. So that's actually what I'm going to do.

MR. CHEN: Thank you, Your Honor.

THE COURT: In fact, what I'm going to do, let's just cut to the chase. I'm not going to construe "optical element configured to detect," unless you want me to.

MR. CHEN: That one, Your Honor, I believe we should.

THE COURT: All right. Well, I'll try. We'll

see.

"Collimating optical element," I'm not going to construe it unless you want me to.

MR. CHEN: We do want that one, Your Honor.

THE COURT: Okay. "Collecting optical element"?

MR. CHEN: Yes. Yes, we do want that one.

THE COURT: Well, and then "focusing optical element" is the only one left. So I'm not going to construe it right now. We'll move on.

MR. CHEN: Understood. Okay.

THE COURT: I may not be able to do a great job since I don't have fulsome briefing, but we'll do what we can.

All right. So, really, it's a case management issue because of the failure of the plaintiffs to cite to the record in their briefing on Page 28, I made the administrative decision not to read further in their briefing. And included in the briefing, then, that I did not consider was the "focusing optical element."

And we can't do these patent cases, as an administrative matter, if people aren't going to do the basic courtesy of putting citations, not even pinpoint citations.

49

So I'm not going to construe "focusing optical element" since the defendant is okay with that.

All right. Hold on one second.

All right. Let's do "image" next.

MR. DENNHARDT: Thank you, Your Honor.

So the dispute here, Your Honor, is whether an image must be pictorial, as Cytek contends. And the second question is whether rays generated from corresponding points on an object must converge to a corresponding point.

THE COURT: All right. Let's start with "pictorial." What do you understand "pictorial" to mean?

MR. DENNHARDT: It's a great question, Your Honor. I don't know. We said that repeatedly in our briefing. We said, "What is pictorial"? I think their response was, "Well, it doesn't require a camera," but they never went on to tell us what it does require.

THE COURT: It seemed to me you said you didn't know, but you seem to imply to have a pictorial image, you had to have a camera. I thought that's your position.

MR. DENNHARDT: That's what we thought. They said no, in their answering brief.

THE COURT: Well, actually, I don't know why you necessarily would. But I will say, and it seems to

50

me you kind of clue in on the fact that there's also a description, or "image" is, in the written description, modified by pictorial at least once, right?

MR. DENNHARDT: I don't believe so, Your Honor.

THE COURT: Okay. But it is digital.

MR. DENNHARDT: There is a reference to a digital image. I agree with that.

THE COURT: I thought you, okay. What's a digital image?

MR. DENNHARDT: I would say created by electronics. So...

THE COURT: Can a digital image be pictorial?

MR. DENNHARDT: I don't know what "pictorial" means.

I mean, like I said, our view is that "pictorial" seems to imply a picture, so a camera. A camera, I think, could be digital, but not all cameras are digital. So I think it could be.

But I think this goes to the heart of the problem, Your Honor, which is how is the jury to know whether something is or is not pictorial?

I think their construction just introduces additional questions and actually makes it harder for the jury to assess the question of infringement.

51

THE COURT: Hold on a second, please.

Sorry about this.

What is a representation?

MR. DENNHARDT: I think it's broad. I think when we're talking about these systems and these particular claims, what we are referring to is light is going to pass through an object, and that light will represent that object.

So in the context of these flow cytometers, for example, will have a dye on a cell, is one potential example. The light can pass through the cell. It's going to interact with the dye, and certain light is going to come out. That light is representing the cell, right? That would be the object.

And that light is then used -- it's quantitated. It's -- you assess the magnitude of light that might come out. And that can give you different kinds of information about that cell or about a group of cells, for example.

So the light in that context could be a representation of the object. You might also have --

THE COURT: Let me ask you this. I want to kind of try to "Joe Six-Pack" terms for me.

So I go for a heart test, okay? It's like an EKG, so, you know, it has a graph of whatever my heart

52

is doing, right? Is that an image of what my heart is doing? Is it an image of my heart? Let me put it that way. Let's start with that.

MR. DENNHARDT: I would think not in the optical sense. And, you know, we are using "image" as it is used in optics, not as it might be used in other areas of focus.

So in optics --

THE COURT: In optics, do they use the word "representation"?

MR. DENNHARDT: Repeatedly. And let me just start by noting both sides agree that representation of an object is correct.

THE COURT: Right.

MR. DENNHARDT: We see dictionaries all over the place.

THE COURT: No, no. I get you see that they define "image," but do you have a dictionary definition for "representation"?

MR. DENNHARDT: I don't think -- sorry. I didn't mean to cut you off.

THE COURT: But do you know, is there a definition in an optics dictionary that defines the word "representation"?

MR. DENNHARDT: I don't think we've identified

one for Your Honor. And, just candidly, I'm not sure whether it is or not. I don't think I've seen one.

THE COURT: Does anybody have that dictionary right now handy, the Oxford Dictionary of Physics, can they look up, is the word "representation" in it?

MR. DENNHARDT: We can try and take a look, Your Honor. I think we may have to pull down the full dictionary. I think we just have the excerpted printouts that were exhibits.

THE COURT: All right.

MR. DENNHARDT: And so I think in the context here, what we're talking about is light, right? We're talking about optics. So it's how the light represents the object. I don't think they disagree with that.

So the only question is: Do we need the other stuff, the other words that they put around it?

And I think as we see from the dictionaries here, the commonly understood definition of "image," as a person of ordinary skill in the art would understand it, is as a representation of an object.

And because both parties agree on that, I think when we get to the question of infringement or validity, whether something is or is not a representation of an object, I don't think that's really going to be the dispute.

I think the dispute, to the extent that you're focusing on the parties' constructions, is whether that image has to be, as they say, pictorial, rays of light converge from different points to a corresponding point by an optical component, et cetera.

THE COURT: Hold on.

Where is the word "converge" in their definition?

MR. DENNHARDT: Focus. I'm sorry. Maybe I said "converge." Focused. I think we agree that "focused" and "converge" are sort of equivalents.

THE COURT: All right.

MR. DENNHARDT: And I think what we'll see, Your Honor, is that the specification talks about many different types of images. You noted digital image. We also see references to finite focalized image, finite focused image, collimated afocal image.

So the specification identifies specific types of images that might occur in the systems. But the claims don't do that, right? They just say "image."

So an image, as used in the claims, must be broad enough to encompass at least the different types of images that are recited in the specification and their construction doesn't do that.

So they require, for example, the light to be focused. But the specification expressly discloses a collimated afocal image. An afocal image, of course, is the opposite of a focused image.

So their construction excludes disclosures that are recited expressly in the specification. They want to limit it to just, for example, the finite focused image, and that's improper. The claim doesn't do that. The claim just says "image."

I'll note, Your Honor, that in the joint claim construction chart, they have no intrinsic evidence at all. Completely blank. So they're not pointing to anything in the specification because, of course, the specification, as we've just seen, doesn't support them.

I'll also just go to the rest of their construction. Rays of light from points on an object are focused to a corresponding point. So there's a multiple-to-one relationship that they're trying to draw here. Rays of light from points focus to a corresponding point.

So they would say there's no image, no image, no image. It's only when you get to that single point that an image is created, right? That's also not true.

We know that, in fact, you're not going to have all of the points on an object are focused to a corresponding point. So this is just simply wrong, as a matter of physics.

I'll also note that they want to try and say all of the points on an object are focused to a corresponding point, but their own expert agrees that in the real world, you're never going to have that because light doesn't behave in a perfect, idealized manner.

You have things like in a real-world imaging optical system -- this is their expert saying this -- there's light scattering, there's aberrations, and there's diffraction.

Light is going to travel in different ways. It's not all going to go or be focused to a corresponding point. So their construction is also wrong as a matter of how the real world works, as confirmed by their own expert.

And, in fact, it's also contrary to exhibits that their expert relies on. So, for example, this is the optics textbook that their expert relies upon, and it talks about light can go and reach a point P. That's referred to as a perfect image, right?

But then it goes on to say they could conceivably arrive to form a finite patch of light or a blur spot about P. So not at P, but about P. It would still be an image.

So it doesn't have to have this perfect focus that they're trying to do, for a number of different reasons. Their expert agrees, the references that their expert relies on agrees, and the specification agrees, but their construction can't be true.

THE COURT: How is this going to play out? Because, see, I have a really hard time understanding this. Right? Because you say, "Defendant ignores the evidence, including the specification's disclosure of non-pictorial images and extrinsic evidence defining image."

All right. Then, when you refer to those, you're talking about, one, that there's a digital image, right? But, to me, a digital image is a pictorial image. I mean, in other words, a picture is a picture. Right? I can see it.

MR. DENNHARDT: Sure.

THE COURT: And they're relying on extrinsic evidence. I mean, they cite in their brief the figures and some things, but they are really, at the end of the day, relying on their expert.

But what I'm worried about is what's the jury going to think. And I think maybe if you help me understand, how do you think this is going to be put in front of the jury, and what would be the dispute.

MR. DENNHARDT: Yeah. So there are two things going on here, I think. The first is pictorial. As we said, I don't quite understand what they're trying to get at.

THE COURT: Well, I think they probably want to limit it to those figures with the dots on the plane.

MR. DENNHARDT: That may be. It's not clear to me what --

THE COURT: I think it's Plane 605. I don't know.

MR. DENNHARDT: I understand what you're referring to, Your Honor.

It's not clear why those are necessarily pictorial and what wouldn't be pictorial if those are. But in any case, to Your Honor's point, a digital image is a specific type of image that's recited in the patent, right?

So even if we assume, even if we equate digital with pictorial, well, that's -- the claim doesn't say "digital image," it just says "image." It's broader. It has to encompass nondigital images.

And the other thing that I think is going on here is this, they're saying an image forms where light rays converge, not where they're collimated.

So that's their point why they want to say it

has to be focused. They want to be able to turn around and say, well, we don't infringe, or maybe it's an indefiniteness argument. I'm not sure. But they want to say, well, the claim says a collimated beam forms an image. But an image can't be formed in a collimated beam. It has to be focused.

So I think that's really what's going on here, Your Honor. And that's wrong for at least two reasons. The first is --

THE COURT: Don't get into the indefiniteness now. If they want an indefiniteness argument, they're going to just say go with yours.

MR. DENNHARDT: And maybe it's a non-infringement argument. They'll say, well, aren't -- we have images formed in a collimated beam and that's impossible, right? But the claim tells you that that's not impossible.

I mean, we have to assume that the claim is right, right? The claim language is what controls here. And the claim language tells you a collimated beam produces a first image. So they are trying to say, well, no, an image can't be formed by a collimated beam.

But the claim language says exactly the opposite. So they want to say, well, Your Honor, the claim is impossible, right? But that's not how claim

construction works. You don't say the claim language is wrong.

And the other thing, of course, is the specification tells you that there are images in collimated beams. It talks about a collimated, afocal image. So it identifies particular types of images that can occur in a collimated beam. A collimated afocal image, that's at Column 36, Lines 25 to 32.

So they want to exclude this embodiment. They want to exclude this disclosure. They want to exclude the claims, and they want to say, well, you can never have an image in a collimated beam so we're done.

The other thing I would note, Your Honor, is you were talking about you can see a picture, a digital image, for example.

And in optics, you can see an image, that's right, but it's not necessarily going to look like the object. It may just look kind of like a blob of light, right? That's the example that I was giving where the light goes through a cell as one example and what comes out, it's not going to look like a picture of the cell, right? It's going to look like a blob of light. But that's still an image because it's a representation of that cell, and the way that it's used in these systems is it will consider the magnitude of the light that's

coming out, and that gives you information about the cell.

So that's how it works in the -- in flow cytometers.

THE COURT:  Okay.  Anything else?

MR. DENNHARDT:  I think that does it, Your Honor.

THE COURT:  All right.  Let's hear from the other side.

MR. KNIGHT:  Your Honor, on image, I think I heard from my colleague here that it is a term in optics, and so it is actually a term of art in optics.

And I just wanted to provide you with one of the pieces of extrinsic evidence that Beckman Coulter relied on.  It's Exhibit 26.  And it's talking about image formation and specifically what it is.  And it says, "It's a collection of rays from each point on an object and their redirection by an optical component onto a corresponding point of an image."

And so there is a very well-known definition for what an image is and the dynamics that are at play when we are talking about optics when we are talking about light.

I know you're very interested in the pictorial representation of an object, so I will address

that first.

When we talk about "pictorial," what we're talking about is something that's visual.  If you have an object, there are a bunch of different representations of that object.  You could have something acoustical; you could have something electrical.  I think you mentioned an example of an EKG as being something that might be digital or data.

Pictorial is simply the fact that we're talking about image.  It's in the word itself.  It's visual.

Next slide, please.

THE COURT:  Hold up.

MR. KNIGHT:  Yes.

THE COURT:  Can you live with "a visual representation"?

MR. DENNHARDT:  Your Honor, so long as we're not going to later hear from the other side, "Well, this doesn't look like the object," right, it's visual but it doesn't look like the object and, therefore, you know that's not a visual representation, I think that would be a problem.

And so it's not clear to me what work the word "visual" would be even doing here.  We are talking about an optical system, we're not talking about an

audio system or an acoustics system or --

THE COURT:  I mean, would you all agree, I mean, See, and I don't know like visual because it sounds like you need a human --

MR. DENNHARDT:  Exactly.

THE COURT:  -- as opposed to a machine.

MR. DENNHARDT:  You got it.

THE COURT:  But "a representation created by light," would you live with that?

MR. PIVOVAR:  No.

MR. DENNHARDT:  I think we can live with that.

THE COURT:  Sir, I don't know your name, but throughout this hearing and the last hearing, you have not only demonstrated facial expressions constantly, enough that my clerks talked about it when we left the last hearing, but you have throughout this hearing, in a very loud voice, well, actually, it's in a whisper, but it's a stage whisper.  And it doesn't help your colleague at the podium when you keep staying stuff out loud.  It distracts me.  It's kind of rude to him.  All right?

MR. PIVOVAR:  I apologize, Your Honor.

THE COURT:  Can you cut it?

MR. PIVOVAR:  I will.

THE COURT:  Thank you.

All right.  Now, I'm sorry, sir.  Develop

your own thought and go from there.  Could you live with "a representation created by light"?

MR. KNIGHT:  As to a replacement for "pictorial" or as --

THE COURT:  No, for "image."

Pictorial is not going to do it.  I mean, I looked up pictorial in the dictionary last night.  I mean, even the definition, it just references back to "picture."  Picture sounds like something painted.

I mean, this is going to go to a jury, right?

MR. KNIGHT:  Right.

THE COURT:  Because do you paint it?  As plaintiff points out, do you need to have a camera?  It doesn't further the day for me.

When I hear you both talk, what comes out to me is that you are saying, well, ultimately, whatever this image is, it has to be created by a light source or it has to emanate from a light source.

MR. KNIGHT:  That is correct, but there's a more critical component.  And so if pictorial doesn't work, understand Your Honor's concerns, we'd be willing to forego that.

What we wouldn't be able to forego is the optical principle here that we see where you have an object that's a light source.  You have rays that are

emanating from that light source that goes through a an optical component.

Here we have a lens, right?

THE COURT: Right.

MR. KNIGHT: And then what an image is is well-known in optics and there is uniformity in terms of the extrinsic sources on both sides on this, is that an image, it is a representation. It looks like that object.

But there's two critical pieces here. One is that if you have light that's going from a particular point on the object, and we'll look at the lower point on the object here.

We've got three light rays, one that's hitting the bottom of the lens, one that's hitting the middle of the lens, and one's hitting the top. They all converge on a corresponding point on the image. Likewise, if you look at a different point on the object, same thing happens.

Two things you can see here with an image and why it is a representation of an object and also different. One, is that the image is actually flipped in orientation. You can see, like, there's a small dot in the object on the top.

THE COURT: Right. Like looking through a

telescope.

MR. KNIGHT: That's exactly right, Your Honor.

And then the second is that it's magnified. And that magnification is a function of the lens. And where that image forms is on an image point, it's basically the vertical. It's how far it is away from that optical component.

Now, we actually know a lot about images. There's a lot of real-world applications. Your eyes process images.

We have an example here. This is just a real-world example. You have -- the sun hits, say, the Statue of Liberty. Light bounces off the Statue of Liberty. That's the object. That light goes through your cornea, hits the lens by your iris, and then focuses down. And what you have that hits your retina is an image.

Now, we heard in grade school that, you know, what we actually see in the real world is actually flipped and our brain reorients it. But that's the concept we're talking about here with an image. And so what's critical here --

THE COURT: Actually, can I step you back?

MR. KNIGHT: Sorry.

THE COURT: No, don't be sorry. You are good,

actually, very polite. I appreciate it.

But it focuses if your lenses are 20/20, right?

MR. KNIGHT: Correct.

THE COURT: But the fact that my lenses aren't 20/20, they might be distorted. I might have a cataract. And now my image is cloudy, but it's still an image, and it's still an image of the object.

And I think that's what they're objecting to is, you know, this focusing to a corresponding point.

MR. KNIGHT: Right. Corresponding collection of points. And I think -- and I understand that, too, having corrective lenses myself, is that you can still have an image, even if it's not sharpened to as much as you can.

If you think about the ELMO here, right? We were doing adjustments and it was really blurry, and then we finally found the focal point where it's sharpest.

The light rays, when we're getting there, they're still moving toward convergence. They're still focusing. It's just whether you -- the surface here is at the focal point. If it's at the focal point, there's full convergence. If you're a little bit further up, the light rays are still focusing, they're just not

focusing to corresponding points. And so that's the difference between a blurry image and then a sharp image. It's exactly at the focal point.

They're both representations of an object, but one -- the critical thing we're thinking about --

I'm sorry. Do you have a question?

THE COURT: Go ahead. Finish.

MR. KNIGHT: Yeah.

One of the critical things that we're thinking about when we talk about imaging in optics is the fact that light is converging down.

And we have intrinsic support.

THE COURT: So what does your machine do that it wouldn't infringe if I give you your construction here? I'm just curious. Like, again, trying to figure out the effect of my construction.

MR. KNIGHT: So the issue that we have is directed towards collimating optical element. We have an internal conflict between what is a collimated beam and a collimating optical element that projects a collimated beam including a first image.

Image is term of art. It's well known by a person of ordinary skill in the art. And a person of ordinary skill, in looking at that particular claim and the function of that claim -- and I believe it's

Claim 14 of the '582 Patent -- they would find these concepts to be irreconcilable. One of the reasons why is that "image" and "object," they're talking about optical systems in imaging optics. And yet what we have here is a system that is non-imaging.

THE COURT: So it's really not an infringement argument, it's that they drafted an impossible claim.

MR. KNIGHT: They drafted an impossible claim. The specification doesn't make any sense. And my colleague here mentioned that there is disclosure of a collimating afocal image. Right?

So what is an afocal image? Image is well known for being focused at the focus point; therefore, a collimating afocal image --

THE COURT: You're saying it doesn't make sense.

MR. KNIGHT: It doesn't make any sense. Because if you have a collimating optical element, you have a collimated beam, right?

And a collimated beam, in the most perfect sense, would just have light rays projecting to infinity. There would be no image play. There would be no place for all the light to converge.

So if you have an image that's baked into what's projected in your collimating optical element,

it's at infinity.

THE COURT: All right. So collimating afocal image was in the written description?

MR. KNIGHT: It's in the written description as an alternative to a configuration for, I believe, the composite microscope objective. Not even the WDM, not related to the collimating optical element.

THE COURT: Okay. Let's step back.

So there's a phrase in the written description "collimating afocal image," which you are telling me actually describes an impossibility. It's a nonsequitur. That's what you're saying?

MR. KNIGHT: That's correct, Your Honor.

THE COURT: Okay. Do you have any intrinsic evidence from which I could draw that conclusion?

MR. KNIGHT: In the way that the patent actually talks about images, and they are very clear with respect to the written description for Figure 9A about what an image is, how -- you know, where it's projected from, and that it's -- the fact it's on an image plane.

THE COURT: The problem is, and I would say, having tried to understand and read 9A, give you the benefit of the doubt. It does discuss a phenomenon exactly as you say, but it doesn't preclude that, in the universe of optics, there is a collimating afocal image.

It's an embodiment, it's a description of it. It doesn't say that this is the entire universe of how light is focused to create an image.

I mean, can you show me language where it does that? Again, I don't debate that it supports kind of your, well, it's not inconsistent for sure. But I go back to: What can you show me in the patent that, if I read it, I would conclude, boy, this patent's use of the term "collimating afocal image," it just makes no sense and it's wrong, and it's a real error, and it's not even in the claim, it's in the written description?

MR. KNIGHT: All right. So if we go to Figure 25, it talks about a collimating optical element that projects a collimated beam, correct?

And so with the collimated beam, there is no image. And it's inconsistent with the way that image is formed here. So having a collimated afocal image doesn't make any sense.

I appreciate your struggle on this, Your Honor.

THE COURT: I've actually never had a case, and, believe me, I've had a lot of cases where there's really nonsensical stuff in patents, and especially in claims. But I don't recall ever having a case where I was asked to just reject, out of hand, you know,

terminology in a written description based on, basically, extrinsic evidence.

MR. PIVOVAR: Your Honor, I'm sorry to -- apologize. Can I just remind my colleague there's some intrinsic record from the file history that might bear on this.

THE COURT: All right. Lets do this, let's take a ten-minute break. Give the court reporter a break.

(Whereupon, a recess was taken.)

THE COURT: All right. Please be seated.

MR. KNIGHT: To answer your question from prior to the break about additional intrinsic support for image and image relating to focusing light, I want to draw your attention, Your Honor, to Exhibit 7. This is the prosecution history for the '106 Patent.

I think you looked at it earlier in our first claim construction hearing when they were talking about collimating.

But, in particular, it highlights the fact that there's a difference between collimating and focusing, and focusing is required for image formation.

And so in the highlighted section here, the applicant specifically disagreed that objective lens in the prior art was configured to focus light because the

73

objective lens collimated rather than focuses. And those two things are not the same.

Now, focusing, they later say involves converging light. And then on Page 10, they indicate that a light that doubled lens 906, focuses, converges on to the image plane 605.

So what that highlights is that there's a distinction for the applicant between collimating and focusing. And when we talk about image formation, given that we specifically reference an image plane, we are talking about focusing light.

THE COURT: So --

MR. KNIGHT: Sorry.

THE COURT: You don't have to apologize.

MR. KNIGHT: Didn't want to interrupt you, Your Honor.

THE COURT: Can an image be formed by collimating light?

MR. KNIGHT: No.

THE COURT: It's because the rays are parallel, right?

MR. KNIGHT: Correct.

THE COURT: All right.

Definitely think, when you want me to construe the term this way, that it can be formed by

74

converging rays.

MR. KNIGHT: That's correct.

THE COURT: How about diverging rays? Can an image be created by diverging rays?

MR. KNIGHT: Not a real image, Your Honor, to be technically correct.

THE COURT: Can you show me, in the intrinsic evidence, where the creation of an image by diverging rays is precluded?

You can speak with them if you want.

MR. KNIGHT: One moment, Your Honor.

(Counsel confer.)

MR. KNIGHT: Your Honor, I think the question as to whether a image can be formed by diverging rays highlights the difference between a real image, which is what we have been talking about, and a virtual image.

And the claims, themselves, talk about projecting a first image or producing a second image. And that indicates a certain directionality, in that the image has to be formed at some point after the optical element.

With a virtual image, that image actually forms prior to the optical element.

And if we could pull up a slide that talks about a virtual image. Down a couple more, please.

75

Thirty-eight. All right.

So when we're talking about a virtual image, this goes to your question, Your Honor, about whether you can form an image by diverging rays. Well, the image itself doesn't actually form, you know, after the light passes through the optical component. And that makes sense. There's no convergence.

And rather, what you do when you're talking about a virtual image, is if you were to orient those rays and pull them back to the point of convergence, that's where the virtual image would be. It's virtual. It doesn't exist.

If I can make one additional point, Your Honor.

THE COURT: Sure.

MR. KNIGHT: So one of the problems that we have with representation of an object in that it could include a collimating afocal image is that from what I heard from counsel is that any kind of light at any point after it passes through a collimating optical element can qualify as an image.

And given that the claims in the '582 Patent specifically recite a first image and second image, we have a notice issue.

How am I to determine if I'm infringing and

76

where the first image is or where the second image is, and how do I distinguish between those two, if I'm using a collimated beam, and there's no actual focusing of the light to a particular image point or collection of image points on an image plane?

And, Your Honor, just one last point. I know I said earlier, one last point, but this is truly one last point.

The pictorial representation, I know we've already discussed it, but as Your Honor might be aware, that didn't come out of the ether. We actually referenced a modern optical engineering dictionary, and that's where it arises. So it's --

THE COURT: Do you know, is "representation" a defined word in that dictionary?

MR. KNIGHT: We will look into that for you and get back to you.

THE COURT: All right. Give me a second.

MR. KNIGHT: All right. Thank you, Your Honor.

THE COURT: Does the plaintiff...

Oh, you're back. All right. Sorry.

Can you have an image formed by collimating rays?

MR. DENNHARDT: Of course you can. A

collimated afocal image, the specification tells us that.

THE COURT: Other than that reference to which is Column 36, Lines 25 through 32 of the '582 Patent, can you point to anything else that shows that you can have an image formed by collimated light rays?

MR. DENNHARDT: Well, there are at least two references to collimated afocal image in the specification. I know Your Honor has them available and can control F through them. So you will find two of them in there.

THE COURT: Okay.

MR. DENNHARDT: I don't have the other one at my fingertips. I apologize.

