# EXHIBIT A

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/016,296 | 06/02/2026 | 11703443 | BECC.P0017US.RE | 1044 |

129381 7590 08/28/2026
NORTON ROSE FULBRIGHT US LLP - BCI
98 San Jacinto Blvd., Suite 1100
Austin, TX 78701

| EXAMINER |
|---|
| ESCALANTE, OVIDIO |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 08/28/2026 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

COOLEY IP LITIGATION
ATTN: IP Docketing Department
1299 Pennsylvania Avenue, NW
Suite 700
Washington, District of Columbia 20004

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/016,296* .

PATENT UNDER REEXAMINATION *11703443* .

ART UNIT *3992* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| ***Order Granting Request For Ex Parte Reexamination*** | **Control No.**<br>90/016,296 | **Patent Under Reexamination**<br>11703443 | |
|---|---|---|---|
| | **Examiner**<br>OVIDIO ESCALANTE | **Art Unit**<br>3992 | **AIA (FITF) Status**<br>No |

***--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--***

The request for *ex parte* reexamination filed 06/02/2026 has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐ PTO-892, b)☑ PTO/SB/08, c)☐ Other: ____

1. ☑ The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional): TWO MONTHS from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

cc:Requester ( if third party requester )

## ORDER GRANTING EX PARTE REEXAMINATION

### I. Review of Facts

1. A request for *ex parte* reexamination of claims 1, 4, 6, 7, 9-11, 13 and 15 of U.S. Patent 11,703,443 issued to Chen on July 18, 2023 (hereinafter the ‘443 patent) was filed on June 2, 2026, and assigned control number 90/016,296 (“the ‘296 Request”).

2. On June 4, 2026, the Office mailed a “Notice of Assignment of Reexamination Request” indicating the ‘296 Request was granted a filing date.

3. On June 15, 2026, the Patent Owner filed a Pre-Order paper with respect to the SNQ determination.

### II. Pertinent History of the ‘443 Patent.

4. The ‘443 patent was filed as U.S. Patent application No. 17/980,669 (the ‘669 application) on November 4, 2022.

5. The ‘443 Patent is a continuation of U.S. patent application Ser. No. 17/645,727 filed on Dec. 22, 2021, which is a continuation of U.S. patent application Ser. No. 15/638,477 filed on Jun. 30, 2017 and issued as U.S. Pat. No. 11,255,772, which is a divisional application of U.S. patent application Ser. No. 14/455,102 filed Nov. 26, 2014, and issued as U.S. Pat. No. 9,746,412, which claims the benefit of priority of U.S. Provisional Patent Application Ser. No. 61/911,859 filed on Dec. 4, 2013.

U.S. patent application Ser. No. 14/555,102 is also a continuation-in-part of International Patent Application Serial No. PCT/US2013/043453 filed on May 30, 2013, which claims the benefit of priority under 35 U.S.C. 119 to U.S. Provisional Patent Application Ser. No. 61/653,245 filed on May 30, 2012, U.S. Provisional Patent Application Ser. No. 61/653,328 filed on May 30, 2012, U.S. Provisional Patent Application Ser. No. 61/715,819 filed on Oct. 18, 2012, U.S. Provisional Patent Application Ser. No. 61/715,836 filed on Oct. 19, 2012, and U.S. Provisional Patent Application Ser. No. 61/816,819 filed on Apr. 29, 2013.

6. On March 27, 2023, during the prosecution of the ‘669 application, the Examiner issued a first action notice of allowance. As set forth therein, an Examiner’s Amendment was entered which amended claim 1 by specifying that the multiplexer is “for a flow cytometer”. In addition, the Examiner provided the following reasons for allowance:

The “prior art fail to disclose or suggest:

Claim 1:

> A wavelength division multiplexer (WDM) for a flow cytometer comprising: receive one or more portions of the light from the set of filters; and reflect the one or more portions of the light to the set of filters; and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector.

Claim 18:

> A flow cytometer comprising: at least one mirror including at least one curved mirror, the at least one mirror configured to: receive one or more portions of the light from the set of filters; and reflect the one or more portions of the light to the set of filters; and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector; and one or more optical fibers, each optical fiber configured to receive light from the optical element and provide the light to a WDM of the one or more WDMs.”

**IPR2025-01319**

On July 17, 2025, a petition for *inter partes* review of U.S. Patent No. 11,703,443 was filed by Cytek Biosciences, Inc. The Petitioner requested institution based on Goodman and Oostman for claims 1-4, 6, 7, 9-11, 13, and 15-18.

On November 20, 2025, the PTAB discretionarily denied the petition.

**III. The '443 Patent**

7. The '443 Patent is directed to the technical field of flow cytometry and, more particularly, to the structure and operation of an improved flow cytometer together with various individual subassemblies included therein.

8. Independent **claims 1 and 15** of the '443 patent are repeated below:

> 1. A wavelength division multiplexer (WDM) for a flow cytometer comprising: a set of filters, each filter of the set of filters configured to pass a corresponding portion of multiple portions of light; at least one mirror including at least one curved mirror, the at least one mirror configured to: receive one or more portions of the light from the set of filters; and reflect the one or more portions of the light to the set of filters; and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector.

