[redacted]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BECKMAN COULTER, INC.,<br>Plaintiff,<br>v.<br>CYTEK BIOSCIENCES, INC.,<br>Defendant. | C.A. No. 24-000945-CFC<br>**REDACTED PUBLIC VERSION** |

**DECLARATION OF MICHELE M. RILEY**

October 13, 2026

[redacted]

[redacted]

## TABLE OF CONTENTS

I. INTRODUCTION .......... 2

II. CONCLUSIONS .......... 4

III. SUMMARY OF JURY AWARD .......... 5

IV. SUPPLEMENTAL DAMAGES .......... 6

V. PREJUDGMENT INTEREST .......... 8

VI. POSTJUDGMENT INTEREST .......... 11

VII. ONGOING ROYALTY .......... 12

A. Beckman Coulter's Bargaining Position is Strengthened by the Judgment .......... 14

B. *Georgia-Pacific* Factors .......... 17

C. Conclusion (Factor 15): The Parties Would Agree to $12,750 per WDM-APD Module .......... 37

[redacted]

## I. INTRODUCTION

1. I am a Senior Advisor with Stout Risius Ross, LLC ("Stout"). Stout is a global financial advisory firm that specializes in investment banking, valuation and financial opinions, and dispute advisory and forensic services. I am a member of Stout's Disputes, Claims, & Investigations group and its Intellectual Property group. My business address is 801 18th Street NW, Suite 700, Washington, DC 20005. I provide a copy of my curriculum vitae as Appendix A, which includes a more detailed description of my education, and other professional experience.

2. On December 19, 2025, I submitted the Expert Report of Michele M. Riley (the "Riley Opening Report") regarding damages and economic issues in connection with Cytek's alleged infringement of certain Beckman Coulter patents. On February 9, 2026, I submitted the Reply Expert Report of Michele M. Riley (the "Riley Reply Report") responding to the expert report of Cytek's expert, John L. Hansen, submitted on January 20, 2026 (the "Hansen Report"). The Riley Opening Report and the Riley Reply Report are collectively referred to herein as the "Riley Prior Reports."

3. On August 20, 2026, the jury verdict in Phase I of trial found Cytek liable for infringement of U.S. Patent No. 10,330,582.[1]

4. Having found liability in Phase I, the trial then proceeded to the damages phase, Phase II. I testified at trial on August 21, 2026.[2] Mr. Hansen provided testimony the same day,[3] for which I was present. The second phase of the trial, Phase II, covered Beckman Coulter's

---

[1] *Beckman Coulter, Inc. v. Cytek Biosciences, Inc.*, No. 1:24-cv-00945-CFC, Joint Verdict Form (Phase I), ECF No. 459 (D. Del. Aug. 20, 2026).

[2] Trial Transcript Volume 5, August 21, 2026, pp. 1288-1348, 1402-1408.

[3] Trial Transcript Volume 5, August 21, 2026, pp. 1359-1402.

[redacted]

damages from the start of the damages period (December 1, 2022)[4] through September 30, 2025.[5]

5. On August 21, 2026, the jury returned its Phase II verdict awarding damages to Beckman Coulter in the amount of $56.11 million, consisting of $20 million in lost profits and $36.11 million in reasonable royalty damages for past damages (for the period of December 1, 2022 through September 30, 2025).[6]

6. I understand that the Court entered judgment in this matter on September 15, 2026.[7]

7. Wilmer Cutler Pickering Hale and Dorr LLP ("Counsel"), as counsel for Beckman Coulter, Inc. ("Beckman Coulter" or "Plaintiff"), has retained me to provide a Declaration calculating:

- Supplemental reasonable royalty damages on infringing WDM-APD modules made, sold, offered for sale, or imported by Cytek in the United States from October 1, 2025, through entry of judgment on September 15, 2026[8];

---

[4] *Beckman Coulter, Inc. v. Cytek Biosciences, Inc.*, Final Jury Instructions (Phase II), No. 1:24-cv-00945-CFC, ECF No. 464, at ¶ 4.2 (D. Del. Aug. 21, 2026).

[5] Trial Transcript Volume 5, August 21, 2026, pp. 1294:22-1295:3, 1387:3-8. Prior to trial, I prepared a supplement to the Riley Prior Reports encompassing certain additional infringing sales by Cytek that were not available to me at the time the Riley Prior Reports were submitted. I understand that Cytek objected to those updated numbers being presented to the jury. Accordingly, the damages evidence at trial cut off at September 30, 2025.

[6] *Beckman Coulter, Inc. v. Cytek Biosciences, Inc.*, No. 1:24-cv-00945-CFC, Verdict Form (Phase II) at 2, ECF No. 466 (D. Del. Aug. 21, 2026); *Beckman Coulter, Inc. v. Cytek Biosciences, Inc.*, Final Jury Instructions (Phase II) at ¶¶ 4.2, 4.3 and 4.4, No. 1:24-cv-00945-CFC, ECF No. 464 (D. Del. Aug. 21, 2026); *supra* n.5.

[7] *Beckman Coulter, Inc. v. Cytek Biosciences, Inc.*, Non-Final Judgment After Verdict, No. 1:24-cv-00945-CFC, ECF No. 474 (D. Del. Sept. 15, 2026).

[8] I understand that Beckman Coulter seeks supplemental damages through September 15, 2026, but that the most recent sales data Cytek has produced as of the date of this declaration extends only through August 2026. Accordingly, my calculations herein, including my calculations of supplemental damages, prejudgment interest, and post-judgment interest accrued to date cover only Cytek's infringement through August 2026. In the event Cytek produces updated financial data at a later time that encompasses its infringing sales through September 2026, I reserve the right to amend and/or supplement my calculations to address such data.

[redacted]

- Prejudgment interest that Beckman Coulter should be awarded on its damages that accrued from December 1, 2022 through entry of judgment on September 15, 2026; and
- The post-judgment interest rate applicable to those damages pursuant to statute (28 U.S.C. § 1961).

8. I have further been asked to evaluate an appropriate going-forward royalty for infringement of the ’582 Patent from the entry of judgment on September 15, 2026 through the expiration date of the ’582 Patent on May 30, 2033.[9] In connection with that analysis, I assessed whether economic conditions or other circumstances, including the parties’ negotiating positions, materially changed between the hypothetical negotiation underlying the jury’s damages award on June 25, 2019 and the hypothetical negotiation used to determine a post-judgment royalty on September 15, 2026, and the effect any such changes would have on the royalties the parties would negotiate on September 15, 2026.[10]

## II. CONCLUSIONS

9. The table below summarizes (1) the jury’s damages award, supplemental damages, prejudgment interest, and accrued post-judgment interest, totaling $75,621,881 as of October 13, 2026; and (2) the applicable prejudgment and post-judgment interest rates, supplemental damages royalty rate, and going-forward royalty rate, together with their respective periods of application.

[9] Discussion with Counsel.

[10] In conducting my analysis, I have reviewed court filings, financial data and information, as well as other publicly available information, and my team had a conversation with Mr. Goff of Beckman Coulter. A list of the materials and discussions I have considered in forming the opinions set forth in this Declaration is attached as Appendix B.

[redacted]

**SUMMARY OF CONCLUSIONS**[11]

| Description | Period | Amount |
|---|---|---|
| **Total Amount Owed** | **As of 10/13/2026** | **$75,621,881** |
| Jury Award | 12/1/2022 – 9/30/2025 | $56,110,000 |
| Supplemental Damages | 10/1/2025 – 9/15/2026 | $8,704,500 |
| Prejudgment Interest | 12/1/2022 – 9/15/2026 | $10,562,210 |
| Accrued Post-Judgment Interest | 9/16/2026 – 10/13/2026 (28 days) | $245,170 |
| **Applicable Rates** | | |
| Pre-Judgment Interest Rate[12] | 12/1/2022 – 9/15/2026 | 7.50% |
| Post-Judgment Interest Rate[13] | Beginning 9/16/2026 | 4.24% |
| Supplemental Damages Royalty Rate | 10/1/2025 – 9/15/2026 | $10,500 |
| Going-Forward Royalty Rate | 9/16/2026 – 5/30/2033 | $12,750 |

## III. SUMMARY OF JURY AWARD

10. The table below summarizes the jury's damages award for infringement of claim 3 of the '582 Patent, including the reasonable royalty and lost-profits amounts and the periods of infringement covered by the award.

**COMPONENTS OF JURY AWARD**

| Description | | Amount |
|---|---|---|
| Reasonable Royalty | | $36,110,000 |
| Lost Profits | + | $20,000,000 |
| **Total Damages Awarded by Jury** | = | **$56,110,000** |

11. Both Mr. Hansen and I presented reasonable royalty analyses to the jury that applied a per-unit royalty rate to Cytek's infringing WDM-APD modules.[14]

---

[11] Exhibit 1.0; Exhibit 1.1; Exhibit 2.0.
[12] The 7.50% rate represents the weighted-average prejudgment interest rate over the applicable period, rather than a single rate applied throughout that period. See Exhibit 2.0.
[13] Exhibit 1.1.
[14] Trial Transcript, Volume 5, August 21, 2026, pp. 1311:9-16, 1312 (Riley), 1384:21-24, 1385:13-18 (Hansen).