But I think, Your Honor, you hit the nail on the head with your question about virtual images.

THE COURT: Actually, the question I hit on the head that I would like you to answer is: Other than now there's two references in the written description to collimated afocal images, can you point to anything else, extrinsic or intrinsic, that tells me that there's such a thing as collimated afocal images or, in other words, that there's an image produced by collimated light?

MR. DENNHARDT: Yes, Your Honor. The claims. The claims all tell you that a collimated beam produces an image. It's all over the claims.

THE COURT: Okay. So that's it, though. It's the claims, and it's the two references in the written description?

MR. DENNHARDT: The claims and the two references in the written description are the ones that specifically refer to a collimated afocal image.

There's also --

THE COURT: Okay.

MR. DENNHARDT: Sorry. There's also, recall earlier, I pointed you to Columns 56 through 58 that are talking about Figure 25 in a context of a different embodiment, and it talks about --

THE COURT: Well, time out. Hold up. Let me just get it.

MR. DENNHARDT: Yeah. It's at the very bottom.

THE COURT: Let me just pull it and find it.

MR. DENNHARDT: It's at Column 56.

THE COURT: All right. So we're now in the '582 Patent, Column 56?

MR. DENNHARDT: That's right.

And all the patents have the same specification so it's --

THE COURT: Great.

MR. DENNHARDT: -- it's across the way, but yes.

At the very bottom, around Line 57.

THE COURT: All right. So that's right, it's a discussion of Figure 25, 26, 27, and 28. Yep, go ahead.

MR. DENNHARDT: Yep. So it's talking about that. It goes through Column 58.

Throughout this it references "image" repeatedly. For example, you will see one at the very bottom, Line 67, "produces an image of substantially the same size."

THE COURT: But you're telling me this is showing light created by collimated rays because at the 902, it's emanating out of the 902 as a collimated ray?

MR. DENNHARDT: It's that, and you will also see that again at...

Here we are.

THE COURT: Okay. Just before you get any further, but doesn't it...

Isn't there convergence of the rays after they leave? In other words, prior to there being an image, there's convergence, correct?

MR. DENNHARDT: Prior to there being... no. I don't think so.

THE COURT: So let's do this. Pull up

Figure 25.

MR. DENNHARDT: Sure. You want me to put it on the screen, Your Honor?

THE COURT: Sure, that'd be great.

MR. DENNHARDT: Actually, I'll do it on the ELMO, if that's all right.

And maybe, Your Honor, before we get there, just because this talks about Figure 25, Columns 44 through 46 repeatedly refers to a collimated beam forming an image, right?

So "collimating optical element projects a magnified image." Here we see "may use an achromatic doublet lens as the first collimating element." Talks about since images, right, are created before the focusing lens.

So there is no convergence, right? The image is created before the focusing lens. So the entire description of Figure 25 is about images and collimated beams.

So it's all over the place in the patent. The claims tell you that a collimated beam forms an image. The specification tells you, and then there is the specific references to the "collimated afocal image," which identifies a particular kind of image in a collimated beam.

THE COURT: Okay.

MR. DENNHARDT: So it's all over the place, Your Honor.

I'm happy to pull up Figure 25 if you like.

THE COURT: And your expert would say there is such a thing as a collimated afocal image?

MR. DENNHARDT: Of course.

THE COURT: Well, I know that. There's enough money out there for experts to tell you anything.

MR. DENNHARDT: Your Honor, I think it would be hard pressed to suggest that that's not something that exists because, again, the specification tells you it exists, right? So --

THE COURT: No. No. I'm sorry. I just don't accept that, for what it's worth.

I mean, there's too many bad patents filed. People will say whatever they need to say. I'm not going to just accept for you...

You might be right as a matter of claim construction, but in the world out there, to be honest, you know, my gut tells me people don't think an image is created by collimated light. That's what my gut says. It's just the rules of claim construction might say otherwise here.

MR. DENNHARDT: And, Your Honor, if I could

from a frame the thinking on this. You're right, the specification and the rules of claim construction would suggest that you could say that a collimated beam forms an image because we see it in the spec, and we see it in the claims.

But they also haven't pointed you to anything that says, well, you can never have a collimated beam with an image, right? There's simply nothing in the record that says that other than --

THE COURT: Their problem is they have to point to extrinsic evidence. I totally agree with that.

And, now, they do cite this prosecution history discussion. I'm not sure, though, it's got to be, I guess, clear and unequivocal, I mean, you know, under the rules of interpretation.

MR. DENNHARDT: So let me point you to a different portion of the prosecution history that, in fact goes the other way.

Well, let me address first their point and and then I will point you to something else.

So what they said, Your Honor, is converging is different -- excuse me -- collimating is different from focusing. I told you at the last hearing we don't dispute that.

They also said a focused beam can form an

image. We agree with that too, right?

What that doesn't tell you is that a collimated beam can't form an image. So there is a step missing in that.

And here, this is our Exhibit C from our supplemental briefing, Your Honor. This is from the examiner interview, right? This is from the file history. And he says, "We're talking about collimating optical element that projects a magnified image."

So he has found that there is this connection between a collimating optical element forming an image and the lens that doesn't.

So, in fact, I would submit, Your Honor, that they are missing a step in their assessment on the file history and, in fact, the file history goes the other direction, right?

THE COURT: What's a magnified image?

MR. DENNHARDT: So a magnified image, I believe, is when the image is bigger than the original object.

THE COURT: Right. And how does it make it bigger? Doesn't it have to converge or diverge the rays?

MR. DENNHARDT: I would submit not, Your Honor.

THE COURT: I mean, otherwise, I mean,

collimated light can only go through something that's pure glass. That's not a lens.

I mean, if you're going to magnify it, don't you need a lens to magnify?

MR. DENNHARDT: So you might need a lens to magnify. Actually, Figure 25 shows exactly this.

So we've got the object here. The actual object isn't shown. Right? But it's showing you this is points on an object.

So the light then diverges, right? It goes into the objective, the collimating optical element -- excuse me. It goes into the collimating optical element 902, right?

Well, now we see the light that's coming out the size of that beam is actually bigger than the points, right? So, now, this would be magnified because it's bigger than the actual object, and it's a collimated beam and Figure 25, the description of Figure 25, tells you that there's an image in here.

So a magnified -- and a magnified image can absolutely be created in a collimated beam. And that's exactly what the examiner found in the file history.

THE COURT: All right. What you both agree on is that the image has to be formed by a light.

MR. DENNHARDT: Agree, Your Honor.

MR. KNIGHT:   Yes.

THE COURT:   You agree, right?

MR. DENNHARDT:   Your Honor, the last point that I would make is, I think my colleague on the other side, in fact, made clear what's going on here.

They're trying to limit the claims to real images, right?  You asked can diverging rays form an image.  He said, well, not a real image, but he conceded that a virtual image can be created, right?

Well, the claims don't say real image.  He wants to limit us to real image, right?  He wants to limit us to the rays have to be converging.  Well, that excludes virtual images, which the claim doesn't do, right?  The claim just says "images."

It excludes collimated afocal images, which are expressly discussed in the specification and expressly discussed throughout the written description of Figure 25.  So there's simply nothing here that says a collimated beam can't form an image.  All of the evidence goes the other way.  All of it.

THE COURT:   Right.  But you say "all the evidence."  There's no evidence in the written description of virtual images.

MR. DENNHARDT:   Correct.

THE COURT:   Okay.  But there is, there is

evidence of a disclosure of a collimated afocal image --

MR. DENNHARDT:   Collimated afocal image --

THE COURT:   -- which cannot be reconciled with their definition.

MR. DENNHARDT:   That's right.  You got it.

THE COURT:   Anything else?

MR. DENNHARDT:   I think that's it, Your Honor.

THE COURT:   One other question for you, sir, come on up.

MR. KNIGHT:   Yes.

THE COURT:   All right.  You can go ahead and say what you want to say, and then I'll ask you a question.

MR. KNIGHT:   Thank you, Your Honor.

So my colleague here just said that there's no evidence in the written description that conforms with our construction, and that's -- we expressly talked about Figure 9 --

THE COURT:   Yeah.  So --

MR. KNIGHT:   -- as well as Figure 36.

THE COURT:   Actually, I don't believe that's what he said.

First of all, I agree with you.  Figure 9 is consistent with what you say.  The question is:  Is there any disclosure of a virtual image?  And I think he

says, I don't think it's disputed, there is not.

MR. KNIGHT:   There is none, and it wouldn't make any sense.

THE COURT:   But that favors you, so give him credit.  He actually acknowledged that there is no virtual image disclosed.  So then you can come back and say, see, there's no virtual image disclosed.  But there is a collimated afocal image disclosed.

And now can you point to any claim which would, if I accept your construction, allow for a collimated afocal image?

MR. KNIGHT:   No, Your Honor, because --

THE COURT:   I don't think you can.

MR. KNIGHT:   Right.

THE COURT:   I think that's the right answer.  I don't think you have a choice.

MR. KNIGHT:   One additional point that I --

THE COURT:   Just wait.

MR. KNIGHT:   Sorry, Your Honor.

THE COURT:   I think we left it, with respect to collimated, I didn't construe it, right?

MR. KNIGHT:   Correct.

THE COURT:   And I think what's going to happen at trial is your experts are going to get up there and your expert's going to say, if I'm looking at Figure 25,

as soon as it leaves 902, it's not collimated, it's impossible, or it just wouldn't be collimated; is that right?

MR. KNIGHT:   I don't know that that's accurate, Your Honor.

THE COURT:   Okay.

I'm troubled by what I'm going to have to construe this as, but I just don't see a way around it, and part of it's based on what I think is just common sense and minimal understanding of optics that I have.

For instance, the idea that you can have magnification without having some kind of divergence or convergence doesn't make sense to me.

Does it make sense to you?

MR. KNIGHT:   It does not, Your Honor.

THE COURT:   And that's what their position is.

And the idea that you could have collimated, purely collimated light create an image doesn't sound right to me.

But the patent discusses collimated afocal images.  And as I say, my gut tells me, my limited experience tells me you're right.

And I think this is a great example of something that points to what I think just doesn't make sense in claim construction, which is that we begin with

the, quote/unquote "plain and ordinary meaning in the context of a patent," unquote. And then we're told to look to extrinsic evidence solely at the beginning.

But if you think about it, ordinary is a normative term. It has to refer to extrinsic evidence in order for the term "ordinary" to have any meaning. It just doesn't make sense. But that's the way we're required to construe patents.

And the problem for you is that the patent talks about a collimated afocal image. And so I think the limitation you want to impose, I can't, under the rules of construction.

I do think it would be better than just deferring to the plaintiff's proposal of representation of an object to add that. It has to be a representation of an object created by light or emanating from a light source.

It sounds like you'll agree to that, I mean, but you're reserving your objections, I understand. But you'll agree at least that much is true, correct?

MR. KNIGHT:    That much is true.

THE COURT:    Yeah. So I think that I'm going to construe it that way, which is, in effect, the plain and ordinary meaning, at least upon to which you can all agree.

And then you're going to make an indefiniteness argument, and what I am going to do is talk to you at the end of this as how we should maybe manage the case going forward, and maybe we should have some briefing and motion practice on some of these issues about adequacy, written description, enablement, and indefiniteness. All right?

MR. KNIGHT:    Thank you, Your Honor.

THE COURT:    All right. So that takes care of "image."

I've construed it as a representation of an object created by light or emanating from a light source.

You know, I refer you all, I had, I call it the Bacon case. I can't remember the title of the case, but Morris Nichols is in here somewhere, aren't they?

MR. TIGAN:    It wasn't my case, Your Honor, but it might be *Hormel versus* --

THE COURT:    Thank you. Good memory. Mr. Tigan, good memory.

You might want to look at that because what I did in that case was the defendant was so sure they had a winning indefiniteness argument that I offered them the opportunity to just litigate one summary judgment motion, but we would do it right away.

And as outlined in my opinion in that case, and I was affirmed, the Federal Circuit has treated indefiniteness, even though you can have competing expert testimony, as an appropriate subject for summary judgment motion.

And in that case, I had a hearing, and I heard competing expert testimony and made determinations as to credibility and ruled and found the patent indefinite. And it was affirmed.

You all might want to read that case and we can talk about whether we should have some kind of similar mechanism here.

Okay. That takes care of "image."

Want to do "portion," the "portion" term next?

MR. DENNHARDT:    Me again, Your Honor.

THE COURT:    All right.

MR. DENNHARDT:    So the dispute here, Your Honor, is whether "portion" gets its plain and ordinary meaning.

It's a well-understood term. The jury is going to know what portion means. Courts repeatedly hold that "portion" has its plain and ordinary meaning because a jury knows what it means, and multiple courts have construed it as a part of any whole, either

separated from or integrated with it.

Cytek's construction, by contrast, builds in a bunch of stuff that's simply not part of the word "portion."

THE COURT:    Now, it sounds like, well, maybe it doesn't sound like, but would you agree to their construction if I just deleted "within a defined beam"?

MR. DENNHARDT:    I think we can do that.

THE COURT:    Okay. So let's just focus on that.

MR. DENNHARDT:    Sure.

I think the place to start, Your Honor, is they never addressed this. We asked them, what is a defined beam.

THE COURT:    Hold on a second.

Would you agree to that? I'll just leave it at that.

MR. KNIGHT:    We can agree to that.

THE COURT:    All right. Great. I like that.

MR. DENNHARDT:    Love it.

THE COURT:    Man. All right. So I'm going to construe "portion of the," per stipulation by the parties, to mean a subset of the spectrum of wavelengths of light.

All right. Can we have more of those types

of constructions, please.

What's next?

Why don't we do "first" and "second" image.

MR. CHEN:   Should I go first?

MR. DENNHARDT:   I had to get to my slides.

THE COURT:   Okay.  No problem.

MR. DENNHARDT:   Three in a row.  All right.

So, Your Honor, we understood your ruling as it related to curved mirror talking about Claims 1 and 5.  What you found was that -- well, there was an order required between them.  We understand your ruling on that.

This term goes exactly the other way.  Right?  So what we see in Claim 1 is an optical relay element produces a first image, and what we see in Claim 12 is the collimating optical element further configured to produce a second image.

We know from up here that the optical relay element receives light from the collimating optical element.  So the order of things in this claim is collimating optical element, relay.  Right?

The relay produces the first image and the collimating optical element produces the second image.  So that tells us the second image comes before the first image.  It goes on to say exactly that.  The first image

is a reimage of the second image.  So, of course, the first image can't come first because it can't reimage something that doesn't exist yet.

We show this -- and we understand, Your Honor, the claim is not limited to Figure 25.  I'm going to do it in the context of Figure 25 because I think it helps visually.

So we see exactly what the claim says depicted here.  So we've got a collimating optical element, we've got the relay that receives light from there, and it produces the first image.  That's in purple.

Then we see in Claim 12 the collimating optical element produces the second image, the light then goes to the optical relay element, and it produces the first image.

So, of course the first image can't precede the second image.  The claim is written in the opposite direction.  So finding it the other way would be completely inconsistent with the claim language.

They rely on the '412 Patent.  And, Your Honor, I think I heard you say earlier that the claims of the '412 Patent are part of the written description.

THE COURT:   The original.  No.  What I said was the original claims of the patent that ended up being

the '412 Patent count as prosecution history.

MR. DENNHARDT:   So I don't think that's exactly what the case that they cited for you says.  It says the original claims -- but it's all talking about in the same patent, right?

So the original claims are claims before amendment.  Right?  That's part of the written description.  That's part of the specification.

Claims from a different patent are not part of the written description of that patent, and I think if you --

THE COURT:   That patent is the original patent.  It's the parent patent.

MR. DENNHARDT:   Right, but --

THE COURT:   So, in other words, the same reason written description kind of freezes in time what was the inventor thinking.  And it looked to me like the case law was pretty compelling.  You count not only the written description, but you look to those initial claims.

MR. DENNHARDT:   I think -- we would submit, Your Honor that that's not what that case says.  It's only talking about one patent.  It's talking about --

THE COURT:   Well, I haven't relied on it yet.

MR. DENNHARDT:   I understand.  I understand.

THE COURT:   I did rely on it.  I did rely on it.  It was probably the fourth source of evidence I relied on.  But go ahead.

MR. DENNHARDT:   Understood.  I just wanted to make sure because I don't think we addressed that point.

So we don't think the '412 Patent has any relevance here, but in any case, it's different from the actual asserted claims, right?

So the claims, as we just saw, tell us that the second image comes sequentially before the first image.

They would exclude that embodiment, right?  So their construction would render those claims, again, impossible because it's totally inconsistent.  We just saw that.  It's also inconsistent with Figure 25.  And it renders Claim 1 and its dependents an impossibility.

So now that's Claim 1 and Claim 12.  So let's now turn to the second set of claims that also use this term.  So that's Claims 14, 20, and their dependents, right?  So they actually do the opposite.

They say collimating optical element projects a collimated beam including a first image.  Then they say -- excuse me -- the same thing as in Claim 20.  So both 14 and 20 say collimating optical element produces the first image.

So let me build that for you here. We've got the collimating optical element. It includes -- projects a beam including the first image.

Then Claim 14 goes on to say there's an optical relay element and it produces a second image.

So what we see now is Claims 1 and 12 say "second" before "first." Claims 14 and 20 say "first" before "second."

What does that tell us? Well, it tells us that "first" and "second" are not importing any order. They're just designating different images in the system. So there is no way to find their construction consistent with both of these claims.

And so what we would submit, Your Honor, is that "first" and "second" here are very clearly not being used to indicate any sequence or order. They're just used as a designation, Image A, Image B.

I think that's it. Easy.

THE COURT: All right. Thank you.

MR. DENNHARDT: Thanks, Your Honor.

THE COURT: Mr. Chen.

MR. CHEN: Thank you, Your Honor.

So we followed your Court's -- Your Honor's instructions at the last hearing, and we looked for evidence in the intrinsic record, specifically the original specification, to support our construction for "first and second image" having positional significance and the specification is supportive, highly supportive of our position.

THE COURT: So I am not saying you don't have arguments that are supportive, but here is the challenge for you.

MR. CHEN: Sure.

THE COURT: So Claim 12.

MR. CHEN: Yes.

THE COURT: And Claims 14 and 20.

MR. CHEN: Sure.

THE COURT: And those are big challenges.

MR. CHEN: Sure. Understood, Your Honor.

So would you like me to address those first and then --

THE COURT: Yes. Go ahead.

MR. CHEN: Okay. So let's go to Claim 12.

So Claim 12 is not part of the original specification. It's also not asserted here by the plaintiffs and for good reason, because we think had they asserted it, it would be indefinite. We think what the patentee meant to write is "wherein the second image is a reimage of the first image." That's the only way it makes sense. So that's our response to Claim 12.

THE COURT: All right.

MR. CHEN: I think, if I'm not mistaken --

THE COURT: 14 and 20, they put them together. How do --

MR. CHEN: Yeah. Claims 14 and 20, what they're trying to do is they are trying to map Claims 14 and 20 onto Figure 25. And again, that's not proper.

There doesn't have to be every single claim, as Your Honor correctly recognized, mapping onto exemplary embodiments. That simply is not required.

And what we see is in the original claims, right here, there is a clear mapping of a collimating optical element that captures light from the extended light source and projects a magnified image of the object as a first light beam, right?

So it travels through and it gets focused down by the focusing lens 905, and then there's the image.

And then for dependent Claim 3, we see that the image relay optical element 907 is arranged to receive a color band of interest of the first light beam, the image relay optical element configured to project a second image --

THE COURT: So let's say I agree with you. Let's do this.

MR. CHEN: Yes.

THE COURT: I think you are probably right, that's the better description, and that Claims 14 and 20 weren't meant to read on Figure 25.

MR. CHEN: That's right.

THE COURT: Where does that end up? I still am stuck with I've got 14 and 20 --

MR. CHEN: Yes.

THE COURT: -- which describe not only a nonsequential but the reverse sequential, right?

MR. CHEN: Well, no. I think 14 and 20 is consistent. "First" is first and "second" is second. I don't see an issue with "image" there.

Only Claim 12, which is not asserted, has this supposed issue, but we think it would be indefinite Claims 14 and 20, no issue there. First image, second image in sequence.

If Your Honor would like me to, I could actually try to sketch out what I believe Claim 14 would look like.

THE COURT: Hold up.

I can't see that. Maybe you can focus on it.

MR. CHEN: Yes, yes, I will, Your Honor. Just trying to make it look...

So you can have a light source, so just to

101

follow the claim language here. You have a collimating optical element arranged to receive light from a light source. The collimating optical element configured to project a collimated beam, including a first image where the collimating optical element has a collimated distance.

And then you have an optical relay element. So as you recall in Figure 25, you have --

THE COURT:   So I get you can draw a picture, but does it preclude the second image from coming before the first image?

MR. CHEN:   Yes. I believe it does because it says there's an optical relay element. That's the mirror, right? That's the optical relay element arranged to receive the collimated beam. The optical relay element configured to extend the distance of the collimated beam, wherein the optical relay element comprises a curved mirror or concave shaped dichroic filter configured to produce a second image, right?

And so this optical relay image -- sorry, optical relay element has to be configured to extend the collimated distance of the collimated beam, right?

And so it's receiving the collimated beam -- here's the curved mirror -- and then it's projecting, basically, onto a second image. So it is sequential.

102

THE COURT:   All right. And then just in a nutshell, though, your argument for why...

You admit there's a presumption that first and second are not sequential under the law, right?

MR. CHEN:   I think the law is it's not like it's a rule, but it basically says that if there's intrinsic evidence that requires a sequence, then there should be a sequence. And here there is a lot of intrinsic evidence --

THE COURT:   But if I have a comprising claim where "first" and "second" are used, I'm to assume that it's not sequential unless there's evidence to the contrary.

MR. CHEN:   The *3M* case, I just want to make sure I get it correct. I don't want to misquote the case. And the *3M* case is very fact-specific, whereas in plaintiff's original briefing, they -- the *3M* case is in the bigger binder. Sorry, Your Honor.

THE COURT:   That's okay.

MR. CHEN:   May I have a minute?

THE COURT:   I mean, your point, I guess, though, would be it's not a presumption like means-plus-function is a presumption.

MR. CHEN:   No. That's right.

THE WITNESS:   It's, again, you've got to

103

read -- it's *Phillips*. You've got to read it in its totality --

MR. CHEN:   That's correct.

THE COURT:    -- in the light of the specification.

MR. CHEN:   That's correct.

THE COURT:   And therefore, your point would be there is no nonsequential use of "first" and "second" in the written description.

MR. CHEN:   That's right.

THE COURT:   You shouldn't impose such a limitation into the claims.

MR. CHEN:   That's correct. Absolutely correct. Thank you.

Yes, yes. So the -- I have it now here in front of me.

Thank you, Ms. Flanagan.

It just states, "The use of the terms 'first' and 'second' is common patent law convention to distinguish between repeated instances of an element or limitation."

But then it goes on to say, "In the context of Claim 1," so it's very context specific, and the *3M* case involved a first pattern and second pattern. It wasn't talking about an optical path of light. It's

104

very different than the other two cases that are cited. One is, like, on an exercise machine, if I can quickly point out that.

THE COURT:   What are you looking for, a case law thing?

MR. CHEN:   Oh, yeah. Just the case law that they try to use in their supplemental briefing. They added some --

THE COURT:   Yeah. Let's go back to it. We're limited on time.

MR. CHEN:   Yes, understood.

THE COURT:   So let's stick to the --

MR. CHEN:   Intrinsic evidence.

THE COURT:   Let's look again, your summary of...

You are saying it's sequential here --

MR. CHEN:   That's it, right.

THE COURT:    -- because Figure 25 --

MR. CHEN:   Yes.

THE COURT:    -- as interpreted by the original claims in the original parent application.

MR. CHEN:   And the original specification. The written description specifically says that there is an image near focusing lens 905, and then it says the concave mirror 907 therefore creates a second image of

the collimating lens 902 near a second focusing lens 902.

THE COURT:   Right.  So again, you're saying 25 is pretty clear that image --

MR. CHEN:   That's right.  As your --

THE COURT:   -- is also sequential?  Okay.

MR. CHEN:   As Your Honor has recognized.

THE COURT:   So that's your biggest piece of evidence.  All right.

And your second would be --

MR. CHEN:   The original claims.

THE COURT:   -- the original claims which purport to read on it.

MR. CHEN:   Correct, Your Honor.

THE COURT:   Okay.  Anything else?

MR. CHEN:   We think the claim language 14 and 20 is also supportive.  It requires a sequence of "first" and "second."

THE COURT:   Okay.

MR. CHEN:   And then that is -- and one more piece of evidence is when they wanted to use "additional," they were able to use the word "additional" in other patents.

THE COURT:   Right. Okay.

MR. CHEN:   Thank you.

THE COURT:   Thank you.

All right.

MR. DENNHARDT:   Let me start with the *3M* case, Your Honor.  It says, "First and second should not be read to impose a serial or temporal limitation unless the intrinsic evidence requires sequential ordering."

They are trying to tell you, well, the absence of any "first" and "second" means that "first" and "second" have order.  Well, that's not what this says, right?  The absence of something doesn't require that a limitation have sequential ordering, right?  So their position is just inconsistent with the *3M* principles.

THE COURT:   All right.  Hold up.

So I'm just having a hard time with the quote here.  Can you point me where it says the use...

What you're referring to.  You have got an excerpt on the slide from *3M Innovations* at Page 1371.  And at the end of...