> 18. A flow cytometer comprising: one or more light sources; a flow cell including a flow channel configured to enable passage of a particle; an optical element configured to detect scattered light emitted by the particle in the flow channel and illuminated by the one or more light sources; one or more wavelength division multiplexers (WDMs), wherein at least one WDM of the one or more WDMs includes: a set of filters, each filter of the set of filters configured to pass a corresponding portion of multiple portions of light; at least one mirror including at least one curved mirror, the at least one mirror configured to: receive one or more portions of the light from the set of filters; and reflect the one or more portions of the light to the set of filters; and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector; and one or more optical fibers, each optical fiber configured to receive light from the optical element and provide the light to a WDM of the one or more WDMs.

**IV. Determination of the '296 Request**

9. Claims 1, 4, 6, 7, 9-11, 13 and 15 of the '443 patent will be the basis for deciding whether or not a "substantial new question of patentability" (SNQ) is present. See 37 CFR 1.620(a).

**V. Criteria for the '296 Request Determination**

10. Whether a substantial new question of patentability (SNQ) affecting any of claims 1, 4, 6, 7, 9-11, 13 and 15 of the '443 patent is raised by the prior art references presented in the '296 Request. See 35 U.S.C. 257(a), MPEP §2242.

**VI. Prior Art References**

11. The '296 Request requests *ex parte* reexamination in view of the following cited prior art references, submitted with the '296 Request and recited below:

1) Oostman et al. U.S. Patent 6,683,314
2) Lemoff et al. U.S. Patent No. 6,198,864
3) Sorin et al. U.S. Patent Pub. 2014/0219606
4) Goodman U.S. Patent 6,542,306
5) Chen U.S. Patent Pub. 2015/0115174

**VI.A. Information Disclosure Statement**

12. With respect to the Information Disclosure Statement submitted on May 15, 2026, along with the Request for Reexamination, the information cited has been considered as described in the MPEP. Note that MPEP 2256 indicates that degree of consideration to be given to such information will be normally limited by the degree to which the party filing the information citation has explained the content and relevance of the information. The Examiner notes that information which has not been dated as required by 37 CFR 1.98 has been crossed out.

**VII. Prior Art Analysis**

13. SNQ standard as set forth in MPEP 2242:

For "a substantial new question of patentability" to be present, it is only necessary that: (A) the prior art patents and/or printed publications raise a substantial question of patentability regarding at least one claim, i.e., the teaching of the (prior art) patents and printed publications is such that a reasonable examiner would consider the teaching to be important in deciding whether or not the claim is patentable; and (B) the same question of patentability as to the claim has not been decided by the Office in an earlier concluded examination or review of the patent, raised to or by the Office in a pending reexamination or supplemental examination of the patent, or decided in a final holding of invalidity (after all appeals) by a

federal court in a decision on the merits involving the claim. If a reexamination proceeding was terminated/vacated without resolving the substantial question of patentability question, it can be re-presented in a new reexamination request. It is not necessary that a *"prima facie"* case of unpatentability exist as to the claim in order for "a substantial new question of patentability" to be present as to the claim. Thus, "a substantial new question of patentability" as to a patent claim could be present even if the examiner would not necessarily reject the claim as either fully anticipated by, or obvious in view of, the prior art patents or printed publications.

In addition, as set forth in MPEP 2216, "[t]he legal standard for ordering *ex parte* reexamination, as set forth in 35 U.S.C. 303(a), requires a substantial new question of patentability. The substantial new question of patentability may be based on art previously considered by the Office if the reference is presented in a new light or a different way that escaped review during earlier examination."

The Examiner finds that both Goodman and Oostman were cited during the prosecution of the '443 patent. However, neither Goodman nor Oostman were specifically addressed by the examiner. It is acknowledged that Oostman was discussed during the prosecution of US Patent 8,746,412 (great-grandparent patent of the instant patent). The Examiner finds that although Oostman and Goodman are "old art," the presentation of Goodman and Oostman with additional references or in combination that teach the limitations which were determined to be important during the original prosecution of the underlying patent presents Oostman and Goodman in a new light and materially different way than previously considered by the Office as set forth below.

**VIII. Prior Art References Raising a Substantial Question of Patentability**

As identified above during the examination of the underlying patent application, the teachings directed to at least "a wavelength division multiplexer (WDM) for a flow cytometer comprising: receive one or more portions of the light from the set of filters; and reflect the one or more portions of the light to the set of filters; and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter

corresponding to the detector" as recited in claim 1 or "a flow cytometer comprising: at least one mirror including at least one curved mirror, the at least one mirror configured to: receive one or more portions of the light from the set of filters; and reflect the one or more portions of the light to the set of filters; and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector; and one or more optical fibers, each optical fiber configured to receive light from the optical element and provide the light to a WDM of the one or more WDMs" as recited in claim 18, will be the basis for determining whether the cited references raise a SNQ as to 1, 4, 6, 7, 9-11, 13 and 15 of the '443 patent.

**Patent Owner Pre-Order Paper**[1]

The Patent Owner, on June 15, 2026, filed a Patent Owner pre-order paper which maintained that every obviousness SNQ combines a flow cytometer reference (Oostman) with one of three optical communications references (Lemoff, Sorin, or Goodman) because Oostman does not disclose the claimed WDM mirror-and-filter arrangement requiring optical communication art to fill that gap. The Patent Owner states that the Office already considered and resolved this precise question-whether a flow cytometer reference could be combined with art from optical communications to satisfy claimed WDM limitations.