[redacted]

12. I presented my reasonable royalty analysis and conclusions to the jury at trial, including my opinion that a reasonable royalty for the '582 Patent was $10,500 per WDM-APD module.[15] That analysis yielded the reasonable royalty damages figure I presented to the jury of $36,112,084.[16]

13. Based on the evidence presented at trial, the jury awarded $36.11 million in reasonable royalty damages.[17] That award matches (after rounding)[18] my conclusion regarding reasonable royalty damages presented to the jury, which was based on my analysis of the appropriate royalty rate of $10,500 per WDM-APD module.[19] The verdict thus supports that the jury awarded reasonable royalty damages based on the $10,500 royalty rate per WDM-APD module I presented.[20]

14. In addition to $36.11 million in reasonable royalty damages, the jury awarded $20 million in lost profits damages, yielding total damages awarded by the jury of $56.11 million.[21]

## IV. SUPPLEMENTAL DAMAGES

15. The jury's reasonable royalty award compensated Beckman Coulter for past infringement and was based on evidence addressing infringement through September 30, 2025.[22] I

---

[15] Riley Opening Report, § VIII.E.d.xv.

[16] Trial Transcript, Volume 5, August 21, 2026, pp. 1294:12-21, 1332:7-12; Trial Demonstrative Slides of Michele Riley, August 21, 2026, PDX-14.82.

[17] *Beckman Coulter, Inc. v. Cytek Biosciences, Inc.*, No. 1:24-cv-00945-CFC, Verdict Form (Phase II) at 2, ECF No. 466 (D. Del. Aug. 21, 2026).

[18] The difference between the calculation I presented at trial and the jury's award is only $2,084, or approximately 0.006%. Calculated as $2,084 = $36,112,084 - $36,110,000.

[19] Trial Transcript, Volume 5, August 21, 2026, pp. 1309:01-1332:12; Trial Demonstrative Slides of Michele Riley, August 21, 2026, PDX-14.82.

[20] Indeed, no other reasonable royalty calculations presented at trial yielded damages within the vicinity of what the jury awarded. Mr. Hansen presented two reasonable royalty scenarios to the jury using a royalty rate of $1,200 per infringing WDM-APD module, which yielded a reasonable royalty of $5,930,400 (and $0 in lost profits) and a reasonable royalty of $5,504,400 (and $11.2 million in lost profits), far from what the jury awarded in the verdict. Trial Demonstrative Slides of John Hansen, August 21, 2026, DDX-19-16, -29-30.

[21] *Beckman Coulter, Inc. v. Cytek Biosciences, Inc.*, No. 1:24-cv-00945-CFC, Verdict Form (Phase II) at 2, ECF No. 466 (D. Del. Aug. 21, 2026).

[22] Trial Demonstrative Slides of Michele Riley, August 21, 2026, PDX-14.52, 14.82.

[redacted]

understand that the '582 Patent does not expire until May 30, 2033[23] and that Cytek has continued to make and sell the same infringing products in the United States since September 30, 2025.[24] Cytek's most recent sales data confirms this.[25] Following trial, Cytek has also stated in press releases that it does not intend to change its infringing products post-verdict.[26]

16. I understand from Counsel that the royalty rate applicable to the period through September 30, 2025 that was awarded by the jury may also be applied to Cytek's continuing infringement from October 1, 2025 through September 15, 2026, the date judgment was entered.[27] I therefore use a royalty rate of $10,500 per WDM-APD module, which, as discussed above, is consistent with the jury's reasonable royalty award, to calculate the supplemental damages Beckman Coulter is owed for pre-judgment damages that were not considered by the jury.

17. Cytek produced updated data reflecting its manufacturing and sales of WDM-APD modules and products containing WDM-APD modules in the United States covering the period from October 1, 2025 to August 31, 2026.[28] I understand that, as of the date of this declaration, Cytek has not produced updated data that encompasses its infringement through September 2026. I thus present calculations below based on Cytek's additional infringement through August 31, 2026, and reserve the right to amend and/or supplement my calculations and conclusions herein to cover Cytek's additional infringement through

[23] https://patents.google.com/patent/US10330582B2/en?oq=10%2c330%2c582.

[24] CYTEK_0001006008.

[25] CYTEK_0001006008.

[26] https://investors.cytekbio.com/news-releases/news-release-details/jury-finds-cyteks-favor-three-four-asserted-claims-company.

[27] I further understand from Counsel that infringement occurring after September 15, 2026—the date judgment was entered—is subject to a separate analysis that considers whether a different royalty is appropriate in light of the verdict and changed circumstances. I thus address infringement occurring after September 15, 2026 separately below.

[28] CYTEK_0001006008.

[redacted]

the date of judgment, September 15, 2026, to the extent such data is made available at a later time.

18. As reflected in Exhibit 3.0, the updated data produced by Cytek indicates that Cytek manufactured and/or sold in the United States 829 additional WDM-APD modules during the period of October 1, 2025 through August 31, 2026.[29]

19. As reflected in the table below, applying the royalty rate awarded by the jury of $10,500 per WDM-APD module to these additional infringing modules yields total supplemental damages of $8,704,500.[30]

**CALCULATION OF SUPPLEMENTAL DAMAGES**

| Description | | Amount |
|---|---|---|
| Royalty Rate (Dollars Per WDM-APD module) | | $10,500 |
| Royalty Base (WDM-APD modules) | × | 829 |
| **Damages** | = | **$8,704,500** |

## V. PREJUDGMENT INTEREST

20. I have been asked to provide a prejudgment interest calculation. Economically, prejudgment interest compensates for the lost use of money by applying an interest rate to the unpaid loss and compounding it forward, much like an outstanding loan or line of credit.[31] The question for the Court is which nonspeculative interest rate reasonably reflects what the plaintiff (here, Beckman Coulter) would have earned on those funds or paid to replace them.

[29] Exhibit 3.0.

[30] Exhibit 3.0.

[31] Mark A. Allen, Carlos Brain & Filipe Lacerda, Reference Guide on Estimation of Economic Damages, in Reference Manual on Scientific Evidence 749, 791–92 (4th ed. 2025) ("Because interest is often reinvested to earn further interest, economic analysis generally supports the use of compound interest.").

[redacted]

21. In my opinion, the prime rate provides a reasonable measure of the prejudgment interest rate applicable in this case, even though other economic measures could support a higher rate.

22. As an economic matter, prejudgment interest makes up for Beckman Coulter not having the money it was owed during the infringement period. The interest rate should therefore reflect what it cost Beckman Coulter to go without those funds, either by borrowing to replace them or by losing the return it would have earned on them.[32] The prime rate measures this reasonably and conservatively. It is the rate banks charge their most creditworthy commercial borrowers, so it reflects what it costs a business in the real world to borrow money.[33] I understand that courts have recognized the prime rate as a practical middle ground for calculating prejudgment interest because it accounts for some degree of risk without creating a windfall or overcomplicating an issue that courts prefer to treat as a straightforward bookkeeping exercise.[34] That approach is a reasonable and conservative measure to use here too.

23. Measures such as weighted-average cost of capital ("WACC") or return on equity ("ROE") may justify higher rates, while a risk-free rate may understate the actual harm.

24. The U.S. Bank Prime Loan Rate (the "Prime Rate") ranged from 6.75% to 8.50% between the fourth quarter of 2022 and the third quarter of 2026.[35] Over that same time period, Beckman

---

[32] Mark A. Allen, Carlos Brain & Filipe Lacerda, Reference Guide on Estimation of Economic Damages, in Reference Manual on Scientific Evidence 749, 787 (4th ed. 2025) ("[I]t is natural to see the past flow as a loss that would have to be financed (e.g., from a bank), and it is necessary to consider what rate of return would have been required in order to finance that loss.").

[33] Fed. Rsrv. Bank of N.Y., Monthly Rev., May 1974, at 118, https://fraser.stlouisfed.org/files/docs/publications/frbnyreview/rev_frbny_197405.pdf.

[34] *IMX, Inc. v. LendingTree, LLC*, 469 F. Supp. 2d 203, 227 (D. Del. 2007); *Bd. of Regents v. Bos. Sci. Corp.*, C.A. No. 18-392-GBW, 2024 WL 2848471, at *16 (D. Del. June 5, 2024) (quoting *IMX*); see also Mark A. Allen, Carlos Brain & Filipe Lacerda, Reference Guide on Estimation of Economic Damages, in Reference Manual on Scientific Evidence 749, 791–92 (4th ed. 2025) ("Where the law does not prescribe the form of interest for past losses, experts will normally apply a reasonable interest rate to bring those losses forward.").