I see where there's some discussion about "the terms 'first pattern' and 'second pattern' should not in and of itself impose a serial or temporal limitation."

By the way, you omit pretty important language.  You omit the introduction, the words that immediately precede that, which says "in the context of

107

Claim 1."  Okay.  So that's the first thing that I am a little troubled by.

But I can't find where does it pick up and say "unless intrinsic evidence requires otherwise"?

Can you show me the case?

MR. DENNHARDT:   I'm sorry.  I didn't hear the end of your question.  I apologize.

THE COURT:   So I am looking at your quote from the case.

MR. DENNHARDT:   Yeah.

THE COURT:   And I see that language you've got up on the first line of your box, until we get to temporal limitation.

Where is the "unless"?

MR. DENNHARDT:   Sorry.  "Unless" is in brackets.  We added that to streamline this.

THE COURT:   Okay.  But where does it pick up?

MR. DENNHARDT:   Your Honor, I apologize.  I don't have the full case in front of me.  I think we'd be happy to follow up with the full quote.

And certainly, Your Honor, to the first point, we thought, you know, including "first pattern" is -- makes clear that we are not talking about generally, right?  We are not saying first never, right?  We are talking about first here.  So we weren't meaning

108

to mislead you on that, Your Honor.

And I think, Your Honor, there's -- this is a pretty standard principle across --

THE COURT:   Well, since it is, show me another case.  Because I am concerned it's misleading.

MR. DENNHARDT:   Sure.  Here's three cases.  The first one is *3M*, we've already talked about that one.  Here --

THE COURT:   And that doesn't hold it.  Just so you're clear, *3M* does not say that unless the intrinsic evidence requires otherwise, first and second are not sequential.  Doesn't say that.

MR. DENNHARDT:   So this is the *Free Motion* case.  Here is it's saying, "First does not denote spatial location.  The correct construction of the word first merely associates the first pivot point with the first extension arm."

That's what we have here.  First relay, first dichroic filter, first focusing lens, first semiconductor detector, right?  It's associating all of these in a group of elements because they all interact together.

THE COURT:   All right.  So show me in the written description where there's a "first" and "second" other than Figure 25.

MR. DENNHARDT:  Where there's -- in what are you asking?

THE COURT:  Anywhere, yeah, just show me. What I want you to show me is show me in the intrinsic evidence where it would require or support nonsequential.

MR. DENNHARDT:  So I think we would posit that it's the opposite, right?  The claims require it.

If we go to 39, right?  Again, we've talked about this already, right, but this requires it.  And the claims, of course, are intrinsic evidence, and so their construction -- and they conceded this, right? They said their construction can't be reconciled with Claim 12.  They say, oh, well, if we rewrite the claim, then it's consistent.

THE COURT:  Agree.  And you're not asserting Claim 12 here, right?

MR. DENNHARDT:  Well, you're not -- we're not, Your Honor, but it is the same point that they made --

THE COURT:  All right.  So other than Claim 12 --

MR. DENNHARDT:  -- on curved mirror on Claim 5.  Sorry.

THE COURT:  Dispense with Claim 12.  Other than that Claim 12, show me intrinsic evidence that requires sequential...

Sorry.  That actually would either not require sequential or would show the opposite of sequential, which I think they admit Claim 12 does.

MR. DENNHARDT:  Sure.  I don't dispute, Your Honor, that I can't point you to a different part of the written description, but I think that's flipping the burden here.  Right?  It's flipping it on us to say, well, show that they're not sequential, and that's not right.

THE COURT:  No, no.  The reason, well, I'm not going to get into an argument with you.  Okay.  So you can't show me anything.

Now, then, you mentioned Claim 14 and 20, and I challenged them to address that.  Mr. Chen did a pretty good job.

So here's your opportunity, show me why I've got to read 14 and 12 to not be sequential.

MR. DENNHARDT:  Sure.  Let's put aside Claim 12.  That's the one that has second image, so I'm not going to talk about second image.

THE COURT:  If I said 12, I misspoke.

MR. DENNHARDT:  No, you didn't.  You didn't. My slide has both on there, and I just wanted to make clear, I'm not going to talk about the portion of Claim 12 that has "second image."

THE COURT:  Right.  But do it without referring to Figure 25.  Just look at the language of the Claim 14 and 20.

MR. DENNHARDT:  Sure.  Yeah.

Claim 1 -- and I'll explain.  I'm starting with Claim 1, but I'll explain that.  So it's the optical relay element produces the first image.  Right?

THE COURT:  Okay.  Hold on a second.  I do want to make sure I get this right.

For starters, Claims 14 and 20, do they depend from Claim 1?

MR. DENNHARDT:  They're both independents.

THE COURT:  Okay.  So why am I looking at --
(Speaking simultaneously.)

MR. DENNHARDT:  I'm sorry.  I'll get there.  I promise.

So Claim 1, optical relay element reflects the beam to produce a first image.

With me?

THE COURT:  Yes.

MR. DENNHARDT:  All right.  Now, Claim 14 says the optical relay element produces a second image.

So the optical relay element in Claim 1 is producing the first image, and then Claim 14 and 20 is producing the second image.

That tells you, Your Honor, that we're not talking about the order of things in the optical path. It says what comes off of the optical relay element in Claim 1 is the first image and in 14 and 20, it's the second image.  That confirms that "first" and "second" is not giving you an order.

THE COURT:  Okay.  All right.  Anything else?

MR. DENNHARDT:  Just briefly, Your Honor. They didn't talk about it, but it's in their brief and in their slides.

On the numerical ordering of elements, the MPEP expressly tells you that you're not to give weight as to the scope of the claims based on the numbering of the elements.

If we go to 13.  Thank you.

Use of reference is to be considered having no effect on the scope of the claims.  So -- and then the -- this is the *Core Wireless* case from the Eastern District of Texas case.

THE COURT:  Do you have a Federal Circuit case which says that?

MR. DENNHARDT:  The Federal Circuit has never addressed that issue.

THE COURT:  Okay.  So I'm not listening to what --

113

(Speaking simultaneously.)

MR. DENNHARDT: So the MPEP, I think, applies to patents, and courts have said that MPEP is given the weight of law.

And, I think, Your Honor, I would also say as a general matter, right, the same claim term is be to interpreted consistently throughout the patent.

So they can't reconcile it with Claim 1, right? They want to say, well, let's just put aside Claim 1. But "first image," as a matter of law, is to be read to have the same meaning throughout.

And the only way to do that is to say, well, "first image" is not giving you a sequence or order. The same claim term throughout the claims is presumably -- is presumptively given the same meaning.

THE COURT: Presumptively. But it's not required.

MR. DENNHARDT: It's not. That's right. But there's no evidence to the contrary here. There's nothing that would suggest, well, let's give it this meaning here and this meaning here.

THE COURT: Okay.

MR. DENNHARDT: And the last thing I would point to, Your Honor -- again, if we go back to 39 -- is what my colleague on the other side had to do was he

114

couldn't say, well, first and second, that gives you enough. He had to say, well, it tells you the relay does this. And then it gets passed to this other thing and then it gets passed to this other thing.

That confirms for you, Your Honor -- and I'll show it in the context of 14 and 20 -- that "first" and "second" is not giving you the sequence, it's the other language. It's the fact that it projects light to the -- it projects the first image and then the optical relay element receives the light from the collimating optical element and produces the second image.

So "first" and "second" are not giving you the order, it's the way that it describes the progression of light that gives you how things flow within the optical path, not "first" and "second."

THE COURT: All right. What are the asserted claims of the '582 Patent right now?

MR. DENNHARDT: So it's -- I'm not sure -- it's at least 1, 14, and 20. So each of those three independent claims that we've been talking about are each asserted.

THE COURT: And for the '443 patent, I was confused by the briefing on that. It said you dropped 17 and 18?

MR. DENNHARDT: Yes, Your Honor. In view of

115

your ruling, so that we didn't have to sort of further dispute this, we said let's put those claims aside.

THE COURT: They briefed 16 and you didn't, and I'm confused.

MR. DENNHARDT: It's not asserted. You have to ask them.

THE COURT: Okay. Thanks.

MR. DENNHARDT: I have the full list of asserted claims for the --

THE COURT: What I wanted to make sure was --

MR. DENNHARDT: -- the independent claims.

THE COURT: -- whether 1, 14, and 20 are asserted.

There is no "second image" in Claim 1; is that right?

MR. DENNHARDT: That's right.

THE COURT: So what I'm going to do is, I'm going to construe "second image" in Claim 14 and 20 to mean an image that is created after the first image.

That's not exactly what you asked for, defendant, but I think -- are you okay with that?

MR. CHEN: Sequentially after, not like the third one or the fourth one.

MR. DENNHARDT: We would dispute that, Your Honor.

116

THE COURT: Hold up.

I can't do that. I don't think that the claim of 14 and 20 require that. And I'm back to Figure 25. Are there any other disclosures of first or second images other than Figure 25 in the patent?

MR. CHEN: Figure 25, which has the written description that very clearly points out, which is the first image and which is the second image. The original claims, which specifically point out --

THE COURT: I got that.

Are there any other than Figure 25 and I guess 25A has sequence in it?

MR. CHEN: That's right.

THE COURT: But is there anything else? Anything else?

MR. CHEN: I believe that is it, Your Honor.

THE COURT: Okay. And then --

MR. CHEN: I want to make sure --

THE COURT: Hold up. I'm going to correct myself.

And can you point to me anywhere in the written description where there is an image between a first and second image?

MR. DENNHARDT: Standing here today, I can't.

THE COURT: Okay. So I'm actually going to

then adopt the defendant's position. It is, it's the second image is created after the first image and there is no intervening image. Okay.

What I don't want to do is go first and second because there's a first image in Claim 1 and there is no second image, and I just don't know what would come up with respect to Claim 1. So I don't want to go there. All right?

So I'm just going to construe second image, for the purpose of 14 and 20. If there's any other asserted claims with a second image, please let me know. Is there?

MR. DENNHARDT:    I expect there are, but as dependent claims, not independent claims.

THE COURT:    Then that's fine.

MR. DENNHARDT:    Yeah.

THE COURT:    So the "second image" for the purposes of Claims 14 and 20, and the reason I'm construing it this way are, I think it's a natural reading of the two claims, especially when read in light of the specification, which *Phillips* instructs is what we're supposed to do. And the only disclosure of first and second images in the written description are disclosures where the second image follows the first image with no intervening image.

---

And Figure 25, in particular, in the written descriptions discussed in Figure 25 I find very informative in that regard.

And I don't think that *3M* requires me, the way plaintiff has suggested, effectively to put a presumption against sequencing first and second. And that's enough that I need to say.

MR. DENNHARDT:    We understand. Thank you, Your Honor.

THE COURT:    All right. That takes care of "second image."

I'm not going to construe "first image."

All right. Let's see. We've got to move fast. What else have we got?

First and second. Did we do focusing optical element? I forget.

MR. CHEN:    We didn't do that one yet. We did first and second curved mirror.

THE COURT:    Let's do first and second focusing optical element.

MR. KHAN:    Thank you, Your Honor.

So this is an example where the claims that they are asking to be construed, the claims, themselves, require that the second focusing optical element come before the first focusing optical element. And that's

---

essentially what we're going to try to show today through the claims. And then there is written description support for our position here as well, which we'll also get through.

Starting with the claims. So, in the claims, there's a first focusing optical element, and it receives light from the optical relay. Then it's configured to focus the light onto the first semiconductor detector. And the dependent claims from Claim 1 in the '582 Patent, Claims 7 and 8, they start talking about branches. And they say, hey, so now the filter is going to create a first branch, and the first branch is the light from the collimated optical element received by the relay. That's the first branch.

And then it talks about the second branch. And the second branch goes to the second focusing optical element onto the second semiconductor detector.

And if you sort of -- this is in Claims 1, 7, and 8, the structure of Claim 17 and 18 is almost identical. And so we're going to try to treat them together. If I can show you in a build that we did to show how this all puts together.

So again, we start with the claim saying I've got an optical filter between the collimating optical element and the optical relay.

---

THE COURT:    Okay. Can I stop you there?

MR. KHAN:    Yes.

THE COURT:    So right now we're discussing Claims 1, 3, 17, 18, and 26.

MR. KHAN:    Correct.

THE COURT:    I just want to stop you.

Mr. Chen, right, are you going to argue this?

MR. CHEN:    Yes, that's correct.

THE COURT:    Do you agree that Claims 1, 3, 17, 18, and 26 read on Figure 25?

MR. CHEN:    I do not believe they do. I have to go back and check. The support that we rely on is the original specification, which includes original claims. So both the written description and the original claims support our position.

THE COURT:    I get you say that, but I just want to know, you've taken the position in the past with a couple of the claims. You are saying these don't even read on Figure 25.

MR. CHEN:    I believe that's correct.

THE COURT:    All right. So why don't you just be prepared to answer that question.

MR. CHEN:    I will.

THE COURT:    Okay. Sorry. Go ahead, Mr. Khan.

MR. KHAN:    And, Your Honor, I think the

ultimate conclusion of their construction is it's going to read out all the embodiments because there's no disclosed embodiment in the specification that's going to address what they're trying to do.

But, anyway, let's step through it.

THE COURT:   Okay.

MR. KHAN:   So, again, Your Honor, I know -- we're just using Figure 25 for illustrative purposes. We're not saying this is how Figure 25 is described in the patent.  So I'm just using Figure 25 to show where the pieces are.

THE COURT:   Well, do you contend that Claims 1, 3, 17, 18, and 26 all read on Figure 25?

MR. KHAN:   They do as we understand them. Therefore, they would be consistent with the written description in that regard.  They're consistent with the written description for other reasons as well, which we'll get to in just a second.

THE COURT:   Okay.

MR. KHAN:   So there's an optical filter, Your Honor.  Again, just using it for illustrative purposes to show that there's an optical filter along a path between the collimating optical element and the relay.

THE COURT:   Now, you previously called that optical, did you not, a dichroic filter?

MR. KHAN:   I believe in this claim it's called an optical filter, and so that's why I'm using that.

THE COURT:   Well, you might be.  So is it the say thing as a dichroic filter?

MR. KHAN:   In the written description, that filter is a dichroic filter.

THE COURT:   And a dichroic filter is also an optical filter?

MR. KHAN:   And a dichroic filter is one form of optical filter, yes.

THE COURT:   Okay.

MR. KHAN:   So it says there's a filter between the collimating optical element and the relay.  And so then it says, "The filter is configured to separate the beam into a first branch and a second branch."

So the filter is going to create two branches.  And so what we've done, Your Honor, is we just annotated the first and second branch.

So now the filter creates a first branch, and the claim says the optical relay element gets the first branch.  So the first branch goes to the optical relay element, that's the first branch.

And then, of course, the second branch then goes the other way, right?

And it says, "The second focusing optical

element receives the second branch."  And that's the second focusing optical element receiving the second branch.

And what gets the first branch?  The claim tells you.  The claim says the first focusing optical element gets the first branch.  And that's sort of after the light has bounced off the filter, onto the relay, and now it's onto the focusing optical element.

And then the claim goes on to say, I've got semiconductor detectors behind the focusing optical elements that now are going to detect the light.  And there's a first semiconductor detector associated with the first focusing optical element, and then the claim is going to say I've got a second semiconductor detector associated with the second focusing optical element.

And so what's going on in this claim, Your Honor, is the second focusing optical element is the initial in the configuration in their view.  And the claim, itself, tells you that.  And this is not inconsistent with the case law we pointed out to you in the brief, which is to say all that's going on is the claim is saying I've got a first group of elements associated with the first branch there.

And so I've got a first branch, and that first branch is going to be detected, focused by the

first focusing optical element, and then it's going to be focused down onto the first semiconductor detector. It's a comprising claim, Your Honor, and so, therefore, the claim on its face, the independent claims that don't preclude the notion of additional elements being configured.

And then the dependent claims actually require it.  The dependent claims that are asserted in this case that they are asking you to construe.

So the specification, Your Honor, this is one of the descriptions that I was getting to earlier, which is the specification actually describes a focusing optical element as the second optical element in the path.

And so, but it's actually the third optical element in the path.  So there's an instance of nonsequential use of "first" and "second" in connection in the focusing optical element.

The written description also equates the words "additional" and "second" specifically as it relates to the focusing lens.  In describing the exact same element, it's 908, the same element, one time it says, hey, that's an additional focusing optical arrangement, 908.  At a different time, same element, it says it's a second focusing lens, 908.

125

THE COURT: And that helps you how?

MR. KHAN: Because, Your Honor, the specification is equating word "second" with "additional." It's not saying second is sequential. So that's a use of the word "second" not to mean "sequential." So it's an affirmative evidence of nonsequential use of "second." And by extension, the affirmative evidence of nonsequential use of "first."

So then, we have more. What is the first, the initial focusing lens in Figure 25 called? And now this is a description of Figure 25. So before I was talking about the claims, just using Figure 25 to illustrate where the components are, but this is now the specification talking about Figure 25.

So what does Figure 25 say that initial lens is? It doesn't say "first." It doesn't say "initial." It calls it the "final," a final focusing lens, which is the opposite, Your Honor, of what they are trying to get you to construe, which is they're saying it should be the initial focusing lens.

So the initial focusing lens here is described as final. The second focusing lens is just described as additional.

And so this is exactly what I think Your Honor was sort of asking for in connection with some of

126

the other terms, it's the use of "first" and "second" in a nonsequential way to describe the focusing lenses, and that's exactly consistent with the claims because the claims require exactly a nonsequential order.

I think they are relying on, essentially, the original claims again, but we would submit that these claims are different. And they also, we submit, cover Figure 25 if properly construed as we are asking them to be.

The usage and numbering, we talked about that, that the MPEP says that that's not relevant. We understand Your Honor's position on that, so I'm not going to belabor it.

THE COURT: Well, my position on it is the Federal Circuit. I was commenting on the Eastern District of Texas case, that that's a district court case and the Federal Circuit has never opined on it, according to your cocounsel.

MR. KHAN: It is true. We looked for that case, Your Honor. And we didn't find --

THE COURT: So you did.

MR. KHAN: And we didn't find it. So you're right, and we understand and appreciate your view on that.

Sorry. So Cytek's construction is just

127

irreconcilable within the claims themselves that they are asking you to construe. And then again, you know, we think what they're -- they're going to -- they're asking for a construction, essentially, that would rule out all of the disclosed embodiments, which, as we gave you the case, Your Honor, where that's not a particularly favorable construction outcome.

THE COURT: All right. Now, just do me a favor. Back up, because we were only dealing with the "semiconductor detector" term here, right?

So can you just, focusing on that in Figure 25, show me where that is not sequential.

MR. KHAN: So I'm sorry, we were focusing on "focusing optical element" --

THE COURT: Wait. I got confused. Sorry. We were focusing on...

Right. And you've already done.

Then the last slide, though, just came up, "focusing semiconductor detector." We haven't dealt with that yet.

MR. KHAN: Correct. I would ask for that to be dealt with together with this.

THE COURT: Well, that's what I was just going to ask. Okay. So can you just go back and show me what the "semiconductor detector" term, though, because you

128

alluded to that.

MR. KHAN: Yeah.

THE COURT: The sequence of that in Figure 25. I had been focusing on the "optical element."

MR. KHAN: Yeah.

THE COURT: In the figure itself.

MR. KHAN: So, Your Honor, in the figure, there's no reference to "first" and "second" as applied to the semiconductor.

THE WITNESS: No, but just show me semiconductors.

MR. KHAN: Oh, oh.

THE COURT: In other words, you did that, what I thought was helpful...

There.

MR. KHAN: Yeah.

THE COURT: That slide, what is that?

Okay. Thank you. I just want to focus on that for a second.

MR. KHAN: Yes.

THE COURT: Okay. So the semiconductor detector, basically, it's correlated with the focusing optical element. They go together.

MR. KHAN: Correct, Your Honor.

THE COURT: All right. And you would admit

129

that in the Figure 25, every numbered focusing optical element has a corresponding numbered semiconductor detector; is that right?

MR. KHAN:    In Figure 25, that's how it's laid out, correct.

THE COURT:    Right.  And you would agree that each focusing optical element and its corresponding semiconductor detector are in the same place in the sequence?

MR. KHAN:    They are --

THE COURT:    So, in other words, and just to be clear, so, in other words, if I have a fourth focusing optical element, it corresponds to the fourth semiconductor detector?

MR. KHAN:    In the claim, the specification, in describing Figure 25, never uses "first" and "second" with respect to focusing optical lenses.  Never uses "first" and "second" with represent to semiconductor detector.

I would submit that the structure of the claim is correct, Your Honor, as you said.  In the structure of the claim, the claim is saying, I've got a first branch.  That's going to go to the first focusing optical element and the first semiconductor detector.

THE COURT:    Okay.

130

MR. KHAN:    But the first branch is not the first in the...

There is a second branch, and these are coming before the first focusing optical element --

THE COURT:    And when you say "these," just to be clear because you are using a pointer on the slide, your point is that the...

Well, first of all, I think your point would be that the final focusing optical element is sequentially the same as the...

Let me stop there.  What is 907?

MR. KHAN:    907 is an optical relay element.  So --

THE COURT:    That's fine.

903 is either an optical filter or a dichroic filter.  It is an optical filter, I guess, is easiest.  That's the genus.

MR. KHAN:    In the claim, it's described as an optical filter.  I apologize, Your Honor.  In these claims, yes.

THE COURT:    All right.  And then 905 and 906 are respectively, according to you, a focusing optical element and a semiconductor detector, correct?

MR. KHAN:    Correct, Your Honor.

This is a depiction of the claim.  We're only

131

using Figure 25 as an illustration.

In the written description, 905 is described as a final focusing lens.  906 is never described as "first."  908 is described as "another focusing optical element arrangement."  908 is also described as "a second focusing lens."

THE COURT:    In the written description?

MR. KHAN:    In the written description.

So I was trying to break apart the claim and the written description.  This is the language of the claim, and then I can go over the written description again.

THE COURT:    No, no.  If I were to summarize the written description for you, what I think the salient points you would want to make are, that 905 is described as a final focusing optical element.

MR. KHAN:    The exact language in the written description is "final focusing lens," yes.

THE COURT:    Final focusing lens I should say.  Okay.

And then 908 is described as a "second."

MR. KHAN:    A second focusing lens.

THE COURT:    Right.

MR. KHAN:    And then also, same element, 908 is described as "another focusing optical arrangement 908."

132

THE COURT:    Okay.  And is there any description in the written description of what you've got here in the chart labeled the "first semiconductor detector"?

MR. KHAN:    There is in the written description.  It never uses the word "first" or "second" to refer to any of the semiconductor detectors.  It just says there are a plurality of semiconductor detectors or there are additional semiconductor detectors.

In this claim, Your Honor, though --

THE COURT:    Don't go to the claim.  Just on the written description.

MR. KHAN:    On the written description.  Okay.  Thank you.  Sorry.  Yep.

THE COURT:    But I think it's undisputed that the focusing elements that are labeled 908, 918, 919, 920, and 921, and would you agree, they all have a corresponding semiconductor detector?

MR. CHEN:    Correct.

THE COURT:    Yeah.  Okay.  All right.  Anything else?

MR. KHAN:    No, Your Honor.  In this claim we think there's only one outcome, but thank you.

THE COURT:    "This claim," well, wait.

MR. KHAN:    These claims.

133

THE COURT:    There's five claims.

MR. KHAN:    Yeah, 1, 3, 17, 18, 26.  The claim, itself, tells you what the answer is.

THE COURT:    All right.  Okay.  Thank you.

MR. CHEN:    Thank you, Your Honor.

To answer Your Honor's questions with respect to these five Claims 1, 13, 17, 18, 26 --

THE COURT:    Actually, do you mind keeping that slide up, please?

MR. CHEN:    -- 26 --

THE COURT:    Go ahead.

MR. CHEN:    As with respect to Claims 1, 3, 17, 18, and 26, none of those claims map on to Figure 25, so that is correct.  That is our position, Your Honor.

But the original claims do, as I will explain.  So the --

THE COURT:    And let's leave the original claims out there.  Let's deal with the written description itself.

MR. CHEN:    Sure.  We'll focus on that first.

THE COURT:    Do you dispute that 905 is identified as the "final focusing lens"?

MR. CHEN:    I would like to go through that part of the specification, Your Honor, in fact.

THE COURT:    Okay.

134

MR. CHEN:    So could you go to the ELMO, please.

Thank you.

So what is that passage referring to?  It needs clarification.  So what this is referring to is that you start off with a collimating optical element.  It captures light from a light source, and it projects a magnified image of an object near a final focusing lens 905.

If we could go to Figure 25, please.

What this is referring to is that you have an optical path here, and at the end of the optical path, there is a focusing lens.  That's all that the word "final" was intended in the specification to say with respect to this path to the first semiconductor detector, you have these various optical elements, a collimating optical element, you've got a dichroic filter, you've got a band pass filter.  Eventually you get to a final focusing lens which focuses the beam of light into an image, into a first image, to a first semiconductor detector.

THE COURT:    Wait.  When you say in the first image, does the written description describe the image created by the "final focusing lens" as the first image?

MR. KHAN:    It does, Your Honor.  If we go to

135

the next column.  So we're in Column 44, bottom of Column 44.

If I could go back to the ELMO, please.  Thank you.

Then we go to the next column, Column 45.  45, okay.

We then see that there is a first image near the focusing lense 905, right?  And we also see that there is the concave mirror 907 that creates a second image near a second focusing lens 908.

So if we can actually go back to Figure 25, that's exactly what the specification and written description describes.  This is 905, creates a first image.  And then there's the optical relay element, and then it creates this second image.