The Examiner finds that a review of the prosecution history of the US Patent 8,746,412 ("the '412 patent") (great-grandparent of the underlying '443 patent) shows that the Examiner stated "Capewell suggests minimizing the size of the image to maximize the optical energy and tolerance to detect misalignment. However, there is no teaching to focus the light beam to **a size smaller than the object**." The Examiner finds that this statement is based on the claimed limitation which recited "a first focusing

[1] On July 21, 2026, the Office mailed a decision expunging the papers filed June 30, 2026 by Third Party from the record. The Papers pertained to requester's petition for leave and response to patent owner's pre-order paper providing information, useful in making the SNQ determination".

optical element configured to focus the first light beam to a size smaller than the object of the extended light source to a first semiconductor detector".

In addition, the Applicant during the prosecution of the '412 patent specifically argued that Oostman and Capewell discuss different kinds of optical system with different sizes of light sources and the Office Action fails to address how to modify a focusing element in fluorescence detection instrument with a focusing element in an optical communication system to focus a beam to a size smaller than the object of the extended light source to a first semiconductor detector, as claimed.

Thus, the Examiner finds that the question was not whether a flow cytometer reference could be combined with art from optical communication but rather whether the prior art disclosed focusing a light beam to a size smaller than the object ("a first focusing optical element configured to focus the first light beam to a size smaller than the object of the extended light source to a first semiconductor detector").

It is noted that this limitation is not set forth in any of the claims of the underlying '443 patent. Therefore, any question raised herein will not be based on the same question considered during the prosecution of the great-grandparent application (i.e. the '412 patent) since the limitations in the current claims are not based on the same limitations considered important to patentability in the '412 patent.

The Patent Owner states that in the '443 Patent's own prosecution the claims reciting a "flow cytometer" brought them outside of the reach of optical communications prior art. The Patent Owner states that the Office allowed claims subject to an Examiner's Amendment requiring clam 1 to recites "A wavelength division multiplexer (WDM) for a flow cytometer comprising…" The Patent Owner stated that the Office recognized that the prior art lacked a WDM for a flow cytometer and that motivation to combine with reference from outside fields was lacking.

The Examiner finds that record during the prosecution of the '443 Patent does not show that it determined that claims reciting a "flow cytometer" was outside the reach of optical communications prior art. The prosecution history shows that the examiner allowed the application for specific reasons as set forth above which focused on a plurality of different limitations which was not disclosed by the prior art.

The Patent Owner states that Oostman was similarly addressed during prosecution of related family member '582 Patent in which the Examiner raises a §102(b) and §103(a) claim rejection based on Oostman, further relying on US2005/0002425 to Govorkov to provide a concave mirror. The Patent Owner states that in the Notice of Allowance, the Examiner expressly noted the recitation of "an optical relay element, including a curved mirror, configured to reflect a portion of a collimated beam receive from a collimating optical element, as claimed in combination with the rest of the claim limitations, so as to improve structure an operation of a flow cytometer together with individual subassemblies."

The Examiner finds that during prosecution of the '582 Patent, the Applicant argued that the cited portions of Oostman fail to disclose "an optical relay element arranged to receive at least a portion of the collimated beam from the collimating optical element, the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a first image". The Applicant stated that the cited portions of Oostman '314 are silent with respect to the beam splitting elements 151 being a curved mirror and/or a concave-shaped dichromic filter. With respect to the combination of Oostman and Govorkov the Applicant states that "The Office has not shown that Govorkov would supply the deficiency of Heffelfinger or Oostman '314".

The Examiner finds that the issue pertained to a specific claim limitation and not a general argument regarding teachings related to 'concave mirror'.

It is noted that neither claim 1 nor claim 18 of the underlying patent claims recite "an optical relay element arranged to receive at least a portion of the collimated beam from the collimating optical element, the optical relay element comprising a curved mirror configured to reflect the portion of the collimated beam received from the collimating optical element to produce a first image".

The Patent Owner states that Cytek's substitution of Goodman, Lemoff, or Sorin for Capewell as the optical communication reference does not alter the question the Office already decided-whether a POSA would have implemented an optical communication technology in a flow cytometer.

The Examiner notes that as set forth above, the Office never decided whether a POSA would have implemented an optical communication technology in a flow cytometer. Rather the issue pertained to specific limitations. In addition, as set forth in MPEP 2242(I), an SNQ can be present even if a prior art rejection could not necessarily be made. Thus, comments regarding whether a POSA should have implemented an optical communication technology in a flow cytometer are not considered in establishing whether a substantial new question of patentability exists.

The Patent Owner states that based on Cytek's Request, Lemoff and Sorin contain the same architecture relied upon as Goodman and Cytek uses all three references interchangeably, advancing the same arguments for each. The Patent Owner argues that the proposed question of patentability is not "substantial". The Patent Owner states that a reasonable Examiner would not have considered Cytek's position important in assessing the patentability of the claims because it ignores the fundamental differences between optical communications and flow cytometry. The Patent Owner states that one fundamental difference between an optical communication system and the devices of Oostman is the intensity of light and detectors used to detect that light.

The Patent Owner further states that a second fundamental difference between optical communications and flow cytometry technology is how light propagates in the system. The Patent Owner states that optical communications systems, like Lemoff, Sorin, and Goodman detect intense light at narrow infrared wavelength ranges with light beams having a small diameter and in contrast, fluorescent detection system such as those disclosed in Oostman needed to detect a wide range of wavelengths of unknown and uncontrolled signal strength in the visible light spectrum.