[35] Federal Reserve Bank of St. Louis, (frequency set to "Quarterly" and aggregation method set to "Average," for Q4 2022 through Q3 2026; accessed October 10, 2026), https://fred.stlouisfed.org/series/DPRIME.

[redacted]

Coulter's parent, Danaher Corporation's WACC (i.e., 8.6% to 8.8%) (its market-dependent cost of funding) has been only slightly above the prime rate (6.75% to 8.50%),[36] while its ROE (the amount of money it generates for shareholders from its invested capital) has ranged from approximately 6.99% to 14.95% (average 9.66%).[37] Those higher measures could support a larger award, so the prime rate fairly compensates Beckman Coulter without giving it a windfall.

25. Applying the prime rates quarterly to the accrued damages from December 1, 2022, through September 15, 2026, with quarterly compounding, produces an equivalent effective annual interest rate of approximately 7.50%.[38]

26. Thus, even when compared to alternative economic measures, the prime rate remains a reasonable approximation of the plaintiff's loss of use of these funds.[39]

27. With these rates, I calculate prejudgment interest through September 15, 2026, the date judgment was entered, in the amount of $10,562,210.[40]

---

[36] Exhibit 2.0.

[37] https://www.macrotrends.net/stocks/charts/DHR/danaher/roe. ROE Average calculated as [9.66% = (14.95% + 9.07% + 7.64% + 6.99%) / 4 years].

[38] See Exhibit 2.0.

[39] *See St. Clair Intell. Prop. Consultants, Inc. v. Fuji Photo Film Co.*, 674 F. Supp. 2d 555, 561 (D. Del. 2009) (awarding prejudgment interest at the prime rate because it "provides a better measure of the risk of nonpayment"); *IMX, Inc. v. LendingTree, LLC*, 469 F. Supp. 2d 203, 227-28 (D. Del. 2007) (recognizing that the prime rate reflects borrowing costs and provides "a better measure of the harm suffered as a result of the loss of the use of money over time" (quoting *Mars, Inc. v. Conlux USA Corp.*, 818 F. Supp. 707, 720-21 (D. Del. 1993)).

[40] Exhibit 2.0. I use an end-of-period convention to calculate the interest, whereby I assume royalties are received at the end of the period (i.e., quarter) and interest begins to accrue during the following period (i.e., the start of the next quarter).

[redacted]

## VI. POSTJUDGMENT INTEREST

28. I understand that post-judgment interest is governed by 28 U.S.C. § 1961, which provides that interest accrues on a federal district court money judgment from the date of entry of judgment until payment.[41] Interest accrues daily and is compounded annually.[42]

29. Under 28 U.S.C. § 1961, the applicable rate for post-judgment interest is the weekly average one-year constant-maturity Treasury yield for the calendar week preceding the judgment date.[43] For judgment entered on September 15, 2026, the applicable measurement period is therefore September 7 through September 11, 2026, during which the weekly average one-year constant-maturity Treasury yield was 4.24%.[44] This rate is fixed as of the judgment date and applies prospectively to the outstanding judgment balance, regardless of subsequent changes in Treasury yields.

30. I calculate the amount owed to Beckman Coulter as of September 15, 2026, to be $75,376,710,[45] inclusive of the $56,110,000 jury award, $8,704,500[46] in supplemental damages for the period from October 1, 2025 to September 15, 2026, and $10,562,210[47] in accrued prejudgment interest. Assuming this amount is included in the amended final judgment, I apply the statutory 4.24%[48] annual rate to the entire balance beginning September 16, 2026.

---

[41] 28 U.S.C. § 1961(a)-(b).

[42] 28 U.S.C. § 1961 (b); see also Mark A. Allen, Carlos Brain & Filipe Lacerda, Reference Guide on Estimation of Economic Damages, in Reference Manual on Scientific Evidence 749, 755 (4th ed. 2025) ("The plaintiff may also be due postjudgment interest, which is interest on the damages award from the date of judgment to the date the defendant satisfies the judgment.").

[43] 28 U.S.C. § 1961(a).

[44] 28 U.S.C. § 1961(a)-(b) Board of Governors of the Federal Reserve System (US), Market Yield on U.S. Treasury Securities at 1-Year Constant Maturity, Quoted on an Investment Basis [WGS1YR], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/WGS1YR, October 12, 2026 (reporting a 4.24% rate for the week ending September 11, 2026, applicable to judgments entered September 14–20, 2026).

[45] Exhibit 1.2.

[46] *See supra* § IV.

[47] *See supra* § V; Exhibit 2.0.

[48] Exhibit 1.1.

[redacted]

I calculate $245,170[49] in post-judgment interest accrued through October 13, 2026, a period of 28 days, bringing the total amount Cytek owes due to the jury award, supplemental damages, prejudgment interest, and post-judgment interest as of October 13, 2026 to $75,621,881.[50] I understand interest continues to accrue daily, compounded annually, until the judgment is satisfied.[51]

## VII. ONGOING ROYALTY

31. Counsel has asked me to evaluate whether the economic circumstances relevant to the June 25, 2019 hypothetical negotiation[52] have changed as of September 15, 2026, the date the Court entered judgment, if the Court orders an ongoing royalty under the '582 Patent in lieu of an injunction. If those circumstances have changed, I have also been asked to determine the royalty that the parties would agree to in a hypothetical negotiation held on that date (the "Post-Judgment Negotiation").

32. As discussed in the Riley Opening Report and in my trial testimony, a reasonable royalty may be determined by reference to a hypothetical negotiation between a willing licensor and a willing licensee, guided by the fifteen *Georgia-Pacific* factors. I understand from Counsel that, in setting an ongoing royalty, courts consider (i) the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability; (ii) changed economic circumstances, such as changes related to the market for the patented products; and (iii) any other post-verdict factor that would affect what a hypothetical negotiation would look like after the verdict. I further understand that the *Georgia-Pacific* factors may guide that analysis. I address each of those considerations below.

---

49 Exhibit 1.1.

50 Exhibit 1.0. The total I present here does not include any post-judgment ongoing royalty for Cytek's infringement that has occurred since September 15, 2026, nor post-judgment interest on that amount.

51 28 U.S.C. § 1961(b).

52 Riley Opening Report, ¶¶ 396-398.

[redacted]

33. My starting point is the $10,500 royalty per WDM-APD module that I presented at trial, which is reflected in the jury's reasonable royalty award.[53] I derived that rate from a hypothetical negotiation as of June 25, 2019 in three steps. First, I apportioned Cytek's incremental profit to the patented WDM-APD architecture, which yielded approximately $13,600 per module.[54] Second, I applied a 70% / 30% value-sharing allocation between Beckman Coulter and Cytek, which yielded $9,520 per module.[55] Third, I concluded that the *Georgia-Pacific* factors supported an upward adjustment to $10,500 per module.[56] As described above, the jury appears to have adopted that royalty rate, as it awarded (with rounding) the full reasonable royalty amount that I testified at trial was appropriate, which was based on that $10,500 per WDM-APD module rate.

34. A negotiation held as of September 15, 2026 would produce a royalty higher than $10,500. As I explain in further detail below, several considerations have moved in Beckman Coulter's favor in the Post-Judgment Negotiation. No factors have moved in favor of lowering the royalty.

35. In addition, changes in economic circumstances, including changes in the market for the patented products, support an upward adjustment to the royalty rate. Cytek's accused products have become more profitable, the economic value of its installed base and associated aftermarket revenues has increased, the parties' competitive overlap has expanded, a substantial replacement cycle on Cytek's installed base will occur over the next 6.7 years, and inflation has reduced the real value of the original fixed-dollar royalty. These developments and the judgment's effect support a higher royalty in the Post-Judgment Negotiation.

---

[53] Trial Transcript, Volume 5, August 21, 2026, pp. 1329:24-1330:6, 1332:7-12; D.I. 466 at 2.

[54] Riley Opening Report, ¶ 491.

[55] Riley Opening Report, ¶¶ 674, 678.

[56] Riley Opening Report, ¶¶ 686-693.

[redacted]

### A. Beckman Coulter's Bargaining Position is Strengthened by the Judgment

36. The June 2019 hypothetical negotiation assumed that the '582 Patent was valid and infringed.[57] My opinion here does not rest on that assumption becoming a reality. Rather, the judgment changes two economic features of the negotiation that the 2019 construct did not resolve: (a) whether Cytek's licensed sales would come at the expense of Beckman Coulter's, and (b) what each party's alternative to agreement is. Both of these strengthen Beckman Coulter's bargaining position at the Post-Judgment Negotiation.

#### a. Diversion of Beckman Coulter's Sales

37. Reasonable royalties and lost profits compensate for distinct economic harms. A reasonable royalty compensates the patent owner for the licensee's use of the patented technology, whereas lost profits compensate for profits the patent owner would have earned on the sales it would have made but for the infringement. Although the hypothetical negotiation underlying a reasonable royalty assumes validity and infringement, it does not assume the licensee's sales displaced the patent owner's sales.