THE COURT:    Right.

MR. CHEN:    Second focusing lens, second image.

We can go back to the ELMO.

Column 45, Lines 20 to 26.

May I continue, Your Honor?

THE COURT:    Oh, I'm sorry.  Yes, yes.

MR. CHEN:    Thank you, yes.

I just want to emphasize that the point about the original claims being part of the specification, there's a lot of case law that supports that.

136

We only cited the *Crown Packaging* case, but I'm sure Your Honor knows, there's a lot of Federal Circuit case law that supports this black letter law.

There's also the *Mentor Graphics vs. Eve* case, which is 851 F.3d 1275 at 1297.  That's a Federal Circuit, 2017.

There's the *Cisco Systems vs. Cirrex* case, 856 F.3d 997 1007, Federal Circuit, 2017.

And so when we look at the original claims, we see that, in fact, the original claims map onto Figure 25, so there's no exclusion of an exemplary embodiment of the patent here.  It reads directly onto the claims.

Both with respect to the first focusing optical element and second focusing optical element, we've got another slide here that also highlights the first semiconductor detector, as you can see in that same element in Claim 1, and the second semiconductor detector in Claim 6.  It's completely consistent with the original specification and original invention of the patents.

Unless Your Honor has any other questions, I think --

THE COURT:    No.

So what we are going to do is we are going to

137

take a break. We are going to take lunch for 45 minutes. We'll come back, and we'll pick up. Does that work?

MR. CHEN: Thank you, Your Honor.

(Whereupon, a recess was taken.)

THE COURT: Please be seated.

All right. So when we left off, we were doing two terms together, right? First and second focusing optical element and semiconductor detector, right, those two terms.

All right. Let's just do this. Because we'll have enough time to finish the rest. Quick summaries of, and I want intrinsic evidence only, all right?

So start with the plaintiff and you want to point immediately to the claims and then you want to point to Figure 25 as an embodiment of the five claims, correct?

MR. KHAN: Correct, Your Honor. So --

THE COURT: And you want to really emphasize, it seems to me, in the written description the fact that the final, there's a reference in the written description to 905 in Figure 25 as being the final focusing optical lens; is that right?

MR. KHAN: Correct, Your Honor.

138

THE COURT: Well, let me ask you this. Are there any identifications of any part of Figure 25 in the written description that use a number, you know, second, third, first?

MR. KHAN: So, Your Honor, I wrote myself a sticky on this point, so I'll just go through it.

For curved mirror in connection with Figure 25, first and second, never used.

For semiconductor in connection with Figure 25, first and second, never used.

For focusing lens, first and second together never used. "Final" is used. "Second focusing lens" is used.

THE COURT: And another.

MR. KHAN: And "another focusing optical arrangement" is used, all in connection with Figure 25.

THE COURT: Well, hold on. So the only one that uses a number, second, right, is "optical --

MR. KHAN: Focusing lens 908.

THE COURT: Or focusing lens. Sorry.

MR. KHAN: 908, yep.

THE COURT: That's it. And that does have "second," though, in the written description.

MR. KHAN: And it's equating it with "another."

139

THE COURT: Right. I hear you.

MR. KHAN: We would say that that's the opposite of using it in a sequential way. It's using it exactly the way the Federal Circuit asks --

THE COURT: And "second" is at what cite of the patent?

MR. KHAN: It's at, Your Honor, 45, 16 to 22. And "additional focusing optical arrangement" is at 58, 2 to 9.

THE COURT: Okay. All right. Go ahead.

MR. KHAN: And then, Your Honor, I think, as we were talking about, the claims in this instance are the most powerful evidence.

THE COURT: Are what?

MR. KHAN: Are the most powerful evidence that the construction has to be nonsequential, because what the claim -- both claims, you know --

THE COURT: Both claims? Wait, there's five claims.

MR. KHAN: Five claims, sorry.

Each independent claim and its dependents create a first branch and a second branch and the first branch is after the second branch. And the first branch gives you a first focusing lens and a first semiconductor detector, and the second branch gives you

140

a second focusing lens and a second semiconductor detector.

And just the claim, itself, reading it, leads to the conclusion that it's nonsequential. But as we just talked about, Your Honor, here there's also written description support for nonsequential use of the numerical terms "first" and "second."

THE COURT: Right. But the universe of those written description references, to be clear, first of all, they all go to Figure 25.

MR. KHAN: Everything I said was Figure 25.

THE COURT: Right. And there's only one that's numerical and that's 908, which is referred to as the "second focusing lens."

MR. KHAN: A "second focusing lens" and "another focusing optical arrangement 908."

THE COURT: Right, but the second. I'm just saying --

MR. KHAN: Yes.

THE COURT: -- it's only with respect to 908.

MR. KHAN: Correct.

THE COURT: Right.

MR. KHAN: Yes.

THE COURT: Now, and it does refer to it as "another."

141

MR. KHAN:  Yes.

THE COURT:  Okay.  And then the final, which is referring to 905, which the final focusing lens.

MR. KHAN:  Yes.

THE COURT:  That's it, though.  I just want to be clear.

MR. KHAN:  The dichroic filter is referred to as "first dichroic filter."  This is the dichroic filter in Figure 25.

THE COURT:  That's 903.

MR. KHAN:  And that's referred to as a "first dichroic filter."

THE COURT:  Correct.

MR. KHAN:  And then there is another dichroic filter and that is, again, Your Honor, in our view, evidence that nonsequential use, there is another dichroic filter --

THE COURT:  Well, actually, in Figure 25, though, it's very clear, the first dichroic filter 903, it's the first element that the ray hits coming out of the magnifying glass.

MR. KHAN:  And I was going to go into second, which is when there is a second dichroic filter and then the use of the word "second" is equated with "additional."  So --

142

THE COURT:  Right.  But the use of the word "second," it is sequential.  Dichroic filter is sequential in Figure 25.

Are you disputing that?

MR. KHAN:  In Figure 25 --

THE COURT:  Yeah.

MR. KHAN:  -- the first --

THE COURT:  The first dichroic filter is 903, right?

MR. KHAN:  And that's described as a second or as an additional dichroic filter.  It's described as both.  The same element is described as both.  That is the next, sequential next after the first, yes.

THE COURT:  Right.

MR. KHAN:  Right.

But in our view, Your Honor, equating between second dichroic filter and additional dichroic filter, the specification doesn't.  It uses the same, describes the same element.  I believe it's --

THE COURT:  Just to tell you, I don't find it persuasive that it says second and then it says but it should be an additional.  I just don't find that persuasive, for what it's worth.

And I give you credit for just acknowledging, because I don't think you have a choice, that with the

143

dichroic filters, it has to be sequential.  I mean, it just has to be.

MR. KHAN:  And, Your Honor, I would submit to you is that the claims that talk about a first dichroic filter are different from the claims that we're looking at here.

THE COURT:  It could be.

MR. KHAN:  Right.

THE COURT:  And then the claims, though, you are telling me that in 1, 3, 17, 18, and 26, there is a first branch and a second branch?

MR. KHAN:  In the dependent claims of Claim 1 which is Claims --

THE COURT:  Because I don't see a branch in Claim 1.

MR. KHAN:  Yeah.  It's in Claims 7 and 8, Your Honor.

THE COURT:  Okay.

MR. KHAN:  So they're on the screen, or it's Claim 7 and 8 that create the same structure as Claims 17 and 18.

THE COURT:  Okay.  They are dependent claims.

MR. KHAN:  Correct, Your Honor.

And so, Your Honor, this is an instance where, essentially, Cytek is asking for an extraordinary

144

result.  I mean, to negate all the claim language that creates the opposite of what they want in terms of sequential reading.

THE COURT:  Okay.  Well, you think it negates all the claim language?  Okay.

MR. KHAN:  It would, Your Honor, because, you know, it would, basically create a situation where the first focusing element in their view has to be the initial focusing element, but the claim, itself, tells you that it's not the initial focusing element.  The second branch goes --

THE COURT:  Where does the claim tell you it's not?

MR. KHAN:  In the order of the claim and how the branches are being created.

THE COURT:  Now, do me a favor.  Walk we through that without referring to Figure 25 and tell me why it must.

MR. KHAN:  I think, Your Honor, if we just abstracted, deleted Figure 25 from --

THE COURT:  Yeah.

MR. KHAN:  -- behind what's on Slide 25 on the screen here, that is, essentially, what the claim is talking about.  Essentially the...

Yeah.  So we can just, you know, mentally we

145

can omit Figure 25 from what we're showing.

So there's a collimating optical element and there's a filter and a relay. That's Claim 18. And it says the filter is between the relay and the collimating optical element.

And then the filter creates two branches, a first and second branch. The first branch goes to the relay. It bounces off the filter and goes to the relay. The second branch goes through the filter, and it goes to what's known as the second focusing optical element.

So the claim, itself, is saying that the second branch is before the first branch because the first branch has to travel farther, Your Honor. It has to go through the relay and then back to the next focusing lens, to what is described then as the first focusing lens.

And then, Your Honor, what I would -- I mean, it's not just negating the claim language. Of course, in our view, it's ruling out Figure 25. But we are sitting here, and they haven't pointed to you a single embodiment in the specification that this would cover.

So --

THE COURT:    When you "that this would cover"?

MR. KHAN:    Sorry. These claims would cover, I mean, you know, under their construction.

146

So under their construction there is no disclosed embodiment in the specification, the written description, that would meet their version of these claims, their construction of these claims.

THE COURT:    All right. Let me just, is first, second focusing optical element only in Claims 1, 3, 17, 18, 26 of the '582 patent?

MR. KHAN:    And certain other dependents, correct. Yes, Your Honor.

THE COURT:    All dependent claims from those five claims?

MR. KHAN:    From those five, yes.

THE COURT:    Okay. And is first and second semiconductor detector in only those five claims and the claims that depend from them?

MR. KHAN:    It is not, Your Honor. For that term, and we briefed this separately for exactly that reason, there is another claim, '106, Claim 1, that also has a first semiconductor detector, and that's why in our view, Your Honor, it would be appropriate to deal with the first semiconductor detector in these claims separate from the first semiconductor detector in the '106 Patent Claim 1.

Because that one, as I already acknowledged to you, Your Honor, that claim is different. That

147

claim, just to be clear about it, that claim just says a curved mirror, a dichroic filter, a first semiconductor detector, right?

But that claim, in candor, doesn't create the structure that this claim does by telling you exactly where the branches are going and what they are doing.

And so we think it's appropriate to treat the two first semiconductor terms separately.

Your Honor, you asked us to draw the claim without Figure 25. And this was, my colleague and I tried to draw this here. So you have a collimating optical element here. You have a filter. It creates two branches, first branch, second branch.

The second branch goes to the second focusing optical element and the second detector. The second branch goes up, the first branch goes to the relay, the filter, the first focusing element, and the first detector.

And this, Your Honor, without using Figure 25, again makes clear that it's not necessarily the initial sequential.

THE COURT:    All right. Mr. Chen, you would say, if I'm looking at the written description, you want me to focus on Figure 25.

MR. CHEN:    Correct.

148

THE COURT:    And you want me to focus on how it's disclosed in the original claim.

MR. CHEN:    That's correct.

THE COURT:    And...

MR. CHEN:    And this doesn't include all of the claim language, sorry, all of the written description that supports our position and also deals with the final focusing --

THE COURT:    So put aside the final for a second. Let's say you persuaded me on that.

MR. CHEN:    Okay.

THE COURT:    That final doesn't show that they are out of sequence.

MR. CHEN:    Yes.

THE COURT:    Okay?

MR. CHEN:    Right.

THE COURT:    And then do you agree that the only numeric description of a part of the Figure 25 is 908 where it's described as a second focusing lens?

MR. CHEN:    908 is described as a second focusing lens, but just the next sentence in Column 45, Lines 22 --

THE COURT:    Yeah.

MR. CHEN:    -- to 26, and I will just go ahead and put this on the ELMO, Your Honor. This is 45, right?

149

THE COURT:  Okay.

41296

MR. CHEN:  Discusses that there is a first image near the focusing lens 905.  The first image that's associated with focusing lense 905, because that's the first focusing lens, and then there is a second image that's associated with the second focusing lens 908.

THE COURT:  Right.  But what shows that they're necessarily sequential just by that?

MR. CHEN:  Oh, because this is talking about Figure 25.  So if you go back to Figure 25, we see that.  We see that 905, which creates the first image, is the first focusing lens.  And 908, which creates the second image, is the second focusing lens.

Now, the other side --

THE COURT:  Hold up.  Hold up.

MR. CHEN:  Sure.

THE COURT:  Where does it say first focusing lens?

MR. CHEN:  It does not say first focusing lens.

THE COURT:  Okay.  That is what threw me for a loop because I didn't see that.

MR. CHEN:  Right, right.  If you can go back to the --

THE COURT:  But the only thing it describes as

---

150

first and second is the image.

MR. CHEN:  That's correct.

THE COURT:  Which we've already dealt with.

MR. CHEN:  That's correct.  But then when we get to the original claims, it makes it very clear the first image and second image --

THE COURT:  But that's where you are really relying on the original claims.

So how about this?  You are saying that Figure 25 is not read on by any of the five claims.

MR. CHEN:  That's right.

THE COURT:  Correct?

MR. CHEN:  They came later.  They're trying to write claims onto products.

THE COURT:  Okay.

MR. CHEN:  Uh-huh.

THE COURT:  Now, and you're pointing to solely Figure 25 and the description that accompanies it in the written description for me to interpret these claim terms that are in those five asserted claims, right?

MR. CHEN:  Plus the original claims, which --

THE COURT:  Okay.

MR. CHEN:  -- which are part of the original specification.

THE COURT:  All right.

---

151

MR. CHEN:  And there's also Figure 25A as well, which does show a consequencing of 905, 908, 918, 919, 920, 921.

THE COURT:  And that's fair, and I think that's an accurate description of Figure 25A.

MR. CHEN:  Correct.

THE COURT:  But is there any disclosure on the written description that the five claims do read on that discloses a sequencing?

MR. CHEN:  I think those claims were drafted much later, and I'm not sure there's written description support for them.

THE COURT:  But that's a different question.

MR. CHEN:  So --

THE COURT:  And I hear you.  That could be.

MR. CHEN:  Uh-huh.

THE COURT:  But, see, where I'm trying to figure out right now is --

MR. CHEN:  Yeah.

THE COURT:  -- I'm trying to figure out how you deal with the claim language --

MR. CHEN:  Yeah.

THE COURT:  -- right?  That's the problem.  And so let's just say, for example, let's just assume I totally agree with your reading of Figure 25.  I totally

---

152

agree with 25A.  And I agree with you that the asserted claims don't read on --

MR. CHEN:  Yes.

THE COURT:  -- Figure 25 or 25A.

MR. CHEN:  Right.

THE COURT:  I've still got these claims I've got to interpret.

MR. CHEN:  Right, right.  And I completely understand that.  And with respect to the independent claims, "first" and "second" are consistent with positional significance and sequence.

The only claims that they point you to are nonasserted Claims 7 and 8 that have to do with the branches.  And we talked about that at the last claim construction hearing where we could put up their slides, and we could actually, if you wouldn't mind giving me the figure that you drew, I would be happy to use that on the ELMO.

THE COURT:  It's under the ELMO, I think.

MR. CHEN:  Oh.  I think you guys took it away.  Do you guys have the figure that he drew?

MR. KHAN:  It's on the screen.  Sorry.

MR. CHEN:  Oh.  Not that one.  The one that you physically drew.  If I could borrow that, I would appreciate that, Counsel.

MR. DENNHARDT:  Oh, sorry.

THE COURT:  This is the branching.

MR. CHEN:  Yeah, this is the branching, right? And we talked about how this is the same juncture.  So it doesn't matter if you call this one the first branch or the second branch.  This claim doesn't map onto this figure, which is why it's --

THE COURT:  But you're back on the figure --

MR. CHEN:  -- it's very frustrating, which is why I want to use their figure.  Because if I use their figure --

You guys don't have it anymore?

THE COURT:  You got rid of the drawing?

MR. CHEN:  Yeah.  I just don't see it.

THE COURT:  Are you sure it's not on the ELMO?

MR. DENNHARDT:  No, no.  It was in the front of this other one.  I'm sorry.

MR. CHEN:  Okay.  Thank you.

THE COURT:  No problem.  It was such masterful artwork, we've got to take advantage of it.

MR. CHEN:  Exactly.  It's a Picasso.

So here, right, even the way they drew it, there's a branch here.  It doesn't really matter if this is the first branch, right?  And this is the second branch.

But, again, this is all about --

THE COURT:  But it does matter because what they are saying is the second branch could come before sequentially the first branch.

MR. CHEN:  Neither comes before the other because this isn't the...

It is not about the same optical path of light.  At this point, they are branching off.

THE COURT:  Yeah.

MR. CHEN:  They are branching off.  And so --

THE COURT:  They're either simultaneous or one is ahead of the other in time sequence.

MR. CHEN:  They're branching off so they're simultaneous.  So at this juncture right here --

THE COURT:  Okay.

MR. CHEN:  -- this could be the first branch or this could be the second branch.  They decided to call this one, based on the other claim terms, the first branch.

THE COURT:  Yeah.

MR. CHEN:  Right?  And because this is not Figure 25 anymore, the way they drew it actually is consistent with the way that we are viewing things, which this is the first branch, or this is the first detector or this is the second detector, right?

And then there could be a third detector and there could be a fourth detector.  But the point is "branch" isn't recited in any of the asserted claims.  "Branch" is not recited in any of the asserted claims.

THE COURT:  Okay.  But then --

MR. CHEN:  I'm not sure why they're trying to use that.

THE COURT:  So then go to the asserted claims.

MR. CHEN:  Yes.  The asserted claims.

THE COURT:  Hold on a second.  Actually, wait a second.  I am a little confused here.  I thought I already covered this with them.

I asked you, Mr. Khan, is first and second focusing optical element only in Claims 1, 3, 17, 18, 26 of the '582 patent and you said and certain other dependent claims as well, right?  Then we did the same thing for the first and second semiconductor detector.

MR. KHAN:  So the asserted claim, each of the five claims, 1, 3, 17, 18, 26, are asserted.

THE COURT:  Okay.

MR. KHAN:  The other dependent claims that are of greatest importance that I was referring to in my answer to you, Judge, was Claim 7 and 8 that depend from Claim 1.

THE COURT:  And they're asserted?

MR. KHAN:  They're not asserted, but they're dependent claims that inform the scope of Claim 1.  And the reason they do is because Claims 7 and 8 mirror almost exactly the structure of Claims 17 and 18, which are asserted.  So we submit, Your Honor, that Claim 1, yeah, and --

THE COURT:  So bottom line, let's assume...

Frankly, you shouldn't assume it.  I think your best argument are Claims 7 and 8, right?

MR. KHAN:  Claims 7 and 8 and Claims 17 and 18, which are also asserted.  And 17 and 18 use the word "branch," and they create the branches in exactly the way we've been talking about.

THE COURT:  All right.  But and you're saying Claims 17 and 18 are asserted?

MR. KHAN:  Correct, Your Honor.

THE COURT:  All right.  Why don't you then, Mr. Chen, look at Claims 17 and 18.

I do think this is a really bizzaro world, right, we're living in where there is real dependence on unasserted claims like Claim 12.

MR. CHEN:  Right.  Okay.  So --

THE COURT:  So 17.

MR. CHEN:  Seventeen depends on Claim 14.  So none of the independent claim --

THE COURT: Hold on a second. And independent claim.

MR. CHEN: Right. So none of the --

THE COURT: So wait. I'm sorry to interrupt you. Sorry.

But, Mr. Khan, I thought you told me that all the claims that use focusing, first and second focusing optical element are either the five that are identified in the slide or depend from them.

So now you're telling me it's not limited to that?

Oh, 17 and 18 are listed there. I apologize. Totally apologize.

MR. KHAN: They are, Your Honor. And Claim 14 doesn't recite these terms.

THE COURT: Okay. I see. Thank you.

All right. So let's just see. Mr. Chen, I think you are going to tell me you don't see anything in Claim 17 which would require sequencing, right? Because there's no second.

MR. CHEN: There's no second there.

THE COURT: Right.

MR. CHEN: That's correct, Your Honor. There is a second in Claim 18.

THE COURT: Eighteen?

MR. CHEN: Yes.

And there is -- yeah, the whole point here is that they should be in sequence, not a first one and then the second one can be the third one, fifth one. And even their drawing supports that, where there is a first...

Because Claim 18 does recite a first branch and a second branch, but the point is the focusing optical elements are in sequence. One is the initial, that's the first, and the second one is sequential.

THE COURT: All right. All right. Can we just have clarification. Which claims use the term...

Which asserted claims? Because I am only interpreting asserted claims. Okay?

Oh, is that a problem, Mr. Khan?

MR. KHAN: Your Honor, the asserted claims would be interpreted in light of their dependence.

In this case, what Cytek is asking with respect to Claim 1 would negate claim language in the dependent claims. So in any event, happy to address --

THE COURT: Well, let's start with this: What asserted claims use the phrase or use the term "second focusing optical element"?

MR. CHEN: Claim 18, Your Honor.

THE COURT: Any other claim?

MR. KHAN: Twenty-six.

MR. CHEN: That's correct.

THE COURT: Does Claim 26 depend from --

MR. KHAN: Oh, apologize, Your Honor. I misread that. It does not. It does not use that term.

MR. CHEN: That's right, yes.

THE COURT: So then other than Claim 18, are there any other asserted claims that use the term "second focusing optical element"?

MR. CHEN: No. The rest of the asserted claims just use "first focusing optical element."

THE COURT: Okay. Are there any terms that use...

Are there any claims other than Claim 18 -- well, strike that again and start over.

First of all, for the record, Mr. Khan, do you disagree that the only claim, the only claim that's been asserted in this case that uses the term "second focusing optical element" is Claim 18 of the '582 patent?

MR. KHAN: I'm just checking, Your Honor.

THE COURT: Thank you.

MR. KHAN: If you could give me a second.

THE COURT: No problem.

MR. KHAN: Appreciate it.

I believe that's correct.

THE COURT: Okay. What are the asserted claims that use the term "second semiconductor detector"?

MR. CHEN: Claim 18, Your Honor.

THE COURT: Anything else?

MR. CHEN: I do not believe so. Oh, wait. For the '582? For the --

THE COURT: We'll get the '106 in a second.

MR. CHEN: Right. Yes.

THE COURT: But just for the '582.

MR. KHAN: In the '582, I believe that's also correct, Your Honor. In the asserted claims of the '582 patent, it's Claim 18.

THE COURT: Okay. Are there any other asserted claims? Now, I think we have Claim 1 of the '106 patent; is that right?

MR. KHAN: Claim 1 of the '106 Patent, yes, Your Honor.

THE COURT: And either of those two, the two terms we're talking about, does it use it?

MR. KHAN: The second terms are not in Claim 1 of the '106 Patent.

THE COURT: There are no second terms?

MR. KHAN: It's just first terms, not second.

THE COURT: Yep. Okay.

So are there any other asserted claims, period, that use either the term "second focusing optical element" or "second semiconductor detector" other than Claim 18 of the '582 Patent?

MR. KHAN:   If we are limiting ourselves to asserted claims, that's it.

MR. CHEN:   Claim 5, Your Honor, uses a second semiconductor detector of the '106.

THE COURT:   The '106?  Okay.

MR. KHAN:   Claim 5 is not asserted.

THE COURT:   Claim 5 is not asserted, so I don't have to construe it.

MR. KHAN:   I think what Mr. Chen --

THE COURT:   Look, it's really simple.  I do want to kind of move on.

I just want to know what the universe is of asserted claims that use the term either "second focusing optical element" or "second semiconductor detector."

And it sounds like right now the entire universe is Claim 18 of the '582 Patent.

MR. KHAN:   For asserted claims, yes.

THE COURT:   Okay.  And Mr. Chen, you agree?

MR. CHEN:   Correct, Your Honor.

THE COURT:   All right.  I don't need argument

anymore.

MR. KHAN:   Okay.

THE COURT:   Here's what I'm going to do.  I don't believe that it's required to be sequential in Claim 18.  I read Claim 18.  I don't see anything in the claim language that requires sequencing.

I think Figure 25 requires sequencing.  The defendant says Claim 18 does not read on Figure 25, and I think Mr. Khan's also admitted it doesn't read on Figure 25.

MR. KHAN:   It does.

THE COURT:   Oh, you say it does?

MR. KHAN:   Under our construction, it would appropriately encompass Figure 25, yes.

THE COURT:   Okay.  Well, I don't have to decide that.  I don't have to decide that because the main thing is, you say it doesn't.

MR. CHEN:   Uh-huh.

THE COURT:   And that's what really I find most informative, right?  At the end of the day, I look to *Phillips*, and I look to whether or not the terms in the claim that I am asked to construe, I am asked to look at what they mean.  I read the claim, but I also am informed by the written description.  And if the claim actually read on Figure 25, I would be informed, and I'd say it's

got to be sequenced.  But the defendant says it doesn't read on it, and then I don't see why I'd be informed by Figure 25.  Okay?

MR. KHAN:   Thank you, Your Honor.

THE COURT:   All right.  Next.

So understand I ruled that, essentially, I am agreeing with the plaintiff on both of those terms, right, "second focusing optical element" and "second conductor detector" in that there doesn't have to be sequencing.