The Patent Owner further states that a third fundamental difference is flow cytometers typically use optical fibers with much greater core diameters than those used in optical communications. Optical communication systems use fibers with core diameters ranging from less than 10 microns to around 50 to 62.5 microns.

The Examiner notes that the Patent Owner has not shown how the fundamental differences are reflected in the claims. For example, during prosecution of the ‘412 patent, the focusing of a light beam to a size smaller than the object of the extended light source was discussed and that the prior art (Capewell) did not disclose this feature. The Patent Owner noted that Lemoff, Sorin, and Goodman detect intense light at narrow infrared wavelength ranges with light beams having a small diameter. Furthermore, the issue with respect to obviousness is a separate issue with respect to determining whether the prior art raises a substantial new question of patentability. In addition, with respect to reference claim 1, the claim does not recite any limitation pertaining to “the intensity of light and detectors used to detect that light”, “light beams having a small diameter” or the use of “fibers with core diameters ranging from less than 10 microns to around 50 to 62.5 microns”.

Thus, any differences are not commensurate with at least claim 1.

The Patent Owner states that Cytek’s Request should also be denied because it raises the same question rejected on the merits in Cytek’s petition for post-grant review of the related ‘106 Patent. The Patent Owner acknowledges that the ‘106 (PGR2025-00084) and ‘443 Patents differ in certain limitations, but Cytek’s obviousness analysis are near-identical, and this prior “decision on the same or substantially identical prior art” already disposed of the arguments Cytek rehashes here.”

The Examiner notes that the Patent Owner acknowledges that the patent claims are not the same and therefore, it is determined that it cannot raise the same question raised in related ‘106 Patent. The Patent Owner has also not shown which specific question was raised and denied by the PTAB and that the same question is raised herein. The Examiner finds that the decision in PGR2025-00084 does not disclose which argument or limitation was found persuasive.

In addition, it is noted that Patent Owner’s 35 U.S.C. § 325(d) arguments in their Pre-Order Paper have not been considered in this Order because the SNQ Notice expressly states that “[t]he paper … should not address why the USPTO should exercise discretion under 35 U.S.C. 325(d) ….” 1545 O.G. at 217.

The Patent Owner on page 15 (Section IV.A) states that a POSA would not have looked at optical communication to solve problems in flow cytometry. In addition, the Patent Owner on page 18 of the submission (Section B) states that a Cyteck identifies no flow cytometry reference motivating a POSA to rely on optical communications art. In addition, the Patent Owner on page 21 of their submission (Section C) states that Cytek's Request offers no reason why a POSA would adopt a configuration that Oostman itself contemplated and rejected in favor of a "more compact" alternative, particularly when Cytek argues compactness is one of the key purported benefits of the combination."

The Examiner notes that in accordance with MPEP 2242, "For a substantial new question of patentability" to be present, it is only necessary that: (A) the prior art patents and/or printed publications raise a substantial question of patentability regarding at least one claim, i.e., the teaching of the (prior art) patents and printed publications is such that a reasonable examiner would consider the teaching to be important in deciding whether or not the claim is patentable; and (B) the same question of patentability as to the claim has not been decided by the Office in an earlier concluded examination or review of the patent, raised to or by the Office in a pending reexamination or supplemental examination of the patent, or decided in a final holding of invalidity (after all appeals) by a federal court in a decision on the merits involving the claim. If a reexamination proceeding was terminated/vacated without resolving the substantial question of patentability question, it can be re-presented in a new reexamination request. It is not necessary that a *"prima facie"* case of unpatentability exist as to the claim in order for "a substantial new question of patentability" to be present as to the claim. Thus, "a substantial new question of patentability" as to a patent claim could be present even if the examiner would not necessarily reject the claim as either fully anticipated by, or obvious in view of, the prior art patents or printed publications. As to the importance of the difference between "a substantial new question of patentability" and a *"prima facie"* case of unpatentability see generally *In re Etter*, 756 F.2d 852, 857 n.5, 225 USPQ 1, 4 n.5 (Fed. Cir. 1985).

Thus, the Examiner finds that although, the Patent Owner's comments regarding 'motivation' or 'obviousness' is noted, this is a separate issue with respect to the determination of a substantial new question of patentability.

The Patent Owner states that no reasonable examiner would consider Cytek's priority argument important in assessing the patentability of the claims and that the Examiner's in reexamination No. 90/0015,441 involving the related '582 Patent found, "[w]hen the claims are read as whole, the words of [the] claim themselves limit the 'curved mirror' to a 'concave mirror,' which is clearly supported" by the parent applications.

The Patent Owner states that a POSA reading the '443 Patent claims would understand that the recited "curved mirror" is a mirror with positive optical power to converge and relay the light in the WDM. The Patent Owner states that the scope of the "curved mirror" limitation in the claims can only be understood to refer to a concave mirror with positive optical power when read in the context of the full claim language and the specification. The Patent Owner states that claim 6 of the '442 Patent narrows in other ways via specifying that the filters in claim 1 are dichroic filters.