38. Applied here, for each Cytek system sale that displaced a Beckman Coulter system sale, lost profits measure the profit Beckman Coulter would have earned on the sale of its entire system. By contrast, the reasonable royalty measures what Cytek would have paid for the right to use the patented technology associated with the WDM-APD module, which are components of the overall systems, in its own products.

39. The jury's lost-profits verdict resolves a question that was not assumed in the parties' 2019 hypothetical negotiation: that Cytek's infringement actually displaces sales of Beckman Coulter's complete systems. Although the parties' competitive overlap is considered under *Georgia-Pacific* Factor five, the pre-verdict hypothetical negotiation is not a means of recovering lost profits. Here, Beckman Coulter's profits on sales of its complete systems

[57] Riley Opening Report, ¶¶ 396-398.

[redacted]

were not incorporated into the $10,500-per-unit royalty presented to the jury.[58] The jury's lost-profits award established something materially different: for certain Cytek sales, the infringement deprived Beckman Coulter not merely of a royalty for Cytek's use of the patented WDM-APD architecture in Cytek's systems, but of the profits Beckman Coulter would have earned from selling its own entire systems. Thus, the lost-profits award established two economically significant facts notpresent at the 2019 hypothetical negotiation: that a subset of Cytek's infringing sales displace sales of Beckman Coulter's complete systems, and that those displaced sales are significant—resulting in $20 million in lost profits to Beckman Coulter for just the period of December 1, 2022 to September 30, 2025.

40. I understand that Beckman Coulter is not seeking lost profits on Cytek's post-judgment sales, making the ongoing royalty its only compensation for those lost sales. The jury's lost-profits award is therefore relevant to the Post-Judgment Negotiation because it not only reinforces that an upward adjustment should be made for the competitive overlap between the parties, but also provides a separate determination of harm not captured by the jury's reasonable royalty. In particular, for certain infringing sales, Beckman Coulter lost the profits it would have earnedon sales of its entire systems. The jury's lost profits determination would inform the economic consequences of continued infringement and the parties' respective bargaining positions at the Post-Judgment Negotiation. The parties to the hypothetical negotiation in September 2026 would not have ignored that this additional economic harm was determined in Beckman Coulter's favor.

41. A willing licensor in Beckman Coulter's position would account for the demonstrated competitive harm rather than negotiate as though its only potential loss is the royalty attributable to the patented component. Under *Georgia-Pacific* Factor five, the parties considered their competitive relationship without knowing whether, or to what extent, the

[58] See for example, Riley Opening Report, ¶¶ 448, 467, 477, 493, 504, and 518.

[redacted]

licensee's sales would displace the licensor's full system sales. Following the verdict, however, that uncertainty has been resolved, allowing the economic consequences of that competition to be assessed more directly. Accordingly, the jury's reasonable royalty rate would serve as a floor, with the lost-profits award exerting upward pressure on the ongoing royalty.

**b. Alternatives to Agreement**

42. In any negotiation, the bargaining range is bounded by each party's walk-away point, and each party's alternative to an agreement sets that point.[59]

43. In the Post-Judgment Negotiation, the questions of validity and infringement have been decided in Beckman Coulter's favor. I understand from Counsel that Cytek's alternative to a license is now the possible exclusion of its Aurora and Northern Lights products from the U.S. market under an injunction, together with exposure to enhanced damages for continued infringement after adjudication. From an economic perspective, a licensee facing exclusion of its principal product lines, or enhanced damages, would pay more than a licensee whose alternative is continued litigation. That shift raises the ceiling of the bargaining range and moves the negotiated outcome toward the licensor.

44. Cytek's post-verdict statements confirm that it intends to keep using the patented technology rather than stop using it or modify it. After the verdict, Cytek publicly stated that the verdict "does not require any changes to the Company's current product offerings or operations" and that it "will continue to invest in" its Full Spectrum Profiling platform.[60] I understand that Cytek has continued to make and sell the same infringing products since September 30, 2025, the end of the damages period presented at trial.[61] Beckman Coulter's

---

[59] Mard, Michael J., and Joseph A. Agiato, Jr., *Valuing Intellectual Property & Calculating Infringement Damages*, AICPA Consulting Services Practice Aid 99-2 (1999).

[60] https://investors.cytekbio.com/news-releases/news-release-details/jury-finds-cyteks-favor-three-four-asserted-claims-company.

[61] CYTEK_0001006007; CYTEK_0001006008.

[redacted]

ability to exclude Cytek from the market for its flagship product line would tend to result in a higher rate.

### B. *Georgia-Pacific* Factors

45. As discussed in the Riley Opening Report and during my trial testimony, Courts typically consider a "hypothetical negotiation" between a willing licensor and a willing licensee and the *Georgia-Pacific* factors to guide the analysis in determining a reasonable royalty.

46. I have been asked to evaluate if there have been any changes to the economic circumstances between the hypothetical negotiation in 2019 and the Post-Judgment Negotiation. I discuss the *Georgia-Pacific* factors affected by changed economic circumstances below. I have analyzed each of the *Georgia-Pacific* factors under the new hypothetical negotiation, and I have determined that other than the factors listed below, the remaining factors would not change from the analysis I presented at trial, as discussed below.

#### a. Factor 5: The Commercial Relationship Between the Licensor and Licensee, such as, whether they are Competitors in the Same Territory in the Same Line of Business; or Whether they are Inventor and Promoter

47. In the Riley Opening Report, I concluded that Factor 5 had a strong upward influence on the reasonable royalty.[62] Beckman Coulter and Cytek are head-to-head competitors, and I estimated that they would have expected to compete for the same customers at least 70% of the time.[63] The remaining roughly 30% reflected ultra-high-parameter applications that the CytoFLEX platform did not then address.[64] The jury's lost profits award is further confirmation of that competition.

48. While the reasonable royalty analysis presented to the jury accounted for the parties' competitive relationship in selecting a rate in a range attributable to the patented

---

[62] Riley Opening Report, § VIII.E.d.v.

[63] Riley Opening Report, ¶ 592.

[64] Riley Opening Report, ¶ 660.

[redacted]

component, that baseline rate did not capture the broader competitive harm in terms of the full system sales. Specifically, it did not quantify the harm to Beckman Coulter, nor the benefit to Cytek, resulting from the displacement of entire system sales—a distinct economic harm the jury subsequently acknowledged through its award of lost profits.[65]

49. Moreover, since the 2019 hypothetical negotiation, additional competitive developments have emerged that exert further upward pressure on the ongoing royalty under *Georgia-Pacific* Factor five.

50. At trial, Cytek emphasized spectral capability as the principal distinction between its products and Beckman Coulter's.[66] Mr. Hansen, for example, attributed approximately 75% of Beckman Coulter's recorded losses to Cytek to spectral capability or color count.[67] Beckman Coulter launched the CytoFLEX Mosaic spectral detection module in March 2025.[68] Mosaic adds spectral detection, with up to 88 detection channels, to the CytoFLEX S and CytoFLEX LX.[69] When the trial record closed, Mosaic had been on the market for only about six months.[70] Mosaic is now a more mature product that has competed directly with Cytek for new spectral customers.[71] Cytek has also continued to sell into the price segments where Beckman Coulter competes most directly. In an internal 2025 presentation titled "Evolution of the Cytek Aurora in 2025," Cytek showed its Aurora Evo 3-laser system

---

[65] Jury Verdict, Phase II, August 21, 2026, D.I. 466, p. 2, Question 1.
[66] Trial Demonstrative Slides of John Hansen, August 21, 2026, DDX-19-20-19-21.
[67] Trial Transcript, Volume 5, August 21, 2026, pp. 1402:3-8.
[68] Deposition of Pietro Lopriore, October 29, 2025, p. 26; https://www.beckman.com/news/beckman-coulter-life-sciences-launches-industry-first-modular-spectral-flow-cytometry-solution.
[69] Deposition of Pietro Lopriore, October 29, 2025, p. 174; Deposition of Fiona Brannen, October 10, 2025, pp. 37-38; https://www.beckman.com/news/beckman-coulter-life-sciences-launches-industry-first-modular-spectral-flow-cytometry-solution.
[70] https://www.beckman.com/news/beckman-coulter-life-sciences-launches-industry-first-modular-spectral-flow-cytometry-solution.
[71] October 2, 2026 Discussion with Matthew Goff.

[redacted]

moving down toward the price-performance position of the CytoFLEX LX.[72] The same slide noted that the majority of mid-range units are "aging and need a refresh."[73]

51. Together, these developments have narrowed the portion of the market in which Cytek's products faced no CytoFLEX alternative, and they have increased the share of Cytek's sales that compete with Beckman Coulter's CytoFLEX platform. A licensor will demand a higher royalty to license a direct competitor, and the more of its business the licensee contests, the higher the royalty.[74] Factor 5 therefore has a stronger upward influence in the Post-Judgment Negotiation than it did in 2019.