So what I'm saying is, essentially, I don't agree with the defendant that the "second focusing optical element" or "second semiconductor detector" in Claim 18 must follow immediately after "first focusing optical element" or "first semiconductor detector" without any intervening optical element or semiconductor detector.

MR. CHEN:   Just with respect to the asserted claim.  But could I actually just make one point, Your Honor?

THE COURT:   Yeah, you can make a point.

MR. CHEN:   Okay.  Can I get that --

THE COURT:   Oh, no, no.  Don't make another argument.  I've got to move on.  So sorry.

MR. CHEN:   Okay.  Just based on the other

claim language, Your Honor, it is the second focusing lens that's receiving the second branch.  They are branching off at that juncture.

THE COURT:   Yeah, I just don't buy that.  Okay.  Then I will state further for the record, then, why.

First of all, I've read the claim.  I don't see anything in the claim that requires sequencing.  Second, I actually found the drawing probative.

And Mr. Chen, you won't like this, and I think you are wonderful advocate, but you won't like it, your inability to persuade me that that diagram shows sequencing.  I don't think it does.  I think it could show simultaneous transmission on branches, Number 1.

And then, Number 2, it doesn't tell you which comes first.  And Mr. Chen admitted that there also could be a third and fourth.  And the problem is that the drawing, just like the claim language itself, doesn't mandate which branch comes first or second.  It just labels them that way.

And the fact is, I think what was really telling is when Mr. Chen looked at the branches, it's like he told me, well, you can call the second one the first or you can call the first one the second.  That goes to the point.  That's the whole point.

165

All right. Sorry it took me so long. Next

So I think, are the only things left the means-plus-function or there are any more first or second left?

MR. CHEN:   I believe that's correct, Your Honor, just "optical element," "collecting optical element," and "collimating optical element."

THE COURT:   Yeah. So the three means-plus-function terms.

MR. KHAN:   Yes, Your Honor.

THE COURT:   Okay. All right. Let's hear then on them.

And then, which one? Do you think there's a benefit to picking one first?

MR. CHEN:   I think it would be good to start with "optical element."

THE COURT:   Okay. We'll do that.

MR. KHAN:   So on this one, Your Honor, Judge, you held that the corresponding structure for this term is 408 and/or 413, and you asked for additional briefing on whether it should be "and" or whether it should be "or."

And I think, perhaps, the defendant went a little bit beyond that in their briefing and also talked about whether there was linking structure.

166

With the Court's permission, maybe I can just address the corresponding structure issue first. And if you would like, whether it's "and" or "or," and then if you would like argument on the linking issue, I can address that as well.

THE COURT:   Okay. That sounds good.

MR. KHAN:   And my apologies again, Your Honor, for the missing citations on Page 28. We have them here, and we think we are going to be able to cover them in detail.

THE COURT:   Okay.

MR. KHAN:   So, Your Honor, the claim term is "optical element configured to detect scattered light." The claim does not say all scattered light. It does not say all forward and scattered light. It just says scattered light. And so the specification is pretty clear that you can have one or more detectors.

At Column 27, Lines 22 to 27, it says, "The optical sensing subsystem includes one or more detectors. Such detectors may include forward scatter FSC, side scatter SSC," and then it also refers to a fluorescence detector. We omitted that but it also says that in the specification so I just wanted to make that clear.

And then in talking about element 408, the

167

408 is the subject of its own figure, Figure 37. It's standalone figure to talk about 408.

And it says detector 408 detects FSC, which, as we discussed, is forward scattered light, and remaining light into the detector 408.

And that language, of course, is the linking language that I think Your Honor also identified during the last hearing that links this to the claim function.

There's a separate figure, entirely separate figure that refers to a second light detection system. And the second light detection system is in 413. And it says you may have a second light detection system 413, different figure from when it was talking about 408 alone, different figure.

Now it says you can have 413 in accordance with some embodiments of the present disclosure. So you can have a second light detection system 413 in accordance with some embodiments.

And then optional language to say the FSC may be detected by 408. Side scatter may be detected by second light detection system 413.

So, Your Honor, we think the specification is pretty clear that both detectors are not required. You have the overview of the flow cytometer and the discussions in the background saying it can be one or

168

more detectors, FS, forward scatter, or side scatter.

You have a discussion of Figure 37 that's very focused on element 408, and then you have a separate figure that talks about elements 408 and 413 together and 413 is described as a, quote, "second light detection system" separate from 408, and throughout the specification uses optional language of the kind that the Federal Circuit has said would allow -- would require --

THE COURT:   Wait, what do you mean the "optional language"? What are you referring to?

MR. KHAN:   Sorry. The "may include." You know, so if the specification says that the system may include 408, that suggests that the corresponding structure for "optical element configured to detect" can be either 408 or 413. That's all I'm saying. So just referring to the "may" language that's often used in describing 408 and 413.

On the linking issue --

THE COURT:   Well, let's just do this. You think they are two separate issues, right? There's either the "and/or" and then you want to deal...

I thought you said to me let's just deal with the is it an "or" or an "and," 408 and 413.

MR. KHAN:   We didn't brief the linking issue

169

because I thought, Judge, your order was pretty clear that you only wanted to hear briefing or get briefing on the "and/or" issue and brief that. We didn't brief the linking issue.

THE COURT: Yeah, okay. So let me hear from them on the "and/or."

MR. KHAN: Okay.

MR. CHEN: Thank you, Your Honor.

Let me start with the claim language. The claim language recites, "An optical element configured to detect scattered light emitted by the particle in the flow channel and illuminated by a light source." It recites "to detect scattered light," and just like the term "image" that --

THE COURT: Hold up. Hold up. Hold up. Before you go any further, I want to make sure.

This is where I got really confused with the briefing. So this is Claim 13. You all agree 13 is asserted, right?

MR. CHEN: That's correct, Your Honor.

THE COURT: I just want to make sure. Because you put 16, though, and I didn't understand what you were doing about Claim 16.

MR. CHEN: They dropped Claims 17 and 18 --

THE COURT: Yeah.

170

MR. CHEN: -- and they didn't tell us that before the briefing.

THE COURT: Well, that's fine.

MR. CHEN: And so 16 is the claim that 17 depends on.

THE COURT: I see. Okay. All right.

MR. KHAN: And Claim 16 was not asserted.

THE COURT: Okay. Great. So then it's true, all I have to worry about is Claim 13?

MR. CHEN: Correct.

THE COURT: Okay. Great. All right. Sorry. Thanks.

MR. CHEN: Yeah, so here is the claim language.

THE COURT: Yep.

MR. CHEN: The optical element has to detect scattered light. And just like "image" is broader, "scattered light" covers both forward scattered light and side scattered light.

And when we actually look at the other claims in the '443 Patent --

And switch the ELMO, please.

-- you can see that with respect to Claim 13, the language is "to detect scattered light," but with respect to a nonasserted claim that also depends on

171

independent Claim 1, there's a recitation of "side scattered detectors."

We can go back to the slides, please.

And so our first position is that the claims recite optical element. I know we discussed this at the first *Markman* hearing, Your Honor, but a detector is not an optical element.

Next slide, please.

The detector is not an optical element. This is what they had originally pointed to as the optical element. This composite objective 60, it does not perform the function of detecting, and so we believe it is indefinite because there's no optical element that performs the function of the detecting.

Now, next slide, please.

THE COURT: Wait. I'm sorry. But see, now, I am really just narrowly focused on: Is it 408 or 413? Or is it 408 and 413?

I can't keep revisiting stuff. You have to understand, I have 300 patent cases. I can't do that.

MR. CHEN: Understood.

THE COURT: I can't remember stuff. You know, I dealt with a different patent case yesterday.

So do me a favor, now you're off on indefiniteness, so I don't know. Now I'm thinking,

172

like, okay, what am I missing?

MR. CHEN: Understood.

THE COURT: You have taken me somewhere where I don't know where I am going.

MR. CHEN: I wasn't you sure that issue was decided or not but I'm happy to go --

THE COURT: When you say "that issue," I thought it was really clear I decided --

MR. CHEN: Means-plus-function.

THE COURT: -- means-plus-function.

MR. CHEN: Right.

THE COURT: And I decided that structure would have to be found in --

MR. CHEN: The specification.

THE COURT: It has to be.

MR. CHEN: Absolutely.

THE COURT: And now, and I said the patent might be rendered indefinite because... Or the claim might be, right, if it doesn't show structure.

MR. CHEN: That's fine.

THE COURT: But it appeared that 408 and 413 detect light.

MR. CHEN: That is correct that they're detectors and they're not optical elements. That's the point that I wanted to make.

173

THE COURT:   But I found that, at your request, "optical element" is a means-plus-function term.  It's at nonce term.

MR. CHEN:   Correct.  Element is a nonce term and --

THE COURT:   Element is.

MR. CHEN:   Understood.  I am happy to move on and explain why, consistent with the claim language being broader to capture both forward scattered light and side scattered light, that both detectors, it's an "and," both detectors are required.

THE COURT:   Okay.

MR. CHEN:   The 408 forward scatter detector and the 413 side scatter detector, both of them are required to cover the full scope of the claim language, which is to detect scattered light.

Doesn't say detect forward scattered light. Doesn't say detect side scattered light.  They could have claimed that.

They didn't.  They claimed something broader, which requires that --

THE COURT:   Well, when you say "broader," is it broader or narrower?  I mean, in other words, it could be, I mean, as an English person --

MR. CHEN:   Yes.

174

THE COURT:   -- you know, like, as opposed to a science person, you know, just reading the grammar, right, that to detect scattered light means I detect two rays from a side scatter or I detect two or three rays from a forward scatter.

In other words, if I do it just purely on the language and, again, not scientific, there may be --

MR. CHEN:   Right.

THE COURT:   -- that a POSA comes in and says something different.  But just from an English point of view, to detect scattered light just means some portion at least of the light that's scattered.

MR. CHEN:   Uh-huh.

THE COURT:   So why is it broader?  It's narrower.

MR. CHEN:   It's broader because when the laser hits the cells in the flow cell, light scatters in a variety of directions.  We talked about this at the first *Markman* hearing.

THE COURT:   Right.

MR. CHEN:   And in order to cover the detection of the scattered light, you need both a forward scatter detector and side scatter detector.

And they actually have different functions. A forward scatter detector is usually used to measure

175

data with respect to size of particles, whereas a side scatter detector is usually used to detect morphology of the particles in the flow cell.

THE COURT:   Let me ask you this.  Is this thing, the box in the middle is the WMD?  What is that box in the middle called?

MR. CHEN:   Oh, no, this is before the WDM.

THE COURT:   Sorry, WDM.  What's the box, Figure 38?

MR. CHEN:   Yeah, so the 60 in Figure 38 is the composite microscope objective.

THE COURT:   Okay.

MR. CHEN:   We are going to be talking about that more with respect to the "collecting optical element" term, Your Honor.

THE COURT:   All right.  Now, the light gets in there.

MR. CHEN:   That's right.

THE COURT:   What's it made out of?

MR. CHEN:   Light is usually laser light.

THE COURT:   The light is.  What's the 60? What 60 made out of?

MR. CHEN:   Oh, 60 is usually, it can either be glass or plastic.  And then the flow cell is 409.  And that's where the cells will enter.  And then the light

176

will irradiate the cells.  And the light will both scatter as well as fluoresce.  The cells will fluoresce light.  And the fluoresce --

THE COURT:   Would you agree that -- sorry.  Go ahead.

MR. CHEN:   Sorry.

The fluorescent light will go to the WDM. The scattered light is being detected by 408 and 413.

THE COURT:   Okay.  Now, 60 --

MR. CHEN:   Sixty.

THE COURT:   -- is it within a box, a metal box or, like, what is it in?

MR. CHEN:   Yeah.  It's within, like, a bigger flow cytometer machine.  It's not part of the WDM.  It's not part of the WDM.

You have the WDM that receives the fluorescent light through an optical fiber.

If we can actually put up Figure 31, which is, I think, one of the very first slides from Slide 3.

So you see 60 here as well.  It doesn't show the forward scatter or side scatter detectors on this figure.  But it does show the 60, which is the composite microscope objective or the collecting optical element.

And so light will scatter after it hits the cells in the flow cell.  And the cells will also

fluoresce. And it's the fluorescent light that eventually gets to the optical fiber 852.

THE COURT: Through the cable.

MR. CHEN: Through the cable, that's right, optical fiber cable to the WDM 90. And then 90 is described in more detail in Figure 25.

And so going back to the --

THE COURT: Just give me a second.

MR. CHEN: Sure.

THE COURT: Okay. Now, you were about to say something, and I asked you to wait a second so I could read.

MR. CHEN: No. I was just reiterating the point that the claim language says "detect scattered light, which includes both forward scatter and side scattered light." And that's why you need both detector 408 and detection system 413.

And that's also supported by Federal Circuit, as well as Delaware case law, that says if you have, basically, multiple functions, or here, "a broader claim that covers both forward scattered and side scattered light."

Similar to the term "image," right? The other side is arguing that "image" is broader; it covers both real images and virtual images.

Same thing here, "scattered light." And they have other claims where they use the words "side scattered" rather than "scattered."

THE COURT: All right. I don't find that argument particularly compelling. Now, I'm afraid I might be missing something, so that's why I was asking questions about the structure of these machines.

MR. CHEN: Yes.

THE COURT: For instance, I asked you: Was 60, the box, what's it made out of? I thought you might tell me, I don't know, it was titanium; it's sealed so no light can escape from it except by a fiber cable or, you know, something, right?

MR. CHEN: Yes.

THE COURT: But didn't say that. You said it's glass.

MR. CHEN: Yeah, that's right.

THE COURT: All right. And I always appreciate your honesty.

MR. CHEN: Uh-huh.

THE COURT: So, but it sounds to me like it's understood that not all the light that's being emitted, whether it's on the side or whether it's forward, is being captured by 408 and 413.

MR. CHEN: Not all, that's correct, Your

Honor. But in this particular space, there's forward scattered detectors and side scattered detectors. That's common in this industry because they capture different things.

THE COURT: Right. But they don't capture everything.

MR. CHEN: They don't capture everything, but they perform different functions. One is to capture, basically, data with respect to size. That's -- I believe that's forward scatter, but my expert will correct me if I have the two things reversed.

And the side scatter detector is used to detect data with respect to the morphology of the cells and particles going through the flow cytometer.

THE COURT: All right. But, for instance, the side detecters, they're not capturing every ray or particle of light emitted on the side.

MR. CHEN: They don't have to because they will already be able to perform their function of telling us the morphology data that we want to have from the sample of cells.

Just similarly, the forward scatter will tell us the information we want about the size so we don't have to capture every single ray.

THE COURT: I got it. That's good.

MR. CHEN: Okay.

THE COURT: That's all I wanted to know.

MR. CHEN: Understood.

THE COURT: They don't have to capture everything. I thought... the nature of my questions was to disclose... for me to discover, wow, is it anticipated that all the light that's being emitted is being captured? And the answer to that this clearly, "No."

MR. CHEN: Right. No.

THE COURT: Okay.

MR. CHEN: That's correct, Your Honor.

THE COURT: Now, Claim 13 doesn't depend in any way from Claim 5, correct?

MR. CHEN: That's correct, Your Honor. They both depend on Claim 1.

THE COURT: Okay. All right. Then I'm going to rule that the structure for Claim 13 of the '443 Patent is 408 or 413.

MR. CHEN: Okay.

THE COURT: Okay? Because I actually don't think claim, that the detecting scattered light is broader than what's anticipated as being detected by side scattered detectors, for instance, in Claim 5 of the patent. To the contrary, as I've previously articulated, to me, it's much narrower.

181

It's basically, to read on this element of Claim 13, you would have to have an optical element that is configured to detect some scattered light. Doesn't have to be all of the scattered light. And that scattered light could be forward, it could be side light, and it doesn't have to be, in its entirety, whether it's forward or side.

Okay. So that takes care of that claim.

What's the next claim?

MR. CHEN: "Collecting optical element." Would you like me to go first, Your Honor?

THE COURT: Well, wait a second. See, when you jump to "collecting"...

Is this Claim 18 of the '443?

MR. KHAN: Your Honor --

MR. CHEN: Claim 1 and 13 of the '106, Your Honor.

THE COURT: Okay. Let's just hold up.

MR. KHAN: I was just going put on the record, Your Honor, there are no other asserted claims with the language "optical element configured to detect." So I think we can put that one to bed.

THE COURT: I think we all agree on that.

MR. CHEN: Yes.

THE COURT: We all agree on that.

182

Now, the question is, though, an optical element that does something besides merely detecting.

MR. CHEN: Yes.

THE COURT: Right. And so for that, what do we have?

MR. CHEN: "Collecting optical element," Your Honor, which is Claims 1 and 13 of the '106 Patent.

THE COURT: Okay. But the only thing I'm at a loss for is, what about claim... oh, because Claim 18 is gone from the '443.

MR. CHEN: They dropped them. That's correct.

MR. KHAN: That's what I was --

THE COURT: Thank you.

MR. CHEN: They dropped them because -- yes.

THE COURT: Yes. I got it.

All right. Thank you.

All right. So now, go ahead.

MR. CHEN: Collecting optical element.

THE COURT: Yep.

MR. CHEN: Would you like me to go first?

THE COURT: Yeah, why don't you.

MR. CHEN: Okay.

THE COURT: Change things around here.

We've got two terms, right?

MR. CHEN: Yes.

183

THE COURT: All right.

MR. CHEN: Could we go to Slide 69, please?

So the parties agree on the claimed function here, which is to collect and focus fluorescent light emitted by a particle illuminated by the light source, such that the fluorescent light leaving the collecting optical element converges.

So that's agreed upon. There's no dispute that this is the claimed function.

THE COURT: Yep.

MR. CHEN: And so there is no structure for collecting optical element. Collecting optical element is only found in the claims. It's not even in the written description at all. It is subject to means-plus-function.

And when we look to see what in the specification performs the function, it always requires a concave mirror and an aberration corrector plate.

And you need that in order to make the light converge, you need a concave mirror, 601, in order to make the light converge.

So using this -- let's see -- this top figure here, this looks, hopefully, familiar at this point. It's similar to what we looked at previously when we were looking at the side scatter detectors, Your Honor.

184

THE COURT: Okay.

MR. CHEN: Right.

But now we're talking about fluorescent light. And so what happens is, light will come in, you will hit the flow cell, there's scattering that happens, but then there's also fluorescing.

And that fluorescent light will be gathered by the concave mirror and then converged. And what the aberration corrector plate does, it fixes aberrations in the light so that you can properly have converging light.

And that's why this is recited throughout the patent in various embodiments. Every single embodiment requires a concave mirror and an aberration corrector plate.

And, in fact, when we look at the original claims of the patent, we see that they actually recited that the composite microscope objective includes a mirror and an aberration corrector plate.

There's nothing in the original claims where you have a composite microscope objective that is -- that's off by itself. That doesn't further, then, specify that you need to have a spherical mirror and an aberration corrector plate in order to perform the claimed function.

As Your Honor knows, you need to have a structure that's sufficient for performing the claim function. A microscope objective, by itself, is not sufficient to perform the claim function of converging light.

And here's an example. This is extrinsic evidence, and also discussed by our expert, Dr. Ilkov. And...

The laser is not showing up very well. Can I get the other one, please? Thank you.

So here's the objects of the lights flowing in this direction, right? This direction, your eyeball is up here and looking through the microscope objective. And, basically, light here, which is diverging, actually gets collimated in this objective. So this is a collimating objective. It's not an objective that converges light.

That's why you always need a concave mirror and an aberration corrector plate.

THE COURT: All right. Just give me a break here.

Again, and I deferred to you about whether you're prejudiced and I would construe this, because they didn't cover this, right?

MR. CHEN: Right.

THE COURT: So I didn't read it.

Let me just step back, though.

MR. CHEN: Sure.

THE COURT: My limited experience with means-plus-function is, you know, the norm is, you battle over whether it's means-plus-function, then you battle over whether there's a specific embodiment disclosed in the written description --

MR. CHEN: That's right.

THE COURT: -- that performs the function.

MR. CHEN: Correct.

THE COURT: So you're saying there isn't?

MR. CHEN: Oh, there is for this term, there is.

THE COURT: Well, it sounds like you're saying there's some combination of disclosures in the patent that do it. That's what, kind of, is throwing me for a little bit of a loop here. And I'm...

MR. CHEN: I think I understand --

THE COURT: Does the law permit that?

MR. CHEN: I think I understand what Your Honor is asking, but, of course, please let me know if maybe I'm not understanding you correctly.

So the first issue is: Does the term "collecting optical element" by itself connote

sufficient structure for performing the recited function?

THE COURT: Right.

MR. CHEN: Which, we all agree on, is the collecting and focusing and converging the light, right?

And our position is, no. And, in fact, the written description doesn't even use the term "collecting optical element" at all.

That said, the written description does say, in multiple embodiments, that a concave mirror and aberration corrector plate perform this function of collecting the light and converging it.

And that is shown in various figures and various written description disclosures, and always involves a concave mirror and an aberration corrector plate.

THE COURT: Can you show me a specific example where there is this disclosure of both of these things --

MR. CHEN: Yes.

THE COURT: -- acting together to perform the claimed function?

MR. CHEN: Absolutely.

THE COURT: As opposed to, I'm looking at your slide --

MR. CHEN: Right.

THE COURT: -- and it seems to be pulling together different things in the written description to do this.

MR. CHEN: Absolutely. And this is also described in our briefing, but I do have some of these places memorized.

And so the first place is on Column 3. There is a discussion of the composite microscope objective, includes a concave mirror and an aberration compensation plate. We call it a corrector plate in other places. So that's one area.

THE COURT: Well, no, no, no. That's where it discloses an exemplary embodiment.

MR. CHEN: Uh-huh.

THE COURT: But where does it say here that that composite microscope objective collects and focuses fluorescent light emitted by a particle illuminated by the light source such that the fluorescent light leaving the collecting optical element converges?

MR. CHEN: Understood.

THE COURT: You're just saying that's applying what you're... like, basically, POSA knowledge?

MR. CHEN: Absolutely, Your Honor. Yeah.

THE COURT: Okay.

MR. CHEN: I understand what you're asking.

And let me just get to places that discuss that.

It's cited in our briefing.

Let's go to our original briefing. That's probably the best place.

Column 34, Lines 43 through 55. Column 34.

Talking about this right here?

Forty-eight onwards. "Figure 9A" --

THE COURT: Yeah, so Figure 9A. Okay.

MR. CHEN: -- "depicts the results of ray tracing from the embodiment of a composite microscope objective, 60, illustrated in Figure 8. As depicted in Figure 9A, scattered and fluorescence emissions from three spatially separated locations in the flow channel near the center of cuvette, 603, may initially propagate for back surface mirror, 601, and pass first through the cuvette, 603, to be internally reflected back to the back surface mirror, 601, then pass through the cuvette, subsequently pass through the aspheric corrector plate, 602, and finally forms three distinct images near an image plane, 605."

So that's just one place. And there's multiple places.

THE COURT: Well, hold up. So then the structure described there consists of 601, 602, 603, 604, and 605.

MR. CHEN: Correct.

THE COURT: Okay. And is that sufficient structure to accomplish, then, that by itself, those five parts, 601 through 605, you're saying together are sufficient structure?

MR. CHEN: That's correct.

There's various embodiments, some with slightly different structures. All of them share the common components of a concave mirror and an aberration corrector plate.

And so, as you can see, our construction has four different proposed structures consistent with the specification. I'll put it up here, Your Honor. And they each have a concave mirror and an aberration corrector plate.

But Your Honor is right, with respect to Figure 9A, there are other components as well.

We're, in a way, pointing to them through the language here, but the most important aspect is that you need to have a concave mirror because that performs a converging function, focuses the light, and you have to have the aberration corrector plate because there's aberrations that are occurring that need to be fixed.

There are other passages as well.

THE COURT: Just hold on a second, please.

All right. So Figure 11 has 601, 602, 603, and 604. Is there a figure that has all of those components plus 605 in the patent?

MR. CHEN: Figure 11.

THE COURT: That's what I just identified.

MR. CHEN: Yes.

THE COURT: So it's missing 605.

MR. CHEN: That is correct. That is correct. 605 is just the image.

THE COURT: So how is that a structure?

MR. CHEN: Yeah, that's just the image plane so you do not need that.

THE COURT: So, for instance, if you were talking to a jury, we could say Figure 11 would be a corresponding structure.

MR. CHEN: Figure 11, I believe, is a corresponding structure, yes.

There are various embodiments and that's why there's just a slight pause, Your Honor. I just want to --

THE COURT: No, see, what I'm used to...

This is limited, but what I'm used to with means-plus-function is the corresponding structure. I literally point to the patent. I tell the jury the corresponding structure is here, and it actually looks

like I could do that here.

MR. CHEN: Yes.

THE COURT: I could say the corresponding structure is Figure 11.

MR. CHEN: Yes.

THE COURT: Could you live with that instead of all the different language you put in your table?

MR. CHEN: I could. I could.

THE COURT: How about the plaintiffs?

MR. KHAN: Your Honor, Figure 11 includes elements that are not associated with the claim function, so it includes things that, like, part of the flow cell. The flow cell is not the structure that's gathering the light, right? And so I think --

THE COURT: But wait. What do you do with the passage that Mr. Chen just pointed me to? Is it Column 44, right?

MR. KHAN: Thirty-four, Your Honor.

THE COURT: Thirty-four?

MR. KHAN: Yes.

THE COURT: I mean, that appears to...

Well, actually, let me ask you this. Are you saying that whatever it is that's depicted in Figure 11 does not collect and focus fluorescent light emitted by a particle illuminated by the light source such that the

fluorescent light leaving the collecting optical element converges?