The Examiner notes that in reviewing PCT/US2013/043453, page 15, lines 18-25 states "[i]n one embodiment of WDM, the first optical element is a lens and the second element is a concave mirror, although it is apparent to those skill in the art that other types of refractive and/or reflective optical components may also be used to achieve the same design goal. Similar to its counterpart in optical communication, the optical path in the WDM of the present disclosure may be folded using dichroic filters." In addition, on page 16, lines 7-10, it is stated that "[i]nstead of concave mirrors, the WDM may be replaced by curved dichroic filters to further increase the number of colored bands selected by the WDM." In addition, page 44, lines 16-22 states "[i]nstead of using concave mirrors for relaying the beam of light reflected from the dichroic filters, one may also use refractive optics as relay element to extend the path of the collimated beam of light." The Examiner also acknowledged that on page 45, lines 25-30 it is disclosed that "[b]y replacing the concave relay imaging mirrors 907' and 910' in FIG. 27 with

concave shaped dichroic filters 907' and 910', the WDM depicted in FIG. 28 provides 2 more color bands in comparison with the WDMs depicted in FIGs. 25 and 27."

The Examiner finds that the specification contrasts 'concave mirrors' with "concave shaped dichroic filters". In these descriptions it is determined that both are 'curved', and both are different types of concave mirrors.

**SNQ 1 (Claims 1, 4, 6, 9, 10, 11, 13, and 15) – Oostman and Lemoff**

The Examiner notes that as explained above, during the original prosecution, the Examiner determined that for claim 1, the prior art did not disclose "A wavelength division multiplexer (WDM) for a flow cytometer comprising…receive one or more portions of the light from the set of filters; and reflect the one or more portions of the light to the set of filters; and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector."

With respect to this, the Examiner finds Oostman describes how its "preferred embodiment features a flow cytometer" that is "illustrative of instruments which employ fluorescence detection and color separation." (Oostman, 5:34-37)

Oostman's FIG. 4 depicts a flow cytometer setup comprising lasers 95, 97, 99, and 101 irradiating a target sample within fluidic system 105, where fluorescent and scattered light is collected by a light collector 111 and focused into optical fibers 123, 125, 127, and 129 to route to respective detector arrays 124, 126, 128, and 130 for color separation and detection. See also 2:66-3:35, 4:25-45.

Lemoff describes how its "demultiplexer includes a main optical block 14 (MOB), an input surface 38, an objective mirror 40, wavelength-specific dielectric interference filters 20, 22, 24 and 26 coupled to the MOB, and a series of relay mirrors 30, 32, and 36 integrated into the MOB to direct and focus light between the interference filters." (4:39 45); See also 5:53-54.

Lemoff explains that "[i]t is important to note that the relay mirrors [30, 32, 36] are concave mirrors, so that the non-collimated and diverging light beam is continuously refocused while propagating between adjacent filters[.]" (5:2-5). See also FIG 3.

Lemoff also discloses that its relay mirrors "receive one or more portions of the light" from the set of filters, teaching that "[t]he light beam portion 68 that is not transmitted through the first filter is reflected by the first filter for impingement upon a second filter 22 via the first internally reflective concave relay mirror 30." (4:59-62). See also 3:26-29; 5:53-54.

Lemoff describes how "an array of lenses 50, 52, 54, and 56 is coupled to the output end 46 of the MOB 14 to direct and focus the filtered light to the adjacent array of detectors 60, 62, 64, and 66[.]" (7:25-29). See also 4:57-59; 5:53-54.

The Examiner notes that the above citations, which addresses various teachings directed to at least "a wavelength division multiplexer (WDM) for a flow cytometer and one or more portions of the light from the set of filters, reflect the one or more portions of the light to the set of filters, and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector", were not previously set forth during the original prosecution of the underlying patent. In addition, no concluded review of this combination was previously set forth on the record.

Accordingly, a reasonable examiner would consider these teachings important in determining the patentability of claims 1, 4, 6, 9, 10, 11, 13, and 15. Accordingly, Oostman and Lemoff raise a Substantial New Question of Patentability.

**SNQ 2 (Claims 1, 4, 6, 9, 10, 11, 13, and 15) – Oostman and Sorin**

The Examiner notes that as explained above, during the original prosecution, the Examiner determined that for claim 1, the prior art did not disclose "A wavelength division multiplexer (WDM) for a flow cytometer comprising…receive one or more portions of the light from the set of filters; and reflect

the one or more portions of the light to the set of filters; and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector."

Oostman describes how its "preferred embodiment features a flow cytometer" that is "illustrative of instruments which employ fluorescence detection and color separation." (Oostman, 5:34-37)

Oostman's FIG. 4 depicts a flow cytometer setup comprising lasers 95, 97, 99, and 101 irradiating a target sample within fluidic system 105, where fluorescent and scattered light is collected by a light collector 111 and focused into optical fibers 123, 125, 127, and 129 to route to respective detector arrays 124, 126, 128, and 130 for color separation and detection. See also 2:66-3:35, 4:25-45.

Sorin discloses its selective mirrors 450, "may be wavelength selective, [a]s illustrated, selective mirrors 450 transmit a selected range of wavelengths/power and reflect a selected range." ([0043].)

Sorin describes how its splitter 430 includes "collimating mirrors 448." ( [0043].) Sorin explains that "[t]he collimating mirrors 448 are curved reflecting mirrors to re-collimate the beam as [it] travels through the splitter 430." See also FIG. 4

Sorin explains that "[s]plitter 430 may be a zigzag optical component receiving a signal from fiber 404." (Sorin, [0042].) Collimating mirrors 448 in Sorin's FIG. 4 embodiment facilitate that "zigzag optical" path, as they are "curved reflective mirrors to re-collimate the beam as [it] travels through the splitter 430." ( [0042]-[0043].)