**b. Factor 6: The Effect of Selling the Patented Specialty in Promoting the Sales of Other Products of the Licensee; the Existing Value of the Invention to the Licensor as a Generator of Sales of his Nonpatented Items; and the Extent of such Derivative or Convoyed Sales**

52. In my Opening Report, I concluded that Factor 6 had a strong upward influence. Sales of the accused instruments generate substantial follow-on revenue from service contracts, consumables, reagents, and accessories.[75] At trial, I identified approximately $55 million in service revenue and $700,000 in consumables revenue predominantly, if not entirely, stemming from Cytek's accused instruments.[76]

53. As shown in the diagram below, service revenue has become an increasingly important part of Cytek's business. From October 1, 2025, through June 30, 2026, service revenue accounted for 30% of Cytek's total revenue, compared with 17% in the period presented to the jury at trial.[77] This represents an increase of 13 percentage points, or approximately 78%,[78] meaning that service revenue's share of Cytek's total revenue has nearly doubled in the last year.

---

[72] CYTEK_0000032596 at CYTEK_0000032615.
[73] CYTEK_0000032596 at CYTEK_0000032615.
[74] Reilly, Robert F. and Schweihs, Robert P., *Valuing Intangible Assets*, 1999.
[75] CYTEK_0000103716 at CYTEK_0000103782; Deposition of David Kennedy, October 2, 2025, pp. 79, 231-238.
[76] Trial Demonstrative Slides of Michele Riley, August 21, 2026, PDX-14.77; Trial Transcript, Volume 5, August 21, 2026, p. 1320.
[77] Exhibit 7.0.
[78] Calculated as [78.2% = (30.1% - 16.9%) / 16.9%]. See Exhibit 7.0.

[redacted]

Each installed instrument generates recurring service and aftermarket revenue over its useful life, which Cytek told the jury can extend for many years.[79] As a result, the economic value of each infringing instrument sale to Cytek extends beyond the initial purchase price to include the recurring revenue generated over the instrument's lifetime.

**Cytek's Service Revenue Share Has Materially Increased Since September 30, 2025**[80]




54. Because the jury found that Cytek's infringing sales displace Beckman Coulter's sales, the service and aftermarket revenue Cytek earns on those sales is revenue that Beckman Coulter would otherwise have had the opportunity to earn through its own service plans and consumables. A licensee that relies more heavily on recurring revenue derived from its licensed instrument sales would pay more for the license, and a competing licensor would demand more. Factor 6 therefore has a stronger upward influence in the Post-Judgment Negotiation.

---

[79] Trial Transcript, Volume 5, August 21, 2026, p. 1371.
[80] Exhibit 7.0.

[redacted]

### c. Factor 7: Duration of the Patent and Term of the License

55. The ’582 Patent expires on May 30, 2033.[81] At the June 25, 2019 hypothetical negotiation, the license term was therefore approximately 13.9 years. As of September 15, 2026, approximately 6.7 years remain.

56. In my Opening Report, I concluded that Factor 7 had an upward influence.[82] A longer term meant a longer period over which Cytek would be excluded from the market absent a license, and a longer period over which Cytek could build goodwill and brand value using the patented technology.

57. Although the remaining patent term is now shorter, those considerations continue to apply. Indeed, changes in Cytek’s commercial position since 2019 make continued access to the patented technology in September 2026 more important in certain respects.

#### *i. Cytek’s Larger Installed Base in 2026 Increases Its Incentives to Secure a License as Compared to 2019*

58. Viewed in isolation, the lower remaining patent term would tend to reduce the upward pressure associated with the duration of the license. However, 6.7 years is still a substantial period in the research flow cytometry market. A 6.7-year remaining patent term approximates an entire technological replacement cycle in the research flow cytometry market.[83] At the 2019 hypothetical negotiation, Cytek was seeking to build its installed base and establish customer relationships that could support future instrument, replacement, and aftermarket sales.[84] In September 2026, Cytek has a much larger installed base of customers who have incorporated Cytek instruments into their experimental designs.

---

[81] https://patents.google.com/patent/US10330582B2.

[82] Riley Opening Report, § VIII.E.d.vii.

[83] Jonni Moore & Mario Roederer, The Flow Cytometry Shared Resource Laboratory: Best Practices to Assure a High-Quality, Cost-Effective Partnership with Biomedical Research Laboratories, 75A Cytometry Part A 643 (2009) (explaining that the scientifically useful lifetime of research instruments is typically approximately five to seven years, substantially shorter than their physical lifetime).

[84] Deposition of Wenbin Jiang, Ph.D., November 26, 2025, pp. 145-146; Deposition of David Kennedy, October 2, 2025, pp. 79, 231-238.

[redacted]

59. Cytek's U.S. installed base is estimated to have grown from approximately 80 in April 2019 to approximately 1,550 by August 2026.[85]

60. Laboratories have incentives to purchase replacement instruments from the same manufacturer, including familiarity with the instruments and compatibility with established workflows.[86] Thus, Cytek's 2026 installed base may create a higher-probability, lower-friction opportunity for future replacement sales because it is less costly to retain an existing customer on an established platform than to persuade a new customer to adopt it.[87] If Cytek could no longer offer instruments using the patented architecture to its U.S. customers, it would risk forfeiting this competitive advantage, losing not only future replacement-instrument sales but also existing customers who would be forced to transition to competing platforms, thereby transferring the benefits of customer stickiness to Beckman Coulter and other competitors. Beckman Coulter, as a direct competitor, would stand to benefit from precisely that outcome. This diminishes Beckman Coulter's incentive to grant Cytek a license because that license would make it easier for Cytek to retain its customers. Beckman Coulter wants to make some portion of those sales itself.

61. This is not a theoretical consideration. A substantial replacement cycle is already taking shape. As discussed above, in an internal presentation, Cytek showed its Aurora Evo 3-laser system moving down toward the price-performance position of the CytoFLEX LX.[88] The same slide noted that the majority of mid-range units are "aging and need a refresh."[89]

---

[85] Cytek Biosciences, Inc., Form 10-K for the year ended December 31, 2021, p. 55; Riley Opening Report, Exhibit 22.2 (citing CYTEK_0000990471, tab "Revenue Detail '19 - '25"); CYTEK_0001006008, tab "Revenue Detail '19 - Aug'26"; Calculated as [estimated April 2019 U.S. placements: (1,110 − 963) × (531 ÷ 963) ≈ 81]; [estimated August 2026 cumulative U.S. placements: 81 + 1,473 ≈ 1,550].

[86] Deposition of Laurent M. Ginestet-Araki, October 28, 2025, pp. 87, 146-147, CYTEK_0000032596 at CYTEK_0000032619.

[87] Deposition of Laurent M. Ginestet-Araki, October 28, 2025, pp. 87, 146-147, CYTEK_0000032596 at CYTEK_0000032619.

[88] CYTEK_0000032596 at CYTEK_0000032615.

[89] CYTEK_0000032596 at CYTEK_0000032615.

[redacted]

62. Other sources I reviewed indicate a replacement cycle of 5–10 years, which indicates a replacement cycle midpoint of 7.5 years.[90] This means that every one of the 1,343 systems[91] Cytek sold in the U.S. between April 1, 2019 and November 30, 2025, a substantial majority of its current U.S. install base, will likely be replaced between September 2026 and May 30, 2033, the date the '582 Patent expires.

63. Without a license, Cytek would risk forfeiting sales to existing customers at precisely the time those customers are considering replacement purchases. Even if Cytek could develop an alternative platform, which the record does not establish, it could no longer necessarily offer customers the same instrument architecture around which those customers have developed their laboratory workflows.[92] In that respect, Cytek would face the prospect of having to reestablish customer acceptance of a materially different system rather than simply selling replacement instruments to customers already satisfied with or effectively locked into its existing platform. Thus, although the remaining license term is shorter, the commercial profit from these easier sales opportunities arising during that term is likely greater.

[90] According to a 2009 peer-reviewed article in Cytometry Part A, titled The Flow Cytometry Shared Resource Laboratory: Best Practices to Assure a High-Quality, Cost-Effective Partnership with Biomedical Research Laboratories, "the scientifically useful lifetime of research instruments is typically about 5 to 7 years." The authors distinguish the scientifically useful life of an instrument from its longer physical life. Cytek does not specify the expected useful life of its flow cytometers in its SEC filings, although its 2025 Form 10-K reports an estimated useful life of 5–10 years for laboratory equipment owned by the company (Cytek 2025 Form 10-K, p. 94). At the September 10, 2025, Morgan Stanley Global Healthcare Conference, Cytek CEO Wenbin Jiang indicated that flow cytometers typically undergo replacement every 7–10 years (2025 Morgan Stanley Conference Transcript). Similarly, during the September 16, 2026, Morgan Stanley Global Healthcare Conference, an analyst referenced a typical 7–10-year replacement cycle, which Cytek's CFO also discussed (2026 Morgan Stanley Conference Transcript). Collectively, these disclosures support an estimated flow-cytometer replacement cycle of approximately 5–10 years, with a midpoint of 7.5 years.