MR. KHAN:    We are not disputing that certain elements in that figure do that.  If I could level up and just frame the dispute.

The first dispute, in light of Your Honor's suggestion with respect to focusing optical element, is whether collecting optical element is sufficient structure.  And we're prepared to speak to that.  But if what we're talking about is, assuming collecting optical element is not sufficient structure, what's the corresponding structure?

The framing that I would offer you, Judge, is they are pointing to very specific embodiments and saying, hey, it's got to be sort of these two elements, pluck it out of Figure 11, these two elements from Figure 9, these two elements from over here.

The specification actually levels up and says there's a composite microscope objective.  The composite microscope objective gathers, collects images, light, and puts it onto the fiber.  That's in Figure 1.

And so we would say, Your Honor, the composite microscope objective is sufficient structure to perform the function.  And they disagree with us.  I see Mr. Chen shaking his head.

THE COURT:    Yeah.  You guys are all head shakers.

MR. KHAN:    So I'm just saying, there's a disagreement, and that's -- I think I am accurately characterizing the disagreement, which is we would say the corresponding structure can be articulated at a level of generality.

And the Federal Circuit instructs that where the specification uses optional language, and we can show you where that is in the specification, you know, may include X, Y, Z, or does not include.

In fact, in this specification, Your Honor, we can show you, there's passages that talk about an aberration corrector plate, which is what Mr. Chen was pointing to may, not be required.  There's passages in the specification that say concave mirror may be included.  That means may not be included.  There's language in the specifications five times.

THE COURT:    Yeah.  Well, again, what happens when I don't read your brief, right?

MR. KHAN:    Yeah.

And we understand that, Your Honor, and we're prepared to walk through the specifications on that issue.

MR. CHEN:    The Federal Circuit also makes it

really clear that the structure needs to be clearly linked with performing the claim function.

The only structures that are clearly linked with performing the claim functions always include a concave mirror, aberration corrector plate.  Could not be more clear in the specification.

And objective, by itself, is insufficient structure for performing the function.  Does not converge light.  Doesn't have to converge light.

THE COURT:    The only reason I'm even hearing this argument is because, Mr. Chen, you said you really want a ruling on these last three terms.

MR. CHEN:    We do want a ruling on this one.

THE COURT:    I know.  But, I mean, I'm just, you know, I'm steamed.  I mean, you know, I came out here, I told you, it really gets my...

I can't believe I had to encounter that in the briefing.  The only reason we even had the hearing is because you didn't do.  You know, you played by the rules.

But the truth of the matter is, I'm not fully up to speed on these last three terms because there's only so much you can do if you are me.

MR. CHEN:    Understood.

MR. KHAN:    Judge, would it help for us to

present the specification cites we're relying on?  Because we have them, and we can walk through them.

THE COURT:    Well, the problem is, if you present it, would it be helpful?  Yeah.  At 2:30?  You know, but I had to prepare for this.

I have limited time.  I have to get my reportables out by September 30.  I won't because of stuff like this.

MR. CHEN:    Could I take two minutes to confer with my colleagues, Your Honor?

THE COURT:    Yeah.

MR. CHEN:    Okay.

(Counsel confer.)

THE COURT:    By the way, I mean, next time I get a brief from this side, if it has something like that, I'm striking it, and I am going to take measures, because this was not fair to the defendant, and it wasn't fair to the Court.

MR. KHAN:    Understood, Your Honor.  Thank you.

MR. CHEN:    Sorry, Your Honor.

I was just trying to ask my colleague if we could forego the "collimating optical element," but unfortunately, it shows up in so many claims, I don't think we can avoid that.  But perhaps you could take the "collecting optical element" under advisement?

197

THE COURT: Actually, how about we do this. Is there a way to structure the case now? We've had a couple of issues about indefiniteness and the written description.

MR. CHEN: Yes. Yes.

THE COURT: Then maybe what we do is, is there a way you can bring motions related to that, or tee those issues up without me needing to address these remaining three terms?

MR. CHEN: Can you give me a minute, Your Honor?

(Counsel confer.)

MR. KHAN: If I could also be heard on that issue? Eventually, not right now.

MR. CHEN: A few things, Your Honor. So there's a lot of claims still that are being asserted. The parties had initially agreed that they would narrow asserted claims in prior art after *Markman*.

Perhaps, we could have an agreement that they can narrow before there's a ruling on all the terms. That might help, then, us be able to file a summary judgment motion that would hopefully --

THE COURT: I like that. I like that idea. Mr. Khan?

MR. KHAN: Your Honor, as to early motion

198

practice, I think the terms that we have been talking about today and the issues that they've purported to raise with respect to indefiniteness and written description, those are not case dispositive. In other words, they are directed to a handful of claims in certain patents.

THE COURT: Okay. That may be, but let's do this, let's do it in stages. I think... and there was an issue before. You said it was on mooted, the narrowing thing, right? The last time I was here, didn't you all say that that motion you brought --

MR. CHEN: That's correct, yes.

THE COURT: -- right, had been mooted? But that's maybe what we ought to do. We ought to force the plaintiff to narrow its asserted claims, and maybe some of these will go away. That seems, to me, a good way to resolve.

And at that point, after you've narrowed it, we could have a status conference and I could hear, is a proposal. I'm not saying I'd agree to it. I'm not saying I'd agree to it, but I might.

And I will say this, Mr. Khan's made a very good point. When I did it in the *Hip Hormel* case, it's because it got rid of the case in its entirety. And I'm not saying... it would have gotten rid.

199

I mean, in other words, what I'm not going to do is, I'm not doing partial summary judgment motions. That doesn't... that does not help. That's, generally, a waste of Court assets, which are so limited.

MR. CHEN: Understood.

THE COURT: And I'm also, to be very clear, because I think somebody could misinterpret what I said of it would get rid of the case in its entirety. I've rejected indefiniteness arguments as many, or more than I've ever granted a motion.

MR. CHEN: Right.

THE COURT: So don't... I have not formed any judgment. I have no idea about the merits of an indefiniteness claim. But it just seems to me that it can be a useful exercise to move a case efficiently.

All right. So I do think what we ought to do is, I don't think it's productive right now to go forward with these three claims, especially if some of them went out the door because they weren't even going to be asserted going forward.

So where are we, right now, how many claims have been asserted? Rather, how many are currently being asserted?

MR. KHAN: We're at 40 claims, Your Honor. It was 42, but we withdrew two claims as part of the

200

briefing.

Sorry, 42. We are now at 42.

THE COURT: Forty-two over three patents?

MR. KHAN: Four patents.

THE COURT: Four patents.

MR. CHEN: Forty-two over four patents, and effectively 57 claims, because there's these multiple dependent, sort of, scenarios.

MR. KHAN: And, Your Honor, we've agreed to go down to 22 within a couple of weeks of the *Markman* order. So we are already -- we've already agreed to go down to half of that, essentially, you know, within short order of a *Markman* ruling.

THE COURT: Okay.

What's your... you have a proposal?

MR. CHEN: What we would propose, I think, is consistent with what Your Honor is saying, is to require them to narrow claims down to...

(Counsel confer.)

MR. KHAN: There was a ruling --

MR. CHEN: That's true. That's true. If it's case dispositive, we would ask for more of a narrowing than 22, Your Honor.

If we could get them to agree to ten claims, I think that would be much more manageable.

201

THE COURT:    Well, definitely would be manageable.

MR. CHEN:    They're going to have to do that for trial anyways.

THE COURT:    Well, right.  I tend not to force it because the really good trial lawyers know, you can't try a case with even ten claims.

MR. CHEN:    Right.

THE COURT:    Good lawyers, the best I see, don't do stuff like that.

MR. CHEN:    Right.

MR. KHAN:    Your Honor, we argued this issue before Judge Tennyson, and she ruled.  And we agreed to 22 claims within a couple of weeks of a *Markman* ruling.

We think that's appropriate in light of, we've got four patents in the case, fact discovery is about to close, and then we were expecting to get some expert discovery.  And we're open to narrowing, of course.  We know we can't try, you know, that many claims.

But I think it makes sense to let us complete fact discovery.  And on fact discovery, Your Honor, it is going to be needed for any indefiniteness issue.  And let me give you an example.

So at the hearing -- you know, you heard at

202

the last hearing about how "collimation" and "collimated."  They were suggesting to you it's indefinite because no one knows what "collimated" means, right?

And, you know, one of the things that they didn't tell you, and we didn't tell you at the time, is the evidence is going to show that their own collimation lens in their product, it is -- the way they collimate it is just by holding it up and shining a light source, and then moving the collimating lens until they see the right spot size on the wall.

That's -- so they're not -- there's no measurement.  There's no quantitation.  There's no nothing.

So fact discovery is going to be incredibly important to a lot of -- both claim development, but also, a lot of indefiniteness issues that they're trying to raise here about, "What is collimation mean to a person of ordinary skill in the art?"  I think we need to hear all of those issues.

THE COURT:    Sorry.  I'm trying to think why that's relevant right now for me to care.

MR. KHAN:    It's relevant because, Your Honor, in terms of claim narrowing and in terms of when to have an early SJ practice, right, we need fact discovery to

203

complete.

We're almost done with fact discovery, about a month, six weeks out, according to new agreement we have.  And we're moving right into expert discovery anyway.

And so from our perspective, you know, we're at the point -- we're not too far away from the point of them being able to make summary judgment motions anyway.  And so it kind of makes sense to just hold this until then.

THE COURT:    Yeah.  I'm not making a ruling on summary judgment, and I expressed that.  I said it might not be a smart idea at all.

Here's what I'm inclined to do.  I'm inclined to say... she gave you two weeks from the *Markman* hearing?

MR. KHAN:    I believe that's right, two weeks.  Yes, Your Honor.

THE COURT:    And, of course, I already had the *Markman* hearing.

MR. KHAN:    I'm sorry?  The ruling.  Sorry.  The ruling.

THE COURT:    Okay.  So I've given you rulings on all but the three terms that I will defend as not being prepared today because of the failure of you to

204

cite to the record, and so I stopped reading your brief.  I think that's the only thing a judge in my position could do.

We're on our second *Markman* hearing.  We've incurred an awful lot of judicial time to date, and we need to move the case.  And so when I figure out all those factors, I think, at this point, I'm going to require the plaintiffs to narrow the claims to 16 claims.

Within two weeks good enough?

MR. CHEN:    Yes.

MR. KHAN:    We can do two weeks, Your Honor.

THE COURT:    Sixteen claims.

And you ought to think about, when you're trying to figure out what claims, I mean, I don't know if it can be avoided, but to the extent you can avoid my having to construe those outstanding three terms, that would be a smart idea.

MR. KHAN:    I believe there are only two outstanding terms.  I may be mistaken.  It's just "collimating optical element" and "collecting optical element," because focusing optical element, I think --

THE COURT:    I've ruled on.

MR. KHAN:    Yes, you're right.

THE COURT:    Right.  Is that true, there's only

two?

MR. KHAN:  There's only two.

MR. CHEN:  I believe that's correct, Your Honor.

THE COURT:  Well, then, ideally neither of those two terms would be in the 16 asserted claims. Because then they are not prejudiced.

MR. CHEN:  Thank you.

THE COURT:  Right?  Now, I'm not saying you have to do it, you know, but that would make sense.

Now, once you narrow in two weeks, if they, they being the defendant -- a singular, "it" -- wants to propose a way to tee up certain issues that it thinks might be efficient, I'm willing to entertain that.

By the way, I take it, if the plaintiff has some efficient way of resolving the case too, I'm willing to listen to that.  I raise that initially not because of...

Well, not because of any reason other than I haven't found it to be successful when you have inadequate written descriptions and indefiniteness.  And to be candid, as I've alluded to earlier is, there's some issues that, you know, my antenna says aren't right with some of this patent issue, like a collimated afocal image.

Now, maybe.  I'm open-minded.  I say things all the time, I have initial reactions, I articulate it, and then I change my mind.  I have actually granted motions or reconsidered rulings I've issued in writing. But I'm just saying, my antenna is up.  It just doesn't make a lot of sense.

And that's also why I, earlier on, suggested there may be early briefing we could address on written description, enablement, or indefiniteness.  But it may be a stupid idea.

All right.  But here's what I'm going to do. We're going to finish for the day.  I've construed all but those two terms, and we're going to just hold them in abeyance.  Well, actually, we'll just hold their construction in abeyance.  They may go away.

I'm going to require the plaintiff, within two weeks of today, to identify the 16 claims that will be the universe from which it will select claims to try at trial.

And then, if you all meet and confer and decide it's worthwhile to have a status conference to discuss ways to move the case, I'm willing to do that. I won't have the status conference, by the way, it won't be until, like, November at the earliest.  I am pretty flooded.

Does that make sense?

MR. KHAN:  It does, Your Honor.

And just to be clear, once we narrow, they would also be required to narrow their prior art per Judge Tennyson's order in the schedule.

THE COURT:  Yeah, I don't know what her order is.

But, Mr. Chen, do you understand that there's going to be corresponding narrowing of the defense after the narrowing of --

MR. CHEN:  Understood, Your Honor.

THE COURT:  Okay.  Sounds good.

Okay.  All right.  Thank you all very much then.  Have a good day.

(The proceedings concluded at 2:53 p.m.)

<u>CERTIFICATE OF COURT REPORTER</u>

I hereby certify that the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

<u>/s/ Bonnie R. Archer</u>
Bonnie R. Archer, RPR, FCRR
Official Court Reporter
U.S. District Court

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BECKMAN COULTER, INC.,

                Plaintiff,

       v.                              Civil Action No. 24-945-CFC

CYTEK BIOSCIENCES, INC.,

                Defendant.

## <u>ORDER</u>

In the two claim construction hearings I held in this case, 8.21.25 Hr'g Tr (docketed as D.I. 151); 9.17.25 Hr'g Tr. (docketed as D.I. 173), I resolved from the bench all but one claim construction dispute. *See* D.I. 190 at 1; D.I. 192 at 1. The parties agree that the sole remaining term—collimating optical element—is a means-plus-function term. D.I. 131-1 at 26; 9.17.25 Tr. 39:25–41:11, 165:2–10. They dispute, however, the precise function and corresponding structure of that term.

Having thought more about the parties' positions, read the transcripts of the hearings, and rereviewed the parties' briefing, I have decided to adopt Beckman's proposed function and corresponding structure. I do so primarily because under Federal Circuit caselaw, the "corresponding structure" means the minimum

structure necessary to perform the recited function. *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1257–58 (Fed. Cir. 1999) (holding that § 112, ¶ 6 does not "permit incorporation of structure from the written description beyond that necessary to perform the claimed function."). My decision is also informed by the Federal Circuit's holding in *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1371 (Fed. Cir. 2001), that "the corresponding structure to a function set forth in a means-plus-function limitation must actually perform the recited function, not merely enable the pertinent structure to operate as intended."

The parties first dispute the function of a collimating optical element. The parties agree on the claims all having a function of "receiv[ing] light from a light source," and then either "project[ing] a collimated beam," or "project[ing] a first image." D.I. 131-1 at 26–31. Cytek, however, further proposes that the function include projecting the beam and image "onto an optical relay element." D.I. 131-1 at 26–28. In support of its position, Cytek points to claim 1's requirement that an optical relay element receive at least a portion of the collimated beam from the collimating optical element. #582 patent at claim 1. While I agree with Cytek that the claims mention this additional detail, the relevant portion of the claims with the term "collimating optical element" that claims a function (e.g., "collimating optical element *arranged to receive light from a light source*, the collimating optical

2

element *configured to project a collimated beam*," #582 patent at claim 1 (emphasis added)) do not contain the additional requirement of an optical relay element. I will accordingly adopt Beckman's proposed functions.

I will also adopt Beckman's proposed structure, as I find that a lens and structural equivalents are sufficient to satisfy the claimed functions. The written description provides many examples of a lens as an optical element that satisfies the claimed functions. For instance, the written description describes "a collimating optical element, in this case an achromatic doublet lens 902, [that] may capture the light from source 901 and project a magnified image of the object," #582 patent at 44:58–61, using the exact words that appear in the claims and tying the use of lenses to the claimed functions. *See also* #582 patent at 4:34–62 (describing a "lens" as an "optical element" that "collimates a beam of light" and "magnifies the extended light source . . . to an image having a size similar to the effective cross section of the first optical element thereby creating a collimated light beam").

Cytek argues that the specification lacks structure to perform the function of "projecting a collimated beam." It argues specifically that for claims 1 and 20 of the #582 patent, an artisan or ordinary skill would view a "magnified image" or "image," as described in the written description, #582 patent at 44:58–61, as not a

3

collimated beam because an image requires ray convergence, while a collimated beam cannot have ray convergence. D.I. 158 at 16–19. I disagree. I declined to construe "collimate" because I was not persuaded that an artisan of ordinary skill would find that a "collimated beam" requires perfectly parallel rays. 8.21 Tr. 133:11–17. Similarly, I construed "image" as simply "a representation of an object created by light or emanating from a light source" because I was not persuaded that an artisan of ordinary skill would find that an "image" requires rays of light to be focused to a point. 9.17 Tr. 90:9–13. Thus, "collimated beam" and "magnified image" are not incompatible.

NOW THEREFORE, at Wilmington on this Twenty-fourth Day of February in 2026, it is HEREBY ORDERED that the Court adopts the following claim constructions with respect to the asserted claims of U.S. Patent No. 10,330,582:

4

| Claim Term | Asserted Claim(s) | Court's Construction under 35 U.S.C. § 112, ¶ 6 |
|---|---|---|
| "collimating optical element" | #582 patent claims 1, 3, and 6 | *Function*: (1) receive light from a light source; (2) project a collimated beam<br><br>*Structure*: a lens, such as an achromatic doublet lens, and structural equivalents thereof |
| | #582 patent claims 23 and 26 | *Function*: (1) receive light from a light source; (2) project a first image<br><br>*Structure*: a lens, such as an achromatic doublet lens, and structural equivalents thereof |

_____

CHIEF JUDGE

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TOT POWER CONTROL, S.L., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1302 (MN) |
| | ) | |
| APPLE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER AFTER PRETRIAL CONFERENCE**

AND NOW, this 20th day of June 2025, after a Pretrial Conference and upon consideration of the Proposed Pretrial Order (D.I. 414) and the discussion at the June 16, 2025 Pretrial Conference, IT IS HEREBY ORDERED that:

1. The Proposed Pretrial Order is ADOPTED as modified by any discussion at the Pretrial Conference. (*See* D.I. 434).

2. A five-day jury trial will begin on June 23, 2025 at 9:30 a.m. with jury selection.[1] The Court has granted a continuance, such that opening statements will begin on Wednesday June 25, 2025 at 9:00 a.m. Subsequent trial days will also begin at 9:00 a.m, Each side should be prepared to present its case until 4:45 p.m. or 5 p.m. of each trial day, although the end of the trial day may, at the discretion of the Court, be earlier or later.

3. The trial will be timed. Each side is allowed up to eleven (11) hours in the jury trial for its opening statement, its direct and cross-examination of witnesses, closing arguments and argument of evidentiary issues. Each side should reserve one hour of its eleven (11) hours for

---

[1] Plaintiff is responsible for providing enough copies of the *voir dire* and a writing utensil for each member of the jury pool, which is estimated to be 45 people. The Court understands that those have been delivered to the Clerk's office.

closing arguments.  Time during the trial day that does not neatly fit into one of these categories

will be attributed to one side or the other as the Court deems appropriate.

4.      Issues that need to be addressed outside the presence of the jury will be taken up at

8:30 a.m., at lunch or at the end of the day as the Court deems appropriate.  Those issues – including

objections to anticipated exhibits or demonstratives – must be brought to the attention of the

Court's Judicial Administrator and the Courtroom Deputy by 7:00 a.m. on the day on which the

objected-to evidence will be adduced.  There will be thirty to forty-five minutes for lunch and a

fifteen-minute break in the morning and in the afternoon.

5.      For the reasons stated at the Pretrial Conference, Plaintiff's Motion *in Limine* No. 1

(D.I. 414-16) is GRANTED, Plaintiff's Motion *in Limine* No. 2 (D.I. 414-16) is GRANTED,

Plaintiff's Motion *in Limine* No. 3 (D.I. 414-16) is GRANTED-IN-PART,  Defendant's Motion *in*

*Limine* No. 1 (D.I. 414-17) is GRANTED-IN-PART, [2] Defendant's Motion *in Limine* No. 2 (D.I.

414-17) is GRANTED-IN-PART,[3] and Defendant's Motion *in Limine* No. 3 (D.I. 414-17) is

GRANTED.

6.      As explained at the Pretrial Conference, the parties may not provide witness binders

or physical copies of documents (demonstratives, deposition transcripts, etc.) to the Court, but the

parties must provide witness binders to the witnesses.  The parties shall provide electronic copies

---

[2]    Defendant's first motion *in limine* seeks to preclude certain evidence and argument about
licensing negotiations, specifically the terms proposed during the negotiations.  As
discussed at the Pretrial Conference, Plaintiff may not raise issues of willfulness or copying
at trial.  Plaintiffs may, however, use the challenged evidence and argument for issues that
remain in the case.  (*See* D.I. 434 at 29:8-29:14).

[3]    Defendant's second motion *in limine* seeks to preclude references to figures, including
financial figures, in the billions as prejudicial.  As discussed at the Pretrial Conference,
Plaintiff may refer to factual numbers, such as units sold, for purposes of presenting
damages calculations.  Otherwise, the parties are directed to reach agreement on
appropriate redactions as outlined at the Pretrial Conference.  (*See* D.I. 434 at 33:2-33:10).

of ALL trial exhibits to the Courtroom Deputy by NOON on June 20, 2025. The trial exhibits must be labeled with JTX, DTX or PTX prefixes with exhibit numbers, and the trial exhibits must be organized in a single folder. Additionally, at the beginning of each trial day, the parties shall provide to the Court's Judicial Administrator and Courtroom Deputy electronic copies of witness folders containing the exhibits and demonstratives (if any) to be used on direct examination and cross-examination[4] of any witnesses expected to be called that day.

7.      The parties should be in the courtroom and prepared to discuss all outstanding issues at 9:00 a.m. on Monday, June 23, 2025.

8.      The Court will hear Plaintiff's proffer and arguments about Plaintiff's damages case on Monday, June 23, 2025, after jury selection is completed.

9.      Any trial logistics should be coordinated through the Courtroom Deputy.

_Maryellen Noreika_
The Honorable Maryellen Noreika
United States District Judge

---

[4]      This includes any deposition transcripts or expert reports to be used with witnesses.

# EXHIBIT 5

# EXHIBIT 14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TOT POWER CONTROL, S.L.,

        Plaintiff,

   v.

APPLE INC.,

        Defendant.

C.A. No. 21-cv-1302-MN

**PLAINTIFF TOT POWER CONTROL S.L.'S MOTION *IN LIMINE* NO. 1:
TO PRECLUDE ANY REFERENCES TO POSITIONS TAKEN DURING CLAIM
CONSTRUCTION OR THE COURT'S STATEMENTS IN THE
CLAIM CONSTRUCTION ORDER**

TOT moves to preclude Apple from making any references at trial to (1) any of the parties' positions taken during claim construction, as well as (2) any of the Court's statements its October 15, 2024 Memorandum Order on claim construction (D.I. 297), aside from the actual claim constructions. The Court's construction of the disputed terms in the '865 and '376 patent claims will be read to the jury as part of the jury instructions. That should be sufficient to inform the jury regarding the claim constructions that are to be applied in its analysis of infringement and invalidity. Apple, however, apparently wants to go further and present to the jury parts of the claim construction order in which the Court explained its reasoning for construing the terms as it did. Any reference to the parties' positions taken during claim construction and the Court's reasoning behind its final claim constructions, however, should be excluded under FRE 402 and 403 as unduly prejudicial, confusing, and irrelevant.

Courts routinely grant motions to exclude any references to claim construction orders aside from the actual constructions. *See, e.g., France Telecom S.A. v. Marvell Semiconductor Inc.*, No. 12-cv-04967-WHO, 2014 WL 4272771, at *1 (N.D. Cal. Aug. 28, 2014) (because "[c]laim construction is a question of law and exclusively within the province of the Court," any "[r]eference to the claim construction order, including the Court's reasoning, is precluded, except for references to the actual constructions."); *MLC Intellectual Prop., LLC v. Micron Tech., Inc.*, No. 14-cv-03657-SI, 2019 WL 2493379, at *1 (N.D. Cal. June 14, 2019) ("It is improper for any witness to testify about the Court's reasoning in the claim construction orders . . ."); *Mobile Telecomms. Techs., LLC v. LG Elecs. Mobilecomm U.S.A., Inc.*, No. 2:13-CV947-JRG-RSP, 2016 WL 454894, at *2 (E.D. Tex. Feb. 5, 2016) (acknowledging previous order, which provided that "the parties shall not expressly or implicitly refer to each other's claim construction positions and shall not expressly refer to any portion of this order that is not a construction adopted by the Court").