Sorin describes in an example system where a "fiber" "may propagate the signal to a wavelength demultiplexer component 228 in communication with several detectors/receivers 206." ( [0031].) Sorin's FIG. 4 embodiment includes splitter 430 that "may be used for a WDM multiplexer/demultiplexer," and where "[f]iber 404 provides propagated signal 410 that is passed to lens 432, splitter 430, lens array 446, and receiver 406." ( [0041]-[0042].)

As shown in FIG. 4, selected ranges of wavelengths pass through selective mirrors 450, with the remainder of the beam reflecting to a collimating mirror 448. ( [0043].) The collimating mirror re-

collimates the incident light beam, which then propagates to the next selective mirror in the set. A second selected range of wavelengths passes through that selective mirror, with the rest of the beam reflecting to the next collimating mirror, and so on.

The Examiner notes that the above citations, which addresses various teachings directed to at least "a wavelength division multiplexer (WDM) for a flow cytometer and one or more portions of the light from the set of filters, reflect the one or more portions of the light to the set of filters, and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector", were not previously set forth during the original prosecution of the underlying patent. In addition, no concluded review of this combination was previously set forth on the record.

Accordingly, Oostman and Sorin raise a Substantial New Question of Patentability.

**SNQ 3 (Claims 1, 4, 6, 9, 10, 11, 13, and 15) – Oostman and Goodman**

This substantial new question of patentability is based on patents already cited in an earlier concluded examination or review of the patent being reexamined, or has been raised to or by the Office in a pending reexamination or supplemental examination of the patent. On November 2, 2002, Public Law 107-273 was enacted. Title III, Subtitle A, Section 13105, part (a) of the Act revised the reexamination statute by adding the following new last sentence to 35 U.S.C. 303(a) and 312(a):

"The existence of a substantial new question of patentability is not precluded by the fact that a patent or printed publication was previously cited by or to the Office or considered by the Office."

For any reexamination ordered on or after November 2, 2002, the effective date of the statutory revision, reliance on previously cited/considered art, i.e., "old art," does not necessarily preclude the existence of a substantial new question of patentability (SNQ) that is based exclusively on that old art. Rather, determinations on whether a SNQ exists in such an instance shall be based upon a fact-specific inquiry done on a case-by-case basis.

In the present instance, there exists a SNQ based on the combination of Oostman and Goodman. A discussion of the specifics now follows:

The Examiner notes that as explained above, during the original prosecution, the Examiner determined that for claim 1, the prior art did not disclose “A wavelength division multiplexer (WDM) for a flow cytometer comprising…receive one or more portions of the light from the set of filters; and reflect the one or more portions of the light to the set of filters; and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector.”

Oostman describes how its “preferred embodiment features a flow cytometer” that is “illustrative of instruments which employ fluorescence detection and color separation.” (Oostman, 5:34-37)

Oostman's FIG. 4 depicts a flow cytometer setup comprising lasers 95, 97, 99, and 101 irradiating a target sample within fluidic system 105, where fluorescent and scattered light is collected by a light collector 111 and focused into optical fibers 123, 125, 127, and 129 to route to respective detector arrays 124, 126, 128, and 130 for color separation and detection. See also 2:66-3:35, 4:25-45.

Goodman is directed to multichannel multiplexer/demultiplxer optical devices. See col. 1, lines 7-11. As set forth in col. 10, lines 17-30, Goodman discloses a reflective surface which comprises at least one collimating reflecting or at least one non-collimating reflector. Goodman explains that the reflectors can be converging lenses or mirrors, collimating lenses or mirrors, or simple reflecting surfaces. Goodman further discloses that the reflectors are preferably convex spherical surfaces designed to relay the image of the fiber facet down the optical train.

Goodman describes how its “demultiplexer device generally includes an optically transparent optical block seated atop an optically transparent beam directing member,” where the “optical block includes a plurality of relay reflectors[.]” (5:63-6:1; see also 4:35-40.) See also col. 10:19-23 (including mirrors as examples of reflectors).) Goodman also indicates that its reflectors comprise "at least one curved mirror." FIG. 1 depicts "a plurality of discrete reflectors 24a-24n that are positioned on top surface

21 of optical block 12 in a linear arrangement." (9:58-61.) These reflectors "can be converging lenses, or mirrors, collimating lenses or mirrors, or simple reflecting surfaces" and may be "preferably convex spherical surfaces designed to relay the image of the fiber facet down the optical train." (See 10:19 23.)

Each of Goodman's reflectors, "as part of an imaging relay system, directs the beam of optical energy from one wavelength selective filter to an adjacent wavelength selective filter." (4:53-58). See also 4:60-62.)

Goodman describes in FIG. 1, "reflectors 24a-24n are positioned opposite from wavelength selective elements 22a-22n such that each of the reflectors directs beam 19 from one wavelength selective element to an adjacent wavelength selective element." (9:61-65) Each of reflectors 24a, 24b, 24n in Goodman's FIG. 1 embodiment both receive a portion of beam 19 from the set of filters and reflect a portion of beam 19 to the set of filters.

Goodman describes that "selected wavelengths incident upon wavelength selective element 22a pass therethrough while the remainder are reflected or absorbed." (12:1-6.) The subsequent reflectors within reflectors 24a-24n perform the same dual operations relative to the set of wavelength selective elements 22a-22n (i.e., "receive one or more portions of the light" from one filter and "reflect the one or more portions of the light" to another filter). (See 12:4-15)

FIG. 1 shows an optical block 12 coupled to a beam-directing member 14 that is configured to direct and focus portions of light passing through the set of wavelength selective elements 22a-22n (i.e., filters) into a corresponding set of optical detectors. (11:8-11, 11:24-30, 11:40-44, 12:56-58.) Beam directing member 14 includes a set of focusing lenses 42 that receive the portions of the beam transmitted through wavelength selective elements 22a-22n.