[91] CYTEK_0000990471, tab "Revenue Detail '19 - '25" and CYTEK_0001006008, tab "Revenue Detail '19-'25."

[92] Deposition of Laurent M. Ginestet-Araki, October 28, 2025, pp. 87, 146-147; CYTEK_0000032596 at CYTEK_0000032619; Deposition of David Kennedy, October 2, 2025, pp. 79, 231–238; Riley Opening Report, ¶¶ 615–618.

[redacted]

### *ii. A 6.7-Year Period is Substantial in Flow Cytometry*

64. A 6.7-year period is a substantial amount of time that Cytek could expand its installed base and Beckman Coulter would continue to face competition from Cytek, with Cytek being the only other company on the market that sells flow cytometers with Beckman Coulter's patented WDM-APD architecture.[93]

65. Essentially, 6.7 years is sufficient time for a licensee to place many products with customers and potentially integrate those products into customers' established laboratory workflows.[94]

66. A 6.7-year period approximates an entire technological replacement cycle for research flow cytometry instruments.[95] A 6.7-year license can provide benefits extending beyond the initial sale of a licensed product.[96] It offers time to grow an installed base, generate follow-on sales, and develop relationships with laboratories.[97] Those considerations still apply: Cytek needs a license through 2033 to keep selling its principal product lines and earning recurring revenue from those sales.

67. Cytek took the position that a longer term does not put upward pressure on the royalty rate and may put downward pressure on it, in part because a longer term gives the licensee more time to design around the patent.[98] Whatever influence that design-around consideration may have had in 2019, it has been reduced for two reasons.

---

[93] Deposition of David Kennedy, October 2, 2025, pp. 79, 231–238; CYTEK_0000032596 at CYTEK_0000032616, CYTEK_0000032619; Riley Opening Report, ¶¶ 615–618.
[94] See Hansen Report, ¶ 243.
[95] A 2009 peer-reviewed article in Cytometry Part A, titled The Flow Cytometry Shared Resource Laboratory: Best Practices to Assure a High-Quality, Cost-Effective Partnership with Biomedical Research Laboratories, "the scientifically useful lifetime of research instruments is typically about 5 to 7 years[.]" The authors distinguish the scientifically useful life of an instrument from its longer physical life.
[96] See Deposition of David Kennedy, October 2, 2025, pp. 79, 233–237; Riley Opening Report, December 19, 2025, ¶¶ 612, 615.
[97] See CYTEK_0000032596 at CYTEK_0000032616, CYTEK_0000032619; Riley Opening Report, ¶¶ 615, 618.
[98] Hansen Report, ¶ 243; Cytek's First Supplemental Response to Interrogatory No. 10 (10/22/2025), at pg. 55 ("The relatively long license term may put downward pressure on the reasonable royalty rate, as a longer term provides greater incentive to a licensee to design around the patented technology.").

[redacted]

68. First, the horizon is shorter. With fewer than seven years remaining, Cytek would have to develop, validate, manufacture, and commercialize any design-around, and recoup its cost, in about half the time available in 2019.[99] The record already showed that abandoning the patented architecture would be costly.[100] Cytek itself concluded that moving to PMTs would require it to make a "new design from scratch" and would be "cost prohibitive."[101]

69. Second, Cytek is more committed to the patented WDM-APD architecture and moving away from that architecture would be significantly more commercially and economically difficult at the time of the Post-Judgment Negotiation:

- Cytek recently launched Borealis, which uses seven WDM-APD modules.[102] This represents an additional investment in, and expansion of, Cytek's use of the accused architecture.

- Cytek's spectral flow cytometry platform is built around the WDM-APD architecture.[103] Moving away from that architecture therefore could require more than a modification to an individual product; it would likely require a broader change to a central aspect of Cytek's product platform.

- The fluors Cytek sells are marketed for use with its systems and, in the case of Borealis, Cytek states that customers obtain the greatest performance benefits using Cytek cFluor reagents optimized for the Borealis system.[104] Although the

---

[99] *See supra* ¶55 (approximately 13.9 years of remaining patent term at the June 25, 2019 hypothetical negotiation versus approximately 6.7 years as of September 15, 2026).

[100] Riley Opening Report, ¶¶ 503–517 (citing BEC-CYTEK-00342681; CYTEK_0000967116 at CYTEK_0000967119, CYTEK_0000967135; CYTEK_0000892402 at CYTEK_0000892421); *see also* Riley Opening Report, ¶¶ 241–245, 684; Trial Transcript, Volume 5, August 21, 2026, p. 1323 (PMTs cost roughly ten to 30 times as much as APDs).

[101] Riley Opening Report, ¶¶ 241–245 (citing CYTEK_0000029762 at 790, 793); *see also* Riley Opening Report, ¶¶ 503–517.

[102] https://investors.cytekbio.com/news-releases/news-release-details/cytek-biosciences-unveil-next-generation-spectral-flow-cytometry; https://cytekbio.com/pages/borealis.

[103] CYTEK_0000029858 at CYTEK_0000029862, CYTEK_0000029871; Trial Transcript, Volume 5, August 21, 2026, pp. 1295, 1322, 1405; DTX-1580 at 10.

[104] https://cytekbio.com/pages/borealis.

[redacted]

reagents may ultimately be agnostic as to the particular collection and detection architecture,[105] moving away from the WDM-APD architecture could diminish Cytek's ability to market those reagents as "optimized" for, or particularly well suited to, its WDM-APD-based systems. See for example: "The Cytek Borealis system is designed to allow customers to use commonly available fluorochromes while gaining the greatest performance benefits when using Cytek cFluor® reagents that have been optimized for the Cytek Borealis system."[106]

- Cytek's public statements following the verdict indicate that it does not presently anticipate changing its existing product offerings or operations and that it intends to continue investing in its Full Spectrum Profiling platform.
    - "The verdict does not require any changes to the Company's current product offerings or operations, and Cytek's spectral flow cytometry products remain available to customers worldwide."[107]
    - "Cytek will continue to invest in its proprietary and patented Full Spectrum Profiling™ platform and remains committed to delivering innovative cell analysis solutions to researchers and clinicians worldwide."[108]
- The WDM-APD architecture also continues to provide Cytek with a cost advantage relative to PMT-based optical architectures. Recent third-party analyst commentary has identified APDs as materially less expensive than the photomultiplier tubes used by certain competitors and says this will help Cytek

---

[105] Deposition of David Kennedy, October 2, 2025, p. 235; https://cytekbio.com/pages/borealis.

[106] https://cytekbio.com/pages/borealis.

[107] https://investors.cytekbio.com/news-releases/news-release-details/jury-finds-cyteks-favor-three-four-asserted-claims-company.

[108] https://investors.cytekbio.com/news-releases/news-release-details/jury-finds-cyteks-favor-three-four-asserted-claims-company.

[redacted]

navigate tariffs.[109] "Unfortunately, CTKB will likely have some unquantifiable impacts related to their importing parts from China. The good news is that some manufacturing costs are related to use of avalanche photo diodes, which are much cheaper than the photo multiplier vacuum tubes that competitors use. We also suspect PMT of CTKB's competitors would also be manufactured in China and that they would be subject to tariffs."[110]

- A design-around that requires Cytek to move toward a different detection architecture therefore would reduce an existing cost advantage which would be compounded by the tariff regime in the U.S. it faces.
- Cytek has a substantial installed base of systems designed around the WDM-APD architecture.[111] Transitioning to a different architecture could create issues not only for future instrument sales, but also for upgrades, replacement modules, servicing, and support for systems already in the field.
- Cytek has built substantially more brand recognition today than existed in 2019, just two years after its initial launch of the Aurora. The brand recognition and goodwill Cytek has been able to cultivate included advertising the infringing WDM-APD technology, which it relied on extensively in its marketing materials from 2019-2025.[112] Thus, moving to an entirely new technology would potentially forfeit the brand recognition and marketing investment Cytek has made.

[109] Piper Sandler, Cytek Biosciences (CTKB), Company Note (Apr 28, 2025).
[110] Piper Sandler, Cytek Biosciences (CTKB), Company Note (Apr 28, 2025).
[111] Cytek Biosciences, Q2 2026 Earnings Presentation, slide 5 (reporting approximately 3,933 instruments installed worldwide).
[112] See, e.g., PTX-61; PTX-342; Trial Transcript, Volume 5, August 21, 2026, pp. 1320–1321; Trial Demonstrative Slides of Michele Riley, August 21, 2026, PDX-14.52, PDX-14.69 (citing CYTEK_0000713633 at CYTEK_0000713642); https://cytekbio.gcs-web.com/news-releases/news-release-details/cytek-biosciences-reports-second-quarter-2026-financial-results.