Providing jurors with information regarding the Court's underlying rationale for choosing one proposed construction over another would be confusing and prejudicial, and would devolve into a mini-trial on the meaning of the Court's statements at the *Markman* hearing and in its claim construction

order.  Such diversions would not only waste time, but they would also create a high risk of prejudice, as jurors may incorrectly assume that the Court's view regarding the parties' respective claim construction positions is somehow indicative of its view on the substantive merits of the case. Furthermore, any discussion of the Court's claim construction reasoning would be couched in legalese and would only confuse the jury.  *See Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, No. CV 17-1390-LPS, 2021 WL 5275780, at *2 (D. Del. Nov. 10, 2021) ("Even assuming there would be some probative value in informing the jury of the Court's prior rulings, that value would be substantially outweighed by the countervailing concerns of Federal Rule of Evidence 403, including confusing the jury, wasting time, and unfairly prejudicing Sunoco.").  For these reasons, the Court should preclude any reference at trial to the parties' positions in claim construction, as well as any reference to the Court's reasoning for adopting its claim constructions.

Dated: May 27, 2025

Brian A. Ratner (DC Bar No. 473284)
*Admitted Pro Hac Vice*
HAUSFELD, LLP
1200 17th Street, N.W., Suite 600
Washington, DC 20036
Tel: (202) 540-7157
Fax: (202 540-7201
bratner@hausfeld.com

Bruce J. Wecker (CA No. 0778530)
*Admitted Pro Hac Vice*
HAUSFELD, LLP
580 California Street, 12th Floor
San Francisco, CA 94111
Tel: (415) 633-1907
bwecker@hausfeld.com

Walter D. Kelley, Jr.
*Admitted Pro Hac Vice*
KELLEY LEGAL, PLLC
120 N. St. Asaph Street
Alexandria, VA 22314
Tel: (757) 287-2000
wkelley@kelleyadr.com

Respectfully submitted,

*/s/ Walter D. Kelley, Jr.*

Brian E. Farnan (DE No. 4089)
Michael J. Farnan (DE No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Denise M. De Mory (*Pro Hac Vice*)
Tara Zurawski (*Pro Hac Vice*)
Corey Johanningmeier (*Pro Hac Vice*)
BUNSOW DE MORY LLP
701 El Camino Real
Redwood City, CA 94063
Tel.: (650) 351-7248
Fax: (415) 426-4744
ddemory@bdiplaw.com
tzurawski@bdiplaw.com
cjohanningmeier@bdiplaw.com

*Counsel for Plaintiff*
*TOT Power Control, S.L.*

-3-

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| TOT POWER CONTROL, S.L.,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | C.A. No. 21-cv-1302-MN |

## [PROPOSED] ORDER ON PLAINTIFF TOT POWER CONTROL S.L.'S MOTION *IN LIMINE* NO. 1: TO PRECLUDE ANY REFERENCES TO POSITIONS TAKEN DURING CLAIM CONSTRUCTION OR THE COURT'S STATEMENTS IN THE CLAIM CONSTRUCTION ORDER

Upon consideration of Plaintiff TOT Power Control, S.L.'s Motion *in Limine* No. 1: To Preclude any References to Positions Taken During Claim Construction or the Court's Statements in the Claim Construction Order, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion *in Limine* No. 1 is GRANTED;

2. The parties may not make any references at trial to (1) any of the parties' positions or arguments made during claim construction, or (2) any of the Court's statements in its October 15, 2024 Memorandum Order on claim construction (D.I. 297), aside from the actual claim constructions.


SO ORDERED this ___ day of _____, 2025.

_____
The Honorable Maryellen Noreika
United States District Judge

-1-

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


TOT POWER CONTROL, S.L.,          )
                                 )
          Plaintiff,             )
                                 ) C.A. No. 21-1302(MN)
v.                               )
                                 )
APPLE, INC.,                     )
                                 )
          Defendant.             )


                    Monday, June 16, 2025
                    2:00 p.m.
                    Pretrial Conference


                    844 King Street
                    Wilmington, Delaware


BEFORE:   THE HONORABLE MARYELLEN NOREIKA
          United States District Court Judge


APPEARANCES:


          FARNAN LLP
          BY:  JOSEPH J. FARNAN, ESQ.
          BY:  SUE L. ROBINSON, ESQ.

          -and-

          BUNSOW DE MORY
          BY:  DENISE DE MORY, ESQ.
          BY:  ELIZABETH DAY, ESQ.
          BY:  GARETH DeWALT, ESQ.
          BY:  MICHAEL E. FLYNN-O'BRIEN, ESQ.

          -and-

          HAUSFELD
          BY:  IAN ENGDAHL, ESQ.

                    Counsel for the Plaintiff

APPEARANCES (Cont'd):

       DLA PIPER LLP
       BY:  ANGELA WHITESELL, ESQ.
       BY:  ERIN P. GIBSON, ESQ.
       BY:  JEFF CASTELLANO, ESQ.
       BY:  MICHAEL G. STRAPP, ESQ.
       BY:  MATTHEW S. MIDDLETON, ESQ.
       BY:  TIFFANY MILLER, ESQ.
       BY:  GREGORY FERRONI, ESQ.

            Counsel for the Defendant Apple, Inc.


          - - - - - - - - - - - - -


       COURTROOM DEPUTY:  All rise.  The United States District Court for the District of Delaware is now in session.  The Honorable Maryellen Noreika presiding.

       THE COURT:  Alright.  Good afternoon, everyone.  Please be seated.  Let's start with some introductions.

       MR. FARNAN:  Good afternoon, Your Honor.  Brian Farnan on behalf of the plaintiff.  With me also from my firm is Sue Robinson.  And with me is Denise De Mory, Michael Flynn-O'Brien, Elizabeth Day and Gareth DeWalt, also from Bunsow De Mory.  And we have Ian Engdahl from Hausfeld.

       THE COURT:  Thank you.

       MS. DE MORY:  Thank you.

THE COURT:  Alright.  Thank you.

MR. CASTELLANO:  Good afternoon, Your Honor. Jeff Castellano form DLA Piper for Apple.  I have with me from DLA, Erin Gibson, Michael Strapp, Paul Steadman, Tiffany Miller and Angela Whitesell.  And we're also joined by three representatives of Apple, all from the IP Group, Andrew Stein, Director; Garrett Sakimae, senior counsel; and Tanya Manno, counsel.  And I would also like to introduce our trial presentation professional, Josh Splansky, who is in the corner there.

THE COURT:  Good afternoon to all of you as well.

So we are here for the pretrial conference and I'm just trying to find my folder that I have.

Alright.  So I wanted to start with summary judgment motions.  We have three issues on summary judgment. First relates to the '865 patent; the second relates to the '376; and the third is the start date for the hypothetical negotiation.  I think I am going to deny all of those because there are issues of material fact.

With respect to the '865 patent, the issue there is whether the outer loop, each of the claim elements must be included in the outer loop.  During claim construction, I did not say that, I said I was not addressing that and it seems to me that the issue is whether -- so outer loop is a

testimony of Qualcomm's witness to that same effect.  Our expert relied on -- first of all, he also noticed that across the products in the damages period the code didn't change over that period of time in a relevant way.  And, of course, also looked at Apple documents identifying when that change would have occurred.  There is no reason to believe and certainly Apple has not put forward any reason to believe that the relevant code in question is the same as in the 4S as was in the products during the damages period.

THE COURT:  Alright.  I am going to deny the motion for summary judgment.  I think there are issues of fact here about whether the earlier software was the same as what is in the currently accused product.

Okay.  Motions in limine.  Plaintiff's motion in limine number 1 seeks to preclude reference to the positions taken by the parties during claim construction.  What really are you guys afraid is going to happen here?

MS. DE MORY:  So when we were negotiating the jury instructions, Apple has been insisting that they need to be able to refer to parts of the claim construction order.  So, I mean, I think this should be a no brainer.  But I think it stems from statements that were made during the claim construction hearing --

THE COURT:  Apple, what is it you want?  Like, I don't understand what -- I mean, obviously if we define

something, it comes in.  I don't know what you -- what are you fighting about?

MS. GIBSON:  Yes, Your Honor.  So we believe that no expert on either side should be able to contradict the Court's claim construction order, and that includes parts of the reasoning of the order.  And let me give a very specific example.

THE COURT:  I want to know exactly what you're talking about, because just saying you can't contradict my order, okay, that's not helpful.

MS. GIBSON:  So the Court has not granted summary judgment of non-infringement and we understand the experts are going to testify as to whether certain claim elements following, for example, the outer loop power control method, the method comprising are met or not, the experts are going to testify about that.  We should be able to cross-examine their expert.  If he gets up, for example, and says that outer loop power control is not a fundamental aspect of the claimed invention, we should be able to cross-examine him on that.

THE COURT:  Not using my order, you can't.  Sorry.

MS. GIBSON:  Okay.

THE COURT:  So if that's what you wanted to do, then no.

MS. GIBSON:  That's it, Your Honor.  We believe he's going to get on the stand and contradict portions of your claim construction order and that's one of them. Because they now believe it doesn't really matter if it's part of the inner loop or outer loop --

THE COURT:  Let's do this.  I'm granting the motion, but if they do that, you are not precluded, you can raise it with me at side-bar or outside the presence of the jury and tell me specifically so that I can deal with it in the context of what is being said.  Okay?

MS. GIBSON:  That works.

THE COURT:  I take your point, he can't come in and say something that is fundamentally the opposite of what I have already said, but I can't tell based on what you're telling me right now like how you would use it or if it's really fair based on what the expert is testifying.

MS. GIBSON:  We understand, Your Honor.  We can raise that at side-bar.

THE COURT:  I will grant it, meaning you can't do it without seeking leave.

MS. GIBSON:  Thank you.  Okay.

THE COURT:  Okay.  Number two, no pejorative terms.  That sounds like a good one.  Okay.  So it seems like there is some agreement here which is Apple says we're not going to use blatantly pejorative terms.  What are we --

do we have an agreement on what we're going to say, or is there still a dispute?

MR. DeWALT:  Your Honor, Gareth De Walt from Bunsow De Mory for the plaintiff.  We have an agreement on the majority of the terms.  The only three things left in here are the terms, nonpracticing entity, NPE, patent assertion entity.  As set forth in our motion in limine, these terms, while Apple asserts that they're neutral, have developed negative connotations over the years.  They're now considered synonymous with some of the other words --

THE COURT:  What do you want them to call you?

MR. DeWALT:  They can call us TOT Power Control or the plaintiff, or anything that is factually accurate.

THE COURT:  And nonpracticing entity is not factually accurate?

MR. DeWALT:  Well, as you'll hear at the trial, Your Honor, TOT is a real company that developed this technology and tried to sell it.  While it hasn't been able to sell or license its technology yet does not put at the same level as patent troll or the other things that nonpracticing entities become synonymous with.

THE COURT:  Okay.  Let me hear from the Apple.

MS. WHITESELL:  Your Honor, in the 30(b)(6) deposition, TOT's founder and CEO, Mr. Medrano, was asked to describe the operations of TOT and he says we have the

are fine if you agree.  If you can't agree, then there are no notebooks.

After trial, I ask that you review the trial transcript and submit any necessary corrections to the court reporter no later than two weeks after trial, that way we don't have a bunch of corrected post-trial briefs to account for.

And those were the issues that I had.  Anything else that you all wanted to address?

MR. CASTELLANO:  Nothing for Apple, Your Honor.

MS. DE MORY:  Nothing for plaintiff, Your Honor.

THE COURT:  Alright.  Well, thank you, everyone, for the arguments that were made today.  And I will see you next week.

COURT CLERK:  All rise.  Court is adjourned.

(Court adjourned at 4:56 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Dale C. Hawkins
Official Court Reporter
U.S. District Court

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

BECKMAN COULTER, INC.,

                Plaintiff,

      v.

CYTEK BIOSCIENCES, INC.,

              Defendant.

C.A. No. 24-0945-CFC



# PLAINTIFF BECKMAN COULTER, INC.'S OPPOSITION TO
# CYTEK'S MOTION *IN LIMINE* NO. 3

## TABLE OF EXHIBITS[1]

| Exhibit No. | Exhibit |
| --- | --- |
| 1 | Excerpts from Opening Expert Report of Michele Riley (Dec. 19, 2025) |
| 2 | Excerpts from Opening Expert Report of David Schaafsma (Dec. 19, 2025) |
| 3 | Excerpts from Deposition of Bing Shan (Oct. 24, 2025) |
| 4 | Excerpts from Opening Invalidity Expert Report of Fedor Ilkov, Ph.D. (Dec. 19, 2025) |
| 5 | Excerpts from Deposition of Fedor Ilkov, Ph.D. (Feb. 24, 2026) |

---

[1] Exhibits cited in this opposition as "Ex. __" are attached to the Declaration of L. Matlock-Colangelo, filed as an attachment to this brief.

Cytek seeks to preclude references "to the Court's commentary regarding claim construction." Cytek MIL No. 3 ("Mot.") at 1. Beckman does not oppose precluding affirmative reliance on statements made during *Markman*. However, Beckman does oppose Cytek's Motion to the extent it seeks to allow Cytek to contradict the Court's constructions or seek to improperly narrow the Asserted Claims under the guise of explaining "plain and ordinary meaning" or arguing indefiniteness.

*First*, Cytek cannot advance arguments that "contradict the court's construction to a jury." *Exergen v. Wal-Mart Stores*, 575 F.3d 1312, 1321 (Fed. Cir. 2009). Yet Cytek seeks to do just that. For example, during *Markman*, Cytek argued that collimation requires strictly parallel rays. D.I. 226 at 3-4 ("a collimated beam cannot have ray convergence"). The Court rejected that argument. *Id.* ("not persuaded that … a 'collimated beam' requires perfectly parallel rays"). Cytek's experts nevertheless repeat Cytek's rejected (and scientifically incorrect)[2] position that collimation requires perfect parallelization. *See, e.g.*, Ex. 4 ¶ 231 (rays "neither converging (i.e., a focused beam) or diverging."); Ex. 5 168:3-7 ("parallel rays usually apply zero divergence"). Cytek's expert reports are replete with additional attempts to contradict the Court's constructions. *See, e.g.*, D.I. 252 at 13-19 (Motion

---

[2] Cytek's technical fact witness admitted that perfectly parallel rays are not possible in real-world systems. Ex. 3 69:1-6 ("[i]n practic[e], we try to make it parallel, but it's not really possible").

1

to Strike such opinions).  Cytek should not be allowed to present these unreliable opinions to the jury.  *See Trudell Med. Int'l v. D.R. Burton Healthcare*, 127 F.4th 1340, 1349-50 (Fed. Cir. 2025) (abuse of discretion to allow arguments rejected at *Markman*).

Cytek's cited cases are not to the contrary.  For example, in *Integra LifeSciences v. HyperBranch Medical Technology*, the Court prohibited testimony "inconsistent with the Court's claim construction."  2018 WL 2186677, at *1 (D. Del. May 11, 2018); *see also Tot Power Control v. Apple*, No. 21-1302-MN, D.I. 434, at 15:1-10 (D. Del. June 20, 2025) (defendant could inform court when testimony "contradict[ed] … claim construction order"); *France Telecom v. Marvell Semiconductor*, 2014 WL 4272771, at *1 (N.D. Cal. Aug. 28, 2014) (permitting use of claim construction "admission[s]" to correct "inconsisten[cies]").[3]

***Second***, Cytek should not be permitted to "limit the full scope" of the Asserted Claims under the guise of "plain and ordinary meaning," *Huawei Techs. v. Samsung Elecs.*, 340 F. Supp. 3d 934, 968 (N.D. Cal. 2018), or argue claim construction to the jury, *Markman v. Westview Instruments*, 517 U.S. 370 (1996).  But again, Cytek plans to do just that.  *See* D.I. 252 at 4-13 (seeking to strike expert opinions unduly narrowing the claims).  For example, Cytek plans to tell the jury that certain

---

[3] *Sunoco Partners Mktg. & Terminals v. Powder Springs Logistics* addressed stricken damages opinions, 2021 WL 5275780, at *2 (D. Del. Nov. 10, 2021), and does not support Cytek's attempt to undermine this Court's constructions.

dependent claims are limited to "spectral flow cytometers" based on the purported plain meaning of "capable of detecting a substantially full spectrum of visible light." D.I. 301 at 20-21. But "limit[ing]" a broad term "to a particular type" is not plain meaning. *Spherix v. Vtexh Telecomms.*, 2015 WL 9311489, at \*28-31 (N.D. Tex. Mar. 19, 2015). Nor should Cytek be permitted to tell the jury that other claims are limited to "conventional" devices based on "the specification." D.I. 301 at 3-4; *see also EMC. v. Pure Storage*, 2016 WL 775742, at \*4 (D. Del. Feb. 25, 2016) (experts cannot "testify[] that [the] specification" limits "the plain and ordinary meaning"). Accordingly, Cytek should be precluded from making arguments that artificially narrow the claims under the guise of explaining "plain and ordinary meaning."

*Finally*, although Beckman does not intend to argue that "the Court's adoption of plain meaning precludes indefiniteness," Mot. 1, the ability of Cytek's experts to apply that plain meaning confirms definiteness. *See Guangdong Alison Hi-Tech v. ITC*, 936 F.3d 1353, 1361 (Fed. Cir. 2019) ("the application of [the disputed terms] by the parties' experts" supported definiteness).

Accordingly, Beckman respectfully requests that the Court preclude affirmative reliance on statements made during *Markman* other than the Court's formal claim constructions, and also preclude Cytek from contradicting the Court's constructions or improperly attempting to narrow the plain and ordinary meaning of the Asserted Claims.

3

OF COUNSEL:

Robert J. Gunther, Jr.
Omar A. Khan
Jeffrey A. Dennhardt
Laura Macro
Lauren Matlock-Colangelo
Jennifer L. Graber
Maggie Sawin
Kelly A. Todd
WILMER CUTLER PICKERING
HALE and DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

James Dowd
WILMER CUTLER PICKERING
HALE and DORR LLP
350 South Grand Avenue
Suite 2400
Los Angeles, CA 90071
(213) 443-5300

Akkad Y. Moussa
WILMER CUTLER PICKERING
HALE and DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

*/s/ Frederick L. Cottrell III*
Frederick L. Cottrell III (#2555)
Kelly E. Farnan (#4395)
Christine D. Haynes (#4697)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
farnan@rlf.com
haynes@rlf.com

*Attorneys for Plaintiff*

4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 9, 2026, true and correct copies of the foregoing

document were served upon the following counsel of record in the manner indicated:

**<u>BY E-MAIL</u>**

Karen Jacobs
Jeremy A. Tigan
Cameron P. Clark
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P. O. Box 1347
Wilmington, DE  19801

**<u>BY EMAIL</u>**

Reuben H. Chen
Cooley LLP
3175 Hanover Street
Palo Alto, CA 94304

Elizabeth M. Flanagan
Cooley LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402

Adam Pivovar
Dustin M. Knight
Rosalynd D. Upton
David Yun
Cooley LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004

*/s/ Christine D. Haynes*
Christine D. Haynes (#4697)
haynes@rlf.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| BECKMAN COULTER, INC., <br><br> Plaintiff, <br><br> v. <br><br> CYTEK BIOSCIENCES, INC., <br><br> Defendant. | C.A. No. 24-0945-CFC |

## [PROPOSED] ORDER GRANTING-IN-PART CYTEK'S MOTION *IN LIMINE* NO. 3 TO EXCLUDE EVIDENCE, TESTIMONY, AND ARGUMENT RELATING TO THE COURT'S COMMENTARY REGARDING CLAIM CONSTRUCTION

Defendant Cytek Biosciences, Inc. ("Cytek") having filed a Motion to Exclude evidence, testimony, or argument excluding evidence, testimony, and argument relating to the Court's commentary regarding claim construction, and the Court having considered the Motion and the accompanying briefs; now, therefore,

IT IS HEREBY ORDERED that:

1. Cytek and Plaintiff Beckman Coulter, Inc. ("Beckman Coulter") are PRECLUDED from introducing any evidence, testimony, and argument relating to the Court's commentary regarding claim construction from the two Markman

hearings (Ex. 1 (8/21/2025 Tr.); Ex. 2 (9/17/2025 Tr.)) and the February 24, 2026 Order (Ex. 3 (D.I. 226))—aside from the Court's formally adopted constructions.

2.  The parties are PRECLUDED from arguing that either party's proposed construction was adopted or rejected by the Court.

3.  The parties are PRECLUDED from advancing arguments that were rejected by the Court during *Markman*.

4.  This ORDER does NOT preclude experts from applying the plain and ordinary meaning of a term, or opining on whether "collimate," "collimating," "collimated beam," and "image" are indefinite, but does PRECLUDE the parties and their experts from asking the jury to perform claim construction, including by seeking to narrow the plain and ordinary meaning of any claim terms.

5.  The parties are also PRECLUDED from arguing that the Court's adoption of plain meaning for these terms precludes indefiniteness, but this ORDER does NOT preclude Beckman Coulter from explaining that the ability of Cytek's experts to apply that plain meaning supports definiteness.

SO ORDERED this ___day of _____, 2026.

_____

Hon. Colm F. Connolly
Chief, United States District Judge

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

BECKMAN COULTER, INC.,

                    Plaintiff,

        v.                                    C.A. No. 24-0945-CFC



CYTEK BIOSCIENCES, INC.,

                    Defendant.

## DECLARATION OF LAUREN MATLOCK-COLANGELO IN SUPPORT OF PLAINTIFF BECKMAN COULTER, INC.'S OPPOSITION TO CYTEK'S **MOTIONS *IN LIMINE***

I, Lauren Matlock-Colangelo, declare as follows:

1.  I am licensed to practice law in the State of New York and have been admitted to this Court *pro hac vice* by Order dated September 3, 2024.  D.I. 8 (so ordered).

2.  I am an attorney with the law firm of Wilmer Cutler Pickering Hale and Dorr LLP, located at 7 World Trade Center, 250 Greenwich Street, New York, New York 10007, and counsel for Plaintiff Beckman Coulter, Inc. ("Beckman Coulter").

3.  I have personal knowledge of the facts set forth herein and with the proceedings in this case, and if called to testify, I would competently testify thereto.

4.  I submit this Declaration in support of the following oppositions by Beckman Coulter:

>   a.  Plaintiff Beckman Coulter, Inc.'s Opposition to Cytek's Motion *in Limine* No. 1 to Exclude Evidence, Testimony, and Argument Relating to Either Party's Other Litigations or Arbitrations

>   b.  Plaintiff Beckman Coulter, Inc.'s Opposition to Cytek's Motion *in Limine* No. 2 to Exclude Evidence, Testimony, and Argument that Cytek Copied, Stole, or Misappropriated the Technology in BEC's Products

1

      c.  Plaintiff Beckman Coulter, Inc.'s Opposition to Cytek's Motion *in Limine* to Exclude Evidence, Testimony, and Argument Relating to the Court's Commentary Regarding Claim Construction

5. A true and correct copy of excerpts from the Opening Expert Report of Michele Riley, dated December 19, 2025, is attached hereto as **Exhibit 1**.

6. A true and correct copy of excerpts from the Opening Expert Report of David Schaafsma, dated December 19, 2025, is attached hereto as **Exhibit 2**.

7. A true and correct copy of excerpts from the deposition transcript of Bing Shan, dated October 24, 2025, is attached hereto as **Exhibit 3**.

8. A true and correct copy of excerpts from the Opening Invalidity Expert Report of Fedor Ilkov, Ph.D., dated December 19, 2025, is attached hereto as **Exhibit 4**.

9. A true and correct copy of excerpts from the deposition transcript of Fedor Ilkov, Ph.D., dated February 24, 2026, is attached hereto as **Exhibit 5**.

10. I declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of July, 2026.

/s/  Lauren E. Matlock-Colangelo

Lauren E. Matlock-Colangelo

3

# CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2026, true and correct copies of the foregoing

document were served upon the following counsel of record in the manner indicated:

| BY E-MAIL | BY EMAIL |
|---|---|
| Karen Jacobs<br>Jeremy A. Tigan<br>Cameron P. Clark<br>Morris, Nichols, Arsht & Tunnell LLP<br>1201 N. Market Street<br>P. O. Box 1347<br>Wilmington, DE  19801 | Reuben H. Chen<br>Cooley LLP<br>3175 Hanover Street<br>Palo Alto, CA 94304<br><br>Elizabeth M. Flanagan<br>Cooley LLP<br>30 S. 9th Street, 7th Floor<br>Minneapolis, MN 55402<br><br>Adam Pivovar<br>Dustin M. Knight<br>Rosalynd D. Upton<br>David Yun<br>Cooley LLP<br>1299 Pennsylvania Avenue NW<br>Suite 700<br>Washington, DC 20004 |

*/s/ Christine D. Haynes*
Christine D. Haynes (#4697)
haynes@rlf.com

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BECKMAN COULTER, INC., <br><br> Plaintiff, <br><br> v. <br><br> CYTEK BIOSCIENCES, INC., <br><br> Defendant. | C.A. No. 24-000945-CFC |

**EXPERT REPORT OF MICHELE M. RILEY**

December 19, 2025



150.   My bases for the conclusions summarized in **Table 8** and **Table 9** are discussed in the remainder of this section.

### *Standard Material Costs*

151.   Standard material costs include Cytek's costs for the materials it uses to produce the Accused Products. ███████████████████████████████████████████ ████████████████████████████ [412] My review of Cytek documents indicates that ████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████. [413] This is consistent with ████████████████████████ ██████████████████████████████████████████████, for example. [414]

### *Other Direct Costs*

152.   "Other direct costs" include Cytek's costs associated with the production of the Accused

---

[412] Deposition of Al Hernandez, October 8, 2025, pp. 50-51.

[413] Exhibits 22.4 and 22.8.

[414] CYTEK_0000115974; See, also, Deposition of Al Hernandez, October 8, 2025, pp. 50-51; ████████████ ███████████████████████████████████████████████████████████

See Deposition of Al Hernandez, October 8, 2025, pp. 95-96.