In Goodman's optical block, a multi-wavelength optical beam is "relayed in a zigzag pattern onto the wavelength selective elements, which separate selected wavelengths from the beam." (4:59-63.) These "separate selected wavelengths" are each "a portion of the light that passed through the filter." The "separate selected wavelengths" are then "focused onto optical receptors," i.e., a "set of detectors," by focusing lenses 42 where "each detector of the set of detectors correspond[s] to a filter of the set of

filters" and receives a "portion of the light" transmitted through a filter. (See 4:63-65, 11:8-12, 11:24-30, 11:31-44, 12:23-32.)

The Examiner notes that the above citations, which addresses various teachings directed to at least “a wavelength division multiplexer (WDM) for a flow cytometer and one or more portions of the light from the set of filters, reflect the one or more portions of the light to the set of filters, and a set of detectors, each detector of the set of detectors corresponding to a filter of the set of filters and configured to receive a portion of the light at the detector that passed through the filter corresponding to the detector”, were not previously set forth during the original prosecution of the underlying patent. In addition, no concluded review of this combination was previously set forth on the record.

Accordingly, Oostman and Goodman raise a Substantial New Question of Patentability.

**SNQ 4 (Claims 1, 4, 6, 9, 10, 11, 13, and 15)[2] – Chen**

The Request states Chen Pub. ‘174 qualifies as prior art under AIA 35 USC. §102(a)(1) because the ‘443 patent is only entitled to claim priority to its own filing date of November 04, 2022.

The Request states that Claim 1 of the ‘443 patent recites “at least one mirror including at least one curved mirror,” but the written descriptions in ancestral application to the ‘443 patent, including the ‘412 patent and PCT App., do not support the recited limitation of a “curved mirror.” The Request states that prior disclosure tach a “concave mirror” that fails to indicate the inventor was in possession of a “curved mirror”. The Request also states that Claim 6 of the ‘443 patent recites that the curved mirror can be a concave mirror, indicating to a POSA that the “curved mirror” of Claim 1 must be broader than a “concave mirror,” even under a broadest reasonable interpretation (BRI).

[2] The Examiner has fully considered the Declaration of Fedor A. Ilkov. In addition, as to SNQ 4, the priority issue with respect to ‘curved mirror’ was discussed. See at least paragraphs 61-70 of the Declaration. The Examiner has reviewed this section as it pertains to the priority issue and Chen as an intervening reference.

The Request states that the written descriptions for the ‘106 patent, ‘772 patent, ‘412 patent, and the PCT App. only describe concave mirror in the wavelength division demultiplexer. The Request states that the term “curved mirror” is broader than “concave mirror”.

The Request states that broadly speaking, curved mirrors can be concave or convex depending on the mirror’s radius of curvature. The Request states that nowhere in the ‘106 patent, ‘772 patent, ‘412 patent, and the PCT App. do the written descriptions recite a “curved mirror” or convex mirrors.

The Request also noted that the Patent Owner made a passing comment that given the written descriptions’ s generalized disclosure that “other types of refractive and/or reflective optical components may also be used to achieve the same design goal,” ‘412 4:59-61. The Request states that such an argument, at best, suggest that it would be obvious to a POSA reading the specification to (unduly) experiment with curved mirrors that were not concave.

The Examiner first determines that a concave mirror is a curved mirror. It is noted that claim 1 and claim 18 uses the broad term “curved” and further dependent claim 6 further narrows “curved” to be “concave”. As noted in the Request, the Examiner finds that in reviewing PCT/US2013/043453, page 15, lines 18-25 states “[i]n one embodiment of WDM, the first optical element is a lens and the second element is a concave mirror, although it is apparent to those skill in the art that other types of refractive and/or reflective optical components may also be used to achieve the same design goal. Similar to its counterpart in optical communication, the optical path in the WDM of the present disclosure may be folded using dichroic filters.” In addition, on page 16, lines 7-10, it is stated that “[i]nstead of concave mirrors, the WDM may be replaced by curved dichroic filters to further increase the number of colored bands selected by the WDM.” In addition, page 44, lines 16-22 states “[i]nstead of using concave mirrors for relying on the beam of light reflected from the dichroic filters, one may also use refractive optics as relay element to extend the path of the collimated beam of light.” The Examiner also notes that on page 45, lines 25-30 it is disclosed that “[b]y replacing the concave relay imaging mirrors 907' and 910' in FIG. 27 with concave shaped dichroic filters 907’ and 910’, the WDM depicted in FIG. 28 provides 2 more color bands in comparison with the WDMs depicted in FIGs. 25 and 27.”

The Examiner finds that the specification describes other types of mirrors. Although the description related to "other types of refractive and/or reflective optical components" are not specific as to the type of mirror, the Examiner finds that in reviewing claim 1, since a concave mirror is a curved mirror and since the earliest application (e.g. the PCT) discloses of at least a concave mirror as well as other types of mirrors, then the claim is supported by the PCT which predates the Chen publication. It is acknowledged that "curved mirror" can encompass more than "concave" however as acknowledge in the Request and discussed above, the PCT discloses "other types of refractive and/or reflective optical components may also be used to achieve the same design goal".