[redacted]

### *iii. Installed-Base and aftermarket effects.*

70. Because Cytek has systems already in the field, a move away from the accused architecture could affect future upgrade sales, replacement components, service obligations, and compatibility across the product portfolio. Those consequences may make a transition more costly than simply redesigning future instruments.

71. Taken together, these considerations indicate that Cytek is more economically and commercially locked into the patented WDM-APD architecture today than it was at the time of the original hypothetical negotiation. Although a shorter remaining patent term might, viewed in isolation, temper upward pressure on the royalty rate, it also reduces the potential economic benefits and possibility of a design-around. This is particularly significant given that, in the more than seven years since the original hypothetical negotiation, Cytek has neither developed (or attempted to develop) nor identified a viable non-infringing alternative. Nor has Cytek identified any comparable alternatives, let alone nonproprietary alternatives to the patented WDM-APD architecture, that have emerged since 2019.

72. These circumstances further reinforce the commercial value of the patented WDM-APD architecture. More than a decade after its commercial introduction in Beckman Coulter's CytoFLEX platform, neither Cytek nor any other market participant appears to have developed an optical design that offers comparable or superior advantages, including performance, cost, and small footprint, to the patented WDM-APD architecture as used in Cytek's and Beckman Coulter's platforms.

73. The continued absence of a viable alternative strengthens the inference that a design-around is neither economically attractive nor commercially realistic, thereby placing additional upward pressure on the royalty rate in a later hypothetical negotiation. Cytek argued that in 2019, it had a longer runway to develop and implement a successful design-around,

[redacted]

potentially allowing it to avoid paying royalties for a portion of the patent term.[113] Today, Cytek has roughly half that time remaining and has invested substantially more in its continued use of the patented technology. The shorter runway and greater entrenchment both reduce the economic value of a design-around to Cytek and make any threat to pursue one less credible in a hypothetical negotiation. These considerations would tend to place upward pressure on the royalty rate in a September 2026 hypothetical negotiation.

**d. Factor 8: The Established Profitability of the Product Made Under the Patent, its Commercial Success, and its Current Popularity; and Factor 11: The Extent to Which the Infringer Has Made Use of the Invention and any Evidence Probative of the Value of That Use**

74. In my Opening Report, I concluded that Factor 8 had an upward influence. From April 19, 2019 through September 30, 2025, Cytek earned approximately $674.1 million in revenue on the accused products at a standard margin of approximately 81.9%.[114] I concluded that Factor 11 was neutral because the royalty base already accounted for the extent of Cytek's use.

75. Cytek's commercial success with the patented technology has continued to grow. Cytek's weighted-average revenue per U.S. analyzer has increased from $252,341 for the December 2022 to September 30, 2025 period presented to the jury to $296,435 over the past year—an increase of approximately 17.5%.[115] Revenue per patented WDM-APD module (calculated as total system revenue divided by the total number of WDM-APD modules) has increased by 11.2%.[116] Adjusting the $10,500 royalty upward by this 11.2% increase suggests an

---

[113] Cytek's First Supplemental Response to Interrogatory No. 10 (10/22/2025), at p. 55 ("The relatively long license term may put downward pressure on the reasonable royalty rate, as a longer term provides greater incentive to a licensee to design around the patented technology.").

[114] Riley Opening Report, ¶¶ 625–626, 635, Exhibits 22.1, 22.6, and 22.8.

[115] Exhibit 6.0.

[116] Exhibit 6.0.

[redacted]

additional $1,176 in royalties per module, resulting in an adjusted royalty of $11,676 per module.[117]

76. The Aurora Evo, which had sold only 40 units when the trial record closed, has since sold 126 units.[118] Cytek has also announced Borealis, its highest-priced system to date, which is built on seven WDM-APD modules.[119]

77. I recognize that a per-module royalty already scales with the number of modules Cytek sells, so additional volume alone would not justify a higher per-module rate. The changes here are different in kind. Cytek has chosen to build its newest and highest-priced platform around the patented WDM-APD architecture, including a platform that uses more modules per instrument than any product at issue at trial.[120] Indeed, the latest generation of Cytek's flagship product increases its use of patented WDM-APD architecture by 40% (7 modules from 5) over its previous highest-capability system, the Aurora Evo 67, enabling more robust detection capabilities within the same compact footprint. This deepening reliance on the patented technology, and the increasing commercial value Cytek derives from it, supports a higher per-module royalty than the rate negotiated in 2019. Factors 8 and 11 therefore have an upward influence in the Post-Judgment Negotiation.

#### e. Other Considerations at the Post-Judgment Negotiation

78. The $10,500 royalty is a fixed dollar amount per module, negotiated as of June 2019. A percentage-of-revenue royalty adjusts automatically as prices rise; a fixed per-unit royalty does not, and it loses real value as the general price level rises.[121] Parties negotiating a per-

---

[117] Exhibit 6.0.

[118] CYTEK_0001006008.

[119] https://investors.cytekbio.com/news-releases/news-release-details/cytek-biosciences-unveil-next-generation-spectral-flow-cytometry; Discussion with Matthew Goff.

[120] CYTEK_0000021008 at CYTEK_0000021008–CYTEK_0000021010; CYTEK_0000713633 at CYTEK_0000713642; https://cytek-web.s3.us-east-1.amazonaws.com/cytekbio.com/documentation-center/technical-specifications/borealis/N9-20178%2BRev.%2BA_Technical%2BSpecifications%2C%2BBorealis_Digital.pdf.

[121] Reilly, Robert F., and Robert P. Schweihs, *Valuing Intangible Assets* (1999), p. 194.

[redacted]

unit royalty in September 2026 would therefore account for inflation since the original negotiation, particularly for a license running through 2033.

79. The Producer Price Index ("PPI"), which measures the average change over time in the selling prices received by producers, for Analytical Laboratory Instrument Manufacturing increased by approximately 27.84% between April 2019 and August 2026, the latest available reporting period.[122] Adjusting the $10,500 per-module royalty to account for this increase yields approximately $13,423 per module in 2026 dollars.[123] Moreover, assuming industry-specific inflation continues at the same annual rate of approximately 3.41%, a fixed $10,500 per-module royalty as of September 30, 2025, would have a real economic value of only approximately $8,123 in September 2025 dollars by May 30, 2033, representing a 22.64% reduction in purchasing power over that period.[124] Assuming sales are distributed evenly between September 30, 2025, and May 30, 2033, and industry-specific inflation continues at the historical compound annual rate of approximately 3.41%, the weighted-average decline in the real economic value of the $10,500 per-module royalty would be approximately 11.81%. Thus, even assuming the Court adopts the proposed $12,750 per-module royalty rate, continued industry-specific inflation at the historical annual rate of approximately 3.41% would reduce its real economic value to approximately $9,863 per module by May 30, 2033. Assuming an even distribution of module sales between September 30, 2025, and May 30, 2033, the royalty would have a weighted-average real economic value of only approximately $11,245 per module, representing an average reduction in purchasing power

---

[122] U.S. Bureau of Labor Statistics, Producer Price Index by Industry: Analytical Laboratory Instrument Manufacturing (Series PCU334516334516), available at https://fred.stlouisfed.org/series/PCU334516334516 (April 2019 index: 159.300; August 2026 index: 203.642). Percentage increase calculated as (203.642 ÷ 159.300 − 1) × 100 ≈ 27.84%.

[123] [$10,500 × (203.642 ÷ 159.300) ≈ $13,423 per module].

[124] The compound annual inflation rate is calculated as [(203.642 ÷ 159.300)^(12/88) − 1 ≈ 3.4054%]. Applying that rate over the 92 months between September 30, 2025, and May 30, 2033, yields [$10,500 ÷ (1.0340544)^(92/12) ≈ $8,123 per module in September 2025 dollars, representing a decline in purchasing power of approximately 22.64%.

[redacted]

of approximately 11.81% over that period.[125] Thus, adopting a $12,750 per-module royalty rate now would effectively lock in a weighted-average real economic value of approximately $11,245 per module through patent expiration. Thus, absent an inflation adjustment, the real economic value of the jury's per-module royalty would decline substantially over the remaining period.

#### f. *Georgia-Pacific* Factors That Have Not Materially Changed

80. As detailed in the table below, the remaining *Georgia-Pacific* factors have not materially changed since the June 2019 negotiation, and my conclusions on them still stand. None of them support a royalty rate lower than the one the jury adopted.

***Georgia-Pacific* Factor 1: The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.**

| June 2019 Conclusion | Post-Judgment Assessment |
|---|---|
| Neutral[126] | Beckman Coulter still has not licensed the '582 Patent.[127] Accordingly, this factor has not changed. |

[125] All amounts are expressed in September 2025 dollars, using the historical compound annual inflation rate of approximately 3.4054%; May 30, 2033: $12,750 ÷ (1.0340544)^(92/12) ≈ $9,863; Sales-weighted average: Approximately $11,245 per module, assuming uniform sales throughout the period; Average erosion: Approximately $1,505 per module, or 11.81%; These calculations assume the $12,750 royalty is valued as of September 30, 2025, and that the historical inflation rate persists through May 30, 2033; September 30, 2025, is used as the starting point for the inflation analysis because it marks the beginning of the period of sales not presented to the jury, during which inflation would progressively erode the real economic value of the $10,500 per-module royalty rate established in 2019.