██████████████████████████████████████

Products, beyond standard material costs.[415] These include ███████████████ ███████

███████ ██████ ████████ █████████████████████████████████████████ ███ ████

██████████████████ ███ ██████ ████████████████████████████. [424]

---

[415] CYTEK_0000084065 (2021); CYTEK_0000213648 (2022); CYTEK_0000068829 (2023); CYTEK_0000437854 (2024); CYTEK_0000289623 (2024); Cytek stated in its 2024 form 10-K that cost of sales "associated with our products primarily consists of manufacturing-related costs incurred in the production process, inventory write-downs, warranty costs, third-party royalty costs, personnel and related costs, costs of component materials, overhead, packaging and delivery and depreciation expense." Cytek also stated that its gross margins factor in "production overhead costs." See Cytek Biosciences, Inc. Form 10-K for the fiscal year ended December 31, 2024, pp. 70, 72, and 75.

[416] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ See Deposition of Al Hernandez, October 8, 2025, p. 97 and CYTEK_0000084065 (2021); CYTEK_0000213648 (2022); CYTEK_0000068829 (2023); CYTEK_0000437854 (2024); CYTEK_0000289623 (2024).

[417] ████████████████████████████████████████████████ See CYTEK_0000115974; Deposition of Al Hernandez, October 8, 2025, p. 130.

[418] ████████████████████████████████████████████ See CYTEK_0000115974.

[419] ████████████████████████████████████████████████████████████████████ See CYTEK_0000115974 and Deposition of Al Hernandez, October 8, 2025, p. 129.

[420] ████████████████████████████████████████ See CYTEK_0000115974.

[421] ████████████████████████████████████████████████. See CYTEK_0000115974.

[422] These costs include distribution services, freight out (sending products to customers), shop supplies, shipping supplies, and intercompany repair costs. See CYTEK_0000115974.

[423] As further discussed in *Georgia-Pacific* factor 2, I am aware that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. See CYTEK_0000115974; CYTEK_0000071182; CYTEK_0000020561 ████████████████); CYTEK_0000426043

[424] ████████████████████████████████████████████████████████████████████████████████ See CYTEK_0000115974.

██



153. I used ███████████████████████ document ████████████████████ ██████████ ) to calculate Cytek's other direct costs.[425] Because these documents cover all Cytek instruments, I calculated each cost category other than royalty expense as a percentage of revenue and assumed that this percentage applied proportionally to the Accused Product revenue. ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████. [426]

154. Deducting standard and indirect costs yields a gross margin for the Accused Products ranging from ███████████ [427]

155. This estimate is supported by Cytek's budgets for the Accused Products, which I understand are ████████████████████████████ ██ ████████████ ████████████████████████████████████████████████ ████████████████████ For example:

- ████████████████████████████████ [429]
- ████████████████████████████████████████ ████ [430]
- ████████████████████████████████████████ █████ [431]

---

[425] CYTEK_0000115974.

[426] ████████████████████████████████████ ████████████ (Deposition of Wenbin Jiang, Ph.D., November 26, 2025, p. 321).

[427] Exhibit 30.2; I note that this is a conservative measure of gross margin, ████████████████████████ ████████████████████████████████" (CYTEK_0000139886).

[428] Deposition of Al Hernandez, October 8, 2025, pp. 11-13.

[429] CYTEK_0000448293.

[430] CYTEK_0000109394 at 397.

[431] CYTEK_0000208404; ████████████████████████ ████████████████

███████████████████████████████████████████████████

### c. The Market Approach

531.    The Market Approach values assets based on comparable transactions between unrelated parties. "The Market Approach to valuing intangible assets is the process by which a market value estimate is derived by analyzing similar intangible assets that have recently been sold or licensed and then comparing those intangible assets to the subject intangible asset."[1066] When considering the Market Approach, an examination of the terms of transfer for similar technology is undertaken and inferences are drawn from those observations to identify terms the parties might have agreed to at the time of the hypothetical negotiation.

532.

533.    Cytek's CEO and Chairman of the Board, Dr. Jiang, ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████.[1071]

---

[1066] Reilly, Robert F. and Schweihs, Robert P., Valuing Intangible Assets, 1999, pp. 157-158.

[1067] Deposition of Patricia del Castillo, October 24, 2025, p. 7.

[1068] Deposition of Patricia del Castillo, October 24, 2025, pp. 56-57.

[1069] Redacted Deposition of Mario Koksch, November 7, 2025, pp. 8, 35-36.

[1070] Redacted Deposition of Mario Koksch, November 7, 2025, pp. 80, 84, 263-264.

[1071] Deposition of Wenbin Jiang, Ph.D., November 26, 2025, pp. 15, 321-322.

███████████████████████████████████████████████

534.    Under the Market Approach, I have analyzed the documents discussed below, including a ████████████████████████████████████████████████ discussed by Dr. Jiang ███████████████████████████████████████████ ████████████████████████████████████████████.

        *i.*    ██████████████████████

535.    I reviewed a document titled, ███████████████████████████████ ███████████████████████████████[1072] ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████[1073]

536.    ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████[1074] I note, in the interest of completeness under my analysis of the Market Approach, that ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████[1075]

537.    Because this document references ████████████████████████ ████████████ I reviewed ███████████████████████████████ ████████████████████████████████████[1076] ██████████████ ████████████████████████████████████████████████

---

[1072] CYTEK_0000115286 at 286.
[1073] CYTEK_0000115286 at 289.
[1074] CYTEK_0000115286 at 294.
[1075] CYTEK_0000115286 at 294.
[1076] CYTEK_0000115286 at 294, 476.

███████████████████████████████████████████████████

*iv.* ████████████████████████████████████

544. ████████████████████████████████████████████████

█████████████████████████████[1098] The agreement settled ongoing litigation between the parties, in which BD accused Cytek and a number of its former employees of trade secret misappropriation and breach of contract.[1099] █████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████"[1100] ████████████████████████████████

██████.[1101] The parties also agreed to dismiss the pending litigation (without either party admitting liability in the matter).[1102] ████████████████████████

████████████████████.[1103] ████████████████████████.[1104]

545. The Licensed Products ██████████████████████████████[1105] ████

████████████████████████████████████████████████████

████████.[1106]

---



[1098] CYTEK_0000020561 at 561.

[1099] CYTEK_0000020561 at 561; Complaint in *Becton, Dickinson and Company v. Cytek Biosciences Inc., Ming Yan, Alfred Riley, David Vrane, Stephen Zhang, Zhenxiang Gong, Alex Zhong, Marina Jaimes, Gil Reinn, and Janelle Shook (Case 3:18-cv-00933-SK)*, pp. 23-35; Deposition of Wenbin Jiang, Ph.D., November 26, 2025, pp. 271-272.

[1100] CYTEK_0000020561 at 569.████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████ See CYTEK_0000020561 at 563.████████████████████████████████

████████████████████████" See CYTEK_0000020561 at 563.

[1101] CYTEK_0000020561 at 569.

[1102] CYTEK_0000020561 at 565, 576. See, also, Deposition of Wenbin Jiang, Ph.D., November 26, 2025, pp. 272-273.

[1103] CYTEK_0000020561 at 570.

[1104] CYTEK_0000020561 at 565-566.

[1105] CYTEK_0000020561 at 563, 569.

[1106] Discussions with Drs. Houston and Schaafsma.

██████████████████████████████████████████████

546.    The agreement defines ███████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████[1107]

547.    In consideration for the above license grant, releases, covenant not to sue, and litigation dismissal, ██████████████████████████████████████

███████████████████████████.[1108] Cytek agreed ████████████████████████

██████████████████████, which are defined to include the ███████████████████

████████████████████████████████████████████.[1109] ████████████

██████████████████████████████████████████████

█████████████[1110] ████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████[1111] The parties agreed that

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████ that was alleged in the litigation proceeding.[1112]

548.    Cytek also agreed ███████████████████████████████████

██████████████████████████████████████████████

---

[1107] CYTEK_0000020561 at 563; Deposition of Wenbin Jiang, Ph.D., November 26, 2025, p. 273.

[1108] CYTEK_0000020561 at 566.

[1109] CYTEK_0000020561 at 563, 566. See, also, Deposition of Wenbin Jiang, Ph.D., November 26, 2025, pp. 273-274.

[1110] CYTEK_0000020561 at 566.

[1111] CYTEK_0000020561 at 567.

[1112] CYTEK_0000020561 at 566-567. █████████████████████████████████

██████████████████████████████████████ (Deposition of Wenbin Jiang, Ph.D., November 26, 2025, pp. 273-274).



.[1113] In addition, on the effective date,



.[1114]

549.    There are certain similarities concerning the terms of the BD and Cytek Settlement Agreement and those of the hypothetical license, as noted below:

-

-

-

550.    There are certain differences concerning the terms of the BD and Cytek Settlement Agreement and those of the hypothetical license, as noted below:

-

---

[1113] CYTEK_0000020561 at 566.

[1114] CYTEK_0000020561 at 577; Deposition of Wenbin Jiang, Ph.D., November 26, 2025, pp. 273-274.

[1115] CYTEK_0000020561 at 569.

[1116] ███████████████████████████████████████

[1117] CYTEK_0000020561 at 561; Complaint in *Becton, Dickinson and Company v. Cytek Biosciences Inc., Ming Yan, Alfred Riley, David Vrane, Stephen Zhang, Zhenxiang Gong, Alex Zhong, Marina Jaimes, Gil Reinn, and Janelle Shook (Case 3:18-cv-00933-SK)*, pp. 23-35.



551. Another important difference between the BD and Cytek Settlement Agreement and the hypothetically negotiated license is that ██████████████████████████

██████████████████████████████████████████

███████████████████████████

552. ██████████████████████████████████████████



---

1118 CYTEK_0000020561 at 561.

1119 CYTEK_0000020561 at 567.

1120 CYTEK_0000154619 at 758.

1121 ████████████████████████████████████████
(CYTEK_0000426043). ███████████████████████



553. ██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████ [1122] ████████████████████████

████████████████████████████████████████████ [1123]

554. ██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████ [1124] ██████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████. [1125]

555. <mark>I understand from Dr. Houston that the Asserted Patents have comparatively more technological value than the patents covered by the BD and Cytek Settlement Agreement.</mark>[1126]

556. Therefore, the effective royalty rate actually to be paid by Cytek under the terms of the BD and Cytek Settlement Agreement was ██████ ███████████████████████████

███████. [1127] █████████████████████ reflects the royalties Cytek paid on the royalty-bearing sales made during the remaining lives of the patents licensed to Cytek from BD.

*v.* ████████████████████

██ ██████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████-██████████████████████████████████████

██████████████████████████████████████████████████

---

[1122] CYTEK_0000426043 at 075.
[1123] CYTEK_0000426043 at 075.
[1124] CYTEK_0000514743 at 744.
[1125] CYTEK_0000514743 at 748.
[1126] Discussion with Dr. Houston.
[1127] Effective royalty rate of ███████████████████████████████████
[1128] BEC-CYTEK-00041387 at 387, 400.

██

████████████████████████████████████████████████████

### *viii.    Market Approach Conclusion*

574. The most relevant agreement to the hypothetical negotiation that I considered under the Market Approach is ████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████ The settlement agreement between BD and Cytek licenses patents that relate to flow cytometry, and it is a patent license to which Cytek is a party. However, this agreement was entered into in settlement of litigation (which would require a significant upward adjustment to the ██ running royalty). Further, as I discussed in my analysis of the agreement above, the effective royalty rate is actually ████████████████████

██████████████████████████

575. Therefore, the Market Approach yields a royalty rate indicator in the range of ██████████ of Accused Product sales.

### d. The Georgia-Pacific Factors

576. In the well-recognized *Georgia-Pacific* case, the court set forth certain factors to be considered when determining a reasonable royalty.[1179] These factors, commonly referred to as the *Georgia-Pacific* factors, are guidelines for evaluating the likely actions of the parties in a hypothetical negotiation. Based on the facts and circumstances of any case, the factors are not necessarily given equal weight, nor are the factors all-inclusive. Rather, the *Georgia-Pacific* factors are part of the overall analysis to determine reasonable royalty damages. Many courts, including the Court of Appeals for the Federal Circuit, have considered the *Georgia-Pacific* factors when determining a reasonable royalty rate under the construct of a hypothetical negotiation.

577. BEC and Cytek would enter into a discussion of the *Georgia-Pacific* factors after determining the negotiating reference range for the royalty rate through consideration of the income,

---

[1179] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), mod. and aff'd, 446 F.2d 295 (2d Cir. 1971), *cert. denied*, 404 U.S. 870 (1971).

████████████████████████████████████████

with this royalty obligation, Cytek would maintain a significant pricing advantage relative to most competitors in the ultra-high parameter segment.

## IX.   DAMAGES CONCLUSIONS

693.   If the Court determines that Defendant is liable for infringing the Asserted Patents, then Cytek owes Beckman Coulter reasonable royalty damages of at least ████████ and lost profits damages of ████████████████████████████████, assuming damages begin on October 17, 2021.[1363] Alternatively, if the Court determines that Defendant is not liable for lost profits damages, Cytek owes Beckman Coulter reasonable royalty damages of at least $███████████████████████████, totaling ████████ assuming damages begin on October 17, 2021.[1364]

## X.   PREJUDGMENT INTEREST

694.   I understand that upon a finding of infringement by Defendant, Plaintiff may be entitled to collect prejudgment interest on its damages. If asked to do so, I will calculate prejudgment interest consistent with this Court's practices.

_____

Michele M. Riley
December 19, 2025

---

[1363] Exhibits 1, 1.1, 2 and 8.
[1364] Exhibit 1.1.

# EXHIBIT 2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BECKMAN COULTER, INC., | ) |
| Plaintiff, | ) |
| v. | ) C.A. No. 24-0945-CFC-EGT |
| CYTEK BIOSCIENCES, INC., | ) |
| Defendant. | ) |

**OPENING EXPERT REPORT OF DR. DAVID SCHAAFSMA, PHD
REGARDING INFRINGEMENT OF U.S. PATENT NOS. 10,330,582, 11,703,443, AND
12,174,107**

December 19, 2025

Dr. David Schaafsma





# EXHIBIT 3



**Planet Depos**
*We Make It Happen*™

# Transcript of Bing Shan, Corporate Designee & Individually

**Date:** October 24, 2025
**Case:** Beckman Coulter, Inc. -v- Cytek Biosciences

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**



**65**

on the front side of the block right, in the real product?

A. You mean I know this structure? Right.

Q. I'm just trying to make sure it's clear that there's a part missing from this view; right?

A. It's missing? Can you remind me which part is missing?

MR. CHEN: Objection. Calls for a legal conclusion. Foundation.

THE WITNESS: Yeah, I would suggest you not use "mirror" here.

BY MR. McGUFFIN:

Q. Okay.

Q. Okay. But there is --

**66**

A. Components, yeah.

Q.

MR. CHEN: Objection. Foundation.

BY MR. McGUFFIN:

MR. CHEN: Objection. Foundation.

BY MR. McGUFFIN:

Q. Okay. So if you can turn to the last page, I want to talk through quickly the components that are shown.

I'm going to start in the lower-left corner.

A. The last page. Okay.

**67**

Q. Yeah, the last page. Starting in the lower-left corner.

MR. CHEN: Objection. Form.

THE WITNESS: Yeah.

BY MR. McGUFFIN:

Q.

MR. CHEN: Objection. Calls for a legal conclusion.

**68**

BY MR. McGUFFIN:

MR. CHEN: Objection. Misstates testimony.

BY MR. McGUFFIN:

MR. CHEN: Objection. Calls for a legal conclusion.

BY MR. McGUFFIN:

Q. Okay.



**Page 69**

A.

Q. Before we get to that, I do want to ask -- the optical fiber is an extended light source; right?

MR. CHEN: Objection. Foundation.

THE WITNESS: What do you mean "extended light source"?

BY MR. McGUFFIN:

Q. Are you familiar with the term "extended light source"?

A. Can you define that?

Q. Well, I'm asking if you're familiar with the term.

A. I don't use this word.

Q. So you don't know what the term "extended light source" means?

A. I don't know the exact word. Maybe we use different term.

**Page 70**

Q. I'm move on. If you don't understand the term, it's not important.

**Page 71**

MR. CHEN: Objection. Calls for a legal conclusion.

BY MR. McGUFFIN:

Q. So you're familiar with the term "dichroic filter"; right?

A. Dichroic, we use a lot on the mirrors. It's different from -- from band-pass filter.

Q. Okay. But are you familiar with the term "dichroic filter"?

A. Dichroic mirror, I familiar with. Dichroic

**Page 72**

filter, I think I rarely use that as -- yeah, as a -- as a technical term.

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BECKMAN COULTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 24-945 (CFC) |
| | ) | (EGT) |
| CYTEK BIOSCIENCES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPENING INVALIDITY EXPERT REPORT OF FEDOR A. ILKOV, PH.D.

Dated: __12/19/2025__                  Respectfully submitted,

_____
Fedor A. Ilkov, Ph.D.

element, such as a lens, mirror or grating, to render rays of light more nearly parallel; a collimator." (D.I. 114, Joint Claim Construction Brief at 74.) Plaintiff also suggests in the alternative that, if "collimating optical element" is construed as a "means-plus-function" term, that its function is to "(1) receive light from a light source; (2) project a collimated beam including a first image." (*Id.*) Plaintiff states that a "lens" or structural equivalents may qualify as a "collimating optical element" under this alternate construction. (*Id.*) In my opinion, Oostman's collimating lens, implemented in Lemoff's WDM, is a "**collimating optical element**" under either interpretation of the term.

231. Oostman's collimating lens added into Lemoff's zig-zag WDM also "**projects a collimated beam**" under the Court's plain and ordinary meaning construction of this term. While my opinion is that the term "collimated beam" is indefinite, in the alternative, a POSA would have understood that a beam wherein all rays of light originating from a point on the source are projected parallel with each other and those rays within the beam are neither converging (i.e., a focused beam) or diverging would satisfy the "**collimated beam**" limitation, which a POSA would have expected to project from Oostman's collimating lens when positioned at a focal length away from the output end of Lemoff's optical fiber **42**. I understand that Plaintiff has proposed that the plain and ordinary meaning of this term means "a beam with nearly parallel rays." In my opinion, the beam projected by Oostman's

149

==highlight== collimating lens equally satisfies Plaintiff's proposed construction as well.

>       iii.    **Claim 1[b]: "an optical relay element arranged to receive at least a portion of the collimated beam from the collimating optical element,"**

232. The combination of Oostman and Lemoff discloses and/or renders obvious Claim 1[b] for the same reasons I provided for Claim 1[b] in Ground 1, fully incorporated here.

>       iv.    **Claim 1[c]: "the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a first image;"**

233. The combination of Oostman and Lemoff discloses and/or renders obvious Claim 1[c] for the same reasons I provided for Claim 1[c] in Ground 1, fully incorporated here.

>       v.    **Claim 1[d]: "a first focusing optical element arranged to receive at least a portion of the collimated beam reflected by the optical relay element; and"**

234. The combination of Oostman and Lemoff discloses and/or renders obvious Claim 1[d] for the same reasons I provided for Claim 1[d] in Ground 1, fully incorporated here.

>       vi.    **Claim 1[e]: "a first semiconductor detector,"**

235. The combination of Lemoff and Frazier discloses and/or renders obvious Claim 1[e]. Whereas Lemoff generally teaches that each of "an array of lenses **50**, **52**, **54**, and **56** is coupled to the output end **46** of the MOB **14** to direct

150

# EXHIBIT 5



## Planet Depos®
We Make It *Happen*™



# Transcript of Fedor Ilkov, Ph.D.

**Date:** February 24, 2026
**Case:** Beckman Coulter, Inc. -v- Cytek Biosciences

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Fedor Ilkov, Ph.D.
Conducted on February 24, 2026

165

document speaks for itself.

THE WITNESS: I do.

BY MR. KHAN:

Q. Okay. In your patent which recites a collimating lens, there's no indication of any divergence or convergence angle; correct?

MR. PIVOVAR: Objection to form. Lacks foundation. Mischaracterizes the document.

THE WITNESS: It implies collimating lens -- collimating light, yes.

BY MR. KHAN:

Q. So in your patent, collimating -- the collimating lens is recited in order to collimate the light; correct?

**A. That's correct.**

Q. And in your patent, it recites the collimating lens to collimate the light. The patent does not specify any convergence or divergence angle; correct?

MR. PIVOVAR: Objection to form. Lacks foundation. Calls for speculation.

THE WITNESS: Reading my patent, POSA would understand that this lens would create light with parallel beams. That's correct.

///

166

BY MR. KHAN:

Q. Okay. And --

**A. Not diverging or converging.**

Q. And so "collimating" by itself means not diverging or converging; correct?

MR. PIVOVAR: Objection to form.

THE WITNESS: That's general understanding. That's how I think POSA would interpret it, the word "collimating" and word "collimating lens" produces.

BY MR. KHAN:

Q. Okay. And the word "collimating" by itself does not mean just narrowing the spatial cross section of a light beam; correct?

MR. PIVOVAR: Objection to form. Vague. Incomplete hypothetical.

THE WITNESS: That's correct.

BY MR. KHAN:

Q. Okay. And collimating by itself does not mean reducing the divergence by the light from a common -- well, stop that. Let me just make my question clear. Sorry.

The word "collimating" by itself does not mean reducing the divergence by the light; correct?

MR. PIVOVAR: Objection to form. Vague. Incomplete hypothetical to the extent it calls for a

167

legal conclusion.

THE WITNESS: In understanding of POSA, if the light emanating from the source that collimating or -- of this light achieved with collimating lens will render the rays in this light parallel each other.

If source has a diverging light, then it renders in parallel each other.

BY MR. KHAN:

Q. So the -- I guess my question was a little bit different. So let me try -- let me see if I can rephrase slightly. Strike that.

The term "collimate" by itself, in your view, does not mean just reducing the divergence by the light; correct?

MR. PIVOVAR: Objection. Asked and answered. Vague. Incomplete hypothetical. Calls for a legal conclusion.

THE WITNESS: It's not just mean that. Among other things, it depends in the situation and specific.

BY MR. KHAN:

Q. So, in your view, the word "collimate" by itself can mean reducing divergence by the light?

MR. PIVOVAR: Objection. Mischaracterizes

168

testimony. Asked and answered. Incomplete hypothetical. Calls for a legal conclusion.

THE WITNESS: Collimation in POSA view, without specifying and limiting anything else, would understood as a parallel -- parallel rays.

And parallel rays usually apply zero divergence or zero angle between these rays.

BY MR. KHAN:

Q. Okay. So the term "collimated" by itself does not mean merely reducing divergence by the light; correct?

MR. PIVOVAR: Objection. Asked and answered several times. Lacks foundation. Incomplete hypothetical. And calls for a legal conclusion.

THE WITNESS: Reducing divergence of light could be achieved and done by quite a few different ways or approaches.

Collimation has, in optics, very specific meaning which renders the rays parallel with -- if someone for some application they wanted to use this term a little bit wider range, they could specify limits within which this terminology used.

Without that limit specifying, it's indefinite or understood as parallel rays.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BECKMAN COULTER, INC.,                )
                                      )
        Plaintiff,                    )
                                      )
            v.                        )        C. A. No.  24-0945-CFC
                                      )
CYTEK BIOSCIENCES, INC.,              )
                                      )
        Defendant.                    )
                                      )

**CYTEK'S REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* NO. 3 TO EXCLUDE EVIDENCE, TESTIMONY, AND ARGUMENT RELATING TO THE COURT'S COMMENTARY REGARDING CLAIM CONSTRUCTION**

BEC agrees that Cytek's MIL 3 should be granted. Any evidence, testimony, and argument relating to the Court's commentary on claim construction from the *Markman* hearings and the Feb. 24, 2026 Order should thus be excluded.

The remainder of BEC's opposition is an improper attempt to effectively submit a fourth MIL to preclude Cytek's experts from opining on why a claim's scope is not reasonably certain despite the "plain and ordinary meaning" of a claim term, in an attempt to seek summary judgment on Cytek's indefiniteness defenses in the guise of a MIL. This is improper. (D.I. 25, ¶ 23 (limiting each party to 3 MILs).) *E.g.*, *Sonos, Inc. v. D&M Holdings Inc.*, C.A. No. 14-1330-WCB, 2017 WL 5633204, at *2 (D. Del. Nov. 21, 2017) (declining to address MIL because it "was seeking a dispositive ruling on a substantive issue in the case"). A jury can consider expert testimony on a term's plain and ordinary meaning. *E.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc) (expert testimony relevant).

As already explained in, Court commentary such as the "reject[ion]" of certain arguments (Opp., 1) is prejudicial, confusing, and routinely excluded. However, if the Court is inclined to allow BEC to point to this, Cytek should likewise be allowed to point to the Court's "serious concerns" about the indefiniteness of the terms "collimate," "collimating," and "collimated beam," and similar commentary regarding "image." (Ex. 1, 133:11-15; Ex. 2, 205:22-206:6.)

1

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Reuben H. Chen
Alexandra Leeper
Juan Pablo González
HanByul Chang
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

Elizabeth M. Flanagan
COOLEY LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402

Adam Pivovar
Dustin M. Knight
David Yun
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 842-7800

Dated: July 15, 2026

/s/ Jeremy A. Tigan
Karen Jacobs (#2881)
Jeremy A. Tigan (#5239)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
kjacobs@morrisnichols.com
jtigan@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Defendant*
*Cytek Biosciences, Inc.*

2