The Examiner notes that with respect to the above discussion, Chen is not a prior art publication and thus, a reasonable examiner would not consider Chen important in determining the patentability of claims 1, 4, 6, 9-11, 13, and 15. Accordingly, Chen does not raise a Substantial New Question of Patentability.

**IX. 35 USC § 325(d)**

35 USC 325(d) states in part, "[i]n determining whether to institute or order a proceeding under this chapter, chapter 30, or chapter 31, the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office." Thus, for the Director to exercise discretion as to whether to Order a reexamination under chapter 30, the Request must first be determined to be based on the same or substantially the same prior art or arguments that were previously presented to the Office.

A review of the post grant history for the '443 patent indicates that the patent was subject to a single prior Office post grant challenge.

On July 17, 2025, Cytek Biosciences, Inc. filed a Petition seeking Inter Partes Review of claims 1-4,6, 7, 9, 10, 11, 13, and 15-18 of the '443 Patent. IPR2015-01319.

On November 20, 2025, the PTAB issued a decision which discretionary denied institution of inter partes review.

A comparison between the prior IPR petition and the current request filed by Cytek Biosciences Inc., indicates that at least one of the grounds asserted as raising an SNQ in the current Request is based on the identical prior art combination that was previously presented in the prior IPR.

Therefore, the statutory threshold permitting the Director to exercise discretion as to whether to Order reexamination under 35 USC 325(d) has been met.

However, in view of the following facts, the Examiner declines to exercise discretion to reject this request.

1.) The fact that in the discretionary denial of the prior AIA petition, the Board did not provide any discussion or evaluation of the arguments or the prior art references presented in the petition.

2.) The fact that there is no prior determination of serial abusive post grant challenges to the '453 patent

3.) The fact that the Examiner has determined that new/additional arguments in the Request raises a substantial new question of patentability (SNQ) of claims 1, 4, 6, 7, 9-11, 13 and 15.

Accordingly, the Examiner declines to discretionarily deny reexam under 35 USC 325(d) and *ex parte* Reexamination is Ordered based on the determination above that the Request raises a substantial new question of patentability of the '453 patent.

Thus, *Ex Parte* reexamination is Ordered based on the determination above that the current Request raises an SNQ to at least one claim of the '453 patent.

**X. Conclusion**

**14. For the reasons given above, the present request for ex parte reexamination raises a substantial new question affecting claims 1, 4, 6, 9, 10, 11, 13, and 15 of the '443 patent.**

15. Claims 1, 4, 6, 9, 10, 11, 13, and 15 were not subject to a final holding of invalidity by a federal court or by the Office in a previous examination over the same issue.

**Extension of Time**

Extensions of Time Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)). Extensions of time in ex parte reexamination proceedings are provided for in 37 CFR 1.550(c).

**Waiver of Right to File Patent Owner Statement**

In a reexamination proceeding, Patent Owner may waive the right under 37 C.F.R. 1.530 to file a Patent Owner Statement. The document needs to contain a statement that Patent Owner waives the right under 37 C.F.R. 1.530 to file a Patent Owner Statement and proof of service in the manner provided by 37 C.F.R. 1.248, if the request for reexamination was made by a third party requester, see 37 C.F.R 1.550. The Patent Owner may consider using the following statement in a document waiving the right to file a Patent Owner Statement: Patent Owner waives the right under 37 C.F.R. 1.530 to file a Patent Owner Statement.

**Amendment in Reexamination Proceedings**

Patent owner is notified that any proposed amendment to the specification and/or claims in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be formally presented pursuant to 37 CFR § 1.52(a) and (b), and must contain any fees required by 37 CFR § 1.20(c). See MPEP § 2250(IV) for examples to assist in the preparation of proper proposed amendments in reexamination proceedings.

**Service of Papers**

After the filing of a request for reexamination by a third party requester, any document filed by either the patent owner or the third party requester must be served on the other party (or parties where two or more third party requester proceedings are merged) in the reexamination proceeding in the manner provided in 37 CFR 1.248. See 37 CFR 1.550.

**Notification of Concurrent Proceedings**

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent No. 11,703,443 throughout the course of this reexamination proceeding. The third party requester is also reminded of the ability to similarly apprise the Office of any such activity or proceeding throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.

16. **All** correspondence relating to this ex parte reexamination proceeding should be directed:

Electronically: Registered users may submit via Patent Center at https://patentcenter.uspto.gov/.

By Mail to: Mail Stop *Ex Parte* Reexam
Central Reexamination Unit
Commissioner for Patents
United States Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

By FAX to: (571) 273-9900
Central Reexamination Unit

By hand: Customer Service Window
Knox Building
501 Dulany Street
Alexandria, VA 22314

For electronic transmissions, 37 CFR 1.8(a)(1)(i)(C) and (ii) states that correspondence (except for a request for reexamination and a corrected or replacement request for reexamination) will be considered timely filed if (a) it is transmitted via the USPTO patent electronic filing system in accordance with 37 CFR 1.6(a)(4), and (b) includes a certificate of transmission for each piece of correspondence stating the date of transmission, which is prior to the expiration of the set period of time in the Office action.

Any inquiry by the patent owner concerning this communication or earlier communications from the Legal Advisor or Examiner, or as to the status of this proceeding, should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

__/Ovidio Escalante/_____

Primary Examiner
Central Reexamination Unit - Art Unit 3992
(571) 272-7537

Conferees:

/M.F/
Supervisory Patent Examiner, Art Unit 3992