[126] Riley Opening Report, ¶ 579.

[127] October 2, 2026 Discussion with Matthew Goff.

[redacted]

***Georgia-Pacific*** **Factor 2: The rates paid by the licensee for the use of other patents comparable to the patent in suit.**

| June 2019 Conclusion | Post-Judgment Assessment |
| --- | --- |
| Neutral[128] | I am not aware of any new Cytek license to comparable patents.[129] Accordingly, this factor has not changed. |

***Georgia-Pacific Factor 3*****: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.**

| June 2019 Conclusion | Post-Judgment Assessment |
| --- | --- |
| Neutral[130] | The license would be non-exclusive under the ’582 Patent. The royalty base is still the WDM-APD module, the smallest patent-practicing unit for the ’582 claims.[131] Accordingly, my conclusions under this factor have not changed. |

***Georgia-Pacific Factor 4*****: The licensor’s established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**

| June 2019 Conclusion | Post-Judgment Assessment |
| --- | --- |
| Upward[132] | Beckman Coulter has not licensed the patents-in-suit to competitors.[133] Any ongoing royalty would effectively constitute a compulsory license following Beckman Coulter’s enforcement of the patent through trial and judgment. My conclusion under this factor therefore remains unchanged.[134] |

---

[128] Riley Opening Report, ¶ 580.

[129] To the extent Cytek produces any such license that it contends is comparable to a license to the ’582 Patent, I reserve the right to respond.

[130] Riley Opening Report, ¶¶ 581–583.

[131] Riley Opening Report, ¶¶ 397–398, 409–410.

[132] Riley Opening Report, ¶¶ 584–585.

[133] October 2, 2026 Discussion with Matthew Goff.

[134] If anything, this factor may weigh further in Beckman Coulter’s favor, as the ongoing royalty is the result of a compulsory license being granted that is contrary to Beckman Coulter’s policy. Nevertheless, my conclusion here does not make an upward adjustment based on this consideration.

[redacted]

***Georgia-Pacific* Factor 9: The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.**

***Georgia-Pacific* Factor 10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.**

| June 2019 Conclusion | Post-Judgment Assessment |
|---|---|
| Strong upward[135] | No new optical detection architectures have emerged that would change the advantages of the patented WDM-APD architecture over other designs, such as PMT-based designs.[136] Accordingly, my conclusions under this factor have not changed. |

***Georgia-Pacific* Factor 12: The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.**

| June 2019 Conclusion | Post-Judgment Assessment |
|---|---|
| Neutral[137] | My conclusions under this factor have not changed. |

***Georgia-Pacific* Factor 13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.**

| June 2019 Conclusion | Post-Judgment Assessment |
|---|---|
| Neutral[138] | My prior apportionment, which included removing the value of spectral unmixing, fluidics, software, and lasers, is unaffected by post-trial events. Accordingly, my conclusions under this factor have not changed. |

135 Riley Opening Report, ¶¶ 627–631.
136 October 2, 2026 Discussion with Matthew Goff.
137 Riley Opening Report, ¶ 636.
138 Riley Opening Report, ¶¶ 637–642.

[redacted]

***Georgia-Pacific* Factor 14: The opinion testimony of qualified experts.**

| June 2019 Conclusion | Post-Judgment Assessment |
| --- | --- |
| Neutral[139] | The jury accepted Beckman Coulter's technical experts' infringement and validity opinions as to claim 3 of the '582 Patent. In accepting the royalty rate I presented at trial, *supra* Section III, the jury also accepted my analysis, which relied in part on the discussions I had with Beckman Coulter's technical experts. Accordingly, my conclusions under this factor have not changed. |

81. Further, in connection with this Declaration, my team spoke with Matthew Goff, Beckman Coulter's Senior Manager, Product Management for Flow Cytometry Hardware, about whether the information and assumptions I previously relied on for my lost profits and reasonable royalty analyses have materially changed.[140] Mr. Goff provided the following information, which confirms that the information and assumptions I previously relied on for my analysis remain applicable:

- Compact form factor remains an important product and purchasing consideration for flow cytometers.[141]
- PMT-based collection and detection architectures continue to lack the configuration, manufacturing, and incremental-upgrade flexibility offered by the WDM-APD architecture.[142]

[139] Riley Opening Report, ¶ 643.
[140] October 2, 2026 Discussion with Matthew Goff.
[141] Riley Opening Report, ¶ 72 & n.206
[142] Riley Opening Report, ¶ 237 & n.574.

[redacted]

- Since the Riley Prior Reports, no new products or alternative detection architectures have been introduced into the market in the U.S. or internationally that would materially affect this analysis.[143]

- The relative market positions and market shares of the principal market participants also have not materially changed.[144]

- The product characteristics and market positioning of the third-party flow cytometers discussed in the Riley Prior Reports, including their pricing, features, performance characteristics, available add-ons and upgrades, service and configuration options, remain materially unchanged. Accordingly, my conclusions regarding acceptable substitutes and the reconstructed but-for market do not change.[145]

- Beckman Coulter continues to possess the manufacturing, sales, and marketing capacity to support the additional sales of Embodying Products with at most de minimis expenses beyond the product-specific material costs reflected in Beckman Coulter's standard margins.[146]

- Beckman Coulter had already established the manufacturing lines, sales coverage, and marketing activities necessary to make the additional sales of its Embodying Products. As before, those additional sales would have required, at most, de minimis additional expenses beyond the product-specific material costs reflected in Beckman Coulter's standard margins.[147] While Beckman Coulter forgoes a future lost profits award by seeking an ongoing royalty, it continues to have capacity to make the sales at the same margins as before.

---

[143] October 2, 2026 Discussion with Matthew Goff.
[144] October 2, 2026 Discussion with Matthew Goff.
[145] Riley Opening Report, ¶¶ 326–348, 524–529; Riley Opening Report Exhibit 49.
[146] Riley Opening Report, ¶¶ 384–385 & nn.845–846.
[147] Riley Opening Report, ¶ 175.

[redacted]

- Beckman Coulter's commission arrangements continue to be based principally on the responsibilities and efforts associated with the sales role and expected win rates, rather than being a purely per-unit expense that necessarily increased with every additional sale.[148]
- Mr. Goff further confirmed that established flow-cytometry manufacturers continue to target instrument contribution margins of at least 60% and that CytoFLEX contribution margins continue to be achieved at approximately 70% and above.[149]

### C. Conclusion (Factor 15): The Parties Would Agree to $12,750 per WDM-APD Module

82. Taking these considerations together, the parties to the Post-Judgment Negotiation would agree to a royalty higher than the $10,500 per WDM-APD module royalty rate awarded by the jury. Factors 5, 6, 7, 8, and 11 have each moved further in Beckman Coulter's favor; inflation has eroded the real value of the 2019 rate; and no factor has moved in Cytek's favor. In my opinion, the parties would agree to an ongoing royalty of $12,750 per infringing WDM-APD module for infringing modules made, used, sold, offered for sale, or imported in the United States from September 16, 2026 through May 30, 2033.[150]

83. A royalty of $12,750 per module would still leave Cytek a substantial share of the profit it earns on accused instruments. For example, at Cytek's post-trial average selling price ($365,907), the royalty on a five-module Aurora would be $63,750 (5 WDM-APD modules multiplied by $12,750), and Cytek would retain the remaining $302,157. [151] In addition, the

---

[148] Riley Opening Report, ¶ 176 & n.478.
[149] Riley Opening Report, ¶ 177.
[150] Calculated as [($12,750 - $10,500) / $10,500 = 21.4%].
[151] See CYTEK_0000990471, tab "Revenue Detail '19 - '25" and CYTEK_0001006008, tab "Revenue Detail '19-'25." From October 1, 2025, through August 31, 2026, U.S. sales of 83 Aurora 67 and Aurora Evo 67 (5-laser) systems generated total revenue of $30,370,248, comprising 18 Aurora 67 systems ($5,631,731) and 65 Aurora

[redacted]

value indicators I presented at trial ranged up to $26,342 per module before value sharing, and my incremental-profit indicator understates the full economic value of the patented technology to Cytek.[152]

Michele M. Riley
October 13, 2026

Evo 67 systems ($24,738,517). The average revenue per system was $365,907 ($30,370,248 ÷ 83). The proposed royalty of $63,750 per system leaves Cytek with approximately $302,157 in revenue per system ($365,907 − $63,750), plus all associated service revenue and other ancillary revenues.

[152] Riley Opening Report, ¶¶ 501–502, Table 47, ¶ 518.